*Sankaranarayanan v. Sashidhar* - 2:24-cv-01745-RAJ

**REBUTTAL EXPERT REPORT OF DR. PETER FAVARO**

PS001636

**Peter J. Favaro, Ph.D.**
**Child and Forensic Psychologist**
The Center for Improved Human Relationships, LLC
617 Port Washington Blvd
Port Washington NY 11050 516.883.5747

**Expert Psychological Report**

**Identifying Information:**
UNITED STATES DISTRICT COURT WESTERN DISTRICT OF WASHINGTON AT SEATTLE
Case No. 2:24-cv-01745
Honorable Richard A. Jones

<u>**Expert Qualifications:**</u>

I am a psychologist licensed in the state of New York (lic. 8168). I have been in private practice since 1986. My area of expertise is psychology within court related matters. Since 1986 I have been privately hired or court appointed to thousands of cases to provide evaluation and expert opinion in cases involving domestic violence, custody disputes and child abuse, as well as to provide court-related services such as supervised visitation, family mediation, anger management, family therapy, civility training and parenting coordination. I have also been appointed and/or hired on cases involving the 1980 Hague Child Abduction Convention.

I am the author of more than a dozen books, including a child development textbook and consumer titles on parenting, co-parenting, civility and anger management.  I have also published in peer reviewed journals and venues, although the majority of my publications are in the consumer press.

As Founder and Executive Director of The Center for Improved Human Relationships, LLC, I create and administer programs that teach high conflict parents civility training. I also run programs which seek to reconcile parents and children who become estranged through the process of divorce.

I have been qualified as a psychology expert in the Eastern and Southern District Federal courts in New York and in jurisdictions outside the State of New York in Hague Convention matters in California, Texas, Vermont and in Connecticut, both as a court appointed neutral and as an independent expert. On three different occasions I have been qualified as an expert in Article 13b of the Hague Convention.

A  list of Hague Convention matters I have testified in and have been qualified as an expert in are as follows:

<u>Case Name</u>                                        <u>County</u>

PS001637[1]

| | |
|---|---|
| Adamis v Lampropoulou | Eastern District New York |
| Dacres v McGowan | District Court District of Connecticut |
| Cruvinel v Cruvinel | Eastern District New York |
| Hernandez v Martin | Southern District New York |
| Hulsh v Hulsh | Northern District of Illinois, Eastern Division |
| Jacquety v Tena Baptista | Eastern District New York |
| Keen v Bowley | Central District California |
| Poretti v Baez | Eastern District New York |
| Saada v Golan | Eastern District New York |
| Shah v Federbush | Eastern District New York |
| Smythe v Blatt | Eastern District New York] |
| Moreau v White | Eastern District of Texas Sherman Division |

I have been appointed as a custody evaluator in divorce cases in the following jurisdictions: Nassau, Suffolk, New York, Brooklyn, Queens, Bronx, Richmond, Westchester and Rockland on thousands of occasions. I have been qualified as an expert in child psychology, divorce and custody, sex abuse, parental alienation, intimate partner violence and domestic violence, substance abuse and also as an expert in the methodology underlying court related mental health evaluations. As recently as July 2024, in the County of Westchester, at The Judicial Training Institute, I lectured the matrimonial bar and members of the Second Department Appellate Court, on aspects of methodology and best practices in custody evaluations.

I evaluate domestic violence as a routine task for court assigned and neutral expert cases. In December of 2023 I sat for a 40 hour domestic violence training as part of my ongoing responsibility to the 18B Mental Health Panel in the First and Second Appellate Department in New York State. Because domestic violence can place the lives of victims at risk all evaluations should be "domestic violence informed." I consider the impact of domestic violence regardless of jurisdiction.

I was asked by the chief judge in Suffolk County to consult on a panel regarding the creation of The Integrated Domestic Violence Court in 2004.

## ORIENTING PRINCIPLES:

Ethics surrounding psychology in court settings require caveats which help the lay reader understand strengths and weaknesses of data interpretation.

The practice of psychology in legal settings is influenced by the imperfect nature of the data gathering as well as imperfections in the data itself. So as not to mislead either the fact finder or lay reader and in acknowledgment of the ethical principle for the practice of forensic psychology I utilize caveats whenever possible so as not to overstate or purvey inappropriate influence. As such the reader will observe caveats in various portions of this report to appropriately frame the opinions contained herein.

### Notes and Caveats About The Methodology Used in this Evaluation:

Psychological data gathering is subject to what scientists commonly call "confounds." Confounds are imperfections in the data that introduce error into the conclusions drawn about the data. The American Psychological Association in its discussion of ethical principles surrounding custody evaluation, contained within the December 2010 issue of American Psychologist (pp 863-867), revised in 2013, points up the importance of multiple methods of data gathering, as a means of addressing the imperfections of psychological data gathering. Consistent with this concern is an explanation of how data is imperfect and might interfere with conclusion formation, especially if all methods of data collection are on some level fundamentally flawed. The following caveats describe the advantages and disadvantages in the type of data collected in this study and are emphasized in various portions of this report:

### Self Report

Self report is often the most frequently utilized measure in evaluating individuals in court settings. This type of data gathering is often divided into "asking questions and talking to people," or data gathering through responses to written questions or structured questionnaires. Both methods can suffer from confounds related to a person's motivation to report information accurately. In legal settings, where litigants have a competitive motivation to acquire relief such as custody or access to their children, the tendency is to present in a favorable and virtuous light. I could not make comparisons regarding this vis a vis the parent's self report because mother chose not to participate in this study.  The hypotheses I make and consider throughout the data collection is that any party will emphasize their strengths and minimize their weaknesses; and in addition, they will often emphasize their adversary's weaknesses and minimize their strengths.

When choosing between collecting self report orally through face to face interview or in written form I utilize both, but will often emphasize written responding. In the current matter I used both techniques. There was little emphasis on standardized tests. This was due to the age of the child, and the paucity of measures that stand up to methodological rigor in legal settings as opposed to clinical settings. Nevertheless I followed APA guidelines regarding using multiple methods of data gathering to inform my opinions.

Written data gives individuals a greater chance to think about the information they provide without the pressure of responding "on the spot." Questionnaire data also memorializes a record of exactly what was asked and how the examined party answered.

Written data is less subject to inaccuracies in data description. Transcribing notes gathered through face to face oral interview is tedious, error prone and does not make for good practical review if it is to be used as evidence at trial. The questionnaire items are available for the other professionals involved in the case to examine and make inferences from, and to compare to issues of fact in the case.

## Collateral Documents and Credibility Assessments:

I do not review collateral documents for the truth of their contents. Collateral information is not always relevant, may suffer from chain of custody issues, or might not reflect information that is as psychologically relevant as the providing party might believe it is. Evidence adduced at trial is ultimately determined relevant by the finder of fact and it is beyond the scope of my role to assign weight or meaning to documents provided by the parties. I provide analyses of collateral documents for descriptive purposes; and avoid making comparative judgements about the parties based on the documents. I avoid relying on motion papers as sources of information. The reasons for this are that motion papers are self serving, not the work product of the parties studied and not sources of information that might not accurately reflect mental health or parenting capacity. I rely on past findings of fact as important and might factor in certain exhibits if they reflect violent or criminal history, or mental health history such as treatment or hospitalization.

I do not offer credibility opinions for two reasons: First, credibility is the sole purview of the trier of fact. Second, mental health experts are not trained in the assessment of credibility and the research on credibility assessment shows that mental health experts are not very good at it even when trained. That is likely because much of the factual data in cases is "he said/she said" data and almost always outside the purview of an evaluator.

## Opinions about Parties Not Directly Evaluated:

Mother would not consent to being evaluated but did permit me to do interviewing of the child; She did not permit me to gather self report information through structured questionnaires or checklists. This placed a limitation on my methodology. However, it is my opinion that I did gather enough information to provide assistance to the trier of fact. In addition I hade incidental contact with the mother, which though brief was important and is described in the sections below.

