Pro Hac Vice Admitted:
Katelyn D. Skinner, OSB No. 105055
Katrina Seipel, OSB No. 164793
Buckley Law, P.C.
5300 Meadows Road, Suite 200
Lake Oswego, OR  97035
Telephone:  503-620-8900
Fax:  503-620-4878
Emails:  kds@buckley-law.com
        kas@buckley-law.com
Of Attorneys for Respondent Dhivya Sashidhar

# UNITED STATES DISTRICT COURT

# WESTERN DISTRICT OF WASHINGTON

Seattle Division

In re: the Application of:

PRASANNA SANKARANARAYANAN,

        Petitioner,

   v.

DHIVYA SASHIDHAR,

        Respondent.

Case No.: 2:24-cv-01745-RAJ

RESPONDENT'S SUPPLEMENTAL
MOTION IN LIMINE TO EXCLUDE
TESTIMONY OF DR. PETER FAVARO

The Convention on the Civil Aspects of International Child Abduction
Done at the Hague on 25 Oct 1980
International Child Abduction Remedies Act, 22 USC § 9001 *et seq.*

## MOTION

COMES NOW, Respondent Dhivya Sashidhar, by and through her attorneys of record, Katelyn Skinner and Katrina Seipel, and moves the Court in limine, for a second time, for an order excluding the testimony of Dr. Peter Favaro, this time for Petitioner's failure to abide by the Court's Order (Doc. 47) following Respondent's initial Motion in Limine in this regard.

On January 3, 2025, this Court, in its Order, directed "Petitioner to articulate what Petitioner believes is true rebuttal testimony" and to provide this statement to Respondent no later than January 4, 2025, at 12:00 pm. Although Respondent received a statement (of sorts) from Petitioner's counsel by the Court's imposed deadline, Petitioner's conduct in addressing this matter continues to be in bad faith. In its previous Order, the Court specifically stated that Petitioner's argument pertaining to this issue "signals gamesmanship that the Court will not tolerate." The Court also commented on Petitioner's contentions being "disingenuous." Rather unfortunately, Petitioner's manner of litigating this matter has not changed, causing Respondent's counsel to, yet again, devote time to drafting this Motion rather than true trial preparations.

In response to the Court's Order to provide a statement of Dr. Favaro's true rebuttal testimony, Petitioner's counsel sent an email, **Exhibit A**, and a highlighted version of Dr. Favaro's initial expert report, **Exhibit B**, to Respondent's counsel. Petitioner's counsel also finally provided a copy of Dr. Favaro's file, notably 12 days after the file was initially requested with no explanation for the delay (provided on the Saturday before a Monday trial). Petitioner's counsel claims that the highlighted portions of Dr. Favaro's report are the only portions "to be removed" as not true rebuttal testimony. Petitioner's selection of such minimal information and opinions "to be removed" was done in bad faith.

At issue here is what is considered true rebuttal information, rather than an initial and independent expert opinion labeled deceitfully as rebuttal. *Century Indem. Co. v. Marine Grp., LLC*, No. 3:08-CV-1375-AC, 2015 WL 5521986 examined this very issue. (D. Or. Sept. 16, 2015). In *Century*, a party did not disclose an expert witness on the date for initial expert disclosures but later disclosed one as a rebuttal expert. In finding that the named rebuttal expert was actually an initial and independent expert, the court reviewed case law decisions

regarding the reach and limits of FRCP 26's definition of rebuttal evidence. "Rebuttal expert reports are proper if they contradict or rebut the subject matter of the affirmative expert report. They are not, however, the proper place for presenting new arguments." *Id.* at *3 (citations omitted). "If the purpose of expert testimony is to contradict an *expected and anticipated* portion of the other party's case-in-chief, then the witness is not a rebuttal witness or anything analogous to one." *Id.* (emphasis added). "An expert rebuttal report that speaks directly to a party's affirmative defenses is not considered proper rebuttal." *Id.*

In striking the "rebuttal" expert's report and testimony in full, the court in *Century*, considering the above law, held that the expert's report presented new arguments, which a rebuttal report may not include. *Id.* at *5. Where the improperly disclosed expert had the opportunity to craft his initial opinions in direct response to each point in the other, properly disclosed, expert reports, the parties who followed the expert disclosure rules were at an extreme disadvantage. The "rebuttal" expert avoided presenting his initial theories and, thus, avoided exposing his theories' weaknesses to rebuttal. Instead, he had the opportunity to both conceal and minimize the weaknesses in his own opinions, while directly attacking the weaknesses in the other experts' theories, knowing very well they would not have the opportunity to submit a rebuttal report. *Id.* at 6.

In this case, just like in *Century*, Petitioner's gamesmanship resulted in Petitioner being able to withhold his expert's report until the rebuttal stage so as to flush out Respondent's expert's arguments and deprive Respondent of an equal rebuttal opportunity. Dr. Favaro has clearly tailored his expert opinions, and Respondent is unable to rebut Dr. Favaro's testimony at trial on matters of which she bears the burden of proof.

Respondent's affirmative defenses were asserted in this matter long ago. Whether the parties' child is at a grave risk of exposure to harm and whether or not the mature child

exception should apply are central, *expected and anticipated*, issues to this case, at the evidentiary heart of this dispute. Dr. Favaro, based on the law cited herein, is prohibited from speaking directly to Respondent's affirmative defenses of grave risk and mature child. This is simply not proper rebuttal testimony "or anything analogous to" it. Additionally, Dr. Favaro may not present new arguments. The law gives him no leeway to obtain independent information to base his report and opinions on (such as information from Petitioner). As a rebuttal expert, he should be permitted to rebut the conclusions of Dr. Poppleton only, based on only the information Dr. Poppleton had available to him.

Petitioner, following the Court's Order to provide a statement of true rebuttal testimony, in **Exhibit B**, limits the information he will elicit from Dr. Favaro at trial in bad faith. He underhandedly continues to attempt to gain an advantage over Respondent going into this trial. Due to Petitioner's bad faith conduct, Respondent does not have a statement of *true* rebuttal testimony to provide her own expert with prior to trial, to review and prepare to address, and she is left at an incredible disadvantage going into this trial. In review of Petitioner's counsel's highlighted report, there remain countless non-rebuttal information, comments, and opinions: Dr. Favaro's conclusions of Mother, his meeting with Father, his review of Dr. Day's report, his review of the child's school records, and the list goes on. The single section of Dr. Favaro's report pertaining to his review of Dr. Poppleton's report is just nine sentences long, and the final of the nine sentences reads, "My conclusion is that for these reasons I did not rely on Dr. Poppleton's report to any large extent in my own opinion formation." In this sentence, Dr. Favaro himself makes it abundantly clear that 100% of Dr. Favaro's report and opinions are independent, initial opinions, which opinions were improperly disclosed and should not be admitted in this trial.

