

```
 1                UNITED STATES DISTRICT COURT

 2           WESTERN DISTRICT OF WASHINGTON AT SEATTLE

 3    _____

 4    PRASANNA SANKARANARAYANAN,      )
                                      ) C24-1745-RAJ
 5                                    )
                        Plaintiff,    ) SEATTLE, WASHINGTON
 6                                    )
      v.                              ) January 21, 2025
 7                                    ) 9:00 a.m.
      DHIVYA SASHIDHAR,               )
 8                                    ) EVIDENTIARY
                                      ) HEARING
 9                      Defendant.    ) Day 4

10    _____

11              VERBATIM REPORT OF PROCEEDINGS
            BEFORE THE HONORABLE RICHARD A. JONES
12              UNITED STATES DISTRICT JUDGE
      _____
13

14
      APPEARANCES:
15

16

17    For the Petitioner:     Richard Min
                              Green Kaminer Min & Rockmore LLP
18                            420 Lexington Avenue
                              Suite 2821
19                            New York, NY 10170

20
      For the Respondent:     Katelyn Skinner
21                            Katrina Anne Seipel
                              Buckley Law PC
22                            5300 Meadows Road, Suite 200
                              Lake Oswego, OR 97205

23

24

25
```

1                          EXAMINATION INDEX

2

3    EXAMINATION OF:                                      PAGE

4    LANDON POPPLETON     CROSS EXAMINATION (Cont.)        3
                          BY MR. MIN
5                         REDIRECT EXAMINATION             23
                          BY MS. SEIPEL
6                         RECROSS EXAMINATION              35
                          BY MR. MIN
7                         REDIRECT EXAMINATION             41
                          BY MS. SEIPEL
8
     PETER FAVARO         DIRECT EXAMINATION               47
9                         BY MR. MIN
                          CROSS EXAMINATION                76
10                        BY MS. SKINNER
                          REDIRECT EXAMINATION            115
11                        BY MR. MIN
                          RECROSS EXAMINATION             125
12                        BY MS. SKINNER

13   DEBORAH DAY          DIRECT EXAMINATION              132
                          BY MR. MIN
14                        CROSS EXAMINATION               161
                          BY MS. SKINNER

15

16

17                         EXHIBIT INDEX

18

19   EXHIBITS ADMITTED                                   PAGE

20    Exhibit 107                                         132
      Exhibit 108, pgs. 1658 - 1674                        47

21

22

23

24

25

1          THE CLERK:  We are resuming our evidentiary hearing

2   in the matter of Sankaranarayanan versus Sashidhar, C24-1745,

3   assigned to this court.

4          THE COURT:  Good morning.  We'll continue the trial

5   with the continued cross examination of Dr. Poppleton.

6   Please have him step forward.

7                      LANDON POPPLETON

8    Having previously been sworn, testified further as follows:

9          THE COURT:  The witness is still under oath.  Resume

10   your examination, counsel.

11          MR. MIN:  Thank you, Your Honor.

12                  CROSS EXAMINATION (Cont.)

13   BY MR. MIN:

14   Q   You didn't perform any psychological testing on the child,

15   correct, Dr. Poppleton?

16   A   That's correct, counselor.

17   Q   You did receive some background information from the

18   mother in the form of written questionnaire answers, correct?

19   A   I did, yeah.

20   Q   What was the purpose of that?

21   A   Just to get a little bit of an idea of some potential

22   history and adversity the child might have experienced.

23   Nothing more.

24   Q   I'm going to show you a document that's been admitted into

25   evidence as Petitioner's Exhibit 110, it's Bates page No.

1    2147.

2    A    Okay.

3    Q    Page 5 of the document.  And this is the questionnaire

4    that you provided to the mother?

5    A    That's correct.

6    Q    Then she gave you back, with answers?

7    A    Yes.  I believe she typed them in.

8    Q    And at the bottom of Page 5, you see where there's a

9    section that asks, "Has your child or do you suspect that

10   your child has been:"

11   A    I do see that, counselor, yes.

12   Q    Then she says "no" to physically abused, "no" to sexually

13   abused, "no" to emotionally abused, right?

14   A    That's correct.

15   Q    She does say the child was neglected, below that, correct?

16   A    Yes, she does.  She says, "yes."  I'd have to recall what

17   she says by looking at it, but I'll just leave it there.

18   Q    And she focused on the fact that in her mind the father

19   was focused on his career; is that accurate?

20   A    I'm reading that as you're talking about it.  Yes, that is

21   correct.

22   Q    And then she says, under the last sentence, that "In

23   recent times, however, the father abandoned our child since

24   August 31st."

25   A    That is correct.

1    Q    Were you aware that the mother had sought and obtained an

2    order of protection against the father, preventing him from

3    having contact with the child?

4    A    My recollection of that, and I reviewed my notes here

5    recently, is that was in the process, I think, by the time I

6    was interviewing her.  So I do have it noted in there, she

7    was trying to obtain one of those through the state of

8    Washington.

9    Q    Okay.  But she didn't tell you whether she had obtained

10   that at that time?

11   A    No, I don't believe that I knew that at that time.

12   Q    And can you just remind us, when is it that you met with

13   the mother?

14   A    Well, that's a great question.  It would have been around

15   Thanksgiving week, before and right after that week.

16   Q    Okay.  Are you aware of the American Psychological

17   Association guidelines in forensic reports and forensic

18   testimony?

19   A    I am aware of it.

20   Q    You're not a member of the APA anymore, correct?

21   A    No.  I was many years ago.

22   Q    Would it be fair to say you did not employ, use, or follow

23   the APA forensic guidelines in this case?

24   A    For what purpose?

25   Q    For what purpose, meaning as an ethical guideline to

1    employ in forensic evaluations.

2    A    Well, you have to look at the purpose those are applied

3    to.  So if you're asking if I did an evaluation with an

4    opinion on the matter, I don't think that they could be

5    applied, given the limitations that I had.  But that's not

6    what I did.  So I'm not what you're referring to.

7    Q    Okay.  AFCC Guideline No. 13 deals with forensic virtual

8    evaluations, correct?

9    A    I would have to look and see, but I believe that's in

10   there.

11   Q    That requires informed consent when evaluating via Zoom,

12   correct?

13   A    I'd have to look at that to recall.  If you have that in

14   front of you, I can do that.  But I would assume that's the

15   case.

16   Q    Did you obtain informed consent when you evaluated the

17   mother and the child by Zoom?

18   A    Yeah.  There was a conversation with the attorneys and an

19   expectation that that would happen that way.  It was all laid

20   out very clearly.

21   Q    Did you get the informed consent from the mother or from

22   the mother on behalf of the child?

23   A    Yeah.  There was a very clear understanding of how that

24   would be happening.  And she voluntarily engaged and

25   voluntarily engaged her child in it.  Then I talked to her

1  child about it and got his assent about it, too.

2  Q   Did you note that in your report that you got the assent

3  of the child to interview him over Zoom?

4  A   I don't know if that's required to be put in the report,

5  but I don't believe it's in there.

6  Q   When you say this was the understanding, this was the

7  understanding of whom?  Between you and the mother's lawyers

8  or between you and the mother?

9  A   Well, everything happened through her representation, so

10  -- and then she engaged in that from all points of view in a

11  voluntary way.

12  Q   We talked a little bit last time about the MMPI test,

13  correct?

14  A   Yeah.  You asked a couple questions about that, I recall.

15  Q   When you have used it in other cases, do you prefer the

16  MMPI 2 or 3?

17  A   I like the 2.  I think it is phasing out.  But that's my

18  -- that's the one I prefer.

19  Q   Why is that?

20  A   I think it's a richer test.  I think it has a stronger

21  research base behind it.  There's at least some child custody

22  norms that I'm familiar with on it.  And I don't view the

23  updated version as having those things.

24  Q   Okay.  What other tests are -- were available to you that

25  you could have used as part of this evaluation, if given more

1   time?

2   A   If I was given more time and given more latitude to

3   conduct an evaluation that would lead to an opinion, which is

4   what path you're going down, it's a hypothetical, I might

5   have used the Child Behavior Checklist.  I might have used an

6   MMPI.  I'm not really sure about that.  I'd still have to go

7   look at the norms on that.  But that might be what I'd use.

8   I often will use a brief screener IQ test just to check for

9   any potential problems.  That's typically what I use.

10  Q   The last part I didn't catch.  You would use an IQ test to

11  check for potential problems?

12  A   Problems with IQ.  It's a screener that I use.

13  Q   And you also mentioned the Child Behavior Checklist?

14  A   Yeah.  It's a very commonly used test.  I use it quite

15  often.

16  Q   Can you explain that Child Behavior Checklist, please?

17  A   Yeah.  It's a test that goes into probably two primary

18  domains.  It looks at areas of competency, like educational

19  attainment and how well they do, what sports and activities

20  they're in, and how well they do those things.  And it has

21  ways of scoring that towards that aim of looking at

22  effectiveness in different domains of life.

23      Then there's another domain of it that looks more at

24  resiliency type of domains.  Those could be things like

25  internalizing problems, like emotional difficulties, or

1    externalizing problems, usually things that manifest in

2    behavior.  It's just a good measure to get an idea of a

3    child's competency and resiliency.

4    Q   Why were you not able to employ the Child Behavior

5    Checklist in this case?

6    A   I think in this particular case I don't believe that the

7    aim was to ultimately provide an opinion or do an evaluation;

8    it was to identify an issue and provide some potential

9    education to the court that might aid in analyzing the

10   evidence in this particular case.  So it was just a different

11   process.

12   Q   So were you instructed by the mother's attorneys not to

13   provide an opinion in this case?

14   A   No.  I wasn't instructed to not provide an opinion.  I

15   think the hope for counsel in many cases, and there's often

16   demands placed on psychologists to do this beyond their data,

17   is that maybe I would do something like that.  But the

18   procedures are inherently -- have inherent limits and would

19   preclude me from providing any opinion on it.

20   Q   But you said before that the aim was to educate, not

21   provide an opinion.  So I'm curious, where did that aim come

22   from?  Was that self-imposed?  Or was that a mandate or

23   instructions from the mother's counsel?

24   A   I think that's a great question.  I think -- I'm not

25   really sure, when I think back on it.  But the best I could

1    probably answer that question is, is that at some levels of

2    involvement of a psychologist, that's what can be provided,

3    is information that might meet a criteria of helpfulness.

4    Other levels of -- through agreement or involvement in the

5    case, can extend itself further to be able to provide

6    opinions on particular matters, depending on what has been

7    offered and asked and agreed to going forward.

8        In this particular case, I don't recall any particular

9    conversation that occurred, other than the best that I could

10   do is provide some information that would be helpful to the

11   trier of fact.

12   Q   So your testimony, then, is that what counsel asked you is

13   to provide information to the finder of fact, not provide an

14   opinion; is that fair?

15   A   I think my answer is, I don't recall any particular

16   conversation about that.  I think it was more fluid around

17   the nature of my involvement and what I'm able to provide.

18   But I don't recall any particular directive that was given.

19   Q   Well, but when I asked you why you didn't employ the Child

20   Behavior Checklist, your answer was because that was not the

21   aim of this case, which was not to provide an opinion, but to

22   provide information.

23       So it seems to me as though you chose not to do the

24   Child Behavior Checklist because you did not believe that

25   your purpose was to provide an opinion to this court.  So it

1  seems as though that was a self-imposed restriction.  Would

2  that be fair?

3          MS. SEIPEL:  Objection, argumentative.

4          THE COURT:  Sustained.

5  Q   If you had employed the Child Behavior Checklist, would it

6  be fair to say that it may have allowed you to provide an

7  opinion to this court?

8  A   No.

9  Q   If you had performed the MMPI-2, a Child Behavior

10  Checklist, an IQ test, and collected other data from

11  collateral methods, would it be fair to say that you would --

12  it would have put you in a better position to provide an

13  opinion to this court?

14  A   Yeah.  I think that that matters.  It's a question of

15  approximating the ability to do that.  I think it would be in

16  a better position, but I don't believe it would still allow

17  that to happen.

18  Q   But you don't know that unless you do the tests, right?  I

19  mean, you don't know whether or not you'd be able to offer an

20  opinion until you collect the data or try to, at least?

21  A   That's not true.  I think I could tell you that now.

22  Q   What would have allowed you to offer an opinion to this

23  court?  What amount of data collection would have permitted

24  you or put you in a position to offer an opinion?

25  A   I appreciate that question, counselor.

1          If there was an agreement that came where it allowed for

2    there to be a comprehensive view of the case itself -- that

3    would be access to all the parties involved, the ability to

4    generate particular hypotheses under the law, to test those

5    through multiple methods of assessment, to seek and develop

6    hypotheses and entertain those hypotheses with respect to

7    alternative relevant and rival hypotheses, and then to be

8    able to ultimately, through employment of procedures,

9    establish reliable findings that could serve as the basis for

10   an opinion that would be something that would be, I think --

11   in a very succinct way, allow you to do that.

12   Q   We may have touched upon this last time, and I apologize

13   if we did, but going through my notes, hopefully they're

14   complete, but --

15   A   Yeah.

16   Q   -- in your evaluation, did you take into consideration any

17   cultural influences or cultural norms?

18   A   Yeah.  I tried to listen to mother about those things.  As

19   I mentioned, I don't have an opinion on them, on the ultimate

20   issue here.  But I did listen to what she had to say about

21   that, and her experience of that, and the influences of that

22   on her and their lives.

23   Q   What about the impact of cultural norms or influences on

24   forms of corporal punishment?

25   A   I think I listened to mother, particularly about how the

1    issues that were described reverberated through the family,

2    from her perspective.

3    Q    So did the mother talk to you about, or did you consider

4    the cultural norms as it relates to forms of corporal

5    punishment that she talked to you about?

6    A    So when you're dealing with cultural norms, you're dealing

7    largely with values.  And there can be a lot of variance,

8    even between families within the same culture.  So I did try

9    to listen very carefully about that and provide some of that

10   in the letter that I wrote.  But ultimately that would have

11   to be evaluated by the trier of fact.

12   Q    Can you repeat the last part?

13   A    Ultimately that has to be evaluated and weighed under all

14   the evidence that is provided.  But I listened to it.

15   Q    You say you listened to it.  But you said you've talked

16   about it in your letter.  Can you point to me where, in your

17   letter, you talk about cultural influences or norms as it

18   relates to corporal punishment?

19   A    I don't believe that's in my letter.  I think that had

20   more to do with kind of how individuals are situated within

21   the family and how things like patriarchal influences can

22   play out.  That was, I believe, the extent of that.

23   Q    I'd like you to focus on my question, not about how you'd

24   like to answer it.  But my question specifically is whether

25   you considered cultural norms or influences as it relates to

1    the allegations of corporal punishment in this family.

2    A    If it didn't come up, it wasn't considered.  And I don't

3    believe that came up.

4    Q    You did consider whether the mother shared inappropriate

5    information with the child, though, correct?

6    A    I think that was apparent through the conversation with

7    the child.  So, yeah, it was on my radar.

8    Q    That included conversations or information the child

9    seemed to have about the ongoing litigation and about

10   financial concerns, correct?

11   A    Yeah.  I think those were the primary issues.  They were

12   financial -- yeah, financial and the ongoing litigation,

13   yeah, absolutely.

14   Q    If a child had asked you to record one of your evaluation

15   sessions --

16   A    Sure.

17   Q    -- at the directive of one of the parents, you would agree

18   that it would raise in your mind the possibility of parental

19   influence in the evaluation, correct?

20   A    Yeah.  It would be one of several possibilities,

21   absolutely.

22   Q    And in this case, would it be fair to say that you could

23   not eliminate the hypothesis that the mother had influenced

24   the child during this evaluation process?

25   A    Well, I think I observed that there were conversations

1   that took place.  I don't think ultimately I was able to test

2   hypotheses against alternative relevant rival hypotheses.  So

3   I don't know that it would have gone that far.  But I

4   certainly made that observation.

5   Q   My question is, you were not able to eliminate the

6   hypothesis that the mother had influenced the child during

7   this evaluation process?

8   A   Yeah.  I don't agree with the presumption behind the

9   question.  You're asking as if I was attempting to test those

10  things.  I wasn't.  And so I didn't even attempt to do that.

11  Q   I don't think that's true.  I mean, you had a thought and

12  a hypothesis that you were not able to test that the mother

13  may have influenced the child during this evaluation process,

14  correct?

15          MS. SEIPEL:  Objection, argumentative.

16          THE COURT:  That's overruled.  You may answer that

17  question.

18  A   I had an observation about that, certainly.  And an

19  observation can lend itself to multiple rival hypotheses, of

20  which one of those could certainly be what you're asking me

21  about.

22  Q   Right.  So I'm not saying you didn't have other

23  hypotheses, but was one of those hypotheses, that the mother

24  was influencing the child during the coercive this

25  evaluation?

1    A    It would be a relevant hypothesis to consider, based on

2    that observation, just by the way these cases are generally

3    looked at.

4    Q    Did you consider that as one of many hypotheses?

5    A    Well, it would have crossed my mind that way.  But I don't

6    believe I was going about testing those things.

7    Q    I'm not asking about whether you tested it; I'm asking

8    whether you considered that as one of many hypotheses.

9    A    The distinction is relevant between what you're asking me

10    and what I'm saying.  But, yeah, it would have crossed my

11    mind, very likely.

12    Q    But if you didn't test it, then it would be fair to say

13    that you could not eliminate it as a hypothesis?

14    A    You have to test things to eliminate them, yes.  So of

15    course, yeah.

16    Q    So the answer was "no," you were not able to eliminate

17    that as a hypothesis?

18    A    The distinction matters.  I didn't attempt to do so.

19    There was no way I could.

20    Q    You were made aware that the child lived in the United

21    States from approximately -- well, from age zero -- not

22    approximately -- to approximately age 6, correct?

23    A    Approximately.

24    Q    He concluded kindergarten in the United States, correct?

25    A    I believe so, yes.

1   Q   And he concluded the end of pre-K, then the full year of

2   kindergarten in Seattle, correct?

3   A   I don't know if I have that level of specificity on that.

4   I think I have more gross years.  But I can work with that.

5   Q   And he lived in Seattle for a little bit less than two

6   years?

7   A   I know he lived there.  I don't know how long it was, but

8   it was -- that probably is correct.  I couldn't tell you

9   specifically.

10  Q   Part of that time was during the COVID pandemic?

11  A   I do remember that, yeah.

12  Q   And then you understand that the child lived in Singapore

13  from approximately ages 6 to 8?

14  A   Yeah.  There was a couple years there too.  The child

15  described that to me.

16  Q   He completed first and second grade in Singapore and

17  started third grade there?

18  A   Yeah.  That was my understanding from him.

19  Q   Okay.

20      And you would agree that a child's developmental stages

21  are important in a case like this when talking about

22  attachments and talking about development and maturity,

23  correct?

24  A   I agree with that 100 percent.

25  Q   And you would agree that in general -- I'm not asking

1    about this specific child in this case -- but in general

2    children make more meaningful connections in their social

3    life outside of their immediate family between the ages of

4    six to eight, than they do from the ages of zero to six?

5    A    Yeah.  I mean, children are going to venture out more the

6    older they get.  I think that would be a reasonable thing to

7    conclude.

8    Q    Once children get into school age, these meaningful

9    connections are more available to them, easier to make, and

10   they're more prone or primed because of their maturity and

11   developmental stage to make those meaningful connections,

12   right?

13   A    Yeah.

14   Q    Earlier on in life, the meaningful connections are

15   typically reserved for their immediate family and those

16   closest to them?

17   A    In early life.

18   Q    In early life.

19   A    Yeah, they're looking, you know, for the security of the

20   arms of their parents.  And as they grow and mature and gain

21   more confidence, they're able to venture out more, and school

22   activities.  And I think that trend would be reasonable.

23   Q    You mentioned in your testimony that you had reviewed the

24   child's school records.  Do you recall that?

25   A    I do recall that, yeah.

1    Q   It's not listed in your letter, though, as one of the

2    documents you reviewed?

3    A   No.  I think I just put that there was some things listed

4    in there.  And I think those school records were reviewed

5    after the letter, if I remember right.

6    Q   Okay.  So it was reviewed after the letter.  So it had no

7    impact on the contents of your letter when you wrote that

8    letter?

9    A   I don't believe so, not from my recollection.

10   Q   Okay.

11   A   I have to go back and look at what I had and when it was,

12   because some of it gets jumbled up.  But my recollection is

13   reviewing that after.  I can't recall if that was part of the

14   cache of information I had.

15   Q   Did your review of the school records alter in any way

16   your testimony here today compared to the contents of your

17   letter?

18   A   No.

19   Q   And by testimony here today, I mean also two weeks ago.

20   A   Yeah.  I get it.  I follow.  I don't think it changed it.

21   And you can look at the letter and see why it wouldn't, but

22   no.

23   Q   Do you recall what school reports or school records you

24   reviewed?

25   A   I believe there was some Singapore records in there that

1  had his grades in there and some descriptions of activities

2  he was involved in.

3  Q   U.S. school records at all?

4  A   I don't recall, honestly, right now.

5  Q   So we talked earlier that you did not do any testing on

6  the child, but you also did not seek any collateral

7  information or speak to any collateral witnesses other than

8  the mother about the child's functioning, correct?

9  A   The mother and child, and that's it.

10 Q   No behavior assessment or emotional assessment completed

11 by the parents in this case?

12 A   Not other than that survey you already asked me about

13 today.

14 Q   Are you familiar with the term "particularized

15 objections"?

16 A   I believe so.

17 Q   What does that mean to you?

18 A   That they have to have particular reasons for why the

19 particular objection is made.

20 Q   And in your interview with the child, can you identify any

21 particularized objections he made to returning to Singapore?

22 A   I provided those in the letter.  I just tried to provide

23 Your Honor with information from the child's words and that

24 was it, so you would have that to look at fairly rawly.

25     But the reasons had to do with things like a prospect of

1   friends, weather, feeling like the weather was better, having

2   a sense of feeling more like an American citizen, like this

3   might be more like home.  And those were the reasons.

4   Q   Did you ask him any follow-up questions or discuss these,

5   what you determined to be objections, with him during the

6   evaluation?

7   A   I asked him very particularly if he thought that his

8   desires to remain in the United States might have any impact

9   on anybody.  I recall that.  I think that's in my letter,

10  too.

11  Q   Did you ask him any questions about what he meant when he

12  said he feels like an American?

13  A   No, other than he just -- that's just what he said, you

14  know.  I didn't follow up on that any further than that.  He

15  said he feels like this is more of a home and he's more of an

16  American.

17  Q   Did you ask him any follow-up questions about what he

18  didn't like about the weather in Singapore?

19  A   He said it was too hot.

20  Q   In your opinion -- withdrawn.

21      You describe these statements to be, in your

22  understanding, to be a particularized objection; is that

23  fair?

24  A   Well, I think you're leading me down those things.  But

25  from the definition I gave you, I think all I can tell you is

1    those are the reasons he provided for his expression.

2    Q    Are you familiar with -- withdrawn.

3         Isn't it true that the psychological literature

4    supports the proposition that children who have been exposed

5    to removal by one parent away from the other parent, will

6    often ally themselves with the taken parent?

7    A    Repeat your question because I want to make sure I really

8    understand that before I answer it.

9    Q    Isn't it true that the psychological literature supports

10   the proposition that children who have been taken from one

11   parent -- taken by one parent from another parent will often

12   ally themselves with the parent that took them?

13   A    Okay.  I appreciate you repeating the question.  I was

14   going to try to repeat it myself before you did that.

15        The psychological literature on alignment with one parent

16   over the other actually lists out a host of risk factors.

17   One of those could certainly -- one of those influencing

18   factors could certainly be the physical removal from access

19   to the other parent.  One of many.

20   Q    In your report you did describe that the child himself

21   described meaningful time with his father, correct?

22   A    That's correct.

23   Q    Did you explore this with the child during your

24   evaluation?

25   A    Yeah, I believe I -- and I think this is in my letter,

 1    too, if I remember right.  But it sounded like kind of

 2    wrestling or roughhousing, play, just things you would find

 3    between a father and a son.

 4    Q   You were unable to observe any parent/child attachment --

 5    well, I'll withdraw the question.  You were unable to observe

 6    any father/child attachment during your evaluation process?

 7    A   I think that's fairly well established, my limits to

 8    access to this case.

 9           MR. MIN:  Your Honor, if I could just have one

10    moment.

11           THE COURT:  You may.

12           MR. MIN:  No further questions, Your Honor.

13           THE COURT:  Redirect?

14           MS. SEIPEL:  Yes.  Thank you, Your Honor.

15                       REDIRECT EXAMINATION

16    BY MS. SEIPEL:

17    Q   Dr. Poppleton, when you were retained on this case, did

18    you guarantee an outcome to my client?

19    A   No, I did not.

20    Q   The last time we were in trial here, Mr. Min asked you

21    quite a few questions about best-interest evaluations.

22    A   Sure.

23    Q   Why did you not complete a best-interest evaluation in

24    this case?

25    A   I don't think it would be possible to do that, given the

1    access to the case.