## Prior Findings:

I do take into account prior findings of fact, especially when they address issues of domestic violence.

I have not been provided with any findings of fact. I do note there is a protective order in place against the father which was not the result of a fact finding.

## Recording of the Child:

After my first talk with the child, mother requested that my next interviews be recorded. Recording child interviews provides potential advantages to the evidence gathering process. However, if it is not done properly it can adversely impact the child's well being. To prevent that, it must be done with safeguards in mind. I advised the mother of this.

Recording a child interview is a much more difficult task than it might appear on the surface. Sound quality is almost never good, making the result difficult to transcribe. When I record sexual abuse interviews (which I believe must be recorded), for instance, I use professional field recording equipment and I do it in a very discreet way. Using a cell phone or tablet device is usually of insufficient quality.

APA guidelines advise that you must tell a child they are being recorded. That adds a confound to the process and places a limitation on the methodology in and of itself. Mother told the child he would be recorded before the second interview. This infers that mother had a conversation with the child about what we spoke about in the first interview. That adds a confound to the process and signals the presence of undue influence. Further, the child was under the impression that the reason mother wanted the interviews recorded was because she wanted to make certain of what was being spoken about to make sure things were actually said. I don't blame her for trying to think strategically; and I understand her motivation, but I do find fault with her putting her child in the middle of her mistrust and suspicion. Observing this behavior in mother raises concerns about her placing the child under undue influence in her interactions surrounding the father.

Mother was so mistrustful of the interview process that she wanted to control several aspects of it. I told her I would be happy to record for her. Her attorney had asked if the interviews were being recorded as well. I said, through counsel I would if it was requested, but I did not say that mother could control the parameters or tell me at the last minute. She insisted the child record me on his iPad, thus giving him a responsibility that is completely inappropriate for a child. She even followed me into the interviewing room and set an iPad down and began recording. I tried to distract the child as best I could.

Prior to entering the interviewing room, I had tried to explain to the mother that recording must be done in a sensitive and unobtrusive way but she did insist on controlling the process.

The state of Washington is a two party consent for recording state. I did not know whether a parent can consent for another person to record their child but I will leave that up to the attorneys. Suffice it to say that I did consent and was happy to but I consented under the demands made by the mother.

On balance I consider mother to have placed unnecessary limitations on the data; and I also believe she placed her own needs above the needs of her child. Solutions existed that could have given mother what she requested but taken the child out of the middle of it.

## INFERENCES, OBSERVATIONS AND CONCLUSIONS:

The APA guidelines for forensic practice (2013) emphasize the importance of distinguishing inferences, observations and conclusions:

Guideline 11.02: Differentiating Observations, Inferences, and Conclusions. In their communications, forensic practitioners strive to distinguish observations, inferences, and conclusions. Forensic practitioners are encouraged to explain the relationship between their expert opinions and the legal issues and facts of the case at hand.

For clarity to the lay reader "inference" is an interpretation. An interpretation uses psychological knowledge to ascribe meaning to a data point. Inferences can be connected to norms, empirical literature, and speculation, the latter of which I must be done cautiously and with caveats which acknowledge potential ambiguity and alternative hypotheses. I have included caveats throughout the report.

 An "observation" is behavior that is directly observed and recorded and inferences are then drawn on the basis of the observation. Inferences related to psychological constructs are explained in the body of this report.  A "conclusion" is a statement made on the basis of more than one type of data or method. The standard in psychological evaluation is the degree of certainty that accompanies the conclusion.


**Additional Caveats:**

I do not take the self report of litigants for the truth of their contents. The content matter of the narratives of the parties is examined for credibility at the time of trial by the trier of facts. My use of the narratives and the representations contained herein is to gain understanding of how self report affects their psychology and family dynamics (such as how elements of their reported histories impacts the children if they are found to be credible at trial.)

In this report the reader will see "if/thens" regarding allegations made by parties examined or not directly examined. They come in the form of "If" the trier of fact deems a representation to be true "then" from a psychological perspective it is important (with the reason why it is important).

I intend to make the limitations of my methodology known as they relate to my opinions.

**Present Study:**

180 minutes three interviews/observations with the child: (December 17th, 18th and 19th 2024)
185 minutes of interviews with the father
December 12, 2024 (70 minutes)
December 17, 2024 (60 minutes+)
December 18, 2024 (35 minutes)
December 19, 2024 (20 minutes)
Information gathering through structured questionnaires (father only, mother declined)
Review of reports of Dr. Poppleton and Dr. Day
Child Behavior Checklist (father only, mother declined)
Review of school records
Family Drawing

This data was assigned different weights, the greatest of which was my interviews with the child.

**Prasanna (Father DOB 8/27/1987)**

**NOTE:** These interviews were collateral to the interviews of the child. Evaluating the father is outside the scope of my role so I do not offer any opinions of his mental health. Behavioral observations of him are purely descriptive.

Parent interviews are usually supplemented by observations of the parent and child interacting together. Since father was unable to see the child because of a protective order, (and somewhat hampered by father living in Singapore) the evaluation parameters which I prefer did not occur. This observation would have helped me understand the parent - child relationship.

Father was articulate and very familiar with the details of his case. Father runs a crypto startup, and works four hour days. He spends a lot of time with his son playing games, helping with homework and practicing soccer. Father avers that he does outdoor activities with his son exclusively because mother has lupus and is sensitive to the sun.

Father appeared younger than his stated age of 37. He was soft spoken. His mood was mostly neutral and tranquil. He also had periods where he was teary and worried. His affect was consistent with the topic matter of what he was speaking about. Father displayed no symptoms of behavioral dysregulation or emotional instability; and no indications of hatred or disdain for the children's mother. He wants "A" to have a relationship with his mother but worries that mother's challenges with mental health prevent her from seeing it in the same way. That is, mother does not want "A" to have a relationship with him.

Father believes that mother's motivation is purely financial; and father believes that even offering her a general settlement is not enough – she wants more. Father denies any act of domestic violence but admits that there was loud fighting but not in front of the child.  (Note: The child acknowledged this in my interviews with him). Father admits that he should learn to be more patient with his son, but never uses any harsh discipline.

Father reports that the child is being influenced to believe that father does not want to see him. He reports that the child has said "that the child wants an equal relationship with both parents."

Father reports that his telephone calls are truncated by mother; and that the mother will not allow the child to pick up the phone, instead she sends him voicemail in lieu of a conversation (the child acknowledges directly that mother does not want him to speak with him). The current protective order does not allow the child to see him.

Father believes that if he paid the mother enough money she would resolve the case.

Father loves his child and says he is heartbroken over not seeing him.

I had a discussion with the father about pinching. He readily admits that he sometimes pinched "A", not hard and never leaves a mark. I helped him understand that in US culture this is seen as improper parenting. This was a completely novel concept to him. He was not defensive at all

about the topic. I discuss cultural norms and beliefs about child rearing practices in the conclusion section of this report.

**Child "A"  (age 8 years, ten months)**

Demeanor and Behavioral Observations Across Interviews

This eight year old child was a delight to talk and play with. He is a handsome young man of average stature who was easy to build rapport with and get to know. He was a bit shy at first but warmed up easily. He was not sure why he was coming to see me but knew it was "something about his dad," He made it clear to me that video game playing is his passion and was very surprised to learn that I am a very well known video game designer and programmer (at least I was some years ago). Video gaming is his favorite thing to do and so as we talked we played video games using a handheld gaming device that he brought and that I brought too (second and third sessions). We did not play any games the first session and I required him to ask his mother if we could play, which he did and which mother consented to. I got feedback from the mother that "A" liked me very much after the first session and that he "wanted to be kind" to me; and as such on the second interview he brought me a juice box and snacks which I thanked him for but said I could only eat a little because I have blood sugar issues. He instructed me on how I could best use the juice box so that I wouldn't spill the contents. I believe I established an excellent rapport with him and I am grateful for the mother's consent to have me speak with him, despite the concern and suspicion and interference she showed (see above).