Moreover, if Dr. Favaro does indeed have any true rebuttal opinions, at this point, it would be impossible to parse through his report to determine what is true rebuttal and what is not. The phrase "you can't un-ring the bell" is used often in the legal world, and the phrase certainly applies here. Dr. Favaro has made independent expert opinions, based on information, evaluations, and analyses that Dr. Poppleton did not consider in making his expert opinions. Asking Dr. Favaro (or Petitioner) to determine which of his opinions is based on Dr. Poppleton's report and which is not, when he himself states that he "did not rely on Dr. Poppleton's report to any large extent" is the equivalent of asking someone to un-ring the bell, it simply cannot be done.

Accordingly, as the Court has already stated that it will not tolerate Petitioner's gamesmanship, Respondent respectfully requests once more that, based on Petitioner's disingenuous and bad faith conduct, Dr. Favaro be excluded from testifying. Should Dr. Favaro be permitted to testify, Respondent will be unduly prejudiced. To the contrary, Petitioner has a true rebuttal expert, Dr. Day, such that Petitioner's rebuttal case should not be unduly harmed.

## CONCLUSION

For the forgoing reasons, Respondent again moves in limine and respectfully requests an Order of this Court excluding Dr. Peter Favaro's testimony and report in its entirety.

DATED: January 5, 2025

_____

Katrina Seipel, OSB #164793
Of Attorneys for Respondent

<u>CERTIFICATE OF SERVICE</u>

I certify that this document was served by electronic service through the CM/ECF system and by e-mail upon counsel for Petitioner, Richard Min, to rmin@gkmrlaw.com, and Michael Banuchis, to mbanuchis@gkmrlaw.com, on this 5th day of January 2025.

_____
Katrina Seipel, OSB #164793
Of Attorneys for Respondent
kas@buckley-law.com

**Attachments:**    20250104_11440694990.PDF; About My ChildPras.pdf; ChildBehaviorChecklist.PDF;
ChildDrawing.PDF; IntakePras.pdf; Notes.PDF; References.PDF; SAS School Report Card 2022-2023
s1.pdf; SAS School Report Card 2022-2023 s2.pdf; SAS School Report Card 2023-2024.pdf; Timeline
of Events.xlsx

**From:** Richard Min <rmin@gkmrlaw.com>
**Sent:** Saturday, January 4, 2025 11:57 AM
**To:** Katelyn Skinner <kds@buckley-law.com>
**Cc:** Katrina Seipel <KAS@buckley-law.com>; Michael Banuchis <MBanuchis@gkmrlaw.com>; Holly McHale
<HMcHale@gkmrlaw.com>; Camilla Redmond <credmond@gkmrlaw.com>
**Subject:** Sankaranarayanan v. Sashidhar

Dear Counsel:

Pursuant to the Court's order, we are articulating the contents of Dr. Favaro's rebuttal testimony with the attached
amended report.  We have highlighted those sections for removal as not relevant to his rebuttal.

Page 1-13 of his report until the Conclusions and Formulations are generally his background, notes, methodology,
caveats, etc. that serve as the basis for his opinions and conclusions, which rebut Dr. Poppleton's evaluation, unless
otherwise highlighted.

In addition, we are providing his case file as requested.

Regards,

_____

**Richard Min|Green Kaminer Min & Rockmore LLP**
420 Lexington Ave. Ste. 2821|New York, NY 10170
O: 212.681.6400|D: 212.257.1944|F: 212.681.6999
rmin@gkmrlaw.com|www.gkmrlaw.com
Fellow of the International Academy of Family Lawyers

_____

ATTENTION:
This electronic message transmission contains information from a law firm which may be confidential or
privileged.  This information is intended to be for the use of the individual or entity named above.  If you are
not the intended recipient, be aware that any disclosure, copying, distribution or use of the contents of this
information is prohibited.  You should delete the message and attachments without printing, copying,
forwarding or saving them.  If you have received this electronic transmission in error, please notify the sender
immediately.
Disclosure under IRS Circular 230: To ensure compliance with requirements imposed by the IRS, we inform you
that any tax advice contained in this communication (including any attachments) was not intended or written
to be used, and may not be used, for the purpose of avoiding tax-related penalties under federal, state or local
tax law or promoting, marketing or recommending to another party any transaction or matter addressed
therein.

EXHIBIT A
Page 1 of 1

**Peter J. Favaro, Ph.D.**
**Child and Forensic Psychologist**
The Center for Improved Human Relationships, LLC
617 Port Washington Blvd
Port Washington NY 11050 516.883.5747

**Expert Psychological Report**

**Identifying Information:**
UNITED STATES DISTRICT COURT WESTERN DISTRICT OF WASHINGTON AT SEATTLE
Case No. 2:24-cv-01745
Honorable Richard A. Jones

**Expert Qualifications:**

I am a psychologist licensed in the state of New York (lic. 8168). I have been in private practice since 1986. My area of expertise is psychology within court related matters. Since 1986 I have been privately hired or court appointed to thousands of cases to provide evaluation and expert opinion in cases involving domestic violence, custody disputes and child abuse, as well as to provide court-related services such as supervised visitation, family mediation, anger management, family therapy, civility training and parenting coordination. I have also been appointed and/or hired on cases involving the 1980 Hague Child Abduction Convention.

I am the author of more than a dozen books, including a child development textbook and consumer titles on parenting, co-parenting, civility and anger management. I have also published in peer reviewed journals and venues, although the majority of my publications are in the consumer press.

As Founder and Executive Director of The Center for Improved Human Relationships, LLC, I create and administer programs that teach high conflict parents civility training. I also run programs which seek to reconcile parents and children who become estranged through the process of divorce.

I have been qualified as a psychology expert in the Eastern and Southern District Federal courts in New York and in jurisdictions outside the State of New York in Hague Convention matters in California, Texas, Vermont and in Connecticut, both as a court appointed neutral and as an independent expert. On three different occasions I have been qualified as an expert in Article 13b of the Hague Convention.