2    Q   Is it in a child's best interests to grow up in an

3    environment of abuse?

4           MR. MIN:  Objection, leading.

5           THE COURT:  Sustained.

6    Q   In an evaluation or assessment you conduct, is a finding

7    of abuse in a court proceeding a finding of fact that you

8    could rely on?

9    A   Let me repeat your question.  If there's a finding of

10   domestic violence or child abuse -- I mean, that's a broad

11   question -- would that be something that would be relied on

12   in making an ultimate issue recommendation?  Is that your

13   question?

14   Q   Would you consider a finding of fact or a finding of

15   domestic violence or abuse in assessing something in a case?

16   A   Yeah, I think you would certainly weigh that.

17   Q   You testified on cross examination that a child who is

18   depressed would be more vulnerable or suspect to a grave risk

19   of harm under the Hague.  Why is that the case?

20   A   There's an interaction -- these are often questions of

21   capacity.  So you have to kind of go back to the model we

22   used for capacity, and that has to do with a parent's ability

23   to meet the daily and emotional and developmental needs of a

24   child.  And domestic violence is a risk factor to that, that

25   exists within a parent where it exists.  And again, you need

1   to look at those carefully.  But there's another piece to

2   that capacity model, and they call it the "interactive

3   component" or the "interactive factor."  And that has a lot

4   to do with the vulnerability, the competency, the resiliency

5   of the child involved, and how that might be interacting with

6   a potential capacity problem that might be defined as the

7   presence or risk of ongoing domestic violence.

8        And so some children can weather those risk factors better

9   than other children can.  And so if you have a child who

10  maybe has some internalizing problems or externalizing

11  problems, you know, or maybe they're suffering in school or

12  socially in some way, you can broaden that out even further.

13  You would have to consider -- and you have to take every case

14  at its facts -- but you'd have to consider that that could

15  increase the vulnerability of that particular child to the

16  impacts of exposure to domestic violence, or family violence

17  -- child abuse.  I think you just said "abuse," so I don't

18  mean to narrow that.

19  Q   You said a number of times throughout your testimony that

20  you're not giving an opinion in this matter as to whether or

21  not there's a grave risk in the case.  So I just have a few

22  follow-up questions to that.

23  A   Sure.

24  Q   If the court finds that father sexually abused mother,

25  would you have concerns about risk?

1   A    Yeah, if there's a sexual-abuse issue in the case, that

2   would -- and there's a finding around that, that would fall

3   under the domain of intimate-partner violence.  And

4   specifically of sexual assault flavor.  And that could --

5   would need to be considered as how it would impact the

6   caregiving environment that a child is being raised in.  And

7   that would be something that would be on the table as

8   relevant.

9   Q    Was there any sexual abuse reported by mother that gives

10  you concern in this case?

11  A    There was lots of -- one of the larger domains that she

12  talked about had to do with what she reported to be pressured

13  sex, punishment if she didn't submit, a lot of things that

14  rose to the level of abuse, related to sex, whether it be

15  anal sex that she didn't consent to, or if it was related to

16  not having sex with her husband and being kicked in the back

17  after it, or having the child shaken, or whatnot, you know,

18  in form of retribution for not engaging in sexual behavior

19  with him.  So it was certainly something that she outlined in

20  quite a bit of detail.

21  Q    You said just now that sexual abuse was one of the domains

22  that mother talked about.  What other domains did you touch

23  on that might give you concern in this case?

24           MR. MIN:  Objection.  Your Honor, this is outside the

25  scope of cross.  This is direct examination, not redirect.

1          THE COURT:  Let's focus, counsel.

2    Q   Mr. Min asked you about your consideration of cultural

3    norms in this matter.  Does mother's report of her Indian

4    culture play into your assessment or concerns in this matter?

5          MR. MIN:  Objection.  Outside the scope of cross.

6    The question I asked was about corporal punishment, not

7    generally about cultural norms, although that's what the

8    witness wanted to answer.

9          THE COURT:  You opened the door.  I'll allow

10   latitude.  Please proceed.

11   Q   Does mother's report of her Indian culture play into your

12   assessment or concerns on this matter?

13   A   Well, she reported many things related to that.  I tried

14   to capture those as best I could in the letter that I

15   provided to recount that history.  But certainly I think you

16   would need to consider those things.

17   Q   Why are you no longer a member of the APA?

18   A   There's just -- there wasn't a reason for me to continue

19   to be a member.  I'm an AFCC member.  That fits more what I

20   do, it's catered more to my community and the work that I do.

21   And that's where I gain the most benefit from.  And that's

22   where I devote my attention.  So I'm a member of a different

23   organization.

24   Q   You testified a little bit on cross examination about the

25   Child Behavior Checklist.  What exactly is the Child Behavior

1  Checklist?

2  A   It's just a measure that -- I'll add a little bit more

3  detail to it, since I believe I was asked partially that

4  question on cross.  But it's a measure that a parent fills

5  out based on their observations of their child on a kind of

6  Likert scale, at least on one part of it.  And it allows you

7  to compare where the child falls across many different

8  domains of competency and resiliency, as compared to other

9  children their age.

10      And so it can tell you if a child, compared to other kids,

11  maybe has conduct struggles, attention problem, that's

12  another one on there.  There's a -- anxious -- I think it's

13  anxious withdraw scale, or anxious depressed and then

14  depressed withdrawn, I can't remember, I always have to look

15  at it to get my memory straight on it.  But there's a variety

16  of scales that tells you where a child falls compared to

17  others within their local peer group.  Or it's really more of

18  a peer group, I would take away "local," but more of a peer

19  group.  That was a misstatement.

20  Q   How is a checklist able to give you information regarding,

21  for example, conduct struggles, attention problems, whether a

22  child is anxious or depressed?

23  A   It's called the "checklist."  And there are things that

24  you would check on it, as a checklist, certainly.  However,

25  there is -- the last two pages of it have a small scale

1   related to a variety of items that would relate to a symptom

2   presentation of a child.  And so they are rated on that on,

3   "not a problem," or "sometimes a problem," or "a problem."

4   It's worded something like that, I'd have to look at the

5   actual checklist to tell you exactly.  But that's the gist.

6       Then those numbers are applied and tabulated in a way to

7   where you can get a score, and then you can place a child on

8   a distribution that compares them to what would be a

9   normative sample to show where they fall compared to those

10  other kids.

11      So you can see if they fall low on those scales, or if

12  they're kind of right in the middle, or average -- average,

13  maybe emotional experiences other kids their age, or if

14  they're on the high end of that distribution.

15      And typically on the higher end of the distribution would

16  indicate a greater likelihood of there being a problem with

17  that particular scale.

18      So that's how they do that.

19  Q   Mr. Min asked you about your consideration of mother

20  sharing what he called "inappropriate information" with the

21  child.  What is your assessment of whether mother is sharing

22  inappropriate information with the child?

23  A   So I think that there is a right way and wrong way to

24  answer that question.  I don't have an actual assessment of

25  where and what that's about, as a conclusion.  I have tried

1  to -- despite efforts to push me into doing that -- I have

2  tried to maintain a position that I don't have a conclusion

3  about that.  But there are multiple things that would be

4  likely things to consider as it relates to that issue that a

5  psychologist, maybe with much more access to the family,

6  might be able to answer, or the trier of fact, judge, would

7  be able to maybe analyze as it relates to that particular

8  issue.

9  Q   You said there would be things to consider.  What things

10  would you consider?

11  A   Typically when there are behaviors of a parent, there are

12  attitudes of a parent -- a lot of it is rooted in attitude.

13  There are words of a parent that are oriented towards what we

14  often call "gatekeeping" or closing the gate on a

15  relationship.  And it can be done through words, deeds, even

16  feelings communicate things as well; that is often the domain

17  that that's looked at under.

18      Now, gatekeeping has many facets to it, and this is why

19  it's not that simple.  There is what's considered unjustified

20  restrictive gatekeeping.  And then there's other terms for an

21  alternative hypothesis to that.  And that would be justified

22  or protective gatekeeping.

23      And that is where the issue of domestic violence comes

24  into play.  So it's not -- you really have to answer -- and

25  this is why that question of domestic violence is of uber

1    importance in every case.  But if there's a domestic violence

2    matter at play, it leads -- from an allegation standpoint,

3    you have to figure that one out first because of the way that

4    it can color everything else.

5        So if there's a history of domestic violence and a parent

6    is oriented towards gatekeeping, and it's a function of that

7    history of abuse, then you would have to look at that as

8    potentially falling into a protective gatekeeping role or a

9    justified gatekeeping position.

10       If there's not, you know, and not really a risk, you know,

11   to be had or established, then it might be an unjustified

12   gatekeeping conclusion that you might be looking at in the

13   alternative to that.

14       And so answering the question of domestic violence would

15   be the very first thing you would have to do to even begin to

16   entertain that gatekeeping question at all.  And that can

17   relate also to the influence that's discussed.  And that

18   could be the conversations that parents are having with

19   children.

20       So it's like -- it's complicated because in our domestic

21   relations world, the rules get turned upside down.  You might

22   have a malignant -- hypothetically speaking -- a malignant

23   pedophile across the street who is on a registry, and as a

24   parent you tell your kid:  Look, you need to stay away from

25   that household because there's some concerns that I have

1   about you going, walking by there, or doing this, or just

2   watch out for this person; nobody says anything about that.

3   They're applauded for their vigilance and concern.  But if

4   that person happens to be the other parent, well, now we've

5   got a huge mess on our hands.  And that's where a lot of

6   arguments can come out, be used against somebody who might be

7   a victim of abuse, related to their gatekeeping behaviors,

8   their words that they express towards their child, and the

9   potential reality that the causal reason for that could

10   actually be the abuse itself, and not the fact that you have

11   a parent who's scorned or vindictive.

12       It's a very difficult analysis to perform and one that has

13   to be done with a lot of care because if it's not done that

14   way, it also is -- the case can also be at risk, and this is

15   a common complaint about it, and that is that using the

16   gatekeeping argument, sometimes they call it "alienation,"

17   against a parent who is doing it as a function of domestic

18   violence is a way that victims of domestic violence get

19   perpetually abused throughout the course.  And so that is why

20   that analysis has to be done very carefully.  And the

21   domestic-violence analysis has to be done first,

22   unequivocally.

23   Q   How would you conduct the domestic-violence analysis?

24   A   Well, I'd certainly be taking information from multiple

25   sources and testing hypotheses about it through my various

1  methods of assessment.  And I'd certainly be doing that under

2  good theory about what we understand about domestic violence

3  and the different typologies of that, things like potency,

4  primary perpetrator, the impact it can have on a parent and

5  how they respond, the potential exposure that that can create

6  to the child, either directly or indirectly, through the

7  aftermath of such.

8      You might even, if you have findings of concern across

9  factors like that, you might be looking also at things that

10 might mitigate the risk.  And that can have to do with things

11 like a parent's insight about it, meaning a perpetrator -- if

12 you have established that there's one -- a perpetrator's

13 insight, you know, their responsibility taking, how they've

14 done -- what they've done to repair that going forward.

15     It's really no small task to tackle.  And so -- but it is

16 really that important.

17 Q   You were asked about psychological research surrounding

18 what may cause a child to align themselves with one parent

19 over the other.

20 A   Sure.

21 Q   And you mentioned that there were other factors to

22 consider other than the one that Mr. Min asked you about.

23 What are those other factors that might be considered?

24 A   Yeah.  There's many things that contribute -- potentially

25 can be contributors to that, from a strictly literature-based

1    perspective, right?

2        So you could look at history of family violence, would be

3    one of them.  History of conflict within the family.  Primary

4    caregiver is certainly one that could contribute to that.

5    There can be where children fall on an attachment hierarchy

6    with their caregivers that can have an influence on it.  You

7    can get the attitude and orientation of the parents

8    themselves, towards each other.  How the children are

9    triangulated into conflict.  There could actually be the

10   influence of other family members, is on that list as well.

11   And I'm just going through a schemata out of Kelly and

12   Johnson's seminal article on this.  Litigation.  Chronic

13   litigation, I believe, is on that as well.

14       And then you get down into some more nuanced ways that

15   that happens as well.  Sometimes children, in the aftermath

16   of domestic violence, or through maybe some of the lack of

17   emotional resiliency of a parent, sometimes they get

18   parentified in cases.

19       And if they are parentified or, in other words, tasked

20   with the job of being responsible for the emotional

21   well-being of a parent, that can also have an influence as

22   well.

23       But that influence, I've seen it go both ways, depending

24   on other factors and how they're interacting with each other.

25       Certainly the physical removal, to your opposing counsel's

 1   question, could be something -- people do take off and

 2   abscond with their children at times.  Or they just take off

 3   without hiding, they sometimes just tell the parent.  And

 4   then the courts have to get involved to try to resolve that.

 5       But you do need to look at whether this is -- the

 6   literature evolved from that to this gatekeeping framework

 7   that I think is a very helpful tool.  But you do need to do

 8   very careful work at teasing apart whether this is a

 9   protective orientation or just one that's completely

10   unjustified and harmful.

11       So those matter.  Because the protective orientation

12   really could reasonably be looked at as something that's a

13   protective factor to healthy child development, where the

14   unjustified restrictive approach would be a candidate risk

15   factor to a child's healthy development.

16           MS. SEIPEL:  I have no further questions.

17           THE COURT:  Further cross?

18           MR. MIN:  Yes, Your Honor.

19                        RECROSS EXAMINATION

20   BY MR. MIN:

21   Q   You talked just now about issues of domestic violence and

22   risk to a child.  And then you mentioned that if there are

23   findings of concern, or if there's concern, you might have to

24   look at mitigating risk, right?  I just want to make sure I

25   understood your testimony correctly.

1    A    Yeah.  I'll say it real succinctly because I think that's

2    what you're basing it on, is if you have an identified

3    primary perpetrator with a concerning pattern, let's say,

4    right, then there are sometimes things within the individual

5    perpetrator themself that would be a risk mitigating -- that

6    could be risk mitigating.

7        That would have to do with insight into understanding

8    their abuse and how they've done it, responsibility taking,

9    and a good orientation towards trying to repair things and

10   make things better for the family, and it had to do with

11   what's contained in the individual themself.  Yes.

12   Q    Okay.  But besides the internal mitigation of risk, I

13   mean, you would agree that there are external things that can

14   be done to mitigate risk, correct?

15   A    There are things that we try to do commonly, yes,

16   certainly.

17   Q    So what -- can you give me some examples of what that

18   might be?

19   A    Yeah.  Sometimes there's orders put in place, orders of

20   protection that proscribe how they'll communicate, if at all.

21   They'll proscribe things like how exchanges will take place,

22   distances to maintain.  Sometimes we bring in third parties

23   to serve as case managers.  All of them are with variable

24   results, depending on the case.  But there are certainly

25   things that we try to do.

1    Q    You talked about orders of protection.  Possibly

2    supervised visitation would be one?

3    A    Yeah.  That didn't cross my mind when you asked that

4    question.  But if there's concern about the risk to the child

5    in a particular case, supervised visitation is commonly used.

6    Q    What about therapeutic visitation?

7    A    Yeah.  It's different.  That's a different mechanism, but

8    it's, in my opinion, a higher level of supervision because it

9    actually allows for some processing to occur that

10   supervision -- straight supervision is going to cut down

11   completely on any conversations that move into a therapeutic

12   area or anything that might relate to any content of the

13   issues that they're dealing with.

14   Q    Would it be fair to say that supervised visitation focuses

15   on preventing harm and therapeutic visitation focuses on

16   repairing relationships?

17   A    I think that's a fair thing to say.  I think that you

18   could find some overlap because I do think contact can be

19   therapeutic also, even without the therapist involved, just

20   if you're looking at it that way.  But I think I would agree

21   with the premise behind your question, certainly.

22   Q    Counsel asked you, on redirect, whether allegations of

23   abuse of a sexual nature would have an impact on a child.

24   And you mentioned it certainly would impact on the caregiving

25   environment.  Do you recall that phrase, "caregiving

1    environment"?

2    A    Yeah, I think that's something that should be considered,

3    yeah, in any case where there's marital sexual abuse or rape.

4    Q    What do you mean by caregiving environment?

5    A    So a family has a task as it relates to a child, and

6    that's to help a child develop on a healthy developmental

7    course.  And if things are happening within the family system

8    that's having an impact on a parent's ability to serve in

9    that role to help a child develop well, then that can have an

10   impact on a caregiving environment.  And things like rape, or

11   any other controlling or abusive tactics, could certainly

12   have an impact on a parent's ability to do that.  And that

13   can be -- it just can create an air or a tension within the

14   environment a child is being raised in.

15   Q    Doesn't that presume that the parents and the child are in

16   one environment together, like one household together?

17   A    So in coercive-control cases, one of the big concerns is,

18   is that it can extend outside of that, outside of them living

19   together.  And the tactics that can often be employed -- and

20   again, these are things that have to be considered -- would

21   be things that would tether parents in some way.  It's often

22   kids and money.  And so tactics of coercion and control can

23   actually play through those as well, even where they're

24   separate.

25        Then there can be other things, like reputation

1    destruction, intimidation, things that would actually allow

2    for -- there are opportunities sometimes for those things to

3    hatch even also.  So they don't have to live together.

4    Q    I appreciate your answer, but it sort of goes beyond what

5    your answer was before because the question counsel asked you

6    about was the sexual allegations --

7    A    Sure.

8    Q    -- the sexual abuse allegations.

9    A    Sure.

10   Q    And your answer to that was the caregiving environment.

11   So I want you to limit yourself to the allegations with

12   respect to sexual assault or abuse, not about coercive

13   control in general.  Okay?

14   A    I --

15   Q    Let me finish.

16   A    Yeah.

17   Q    So my question to you is, the idea that sexual abuse and

18   assault that would be ongoing would affect the child's

19   caregiving environment presumes that they live in the same

20   household, correct?

21   A    Yeah.  Well, for you to -- there has to be some

22   opportunities for sexual assault to occur, right?  And so

23   they would have to be together in some way.  They don't

24   always have to live in the household together for that to

25   happen.  But generally speaking, I think that has been my

1  experience, that that's what happens during the relationship

2  and not after.

3  Q   Okay.  You were asked some questions about depression and

4  risk factors.  But in this case, did you make any observation

5  or gather any information that this child was depressed?

6  A   I believe it's at the end of my notes on that.  I asked

7  him a little bit about how his mood is, and I can --

8  Q   He said he was bored, correct?

9  A   Well, he said more than that, counselor.  He did say he

10 was bored, certainly.  But I asked him a little bit about --

11 Q   I'm not asking you to look at your report.

12 A   Yeah.  Off the gist, he talked about having some mixed

13 moods and them being up and down.  And that's at the end of,

14 I think, my notes that were provided through a discovery

15 request.

16 Q   You didn't diagnose him as having depression, though?

17 A   No.  I didn't diagnose anyone in this case, counselor.

18 Q   Based upon your observation of the child, would you be in

19 a position to diagnose him as having depression?

20 A   No.  I didn't do a diagnostic evaluation on this child.

21 Q   My question wasn't whether you did a diagnostic

22 evaluation, and let me finish my question.  My question is,

23 based upon the information that you gathered, would you be in

24 a position to diagnose him as having depression?

25 A   No.

1   Q   Do you agree that the issue of gatekeeping is tied to or

2   tethered to the issue of undue influence?

3   A   So I think -- I don't know how you're defining "undue."  I

4   think there's certainly an impact that it can have on

5   influence.  I don't know how you can get around that.

6   Q   Sure.  You're familiar that undue influence is one of the

7   factors a court has to look at when considering the

8   mature-child objection exception, right?

9   A   I understand.

10  Q   So you would agree that any information pertaining to

11  gatekeeping or any opinions that one might be able to draw

12  with respect to gatekeeping would be related to something the

13  court would have to determine as it relates to the potential

14  for undue influence?

15  A   Yeah.  I think when you're looking at a case like this,

16  you need to formulate where the influence is coming from and

17  the impact that that could certainly have.  And that's the

18  best information I think I could speak to, either generally,

19  or if I had more access to the case, more specifically.

20  Q   Okay.

21          MR. MIN:  No further questions, Your Honor.

22          THE COURT:  Anything further, counsel?

23          MS. SEIPEL:  Very briefly, Your Honor.

24                          REDIRECT EXAMINATION

25  BY MS. SEIPEL:

1  Q   Dr. Poppleton, the things that Mr. Min asked you about

2  regarding mitigation to risk, like therapeutic visitation or

3  supervised visitation, does the literature in your field say

4  anything about how effective these measures are at removing

5  domestic violence?

6  A   I think it's quite mixed.  I don't think that that has a

7  reliable literature body behind it.

8      I can tell you that the nature of coercive control, if

9  it's what's happening in a case, you always have to put on

10 your radar that there can be a risk of a victim doing things,

11 trying to ward off threats, by appeasing and complying and

12 falling back into the old patterns that existed in the

13 relationship.  And that can undermine best attempts at trying

14 to protect and set up structure to do that.  It requires a

15 reliance on parties who end up in a cult of two.

16         MS. SEIPEL:  I have nothing further.

17         THE COURT:  Anything further?

18         MR. MIN:  No.

19         THE COURT:  Any objection to this witness being

20 excused?

21         MS. SEIPEL:  He can be excused.

22         MR. MIN:  No objection.

23         THE COURT:  Thank you.  You're excused.

24     We'll do a stretch break at this time.  Counsel, call your

25 witness.

 1          MS. SKINNER:  Your Honor, the respondent rests,

 2   except that we would ask the court to admit into evidence

 3   passport pages, which we received from the petitioner.  And I

 4   conferred with petitioner's counsel.  He has no objection.

 5   We're compiling those for production as an exhibit to the

 6   court as we speak.

 7          THE COURT:  They haven't been created at this point?

 8          MS. SKINNER:  They were provided last night, and my

 9   assistant is working to compile what was received into a

10   format to provide to the court.

11          THE COURT:  Any objection?

12          MR. MIN:  We'll look at what they produced, but, no,

13   in general we have no objection to the passport pages.  I

14   fully intend the passport page production will be what they

15   purport to be.  But absent that one caveat, there's no

16   objection.

17          THE COURT:  Wait until we see an actual presentation,

18   counsel.

19          MS. SKINNER:  Thank you, Your Honor.  With that, we

20   rest.

21          THE COURT:  Counsel?

22          MR. MIN:  Yes, Your Honor.  We'd like to call

23   Dr. Peter Favaro as a rebuttal witness.

24       Your Honor, as Your Honor can recall, there was obviously

25   a lot of back-and-forth about Dr. Favaro's report and

1    testimony.  We submitted, with the consent of respondent's

2    counsel, last night, a copy of a redacted report by

3    Dr. Favaro.

4         However, in light of Dr. Poppleton's testimony on the

5    issue of gatekeeping, we believe that Dr. Favaro's report

6    should be admitted into evidence unredacted because many, if

7    not all, of the portions of the report, and we can go back

8    through it, related to the issue of gatekeeping, which is

9    what Your Honor had suggested should be removed and what was

10   the subject of redactions between counsel.

11        However, because respondent's counsel on redirect

12   specifically asked about gatekeeping and because

13   Dr. Poppleton admitted that gatekeeping is relevant to the

14   consideration of undue influence in this case, which is a

15   critical factor for this court to decide upon, we believe

16   it's only appropriate that Dr. Favaro be permitted to offer

17   testimony on the issue of gatekeeping.

18             THE COURT:  Any particularized response?

19             MS. SKINNER:  Your Honor, we would just renew our

20   motion that Dr. Favaro's report indicates that his conclusion

21   is that he did not rely on Dr. Poppleton's report in

22   formulating his opinions.  Again, that the report is not a

23   proper rebuttal report, and we'd ask the court to make a

24   ruling on the motion that we presented before.  In the

25   alternative, we rely on the exclusions that we had already

 1   conveyed to petitioner's counsel.

 2          THE COURT:  Before I read the report, let's hear the

 3   witness's testimony, so I can have context regarding what

 4   should be redacted or not, and there can be pinpoint accuracy

 5   as to what portions of the report that you're referring to

 6   that you believe the door has been opened on this particular

 7   area of gatekeeping, counsel.

 8          MR. MIN:  Thank you.

 9                        PETER FAVARO,

10       having been sworn under oath, testified as follows:

11          THE CLERK:  If you could please state your first and

12   last names and spell your last name for the record.

13          THE WITNESS:  First name Peter, last name Favaro, "F"

14   as in Frank, A-V-A-R-O.

15          THE COURT:  Just so we're clear, counsel, what I have

16   before me is Dr. Favaro's report.  I only see two very

17   limited redactions.  Are you representing to the court that

18   those limited redactions are pinpointed on the question of

19   gatekeeping?

20          MR. MIN:  One second, Your Honor.

21       Your Honor, I want to make sure Your Honor is looking at

22   the copy that was sent to the court last night.  I saw a nod

23   from your clerk, so I think we're on the same page.

24       Your Honor, if I could just have one moment.  Your Honor,

25   I apologize, I have the redactions that are blocked in.  We

1  also have a version that's just highlighted, and I want to

2  pull that up so I make sure I answer your question

3  accurately.