Session one:

My questions were pre-planned. I had the questions written on a small pad which I kept on my lap. As "A" spoke I filled in the spaces on the pad. This is called a structured interview and I believe it is one of the best ways possible to memorialize interview data in a non intrusive way.

"A" started off shy but warmed up quickly. He commented that we were in a big (conference) room. He appeared to be impressed with that. I asked him if he knew why we were here. He was not sure but he thought it had something to do with his dad. He lives in a home that he considered small compared to his home in Singapore. He shares his room in his US home with his mother and his grandmother, sometimes in the same bed but there is a second bed in his room as well. Throughout all of the interviews he emphasizes that he is "bored," when he refers to his home life. He used the word "bored" or "boring" repeatedly throughout the interviews. He said that he is bored in the US and bored in Singapore too. Despite being bored he likes his US friends but has plenty of friends in Singapore too.

I started off by asking "A" if he knows the difference between the truth and a lie. He commented that "the truth is the truth and a lie is something that you tell to get something." This is an age appropriate definition but does not necessarily represent any greater than average maturity. As children get older they usually add that there is a consequence to telling a lie and that the truth is tied to being moral. So, in this sense he does not show any extraordinary maturity. His answer was concrete and it seems like he is at the beginning stages of social maturation.

During this interview he referred to his dad as a "liar." When asked what he lied about he said that his father put video cameras in the house. I acknowledged that this is not an appropriate thing to do but I wanted to know how it was a lie. He continued by telling me he saw the cameras, even in the bathroom. If this is true and the cameras were turned on this is very inappropriate. However, in terms of reasoning. "A" is conflating doing something inappropriate with lying. Both are bad but they are different. This is also an indication of immature reasoning. The exception to this would be if the mother spoke to him about it (which "A" denies) or if he confronted his dad about it and his dad lied. (Father says this did not happen).

"A" acknowledges he sometimes lies (mostly about video game playing). He sneaks in time, which is normal. Mother and father operate his video game play on what is called a "token economy." This represents excellent parenting by BOTH parents. "A" earns video game time and will also get "docked" if he does something that his parents do not like. For instance if he says he is bored his mother will take fifteen minutes of time away.

"A" likes to bring the topic back to video games whenever he can. It is his "safe space/topic." He spontaneously thanked me by saying it is nice to have someone to talk to about "things" and video games.

We discussed his feelings toward his father. First he said he "liked" his father and then, unprompted he said he "loves" his father, then unprompted he said he loves his father "very much" and said (unprompted) that he really wants to see him. In a later interview he went back to saying he "likes" his father.

"A" talks about listening to his parents argue. He was not in the same room but he tried to listen to them. He didn't really hear what they were saying, He never saw his father push or shove his mother but refers to what went on as "violence." [He clarified this in Interview #2]. He talks about his mother being upset. At one point his father had his bags packed and said he was leaving to go out of town but "A" did not know why. Dad said he would come back and "A" believed he could have come back. Father says he could not come back because of the protective order but he knows "A" believed he could have come back but did not want to. If mother reinforced this belief it would represent undue influence.

"A" says he knows what a protective order is. He brought up the word after initially not remembering it. He says he "knows all about it," saying "Mom told me everything." This is an example of undue influence and it is something that I opine on with a high degree of certainty.

I asked "A" about telephone time and whether or not his mom wants him to talk to his dad. He said no emphatically, then added "but I want to (unprompted). This is an example of undue influence.

Again on the topic of video games - he likes Minecraft and Roblox. Nothing violent. He knows that video game addiction is and he playfully says "I have it!" Since there is structure around his screen time I do not think he is addicted to screen time. He is merely being playful and showing a playful rapport with me. He likes science and math too.

I ask him to tell me what mom does for a living. His response was "sends email and talks on the phone." This is an age appropriate observation but does not indicate a mature mind.

"A" knows a little about the US. He doesn't know what the coasts are. He doesn't know who the president is — he says it's Donald Trump. I said, "not yet," and then he remembered "Joseph something"; and I congratulate him for knowing that.

On the issue of resisting going back to Singapore, "A" tells me he's fine going back to Singapore and does not mind going back as long as his mom and dad live in different houses and he visits both. He didn't like the yelling and "the violence." This was followed up in Interview 2.

He once again discloses that he wants to talk to his father on the phone and misses him and wants to see him.

We talked about feelings again and about the movie "Inside Out," which I believe has done a great job of teaching kids about their feelings. I asked how his mother feels and he reported "angry" and "frustrated." Asked about dad and he first said "anxiety" and then said "I don't know." We talked more about feelings and debated playfully about ennui.

We finished up by disagreeing that ennui is more helplessness and despair (more like "the blahs" versus "A"'s belief that it meant "boring.")

The session ended with "A" being excited to play video games next time and looking very happy.

Session 2:
Mother and I began Session 2, engaging in a conversation about recording (see above) which ended in her coming into the interview conference room and placing the child's iPad with a recording app on the table. I would have not placed it there because it did not seem to be in a good position for recording. I hope mother was not recording me and her talking because she did not ask for consent for that. It would have been okay if she had asked, however. Mother had already objected to telling her side of the story which I would have appreciated, as it would have given me context about domestic violence allegations and also would have given me information about what I could have followed up on with the child.

"A" and I began by talking about video games for a moment and while we were setting up I asked if mom told him anything about recording me. He started by saying "She wanted to make sure…" and then stalled but the gist of what he was reporting was that mom wanted to make sure I was accurately reporting. He didn't know he was recording (in contrast to what mother said) but didn't seem to care when he surreptitiously discovered his iPad was on and recording. He did repeatedly look over to the iPad when we were just talking and not playing video games.

We started this session by doing a family drawing. The way I use family drawings is not by assigning any symbolic meaning to them, rather by using the drawing as an anchor around asking the child to tell me what is going on.

"A" made several self-deprecating comments about his drawing ability. I assured him that I would not judge.

The drawing was noteworthy in that all the family members were together and they were encircled by a wavy line. "A" said this was to show them as a family. I asked him to tell me how everyone was feeling. He said that everyone was "happy." I asked if there was anything going on to make them unhappy and he answered only if there was violence. This prompted me to ask him again if he ever saw violence to which he denied it (for the second time). I asked him if his mother ever talked to him about violence. He became very nervous and said yes. I asked him how many times, and at first he could not answer and then said "two or three times." If that is true this would indicate undue influence. Violence is a topic I am unsure whether "A" truly understands, when he talks about it his affect is neutral. When family violence traumatizes children their disclosures are made with affect consistent with the content they are retelling. "A"'s disclosures were made with neutral affect. My inference when all the data are considered, is that "A" has heard some yelling and has been told his father is violent and that has convinced him there was violence in his home. I will discuss the hypotheses around this later in this document.

"A" and I played a racing game. We took turns playing and "A" is super competitive. He did not want me to lose (we were playing as a team) so he would press buttons on my controller. He then gave me a lesson so that I could get better. There is no underestimating how sweet "A" is. There was a lot of laughing and giggling throughout our play. I asked him if he could tell me what he would wish for if a genie gave him 3 wishes. He didn't know what a genie is but the closest thing I could think of was "Gin," which is not such a nice figure in his culture but it was all I could think of. He got the analogy. He said "infinite wishes," which is not an uncommon response for kids.

I needed to help "A" come out of his video game playing concentration so that we could end our session. He is very attached to the games. Finally I asked "What does a dog have four of?" He said "legs?" I said "No, 'paws' Pause the game!" He smiled at that but kept playing.

After a bit more cajoling he did finally stop.

We talked about seeing each other tomorrow.

Session 3:
"A" greeted me warmly. As I walked into the consultation room, mother took the iPad and positioned it closer to "A" than it was before and adjusted it several times. My suspicion is that she did not get the audio quality she was looking for in the prior session. "A" playfully sang into the recorder.

"A" went back to using the word "like" to refer to his dad. I reminded him that he said love at some other point. I hypothesize that mother might have coached "A" because he was much more subdued about talking about his father than he was in the last two sessions.