A list of Hague Convention matters I have testified in and have been qualified as an expert in are as follows:

Case Name                                County

PS001637[1]

| Adamis v Lampropoulou | Eastern District New York |
| Dacres v McGowan | District Court District of Connecticut |
| Cruvinel v Cruvinel | Eastern District New York |
| Hernandez v Martin | Southern District New York |
| Hulsh v Hulsh | Northern District of Illinois, Eastern Division |
| Jacquety v Tena Baptista | Eastern District New York |
| Keen v Bowley | Central District California |
| Poretti v Baez | Eastern District New York |
| Saada v Golan | Eastern District New York |
| Shah v Federbush | Eastern District New York |
| Smythe v Blatt | Eastern District New York] |
| Moreau v White | Eastern District of Texas Sherman Division |

I have been appointed as a custody evaluator in divorce cases in the following jurisdictions: Nassau, Suffolk, New York, Brooklyn, Queens, Bronx, Richmond, Westchester and Rockland on thousands of occasions. I have been qualified as an expert in child psychology, divorce and custody, sex abuse, parental alienation, intimate partner violence and domestic violence, substance abuse and also as an expert in the methodology underlying court related mental health evaluations. As recently as July 2024, in the County of Westchester, at The Judicial Training Institute, I lectured the matrimonial bar and members of the Second Department Appellate Court, on aspects of methodology and best practices in custody evaluations.

I evaluate domestic violence as a routine task for court assigned and neutral expert cases. In December of 2023 I sat for a 40 hour domestic violence training as part of my ongoing responsibility to the 18B Mental Health Panel in the First and Second Appellate Department in New York State. Because domestic violence can place the lives of victims at risk all evaluations should be "domestic violence informed." I consider the impact of domestic violence regardless of jurisdiction.

I was asked by the chief judge in Suffolk County to consult on a panel regarding the creation of The Integrated Domestic Violence Court in 2004.

**ORIENTING PRINCIPLES:**

Ethics surrounding psychology in court settings require caveats which help the lay reader understand strengths and weaknesses of data interpretation.

PS0016382

The practice of psychology in legal settings is influenced by the imperfect nature of the data gathering as well as imperfections in the data itself. So as not to mislead either the fact finder or lay reader and in acknowledgment of the ethical principle for the practice of forensic psychology I utilize caveats whenever possible so as not to overstate or purvey inappropriate influence. As such the reader will observe caveats in various portions of this report to appropriately frame the opinions contained herein.

**Notes and Caveats About The Methodology Used in this Evaluation:**

Psychological data gathering is subject to what scientists commonly call "confounds." Confounds are imperfections in the data that introduce error into the conclusions drawn about the data. The American Psychological Association in its discussion of ethical principles surrounding custody evaluation, contained within the December 2010 issue of American Psychologist (pp 863-867), revised in 2013, points up the importance of multiple methods of data gathering, as a means of addressing the imperfections of psychological data gathering. Consistent with this concern is an explanation of how data is imperfect and might interfere with conclusion formation, especially if all methods of data collection are on some level fundamentally flawed. The following caveats describe the advantages and disadvantages in the type of data collected in this study and are emphasized in various portions of this report:

**Self Report**

Self report is often the most frequently utilized measure in evaluating individuals in court settings. This type of data gathering is often divided into "asking questions and talking to people," or data gathering through responses to written questions or structured questionnaires. Both methods can suffer from confounds related to a person's motivation to report information accurately. In legal settings, where litigants have a competitive motivation to acquire relief such as custody or access to their children, the tendency is to present in a favorable and virtuous light. I could not make comparisons regarding this vis a vis the parent's self report because mother chose not to participate in this study. The hypotheses I make and consider throughout the data collection is that any party will emphasize their strengths and minimize their weaknesses; and in addition, they will often emphasize their adversary's weaknesses and minimize their strengths.

When choosing between collecting self report orally through face to face interview or in written form I utilize both, but will often emphasize written responding. In the current matter I used both techniques. There was little emphasis on standardized tests. This was due to the age of the child, and the paucity of measures that stand up to methodological rigor in legal settings as opposed to clinical settings. Nevertheless I followed APA guidelines regarding using multiple methods of data gathering to inform my opinions.

Written data gives individuals a greater chance to think about the information they provide without the pressure of responding "on the spot." Questionnaire data also memorializes a record of exactly what was asked and how the examined party answered.

PS001639[3]

Written data is less subject to inaccuracies in data description. Transcribing notes gathered through face to face oral interview is tedious, error prone and does not make for good practical review if it is to be used as evidence at trial. The questionnaire items are available for the other professionals involved in the case to examine and make inferences from, and to compare to issues of fact in the case.

**Collateral Documents and Credibility Assessments:**

I do not review collateral documents for the truth of their contents. Collateral information is not always relevant, may suffer from chain of custody issues, or might not reflect information that is as psychologically relevant as the providing party might believe it is. Evidence adduced at trial is ultimately determined relevant by the finder of fact and it is beyond the scope of my role to assign weight or meaning to documents provided by the parties. I provide analyses of collateral documents for descriptive purposes; and avoid making comparative judgements about the parties based on the documents. I avoid relying on motion papers as sources of information. The reasons for this are that motion papers are self serving, not the work product of the parties studied and not sources of information that might not accurately reflect mental health or parenting capacity. I rely on past findings of fact as important and might factor in certain exhibits if they reflect violent or criminal history, or mental health history such as treatment or hospitalization.

I do not offer credibility opinions for two reasons: First, credibility is the sole purview of the trier of fact. Second, mental health experts are not trained in the assessment of credibility and the research on credibility assessment shows that mental health experts are not very good at it even when trained. That is likely because much of the factual data in cases is "he said/she said" data and almost always outside the purview of an evaluator.

**Opinions about Parties Not Directly Evaluated:**

Mother would not consent to being evaluated but did permit me to do interviewing of the child; She did not permit me to gather self report information through structured questionnaires or checklists. This placed a limitation on my methodology. However, it is my opinion that I did gather enough information to provide assistance to the trier of fact. In addition I had incidental contact with the mother, which though brief was important and is described in the sections below.

**Prior Findings:**

I do take into account prior findings of fact, especially when they address issues of domestic violence.

I have not been provided with any findings of fact. I do note there is a protective order in place against the father which was not the result of a fact finding.

**Recording of the Child:**

PS001640[4]

After my first talk with the child, mother requested that my next interviews be recorded. Recording child interviews provides potential advantages to the evidence gathering process. However, if it is not done properly it can adversely impact the child's well being. To prevent that, it must be done with safeguards in mind. I advised the mother of this.

Recording a child interview is a much more difficult task than it might appear on the surface. Sound quality is almost never good, making the result difficult to transcribe. When I record sexual abuse interviews (which I believe must be recorded), for instance, I use professional field recording equipment and I do it in a very discreet way. Using a cell phone or tablet device is usually of insufficient quality.