4          THE COURT:  Counsel, perhaps if you continue your

5  examination of this witness and as it comes up regarding the

6  redacted portions, you can then alert the court to particular

7  places.

8          MR. MIN:  Thank you.

9      Your Honor, for now we would offer, just before we start,

10  his CV and the redacted report into evidence, as

11  Dr. Poppleton's CV and report was admitted into evidence.

12          THE COURT:  Those are exhibit numbers?

13          MR. MIN:  The redacted report is not -- does not have

14  an exhibit number because that was just e-mailed to the

15  court, per the court's request.  So we could describe it as

16  sub A to the existing report, or give it a new number.

17          THE COURT:  The CV is listed at 108.

18          MR. MIN:  Yeah.  That included the unredacted report.

19  So we could list the redacted report as 108-A, or we can list

20  it as a fresh number.

21          THE CLERK:  Let's do 108-A.

22          THE COURT:  Let's do 108-A, counsel.  And the CV of

23  Dr. Favaro is 108.

24      First, counsel for the respondent, is there any objection

25  to 108 being admitted?

 1          MS. SKINNER:  No objection to the witness's CV, Your

 2   Honor.  And we again renew our motion and supplemental motion

 3   to strike the report as not a rebuttal report, indicating

 4   that Dr. Favaro has four paragraphs of critique of

 5   Dr. Poppleton's report on page 13 of his own.  Other than

 6   those paragraphs of critique, Dr. Favaro's report is an

 7   initial report providing opinions on grave risk and

 8   mature-child objections.

 9          THE COURT:  I'll reserve ruling pending the testimony

10   of the witness.

11          MR. MIN:  Your Honor, I want to clarify.  108, the CV

12   pages are Bates-stamped pages 1658 through 1674.  So I want

13   to be clear that those are the only pages that should be

14   admitted from 108.  And 108-A would be the redacted report

15   that was e-mailed to the court and counsel last night.

16          THE COURT:  I take it, counsel, that there is no

17   objection to 1658 to 1674?

18          MS. SKINNER:  Yes.

19          THE COURT:  To that extent, that exhibit is admitted.

20   The only issue now is 108-A.  Please continue.

21          (Exhibit 108, pgs. 1658 - 1674 was admitted.)

22                       DIRECT EXAMINATION

23   BY MR. MIN:

24   Q   Dr. Favaro, can you describe your current occupation,

25   please?

1    A    My current occupation is that I practice psychology in

2    court-related settings.

3    Q    You're a licensed psychologist?

4    A    Yes.

5    Q    Where?

6    A    State of New York.

7    Q    How long have you been a practicing psychologist?

8    A    I'm coming up on my 39th year.

9    Q    Can you just give the court, since we have your CV, a

10    brief background of your education?

11    A    I took my undergraduate degrees at Hofstra University.

12    Then I continued at Hofstra University to receive my master's

13    and two Ph.Ds.

14        Subsequent to that, I did a postdoctoral -- some

15    postdoctoral training at North Shore University Hospital in

16    the area of pediatric neuropsychology.

17    Q    Do you belong to any professional organizations?

18    A    I'm a member of the American Psychological Association.

19    Q    What is that?

20    A    It's the largest organization of psychologists devoted to

21    practice in many, many different areas.  And it promotes the

22    science of psychology in a number of academic, social and

23    legal areas.

24    Q    And have you ever written in the area of parental -- child

25    and parental forensic evaluations?

1   A   That specific, no.  I've done a lot of presentations on

2   child custody evaluations and forensics.  I do mostly

3   speaking in that area, not so much writing.

4   Q   Can you give a brief summary of the presentations you've

5   given in that area?

6   A   I've given numerous presentations to the American Bar

7   Association, the local bar association, the matrimonial bar

8   association, and just -- I think it was in September, I gave

9   a presentation to the judges in Westchester in the First and

10  Second Department Appellate Division on best practices for

11  forensic evaluation.

12  Q   When you say First and Second Department, since we're in

13  the great state of Washington, what does that mean, the First

14  and Second Department?

15  A   The jurisdictions in the state of New York are separated

16  into different departments.  And the Second Department is

17  where I practiced mostly.  That would be Nassau and Suffolk

18  counties.  And also then in Manhattan.  And they're all

19  grouped by departments.

20  Q   Do you have any training in forensic evaluations?

21  A   Yes.

22  Q   What sort of training?

23  A   It was a large part of my training when I was in

24  professional school because of the emphasis that's placed on

25  evaluation, numerous continuing educations.  I just finished

1    a 40-hour mandatory training, mandatory by the governor of

2    the state of New York, on forensic evaluation in child

3    custody cases involving domestic violence.

4    Q   Tell me about that training program, the 40-hour training

5    program.  What did that entail?

6    A   It was a mandatory training.  You couldn't be on the

7    approved list of forensic evaluators if you didn't take it.

8    It covered aspects of coercive control.  It covered aspects

9    of violence.  Many statistics on domestic violence.  And they

10   were both individual presentations and group breakout

11   sessions to try to solve problems in cases involving domestic

12   violence.

13       And there was a large component of that training that

14   covered doing domestic violence informed custody evaluations.

15   Q   And does your work entail a lot of cases dealing with

16   issues of domestic violence?

17   A   Yes.  Every custody case that I do has a component in it

18   that requires me to evaluate domestic violence.

19   Q   You said earlier, when I asked you to describe your

20   occupation, that you are a psychologist in court settings,

21   right, something like that?

22   A   Yes.  I'm not a treating psychologist.

23   Q   What do you mean when you say psychologist in court

24   settings?

25   A   Well, I do many custody evaluations, which the setting

1    would a legal setting.  The cases are neutral cases.  Plus I

2    do a fair amount of peer review and rebuttal.  And then also

3    with respect to the Hague Convention, over the last maybe

4    15 years, I've increased my practice in this area and have

5    done probably about 50 Hague evaluations; but about 30 cases

6    of testimony, 25, 30 cases of testimony all over the country.

7    Q    In your role as a forensic evaluator in court settings,

8    what sort of data do you try to accumulate or receive?

9    A    Some of it is self-report data that comes in the form of

10   face-to-face interviews, but also questionnaires that I have

11   developed over the last seven or eight years to collect

12   information efficiently and effectively.

13        Psychological testing.  Child interviewing.  Observations

14   of parents and children, review of collateral documents.

15   Q    You talked about being on the First and Second Department

16   list of mental health providers in the state of New York.

17   What does that give you the opportunity to do, being on the

18   list?

19   A    Well, you cannot do a court-ordered custody evaluation in

20   the state of New York unless you are an approved panel

21   member.

22   Q    Have you been appointed by the courts of the state of New

23   York to undergo custody evaluations?

24        MS. SKINNER:  Objection, relevance.

25        THE COURT:  It's overruled.

1    A    Thousands of times.

2    Q    How many in the last year or so?

3    A    Let's say 2024, I've probably done 70 or 80 evaluations.

4    Q    And how many times have you been qualified to give expert

5    testimony in custody cases?

6    A    Every time I was presented, and probably in the hundreds

7    of times.

8    Q    And in Hague cases, you said you testified 20 or 25 times?

9    A    About that, yeah.

10   Q    And have you been qualified to give expert testimony in

11   Hague cases?

12   A    I've been qualified on issues of domestic violence.  I've

13   been qualified as an expert in grave risk, on Article 13(b)

14   of the Hague Convention.  I've been qualified in the area of

15   general psychology.

16   Q    What about in the area of the mature child exception?

17   A    I haven't been presented as that.  I mean, I've done

18   evaluations concerning it, but I was never offered as an

19   expert in that.

20   Q    Did you recently testify in a case in the state of New

21   York -- withdrawn.

22        In what courts have you testified in Hague Convention

23   cases before?

24   A    Eastern District of New York, Southern District of New

25   York.  I've been qualified in the states of Virginia, Texas,

 1  Los Angeles, Central Los Angeles, Central District.  Those

 2  are the ones I can remember, off the top of my head.

 3  Q   Outside the state of New York, you mentioned a couple.

 4  A   Yeah.

 5  Q   In those cases, did you undergo forensic evaluations?

 6  A   Did I undertake them?

 7  Q   Yes.

 8  A   Yes.  Oh, wait, there was also a neutral forensic that I

 9  did in the state of Connecticut.

10  Q   And in many of the cases that you testified, was the issue

11  of grave risk of harm present?

12  A   All of them.

13  Q   Your testimony is that 25 or 30 cases, none of them dealt

14  with the child age of maturity objections?

15  A   No.  Some of them have involved that, but I was never

16  offered as an expert in that.

17  Q   Did you provide opinions about a child's age and maturity

18  in those cases?

19  A   Yes.

20  Q   And about a child's objections?

21  A   Yes.

22        MR. MIN:  Your Honor, at this time we'd move to

23  qualify Dr. Favaro as an expert in the area of child

24  psychology, maturity, risk of harm and undue influence.

25        THE COURT:  You may proceed.

1          MS. SKINNER:  Your Honor, may I be heard?

2          THE COURT:  You may.

3          MS. SKINNER:  Thank you, Your Honor.

4     We would object to the qualification of this witness to

5     testify in this matter because he is presenting himself as a

6     psychologist without the licensure to do so.  In the state of

7     Washington, under RCW 18.83.020, it's unlawful for any person

8     to represent himself or herself to be a psychologist without

9     first obtaining a license as provided in the chapter.

10         And then we go into RCW 18.83.010, and it describes the

11    practice of psychology to include the observation,

12    evaluation, interpretation of human behavior, which includes

13    but is not limited to psychological measurement, assessment,

14    evaluation by means of psychological, neuropsychological and

15    psychoeducational training, and includes guidance and

16    counseling of therapeutic techniques.

17         So we would ask this court to not qualify this witness, as

18    the licensure is directly related and relevant to qualifying

19    this witness as an expert.  You can't have an expert without

20    a valid license.

21         THE COURT:  Counsel.

22         MR. MIN:  Your Honor, this seems to be something that

23    counsel may have brought up in a motion in limine where it

24    could properly be discussed and briefed.  They brought two

25    motions in limine and never raised this issue once.  And

 1   unless they decided to save it for this moment, it seems as

 2   though this is either some sort of attempt at, like, ambush

 3   strategy.

 4       But, Your Honor, at this point I certainly can't respond

 5   to an issue that counsel just raised on the spot.  I mean, I

 6   think expert testimony does not require the practice of

 7   psychology in the state.  He's giving his opinion.  He is a

 8   licensed psychologist.  Certainly, I'm assuming by counsel's

 9   representation, maybe Dr. Poppleton, who is based in

10   Oregon --

11           THE COURT:  Counsel, slow down, please.

12           MR. MIN:  -- has some sort of licensure in the state

13   of Washington.  But I can't certainly speak to that.  But at

14   the end of the day, Dr. Favaro is a licensed psychologist in

15   the United States.  He's not treating anyone in the state of

16   Washington.  He's simply offering his opinion.

17           THE COURT:  Does the statute suggest that he is

18   required to be a licensed physician in the state of

19   Washington?

20           MS. SKINNER:  Yes, Your Honor, specifically pointing

21   to the statute 18.83.020 and 010, indicating that it's

22   unlawful for a person to represent himself to be a

23   psychologist without first obtaining a license.  And then,

24   again, the definitions, when we go into the practice of

25   psychology, it's not limited to somebody who evaluates,

 1   diagnoses and treats; it's much more broad to include a

 2   description of a psychologist who is doing observation,

 3   evaluation, interpretation, including psychological

 4   measurements, assessments and so forth.

 5       And we believe that now is the proper time to bring this

 6   motion, as now is the time that petitioner is offering this

 7   witness to be an expert.

 8           THE COURT:  Counsel, we're right at our morning

 9   break.  I'll give you the opportunity of the recess to engage

10   in any type of additional response that you'd like to provide

11   to the court.

12           MR. MIN:  Briefly, can I just address the matter and

13   then we'll supplement with further response afterwards?

14           THE COURT:  Yes.

15           MR. MIN:  Your Honor, counsel has known for quite

16   some time that we're offering this witness as an expert.  So

17   I think it's a little bit misleading to suggest to the court

18   that this was the opportune time to raise this issue because

19   this is when we're offering this witness as an expert.

20       I mean, I would start there.  But otherwise, we can

21   address the issue when we return.

22           THE COURT:  All right.  We'll take our break.  Please

23   rise.

24                       (Recess.)

25           MR. MIN:  Your Honor, I reiterate, this should have

1    been an issue raised on the motion in limine stage.  In our

2    preliminary research on this issue, there's certainly some

3    cases that talk about how this should go to weight, not to

4    admissibility of an expert's testimony.  We would want the

5    opportunity to brief this, before anything.  I think we're

6    wasting sort of valuable trial testimony time.  We do think

7    this is a weight issue, not an admissibility issue.

8         The statute specifically says a person cannot hold

9    themselves out to be a psychologist; it doesn't say you can't

10   render testimony in a court, which is the purpose of this

11   individual's testimony here.  He's not practicing psychology;

12   he's not offering his services in the state of Washington.

13   So I don't think that that's a relevant criteria in this

14   case, Your Honor.

15             THE COURT:  We'll move forward, counsel.  This is

16   what I'm going to do.  The respondent's case elected to wait

17   until now to raise this question, and I do agree with counsel

18   it would have been helpful for the court to have this

19   information and this challenge before we even started today's

20   proceedings, but in light of the fact that we are where we

21   are right now, I'm going to permit the witness to testify.

22   I'll give counsel the opportunity to brief the issue over the

23   evening hour.

24        If the court is not satisfied that counsel's arguments are

25   persuasive and if the witness should not be permitted to

 1   testify, I'll strike the witness's testimony.  But I don't

 2   think it's appropriate right now to delay the proceedings to

 3   wait until research is done.

 4        So please return back to the witness stand.

 5             MS. SKINNER:  Your Honor, may I be heard on two

 6   points?  One point being that we had no knowledge or

 7   information, until today, whether or not this witness would

 8   have applied for any kind of professional licensing under the

 9   state of Washington and which would have allowed him to be

10   qualified as an expert.

11        The second part being, the statute specifically provides a

12   carve-out for exceptions to the licensure requirement, two

13   exceptions, one for the teaching of psychology in an

14   educational institution; or two, for the conduct of research

15   for the problems of human or animal behavior.

16        So the statute does specifically carve out two exceptions.

17   Those exceptions do not include forensic evaluation.  And I

18   understand that Your Honor's ruling is that petitioner would

19   brief that issue, and we'll resume tomorrow on the issue.

20   Thank you.

21             THE COURT:  That still doesn't address the concern,

22   counsel, that if you were aware at any level that you were

23   going to challenge this witness's qualifications -- you

24   certainly had the witness's CV before you, you certainly knew

25   what the limitations of his CV were in terms of the state of

1  New York, or other states he's represented he's provided

2  testimony in.  But we are where we are, as I've indicated,

3  counsel.  And the appropriate remedy is to let the witness

4  testify and let the parties provide any additional briefing

5  you believe is appropriate or necessary.

6       MS. SKINNER:  Thank you, Your Honor.  And with that,

7  we do object, then also to the underlying certification,

8  pending Your Honor's ruling on the matter, as to the mature

9  child exception.  It appears that this witness has provided

10  expert testimony in cases where he has not been offered as an

11  expert on the issue of mature child.  So we don't believe

12  this witness has the qualifications, training and background

13  in order to be qualified specifically on the mature child

14  exception.

15       THE COURT:  All right.  Let's proceed.

16       MR. MIN:  Your Honor, one clarification.

17  Respondent's counsel, in her statement, said, "We understand

18  that petitioner will brief this issue tonight."  But my

19  understanding of what the court said is that all counsel

20  should be briefing this issue tonight.

21       THE COURT:  That's correct.  That's correct.

22    And, counsel, we're going to break at 10 minutes to 12

23  today.  So if you're scheduling where you're going with your

24  examination, please understand that.

25       MR. MIN:  Thank you, Your Honor.

1              THE COURT:  Please proceed.

2              MR. MIN:  Thank you, Your Honor.

3     Q    Dr. Favaro, in your capacity as a forensic evaluator, does

4     your work or process in custody cases differ than your

5     process in Hague Convention cases?

6     A    Yes.

7     Q    How so?

8     A    The Hague Convention cases are about jurisdiction, not

9     custody.  And best interests are generally not a legal aspect

10    of Hague defenses.

11    Q    Are there similarities in the process?

12    A    Yes.

13    Q    How so?

14    A    They're both evaluated in approximately the same way.  I

15    think that a difference is that in Hague cases, while I reach

16    out to the other side and ask for their participation in

17    custody cases that I do, they're usually -- the court usually

18    orders both parties to participate.

19    Q    Did you attempt to obtain permission to evaluate and meet

20    with the mother in this case?

21    A    Yes.

22    Q    What was your understanding as to whether the mother would

23    make herself available to meet with you in an evaluation

24    capacity?

25    A    The mother made herself available to bring the child for

1  me to interview the child, but she would not fill out

2  questionnaires or would not make herself available for an

3  evaluation.

4  Q   Can you briefly describe what you were asked to do in this

5  case?

6  A   I was asked to look at Dr. Poppleton's work product and

7  provide a critique and alternative hypotheses.

8  Q   When you say "alternative hypotheses," what do you mean by

9  that?

10 A   Well, I think that from a legal perspective it means

11 rebuttal.  But from a peer-reviewed perspective, it means to

12 examine the underlying work product and provide alternative

13 hypotheses or critiques.

14 Q   If you had -- after your meetings with the child and

15 receipt of information from various sources, if you had come

16 to the same -- I'm looking for a different word than

17 conclusion -- but had made the same observations as

18 Dr. Poppleton, would it be necessary for you to prepare a

19 report in this case?

20 A   Well, in this case I did agree with some of his

21 hypotheses, but I didn't agree with others.  So it would have

22 been necessary for me to write a report or provide testimony

23 relative to my comparison of my data versus his.

24 Q   Okay.  And would you say that your data was different than

25 Dr. Poppleton's?

1    A    Yes.

2    Q    Okay.  Would you say that your evaluations of the child

3    differed than those reported by Dr. Poppleton?

4    A    Yes.

5    Q    How many times did you meet with the child?

6    A    Three times.

7    Q    How long?

8    A    One hour each time.

9    Q    Can you briefly describe your meetings with the child?

10   A    When the child first came to see me on the first session,

11   he was a little bit shy in the beginning.  He was -- he came

12   in, and he was being hugged by his mom.  It was clear that

13   they have a close relationship.  And then he came into the

14   room that I was in and that I had set up for us to have an

15   interview, and he immediately formed a good rapport with me.

16   This is a very socially enjoyed child, kind child,

17   well-mannered child.  And I have to say that we really hit it

18   off well.  He answered my questions.

19        I asked him if the next time he wanted to meet, he wanted

20   to play some video games.  As it turns out, I asked his --

21   very interested in video games, and I spent a part of my

22   career being a video game designer for a couple of big

23   companies to pay my way through graduate school, so we

24   immediately had common ground -- and I asked him to ask his

25   mother if we could have some permission to play video games

 1   while we chatted.  She said "yes."

 2       You want me to go session by session, right?

 3   Q   Are you on the first session right now?

 4   A   In the first session we had a chat about many things, and

 5   then made plans to play some video games during the next

 6   session.  He was very excited about that.

 7   Q   Okay.  Let me stop you before you go on to the second

 8   session.

 9   A   Sure.

10   Q   How long was that first session for?

11   A   One hour.

12   Q   And who was in the room when you were talking to AS?

13   A   Just the child and I.

14   Q   And do you recall the nature of the conversations you had

15   with the child during the session?

16   A   Yes, it's in my report.  We talked about what the child

17   had experienced at home, talked about whether the child had

18   any objection to moving back to Singapore.  We talked about

19   how his parents bickered and how he tried to listen to them

20   bicker, but he couldn't exactly describe what he heard.  The

21   child referred to violence --

22           MS. SKINNER:  Objection, hearsay.

23           THE COURT:  Sustained, counsel.

24           MR. MIN:  Your Honor, this is during the coercive

25   evaluation.  The child's statements are certainly a critical

1  part.  There's a hearsay exception for this forensic process

2  and statements made by the child.  I mean, certainly there

3  was ample testimony by Dr. Poppleton, invited by respondent's

4  counsel, about statements made by the child and the child's

5  objections in this case.

6          THE COURT:  Counsel, anything further?

7          MS. SKINNER:  Your Honor, nothing further other than

8  this is hearsay, and there's no exception to the hearsay.

9  And merely because it was not objected on prior testimony

10  doesn't mean that waives any further objections on this.

11          THE COURT:  Counsel, that's a strategy question, if

12  you chose not to object.  What particular exception are you

13  referring to that would apply to the specifics of this

14  child's statements to this doctor?

15          MR. MIN:  Understood.

16  Q   Can you describe your second session with the child?

17  A   Second session with the child, the mother pulled me aside

18  prior to my going in to see the child and asked me if it

19  would be okay to record -- for the child to record my session

20  with him.  And I said that it would be okay, but that I would

21  like to set it up so that the child wasn't uncomfortable with

22  any recording device in front of him.

23      Mother did not consent to that, walked directly into the

24  room, set up an iPad in front of her child.  And the child

25  immediately began singing into her iPhone -- into her iPad,

1    rather.

2        We played.  It was mostly a play session.  I was

3    interested in knowing from the child why he thought his mom

4    had to record me.  And I don't think I can continue my answer

5    without the hearsay objection, so I won't.

6        We continued to have great rapport with one another.  He

7    was kind enough to bring me a juice box and some snacks.  And

8    we continued to talk and play.

9    Q    Can you describe your third session, please?

10   A    Very similar to the second session.  And then we exchanged

11   pleasantries, and that was it.

12   Q    Did you observe any changes in AS's demeanor during your

13   sessions?

14   A    Yes.

15   Q    How so?

16   A    He was much more open in the first session.  But he

17   literally could not take his eyes off the iPad during the

18   subsequent sessions.  And as a result, he was more subdued.

19   Q    What limitations were present in your report?

20   A    Well, I think that, you know, methodology is always very

21   important.  Mother sort of stepping over my methodology to

22   include the kind of recording that she wanted to occur,

23   created a little bit of a breakdown in the rapport between

24   the child and I.  Certainly a limitation that I didn't get to

25   speak to both parents.  And that is usually something I'm

 1  able to do.  So I considered that a methodological limitation

 2  as well.

 3  Q   In addition to interviewing and evaluating AS, did you

 4  view any other materials as part of your evaluation?

 5  A   Yes.  I reviewed school reports, and I reviewed some

 6  questionnaires that the father had submitted for information.

 7  I reviewed report cards that the child had been issued while

 8  living in Singapore.

 9  Q   Did you talk to the child about whether he had any

10  objection to returning to Singapore?

11  A   Yes.

12  Q   Did the child express to you any objections to going back

13  to Singapore?

14          MS. SKINNER:  Objection, hearsay.

15          THE COURT:  Sustained.

16          MR. MIN:  Your Honor, this goes to his state of mind

17  at that moment when reporting to Dr. Favaro, the child's

18  state of mind, which is, of course, a relevant consideration

19  in this case.

20          THE COURT:  With that explanation, the court will

21  overrule.  The witness is permitted to testify.

22  A   May I have the question, again?

23          MS. SKINNER:  Your Honor, may I have an opportunity

24  to respond?  The state of mind applies to the listener, not

25  that of the speaker.

1          THE COURT:  It's overruled, counsel.

2          MS. SKINNER:  Thank you, Your Honor.

3          THE COURT:  Repeat the question, counsel.

4          MR. MIN:  Sorry.

5   Q   I had asked you whether or not you had any discussions

6   about the child going back to Singapore.  I think you said

7   "yes."  Then I believe I asked you what did the child tell

8   you about returning to Singapore?

9   A   It was part of a larger conversation.  He did not object

10  to returning to Singapore.  And in his words, he basically

11  said that as long as he wasn't near violence between the

12  mother and father.  I then probed further.  And the child

13  told me, "You mean to say that my mother would live in one

14  house and my father would live in another house, and I would

15  see them each at different times?"  I replied, "Yes."  And he

16  said, "Oh, that would be fine."

17  Q   Did the child tell you anything that led you to believe

18  that he had an objection to returning to Singapore?

19  A   No.

20  Q   Did the child tell you anything that led you to believe

21  that the child had personally witnessed any violence between

22  the parties?

23         MS. SKINNER:  Objection, hearsay.

24         THE COURT:  Counsel, you're starting to go far afield

25  and beyond the scope of the limited latitude the court is

1   allowing.  So let's ask another question.

2           MR. MIN:  Your Honor, I would also make the 803(4)

3   exception argument, that this is in the coercive medical

4   diagnosis or treatment.  And I think the exception applies

5   there, but I'll move on.

6           THE COURT:  Please continue.

7   Q   Did you form any opinions as part of your evaluation in

8   this case?

9   A   Yes.

10  Q   Did you form any opinions about grave risk of harm?

11  A   Yes.

12  Q   And I'll broaden that out to ask if you formed any

13  opinions about risk of harm to this child?