I asked "A" how his parents act when he doesn't do what he wants. He told me that his mother usually doesn't have to do anything because he behaves with her. He offers that when his father

is disappointed in him he "hits" him. He then changed his response to "pinches." He says that his father does this often. He does not leave a mark.

Although "A" made this disclosure, he did not change his answer that going back to Singapore, as long as mother was there would not be something he would object to. He said that his mother did not tell him what to say to me.

Much of our talk happened while we were playing games. I would have to coax him to re-enter the conversation. This is often how children his age socialize. Whether this is a good or bad thing is up for debate but modern children interact with one another while fiddling with their devices.

We talked a bit about friends, playdates and sleepovers. "A" shared that he did not know his US friends well enough to have sleepovers.

"A" was better able to accept boundaries about stopping his play but tried to prolong it just a bit.

"A" and I talked about how nice it was for us to make new friends with one another. "A" said he would miss playing with me. I said I would miss him too. When I walked him outside he handed the iPad to his mother. Before we left the room "A" seemed eager to shut the iPad off as a result it did not record me telling mother what a great kid "A" is.

Collateral Documents

Questionnaires:

The questionnaires were of limited utility. They are of much better utility when both parents fill them out (mother declined participating). I did find the following responses and patterns to be reliable and consistently stated.

Acknowledgement of good co parenting principles
Denial of domestic violence
A co parenting environment that is high in conflict
Self criticism on father's part. He does not deny pinching but says he could improve by not threatening to pinch his son on the arm.
His concern about the mother being critical of the son
He was negative toward the mother in describing her character and motivation.

Family drawings

Please refer the the sections above which describe the family drawings in Session Two with "A".

The Child Behavior Checklist

This checklist is not normed for use in legal settings. It is a checklist of attributes the parent sees in the child. This would have had more utility if both parents had filled it out. This would have given me an opportunity to compare parental perceptions. Mother declined to fill this out. Father describes "A" as well adjusted and well behaved.

Report of Dr. Poppleton

Dr. Poppleton's report was a fair rendition of how coercive control adversely influences victims and children but he neglects citing alternate hypotheses although he does offer caveats. The self report of alleged domestic violence must rest on findings of fact. There are none at present so it will be up to the trial court to determine whether the mother's allegations are credible. Dr. Poppleton acknowledges this.

Dr. Poppleton did not do any psychological testing and relies on too little information to substantiate any hypothesis.

Mother's assertion that the child had no relationship with the father and the insinuation that the child is not bonded to him is controverted by my three hours of interviewing and observing the child. Dr. Poppleton did nothing to examine undue influence.

Dr. Poppleton relies on the self report of the mother to speculate on the experiences of the child.

My conclusion is that for these reasons I did not rely on Dr. Poppleton's report to any large extent in my own opinion formation.

Report of Dr. Day

The report of Dr. Day notes similar methodology concerns expressed by me. I concur with her conclusions in their entirety and note the failure of Dr. Poppleton to develop hypotheses which discuss undue influence. I did rely on Dr. Day's report to a limited extent to assess how it comports with my methodology concerns about Dr. Poppleton and my own conclusions.

School Reports

School reports from the Singapore American School from 2022 to 2024 indicate that "A" receives glowing praise in both academic acumen and social interaction. He occasionally needs to be told to get on track but otherwise his grades are all in the "S" or "3" range which are the best grades possible.

## CONCLUSIONS AND FORMULATION:

1.  The Issues of Mature Age and Undue Influence:

The concept of "mature age" is a psycho-legal construct. That is to say it is a concept meant to guide and direct the court in its decision making based on psychological data and reasoning. Mature age cannot be directly measured because a child can be "mature" in some ways and naive or adversely influenced in other ways. This is especially true in children under 12 which is generally when children develop more complex and abstract reasoning.

PS001649[3]

The term "construct" refers to an abstract concept or theoretical idea that is not directly observable but is used to explain and predict phenomena within the domain of human behavior. Constructs are integral to the field of psychology because they provide a framework for understanding complex and multifaceted human behaviors in a systematic and testable way (Furr & Bacharach, 2014). However in psycho-legal settings mature age is a legal defense, not testable via psychological testing (it is indirectly inferred); and with respect to psychological testing there are no tests developed or normed for testing mature age in a legal setting. Nor is it systematic; and not a framework because it is not subject to hypothesis testing. This is especially so in this case because hypothesis testing was made difficult  because of the mother's limited permissions.

As such, in this case, the notion of mature age is subject to presumptions and confounds that could misdirect the lay reader and confound the logic applied to the issue.  What I am saying here is that mature age is difficult to assess, except by offering behavioral examples.

By way of context, constructs (like mature age) are the building blocks of theories and research in many areas of psychology. Examples include self-esteem, intelligence and attitudes. These, like mature age, are abstract in nature and often require empirical support to make them measurable.  (Rosenberg, 1965). By defining constructs operationally, researchers can develop empirical tests to assess their validity and reliability (Cronbach & Meehl, 1955). Still there are no empirical tests to measure mature age. In this case, psychological tests for directly measuring mature age are not available. There are psychological tests which purport to measure social maturity (like the BASC or Vineland) but the utility of these measures have been sharply criticized for use in legal settings and especially so in the context of Hague Convention cases. In addition use of these measures generally requires the participation of both parents and often teachers as well. Mother's failure to consent impairs these comparisons.

Factors seen in observable behavior which auger against mature age are "A"'s ideas about "violence" in his home and how he draws those conclusions. He has not seen any violence, has heard yelling, does not know what the yelling was about and conflates violence with arguing. There might have been violence in the home but it was nothing "A"  can supply details about.

"A" loves his mother and wants to be where she is, but wanting to be with a parent is a different construct than using mature logic for "wanting to live in a place." Although he wants to live with his mother (perhaps a more important construct or metric for a custody case), he has no objection to living in Singapore. As such he is not making any choice except that he wants to live where his mother is. He will live in Singapore as long as mother and father do not live in the same house.

"A" does not state an objection to returning to Singapore although he wants it on his own terms. Mother and father cannot live together and he wishes to see them both. At my last session with him "A" does not state a preference. He clearly states he has not decided.

"A" deliberated at one point that he would like to remain in the USA because of the "violence" in Singapore.  So he is inconsistent with regard to stating a preference because at another point after he said this, he says he is still "not sure.". Regardless, he does not state an objection to returning to Singapore. However when this is examined, it is hard to acknowledge that "A" really understands what violence is because he equates it with his parents arguing, which he

acknowledges he has heard from another room through closed doors. A fact finding at trial will examine the parties credibility surrounding "grave risk." All of the professionals in this case agree that domestic violence in the home constitutes grave risk, but arguing between parents in and of itself, while concerning, does not necessarily constitute domestic violence or grave risk. Domestic violence is a finding not an opinion. It is up to the fact finder to determine it after all the evidence is weighed. "A" has never wavered about not objecting to a return to SIngapore,

"A" speaks at length about how "bored" he is. He uses the term to describe life here in the USA as well as Singapore. This indicates to me that "A" is under stimulated in general and is also an indication that he is not of mature age. Mother punishes him for saying he is bored, I consider this a form of influence. The psychological term for that interaction is "shaping." Mother is suppressing a behavior ("A" saying he is bored) and by selectively rewarding him with game play if he does not say he is bored. Apparently, this is not effective since "A" says he is bored a lot.

"A"s love of video gaming can be a bit concerning. I believe that children who have a very strong interest in gaming sometimes do so to distract themselves from stress. His fervent interest in gaming was obvious to me in my time with him. While he was playing he was somewhat unreachable because he was so absorbed. Children who play games with intense focus manage social relationships by playing parallel with one another. They do not interact unless they are playing multiplayer games online. "A"'s limited ability to engage while playing; his inability to stop playing, were indicators of immaturity. While the argument "they [me and "A"] only played games"might be posed to diminish the importance of what happened during "A"s time with me, it is actually very good data. And there was plenty of non video game talk as well.