APA guidelines advise that you must tell a child they are being recorded. That adds a confound to the process and places a limitation on the methodology in and of itself. Mother told the child he would be recorded before the second interview. This infers that mother had a conversation with the child about what we spoke about in the first interview. That adds a confound to the process and signals the presence of undue influence. Further, the child was under the impression that the reason mother wanted the interviews recorded was because she wanted to make certain of what was being spoken about to make sure things were actually said. I don't blame her for trying to think strategically; and I understand her motivation, but I do find fault with her putting her child in the middle of her mistrust and suspicion. Observing this behavior in mother raises concerns about her placing the child under undue influence in her interactions surrounding the father.

Mother was so mistrustful of the interview process that she wanted to control several aspects of it. I told her I would be happy to record for her. Her attorney had asked if the interviews were being recorded as well. I said, through counsel I would if it was requested, but I did not say that mother could control the parameters or tell me at the last minute. She insisted the child record me on his iPad, thus giving him a responsibility that is completely inappropriate for a child. She even followed me into the interviewing room and set an iPad down and began recording. I tried to distract the child as best I could.

Prior to entering the interviewing room, I had tried to explain to the mother that recording must be done in a sensitive and unobtrusive way but she did insist on controlling the process.

The state of Washington is a two party consent for recording state. I did not know whether a parent can consent for another person to record their child but I will leave that up to the attorneys. Suffice it to say that I did consent and was happy to but I consented under the demands made by the mother.

On balance I consider mother to have placed unnecessary limitations on the data; and I also believe she placed her own needs above the needs of her child. Solutions existed that could have given mother what she requested but taken the child out of the middle of it.

<u>**INFERENCES, OBSERVATIONS AND CONCLUSIONS:**</u>

The APA guidelines for forensic practice (2013) emphasize the importance of distinguishing inferences, observations and conclusions:

PS001641[5]

Guideline 11.02: Differentiating Observations, Inferences, and Conclusions. In their communications, forensic practitioners strive to distinguish observations, inferences, and conclusions. Forensic practitioners are encouraged to explain the relationship between their expert opinions and the legal issues and facts of the case at hand.

For clarity to the lay reader "inference" is an interpretation. An interpretation uses psychological knowledge to ascribe meaning to a data point. Inferences can be connected to norms, empirical literature, and speculation, the latter of which I must be done cautiously and with caveats which acknowledge potential ambiguity and alternative hypotheses. I have included caveats throughout the report.

An "observation" is behavior that is directly observed and recorded and inferences are then drawn on the basis of the observation. Inferences related to psychological constructs are explained in the body of this report. A "conclusion" is a statement made on the basis of more than one type of data or method. The standard in psychological evaluation is the degree of certainty that accompanies the conclusion.

**Additional Caveats:**

I do not take the self report of litigants for the truth of their contents. The content matter of the narratives of the parties is examined for credibility at the time of trial by the trier of facts. My use of the narratives and the representations contained herein is to gain understanding of how self report affects their psychology and family dynamics (such as how elements of their reported histories impacts the children if they are found to be credible at trial.)

In this report the reader will see "if/thens" regarding allegations made by parties examined or not directly examined. They come in the form of "If" the trier of fact deems a representation to be true "then" from a psychological perspective it is important (with the reason why it is important).

I intend to make the limitations of my methodology known as they relate to my opinions.

**Present Study:**

180 minutes three interviews/observations with the child: (December 17th, 18th and 19th 2024)
185 minutes of interviews with the father
December 12, 2024 (70 minutes)
December 17, 2024 (60 minutes+)
December 18, 2024 (35 minutes)
December 19, 2024 (20 minutes)
Information gathering through structured questionnaires (father only, mother declined)
Review of reports of Dr. Poppleton and Dr. Day
Child Behavior Checklist (father only, mother declined)
Review of school records
Family Drawing

PS001642[6]

This data was assigned different weights, the greatest of which was my interviews with the child.

**Prasanna (Father  DOB⬛⬛⬛1987)**

**NOTE:** These interviews were collateral to the interviews of the child. Evaluating the father is outside the scope of my role so I do not offer any opinions of his mental health. Behavioral observations of him are purely descriptive.

Parent interviews are usually supplemented by observations of the parent and child interacting together. Since father was unable to see the child because of a protective order, (and somewhat hampered by father living in Singapore) the evaluation parameters which I prefer did not occur. This observation would have helped me understand the parent - child relationship.

Father was articulate and very familiar with the details of his case. Father runs a crypto startup, and works four hour days. He spends a lot of time with his son playing games, helping with homework and practicing soccer. Father avers that he does outdoor activities with his son exclusively because mother has lupus and is sensitive to the sun.

Father appeared younger than his stated age of 37. He was soft spoken. His mood was mostly neutral and tranquil. He also had periods where he was teary and worried. His affect was consistent with the topic matter of what he was speaking about. Father displayed no symptoms of behavioral dysregulation or emotional instability; and no indications of hatred or disdain for the children's mother. He wants "A" to have a relationship with his mother but worries that mother's challenges with mental health prevent her from seeing it in the same way. That is, mother does not want "A" to have a relationship with him.

Father believes that mother's motivation is purely financial; and father believes that even offering her a general settlement is not enough – she wants more. Father denies any act of domestic violence but admits that there was loud fighting but not in front of the child.  (Note: The child acknowledged this in my interviews with him). Father admits that he should learn to be more patient with his son, but never uses any harsh discipline.

Father reports that the child is being influenced to believe that father does not want to see him. He reports that the child has said "that the child wants an equal relationship with both parents."

Father reports that his telephone calls are truncated by mother; and that the mother will not allow the child to pick up the phone, instead she sends him voicemail in lieu of a conversation (the child acknowledges directly that mother does not want him to speak with him). The current protective order does not allow the child to see him.

Father believes that if he paid the mother enough money she would resolve the case.

Father loves his child and says he is heartbroken over not seeing him.

I had a discussion with the father about pinching. He readily admits that he sometimes pinched "A", not hard and never leaves a mark. I helped him understand that in US culture this is seen as improper parenting. This was a completely novel concept to him. He was not defensive at all

PS0016437

about the topic. I discuss cultural norms and beliefs about child rearing practices in the conclusion section of this report.