14  A   Yes.

15  Q   What were your opinions?

16  A   With respect to grave risk, if there is a finding of

17  domestic violence and if the child was exposed to domestic

18  violence, then there would be a risk to the child.  I don't

19  know if it would be a grave risk.  But also, if you consider

20  mitigating factors such as the parents living in different

21  places, the parents not having contact with one another, the

22  father --

23          MS. SKINNER:  Objection.  Outside the scope of the

24  question.

25          THE COURT:  It's overruled.

1  A   -- the father having some supervised visitation perhaps,

2  or therapeutic visitation perhaps, as was discussed, that I

3  don't really believe that there would be a grave risk under

4  those circumstances.

5  Q   Okay.  So let me break that down.  Assuming that there --

6  the court believes and finds that there is a history of

7  domestic violence and, coupled with that, that the child was

8  a witness or exposed to that domestic violence, then that

9  certainly could lead to the conclusion that there are risks

10  to this child.  That would be fair, right?

11  A   There are some risks, if those things are true.

12  Q   And you also said that if there are risks, there could be

13  mitigating circumstances, or mitigating, I guess, factors

14  that could mitigate against that risk; is that fair?

15  A   Yes.

16  Q   And you've suggested or proposed a couple of things that I

17  guess you heard Dr. Poppleton talk about, supervised

18  therapeutic visitation being a couple of those, correct?

19           MS. SKINNER:  Objection, leading.

20           THE COURT:  That is leading, counsel.

21           MR. MIN:  I wanted to make sure I understood, but

22  I'll move on, Your Honor.

23  Q   What about supervised or therapeutic visitation would

24  mitigate against any risk that would be present to this child

25  in those circumstances?

1  A    Supervised and therapeutic visitation offer the

2  supervisor, multiple opportunities to observe whether or not

3  the parent is doing anything inappropriate or anything that

4  would place the child in harm's way during those

5  circumstances.

6       So there would be ongoing monitoring of anything the

7  father might do that would bring any risk to the child

8  physically or psychologically.

9  Q    What about orders of protection?  Would that be something

10 that could mitigate against risk in the future?

11 A    Well, I feel like that question poses to me something that

12 would require a legal opinion.  I mean, obviously on the most

13 basic level an order of protection is meant to keep people

14 away from one another.  And for that reason I would say it

15 mitigates risk.

16 Q    Did you form any opinions about whether the child had been

17 influenced by the mother in this case?

18 A    Yes.

19 Q    What opinions did you form?

20 A    Well, certainly the way the mother behaved with respect to

21 the recording was her influencing my process.  And I do

22 believe that the best way to formulate an opinion about

23 something is to observe it directly, which I did.  Based on

24 things the child told me that the mother said to him, I

25 believe that was also an important piece of data.

1          MS. SKINNER:  Your Honor, I move to strike this

2    opinion testimony based off of evidence that's not

3    admissible.

4          THE COURT:  What's your specific objection?

5          MS. SKINNER:  That this witness has not laid a

6    foundation for providing his opinion when he's testifying

7    that his opinion is based off of evidence that is not

8    provided to this court.

9          THE COURT:  What specifically you referring to

10   counsel?

11         MS. SKINNER:  Oh, sorry, Your Honor.

12     He's indicated that he based his opinion partially on

13   things the child told him.

14         THE COURT:  All right.  The court hasn't allowed the

15   witness to testify to what the child told him; he's

16   identifying what the basis of that conclusion or opinion is.

17   So that objection is overruled.

18         MS. SKINNER:  Thank you, Your Honor.

19   A    May I continue?

20         THE COURT:  Let's have another question, so you'll

21   know where to continue.

22         MR. MIN:  Sure.  Thank you.

23         THE COURT:  I believe your question, counsel, was the

24   child influenced by the mother.

25   Q    What sort of impact could exposing the child to ongoing

1   litigation have with respect to what a child may present as

2   his preference?

3   A   Well, certainly my experience as a custody evaluator,

4   where in many of those cases the litigation goes on for

5   years, it has an adverse impact on the child.

6   Q   What is the -- did you agree with Dr. Poppleton's

7   statement that one of the considerations or one of the

8   possible reasons a child may express a preference to be with

9   one parent over another might be that they are with the

10  parent that took them away from the other parent?  Do you

11  follow that?

12  A   Yes.  I do agree with that statement.  Children rely on

13  their parents for survival.  And they are going to align

14  themselves with the parent who's helping them survive.

15      And the only exception to that would be the kind of

16  abduction of a child where the child is tortured, or hurt, or

17  threatened physically, which does not exist in this case.

18  Q   Did you agree with Dr. Poppleton's testimony that

19  developmentally, children ages six to eight make more

20  meaningful connections outside of their immediate family than

21  when they were younger?

22  A   I would say between the ages of six and eight, their

23  meaningful connections are in both places, social and

24  familial.

25      They don't really individuate until they become preteens,

 1    and their friends are more important than anything else.

 2    Q   When formulating your opinion on the issues of risk to

 3    this child, were any of the bases of your opinion statements

 4    made by the child to you about his relationship to his

 5    father?

 6    A   No.

 7    Q   With respect to your opinions regarding the potential for

 8    undue influence by the mother to the child, were any of your

 9    opinions based upon the statements made to you by the child?

10    A   Yes.

11    Q   I'm going to ask you what those statements are.

12            MR. MIN:  And, Your Honor, I'm going to preface this

13    -- I'll address it if there is an objection.

14    Q   What statements did the child make to you that led you to

15    conclude or opine that there was undue influence from the

16    mother to the child?

17            MS. SKINNER:  Objection, hearsay.

18            MR. MIN:  Your Honor, I'm going to cite to Rule 703

19    in terms of basis of expert testimony.  An expert is allowed

20    to or can rely on data that they collected or information

21    they gathered to form their opinion if it's used -- if it's

22    data that they would routinely rely upon in their profession.

23    And the question is whether or not the information --

24    probative value outweighs the prejudicial effect.  And this

25    is a bench trial.

1           THE COURT:  Counsel, typically doesn't that come in

2    the format of the expert can rely upon data, but the

3    underlaying data doesn't necessarily be something that the

4    witness testifies about?  He can render the opinion and

5    cross-reference and say:  These are the things I considered.

6    But not to the extent you're representing to the court that

7    they can wholesale introduce all the information they

8    gathered and considered.

9           MR. MIN:  Understood, Your Honor.

10          THE COURT:  The objection is sustained on that

11   ground.

12   Q   Let's go through, and we were talking about this before,

13   what was the basis of your opinion that the mother was

14   negatively influencing the child?

15   A   I would say the most significant thing relates to the part

16   of the conversation I had with the child where he informed me

17   that his mother --

18          MS. SKINNER:  Objection, hearsay.

19          THE COURT:  Sustained.

20   Q   Did you form any opinions about the child's level of

21   maturity and intelligence in this case?

22   A   Yes.

23   Q   What was your opinion?

24   A   Very smart.  Very, very smart child, who is articulate and

25   expressive, but who is not anything different than a typical

 1   eight- to nine-year-old child.  His preoccupation is with

 2   video gaming.  And he describes his life both in Singapore

 3   and in the United States with not much richness.

 4          MS. SKINNER:  Objection, hearsay.

 5          THE COURT:  I'll allow limited latitude.

 6   A   He describes himself as bored everywhere.  And I would say

 7   that, significantly, his age was represented the most when I

 8   asked him if he knew the difference between the truth and a

 9   lie.

10   Q   What do you mean?

11   A   Well, you can judge a child's maturity by what point they

12   are in their moral development.  And this child told me that

13   the difference --

14          MS. SKINNER:  Objection, hearsay.

15          THE COURT:  Sustained.

16   Q   Were you able to evaluate his ability for abstract

17   reasoning?

18   A   Yes.

19   Q   What was your evaluation of that?

20   A   Typical eight-year-old kid.

21          MR. MIN:  Your Honor, just one moment.

22      No further questions, Your Honor.

23          THE COURT:  Cross examination.

24

25

1                          CROSS EXAMINATION

2     BY MS. SKINNER:

3     Q   Dr. Favaro, you have not been presented as an expert in

4     mature child abduction in eight cases before.  Was that your

5     testimony?

6     A   Yes.

7     Q   Yet you have offered an expert opinion in cases on a

8     mature-child objection.  Was that your testimony?

9     A   Correct.

10    Q   Without being qualified to do so?

11    A   Yes.

12    Q   You testified that best interests is not generally an

13    aspect of Hague cases.  Not generally, or not ever?

14    A   I say not generally, because whenever we're dealing with

15    the welfare of a child, no matter what kind of information

16    we're dealing with, in part we're dealing with the child's

17    best interests.  It's unavoidable.

18    Q   But that's not what the treaty calls for, correct?

19    A   Correct.  That's not what the treaty calls for.  The

20    treaty calls for the defenses that are being examined here at

21    trial.

22    Q   So it would not be appropriate, then, to consider things

23    outside of what the treaty calls for?

24    A   That's not what I said.  To clarify, I said that it is

25    almost impossible to tease out a child's best interests when

1  we're talking about things like grave risk.  Of course it's

2  not in a child's best interests to go to a place where he

3  might be in harm's way physically or psychologically.

4  Q   But we're not evaluating the child's best interests,

5  correct?

6  A   From a legal standpoint?  No, we are not.

7  Q   You testified that mother would not make herself available

8  for an evaluation.  But you weren't doing an evaluation on

9  mother, that's not what you were called to do, correct?

10 A   She wouldn't make herself available as a collateral.

11 Q   You testified that in the third session in meeting with

12 AS, he couldn't take his eyes off of the iPad.  Do you

13 remember that testimony?

14 A   Yes.  In the second and third.

15 Q   Okay.  But didn't you, in fact, play video games nonstop

16 with AS on your Nintendo Switch that you brought?

17 A   Yes.

18 Q   So his eyes were glued to two devices at the same time; is

19 that your testimony?

20 A   That is my testimony.  He was distracted by the iPad both

21 times.

22 Q   And he was distracted by the video games as well, correct?

23 A   Yes.

24 Q   You told the child that if returned to Singapore, he could

25 be in an environment where his parents would live in two

1    separate households?

2    A    No.  He asked me that.

3    Q    And you confirmed and affirmed that to him, correct?

4    A    Yes.

5    Q    You testified that he did not voice an objection to being

6    returned to Singapore, but you only laid out the possibility

7    to him that he could be returned to two separate households,

8    correct?

9    A    Correct.

10    Q    Would you --

11    A    Just to finish, counsel.

12    Q    Excuse me, there's no question pending.

13    A    But I didn't finish my answer.

14    Q    There's no question pending, Dr. Favaro.

15         Wouldn't you agree that mitigative actions become

16    difficult when an abusing parent has essentially limitless

17    monetary resources?

18    A    I don't think I can answer that question.

19    Q    You testified that a way to justify a child being taken is

20    only when they've been threatened, tortured or physically

21    hurt by the parent left behind.  But that's not the grave

22    risk of exposure to harm standard, correct?

23         MR. MIN:  Objection, calls for a legal conclusion.

24         THE COURT:  Sustained.

25    Q    So is it your testimony -- is that a correct recitation of

1  your testimony?

2  A   I don't think so, counsel.

3          MR. MIN:  Objection as to form.

4          THE COURT:  That's overruled on those grounds.

5  Q   You testified that a way to a child being taken is when

6  they are -- you used the words "threatened, tortured or

7  physically hurt," did you not?

8  A   I used that in the context of the question that asked me

9  about a child's allegiances to a parent.

10 Q   You are not licensed to practice or be -- or represent

11 yourself as a psychologist in the state of Washington,

12 correct?

13 A   Correct.  I did apply for -- I did contact the Department

14 of Health on ten different occasions and could not get a

15 response from them.

16 Q   And you are representing yourself today to be a

17 psychologist without having a Washington-issued license,

18 correct?

19 A   No.  I'm representing myself to be a psychology expert,

20 not a psychologist.

21 Q   Can one become a psychology expert without having a

22 license to practice psychology?

23 A   It's been the case for every other out-of-state Hague case

24 that I've ever done.  I call the licensing board, I inquire,

25 and I've not had to have temporary licensure in any of those

1  occasions.

2  Q    And you've never testified in the state of Washington on a

3  Hague case, correct?

4  A    Correct.

5  Q    Now, in this evaluation that you completed, did you make

6  observations?

7  A    Of course.

8  Q    And evaluations?

9  A    Yes.

10  Q    And interpretations?

11  A    I don't think I made any interpretations.

12  Q    You rendered psychological measurements?

13  A    I've rendered -- no, I didn't do any psychological

14  measurement of the child.

15  Q    Assessment?

16  A    I did not assess the child.

17  Q    Evaluation?

18  A    I think I evaluated the child, yeah, sure.

19  Q    Through psychological testing?

20  A    I did not do psychological testing.

21  Q    You did not do psychological testing.  So tell me about

22  the checklist that you had father fill out.

23  A    The father filled out a checklist in Singapore, okay, for

24  collateral information.  If the mother had participated in

25  the evaluation, I would have given her that, too.

1    Q    I was asking about the checklist that you had father fill

2    out and you designate an importance that it was filled out in

3    Singapore.  That was actually filled out by a scribe of yours

4    as it was read to him, correct?

5    A    A scribe of mine?  No.

6    Q    Is it your testimony that he filled that out himself,

7    directly?

8    A    I probably should have, but I did not ask him if he filled

9    it out directly.

10   Q    Were you here present during his testimony earlier in this

11   trial?

12   A    Yes.

13   Q    Did you observe his testimony where he indicated that he

14   did not fill it out directly but a scribe from your office

15   filled it out for him?

16   A    I didn't catch that.  A scribe from whose office?  My

17   office?

18   Q    Yes.

19   A    No.  I don't have a scribe in my office.

20         MR. MIN:  Objection.  That was mischaracterizing the

21   testimony.

22         THE COURT:  That's sustained, counsel.  Rephrase the

23   question.

24   Q    You provided the questionnaire or checklist to the

25   petitioner but did not ask further as to how he completed

1   that?

2   A   Correct.  I should have, but I didn't.

3   Q   You did no intimate partner violence risk assessment on

4   the father in this case, correct?

5   A   I couldn't.  To do that, you have to be able to interview

6   both parties.

7   Q   So my question was yes or no.  You did no intimate partner

8   violent risk assessment on father in this case, correct?

9   A   That is correct.

10  Q   You considered a restraining order that was issued against

11  the father by a Washington court in your evaluation, correct?

12  A   Yes.

13  Q   And in that restraining order, the courts of Washington

14  issued that order to mother, upon making findings of fact of

15  actions that took place, correct?

16  A   Correct.

17  Q   And that's a finding of fact in which you must consider in

18  your evaluation, correct?

19  A   And I did, correct.

20  Q   So you did not state in your report that, "I have not been

21  provided with any findings of fact"?

22  A   Is that in my report?

23  Q   And you did not state, "I do note there is a protective

24  order in place against father, which was not the result of a

25  finding of fact"?

1    A    Yes, I think that was a TOP, prior to the finding.

2    Q    So you believed that the courts of Washington have the

3    authority to issue restraining orders without making any

4    findings of fact of abuse?

5              MR. MIN:  Objection as to form, legal conclusion.

6              THE COURT:  Sustained.

7    Q    You indicated, again, that mother would not consent to

8    being evaluated, correct?

9    A    Correct.

10   Q    And then at the same time, you also indicated that

11   evaluating father is outside the scope of your role, correct?

12   A    Correct.  That's --

13   Q    You wanted to evaluate mother but not father, correct?

14   A    I wanted -- as I testified previously, I wanted to have

15   the mother as a collateral contact in this case.  And my

16   report clearly indicates that father was used only as a

17   collateral contact in this case.

18   Q    You indicated that you found no indication of hatred or

19   disdain for the child's mother made by father, correct?

20   A    Yes.

21   Q    But in the intake paperwork that father provided to you,

22   he described a slew of complaints against mother, correct?

23   A    Yes.

24   Q    You indicated that you believed mother to be having some

25   type of inappropriate influence over the child.  Yet despite

1  that influence, you testified you were able to have a

2  fantastic rapport with the child, correct?

3  A   Correct.

4  Q   Whatever influence may or may not have been made on the

5  child, you were still able to break through that, correct?

6  A   Yes.

7  Q   And despite whatever he may have heard or influenced --

8  sorry, I'll strike that.

9       You believe the child is a concrete thinker; is that

10 correct?

11 A   Yes.  Appropriate for age.

12 Q   And an operational thinker?

13 A   No.  I might have said "concrete operational."  That is a

14 designation that was given by the theorist who posited

15 theories about a child's development.  It's called the

16 "concrete operational stage of development."

17 Q   You were able to review Dr. Poppleton's report in which he

18 relayed instances of abuse, domestic violence, intimate

19 partner violence that mother reported by father, correct?

20 A   Sorry.  Couldn't hear over the coughing.

21 Q   You were able to review Dr. Poppleton's letter in which he

22 relayed information from mother where she describes abuse by

23 father, correct?

24 A   Correct.

25 Q   Now, if the allegations made by mother are true, then she

1    would be a victim of domestic violence, correct?

2    A    Yes.  It says so right in the report.

3    Q    And you agree with that?

4    A    I believe I said all three experts agreed on that, yes.

5    Q    So if the allegations of mother are supported and found to

6    be credible, then the child would be at grave risk for

7    serious psychological harm, correct?

8    A    I testified to that on direct.

9    Q    And that's because the connection in the literature

10   between children who are reared in the presence of intimate

11   partner violence and being in that environment can lead to

12   altered brain development, correct?

13   A    That only has to do with infants.

14   Q    Impaired cognitive development?

15   A    Impaired brain morphology development.  You said two

16   different things in the same sentence.

17        Impaired brain development is something that occurs when

18   an infant grows up in the same environment as the coercive

19   the control dynamic exists.

20   Q    If the child is being subjected to those abuses and

21   violence in the home from the time of infancy, is that what

22   you're saying?

23   A    No.  What I'm saying -- and I'm sorry if it's not clear --

24   is that the research literature that you're describing says

25   that when an infant grows up in a home where there's domestic

 1    violence, intimate partner violence, it can have an impact on

 2    the developing brain.

 3    Q    Okay.  And that can impair cognitive development?

 4    A    Yes.

 5    Q    And social -- and lead to social and emotional

 6    dysfunctionality?

 7    A    Yes.

 8    Q    And within the intimate partner violence and coercive

 9    control, there could include use of harassment of the victim,

10    correct?

11    A    That's the definition.

12    Q    Manipulation?

13    A    Also part of the definition.

14    Q    Humiliation?

15    A    Part of the definition.

16    Q    And that's all as a means of controlling the power dynamic

17    in the relationship, correct?

18    A    That is correct.

19    Q    And in those cases the victim of that kind of intimate

20    partner violence shows fear; is that right?

21    A    Yes.

22    Q    And intimidation?

23    A    Yes.

24    Q    They can show confusion about whether or not to stay or

25    leave the relationship, with the hope that the relationship

1    might improve?

2    A    Correct.

3    Q    And there would be an element of entrapment?

4    A    Yes.

5    Q    And manipulating the power dynamics in that relationship,

6    so that the victim feels that they cannot escape, right?

7    A    That is what intimate violence means.

8    Q    And that can include also shouting or pushing?

9    A    Yes, it can.

10   Q    And making the victim feel as if she's a second class

11   citizen in the relationship?

12   A    Yes.

13   Q    And you reviewed Dr. Poppleton's letter in which physical

14   violence was described of father hitting the child, correct?

15   A    Yes.

16   Q    And pinching the child?

17   A    Yes.

18   Q    In your Child Behavior Checklist that you had in this

19   case, that was not scored, correct?

20   A    No.

21   Q    Why didn't do you that?

22   A    I didn't use it for that purpose.  I used it to gather

23   information.

24   Q    So wouldn't it have been helpful to determine whether the

25   child is, in fact, suffering from any mental health concerns?

1  A    Not using that in this setting.  The use of that checklist

2  in this setting has been very harshly criticized because it's

3  based on the self-report.  And parents will sometimes, I

4  guess, not create the most honest self-report because they're

5  looking to achieve a goal.

6       But I use it just to get a parent's description of how

7  they see their child.

8  Q    And a child's decompensated mental health could be a

9  result of violence in the home, correct?

10 A    Once again, please?

11 Q    A child's decompensated mental health could be a result of

12 violence in the home.

13 A    It could be.  It's possible.

14 Q    Wouldn't you agree that holding contradictory feelings is

15 a developmental step to maturity?

16 A    I'm sorry, counsel, I don't understand the question.  Can

17 you say it again?

18 Q    Holding contradictory feelings is a developmental step to

19 maturity.  Do you agree with that statement?

20 A    I don't know what it means.

21 Q    To feel two things at the same time that contradict one

22 another.

23 A    And what could that be related to?

24 Q    It is a developmental step towards maturity.

25 A    There's not enough information in that question for me to

1  answer.  At what age?

2  Q    At any age.  Is that a step towards maturity?

3  A    Any type of thinking could be a step to maturity.  I don't

4  know whether or not it would be fair to say that holding

5  contradictory feelings, without any other context, would be

6  related to that.  I think that children as young as three

7  years old can have contradictory feelings.

8  Q    And acknowledge those?

9  A    Yes.

10  Q    You told the child on your first meeting that his father

11  loves him very much, correct?

12  A    Yes.

13  Q    Where did you base that statement from?

14  A    Speaking to the father.

15  Q    And you were aware that there is a protective order issued

16  by the state of Washington prohibiting direct or third-party

17  contact between the father and the child?

18  A    Yep.  Most orders of protection do that.

19  Q    And despite that, you passed along a message to the child

20  from the father?

21  A    The father didn't give me that message.

22  Q    You just testified that the father did.

23  A    No, the father --

24        MR. MIN:  Objection.  Mischaracterization.

25        THE COURT:  Let the witness answer the question.

 1    A    The father never told me I want you to tell my son that I

 2    love him very much.

 3    Q    And you told the child, on the first meeting, that the

 4    father misses him?

 5    A    Um, I don't believe so.

 6    Q    So your statement that the father loves the child very

 7    much, that is an influence on the child as to how the child

 8    might then react to your questions and interactions with him;

 9    is it not?

10    A    It could be.

11    Q    And if that statement that you made to the child was one

12    of the bases for mother's request to have an audio recording

13    of such blatant influence, that would be reasonable, would it

14    not?

15    A    No, I don't think so, counsel.

16         THE COURT:  Counsel, we're at ten minutes to twelve.

17    We need to stop at this point and resume at 1:30 this

18    afternoon.  You may step down, sir.

19                       (Recess.)

20

21

22

23

24

25

```
 1                        AFTERNOON SESSION
 2            THE COURT:  Please retake the witness stand, sir.
 3     Counsel, you may resume your examination.
 4            MS. SKINNER:  Thank you, Your Honor.
 5       And, Your Honor, I have questions for this witness that
 6     may be based on his report or qualifications as an expert.
 7     And for the logistics of today's trial day, should I continue
 8     to ask those questions pending Your Honor's decision?
 9            THE COURT:  Yes.
10            MS. SKINNER:  Thank, Your Honor.
11     Q   Dr. Favaro, when were you retained in this case?
12     A   I don't know the exact date off the top of my head.  But I
13     believe it was sometime late November, early December.
14     Q   And who reached out to you?
15     A   Mr. Min.
16     Q   What were you hired to do?
17     A   I was hired to review the work product of Dr. Poppleton
18     and provide critique and also alternative opinions to the
19     opinions that he had.  But he didn't really have any
20     opinions, so I offered opinions where he had not.
21     Q   And so did you critique Dr. Poppleton's methodologies?
22     A   Um, I think I critiqued parts of his methodology.  It
23     would be in the report.
24     Q   Why would you critique parts but not all?
25     A   Because some parts were appropriate.
```

1    Q    So the parts that you felt needed critique, were

2    critiqued?

3    A    Yes.

4    Q    And the parts that were appropriate, were not critiqued?

5    A    Yes.

6    Q    And did you consider, in your rebuttal analysis, the

7    pieces of information that Dr. Poppleton either considered or

8    did not consider?

9    A    It's definitely something that I looked at.

10   Q    And did you consider his use or not use of psychological

11   testing?

12   A    Yes, I definitely considered that.

13   Q    And did you consider the standard of care that was used?

14   A    Yes.

15   Q    And whether or not he relied on multiple sources?

16   A    He did rely on multiple sources.

17   Q    Do you agree with Dr. Day's indication that when

18   addressing the age and maturity of a child's development and

19   the capacity to understand, the nature of the situation must

20   be assessed?

21   A    I definitely agree with that statement.  I don't recall if

22   I saw Dr. Day say that.

23   Q    And do you believe that standardized testing can evaluate

24   the cognitive and developmental stages of a child?

25            THE COURT REPORTER:  Excuse me, can you repeat that?

1   Q   Do you agree that standardized testing can evaluate the

2   cognitive and developmental stages of a child relevant to

3   their maturity?