Undue Influence

"Undue influence" must be taken into account with any data which purports to support any argument for mature age. It constitutes "the other side of the coin." There is substantial evidence which supports that mother has unduly influenced "A." This is not only seen in her influencing the evaluation process and making her son audio record me which could have but did not seem to undermine the child's trust in me. Other behavioral indices of undue influence come from the comments mother has made to the child about violence allegedly perpetrated by the father, Another disclosure by the child was that mother does not want "A" speaking to the father by phone. The child told this to me directly. Father has told me that he pleads with the child to pick up the phone, even if to say to the father, "I do not want to speak with you."

Another indicator of undue influence was when the child told me about the "protective order" a term no eight year old child knows about unless taught what it is. I did not bring up the term — the child did, and when I asked him where he learned the term "A" told me "my mother told me everything."

The mother is out of touch with her own motivation for behaving in certain ways. She does not realize how intrusive her behavior was to my evaluation because she thinks that I will lie about what happens during my interview with the "A". Her behavior is direct evidence that she will overstep in order to control the outcome. This is the first time in forty years of practice where a

parent has behaved like this. I understand her reasoning but behind that reasoning is self righteousness that can lead to adverse consequences for her child.

Restrictions that were placed on my assessment introduce significant confounds into my analysis. How these restrictions were placed on me are significantly related to the analysis. I have described the confounds but ultimately it will be up to the court to determine things like whether, from a legal perspective, they represent a form of undue influence placed purposefully on the process as well as the child.

2.      How The Issue of Domestic Violence Factors Into Hague Issues and Defenses:

Issues surrounding domestic violence are becoming increasingly important in court decisions in many venues; and in this case they factor into perceptions of mature age as well. This overview explains why:

Intimate Partner Violence (IPV) is any behavior either physical or emotional that seeks to manipulate, humiliate or  entrap a current or former partner. This behavior has been examined in this case, by Dr. Poppleton. Mother has given examples of abuse to Dr. Poppleton. The history of domestic violence as reported to Dr. Poppleton is that it is  high in frequency (It has allegedly happened often), intensity (it has allegedly caused her injury) and duration (It has allegedly happened over a long period of time).

Evan Stark's concept of coercive control further elucidates the mechanisms through which abusers exert power. Coercive control is a pattern of behaviors that include intimidation, isolation, and control over resources, which can intensify post-separation as abusers seek to reassert dominance. Stark (2007) notes that these behaviors aim to dismantle a victim's autonomy and self-efficacy, increasing their exposure to harm even after leaving the relationship. All three experts agree that domestic violence is harmful to the victim and children.

However, determining the credibility of allegations of abuse are up to the fact finder.

Corporal punishment described  by "A" includes that father pinches him as a form  of discipline. Father acknowledges this.  APA ethics require that cultural differences must be explored and acknowledged:

There is no definitive evidence that pinching as a specific child-rearing practice is universally accepted or prescribed within Hindu parenting traditions. However, certain physical disciplinary methods, including mild forms such as pinching, have historically been used in many cultures, including Hindu communities, as part of broader strategies for instilling discipline.

In Hindu parenting, discipline and respect for authority are often emphasized as essential virtues. In traditional settings, parents or elders may use mild physical gestures, such as pinching or tapping, to correct behavior without causing significant harm. These actions are typically seen as symbolic forms of correction rather than severe punishment. They are often justified as non-abusive and are sometimes accompanied by verbal admonitions to teach the child the perceived

importance of obedience and self-control (Kakar, 1978 in The Inner World: A Psycho-analytic Study of Childhood and Society in India. Oxford University Press.).

This is meant purely for context and does not condone pinching as a form of discipline as this is not a cultural norm in the United States.

Gatekeeping:

Parental Gatekeeping is an important formulation in this case because of how it operates on the minds of children. In this case, if it is found, it would in my opinion represent a form of undue influence as well as child maltreatment.

Parental gatekeeping refers to behaviors by one parent that regulate the other parent's access to their child and influence the quality of the parent-child relationship. Father asserts that mother controls access, primarily phone access (which is significant because it is the only access allowed) and seeks to marginalize him by doing this. In this case it is likely that whatever feelings the child has that are critical or negative are going to be potentiated or intensified by stunted contact. Gatekeeping behaviors can range from facilitative to restrictive. Facilitative gatekeeping involves actions that encourage and support the involvement of the other parent in the child's life, whereas restrictive gatekeeping involves limiting the other parent's involvement, often through criticism, withholding access, or creating barriers to interaction (Austin et al., 2013; Ganong et al., 2017). Father claims that mother engages in these behaviors in a repeated pattern.

Restrictive gatekeeping can arise from concerns about the other parent's competence or safety but may also stem from conflict, control issues, or attempts to alienate the child from the other parent (Pruett et al., 2012). Father alleges that this is a co-parenting dynamic that interferes with his access.

Restrictive gatekeeping, particularly in high-conflict divorces, can harm children's emotional well-being. Children exposed to restrictive behaviors may experience loyalty conflicts (alleged to be a dynamic in this case), stress, and anxiety due to the pressure to align with one parent over the other. This dynamic can disrupt attachment bonds and increase the risk of depression and emotional insecurity (Sandler et al., 2013). Conversely, facilitative gatekeeping supports emotional security and positive identity development by fostering strong relationships with both parents.

Restrictive gatekeeping can impair the quality of the child's relationship with the targeted parent. This may lead to estrangement or even parental alienation in severe cases, negatively affecting the child's sense of familial belonging and stability (Warshak, 2015). Children in such circumstances may internalize feelings of guilt or confusion about their loyalties, which can affect their long-term relational patterns. Children subjected to restrictive gatekeeping are at a higher risk for behavioral issues, including aggression, social withdrawal, and academic difficulties. These effects are often intensified by the child's exposure to ongoing parental conflict and diminished parental involvement (Kelly & Emery, 2003). Conversely, when gatekeeping is facilitative, children tend to exhibit fewer behavioral problems and greater social competence due to the stability and cooperative parenting environment.The effects of restrictive

gatekeeping can persist into adulthood, influencing the child's future relationships and trust in others. A history of limited access to one parent can leave adult children with unresolved issues related to loss, abandonment, or inadequately processed family conflict (Hetherington & Kelly, 2002).

In my experience blocked contact can erode the bond between the targeted parent and child who might inadvertently assume that the targeted parent does not wish to be in contact with the child. This, in turn can lead to a permanent estrangement, especially when there is a lot of geographical distance between the targeted parent and the child.

Gatekeeping can and does sever bonds with the targeted parent and can be difficult if not impossible to repair.

**Summary Statement:**

While the methodology utilized to formulate my conclusions in this case was somewhat compromised by mother's lack of participation, and interference, it did not destroy the usefulness of the data completely.

This case is an extremely volatile case involving allegations of domestic violence, and claims of parental access interference, undue influence on the children and restrictive parental gatekeeping.

I attempted to show how all of these dynamics influence a child's state of mind when considering whether a child is of mature age. In this case there are several factors which indicate the child is not of mature age to determine where he wants to live. While he is more emotionally close to his mother he wants to be in the same vicinity of where she is. The country does not appear to matter, He has no objection to returning to Singapore. He has no fear of returning to Singapore. He does not think Singapore is a dangerous place. He has as many friends in Singapore as he does in the United States. His Singaporean school grades are consistently good.

"A"'s views are colored by a pattern of intrusive behavior which mother demonstrated directly to me in the course of this evaluation by trying to control the evaluation environment. She has also burdened the child with the responsibility of doing things (like recording our sessions) and knowing things (about the marital relationship), such as the protective order, which drag the child into the middle of the co-parenting conflict. Docking the child for saying he is bored inhibits the child's self expression which is an undue influence in and of itself.

Mother is a loving mother, but her behavior (meant to protect the child) is also self righteous and if what the child says is true, inappropriate.