**Child "A"  (age 8 years, ten months)**

Demeanor and Behavioral Observations Across Interviews

This eight year old child was a delight to talk and play with. He is a handsome young man of average stature who was easy to build rapport with and get to know. He was a bit shy at first but warmed up easily. He was not sure why he was coming to see me but knew it was "something about his dad." He made it clear to me that video game playing is his passion and was very surprised to learn that I am a very well known video game designer and programmer (at least I was some years ago). Video gaming is his favorite thing to do and so as we talked we played video games using a handheld gaming device that he brought and that I brought too (second and third sessions). We did not play any games the first session and I required him to ask his mother if we could play, which he did and which mother consented to. I got feedback from the mother that "A" liked me very much after the first session and that he "wanted to be kind" to me; and as such on the second interview he brought me a juice box and snacks which I thanked him for but said I could only eat a little because I have blood sugar issues. He instructed me on how I could best use the juice box so that I wouldn't spill the contents. I believe I established an excellent rapport with him and I am grateful for the mother's consent to have me speak with him, despite the concern and suspicion and interference she showed (see above).

Session one:

My questions were pre-planned. I had the questions written on a small pad which I kept on my lap. As "A" spoke I filled in the spaces on the pad. This is called a structured interview and I believe it is one of the best ways possible to memorialize interview data in a non intrusive way.

"A" started off shy but warmed up quickly. He commented that we were in a big (conference) room. He appeared to be impressed with that. I asked him if he knew why we were here. He was not sure but he thought it had something to do with his dad. He lives in a home that he considered small compared to his home in Singapore. He shares his room in his US home with his mother and his grandmother, sometimes in the same bed but there is a second bed in his room as well. Throughout all of the interviews he emphasizes that he is "bored," when he refers to his home life. He used the word "bored" or "boring" repeatedly throughout the interviews. He said that he is bored in the US and bored in Singapore too. Despite being bored he likes his US friends but has plenty of friends in Singapore too.

I started off by asking "A" if he knows the difference between the truth and a lie. He commented that "the truth is the truth and a lie is something that you tell to get something." This is an age appropriate definition but does not necessarily represent any greater than average maturity. As children get older they usually add that there is a consequence to telling a lie and that the truth is tied to being moral. So, in this sense he does not show any extraordinary maturity. His answer was concrete and it seems like he is at the beginning stages of social maturation.

PS001644[8]

During this interview he referred to his dad as a "liar." When asked what he lied about he said that his father put video cameras in the house. I acknowledged that this is not an appropriate thing to do but I wanted to know how it was a lie. He continued by telling me he saw the cameras, even in the bathroom. If this is true and the cameras were turned on this is very inappropriate. However, in terms of reasoning. "A" is conflating doing something inappropriate with lying. Both are bad but they are different. This is also an indication of immature reasoning. The exception to this would be if the mother spoke to him about it (which "A" denies) or if he confronted his dad about it and his dad lied. (Father says this did not happen.)

"A" acknowledges he sometimes lies (mostly about video game playing). He sneaks in time, which is normal. Mother and father operate his video game play on what is called a "token economy." This represents excellent parenting by BOTH parents. "A" earns video game time and will also get "docked" if he does something that his parents do not like. For instance if he says he is bored his mother will take fifteen minutes of time away.

"A" likes to bring the topic back to video games whenever he can. It is his "safe space/topic." He spontaneously thanked me by saying it is nice to have someone to talk to about "things" and video games.

We discussed his feelings toward his father. First he said he "liked" his father and then, unprompted he said he "loves" his father, then unprompted he said he loves his father "very much" and said (unprompted) that he really wants to see him. In a later interview he went back to saying he "likes" his father.

"A" talks about listening to his parents argue. He was not in the same room but he tried to listen to them. He didn't really hear what they were saying, He never saw his father push or shove his mother but refers to what went on as "violence." [He clarified this in Interview #2]. He talks about his mother being upset. At one point his father had his bags packed and said he was leaving to go out of town but "A" did not know why. Dad said he would come back and "A" believed he could have come back. Father says he could not come back because of the protective order but he knows "A" believed he could have come back but did not want to. If mother reinforced this belief it would represent undue influence.

"A" says he knows what a protective order is. He brought up the word after initially not remembering it. He says he "knows all about it," saying "Mom told me everything." This is an example of undue influence and it is something that I opine on with a high degree of certainty.

I asked "A" about telephone time and whether or not his mom wants him to talk to his dad. He said no emphatically, then added "but I want to (unprompted). This is an example of undue influence.

Again on the topic of video games - he likes Minecraft and Roblox. Nothing violent. He knows that video game addiction is and he playfully says "I have it!" Since there is structure around his screen time I do not think he is addicted to screen time. He is merely being playful and showing a playful rapport with me. He likes science and math too.

PS001645[9]

I ask him to tell me what mom does for a living. His response was "sends email and talks on the phone." This is an age appropriate observation but does not indicate a mature mind.

"A" knows a little about the US. He doesn't know what the coasts are. He doesn't know who the president is — he says it's Donald Trump. I said, "not yet," and then he remembered "Joseph something"; and I congratulate him for knowing that.

On the issue of resisting going back to Singapore, "A" tells me he's fine going back to Singapore and does not mind going back as long as his mom and dad live in different houses and he visits both. He didn't like the yelling and "the violence." This was followed up in Interview 2.

He once again discloses that he wants to talk to his father on the phone and misses him and wants to see him.

We talked about feelings again and about the movie "Inside Out," which I believe has done a great job of teaching kids about their feelings. I asked how his mother feels and he reported "angry" and "frustrated." Asked about dad and he first said "anxiety" and then said "I don't know." We talked more about feelings and debated playfully about ennui.

We finished up by disagreeing that ennui is more helplessness and despair (more like "the blahs" versus "A"'s belief that it meant "boring.")

The session ended with "A" being excited to play video games next time and looking very happy.

Session 2:
Mother and I began Session 2, engaging in a conversation about recording (see above) which ended in her coming into the interview conference room and placing the child's iPad with a recording app on the table. I would have not placed it there because it did not seem to be in a good position for recording. I hope mother was not recording me and her talking because she did not ask for consent for that. It would have been okay if she had asked, however. Mother had already objected to telling her side of the story which I would have appreciated, as it would have given me context about domestic violence allegations and also would have given me information about what I could have followed up on with the child.

"A" and I began by talking about video games for a moment and while we were setting up I asked if mom told him anything about recording me. He started by saying "She wanted to make sure..." and then stalled but the gist of what he was reporting was that mom wanted to make sure I was accurately reporting. He didn't know he was recording me and her talking because she did not seem to care when he surreptitiously discovered his iPad was on and recording. He did repeatedly look over to the iPad when we were just talking and not playing video games.

We started this session by doing a family drawing. The way I use family drawings is not by assigning any symbolic meaning to them, rather by using the drawing as an anchor around asking the child to tell me what is going on.

PS001646°

"A" made several self-deprecating comments about his drawing ability. I assured him that I would not judge.