4   A   No.

5   Q   Did you rely on Dr. Day's report in coming up with your

6   report?

7   A   In part.

8   Q   Because you disagreed with some parts of her report?

9   A   If the statement that you just made comes from her report,

10  I do not agree with that.

11  Q   Dr. Favaro, you did not evaluate domestic violence in this

12  matter because you indicated you did not have access to the

13  mother, correct?

14  A   That's not the only reason.

15  Q   That was one of the reasons?

16  A   One of the reasons.

17  Q   Yet you still provided an opinion on the matter of

18  domestic violence in this case, correct?

19  A   No.  I provided information about it by saying that

20  domestic violence is something that can only be determined by

21  the trier of fact.  And if it was determined, that might have

22  an impact on the Hague Convention.  Domestic violence is not

23  a psychological opinion; it's a finding of fact.

24  Q   You did not rely on that finding in the Washington

25  protective order, correct?

 1  A   I never said I didn't rely on it.  I just -- it's just not

 2  something that would generate an opinion on domestic

 3  violence.  A finding of fact is always something that should

 4  be taken into consideration.

 5  Q   Okay.

 6      Can you tell me what consent means as it relates to

 7  sexual contact?

 8  A   It's quite literal.  It means that when two partners are

 9  about to engage in sexual contact, both partners must consent

10  to it.

11  Q   Is an element of consent that it is uncoerced?

12  A   I'm not sure I understand your question.

13  Q   Can you have consent that has been coerced?  Or is that no

14  longer consent?

15  A   It really depends on what you mean by "coerced."  I think

16  that in lots of relationships between men and women, people

17  have different drives, they have different desires, and they

18  could -- I would say that consent or coercion goes on

19  continually.

20  Q   Is consent something that's given one time and it's good

21  for all times?

22  A   Of course not.

23  Q   So does consent need to be given each time there's sexual

24  contact?

25          MR. MIN:  Objection.  This seems to call for a legal

 1   conclusion.  I'm not sure how it's relevant to the testimony.

 2          THE COURT:  I'll sustain the objection on relevance

 3   at this point in time, counsel.

 4          MS. SKINNER:  Your Honor, I'm laying the foundation

 5   for the fact that this witness reviewed information in

 6   Dr. Poppleton's letter regarding sexual abuse, sexual

 7   assault, and what this witness then determined or made

 8   findings about in concluding his opinions.

 9          THE COURT:  Well, then cross-reference the

10   examination in the context of the report because this witness

11   has been called as a rebuttal witness only.  So please

12   proceed in that fashion.

13          MS. SKINNER:  Thank you, Your Honor.

14          THE COURT:  Objection is overruled.

15   Q   Dr. Favaro, did you review the portions of Dr. Poppleton's

16   report that noted descriptions from mother about sexual

17   assault?

18   A   Yes.

19   Q   And pressure being put on mother to have sex when she did

20   not consent to it?

21   A   Yes.

22   Q   And pressure and demand or badgering for sex?

23   A   I would go pressure or demands, but not badgering.

24   Q   And did you review the letter to describe disrespect of

25   sexual boundaries of mother?

 1   A   Yes, that's her assertion.

 2   Q   Such as pressuring for unwanted anal sex when she did not

 3   want it?

 4   A   If that were true.

 5   Q   But you reviewed Dr. Poppleton's letter that contained

 6   such statements from mother, correct?

 7   A   Correct.  But Dr. Poppleton's letter does not say whether

 8   or not any of that is true.  That is something for the finder

 9   of fact.

10   Q   Okay.  That wasn't my question.

11       Did you also review the letter to include reports of

12   retribution against mother setting a sexual boundary?

13   A   Yes.

14   Q   And how about father's demand?  Did you review the letter

15   to include mother's indications that father made demands and

16   kept a record of sexual contact?

17   A   I don't recall that.

18   Q   Would harming or threatening to harm a child be --

19   considering that it was a pattern that existed in order to

20   obtain favors or submission be a concern?

21       MR. MIN:  Objection as to form.

22       THE COURT:  Sustained.

23   Q   If the -- if a parent had threatened to harm a child lest

24   the other parent conceded to their sexual demands, is that a

25   concern?

1    A    If true, yes.

2    Q    What about if a partner refused to use a condom when asked

3    to?  Would that be a concern?

4              MR. MIN:  Objection.  Concern about what?

5              THE COURT:  Be more specific, counsel.

6    Q    In the analysis of whether or not intimate-partner

7    violence exists, would a fact that refusing to use a condom

8    when asked to be considered?

9    A    In every case?

10   Q    In every case, yes?

11   A    I'm asking you, are you asking me this about every case of

12   alleged intimate-partner violence?

13   Q    In some cases.

14   A    I can't answer that because I don't know what the "some"

15   refers to.

16   Q    And how about intimate-partner violence as it relates to

17   financial control?  Did you review Dr. Poppleton's letter to

18   include statements from mother about concerns for financial

19   control from father?

20   A    Yes.  If that's -- that's what mother told Dr. Poppleton.

21   Q    And would it be part of an intimate-partner violence

22   analysis to review allegations that father was in control

23   over a large amount of finances during the relationship?

24   A    No.  Just because he had control over the money, that's

25   not something that would elicit, in my opinion,

 1    intimate-partner violence.  Just somebody has more money than

 2    the other.  No.

 3    Q    What about giving an allowance?

 4    A    I don't think that would be dispositive of an

 5    intimate-partner violent dynamic.

 6    Q    And what about leaving a victim in an uncertain position

 7    as to whether or not she would have any finances available if

 8    the abuser was threatening to leave?  Would that be part of

 9    the analysis?

10    A    I'm sorry, the background noise prevented me from hearing

11    your question.

12    Q    Would it be part of the analysis, in the intimate-partner

13    violence, that the abuser would leave the victim in an

14    uncertain position as far as financially if he were to leave

15    her?

16    A    I don't know what you mean by "uncertain position."  If

17    you could clarify, I'll answer.

18    Q    Meaning left without a way to pay for basic necessities.

19    A    Well, that's much more concrete, yes.

20    Q    What about when a partner is talking about the finances in

21    terms of "My money" and not "Our money.  Is that something

22    that would be seen in such a dynamic?

23    A    Not necessarily at all.

24    Q    And what about withholding information about finances?

25    Could that be part of the dynamic?

1    A    Depends on what information was withheld.

2    Q    You've heard the testimony given by mother in this case,

3    correct?  You've been sitting in the courtroom?

4    A    Yes.

5    Q    And you've heard her reports that father had struck her?

6    A    Yes.

7    Q    And that he kicked her in the back when he was angry she

8    didn't have sex with him?

9    A    That's not what I heard.

10   Q    And that she went to get an X-ray due to that injury?

11   A    I don't recall.

12         MR. MIN:  Objection.  The witness just testified

13   that's not what he heard.  And the follow-up question assumed

14   the fact that this witness is not either privy to or aware

15   of.

16         THE COURT:  That's sustained, counsel.  Rephrase the

17   question.

18   Q    Did you hear mother's testimony that she went to get an

19   X-ray from an injury she sustained by father?

20   A    I don't recall that testimony, specifically.  I recall

21   that he kicked her while he was sleeping.

22   Q    And you don't recall testimony that she went to get

23   follow-up treatment for that?

24   A    Not as I sit here right now.  I'm not recalling that.

25   Q    And so wouldn't you agree, then, that if mother's

1    statements were true, that that would be a consideration for

2    the court in determining whether or not a grave risk of

3    exposure to harm exists for this child?

4            MR. MIN:  Objection as to form.

5            THE COURT:  Sustained.

6    Q    Dr. Favaro, you noted in your report that the elements of

7    grave risk, such as domestic violence and coercive control,

8    are subject to the court's ruling, correct?

9    A    Yes.

10   Q    The court's ruling of what?

11   A    The court's ruling about credibility as to whether or not

12   those incidences actually occurred.

13   Q    And it's not your job to make that determination, correct?

14   A    Correct.

15   Q    Dr. Favaro, it's true that a child who witnesses coercive

16   control or who lives in a coercively controlling environment

17   receives the same type of emotional trauma as a child who is

18   directly abused, correct?

19   A    Yes.

20   Q    Dr. Favaro, you've described yourself as a very well-known

21   video game designer and programmer, correct?

22   A    Yes.

23   Q    Well-known to whom?

24   A    Well-known to the population of people that buy video

25   games.

1    Q    That immature population that you talked about?

2               MR. MIN:  Objection.

3               THE COURT:  Sustained.

4    Q    You wrote a choose-your-own-adventure-styled video game

5    called Alter Ego, didn't you?

6    A    That was, I don't know, I think in the '80s, yeah.

7    Q    Is that a "yes"?

8    A    I said "yes."

9    Q    I didn't ask you when.

10   A    I was just thinking out loud, counsel.

11   Q    Okay.  When the player's character was put in certain

12   scenarios, they could choose from a set of options in that

13   game, correct?

14   A    Correct.

15   Q    The player could take certain actions when prompted?

16   A    Correct.

17   Q    And you wrote all of those scripts, correct?

18   A    Yes.

19   Q    The scenes that were created?

20   A    Yes.

21   Q    And the scenarios that were set up?

22   A    Yes.

23   Q    And that included a scene where the player is a child and

24   is kidnapped?

25   A    Yes.

 1    Q    And tortured?

 2    A    I don't recall the torturing part.  But, yes.

 3    Q    Killed?

 4    A    I don't recall that either.  But might have been.

 5    Q    And buried?

 6    A    Yeah.

 7    Q    And you wrote a scene where the player can join friends in

 8    sex with a willing but obviously mentally disturbed woman,

 9    right?

10    A    Yes.

11    Q    And the player could choose whether or not to participate

12    in such a gang rape?

13    A    Yes.  Those were all from real-life stories.  Correct.

14    Q    And you created the first video game to ever come with a

15    maturity warning on it because of sex and violence?

16    A    Correct.

17    Q    And the producer asked you to cut some of that content,

18    right?

19    A    No.  The producer asked me to cut content that had to do

20    with gay lifestyle.

21    Q    And you wouldn't?

22    A    I didn't.

23    Q    You stood your ground on all their nervousness of what the

24    game contained, correct?

25    A    Um, I don't know that that was the case.  What was the

1   case was that they objected to certain content.  The content

2   was all derived from one thousand interviews about people's

3   true-life stories.  And subsequently, we settled on what was

4   in the game based on people's true-life experiences.

5   Q   And it was a fantasy that a player could fantasize about?

6   A   I'm not quite sure what you mean by that.  It was --

7   Q   The game placed the player in a fantasy world, correct?

8   A   The game setting was a fantasy world.  But the content was

9   from real-world life experiences.

10  Q   The player playing the game was not doing real-life

11  action; they were in a fantasy world, correct?

12          MR. MIN:  Objection, relevance.

13          THE COURT:  Counsel, it's starting to go far afield;

14  could you narrow it or move on.

15          MS. SKINNER:  I'll move on, Your Honor.

16          THE COURT:  Thank you.

17  Q   Dr. Favaro, what alternative hypotheses did you come up

18  with in your report?

19  A   Well, certainly my opinion that domestic violence had to

20  be evaluated by the trier of fact suggests that there's two

21  hypotheses right there.  One hypothesis is that domestic

22  violence is credibly stated; the other is that it's not.

23  Q   So it's either domestic violence or it's not, right?

24  A   Yes.

25  Q   And that needs to be evaluated by the trier of fact?

1   A    Yes.

2   Q    How is that not exactly what Dr. Poppleton wrote in his

3   letter?

4   A    That is what Dr. Poppleton wrote in his letter.  I don't

5   agree with him -- I don't disagree with him in its entirety.

6   And there's also a paragraph in my report that all three

7   experts concur that domestic violence should be taken into

8   consideration when adjudicating grave risk.

9   Q    Did you read Dr. Day's report where she sets forth what

10  she describes as alternative hypotheses?

11  A    Yes.

12  Q    Do you agree that an alternative hypothesis is that the

13  child has an attachment to both parents?

14  A    I don't think it was ever stated that he didn't.  So there

15  can't be an alternative hypothesis.  It's just a fact.

16  Q    How does that rule out, or not, grave risk?

17  A    Well, it doesn't.  It doesn't address grave risk.  The

18  fact that he loves both of his parents, that doesn't address

19  grave risk.

20  Q    And how about Dr. Day's indication, that alternative

21  hypothesis, that with mother having exclusive access and

22  influence, there is an attempt to align or alienate the child

23  from the father?  That's not an alternative hypothesis, is

24  it?

25  A    Yeah.  But it exists in the context of more than one

1    hypothesis.  Either mother -- either the mother placed the

2    child under undue influence, or she didn't.  And there was

3    data that I presented about whether or not she did.  And the

4    alternative is that the judge may feel that that doesn't

5    constitute undue influence.  So whenever you present one

6    hypothesis, the other hypothesis is also relevant and

7    possible.

8    Q    But hypotheses are supposed to rule out an issue.  That

9    doesn't rule out grave risk, right?

10   A    You're going to have to give me more context than that.

11   What doesn't rule out grave risk?

12   Q    Mother having exclusive access and influence with an

13   attempt to align or alienate the child from their father.

14   That's not an alternative hypothesis that rules out whether

15   or not a grave risk exists?

16        MR. MIN:  Objection to the form and mischaracterizing

17   evidence.  The issue of influence goes to maturity, not grave

18   risk.

19        THE COURT:  Sustained.

20   Q    The mother is a restrictive gatekeeping parent is not an

21   alternative hypothesis, correct?

22   A    Yes.  Of course it is.  The alternative is, she's not.

23   Q    But the hypothesis is, is there a grave risk or not; isn't

24   that right?

25   A    That is the --

1            MR. MIN:  Objection as to form.

2            THE COURT:  Overruled.

3   A   That is a potential factor that should be taken into

4   consideration when evaluating grave risk.

5   Q   Okay.  So the restrictive gatekeeping parent is not an

6   alternative hypothesis; you're saying it's a factor, it's a

7   consideration; is that right?

8   A   The alternative hypothesis to anything that is is that it

9   isn't.

10  Q   So the alternative hypothesis that needs to be determined

11  in this case is whether there is a grave risk of harm of

12  exposure to the child, correct?

13  A   No, not correct.  The hypothesis of whether or not the

14  mother is a gatekeeper doesn't go to grave risk, it goes to

15  undue influence.

16  Q   Which is a consideration in the grave-risk analysis,

17  correct?

18  A   That's acceptable.

19  Q   Dr. Day indicates that, again, a hypothesis is the child

20  did not report any physical or psychological risk while in

21  the presence of either parent.  That's not a hypothesis,

22  correct?

23  A   It is a hypothesis if the child did report it to someone

24  that Dr. Day wasn't aware of.

25  Q   It's not the hypothesis to the ultimate question of grave

1    risk, correct?

2    A    Oh, it's definitely a factor in grave risk.

3    Q    It's an observation or factor, correct?

4    A    No.  If the child did not see his parents in an abusive

5    relationship with one another, then that augers against grave

6    risk because if there is such contact and it is seen by the

7    child, that goes to the hypothesis that there is grave risk.

8    Q    So it would impact the ultimate question; is that your

9    testimony?

10   A    What ultimate question?

11   Q    Of the existence of grave risk or not.

12   A    So that -- I can break it down.  Domestic violence

13   constitutes a grave risk, okay?  The circumstances around

14   domestic violence helps inform us about what the child saw

15   because what the child sees will affect them, okay?

16        In this line of questioning, the child didn't see

17   anything.  That doesn't preclude Your Honor from finding that

18   there was domestic violence, which bolsters the hypothesis of

19   grave risk.

20   Q    Did you consider an alternative hypothesis that there was

21   justified restrictive gatekeeping occurring?

22   A    Yes.  I definitely considered that.  Because, as

23   Dr. Poppleton testified, some parents will restrict access to

24   another parent if they believe that that restriction serves a

25   protective functioning.

1    Q    And one of the justifications is a corroborated history of

2    intimate-partner violence, correct?

3    A    No, I don't know where that question came from.  I don't

4    understand it.  First we're talking about what the child

5    sees.  Now we're talking about a much more general concept.

6    Q    What are some of the factors that would go into having

7    justified restrictive gatekeeping?

8    A    It's way too broad to answer because the kind of

9    restrictive gatekeeping that I became aware of in this case

10   is that mother doesn't want the child to have any contact

11   with the father.  So I don't think anything justifies that.

12   Q    Didn't you rely on the Austin Fieldstone and Pruett *Bench*

13   *Book For Assessing Parental Gatekeeping* in parenting

14   disputes?

15   A    I know that bench book.

16   Q    Didn't you rely on it or include it as a reference in your

17   report?

18   A    Yes.

19   Q    Okay.  And so aren't you familiar with Table 2 within the

20   report -- within that study that describes some reasons for

21   justified restrictive gatekeeping?

22   A    That's not what I was talking about, counsel.  I was

23   talking about the level of restriction, which in this case I

24   became aware that the mother wanted to restrict all contact

25   with the father.

1  Q    Okay.  I'm talking more in general what -- some of the

2  justifiable reasons for restrictive gatekeeping could include

3  a corroborated history of intimate-partner violence?

4  A    But it still goes far afield from the question of how

5  restrictive is the gatekeeping?  Okay?  A parent -- and you

6  know I certainly don't condone any kind of violence -- a

7  parent who completely refuses to allow a child access to

8  another parent, that's a very extreme measure, okay?  I

9  definitely agree with the part of your question that says,

10  you know, are there times when a parent is right to restrict

11  access to another parent?  Yes, there are times.  Okay?  But

12  does that include all access to a parent to the point where

13  it becomes a termination of his rights as a parent?

14  Q    Dr. Favaro, you're going way out of what my question is,

15  so let's rein it back in.  I'm talking about the Austin

16  Fieldstone and Pruett study that you cited, which indicates

17  when the evidence supports the restrictive parent's position

18  or corroborates allegations of harm, then it is a case of

19  justified restrictive gatekeeping.  Do you agree with that

20  statement from the study that you cited?

21  A    No, I do not.  Because I keep on saying it depends on how

22  restrictive.

23  Q    Okay.  So you don't agree with the portion of the study

24  that you've referred to?

25  A    That's a mischaracterization, counsel.  I don't agree that

1   the highest level of restriction is supported --

2   Q   Nobody is talking about that level.

3   A   I do agree --

4        THE COURT:  Counsel, let the witness finish his

5   answer.

6   A   I do agree that it can be appropriate for a parent to

7   restrict contact for the purposes of protecting a child.

8   Q   Thank you.

9        And that a history of harsh discipline of the child or

10  child abuse is also a reason as to where there could be some

11  justified restrictive gatekeeping, correct?

12  A   You uses the words "could be" and "some."  So those are

13  words that encompass a lot of things and a lot of behavior.

14  But in those words that you just asked me in your question

15  that use the words "could be" and "some," I would agree.

16  Q   Protective gatekeeping is a reason why a parent would want

17  to limit access for involvement of the other parent to the

18  child, correct?

19  A   Limit, not eliminate.

20  Q   I didn't say eliminate, Dr. Favaro.  I said protective

21  gatekeeping is defined in terms of the reason a parent wants

22  to limit access for involvement by the other parent, correct?

23  A   At times, correct.

24  Q   And some of those reasons --

25       MR. MIN:  I apologize for interrupting.  I just note

1    -- I know this morning respondent had a mask on.  And I'm

2    wondering if that was for illness purposes.  But I notice

3    respondent doesn't have a mask on.  So I want to clarify if

4    there is some illness or something that we should be

5    cognizant of.  I just want to address that.

6              THE COURT:  Counsel.

7              MS. SKINNER:  Your Honor, I would say that's kind of

8    an inappropriate question.  My client can be in control of

9    how she needs to protect herself or not.  I think that she's

10   cognizant of everybody's health and safety here.  So if the

11   court would request that if my client has a cough, to keep

12   the mask on, we can certainly respect that.

13             THE COURT:  Counsel, you'll notice the court has put

14   an additional air filter right behind your co-counsel, out of

15   an abundance of caution.  There's an excessive amount of

16   coughing where it's been disruptive to some of the witnesses

17   to be able to hear the questions.  And the same for the

18   court.  The court has been willing to accommodate you

19   remaining at counsel table, and co-counsel to do the same.

20   The court is not only interested in your client's health, but

21   the health of everybody in this courtroom.  And one of the

22   things we've learned in the COVID restrictions is how to

23   protect each other from passing illness.

24        So if your client has any type of an illness at this time

25   that is causing her to aspirate or cough in the open air, I

1   think it would be advisable for her to wear a mask.  I'm not

2   going to make an assessment -- I'm not a doctor of

3   medicine -- to tell somebody if they're capable of infecting

4   anybody else.  But I think, out of an abundance of caution

5   and courtesy to the parties, if she is sick with something

6   more than an allergy, she should wear a mask.

7              MS. SKINNER:  Understood, Your Honor.  Thank you.

8              THE COURT:  Please proceed.

9   Q    And Dr. Favaro, some of those reasons that could be

10  protective and justified gatekeeping could include a history

11  of substantial intimate-partner violence, correct?

12  A    That's correct.

13  Q    And could include harsh parenting by the other parent,

14  correct?

15  A    Could potentially, yes.

16  Q    And then, again, when the evidence supports the

17  restricting parent's position, when the evidence supports it,

18  and there have been corroborations of the allegations of

19  harm, that would be a case of justified restrictive

20  gatekeeping, correct?  To some level.  I'm not talking about

21  the strictest level.  To some level.

22  A    When you say "to some level," I would agree.

23  Q    And in such situations, telephonic access may be denied,

24  unless it's supervised or on speaker.  That's one of the

25  protections that could be put in place, correct?

1  A    It depends.  It depends on how it's supervised.  It

2  depends on what protocols are used.  It depends on whether or

3  not the contact would be recorded.  It's a very unnatural

4  setting when parents speak to their children on FaceTime or

5  on the telephone.  So precautions need to be taken about how

6  that works, what the protocols are, what the logistics are.

7  Q    But you did not analyze whether any of mother's -- if she

8  had restrictive gatekeeping actions in this case, if those

9  were framed due to a history of intimate-partner violence,

10  correct?

11  A    No.  Because I haven't spoken to the mother.

12  Q    So then how can you make any conclusions about whether her

13  gatekeeping was restrictive or protective if you haven't

14  analyzed that?

15  A    All of the questions that you asked me about that were

16  hypotheticals, okay?  So I answered the way I answer

17  hypotheticals.  You gave me a set of facts.  They were

18  hypotheticals.  I answered.

19  Q    So you're making no findings about whether there was

20  unjustified restrictive gatekeeping here?

21  A    I'm not making any findings because I'm not a judge.  And

22  the judge is the only person that can make findings.

23  Q    Not making any opinions on that?

24  A    I think I gave you all the opinions for the circumstances

25  that you asked me.

1    Q   You stated in your report, "In this case, if it is found"

2    -- meaning parental gatekeeping -- "it would, in my opinion,

3    represent a form of undue influence."

4    A   Yes.  That's what I said.

5    Q   But, again, how can you make that opinion if you have not

6    analyzed whether the gatekeeping is a product of father's

7    abuse?

8    A   Because I relied on information that was presented to me

9    by the child.

10   Q   But you did not do an intimate-partner violence analysis

11   assessment here?

12   A   I do not think you have to do an intimate-partner violence

13   assessment to make note of behavior that's consistent with

14   gatekeeping.

15   Q   Are there certain tactics that abusers use in which the

16   child is used as a form of abuse against the other parent?

17   A   Are there tactics?  Yes.

18   Q   And could some of those tactics include accusing the

19   parent of being restrictive?

20   A   I don't -- a question that's presented to me in such a

21   general form is not something I can answer.

22           MS. SKINNER:  I have no further questions for this

23   witness.

24           THE COURT:  Redirect.

25           MR. MIN:  Thank you, Your Honor.

| | |
|---|---|
| 1 | REDIRECT EXAMINATION |
| 2 | BY MR. MIN: |
| 3 | Q   Counsel asked you if you spoke to the child about |
| 4 | returning to Singapore in two separate homes.  Do you recall |
| 5 | that? |
| 6 | A   Yes. |
| 7 | Q   Why did you talk to the child about living in two separate |
| 8 | homes if returned to Singapore? |
| 9 | A   The child brought that up to me.  I didn't question the |
| 10 | child about living in two separate homes.  The child brought |
| 11 | it up to me by saying, "If I returned, would I have to" -- |
| 12 | MS. SKINNER:  Your Honor, we'd object as to hearsay. |
| 13 | MR. MIN:  Your Honor, if I could be heard on the |
| 14 | hearsay issue. |
| 15 | THE COURT:  Yes. |
| 16 | MR. MIN:  Your Honor, in the case of *Jacquety v.* |
| 17 | *Baptista* out of the Southern District of New York, 538 F. |
| 18 | Supp 3d 325, in 2021, the court noted when there was an |
| 19 | objection to hearsay because one of the party's forensic |
| 20 | experts was testifying as to what the child told the |
| 21 | forensic, that the court relied on Rule 803(4), talking about |
| 22 | the fact that the declarant, in this case the child, is |
| 23 | expected to understand the truth and understand she is |
| 24 | providing information for purposes of diagnosis or treatment. |
| 25 | THE COURT:  Counsel, slow down please. |

1          MR. MIN:  Providing information for the purpose of

2   diagnosis and treatment.