The child's love of video games infers to me that video game environments are his preferred environments. Video games are his escape and the process of escaping serves a calming purpose. This indicates a lack of maturity but it is also understandable because the prospect of choosing where he wants to live is likely very stressful.

The defense of grave risk was also examined. The elements of grave risk such as domestic violence and coercive control are subject to the court's ruling. Findings of domestic violence are made by judicial determination, not by expert opinion;  and if there are findings that suggest  grave risk and all the experts agree on this.

The child did not report anything that would constitute child abuse. His disclosure about father pinching indicates  unwise parenting but not necessarily abuse. This pattern of behavior could be culturally influenced but the father should still address it and avoid it.

In conclusion, "A" is not of mature age for the reasons stated above; and there is substantial data which shows undue influence. "A" is not afraid to return to Singapore, nor does there appear to be a grave risk of harm if he does. I hold these opinions with a high degree of psychological certainty.

Respectfully submitted,

Peter J. Favaro, Ph.D.
Child and Forensic Psychologist
December 20th 2024

**References:**

- Austin, W. G., Fieldstone, L., & Pruett, M. K. (2013). Bench book for assessing parental gatekeeping in parenting disputes: Understanding the dynamics of gate-closing and gate-opening in child custody disputes. *Journal of Child Custody, 10*(1), 1–16. https://doi.org/10.1080/15379418.2013.778693

- Cronbach, L. J., & Meehl, P. E. (1955). Construct validity in psychological tests. *Psychological Bulletin, 52*(4), 281–302. https://doi.org/10.1037/h0040957

- Furr, R. M., & Bacharach, V. R. (2014). *Psychometrics: An introduction* (2nd ed.). SAGE Publications.

- Ganong, L. H., Coleman, M., & Chapman, A. (2017). Gatekeeping after separation and divorce: Understanding boundary ambiguity. *Family Relations, 66*(4), 675–689. https://doi.org/10.1111/fare.12265

- Hetherington, E. M., & Kelly, J. (2002). *For better or for worse: Divorce reconsidered*. Norton.

- Kelly, J. B., & Emery, R. E. (2003). Children's adjustment following divorce: Risk and resilience perspectives. *Family Relations, 52*(4), 352–362. https://doi.org/10.1111/j.1741-3729.2003.00352.x

- Pruett, M. K., Williams, T. Y., Insabella, G., & Little, T. D. (2012). Family and legal indicators of child adjustment to divorce among families with young children. *Journal of Family Psychology, 17*(2), 169–180. https://doi.org/10.1037/0893-3200.17.2.169

- Rosenberg, M. (1965). *Society and the adolescent self-image.* Princeton University Press. Society and the Adolescent Self-Image

- Sandler, I., Wolchik, S., Winslow, E., & Schenck, C. (2013). Stressors, resources, and stress mediators associated with children's mental health problems after divorce. In M. A. Fine & F. D. Fincham (Eds.), *Handbook of family theories: A content-based approach* (pp. 319–336). Routledge.

- Stark, E. (2007). Coercive control: How men entrap women in personal life. Oxford University Press.

- Warshak, R. A. (2015). Parental alienation: Overview, management, intervention, and practice tips. *Journal of the American Academy of Matrimonial Lawyers, 28*(1), 181–232.

**Peter J. Favaro, Ph.D.**

**Child and Forensic Psychologist**

**The Center for Improved Human Relationships, LLC**

**617 Port Washington Blvd**

**Port Washington NY 11050 516.883.5747**

**Pursuant to Rule 26 of the Federal Rules of Civil Procedure (vi) this is a statement of the compensation paid on Case No. 2:24-cv-01745.**

**Payment collected as of 12/20/2024: $40,000 USD.  Expected total to completion including overage and further services to completion of trial $87,000,**

**Respectfully submitted,**

**Peter J Favaro, Ph.D.**

PS001657

Vitae of

# Peter Joseph Favaro, Ph.D.
Psychologist

NYC and Long Island Offices
Main Office: 617 Port Washington Boulevard * Port Washington, NY 11050
Phone (516) 883-5747 * Fax (516) 883-5869

<u>Education</u>

Ph.D. School-Clinical Psychology, Hofstra University, September 1983.

M.A. Psychology, Hofstra University, May 1980.

B.A. Liberal Arts, Psychology/Biology, Hofstra University, May 1979.

Certificates/Licenses Held:
New York State Psychologist, Licensed February 1985

Certified Mediator

<u>Clinical Psychology</u>

May 1991 – Present
Forensic psychology expert/custody evaluator. Responsible for evaluating mental health and parenting competencies in civil and criminal cases. Court appointed in over 4000 cases in the following jurisdictions: Nassau County, Suffolk County, Richmond County, New York County, Kings County, Bronx County, Queens County, Rockland County, Westchester County. Appointments have been in the Supreme, Family and District

1

Courts.   Specific areas of qualification have been child and adolescent psychology, the methodology and evaluation of child custody cases, child sex abuse, drug and alcohol abuse.

Court related services by court appointment include supervised visitation, therapeutic visitation, parenting education, parenting coordination.

Producer of the following SmartParenting Tools for Professionals:
*Interviewing Techniques for Judges and Law Guardians*
*Parent's Resources Questionnaire* – a comprehensive survey addressing important factors for initial information gathering for custody evaluation and conflict resolution. Used to determine each parent's knowledge of their children and their parenting skills.
*Parenting Resources Questionnaire Custody Evaluation Task Inventory* – also used for custody evaluation and conflict resolution, this multi-task booklet assesses each parent's problem solving abilities, their attitudes about their children and their skills as a parent.
*Conflict Resolution Workbook* – exercises and tools to be used in mediation setting or program.
*Supervised Visitation Checklist Record* – uses a standardized format to be used throughout the supervised visitation process, including checklist and narrative responses.

*Mastering Calm Six Critical Paths to Managing Anger* – this book is available as a stand-alone book, is a one-on-one program in my office and available on-line as a self-paced program.   Both the in-person program and the on-line program require that each student successfully demonstrate knowledge of coping skills, communication techniques and conflict resolution skills taught in the Mastering Calm Program. Students must pass a final examination at 80 percent or higher to earn a certificate.
*Anger: Plain and Simple Program* - this book is available as a stand-alone book and available on-line as a self-paced program. This course typically takes approximately seven hours to complete and students must demonstrate knowledge of coping skills, communication techniques and conflict resolution skills taught in the Anger: Plain and Simple Program. Students must pass a final examination at 80 percent or higher to earn a certificate.
*Anger Answers* – this book was initially developed for the Fort Bend County, Texas

2

Juvenile Department of Probation.   It is a thirty day anger management program that is available in book form and on-line as a self-paced program. Students are required to keep a journal as well as demonstrate knowledge of coping skills, communication techniques and conflict resolution skills taught in the Anger Answers Program. Students must pass a final examination at 80 percent or higher to earn a certificate.

March 1985 – Present
Private practice, concentrating on diagnosis, assessment and treatment of children and adolescents.

September 1979 – September 1983
Hofstra University Psychological Evaluation Research Center. Psychotherapist: Assessment, diagnosis and treatment of emotional and learning disorders, individual and group therapy.

August 1981 – August 1982
State University of New York at Farmingdale (clinical internship). Psychotherapist: Assessment, diagnosis and treatment of emotional and learning disorders, individual and group therapy.

<u>Consulting</u>

1999 – 2005
Blisstribution, Brooklyn, NY
Mental health liaison to help employees find appropriate psychological services. In-service training on issues of customer service and public relations.

April 1992 – 1993
Executive Director, Discovery Enrichment Program, Inc. Founder of organization dedicated to teaching children confidence building, self-esteem, leadership and social skills through science and nature activities. Responsible for all phases of program

3

PS001660

development, staff training, creative concepts.

March 1991 – 1995
Consultant to Kloster Cruiselines Ltd.   Responsible for training of all children's program staff, youth coordinators and supervisors for two fleets (14 ships) of cruise ships. Designed and implemented intensive 40 hour workshop on child management, team building, children and teen recreation programming, activity design, and risk and liability management.