The drawing was noteworthy in that all the family members were together and they were encircled by a wavy line. "A" said this was to show them as a family. I asked him to tell me how everyone was feeling. He said that everyone was "happy." I asked if there was anything going on to make them unhappy and he answered only if there was violence. This prompted me to ask him again if he ever saw violence to which he denied it (for the second time). I asked him if his mother ever talked to him about violence. He became very nervous and said yes. I asked him how many times, and at first he could not answer and then said "two or three times." If that is true this would indicate undue influence. Violence is a topic I am unsure whether "A" truly understands, when he talks about it his affect is neutral. When family violence traumatizes children their disclosures are made with affect consistent with the content they are retelling. "A"'s disclosures were made with neutral affect. My inference when all the data are considered, is that "A" has heard some yelling and has been told his father is violent and that has convinced him there was violence in his home. I will discuss the hypotheses around this later in this document.

"A" and I played a racing game. We took turns playing and "A" is super competitive. He did not want me to lose (we were playing as a team) so he would press buttons on my controller. He then gave me a lesson so that I could get better. There is no underestimating how sweet "A" is. There was a lot of laughing and giggling throughout our play. I asked him if he could tell me what he would wish for if a genie gave him 3 wishes. He didn't know what a genie is but the closest thing I could think of was "Gin," which is not such a nice figure in his culture but it was all I could think of. He got the analogy. He said "infinite wishes," which is not an uncommon response for kids.

I needed to help "A" come out of his video game playing concentration so that we could end our session. He is very attached to the games. Finally I asked "What does a dog have four of?" He said "legs?" I said "No, 'paws' Pause the game!" He smiled at that but kept playing.

After a bit more cajoling he did finally stop.

We talked about seeing each other tomorrow.

Session 3:
"A" greeted me warmly. As I walked into the consultation room, mother took the iPad and positioned it closer to "A" than it was before and adjusted it several times. My suspicion is that she did not get the audio quality she was looking for in the prior session. "A" playfully sang into the recorder.

"A" went back to using the word "like" to refer to his dad. I reminded him that he said love at some other point. I hypothesize that mother might have coached "A" because he was much more subdued about talking about his father than he was in the last two sessions.

I asked "A" how his parents act when he doesn't do what he wants. He told me that his mother usually doesn't have to do anything because he behaves with her. He offers that when his father

PS001647[1]

is disappointed in him he "hits" him. He then changed his response to "pinches." He says that his father does this often. He does not leave a mark.

Although "A" made this disclosure, he did not change his answer that going back to Singapore, as long as mother was there would not be something he would object to. He said that his mother did not tell him what to say to me.

Much of our talk happened while we were playing games. I would have to coax him to re-enter the conversation. This is often how children his age socialize. Whether this is a good or bad thing is up for debate but modern children interact with one another while fiddling with their devices.

We talked a bit about friends, playdates and sleepovers. "A" shared that he did not know his US friends well enough to have sleepovers.

"A" was better able to accept boundaries about stopping his play but tried to prolong it just a bit.

"A" and I talked about how nice it was for us to make new friends with one another. "A" said he would miss playing with me. I said I would miss him too. When I walked him outside he handed the iPad to his mother. Before we left the room "A" seemed eager to shut the iPad off as a result it did not record me telling mother what a great kid "A" is.

Collateral Documents

Questionnaires:

The questionnaires were of limited utility. They are of much better utility when both parents fill them out (mother declined participating). I did find the following responses and patterns to be reliable and consistently stated.

Acknowledgement of good co parenting principles
Denial of domestic violence
A co parenting environment that is high in conflict
Self criticism on father's part. He does not deny pinching but says he could improve by not threatening to pinch his son on the arm.
His concern about the mother being critical of the son
He was negative toward the mother in describing her character and motivation.

Family drawings

Please refer the the sections above which describe the family drawings in Session Two with "A".

The Child Behavior Checklist

This checklist is not normed for use in legal settings. It is a checklist of attributes the parent sees in the child. This would have had more utility if both parents had filled it out. This would have given me an opportunity to compare parental perceptions. Mother declined to fill this out. Father describes "A" as well adjusted and well behaved.

PS0016482

Report of Dr. Poppleton

Dr. Poppleton's report was a fair rendition of how coercive control adversely influences victims and children but he neglects citing alternate hypotheses although he does offer caveats. The self report of alleged domestic violence must rest on findings of fact. There are none at present so it will be up to the trial court to determine whether the mother's allegations are credible. Dr. Poppleton acknowledges this.

Dr. Poppleton did not do any psychological testing and relies on too little information to substantiate any hypothesis.

Mother's assertion that the child had no relationship with the father and the insinuation that the child is not bonded to him is controverted by my three hours of interviewing and observing the child. Dr. Poppleton did nothing to examine undue influence.

Dr. Poppleton relies on the self report of the mother to speculate on the experiences of the child.

My conclusion is that for these reasons I did not rely on Dr. Poppleton's report to any large extent in my own opinion formation.

Report of Dr. Day

The report of Dr. Day notes similar methodology concerns expressed by me. I concur with her conclusions in their entirety and note the failure of Dr. Poppleton to develop hypotheses which discuss undue influence. I did rely on Dr. Day's report to a limited extent to assess how it comports with my methodology concerns about Dr. Poppleton and my own conclusions.

School Reports

School reports from the Singapore American School from 2022 to 2024 indicate that "A" receives glowing praise in both academic acumen and social interaction. He occasionally needs to be told to get on track but otherwise his grades are all in the "S" or "3" range which are the best grades possible.

**CONCLUSIONS AND FORMULATION:**

1. The Issues of Mature Age and Undue Influence:

The concept of "mature age" is a psycho-legal construct. That is to say it is a concept meant to guide and direct the court in its decision making based on psychological data and reasoning. Mature age cannot be directly measured because a child can be "mature" in some ways and naive or adversely influenced in other ways. This is especially true in children under 12 which is generally when children develop more complex and abstract reasoning.

PS0016493

The term "construct" refers to an abstract concept or theoretical idea that is not directly observable but is used to explain and predict phenomena within the domain of human behavior. Constructs are integral to the field of psychology because they provide a framework for understanding complex and multifaceted human behaviors in a systematic and testable way (Furr & Bacharach, 2014). However in psycho-legal settings mature age is a legal defense, not testable via psychological testing (it is indirectly inferred); and with respect to psychological testing there are no tests developed or normed for testing mature age in a legal setting. Nor is it systematic; and not a framework because it is not subject to hypothesis testing. This is especially so in this case because hypothesis testing was made difficult  because of the mother's limited permissions.