3       The court noted that the party seeking to restrict the

4   testimony said there's a difference between -- difference

5   because the testifying expert was a forensic, was providing

6   forensic opinion in litigation.  And the court noted, "The

7   law draws no such distinction."

8       And then citing to a case from the Second Circuit in 1978,

9   *O'Gee v. Dobbs House Incorporated,* 570 F. 2d 1084, and it

10  states that, "Rule 803(4) clearly permits the admission into

11  evidence of what (a patient) told (a doctor retained for the

12  purposes of the litigation) about her condition.  So long as

13  it was relied on by (a) (the doctor) in formulating his

14  opinion."  And the foundation is properly laid.

15      The court allowed the child's statements to be testified

16  by the forensic evaluator because it dealt with the child's

17  history and allegations of abuse in the household from the

18  father to the mother.

19      So, Your Honor, we would renew our application that the

20  statements by the child, as it relates to the history and the

21  child's own statements with respect to the allegations the

22  mother is making, to be permissible under Rule 803 (4).

23          THE COURT:  What's the nature of the case?

24          MR. MIN:  This was a Hague Convention case, Your

25  Honor.

1              THE COURT:  Counsel.

2              MS. SKINNER:  Your Honor, if petitioner is submitting

3     his witness as someone who is providing diagnosis and

4     treatment, then we renew our request to have this witness not

5     be qualified as an expert on the grounds that he's in

6     violation of state statute that is potentially submitting

7     himself to a gross misdemeanor, which would be subject to

8     jail time and a fine.

9              MR. MIN:  Your Honor, we'll brief this later.  But we

10    did, during the break, find a case from the District of New

11    Mexico, *Salazar v. Seagrave.*  The cite is 2004 WL 7337792.

12    The court stated, "Dr. Dvoskin's failure to comply with New

13    Mexico's regulatory requirements for out-of-state

14    psychologists to perform IPEs, does not mandate the exclusion

15    of Dr. Dvoskin's expert testimony.  The admissibility of his

16    testimony will be determined at trial under the Federal Rules

17    of Evidence in *Daubert*.  Plaintiff's motion to disqualify

18    Dr. Dvoskin's illegal evaluation or to bar it or strike it as

19    evidence will be denied."

20         Your Honor, this goes to weight.  This goes to Your

21    Honor's judgment in terms of, again, how much weight to give

22    to the testimony.  But the admissibility of the testimony, I

23    don't think, is at question.

24         Dr. Favaro's -- the statute itself specifies that Dr.

25    Favaro can't hold himself out to be a psychologist.  But

 1   there are several state statutes that specifically limit what

 2   an out-of-state psychologist can do, including providing

 3   forensic testimony.

 4       There are several state statutes we found that

 5   specifically limit forensic testimony.  And courts have used

 6   that to strike forensic testimony when you're not licensed.

 7   But in our, again, limited research thus far, when the state

 8   statute does not limit it, there's a distinction between

 9   holding yourself out to be a psychologist and the expert

10   testimony you make at trial.

11       And this case shows that even though this psychologist was

12   maybe not permitted to perform the function in the state of

13   New Mexico, IPEs, they were still permitted to provide expert

14   testimony, Your Honor.

15       THE COURT:  Counsel, anything further?

16       MS. SKINNER:  Your Honor, this witness in his report

17   self-titled himself as "child and forensic psychologist" and

18   issued a report in the state of Washington.  And now

19   apparently is relying upon an exception to hearsay that he

20   provided diagnosis and treatment of a patient.  So we

21   continue our objection that under the law that we are under,

22   within the state of Washington, district of Washington, which

23   the rules for psychologists are different than those in New

24   Mexico, is what rules here.

25       MR. MIN:  I want to be clear.  We're not stating he

1    provided treatment.  We're just stating what the Rule 803(4)

2    says.  And I think it's a little bit misleading for counsel

3    to represent simply because we're reciting the rule that

4    we're alleging that he provided treatment in the state.

5    We're saying that is what the rule says.

6        And the court in the Southern District of New York noted

7    that there is no distinction between forensic expert

8    testimony in this regard.  Clearly Dr. Favaro has stated that

9    he has come to some sort of conclusion with respect to

10   gatekeeping, undue influence, risk of harm.  Those are

11   certainly, you know, maybe not medical diagnoses, but

12   opinions and conclusions he's reaching in his profession as a

13   psychologist.

14       So I wanted to draw the distinction.  I know respondent

15   seemingly wants to tie him into some sort of treatment in

16   Washington.  And we're not alleging that.  And we're not

17   holding Dr. Favaro out as a treating psychologist.

18           THE COURT:  The original response provided by counsel

19   for petitioner as far as the objection going to weight as

20   opposed to admissibility is what the court ultimately comes

21   to, counsel.  And I believe the statute that you're referring

22   to deals in the context of from a licensing standpoint to be

23   permitted to do or engage in certain types of treatment or

24   care.

25       There may be consequences for him not being in compliance

1   with a state statute, but I don't believe anything that's

2   been provided to the court would be an exclusion to say, and

3   if not, then they're prevented from testifying or prevented

4   from entering any opinion in court.  Does that statute go

5   that far, counsel?

6        MS. SKINNER:  No, Your Honor.  But the statute

7   specifically states that one cannot hold themselves out as a

8   psychologist in the state of Washington without complying

9   with those rules.

10       THE COURT:  And as a result of not complying with

11  that rule, what's the consequence?  It's perhaps criminal

12  prosecution or civil sanctions against the doctor, but you

13  haven't stated anything or provided any language in that

14  statute that would preclude that person from testifying in

15  court.

16       MS. SKINNER:  Your Honor, then we argue that he does

17  not hold -- he doesn't hold a valid license to be able to

18  provide the testimony, to be able to provide the evaluation.

19  So if he was -- if he did not conduct the evaluation

20  according to Washington licensing requirements, that

21  evaluation should be null and void.  He should not get the

22  benefit of an evaluation that was conducted unlawfully.

23       THE COURT:  Then that would give the court the

24  opportunity to weigh what this doctor provided, in the

25  absence of being in compliance with statutory requirements,

1   to be able to render an opinion.  So, again, it goes back to

2   the original determination made by this court.  This goes to

3   weight and not admissibility.

4          MS. SKINNER:  Thank you, Your Honor.

5          THE COURT:  Please proceed.

6          MR. MIN:  Your Honor, is there a ruling on the

7   hearsay?

8          THE COURT:  Yes.  He may testify.

9   Q   So I was asking you and you were testifying, before there

10  was an objection, about what the child asked you about

11  returning to Singapore and the presence or possibility of two

12  separate homes.  Can you talk about that?

13  A   Yes.  It came up in the context of me asking the child if

14  he would be afraid to go back to Singapore, what were his

15  feelings.  The child reported to me that he would not want to

16  go back to a home that his mother and father lived in

17  together.  Okay?  The conversation then turned to, "What if

18  you weren't going back to a home where your mother and father

19  lived together?"  And he said to me, "Do you mean that if my

20  mother and father were in different places and I saw them

21  each for their own time with me?  I would have no problem

22  with that."

23  Q   You heard Dr. Poppleton's testimony earlier that the

24  reasons the child gave to Dr. Poppleton why he didn't want to

25  go back to Singapore was because of the weather, because he

1    had more opportunity for friends than in Singapore, and

2    because he considered himself to be American.  You heard that

3    testimony?

4    A    Yes.

5    Q    Were those any reasons -- any of the reasons the child

6    gave you about whether he wanted to stay in the U.S. or

7    Singapore?

8    A    No.  He did say that he was making more friends in the

9    United States.  Okay?  But the other statements made to

10   Dr. Poppleton seemed to me to go to mature age than anything

11   else.

12   Q    What do you mean by that?

13   A    He's saying that he likes it in the United States better

14   because the weather is nicer, you know.  That's not a mature

15   abstraction.

16   Q    Hearing that testimony from Dr. Poppleton, did that have

17   any impact on your opinion as to the child's level of

18   maturity with respect to his ability to provide an objection?

19   A    Yeah.  Typical eight- to nine-year-old reasoning.

20   Q    Did you and the child talk about friendships he made in

21   Singapore?

22   A    Yes.

23   Q    Did he report to you whether he had any friends in

24   Singapore?

25   A    He said he had more friends in Singapore than in the

1    United States.

2    Q   Other than what you just testified to, were there any

3    reasons the child gave you that he might prefer to live in

4    the United States over Singapore?

5    A   No.  I think the conclusion that I came to was that his

6    preference was to live with his mom, not to live in a place.

7    His attachment was to his mother, not the location.

8    Q   What was the basis for you to opine that there was undue

9    influence in this case?

10   A   The child told me that he was aware of all aspects of the

11   order of protection.  He said, "I know everything about the

12   protective order."  Also, the child -- I asked the child if

13   his mother did not want him to speak to his father on the

14   phone.  And the child enthusiastically said that she didn't.

15   Mother's behavior around the recording was significant to me

16   because -- not because she wanted the sessions recorded, I

17   offered to record the sessions in an unobtrusive way, but

18   more that she put herself -- her child in the position of

19   recording.  Giving him that responsibility to record me, I

20   think, was undue influence.

21   Q   Why do you think that?

22   A   Because the child was clearly bothered by the iPad that

23   was next to him.  And when I asked him, "Why did your mom

24   want to record me?"  The child, in not so many words, told me

25   that she wanted to make sure I wasn't lying.

1   Q   Did that make you feel as though there might have been

2   some potential for the child to -- withdrawn.

3        Did that make you feel like there was some sort of

4   adversarial position between you and the child?

5            MS. SKINNER:  Objection, relevance.

6            THE COURT:  Sustained.

7   Q   Counsel asked you on cross examination about gatekeeping

8   and whether or not certain facts or certain allegations with

9   respect to IPV would have been relevant to your opinion on

10  gatekeeping and undue influence.  And I believe your answer

11  was, well, you observed behavior -- or that you observed

12  behavior that was consistent with gatekeeping, irrespective

13  of that, right?

14  A   Yes.

15  Q   What behavior was that?

16  A   The mother's participation in modifying my methodology by

17  recording.

18  Q   Would you agree that there are differing levels of risk to

19  a particular child, depending on the circumstances of their

20  situation?

21  A   I didn't understand the word that you said after

22  "differing levels of."

23  Q   Would you agree that assuming there's domestic violence in

24  the home, that the level of risk to a child can depend on

25  other circumstances?

1   A    Yes.

2   Q    You heard some testimony earlier that if a child is

3   suffering from some mental-health issues, perhaps, like

4   depression, they may be more vulnerable to those risks,

5   right?

6   A    Correct.

7   Q    And there are other circumstances, is there not, that

8   would contribute to how much risk could be present to a

9   child?

10  A    Yes.

11  Q    Such as?

12  A    Such as the proximity of the parents to one another during

13  visitation changes and the possibility of any criminal

14  stalking activity that might occur.

15  Q    You heard testimony from Dr. Poppleton that a child's

16  resiliency could impact on the risk of harm to the child,

17  correct?

18  A    The degree to which a child is resilient, which is sort of

19  an invulnerability to stress, would be a factor.

20           MR. MIN:  No further questions, Your Honor.

21           THE COURT:  Recross?

22                          RECROSS EXAMINATION

23  BY MS. SKINNER:

24  Q    Dr. Favaro, the child indicated to you that he does not

25  want to go back to a home where his mother and father lived

1    together, correct?

2    A    Yes.

3    Q    And the child told you that his friends would miss him in

4    Singapore, but that he wants to live here in the U.S.,

5    correct?

6    A    Yes.

7    Q    So he's taking other people's feelings into consideration,

8    right, that his friends would miss him?

9    A    Okay.  Yeah.

10   Q    And then despite the fact that he believed his friends

11   would miss him, he still wanted to live in the U.S., right?

12   A    He didn't tell me he wanted to live in the U.S.

13   Q    So if that statement were true that was included in

14   Dr. Poppleton's report, that the child said, "My friends

15   would miss me, but I want to live here," then that would

16   indicate that he can take other's feelings into mind yet

17   still have his own conviction, correct?

18   A    In that particular instance, yes.

19   Q    And the child did call the U.S. his home, correct?

20   A    Not to me.

21   Q    How much were you paid for your work in this case?

22   A    I was currently paid $40,000.

23   Q    What do you mean by "currently"?

24   A    That's what -- sorry.  That's what the father paid me to

25   date.  I don't know what his additional billing is going to

1  be yet.

2  Q    To date, through today?

3  A    Yes.

4  Q    And you testified that the child could not talk to the

5  father -- the child was telling you that he could not talk to

6  his father, right?

7  A    Correct.  No, no, that's not correct.

8       I asked a much different question.  I asked the child if

9  his mother wanted him to speak to his father.

10 Q    So you asked the child what his mother wanted?

11 A    Yes.

12 Q    Okay.  And there was a protective order in place so that

13 the child and the father could not talk, in any event,

14 correct?

15 A    Yes.  The child brought that up to me, yes.

16 Q    But that was, in fact, in existence, correct?

17 A    Yes.

18 Q    I believe you just testified that mother put the child in

19 the position of securing the recording?

20 A    The mother put -- the mother didn't record.  The child

21 recorded.  The mother asked me if I minded if the child would

22 record me.

23 Q    I thought you testified that the mother went into the room

24 and placed the iPad on the table?

25 A    She certainly did.

1    Q    And when you asked the child why he thought mom wanted to

2    record, didn't he say, "To make sure that you don't tell me

3    something I'm not supposed to know.

4    A    I don't think he said those words, no.

5    Q    Other than telling the child that his father loved him,

6    did you pass on any other feelings that you believed that the

7    father had for the child?

8         MR. MIN:  Objection, mischaracterization of the

9    testimony.

10        THE COURT:  Overruled.  You may answer the question.

11   A    No, I didn't say anything.

12   Q    You heard testimony about father putting hidden cameras in

13   mother's home to observe her, did you not?

14   A    From the testimony or from the child?

15   Q    From the testimony.

16   A    Yes.

17   Q    And you heard testimony that that -- that father admitted

18   that was done without mother's permission, correct?

19   A    Correct.

20   Q    Was that fact considered in your evaluation at all?

21   A    Oh, yes.

22   Q    Did you mention it in your report?

23   A    No, I did not, because it was collateral.

24   Q    What do you mean?

25   A    I got that information at the trial.  And I got it from

1    the child.  But because I was not evaluating the father, it
2    was collateral information.
3    Q   So you didn't find that information to be relevant to put
4    into your report when discussing whether there was a grave
5    risk of exposure of harm to the child?
6    A   Well, I didn't put it in the report, but I can certainly
7    consider it now.
8    Q   But you didn't consider it then?
9    A   I didn't.  I probably should have.
10            MS. SKINNER:  No further questions.
11            THE COURT:  Redirect?
12            MR. MIN:  Nothing further.
13            THE COURT:  Any objection to this witness being
14   excused?
15            MR. MIN:  No, Your Honor.
16            THE COURT:  From the defense?
17            MS. SKINNER:  Excuse me?
18            THE COURT:  Any objection to this witness being
19   excused?
20            MS. SKINNER:  No, Your Honor.
21            THE COURT:  You may step down, sir.  You are excused.
22       And your next witness, counsel.
23            MR. MIN:  Yes, Your Honor.  The next witness we would
24   call is Dr. Deborah Day, who I believe is -- can we take a
25   short bathroom break?

 1                 THE COURT:  Why don't we take our afternoon recess.

 2                              (Recess.)

 3                 THE COURT:  Counsel, your next witness.

 4                 MR. MIN:  As I stated, we're calling Dr. Deborah Day

 5     as our next witness.

 6                 THE CLERK:  Dr. Day, if you could please raise your

 7     right hand.

 8                              DEBORAH DAY,

 9         having been sworn under oath, testified as follows:

10                 THE CLERK:  If you could please state your first and

11     last names and spell your last name for the record.

12                 THE WITNESS:  Absolutely.  Deborah, D-E-B-O-R-A-H,

13     first name, Deborah.  Last name Day, D-A-Y.

14                 MS. SKINNER:  Your Honor, at this time I would like

15     to renew our motion regarding this witness.  Your Honor

16     previously excluded Dr. Day's report on a motion in limine

17     that we submitted.  We ask the court to not hear testimony

18     from this witness as cumulative under 403.  She will be

19     testifying as to the same thing that Dr. Favaro did, which

20     under his testimony, he was providing rebuttal of

21     Dr. Poppleton's, critique of his methodology, critique of

22     what Dr. Poppleton considered, and the standards

23     Dr. Poppleton used, et cetera.  And I believe this witness

24     will testify regarding the same thing.

25                 THE COURT:  Well, counsel, since I'm not clear how

1  far this witness is going to go on her examination, I believe

2  I communicated before, if you believe as the witness is going

3  forward it's providing cumulative testimony, I now have

4  context as to whether or not it will be cumulative or not.

5  You're entitled to make an objection.  But as far as me

6  giving a wholesale ruling precluding the testimony, that will

7  not be granted.

8          MS. SKINNER:  Thank you, Your Honor.

9          THE COURT:  You may proceed.

10         MR. MIN:  Your Honor, with that in mind, we would

11 like to just move things along and offer 107 into evidence,

12 which is her CV and her short report, rebuttal report.  And

13 to the extent Your Honor finds anything to be cumulative,

14 perhaps that can be stricken afterwards.  But moving it

15 along, I'd rather have that admitted.

16         THE COURT:  110, counsel?

17         MR. MIN:  107.

18         THE COURT:  Okay.  Counsel?

19         MS. SKINNER:  Your Honor, we have the same objection.

20 We have no objections to the CV, but the content of the

21 report is this expert's rebuttal report, which we're

22 objecting to as being cumulative.

23         THE COURT:  All right.  I'll admit 107 regarding the

24 CV.  And I will reserve ruling on the full admissibility of

25 107 until after I've had the opportunity to hear testimony

 1   and counsel's objections to the content of the report.

 2   Please proceed.

 3                    (Exhibit 107 was admitted.)

 4                    DIRECT EXAMINATION

 5   BY MR. MIN:

 6   Q   Dr. Day, can you please describe your current occupation?

 7   A   I am a Florida licensed psychologist in private practice

 8   at Psychological Affiliates.  We have two offices located in

 9   Winter Park and Palm Beach County.

10   Q   How long have you been a practicing psychologist?

11   A   Since 1985.  I believe that's 39 years.

12   Q   Okay.  And what is your practice focused on?

13   A   I am primarily a clinical and forensic psychologist.  I

14   continue to see patients, although I limit my practice of

15   patients.

16       I am primarily doing forensic work in the family-law

17   arena.  I do what are called "social investigations," used to

18   be called "custody evaluations."  I do psychological

19   evaluations.  I do consulting in all sorts of legal cases

20   where I am not testifying.  And I do work-product reviews or

21   rebuttal of other psychologists' work product.

22   Q   Can you give the court a brief background of your

23   education, please?

24   A   Yes.  I have an AA degree in psychology from Edison

25   College in Fort Myers.  I have a bachelor's degree in

 1   psychology from the University of Central Florida.  I have a

 2   master's degree in clinical psychology from Florida Technical

 3   University in Melbourne, Florida.  And a doctor in psychology

 4   or a PsyD degree in clinical psychology.  I obtained that in

 5   1985 from Florida Institute of Technology.

 6   Q   What professional associations do you belong to?

 7   A   I am a member of the Florida Psychological Association,

 8   the Association of Family and Conciliation Courts, the APSAC,

 9   which is the association for the prevention of child abuse.

10   I am a member of the Florida bar.  I'm not a member; I'm an

11   affiliate member.  They allow non-attorneys to be members.

12   I'm also a member of the International Collaborative

13   Association and the Florida Association of Collaborative

14   Professionals.

15   Q   I think you mentioned the Association of Family and

16   Conciliatory Courts; is that right?

17   A   Yes.  AFCC.

18   Q   That's what Dr. Poppleton testified he's a member of as

19   well?

20   A   Yes.

21   Q   And have you written in the area of child and forensic

22   evaluations?

23   A   Yes, I have.  I published several articles in the *Journal*

24   *of Forensic Psychology.*  They're peer-reviewed journal

25   articles on child custody, the work around family law.  I've

1   also published a book in the area of child abuse and have

2   several peer-reviewed articles in child abuse.

3   Q    What about presentations?  Have you given any

4   presentations or lectures or CLEs on the issue of child

5   forensic evaluations?

6   A    Yes.  I am a regular speaker in Florida at the Florida

7   Judicial College, Florida Judicial Advanced College and new

8   judges college.  I'm a regular speaker at the Florida Bar,

9   the Academy of Matrimonial Lawyers.  They're national and

10  international conferences.

11       I speak at the local Florida association such as the FACP,

12  or the Florida Association of Collaborative Professionals.  I

13  speak regularly at Florida's largest family-law event.  I

14  will be speaking on Friday.  We'll have about 1,800 judges

15  and family lawyers present.  So it's geared towards board

16  certification renewals and new attorneys coming in for board

17  certification.

18  Q    Do you have any training in forensic evaluations?

19  A    Yes.  My internship was under the supervision of a

20  forensic psychiatrist and forensic psychologist.  So I did my

21  residency under them.  They then subsequently hired me.

22       My CEs, my continuing education, because I'm a licensed

23  psychologist, a licensed mental health professional, and a

24  certified family mediator, I'm required to take about 70

25  continuing education credits every two years.  And I

1  primarily focus on forensic psychology in my continued

2  training.

3  Q   And in your career, have you ever been appointed by a

4  court or conducted a forensic evaluation for children and

5  families?

6  A   Yes.

7  Q   How many times, would you say, in the last year or so?

8  A   I usually get an order every couple of weeks.  I probably

9  average about 20 per year.  They usually take two to three

10 months, sometimes longer to get done.  I can tell you in

11 terms of testifying, last year I testified 39 times in either

12 a deposition, a hearing, or a trial, in family or civil

13 matters or Hague.

14 Q   Okay.  And have you been -- what areas have you been

15 qualified to give testimony in?

16 A   I have been qualified generally as a clinical and forensic

17 psychologist with subspecialties in psycho-legal family-law

18 issues, domestic violence, child abuse, conflict families and

19 traumas.

20 Q   Have you ever, as an expert witness, testified on issues

21 concerning children and their interactions with their

22 parents?

23 A   Yes.  That is primarily the focus of my practice on a

24 day-to-day basis.

25 Q   Have you ever provided testimony in Hague Convention

1  cases?

2  A   Yes, I have.

3  Q   How many times?

4  A   Last year, one time.  I was hired to do a risk assessment

5  of a father in a case coming out of Sweden.  Prior to that, I

6  have two consulting cases in the UK, where I didn't testify,

7  but I was a consultant on a team.

8      I've had two cases where I looked at grave risk and mature

9  age, coming out of South America, where I was appointed by

10 the judge in Florida to evaluate the children based on those

11 two questions.  And I have a case in Germany where I was

12 hired by the mother to evaluate her child who had been

13 abducted to Germany.  The case ultimately settled, so I did

14 not testify.

15 Q   And --

16 A   So I think total six, today seven.

17 Q   Not including the ones in which you were consulted, did

18 you conduct forensic evaluations in the other cases?

19 A   I did.

20 Q   You said a couple of those cases or some of those cases

21 involved risk assessment for the child.  And some of them

22 involved the child's maturity and objections, right?

23 A   Yes.

24         MR. MIN:  At this time we'd move to have Dr. Day

25 admitted as an expert in forensic psychology.

1          THE COURT:  Counsel, any objection?

2          MS. SKINNER:  No, Your Honor.

3          THE COURT:  Accepted.  Counsel, please proceed.

4    Q    Dr. Day, could you briefly describe what you were asked to

5    do in this case?

6    A    I was asked to review Dr. Poppleton's letter to the court,

7    to look at it in terms of standard of care for the practice

8    of forensic psychology, and particularly in Hague cases, and

9    the questions he was asked to answer.

10   Q    Did you evaluate the child in this case?

11   A    I did not.  I did not meet with anyone or evaluate anyone.

12   It was pure rebuttal work, product review.

13   Q    Did you at some point review Dr. Favaro's report in this

14   case?

15   A    I did, after he published it.

16   Q    Okay.  And in what ways does the task you were provided

17   differ from the report Dr. Favaro produced?

18   A    Dr. Favaro worked primarily, in my opinion, in his

19   rebuttal, looking at the interviews with the child and doing

20   a second interview.  And really assessing the methodology of

21   Dr. Poppleton, in the child's arena, by having those

22   interviews.  And then meeting with the father in a collateral

23   interview.  So that was very different than what I did.

24   Q    Why do you say it was different from what you did?

25   A    I did not meet with anyone.  Mine falls within the four

1  corners of Dr. Poppleton's report and his methodology.  So he

2  did process.  I did methodology.