October 1991 – 1995
Consultant to SkiWee Ski School, a franchise business owned and operated by Times Mirror Group. Responsible for clinicing staffs at over 80 winter resorts on the care and management of children in resort settings.

October 1991 – 1995
Consultant to Professional Ski Instructors Association. Guest speaker at yearly symposium on children and skiing. Responsible for clinics given to 300 professional ski instructors on the care and management of children in resort settings.

Academic / Teaching

1985 – 1987
Member, Advisory Board for Institute for Continuing Education in Psychology.

1983 – 1993
Hofstra University: Departments of Psychology, Graduate Education, Computer Science. Rank: Adjunct Assistant Professor.

Courses:
  Statistics for Behavioral Sciences          Sleep and Dreaming
  Research Methods                            Advanced Seminar
  Introductory Psychology                     History of Psychology

4

Child Development                          Adolescent Psychology
Human Sexual Behavior                      Clinical Psychology
Computers in Elementary Education          Intro to Computers
Computers in Secondary Education           Expert System Design & Development

## School Psychology / Special Education

October 1981 – May 1982
Port Washington School District. Consulting School Psychologist: Developed behavior
program for a group of thirty emotionally handicapped and learning disabled elementary
school children.

September 1982 – February 1983
William Floyd Union Free School District. School Psychologist: Assessment and
diagnosis of learning problems, individual education plans, group counseling,
supervision of social workers.

November 1985 – January 1986
North Bellmore Union Free School District. Consulting School Psychologist: Provided
counseling, social skills training, parenting training to students and parents in special
education grades 4 through 6.

## Computers and Electronic Media

October 1992
Iota Technologies, Oyster Bay, New York
Vice President, Behavioral Technologies.   Became project leader for multimedia
artificial intelligence and virtual reality projects which included interactive games,
behavioral immunology health programs, and telepresence applications.

May 1992
Seahawk Deep Ocean Technology, Tampa, Florida

5

PS001662

Became responsible for development of all interactive and multimedia exhibits for Seahawk Shipwreck and Treasure Museum.

June 1990
Became a distributor/developer for Psion, Inc. a handheld computer company. Developed a number of applications including word processor for the handicapped, speech synthesizer and talking board for severely speech impaired, pocket databases and a sports performance analyzer.

March 1989
Designed and implemented Child's Play educational software for Holt, Rinehart and Winston. Child's Play is a textbook ancillary that teaches child development concepts intuitively by emulating the Socratic teaching method via computer software.

January 1985 – January 1987
Educational and Entertainment Software Designer for Activision, Inc. Mountainview, California. Designed Alter Ego TM, an award-winning, fantasy role-playing adventure about psychology and life.   Considered to be one of the first virtual reality games.

November 1985
Received approval for Small Business Innovative Research grant to develop an expert system designed to assist in psychiatric diagnosis, assessment and report writing.

September 1985 – June 1989
North Bellmore Union Free School District. Consultant: Designed and implemented district-wide microcomputer literacy program for teachers and administrators. Developed custom special education software, expert system design for individual education plan management, and development of audio-visual aids for the instruction of word processing.

November 1984 – December 1984
Board of Cooperative Education Services (South Westchester)
In-service training, district-wide evaluation of computer needs.

6

PS001663

April 1984 – April 1985
Altro Human Services, Inc. Consultant: Designed and developed software for rehabilitation and education program for chronic psychotic population. System: Apple MacIntosh.

January 1984 – January 1985
Prentice-Hall, Inc. Consultant: Book and software evaluation and review.   Systems: Apple, Commodore 64, IBM-PC, PC Jr.

March 1982 – November 1983
Softside Publications, Milford, New Hampshire. Education Editor:   Manuscript review, feature writing, software development. Developed consumer entertainment software including computerized relaxation trainer, adventure games, cooperative games, music software, board games and art software for children.
Systems:   Apple IIe, Atari, TRS-80, IBM PC.


<u>Educational Video</u>


June 1988 – May 1989
Consultant to Pinnacle Associates, Inc. Beverly Hills, California
Played a key role in the development of a videotape series designed to teach social skills, critical thinking and social values.   Wrote scripts for 13 shows on a variety of topics including responsibility, self-control and positive thinking.   Managed seventy children on the movie set during filming.

7

PS001664

<u>Audio / Video / On-Line / Publications</u>

*Navigating the Civility High Road Strategic Advice for Managing Difficult Co-Parents and Adversarial Relationships*  - 2024 Fulton Books
This textbook and workbook is designed to help parents deal with, manage and avoid conflict during or after a divorce.

*Staying in Love Secret Recipes For Making Love Last* – 2022 Fulton Books
After spending almost 40 years watching relationships fall apart and helping people find new beginnings, this book is about reconnection, rebuilding and creating recipes for success.

*Iffy about 50-50: How to Better Apportion Parental Custody Arrangements,* New York State Bar Association Journal, August 1, 2021

*Smart Parenting During and After Divorce* – November 2008
This book presents non-adversarial methods, information, strategies, and resources on visitation, communication, conflict resolution, anger management, scheduling of holidays and visitation, decision-making, the effects of divorce on children at different ages, the influence of a parent's social life on children, and negotiating under both good and bad circumstances.     McGraw Hill 222p

*Anger Management – Six Critical Steps to a Calmer Life* – September 2005
Details the roles anger and conflict play in day-to-day interactions at home, at work and in social environments using real0life examples.   The first section describes the psychology and behavior of predatory people, the other teaches you how to deal with situations where remaining "cool under pressure" can be a vital survival tactic.
Career Press 288p

*Anger: Plain and Simple*   Spring 2004
Self-published anger management guide and manual for in-house use at SmartParenting, distribution over the Internet, one-on-one classes and on-line self-paced program.   Students must pass a final examination at 80 percent or higher to earn a certificate. 47 p

8

PS001665

*Anger Answers*    Spring 2004
This self-published book was initially developed for the Fort Bend County Texas
Juvenile Department of Probation. It is a thirty day anger management program that is
available in book form and on-line as a self-paced program.   Students must pass a final
examination at 80 percent or higher to earn a certificate. 64 p

*Mastering Calm* Winter 2002
Self-published anger management guide and manual for in-house use at
SmartParenting, distribution over the Internet, one-on-one classes and on-line self-
paced program. Students must pass a final examination at 80 percent or higher to earn
a certificate. 322 p

*101 Ways To Make A Difficult Divorce Easier On The Children*    Fall 1998

*Every Child Succeeds Given Enough Time*    Fall 1998   A self-paced structured
learning program designed to teach the basic skills of parenting and child management,
includes workbook and audio tape or CD.

*The Good Behavior Coupon and Guidebook*    Spring 1996
A Good Behavior Incentive Program for parents and teachers

PBS Pilot:   *SmartParenting: Success in School*   Fall 1995
Host of a 30 minute show co-produced by PBS station WEDU in Tampa, Florida.
Worked with 4 sets of parents and co-host on the issues of separation anxiety, coping
with peer pressure, forming good study habits and communicating about sex, drugs and
alcohol.

Book:   *SmartParenting: An Easy Approach to Raising Happy, Well-Adjusted Kids*,
Contemporary Books   Spring 1995

Book:   *The Parent's Answer book: Over 101 Solutions to Everyday Parenting
Problems*,
Contemporary Books   Spring 1995

9

PS001666

Book:   *The Divorced Parent's Guide to Managing Custody and Visitation*, R and E Publications   Spring 1995

Book:   *Can I Have Your Attention, Please? A Guide For Parents With Hyperactive and ADD Children,* R and E Publications   Spring 1995

Book:   *Think Before You Act!* R and E Publications   Spring 1995

AudioCassette Series: *SmartParenting: An Easy Approach to Raising Happy, Well-Adjusted Kids* (6 1-hour cassettes plus workbook), Nightingale-Conant   Fall 1994

Regular Feature Writer since Spring 1990: American Academy of Pediatrics' Healthy Kids. Circulation approximately 2 million. Article topics have included discipline, school achievement, learning disabilities, coping and socialization.