As such, in this case, the notion of mature age is subject to presumptions and confounds that could misdirect the lay reader and confound the logic applied to the issue.  What I am saying here is that mature age is difficult to assess, except by offering behavioral examples.

By way of context, constructs (like mature age) are the building blocks of theories and research in many areas of psychology. Examples include self-esteem, intelligence and attitudes. These, like mature age, are abstract in nature and often require empirical support to make them measurable.  (Rosenberg, 1965). By defining constructs operationally, researchers can develop empirical tests to assess their validity and reliability (Cronbach & Meehl, 1955). Still there are no empirical tests to measure mature age. In this case, psychological tests for directly measuring mature age are not available. There are psychological tests which purport to measure social maturity (like the BASC or Vineland) but the utility of these measures have been sharply criticized for use in legal settings and especially so in the context of Hague Convention cases. In addition use of these measures generally requires the participation of both parents and often teachers as well. Mother's failure to consent impairs these comparisons.

Factors seen in observable behavior which auger against mature age are "A"'s ideas about "violence" in his home and how he draws those conclusions. He has not seen any violence, has heard yelling, does not know what the yelling was about and conflates violence with arguing. There might have been violence in the home but it was nothing "A"  can supply details about.

"A" loves his mother and wants to be where she is, but wanting to be with a parent is a different construct than using mature logic for "wanting to live in a place." Although he wants to live with his mother (perhaps a more important construct or metric for a custody case), he has no objection to living in Singapore. As such he is not making any choice except that he wants to live where his mother is. He will live in Singapore as long as mother and father do not live in the same house.

"A" does not state an objection to returning to Singapore although he wants it on his own terms. Mother and father cannot live together and he wishes to see them both. At my last session with him "A" does not state a preference. He clearly states he has not decided.

"A" deliberated at one point that he would like to remain in the USA because of the "violence" in Singapore.  So he is inconsistent with regard to stating a preference because at another point after he said this, he says he is still "not sure.". Regardless, he does not state an objection to returning to Singapore. However when this is examined, it is hard to acknowledge that "A" really understands what violence is because he equates it with his parents arguing, which he

PS001650[4]

acknowledges he has heard from another room through closed doors. A fact finding at trial will examine the parties credibility surrounding "grave risk." All of the professionals in this case agree that domestic violence in the home constitutes grave risk, but arguing between parents in and of itself, while concerning, does not necessarily constitute domestic violence or grave risk. Domestic violence is a finding not an opinion. It is up to the fact finder to determine it after all the evidence is weighed. "A" has never wavered about not objecting to a return to SIngapore,

"A" speaks at length about how "bored" he is. He uses the term to describe life here in the USA as well as Singapore. This indicates to me that "A" is under stimulated in general and is also an indication that he is not of mature age. Mother punishes him for saying he is bored, I consider this a form of influence. The psychological term for that interaction is "shaping." Mother is suppressing a behavior ("A" saying he is bored) and by selectively rewarding him with game play if he does not say he is bored. Apparently, this is not effective since "A" says he is bored a lot.

"A"s love of video gaming can be a bit concerning. I believe that children who have a very strong interest in gaming sometimes do so to distract themselves from stress. His fervent interest in gaming was obvious to me in my time with him. While he was playing he was somewhat unreachable because he was so absorbed. Children who play games with intense focus manage social relationships by playing parallel with one another. They do not interact unless they are playing multiplayer games online. "A"'s limited ability to engage while playing; his inability to stop playing, were indicators of immaturity. While the argument "they [me and "A"] only played games"might be posed to diminish the importance of what happened during "A"s time with me, it is actually very good data. And there was plenty of non video game talk as well.

Undue Influence

"Undue influence" must be taken into account with any data which purports to support any argument for mature age. It constitutes "the other side of the coin." There is substantial evidence which supports that mother has unduly influenced "A." This is not only seen in her influencing the evaluation process and making her son audio record me which could have but did not seem to undermine the child's trust in me. Other behavioral indices of undue influence come from the comments mother has made to the child about violence allegedly perpetrated by the father, Another disclosure by the child was that mother does not want "A" speaking to the father by phone. The child told this to me directly. Father has told me that he pleads with the child to pick up the phone, even if to say to the father, "I do not want to speak with you."

Another indicator of undue influence was when the child told me about the "protective order" a term no eight year old child knows about unless taught what it is. I did not bring up the term — the child did, and when I asked him where he learned the term "A" told me "my mother told me everything."

The mother is out of touch with her own motivation for behaving in certain ways. She does not realize how intrusive her behavior was to my evaluation because she thinks that I will lie about what happens during my interview with the "A". Her behavior is direct evidence that she will overstep in order to control the outcome. This is the first time in forty years of practice where a

PS001651[5]

parent has behaved like this. I understand her reasoning but behind that reasoning is self righteousness that can lead to adverse consequences for her child.

Restrictions that were placed on my assessment introduce significant confounds into my analysis. How these restrictions were placed on me are significantly related to the analysis. I have described the confounds but ultimately it will be up to the court to determine things like whether, from a legal perspective, they represent a form of undue influence placed purposefully on the process as well as the child.

2.    How The Issue of Domestic Violence Factors Into Hague Issues and Defenses:

Issues surrounding domestic violence are becoming increasingly important in court decisions in many venues; and in this case they factor into perceptions of mature age as well. This overview explains why:

Intimate Partner Violence (IPV) is any behavior either physical or emotional that seeks to manipulate, humiliate or entrap a current or former partner. This behavior has been examined in this case, by Dr. Poppleton. Mother has given examples of abuse to Dr. Poppleton. The history of domestic violence as reported to Dr. Poppleton is that it is high in frequency (It has allegedly happened often), intensity (it has allegedly caused her injury) and duration (It has allegedly happened over a long period of time).

Evan Stark's concept of coercive control further elucidates the mechanisms through which abusers exert power. Coercive control is a pattern of behaviors that include intimidation, isolation, and control over resources, which can intensify post-separation as abusers seek to reassert dominance. Stark (2007) notes that these behaviors aim to dismantle a victim's autonomy and self-efficacy, increasing their exposure to harm even after leaving the relationship. All three experts agree that domestic violence is harmful to the victim and children.

However, determining the credibility of allegations of abuse are up to the fact finder.

Corporal punishment described by "A" includes that father pinches him as a form of discipline. Father acknowledges this. APA ethics require that cultural differences must be explored and acknowledged:

There is no definitive evidence that pinching as a specific child-rearing practice is universally accepted or prescribed within Hindu parenting traditions. However, certain physical disciplinary methods, including mild forms such as pinching, have historically been used in many cultures, including Hindu communities, as part of broader strategies for instilling discipline.