3  Q   What do you mean when you say the "four corners of

4  Dr. Poppleton's report"?

5  A   So I looked at the data that Dr. Poppleton looked at.  I

6  did not go out and gather my own data.  I looked at his

7  report and his underlying data points.

8  Q   Why is it important -- what's the importance of a rebuttal

9  work product review in a case like this?

10  A   So often we see the same data and have different opinions

11  on what that data might generate, or the ideas behind that

12  data.  And we look at the standard of care.  Does this report

13  meet what we call a "minimum standard of care," based on the

14  forensic community of psychologists?  So we look at that.

15  And then, does this data meet that standard?  And then, does

16  this data have alternative potential hypotheses within the

17  data that weren't discussed?  So that's really the

18  methodology component of what I did.

19  Q   What criteria, if any, do you utilize in doing a rebuttal

20  work-product review?

21  A   I didn't hear that second word you said.  Could you repeat

22  that, please?

23  Q   What criteria, if any, do you use in doing a rebuttal

24  work-product review?

25  A   So I use two criteria.  One, I did review the AFCC

1    guidelines for child custody evaluations in family-law cases.

2    They have promulgated new criteria in 2022.  I reviewed those

3    in relationship to Dr. Poppleton.  And I also reviewed the

4    specialty guidelines for forensic psychology promulgated by

5    the American Psychological Association.  They are the only

6    association that generates guidelines specific to

7    psycho-legal practice.  It's not for family-law cases.  It's

8    general forensic practice and the things that you should be

9    mindful of.  And they provide those guidelines.  So I looked

10   at both of those.

11   Q   And ultimately, did you produce a report or prepare a

12   report that detailed your findings and conclusions?

13   A   I did.  Yes.

14   Q   I'm going to show you a document marked for identification

15   as Petitioner's 107.  And, Dr. Day, we'll scroll through, I

16   believe, the five pages of this.  And if you can identify

17   this document for the court.

18   A   Yes.

19   Q   Is this the report that you produced?

20   A   Yes, sir, it is.

21   Q   Did your report contain specific critiques of

22   Dr. Poppleton's report?

23   A   Yes, it did.

24   Q   What were those critiques?

25   A   My review of Dr. Poppleton's report indicated that he did

 1  not meet what I would call the standard of care for doing a

 2  forensic assessment.  He basically did interviews.  He

 3  acknowledges -- and I appreciate that he acknowledged that

 4  the interviews are not reliable sources of data.  They're

 5  data points of somebody's perception rather than facts.

 6      He said he was answering two questions:  Grave risk and

 7  mature age.  Ultimately, he does not answer those questions.

 8      So my critique was his report is really a regurgitation of

 9  the mother's history and an interview with the child, without

10  any conclusions.  He did not render any, what I would call,

11  alternative hypotheses in the case as part of forensic

12  practice.

13      After listening to his testimony, I realized that he had

14  not, in his report, followed the guidelines of the

15  professional association in which he is a member, AFCC,

16  regarding Zoom.  He did not follow standard 13.1, 13.2 or

17  13.3 regarding the methodology of doing a forensic interview

18  via Zoom.

19      I found that most of the information was common sense.

20  That the court could easily have determined or gathered that

21  information via testimony from the court.  And I think that

22  reviews, basically, my opinions.

23  Q   What do you mean when you say you later realized that

24  Dr. Poppleton did not comply with the AFCC guidelines 13.1,

25  13.2 and 13.3 regarding Zoom evaluations?

1   A    In listening to him testify -- the AFCC guidelines for

2   custody work and family law says that you will get written

3   consent for Zoom, that you will identify the limitations of

4   using Zoom.  In your written consent you will also identify

5   how you will confirm that people are alone in a room.  You

6   will take special caution with children.  Using Zoom is very

7   difficult to evaluate them, so you have to identify their age

8   and their maturity and ability to function in that setting.

9   You are also, in your report, supposed to identify the

10  limitations and how it impacts on the integrity of your data.

11  And that children should be, in the report, should locate the

12  -- where the children or the interviewer is located should be

13  identified in the report.

14      So in reading through his report, none of that information

15  was contained.  So it was only through his testimony that I

16  learned that he did this, not in person, but in a Zoom

17  setting.

18  Q    You heard the testimony of Dr. Poppleton a couple weeks

19  ago and earlier today.

20  A    I did.

21  Q    Did you have any critiques about his lack of testing in

22  his evaluation process?

23  A    Psychologists are unique.  We have a couple of things that

24  we can do that other mental health professionals cannot do.

25  We can do psychological testing and psychological

1    instruments.  Instruments are another way to gather

2    information.  Psychological tests are valid and reliable

3    tests that measure or assist in measuring the questions

4    before the court.  So when looking at children and looking at

5    their maturity, one of the things you want to know is their

6    cognition.  So there was no testing about cognition.  What's

7    this child's IQ?  Is he in the normal range?  Is he above

8    average?  Is he below average?  There's no identification or

9    even an observation of that.

10        So psychological testing gives us reliable and valid data

11   in which we can test our own clinical or forensic opinions or

12   judgment as we're going through an assessment.

13   Q   You heard Dr. Poppleton's testimony that his aim of his

14   report was not to provide an opinion, correct?

15   A   I heard his testimony, yes, I did.

16   Q   Okay.  Would it be -- well, withdrawn.

17        You also heard Dr. Poppleton's testimony that he was --

18   his role was to provide information to the court?

19   A   Yes.  I heard him say that.

20   Q   Now, would it be fair to say that the results of

21   psychological testing with respect to this child's maturity

22   and level of intelligence, perhaps through an IQ test, would

23   have provided the court better data with respect to his level

24   of maturity?

25   A   Not only would it have provided additional data, it would

1   have been consistent with our standards of using multiple

2   methods of information gathering.  So we have that uniqueness

3   of using psychological testing instruments.  And sometimes

4   they're not tests, but they are instruments that we use, or

5   questionnaires.  All of those things help us gather

6   information, along with then testing what the school records

7   would say, what the teacher might say.  So it helps us craft,

8   developmentally and intellectually, where a child might be.

9   Q    Was Dr. Poppleton's failure to gather collateral sources

10  of information from individuals other than the mother and the

11  child, or documents perhaps, other than the school records he

12  testified to, something that you critiqued in your report?

13  A    Yes.  I talk about the limited sources of the information.

14  And when you think about doing forensic assessments, you

15  think about collateral data from other professionals, other

16  than ourselves.

17       So where can we get people who have other objective data?

18  We don't typically think about mom and dad in a dispute

19  having objective data.  They tend to want to present their

20  narrative.

21       So we look at medical records as an example.  Was the

22  child ever in therapy?  What does the schoolteacher say?

23  What do the school records say?  Was there ever a school

24  assessment?  So we look outside of this family for those

25  pieces of data that help us understand the context in which a

1   child makes a statement.

2   Q   Are there any tests or instruments that could have been

3   helpful to ascertain the presentation by the mother?

4   A   Certainly.  An evaluation of the mother would have been

5   helpful to the court to understand her impression management,

6   as an example.  Psychologists have instruments called

7   "impression management instruments" where we can look at a

8   person, whether they're faking good, putting their best foot

9   forward, or faking bad.

10      As an example, in work comp cases, workman's comp cases,

11  people tend to have more symptoms and more problems.  In

12  child custody cases, they tend to put their best foot forward

13  and have a very unrealistic positive image of themselves.  So

14  we can understand the lens in which a person is giving us the

15  information.

16      The next is objective personality tests that look at

17  personality strengths and weaknesses.  Dr. Poppleton talked

18  about the MMPI-2.  I love the MMPI-2.  It gives us

19  information beyond what a person will tell us.

20      I also use the MMPI-3.  The MMPI-3 also has child custody

21  norms.  They have been adapted from the MMPI-2-RF.  So they

22  are exactly the same.  It's just your comfort level.  Both

23  are good tests.

24      There are other tests, like the personality assessment

25  inventory.  It helps us to rule out personality disorders,

1    mental health issues, substance abuse issues.  So those are

2    all helpful as we craft our opinions in a case to have those

3    objective data points.

4        We also have many instruments that parents take regarding

5    their children.  So it helps us see, through the eyes of the

6    parents, objectively how they see their children.

7        There are things, like you've heard, the Child Behavior

8    Checklist.  There's the BASC.  The Behavioral Assessment

9    System For Children.  You give them both to the parents and

10   to the child.  And you compare those to your own impressions

11   of that child.  So those are important information gathering,

12   when you have access to both parents.  Sometimes you don't

13   have access, like in Hague cases you may not have access.

14   But the more data points, the more you're going to understand

15   the point of view that that parent and that child are talking

16   through.

17   Q    Would any of these tests or inventories or instruments --

18   could they have been helpful in assessing possible risks of

19   harm to a child?

20   A    Absolutely.

21   Q    How so?

22   A    We have instruments such as the HCR, which is a risk

23   assessment.  It looks at the totality of the data about a

24   person and puts it in categories regarding risk.  And we, we

25   cannot say there's no risk.  We don't have that ability.

 1    Courts can say "no."  We can say there's low risk, there's

 2    medium risk, there's high risk.

 3        As an example, somebody -- I just evaluated an individual.

 4    He brought a gun out on a golf course and threatened

 5    somebody.  He had a young child.  The judge ordered a risk

 6    assessment.  I was able to assess the risk.

 7            MS. SKINNER:  Objection as to this narrative.

 8            THE COURT:  Sustained, counsel.

 9    Q   Well, if you could answer without talking about specifics

10    about how this test that you mentioned -- I think you said

11    the HCR or HRC?

12    A   Yeah.

13    Q   How could that be helpful in evaluating risk of harm to

14    the child?

15    A   Well, it's a risk.  It categorizes a person's history and

16    current status regarding their risk across a number of

17    different categories.  Whether that's alcohol, prior criminal

18    acts, impulsivity, child abuse allegations, domestic

19    violence, all of that information is categorized and rated in

20    terms of a risk.

21    Q   Is there anything that can test trauma in a child?

22    A   Absolutely.

23    Q   Such as?

24    A   The Trauma Symptom Checklist for children is a reliable

25    and valid measure of trauma.  So trauma can be from anything.

1   But what we're really looking at, how does that trauma

2   demonstrate in the behaviors or symptoms and emotions in a

3   child?  So it gives us an objective way of measuring what we

4   typically see from a trauma survivor.

5       It goes as far as to say, is it clinically significant

6   enough to reach a post-traumatic stress disorder diagnosis?

7   Meaning, if they meet the DSM-5-TR criteria, does that

8   clinical assessment meet up with the DSM-5 criteria for PTSD?

9   It may not.  That doesn't mean the child doesn't still have

10  trauma, but it gives us a better view of how that trauma

11  looks like and how it's manifesting in symptoms and

12  behaviors.

13  Q   Is there a relationship between trauma and risk of harm to

14  a child?

15  A   Yes.  Well, let me caveat that, if I may.  Risk of harm

16  means there's a potential for physical or psychological

17  injury.  It's a risk for.  The trauma has to be experienced,

18  in terms of something traumatic happening, and then

19  manifesting the symptomology or behavioral changes of that

20  trauma impact.

21  Q   You heard the testimony earlier from Dr. Poppleton that a

22  child who may suffer from depression could be potentially at

23  greater risk of harm than a child who is not suffering from

24  depression.

25  A   Children who have -- so we have to distinguish between

1   sadness and adjustment and depression.  Children have a range

2   of emotions, just like adults do.  So we have to be careful

3   when we use words like that.  So has there been a clinical

4   diagnosis of depression, or is that a descriptor to talk

5   about an adjustment because they relocated or they're going

6   through a divorce in their family?

7        So he said depression makes children more vulnerable.

8   That falls into a mental-health category.  So when a child

9   has a mental-health issue, whatever that might be, it could

10   make them more vulnerable.  It depends on what vulnerable

11   you're talking about, also.  Vulnerable to what?

12   Q   Right.  It would be fair to say that a risk assessment to

13   a child involves several considerations specific to that

14   child, specific to the child's circumstances and other

15   considerations, correct?

16             MS. SKINNER:  Object to leading.

17             THE COURT:  It is leading, counsel.  Rephrase.

18             MR. MIN:  Sure.

19   Q   Generally, what do you look for when you undertake a risk

20   assessment to a child?

21   A   Well, the first thing I want to know is their cognition.

22   What is their ability to understand and process information

23   from a cognitive standpoint?  What's their intellectual

24   ability?  Then I look at their maturity.  What is their

25   maturity?  Where do they fall on that continuum of

1    development?

2        So as an example, an eight-year-old would fall between six

3    and 11, and we would go through the stages of psychosocial

4    development.  That includes cognition, social relationships.

5    Then you look at categories within social relationships.  Is

6    this child a leader?  Does he fall in the middle of his peer

7    group?  Or is he a follower?  Then we look at emotions.  How

8    did that eight-year-old or six-year-old or eleven-year-old

9    manage their emotional regulation?  Emotional regulation

10   starts to develop around the age of eight where children get

11   a better handle on their emotions.

12       So you kind of think about an eight-year-old compared to a

13   four-year-old, who would have a temper tantrum.  An

14   eight-year-old shouldn't be having four-year-old temper

15   tantrums.  So we're gauging their emotional functioning and

16   maturity.  We look at that category or risk.

17       Then we look for attachments.  Attachments are so

18   important in looking at risk.  So children really fall into

19   three or four categories of attachments.  About 65 percent of

20   children fall into a secure attachment category where they

21   have a secure attachment with both parents; that's the

22   healthiest attachment.

23       And even within that secure attachment, there may be a

24   hierarchy of preference attachments.  So I like my mom better

25   than my dad, but I'm attached and bonded to both of them.

1       Then as we go down the continuum, we're looking at whether

2   they have anxious attachments.  They can't predict their

3   parents will meet their emotional needs, so they develop

4   maladaptive coping strategies.  About 15 to 20 percent of

5   cases, children have insecure attachments.

6       Then the worst category is disorganized anxious

7   attachments, where they're unable to rely on their parents to

8   meet their emotional needs, their day-to-day needs, their

9   need for shelter, food and caregiving.  That's where the risk

10  is, really, in these two second categories.  So we have to

11  evaluate attachments.

12      The last category I think is important to evaluate is

13  resilience.  Children fall on a continuum of a resilience.

14  Children are who resilient can deal with trauma, they can

15  deal with their parents' divorce, they can deal with some

16  events happening, and they move on and do relatively well.

17  It doesn't change who they are.  They're resilient from it.

18      Then we go down the continuum and we see non-resilient

19  children or children who really are resistant to change.

20  They don't like their schedule changed.  They don't like to

21  eat certain foods.  They are affected by texture, bed time.

22  Any changes to their routine.  So those are the bookends on

23  resiliency versus resistance.  So we need to evaluate that.

24      All of those categories for psychologists help us evaluate

25  the needs of that child, where he is developmentally, and

 1  risk.

 2  Q   How does domestic violence, IPV, or coercive control

 3  relate to these categories you just testified to when doing a

 4  risk assessment?

 5  A   So IPV talks about domestic violence.  Typically physical,

 6  can be emotional, can be sexual, can be psychological abuse,

 7  within married or intimate partners.  So it's a term of art

 8  that we use to talk about domestic violence within marriages

 9  or partnerships.

10      Coercive control is the power and control dynamic within

11  IPV.  Now I forgot your question.  Could you restate it,

12  please?

13  Q   Yes.  How does IPV or coercive control relate to these

14  categories that you just testified to when it comes to doing

15  risk assessments?

16  A   So let's just take resilient children.  Resilient children

17  may have some knowledge of some things happening in their

18  family, but they're resilient, so they're not -- they don't

19  receive that depth of trauma, where you have a more resistant

20  child who is going to experience those same events with much

21  more difficulty and traumatically.  So, again, knowing that

22  child is going to assess how they manage domestic violence in

23  their family.

24      Younger children sometimes are unaware, they think

25  domestic violence, or arguing, or coercive -- they don't

 1   really understand coercive control because they normalize it

 2   within their family.

 3       Older children, adolescents are more attuned to not just

 4   the fighting.  It's not fighting; it's abuse.  And they

 5   become more acutely aware of it.  And sometimes they try to

 6   intervene.  Sometimes they run away.  Sometimes they

 7   emotionally dysregulate.  They certainly don't do better

 8   because of it.  They tend to have more risk for drug and

 9   alcohol problems, poor peer relationships or academics.

10       So, again, it's a continuum based on the development of

11   the child and all those personality characteristics that

12   we've talked about.

13       Domestic violence is not one size fits all.  We don't just

14   make a blanket statement.  We have to evaluate the child for

15   those issues.  And we have to evaluate the parents so we can

16   understand how those dynamics impact upon the child, from

17   their perspective.

18   Q   And do you believe that Dr. Poppleton drew any sort of

19   nexus between this child and the allegations of domestic

20   violence presented by the mother?

21   A   He did not in his report, nor did he on the stand when he

22   was testifying.

23   Q   Why do you say that?

24   A   Because he just said generally in his report that domestic

25   violence isn't good for families.  And I think we all can

 1   agree to that.  And then on the stand he basically said, I

 2   didn't reach opinions about that, I put out the data, that's

 3   for the trier of fact to determine.

 4   Q    Now, do you think there's such data provided by Dr.

 5   Poppleton to do a proper risk assessment to this child?

 6   A    There was not a risk assessment to this child.

 7   Q    But my question is, based upon the data provided by

 8   Dr. Poppleton in his report, would that data be sufficient to

 9   do a proper risk assessment to this child?

10   A    In my opinion, no.

11   Q    Why not?

12   A    It's not multiple methodologies that psychologists are so

13   good at doing.  He talked to the child.  He talked to the

14   mother.  He looked at some data.  He didn't identify what

15   data he looked at.  Today I heard that he looked at the

16   school records, after the fact, after his opinions.

17        So there's not this multiple look at this child from

18   multiple sources of information.

19        I did not see that he did any collateral interviews with

20   other people outside of the family to get a feel for the

21   risk, resiliency, maturity of the child.  And then we didn't

22   use any psychological tests that really help us hone in on a

23   risk assessment and whether it's low, medium or high risk for

24   a child in a particular situation.  So there was general

25   information about risk and some information from interviews.

 1  But it wasn't formulated into opinions because they were

 2  missing pieces of data.

 3  Q   You talked about a few different criteria or categories

 4  that you consider when you go through a risk assessment.  And

 5  I want to walk you through those.  So the first thing you

 6  mentioned was intellect.  Do you believe Dr. Poppleton

 7  sufficiently assessed the child's intellect?

 8  A   So he does not talk in his report about the child's

 9  intellect.  So I don't know.  It seems from the vocabulary,

10  he's at least average.  But he could be gifted, which is a

11  whole other category that we would need to talk about.

12  Gifted children are very different than children with average

13  cognitive skills.  So I did not see where we could say,

14  cognitively, where this child was functioning.

15  Q   With respect to maturity and development, do you believe

16  that Dr. Poppleton adequately assessed the child's maturity

17  and development as it relates to doing a proper risk

18  assessment?

19  A   In my opinion, no.  He asked good questions in the

20  interview, but he didn't take those questions, explore them

21  further and come to a conclusion about the maturity of this

22  child.  Does he look like other eight-year-olds?  Does he

23  fall into that Piaget category of development that we're all

24  familiar and trained in?  I didn't see any assessment of

25  that.

1   Q   What about the child's ability to emotionally regulate

2   himself or emotional regulation?  Did Dr. Poppleton assess

3   the child's emotional regulation capabilities?

4   A   Not that I recall, no.

5   Q   What about assessing the child's attachments to his

6   parents?  Did Dr. Poppleton adequately assess the child's

7   relative attachments to his parents?

8   A   In my opinion, no.

9   Q   Based upon the data that you reviewed in Dr. Poppleton's

10  report, would you be able to conclude whether the child has a

11  secure attachment to one, or -- either or both parents, has

12  an anxious attachment, or a disorganized anxious attachment?

13  A   From the data alone in his report, no, I could not assess

14  that.

15  Q   What about the child's resilience?  Dr. Poppleton

16  testified a little bit about the child's resilience.  But do

17  you believe that Dr. Poppleton's report adequately assessed

18  the child's resilience?

19  A   I don't recall in his report the word "resilience" being

20  used.

21  Q   Did Dr. Poppleton assess the child's understanding of the

22  circumstances and situation he's in?

23  A   He interviewed him and asked what I would call reasonable

24  questions.  But then he doesn't turn that data into an

25  opinion or doesn't seek other data points to make an opinion

1   on those issues.  So, no.

2           THE COURT:  Counsel, why don't we take a stretch

3   break.

4                       (Stretch break.)

5           THE COURT:  Counsel, before we take up, could you

6   give me an assessment of the remaining witnesses to testify?

7           MR. MIN:  Yes, Your Honor.  We have Dr. Day.  We have

8   one expert from Singapore.

9           THE COURT:  Who is that?

10          MR. MIN:  Kee Lay Lian, and she should be in the

11  waiting room.  And we may or may not call my client for a

12  quick rebuttal.  But we are at the tail end.  Miss Kee will

13  -- her testimony should be a half hour on direct.

14          THE COURT:  How do you spell her last name, counsel.

15          MR. MIN:  K-E-E.

16          THE COURT:  I have K-A-Y, L-E-E.

17          MR. MIN:  Oh, I could be mistaken.

18          THE COURT:  That's the person you're referring to?

19          MR. MIN:  Yes.

20          MS. SEIPEL:  Your Honor, because you inquired of my

21  opponent here, we do plan to call Dr. Poppleton and likely

22  Ms. Sashidhar in our rebuttal.

23          THE COURT:  So the remaining witnesses will not be

24  called, and both parties will confirm that.  Correct,

25  counsel?

1          MS. SEIPEL:  Correct.

2          MR. MIN:  I don't think we have any other remaining

3   witnesses on our amended list.  But, yes.

4          THE COURT:  I'm looking at the witness list that was

5   provided to the court, and there's about 15 people.

6          MR. MIN:  Those are all respondent's.  I guess we can

7   address this when the time arises; I'm not entirely sure how

8   respondent would be called in rebuttal on her own case.

9          THE COURT:  Any reason to believe we won't finish

10  this case tomorrow?

11         MR. MIN:  I think we should be done in the morning,

12  frankly.  And I was going to ask Your Honor about summations

13  at the end of today, but we can talk about that now.

14         THE COURT:  No.  What's your assessment of your

15  summary conclusion statement to the court?

16         MR. MIN:  I'm sorry?

17         THE COURT:  Give me your estimate on how much time

18  you'll need.

19         MR. MIN:  For summation?

20         THE COURT:  Yes.

21         MR. MIN:  We can do summation for 15 minutes, we can

22  do summation for an hour, it's really up to Your Honor.  Half

23  an hour to 45 minutes would be fine.

24         THE COURT:  Counsel.

25         MS. SEIPEL:  Hour, hour and a half.

1    THE COURT:  I'll tell you what, I'll see where we are

2    tomorrow.  Tomorrow is Wednesday, counsel, and this court has

3    other matters and other hearings set Thursday and Friday.

4    And then the court is unavailable next week.  So to get this

5    case completed, we need to move in that direction with that

6    understanding.  Okay?

7        Please continue your examination of the witness.

8        MR. MIN:  Thank you.

9    Q    Did you develop any alternate hypotheses based upon

10   Dr. Poppleton's data in his report?

11   A    Based on his data points, I offered alternatives to think

12   about.  Not that I'm rendering them as opinions, but they're

13   hypotheses that the data could, in fact, lead us to those

14   conclusions.

15   Q    What were those alternate hypotheses?

16   A    The first one was that the mother was sharing

17   inappropriate information with the child, both financial

18   information and litigation information.  The child talked

19   about that.  And that goes to a potential undue influence.

20       The next one is that there is data suggesting attachments.

21   Could it be that he is securely attached to both parents and

22   has that appropriate attachment?  That wasn't explored.  So

23   that's an alternative hypothesis.

24       The child did not report to either Dr. Poppleton or

25   Dr. Favaro, physical or psychological abuse or injuries.  So

1    a hypothesis is that he is not at risk.  The mother was

2    having exclusive access to the child.  The father has no

3    contact with the child.  So we have to explore what kind of

4    influence she could be having on an eight-year-old who is

5    being interviewed by professionals.  It goes to that first

6    category of providing inappropriate influence or information.

7        The mother could be a restrictive gatekeeper.  Restrictive

8    gatekeeping, you've heard a lot about that today, is an

9    inappropriate behavior in either restricting the child or

10   information or things from one parent for reasons of their

11   own psychological makeup.  And there are often very complex

12   reasons for restrictive gatekeeping.  It's not an easy thing

13   to understand.  But that's an alternative to protective

14   gatekeeping.

15       And I thought that there were cultural influences that

16   needed to have a close look in this case.  This is a mother

17   who reports to Dr. Poppleton that she is from a very

18   traditional conservative Indian family.  And what looks one

19   way in a conservative traditional family of Indian culture

20   looks different when looked at through U.S. standards and

21   eyes.  So there wasn't that comparison.  And those are

22   alternative hypotheses that if somebody had done a thorough

23   assessment, would have been addressed because those pieces

24   were in his data.  He just didn't do anything with the data

25   points.