Book:   *Already Been Chewed: A Guide For Anyone Who Works With Kids and Doesn't Want To Be Bitten By Them*, Times Mirror Publications 1989

Book:   *Understanding Child Development* (Consulting Authorship), Holt , Rinehart and Winston 1988

Book:   *Educator's Guide to Microcomputers and Learning,*   Prentice-Hall, College Textbook Division, 1986

Consumer Magazine Article: "The Secret World of Imaginary Friends," Child, December 1987

Consumer Magazine Article: "Take Me Home Before I Die: Sending Your Children To Summer Camp," Child,   May 1988

Monthly Column in a Consumer Magazine: *Family Computing,*   a Scholastic Publication (circulation 400,000) – Microcomputer puzzle series as of March 1984. Contributing Editor as of July 1984.

10

Consumer Magazine Article: *Creative Computing* – April 1983. "My Five Year Old Knows Basic."
Book Chapter:    *Using Computers in the Classroom: an Idea Resource for Teachers* (Chapter Title: "Software for Developing Cognitive Skills"), World Book Publishers, 1984

Consumer Magazine Article Series: *Softside*, Milford, New Hampshire
Issue #35   -   "Games for Cooperation and Growth: An Alternative for Game Designers"
Issue #39   -   "Secrets of Software Design (Part 1)
Issue #40   -   "Speaking Easy: Speech Synthesis for Microcomputers"
Issue #43   -   "Taught to the Tune of a Silicon Chip"
Issue #44   -   "Secrets of Software Design (Part 2)
Issue #46 – "How Video Games Affect Players"

<u>Presentations, Partial</u>

<u>Westchester County Bar Association, NY Chapter of the American</u>          June 2024
<u>Academy of Matrimonial Lawyers and Westchester Women's Bar</u>
<u>Association</u>
Pace Law School
Invited Speaker, Determination of a Child's Best Interests

<u>Nassau and Suffolk County Supreme Court Judges Conference</u>          January 2024
Touro Law Center
Invited Speaker, Substance Abuse in Custody Cases

<u>UN Women</u>
<u>The Foundation for Gender Equality</u>
Spotlight Speaker, "Fighting Cyber Sexual Abuse"          May 2016

11

New York State Family Court Judicial Training Seminar          March 2016
Invited Speaker, March 30 and March 31, 2016
Topics: "Lincoln Hearings" and "Ways to Address Visitation Refusal"


Nassau County Matrimonial Bar Association          November 2015
Invited Speaker
"The Myth of Supervised Visitation"


New York State Bar Association          October 2015
Invited Speaker, Family Law Section
"The Mental Health Expert/Forensic"


American Academy of Matrimonial Lawyers, New York Chapter          December 2013
Invited Speaker, "Child Centricity vs. Due Process: The Conflict
Between *Parens Patriae* and Parents' Rights


New York State Matrimonial Judicial Training Seminar          March 2013
Invited Speaker


New York State Bar Association, Annual Meeting          January 2011
Committee on Children and the Law's Continuing Education Program
Invited Speaker


New York State Matrimonial Judicial Training Seminar          May 2009
Invited Speaker


Nassau County Matrimonial Bar Association          March 2009
Invited Speaker

12

PS001669

<u>St. John's Law School</u>                                              2007
Invited Speaker, Matrimonial and Family Law
Justice Lawrence Brennan, Nassau County Family Court
Once yearly since 1999

<u>2004 Family Law Seminar</u>, Corpus Christi, Texas                    March 2004
Seminar Speaker "Cross Examination of Mental Health Experts"
And "Co-Parenting in the New Millennium"

<u>Suffolk County Matrimonial Bar Association</u>                        November 2004
Invited Speaker

<u>Nassau County Colombian Lawyers Association</u>                       April 2003
Keynote Speaker

<u>Nassau County Matrimonial Bar Association</u>                         March 2003
Invited Speaker

<u>Nassau County Supreme Court Matrimonial Judges Conference</u>        February 2003
Invited Speaker

<u>Integrated Domestic Violence Task Force</u>                          May 2002
Justice Alan Oshrin, Suffolk County District Administrative Judge

<u>Nassau County Supreme Court Matrimonial Judges Conference</u>        December 2001
Invited Speaker

13

PS001670

Nassau County Supreme Court Matrimonial Judges Conference                March 2001
Invited Speaker


Statewide Meeting of Parenting Education Programs                December 2000
Justice Evelyn Fraeze, Albany NY


Nassau County Bar Association                October 1998
Invited Speaker, Topic: Personality Testing


Nassau County Supreme Court Matrimonial Judges Conference        September 1998
Invited Speaker


Appellate Division, 2nd Judicial Department                May 1998
Invited Speaker, "Interviewing Techniques for Law Guardians"


National Parenting Conference, Walt Disney World, FL                August 1997
Invited Speaker "Making a Difficult Divorce Easier on Your Children"


Suffolk County Law Guardian Panel                March 1997
Invited Speaker, Presentation Topic:
"Critical Path for Determining Forced Visitation"


Nassau County Bar Association                March 1997
Invited Speaker, Presentation Topic:
"Validation of Sexual Abuse Allegations"


14

PS001671

<u>Port Washington Schools</u>, Sousa Middle School                    March 1997
Invited Panel Member, "Knowing When Athletics Are Right For Your Child"


<u>International Network for Children & Families</u>, San Diego, CA    November 1996
Keynote Speaker: "Are Our Children Growing Up Too Fast? How
The Media Influences Our Children" and "Understanding Your Child's
Temperament (And Your Own)"


<u>Pasco Pediatric Foundation Event</u>, Pasco County, FL            September 1996
Keynote Speaker: "Maximizing Your Child's Potential in School"


<u>Nassau County Family Law Committee</u>                            September 1996
Invited Speaker, "Critical Path for Determining Forced Visitation"


<u>Parent Institute Days</u>, Chicago, IL                            March 1996
Keynote Speaker: "Are Our Children Growing Up Too Fast?"


<u>Nassau County Bar Association</u>                                 April 1996
Invited Speaker:   "Supervised Visitation Issues"


<u>American Orthopsychiatric Association Meeting</u>                 April 1985
Invited Speaker:   "Thinking About Computers In Early Education:
An Act of Treason?"


<u>Harvard University</u>, Small Computers in Mental Health Conference    June 1984
Invited Speaker "Designing Software from Theory, not Vice Versa"


15

PS001672

Columbia University, Conference on Educational Microcomputing       November 1983
Invited Speaker:" Using Cognitive Strategies in Educational
Software Design"


Media Appearances /Partial


Montel Williams Show, On-Air Psychologist, Expert                      1999 – 2008
Average five to six new shows per season, repeated through season


The Morning Show with Mike and Juliet, On-Air Psychologist, Expert    2007 - 2010


WHUR, Washington DC. One hour live radio show including call-ins       April 2004


Additional Television Appearances
20/20, CBS Morning Show, Home Matters, News12 Long Island


Community Service / Honors


Advisor, Parent Resource Center, Port Washington, NY Frequent lecturer on behavior,
education and school achievement.   Operated community hotline three days per week
to answer questions about child development and behavior.

Chairperson, Advisory Board, Center for Parents and Children, North Shore University
Hospital, Glen Cove, NY   Frequent group leader and lecturer on infant and child
development and behavior. Coordinated lecture series with other professionals in the

16

community.

Recipient, Community Service Award, Lions Club, February 1991

Recipient, Community Service Award, Thomas Gulotta, Nassau County Executive, September 1990

Recipient, Community Service Award, Center for Parents and Children, June 1990

Recipient, Community Service Award, Parent Resource Center, September 1990

<u>Membership</u>

Chairperson and Founding President,
Parenting Coordinators of New York (PCNY)                    2007 - 2009

17

PS001674