In Hindu parenting, discipline and respect for authority are often emphasized as essential virtues. In traditional settings, parents or elders may use mild physical gestures, such as pinching or tapping, to correct behavior without causing significant harm. These actions are typically seen as symbolic forms of correction rather than severe punishment. They are often justified as non-abusive and are sometimes accompanied by verbal admonitions to teach the child the perceived

PS001652[6]

importance of obedience and self-control (Kakar, 1978 in  The Inner World: A Psycho-analytic Study of Childhood and Society in India. Oxford University Press.).

This is meant purely for context and does not condone pinching as a form of discipline as this is not  a cultural norm in the United States.

Gatekeeping:

Parental Gatekeeping is an important formulation in this case because of how it operates on the minds of children. In this case, if it is found, it would in my opinion represent a form of undue influence as well as child maltreatment.

Parental gatekeeping refers to behaviors by one parent that regulate the other parent's access to their child and influence the quality of the parent-child relationship. Father asserts that mother controls access, primarily phone access (which is significant because it is the only access allowed) and seeks to marginalize him by doing this. In this case it is likely that whatever feelings the child has that are critical or negative are going to be potentiated or intensified by stunted contact. Gatekeeping behaviors can range from facilitative to restrictive. Facilitative gatekeeping involves actions that encourage and support the involvement of the other parent in the child's life, whereas restrictive gatekeeping involves limiting the other parent's involvement, often through criticism, withholding access, or creating barriers to interaction (Austin et al., 2013; Ganong et al., 2017). Father  claims that mother engages in these behaviors in a repeated pattern.

Restrictive gatekeeping can arise from concerns about the other parent's competence or safety but may also stem from conflict, control issues, or attempts to alienate the child from the other parent (Pruett et al., 2012). Father alleges that this is a co-parenting dynamic that interferes with his access.

Restrictive gatekeeping, particularly in high-conflict divorces, can harm children's emotional well-being. Children exposed to restrictive behaviors may experience loyalty conflicts (alleged to be a dynamic in this case), stress, and anxiety due to the pressure to align with one parent over the other. This dynamic can disrupt attachment bonds and increase the risk of depression and emotional insecurity (Sandler et al., 2013). Conversely, facilitative gatekeeping supports emotional security and positive identity development by fostering strong relationships with both parents.

Restrictive gatekeeping can impair the quality of the child's relationship with the targeted parent. This may lead to estrangement or even parental alienation in severe cases, negatively affecting the child's sense of familial belonging and stability (Warshak, 2015). Children in such circumstances may internalize feelings of guilt or confusion about their loyalties, which can affect their long-term relational patterns. Children subjected to restrictive gatekeeping are at a higher risk for behavioral issues, including aggression, social withdrawal, and academic difficulties. These effects are often intensified by the child's exposure to ongoing parental conflict and diminished parental involvement (Kelly & Emery, 2003). Conversely, when gatekeeping is facilitative, children tend to exhibit fewer behavioral problems and greater social competence due to the stability and cooperative parenting environment. The effects of restrictive

PS001653[7]

gatekeeping can persist into adulthood, influencing the child's future relationships and trust in others. A history of limited access to one parent can leave adult children with unresolved issues related to loss, abandonment, or inadequately processed family conflict (Hetherington & Kelly, 2002).

In my experience blocked contact can erode the bond between the targeted parent and child who might inadvertently assume that the targeted parent does not wish to be in contact with the child. This, in turn can lead to a permanent estrangement, especially when there is a lot of geographical distance between the targeted parent and the child.

Gatekeeping can and does sever bonds with the targeted parent and can be difficult if not impossible to repair.

**Summary Statement:**

While the methodology utilized to formulate my conclusions in this case was somewhat compromised by mother's lack of participation, and interference, it did not destroy the usefulness of the data completely.

This case is an extremely volatile case involving allegations of domestic violence, and claims of parental access interference, undue influence on the children and restrictive parental gatekeeping.

I attempted to show how all of these dynamics influence a child's state of mind when considering whether a child is of mature age. In this case there are several factors which indicate the child is not of mature age to determine where he wants to live. While he is more emotionally close to his mother he wants to be in the same vicinity of where she is. The country does not appear to matter, He has no objection to returning to Singapore. He has no fear of returning to Singapore. He does not think Singapore is a dangerous place. He has as many friends in Singapore as he does in the United States. His Singaporean school grades are consistently good.

"A"'s views are colored by a pattern of intrusive behavior which mother demonstrated directly to me in the course of this evaluation by trying to control the evaluation environment. She has also burdened the child with the responsibility of doing things (like recording our sessions) and knowing things (about the marital relationship), such as the protective order, which drag the child into the middle of the co-parenting conflict. Docking the child for saying he is bored inhibits the child's self expression which is an undue influence in and of itself.

Mother is a loving mother, but her behavior (meant to protect the child) is also self righteous and if what the child says is true, inappropriate.

The child's love of video games infers to me that video game environments are his preferred environments. Video games are his escape and the process of escaping serves a calming purpose. This indicates a lack of maturity but it is also understandable because the prospect of choosing where he wants to live is likely very stressful.

PS001654[8]

The defense of grave risk was also examined. The elements of grave risk such as domestic violence and coercive control are subject to the court's ruling. Findings of domestic violence are made by judicial determination, not by expert opinion; and if there are findings that suggest grave risk and all the experts agree on this.

The child did not report anything that would constitute child abuse. His disclosure about father pinching indicates unwise parenting but not necessarily abuse. This pattern of behavior could be culturally influenced but the father should still address it and avoid it.

In conclusion, "A" is not of mature age for the reasons stated above; and there is substantial data which shows undue influence. "A" is not afraid to return to Singapore, nor does there appear to be a grave risk of harm if he does. I hold these opinions with a high degree of psychological certainty.

Respectfully submitted,

Peter J. Favaro, Ph.D.
Child and Forensic Psychologist
December 20th 2024

**References:**

- Austin, W. G., Fieldstone, L., & Pruett, M. K. (2013). Bench book for assessing parental gatekeeping in parenting disputes: Understanding the dynamics of gate-closing and gate-opening in child custody disputes. *Journal of Child Custody, 10*(1), 1–16. https://doi.org/10.1080/15379418.2013.778693

- Cronbach, L. J., & Meehl, P. E. (1955). Construct validity in psychological tests. *Psychological Bulletin, 52*(4), 281–302. https://doi.org/10.1037/h0040957

- Furr, R. M., & Bacharach, V. R. (2014). *Psychometrics: An introduction* (2nd ed.). SAGE Publications.

PS0016559