1    Q    Let me ask you about the cultural part of it.  What

2    potential impact would the cultural consideration have in

3    assessment of this family or the control dynamics or risk of

4    harm?

5    A    So it can explain some behaviors.  Is it a patriarchal

6    culture where dads are in control or husbands are more in

7    control of finances and decision-making?  It could be a

8    cultural aspect of discipline.  It can be a cultural aspect

9    of seeing women as less important as compared to men.  Male

10   children are more important than female children.  Those are

11   cultural issues that we in the United States see a certain

12   way, but other cultures may act and respond differently.

13        So we have to have cultural diversity and understanding

14   and delve into those so we're not putting the wrong normative

15   sample or population on a family.

16   Q    And when you said that one of the alternate hypotheses was

17   that the child may have attachment or secure attachment to

18   both parents.  What in Dr. Poppleton's report leads you to

19   surmise that that could be an alternate hypothesis?

20   A    He talked about both of his parents in very positive

21   terms.  He misses his dad.  Wanted to see his dad.  Wondered

22   what was going on, why he wasn't speaking to his dad.

23        So there were positive statements made about his father.

24   There were positive statements made about his mother.  He

25   relies on her for his caregiving and nurturing.  Those were

1    all in the interviews with the child.

2        So you would build alternative hypotheses.  Is this a

3    securely attached child?  Is this an anxiously attached

4    child?  Or is this a disorganized child?  The data tends to

5    -- just that little bit of data speaks positively.  So it

6    leans towards he has a secure attachment with both parents.

7              MR. MIN:  No further questions at this time, Your

8    Honor.

9              THE COURT:  Cross examination?

10             MS. SKINNER:  Thank you, Your Honor.

11                         CROSS EXAMINATION

12   BY MS. SKINNER:

13   Q   Dr. Day, you testified that you looked at the data that

14   Dr. Poppleton looked at, right?

15   A   Yes.

16   Q   And then you looked at a whole bunch of other stuff that

17   Dr. Poppleton didn't look at, right?

18   A   You know, I don't think so.  I was given the data that I

19   was told Dr. Poppleton had access to.  That's my belief in

20   the listing of data points.

21   Q   So when you indicate that you received e-mails from Ms. --

22   from the parties from November 2017 through August 2024, who

23   provided those to you?

24   A   Mr. Min did.  All of this data was provided by his office.

25   My understanding was that was information that Dr. Poppleton

1    also had access to.

2    Q    Who told you that?

3    A    Mr. Min.

4    Q    And where in Dr. Poppleton's report does it say that he

5    considers, for his report, e-mails between the parties from

6    November 2017 through August 2024?

7    A    His report does not list any data that he considered.  He

8    says the mother gave him data; he does not identify what that

9    data is.

10   Q    Okay.  So we can't be certain that the information that

11   you're listing that you reviewed is the same information that

12   Dr. Poppleton reviewed?

13          MR. MIN:  Objection, Your Honor.  Is counsel

14   representing that -- because they certainly know what

15   Dr. Poppleton reviewed because they provided that material to

16   us -- are they representing that these are not materials that

17   Dr. Poppleton reviewed?  Because if so -- if that's not their

18   representation, then I believe this is a fairly disingenuous

19   line of questioning, Your Honor.

20          MS. SKINNER:  Your Honor, I don't know what Mr. Min

21   provided to his expert, and that's what I'm asking this

22   expert about.

23          THE COURT:  You can ask that specific question,

24   counsel.

25          MS. SKINNER:  Okay.

1  Q   And so when you describe these documents that you looked

2  at, including a calendar and financial statements and the

3  stock transfer agreement, where did you receive those

4  documents?

5  A   As I said, everything I've received was from Mr. Min, who

6  represented to me that that was the underlying data that

7  Dr. Poppleton had been provided.

8  Q   So when you indicate that you reviewed the Supreme Court

9  case *Golan v. Saada*, your understanding was that

10  Dr. Poppleton also reviewed that report -- that case?

11  A   That's my understanding.  I have no other source of

12  information other than this was Dr. Poppleton's information.

13          MR. MIN:  Your Honor, again, I find this to be

14  somewhat disingenuous because we have communications from

15  respondent's counsel where they provide us this case as

16  something that Dr. Poppleton reviewed.  So, again, unless

17  they're -- have some good-faith basis to suggest that this

18  was not reviewed by Dr. Poppleton, even though they

19  represented to us and gave us these documents, purportedly as

20  reviewed by Dr. Poppleton, I find this line of questioning

21  very disingenuous.

22          THE COURT:  Counsel, haven't we heard testimony from

23  Dr. Poppleton specifically about the documents he reviewed

24  and considered?

25          MR. MIN:  I don't think the question was asked, the

1   totality of all the documents reviewed, but I can represent

2   to this court that we received communications from

3   respondent's counsel stating that these were documents that

4   were part of Dr. Poppleton's review.

5        So, again -- I didn't ask that question because I didn't

6   truthfully find it to be that interesting or relevant.  But

7   if respondent is going down a line of questioning trying to

8   assert that she looked at documents that Dr. Poppleton

9   didn't, when they provided documents to us representing that

10  he reviewed certain documents, it's very disingenuous and

11  misleading, Your Honor.

12       THE COURT:  Let's clarify from the witness what she

13  reviewed.  I'm not sure what the nature of your specific

14  objection is, counsel, or the legality of the objection.  But

15  is there a specific question, counsel, that you can get to

16  that deals specifically with what this witness reviewed in

17  her preparation or what document that she reviewed that would

18  suggest what Dr. Poppleton reviewed?  Do you understand?

19       MS. SKINNER:  Yes.  Thank you, Your Honor.

20       And I was going through the documents that she reviewed

21  and then asking her understanding of those.  But I can

22  rephrase.

23       THE COURT:  As well as clarifying what documents she

24  was of the understanding that Dr. Poppleton reviewed.  That's

25  two different categories.

1              MS. SKINNER:  Thank you, Your Honor.

2    Q    So, Dr. Day, is it your testimony that every document that

3    you reviewed, you understood from petitioner's counsel to be

4    a document that Dr. Poppleton also himself reviewed?

5    A    Yes, ma'am.

6    Q    You indicate that you reviewed --

7    A    Let me clarify that.  I can't say that he reviewed them.

8    I was told they were in his possession and provided to him.

9    Whether he reviewed them or not, I don't know.  But that's

10   what was represented to me.

11   Q    Thank you for that clarification.

12   A    You're welcome.

13   Q    You indicate that you reviewed a Singapore police force

14   record dated January 8, 2024.  What are you aware of occurred

15   on January 8th of 2024?

16   A    Can you just tell me where you're reading from?  It will

17   save some time.

18   Q    On Page 1 of your rebuttal report, bullet point No. 4 of

19   the documents that you reviewed.

20   A    That would be her statement about the argument they had

21   and the fight over the telephone.  It's her statement.

22   Q    And so your understanding -- your report here lists that

23   that took place on January 8th of 2024.  Is that what this

24   states?

25   A    The date of that report was January 8, 2024, yes.  It

1    doesn't mean it happened on that date.  They generated a

2    report and dated it on that date.

3    Q   So your understanding was that there was police

4    involvement with this family January 8, 2024, or prior?

5    A   So I don't know the answer to that.  All I have are the

6    documents.

7    Q   Do you have a reason to doubt the veracity of the

8    documents?

9    A   No.  But you're asking me about the veracity of those

10   documents.  And they're not my documents, so I can't swear to

11   them.

12   Q   So these are documents that you considered in your report,

13   correct?

14   A   I didn't consider them, because I'm not drawing

15   conclusions or opinions.  I'm listing the documents that were

16   provided to me that came from Dr. Poppleton.

17   Q   Okay.  You just --

18   A   So I list what he has -- I'm sorry.

19   Q   You're saying you're listing what you understood

20   Dr. Poppleton to have had in his possession?

21   A   That's correct.

22   Q   But you go one step further in your report and indicate to

23   this court that you reviewed the documents?

24   A   Yes.  I've read the documents.  I wanted to know what

25   Dr. Poppleton did.  That's why I say I reviewed the four

1    corners of his material to look at the consistency and

2    standard of care.  He did not list these in his report.  I

3    had no idea when I saw his report that he had these data

4    points.

5    Q    What do you mean you had no idea that he had this

6    information?

7    A    So when his report was published, he said, "I received

8    some documents from the wife in this case."  He doesn't

9    identify the documents or what he relied on.

10   Q    And so subsequent to your receipt of Dr. Poppleton's

11   report is when you received these documents yourself?

12   A    Yes.

13   Q    So you reviewed a Singapore police force report that was

14   dated March 10, 2024; is that right?

15   A    Yes.

16   Q    So you reviewed a document where there was police

17   involvement with this family March 10th of 2024, or before?

18   A    Yes.

19   Q    In a description of one document that you reviewed, you

20   reviewed an e-mail purportedly from mother to father that was

21   dated October 14th of 2024 in which mother let father know

22   that she and the child had landed, and then you put in

23   quotes, "some time ago," unquote, in Washington.  Why did you

24   add quotes to that phrase within your description of the

25   document?

1  A   Because those are her words exactly from the documents.

2  So any time you quote somebody, you are to put them in

3  quotes.

4  Q   Why, out of all of the words in that document, did you

5  choose to quote those three words?

6  A   So refer me where you are so I can read it and give you a

7  better answer.  What page are you on?  Two?

8  Q   On Page 2 of your rebuttal report, bullet point 9.

9  A   Because I found it was striking that she did not tell him

10 when that happened, that she kept it very vague.  So when I

11 read it, I didn't know if she had landed a week ago, a month

12 ago, five minutes ago.  I thought it was an interesting use

13 of language.  And I thought it was relevant in looking at the

14 case.

15 Q   Why does that matter to rebutting Dr. Poppleton's letter?

16 A   If there is a hypothesis that mom is a restrictive

17 gatekeeper or she's influencing or is a hypothesis that she

18 is not giving dad information about the son, that is a piece

19 of information that you would utilize in coming to your final

20 conclusions or generating hypotheses.  It's a piece of data

21 that would fit in a category.

22 Q   When was the first time you have ever read the *UCLA*

23 *Women's Law Journal* article "You Can and You Should:  How

24 Judges Can Apply the Hague Abduction Convention to Protect

25 Victims of Domestic Violence"?

1    A    When is the first time I've ever read that?  Is that your

2    question?

3    Q    Yes.

4    A    I can't tell you.  This was not the first time I've read

5    it.

6    Q    When was the first time you read the "Hague Domestic

7    Violence Expert Paper No. 2.  The Grave Risk Exception and

8    Domestic Violence"?

9    A    I believe this was the first time I may have read that.

10   Q    You indicate, when giving your overview of Dr. Poppleton's

11   report, that he summarized his findings "Stating he was

12   providing an opinion on grave risk of harm or intolerable

13   situation and the age and maturity of the child."  Didn't you

14   write that?

15   A    I did.

16   Q    But Dr. Poppleton did not provide an opinion, right?

17   A    Correct.  So his report begins with:  I'm going to do

18   these things.  And he ends by saying:  I'm not doing these

19   things.

20   Q    You indicate that Dr. Poppleton stated he was providing an

21   opinion.  But he did not state that, correct?

22   A    If you want to show me his report, I believe it's in his

23   referral, the first page.  And he said "I've been asked to

24   provide opinions."  I don't have his report right in front of

25   me.  Oh, here it is.  "I was retained to reference two issues

1   under Article 13 and provide information to the court on

2   them.  The first is grave risk of harm or intolerable

3   situation if the child in this case is ordered to go to

4   Singapore.  The second is related to the objections of

5   child."  He talks about how he's going to do the framework

6   and analysis and what he did in order to address those

7   issues.

8   Q    So he did not state he was providing an opinion, correct?

9   A    He didn't use those words.  But as a reader of this

10  report, that's what the expectation is based on, the wording.

11  He's going to examine these two issues.  Here are the issues

12  I'm going to examine.  I interpret that as rendering a

13  conclusion or an opinion.

14  Q    Right.  But in your report you said that he stated he was

15  providing an opinion.  His letter nowhere states that he is

16  providing an opinion, correct?

17  A    I agree.  The word is my word on "opinion" and my

18  interpretation of his statement of "examine."

19  Q    You indicated that Dr. Poppleton needed to get written

20  consent in order to meet with the mother and child over Zoom,

21  correct?

22  A    Yes.

23  Q    Are you aware of whether he did receive written consent

24  from mother?

25  A    I have no indication, except his testimony that I listened

1   to that he said he explained it.  He didn't say he got it in

2   writing.

3   Q   And so if mother's counsel reached out to Dr. Poppleton,

4   in writing, and indicated on behalf of mother that she

5   consented, would that satisfy that requirement for written

6   consent?

7   A   No.

8   Q   Why not?

9   A   Written consent is a document that you provide to the

10  patient or client to inform them about the process and

11  procedures, the risks and the liability of doing so.  It's an

12  explanation document.  So the person has what you call

13  "informed consent" about what they're going to be

14  participating in.

15      Those are the guidelines in the specialty guidelines for

16  forensic psychology and AFCC guidelines for family-law cases,

17  when using -- when working in a psycho-legal context.

18      In addition to written, you are then supposed to explain

19  the written document to the person to make sure that they

20  understand the written consent.  Consent is extremely

21  important in a psycho-legal context.

22  Q   And the child and mother are not patients of

23  Dr. Poppleton, correct?

24  A   It has nothing to do with patients.  It could be a

25  patient, if you're going in for treatment.  It can be court

1    ordered to go in for an evaluation --

2    Q    Dr. Day, I had one question to you.  I asked you whether

3    or not the child and mother were patients of Dr. Poppleton.

4    A    Technically they were patients or clients.  I don't know

5    which word Dr. Poppleton uses in his psycho-legal context.

6    Q    The guidelines are just that, guidelines, not

7    requirements, correct?

8    A    Correct.  Any time you are a member of an organization,

9    you are to follow the guidelines to the best of your ability.

10   Q    Okay.  And wouldn't you agree that meeting in this type of

11   a scenario with a child via Zoom one-on-one could be a better

12   setup than meeting in person with a child who is intently

13   focused on video gaming and not on the doctor?

14   A    So you wouldn't know that prior to meeting the child.  So

15   you wouldn't have the ability to make that determination

16   ahead of time, because you don't know the child.  And what it

17   identifies in the AFCC guidelines is Zooming with children is

18   more of a risk than meeting with a child in person where you

19   can see all of the information.  So there is a caveat in 13.2

20   about children and Zooming.  You have to understand their age

21   and their maturity.

22   Q    But you didn't make any kind of analysis about whether

23   this child would be particularly better in a setup on a

24   direct one-on-one Zoom with no distractions versus an

25   in-person meeting with a lot of distractions?

1   A    So I have no opinion about this child and whether Zoom or

2   in person is a better fit.  My comments are about

3   Dr. Poppleton's use of informed consent.

4   Q    Dr. Favaro in this case did not get any information from

5   professional collaterals, like the child's doctor, correct?

6   A    Not to my knowledge.

7   Q    Didn't get any direct information from the live-in maid

8   that the parties had in Singapore, correct?

9   A    Not to my knowledge, no.

10  Q    And Dr. Favaro didn't do any IQ testing on the child?

11  A    No, he did not.

12  Q    Dr. Favaro didn't do any personality testing on anybody,

13  correct?

14  A    Correct.

15  Q    Dr. Favaro didn't do an HCR risk assessment, correct?

16  A    That's only to do with adults.  So, no, he didn't evaluate

17  either of the adults.

18  Q    Even though there were clearly allegations of domestic

19  violence in this case, right?

20  A    So there are allegations of coercive control and some

21  physical abuse in this case.  You are correct.

22  Q    And Dr. Favaro did not do any kind of a trauma checklist

23  for the child, right?

24  A    That's correct.

25  Q    You indicate, as far as maturity, there's a category of

 1    development, I believe, between the ages of six and 11 years

 2    old.  Do you remember that testimony?

 3    A    I do.

 4    Q    What does the literature and studies show about the

 5    percentage of the adult population that reaches that next

 6    level of maturity after the six- to 11-year-old category?

 7    A    I don't think I understand your question.  What's the next

 8    age range?

 9    Q    How many of the -- are you aware of any studies that

10    describe what percentage of the U.S. population reaches the

11    next level of maturity?

12    A    I'm not aware of any studies that talks about a

13    percentage.

14    Q    You testified, and I'm not sure if I misheard you, but I

15    thought your testimony was that the child did not report

16    physical or psychological abuse.  Was that your testimony?

17    A    Yes.

18    Q    Okay.  So you -- are you discounting Dr. Favaro and

19    Dr. Poppleton's report where the child describes being hit

20    and pinched?

21    A    Hitting and pinching is not physical abuse; it's

22    discipline.  And unless you have more information about

23    bruising or trauma from those forms of discipline, they would

24    not be categorized as abuse.

25    Q    Are you talking about some legal standard in the state of

1  Florida about what abuse is?

2  A   General knowledge on what abuse is.  As far as I know, it

3  is still allowed in the United States to use corporal

4  punishment with your children.  You're not allowed to injure

5  your children.

6  Q   You're telling me there's some type of a federal law that

7  you're referring to about the United States law on abuse?  Is

8  that what you're saying?

9  A   No.  In general from my work in the child protection arena

10 for many years, there is a standard in which abuse, physical

11 abuse is judged.  And it is not discipline, physical or

12 corporal punishment.  It is an injury, bruising, a mark left

13 on a child.

14 Q   What do you mean by there is a standard?  What can you

15 cite to me?

16 A   So out in Colorado there is the center that established

17 what child abuse is.  And from that standard the national

18 child abuse centers have been established in each state.  I

19 cannot remember the name of the place in Colorado.  I

20 apologize.  I wasn't expecting that question.  And from that,

21 back in the '50s, child abuse was defined for the very first

22 time.  And it was physical abuse that was defined.

23    Out of that, then child sexual abuse became defined and

24 recognized.  And through the years, we've then gone on to

25 define child emotional abuse and psychological abuse.  Is it

1    the Kempe Center?  I think it's the Kempe Center.

2        So that's how we started in the U.S., many years ago,

3    trying to define it and set up child advocacy centers using

4    those definitions.  And training professionals all over the

5    country to recognize the difference between different types

6    of child abuse.

7    Q   So is it your testimony that the standard says that in the

8    United States a parent may hit a child because the parent

9    wants them to do or refrain from doing something, so long as

10   that does not leave trauma or visible injury?

11   A   That's my understanding of the standard in the use of

12   corporal punishment.

13   Q   What about when a parent shakes a young child in order to

14   cause another parent to engage in sexual demands; is that

15   abuse?

16   A   So shaking has various stages and depth.  Certainly we

17   know that shaken baby -- when you shake and cause head trauma

18   or a contrecoup injury, it's child abuse.  Grabbing the child

19   by the arm and shaking a child gently is on the other end of

20   the continuum.  And we see parents do that all the time

21   without injuring the child.

22   Q   I gave the caveat that it was for the purpose, right, of

23   causing the other parent to engage in that parent's sexual

24   demands.

25   A   That's a different issue than whether the child was

 1  injured.  It is never appropriate to use a child in any

 2  context that is abusive or controlling.

 3  Q   Well, that's what we're trying to talk about, is what

 4  you're testifying is the definition of abuse and controlling.

 5  And so you're saying it's never appropriate to act in a

 6  physical manner in the way that I describe shaking a child,

 7  if to do so is to coerce the other parent to engage in sexual

 8  demands.

 9  A   That's what you said.

10  Q   Do you agree?

11  A   And I concurred that never -- it's never appropriate to

12  use a child in any context to coerce another parent.

13  Q   You testified that in this case an evaluator would want to

14  look at cultural differences when analyzing domestic violence

15  or abuse.  Did you testify about that?

16  A   Yes.

17  Q   What about basic human rights to not be hit?  Would you

18  agree that that spans all cultures?

19  A   Well, I don't agree that it spans all cultures.  I do

20  agree that that is a basic human right.  That doesn't mean

21  it's practiced.

22  Q   Would it be a basic human right to be free from abuse?

23  A   Yes.

24  Q   Would it be a basic human right to be free from another

25  person's control?

1    A    I would hope so, yes.

2    Q    You testified that, in your opinion, Dr. Poppleton could

3    not opine on a risk to this child because Dr. Poppleton only

4    interviewed the child and talked with mother; is that right?

5    A    Correct.

6    Q    But isn't that what Dr. Favaro did when making his opinion

7    on a risk?  He just interviewed the child and talked with the

8    father?

9    A    He went farther.  I believe he has the school records, if

10   I'm recalling correctly.  He did the Child Behavior Checklist

11   with the father.  And he looked at additional records.

12   Q    School records didn't have anything to do with an analysis

13   of risk of harm, right?

14   A    No.  But it helps us understand the maturity of the child

15   and his resiliency, how he's doing academically, did the

16   school have any concerns.

17   Q    So we're talking about this, what you call, I believe, is

18   a national definition of abuse.  But that's not what the

19   Hague treaty talks about.  What is grave -- how is grave risk

20   defined under the Hague Convention?

21          MR. MIN:  Objection.  Calls for a legal conclusion.

22          THE COURT:  To the extent of her knowledge, she may

23   answer that question.

24          THE WITNESS:  Your Honor, I didn't hear you.  Can I

25   answer?

1           THE COURT:  Yes.  You can answer, to the extent of

2   your knowledge.

3   A   Okay.  It is the potential of physical or psychological

4   harm to a child if returned to their habitual residence.

5   Q   That the child would be subject to the physical or

6   psychological harm, or that the child would be exposed to the

7   physical or psychological harm?

8           MR. MIN:  Objection, Your Honor.  This witness's

9   understanding of a conclusion this court will have to make is

10  irrelevant to these proceedings.

11          THE COURT:  Counsel, I'll let the witness testify as

12  to her understanding.  But I think you're getting into the

13  arena of her giving a legal opinion.  The court does that,

14  not the witness.

15          MS. SKINNER:  Thank you, Your Honor.  I'll move on.

16          THE COURT:  Please do.

17  Q   In your review of Dr. Poppleton's letter, you found that

18  mother had reported sexual coercion.  What was that?

19  A   What was what, the sexual coercion?

20  Q   Yes.

21  A   I don't recall exactly, without looking at the report.

22  What I recall, in a general summary, is that he would

23  influence her by making her feel bad, shaming her, not

24  permitting her to say no, making demands about sexual issues

25  that she was not comfortable with.  That was my summary of

1   what he reported she said.

2   Q   And then you saw, in Dr. Poppleton's letter, that he

3   described mother's statements, that when mother would not

4   give father sex, that he would hit the child.  You saw that

5   in Dr. Poppleton's report?

6   A   I didn't hear the word.  Kick the child?

7   Q   Hit.

8   A   Hit.  I don't remember that.  I remember her saying as an

9   infant he would shake the child if she refused.  I don't

10  remember kick.

11  Q   Hit, with an "H."

12  A   Hit, I'm sorry.  I don't remember hit either.

13  Q   And you were here present when father testified that he

14  has hit his child, correct?

15  A   Yes.

16  Q   When he testified that he has pinched the child?

17  A   Yes.

18  Q   Your rebuttal report doesn't comment on the financial

19  control that Dr. Poppleton took into consideration.  Why not?

20  A   Why?  I didn't comment on a lot of what Dr. Poppleton

21  said.  If he stated something that's a fact, I'm not talking

22  about the facts, per se.  I'm talking about the methodology

23  that he utilized in this psycho-legal evaluation.

24  Q   And part of his methodology is to report and look at

25  certain aspects of intimate partner violence that mother has

1  alleged, correct?

2  A    Yes.  And when he did that, he also put the caveat that

3  this is her report, I don't know if it's a valid report.  So

4  he didn't do any investigation as to the validity of her

5  statements.

6  Q    Right.  But he's setting up the framework that financial

7  control is a part of intimate partner violence, correct?

8  A    Correct.  So she says that.  That doesn't make it a true

9  event.  And we as psychologists are not financial

10 professionals, and we don't do financial analyses.  That

11 would fall to somebody else.  So he's raised it as a

12 hypothesis.  But there are other conclusions or alternative

13 hypotheses that could also be generated.  Such as, she had

14 her own money.  He knew she had money.  He gave her an

15 allowance.  That allowance was enough.  He was paying the

16 bills.  We see those kinds of things in divorces all the

17 time.

18      So we want to make sure when we say something, that we

19 then analyze that data to see if it's one of those divorce

20 things that people do to hurt each other, or if it's

21 financial abuse.

22           THE COURT:  Counsel, we're right at 4:30.

23      We'll take our recess for the day and pick up tomorrow

24 morning at nine.

25           MR. MIN:  Your Honor, can I ask one question?

1      Your Honor made a ruling about Dr. Favaro, so do we need

2   to submit briefing tonight or has that decision been

3   rendered?

4          THE COURT:  I think the court is satisfied that

5   that's as far as we can go.

6          MR. MIN:  Thank you, Your Honor.

7                    (Adjourned.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25