1        UNITED STATES DISTRICT COURT

2     WESTERN DISTRICT OF WASHINGTON AT SEATTLE

3  _____

4   PRASANNA SANKARANARAYANAN,     )
                                   ) C24-1745-RAJ
5                                  )
                 Plaintiff,        ) SEATTLE, WASHINGTON
6                                  )
    v.                             ) January 22, 2025
7                                  ) 9:00 a.m.
    DHIVYA SASHIDHAR,              )
8                                  ) EVIDENTIARY
                                   ) HEARING
9                Defendant.        ) Day 5

10 _____

11          VERBATIM REPORT OF PROCEEDINGS
        BEFORE THE HONORABLE RICHARD A. JONES
12          UNITED STATES DISTRICT JUDGE

13 _____

14

   APPEARANCES:
15

16

17   For the Petitioner:    Richard Min
                            Green Kaminer Min & Rockmore LLP
18                          420 Lexington Avenue
                            Suite 2821
19                          New York, NY 10170

20

     For the Respondent:    Katelyn Skinner
21                          Katrina Anne Seipel
                            Buckley Law PC
22                          5300 Meadows Road, Suite 200
                            Lake Oswego, OR 97205

23

24

25

1               EXAMINATION INDEX

2  EXAMINATION OF:                                    PAGE

3   DEBORAH DAY        CROSS EXAMINATION (Cont.)        3
                      BY MS. SKINNER
4
    KEE LAY LIAN       DIRECT EXAMINATION              23
5                      BY MR. MIN
                       CROSS EXAMINATION               43
6                      BY MS. SKINNER

7   PRASANNA            DIRECT EXAMINATION             69
    SANKARANARAYANAN    BY MR. MIN
8                       CROSS EXAMINATION              72
                        BY MS. SKINNER
9                       REDIRECT EXAMINATION           84
                        BY MR. MIN
10
    LANDON POPPLETON    DIRECT EXAMINATION             90
11                      BY MS. SEIPEL
                        CROSS EXAMINATION              107
12                      BY MR. MIN

13

14

15               EXHIBIT INDEX

16

   EXHIBITS ADMITTED                                 PAGE

17
    Exhibit 107                                        22
18

19

20

21

22

23

24

25

1          THE CLERK:  We are resuming our evidentiary hearing

2     in the matter of Sankaranarayanan v. Sashidhar, C24-1745

3     assigned to this court.

4          THE COURT:  Good morning, counsel.  We'll continue

5     with the cross examination.

6                        DEBORAH DAY

7      Having previously been sworn, testified further as follows:

8                   CROSS EXAMINATION (Cont.)

9     BY MS. SKINNER:

10    Q   Dr. Day, yesterday you testified a bit about some

11    guidelines that you believe Dr. Poppleton should be following

12    in the course of the work that he did in this case.  Do you

13    recall that testimony?

14    A   Yes.

15    Q   I just want to be clear, so that we understand exactly the

16    guideline that you're referencing, are you speaking of the

17    "Association of Family and Conciliation Courts' Guidelines

18    For Parenting Plan Evaluations in Family Law Cases," Version

19    2022?

20    A   So I referred to two.  He said he is a member of AFCC and

21    follows those guidelines.  I brought to the court's attention

22    the specialty guidelines for forensic psychology promulgated

23    by the American Psychological Association.  I did refer to

24    the guidelines, AFCC guidelines regarding using Zoom.  Those

25    are the guidelines that have been promulgated regarding Zoom

1  since COVID.  So he uses those guidelines, he says, in his

2  practice.  So my assumption is he's familiar with those

3  guidelines.

4  Q   Let me clarify my question.  When you are referring to the

5  AFC guidelines, are you referring to the "Association of

6  Family and Conciliation Courts' Guidelines for Parenting Plan

7  Evaluations in Family Law Cases," circulated in 2022.  Yes or

8  no?

9  A   Yes.

10  Q   Thank you.

11  A   Yes.  You're welcome.

12  Q   Your report, Dr. Day, states that the question of grave

13  risk to the child remains unanswered by the information

14  provided by the mother to Dr. Poppleton, didn't it?

15  A   I don't think -- if you want to point to my report that

16  you're quoting, I'll be glad to answer that.

17  Q   That's a yes-or-no question, Page 3, the second paragraph

18  from the bottom.

19  A   Yes.  That's what I reported.

20  Q   And yesterday we had started talking about some of the

21  information that mother provided to Dr. Poppleton in the

22  report about abuse in the home.  Do you recall that

23  testimony?

24  A   Yes.

25  Q   We talked about reports that mother made about pinching,

1    shaking, hitting, right?

2    A    Yes.

3    Q    And sexual control and coercion, right?

4    A    Yes.

5    Q    And then we started to talk about some financial control

6    as it relates to the intimate-partner violence.  Would you

7    agree that the AFCC guidelines for examining intimate-partner

8    violence includes examining economically aggressive behaviors

9    involving the use of financial means to intentionally

10   diminish or deprive another of economic security, stability,

11   standing or self-sufficiency?

12   A    Yes.

13   Q    And in addition to reviewing physical, sexual, financial

14   issues in intimate-partner violence, we look at coercive and

15   controlling behaviors, right?

16   A    Yes.

17   Q    And the AFCC guidelines for intimate-partner violence,

18   when looking at these, includes an examination of

19   psychologically aggressive behaviors which involve

20   intentional harm to emotional, safety, security or

21   well-being, right?

22   A    Yes.

23   Q    And that can include coercively controlling behaviors that

24   involve harmful conduct that subordinates the will of another

25   through violence, intimidation, intrusiveness, isolation,

1    and/or control, right?

2    A    Yes.

3    Q    And Dr. Poppleton's report touches on some of these

4    behaviors that mother describes, such as threats to her

5    reputation to disseminate intimate videos of her, right?

6    A    Yes.

7    Q    And to place hidden cameras in her home, right?

8    A    Yes.

9    Q    And you would agree that in analyzing coercive control

10   within the intimate-partner violence, that there is -- that

11   there is no doubt that there's impact on children who are in

12   this environment, correct?

13   A    Are you talking in general terms?

14   Q    Correct.

15   A    In general terms, depending on the age of the child, it

16   can impact on children, yes.

17   Q    And as Dr. Poppleton's letter indicates, there could be

18   significant risk of harm to a child's physical and emotional

19   and social development after witnessing intimate-partner

20   violence.  Would you agree with that?

21   A    Yes.

22   Q    And that there could be other negative outcome risks,

23   correct?

24   A    Yes.

25   Q    And Dr. Poppleton's letter indicates that there's a clear

1  difference between the behavior and psychological health of

2  children exposed to domestic violence in the home and those

3  who are not.  You agree with that?

4  A   Yes.

5  Q   And do you agree that in his letter he writes, "In light

6  of the overwhelming evidence that depicts both the short-term

7  and long-term damage that witnessing domestic violence in the

8  home can have on children, it is important to be proactive in

9  protecting them from these harms through education, support

10  for abused parents, and improved identification and

11  intervention for the children."

12       You would agree with that?

13  A   I don't recall where that is in his report, so I can't say

14  it's in his report or not.  If you want to point that to me,

15  I'm glad to look at it.

16  Q   So that's on Page 5.  And my question is, would you agree

17  with those conclusions?

18  A   In general, yes.

19  Q   And would you agree that if true, these would be such

20  instances that could fall under intimate-partner violence,

21  which would be placing hidden cameras in a partner's home?

22  A   So asking me if it's true?

23  Q   If that's something that occurred, would that fall under

24  the umbrella of an intimate-partner violence environment?

25  A   It could, yes.

1   Q    And what about an admission by a partner that they

2   retained a lawyer for the purposes of conflicting that lawyer

3   out so the other partner could not retain them?

4   A    That's a common practice in high-conflict divorces.

5   Q    Is that a coercive and controlling behavior?

6   A    Not in and of itself.

7   Q    Could it be, with other surrounding evidence of coercive

8   and controlling behaviors?

9   A    Coercive and controlling behavior has to demonstrate a

10  pattern of behaviors.  It's not an isolated issue.  People

11  going through divorce do things they don't typically do.  So

12  you would need to evaluate the entire family dynamic to

13  understand those specific findings.

14  Q    If that act of conflicting out a lawyer for the purpose

15  that the other parent could not retain them was part of a

16  pattern of other intimate-partner violence factors, would

17  that be included?

18  A    I'm not sure I would include that.

19  Q    So you just think that it's a common practice that

20  high-conflict parents do, and it's not a concern for you?

21  A    In the --

22        MR. MIN:  Objection, Your Honor.  Argumentative as to

23  form.

24        THE COURT:  It's overruled.

25  A    It is a common practice that I see in my practice.

1  Probably more often than not, people go to multiple attorneys

2  with that intent.  It's part of gaining leverage in a

3  divorce, just like taking money is a leverage point.

4       So in and of itself, I see it frequently.  I don't

5  classify it as a domestic-violence issue.

6  Q   And would pinching a child so hard that the child would

7  cry, tremble, run away, and run to the other parent for

8  consolation be part of -- could be part of an environmental

9  intimate-partner violence, domestic violence?

10 A   Could be.  I don't know the circumstances.

11 Q   Dr. Day, in your report you indicate that mother described

12 a threat to her child which was not defined in the letter,

13 meaning Dr. Poppleton's letter, except to say that the

14 husband regularly shook their child as an infant.  You said

15 that, right?

16 A   Yes.

17 Q   But threat is mentioned ten times in Dr. Poppleton's

18 letter, isn't it?

19 A   Threat to -- I'm a little confused by the question.  Could

20 you clarify it, please?

21 Q   That there's a threat to the family unit, to mother, to

22 the child.

23 A   I'm still not clear what you're asking me.  Did he use

24 that word in his report?  Yes, he used that word.  He didn't

25 define what that threat was, beyond the shaking.  And I

1    believe she said hit him one time, or slapped him one time

2    and hit him.  There's no timeframe.  There's no understanding

3    of whether that was discipline, whether she was present,

4    whether she also engaged in similar behavior.  There's so

5    many pieces missing that when we take pieces, it's difficult

6    to answer whether something is or is not abuse, part of a

7    bigger picture.  It's just difficult.

8    Q   So you just described that Dr. Poppleton's letter did

9    include a description from mother about hitting the child.

10   But you do not relay that in your letter as being a threat to

11   the child.

12   A   Again, hitting a child can be corporal punishment.  While

13   I don't support corporal punishment as a psychologist, it is

14   permissible and used in many families.

15       I can't distinguish from Dr. Poppleton's letter, or his

16   interview with the wife, whether this was corporal punishment

17   or abuse.  I'm not aware that authorities were called and

18   have any findings of abuse.  I'm not aware of any police

19   being involved with the child.  I'm not aware of any school

20   reporting.  So it doesn't appear to me that there are any

21   findings of abuse against this child reported by

22   Dr. Poppleton.

23   Q   And you would agree that there is a threat to -- or

24   concerns of violence and coercive controlling behaviors

25   against mother that are related in Dr. Poppleton's letter,

1  correct?

2  A   So Dr. Poppleton says in his letter -- he reports what the

3  mother tells him.  He also says, I don't know if this is

4  reliable.  I am not vouching for this information.  I'm not

5  certifying that this is accurate, but here's what she said.

6      And he doesn't draw any conclusions whether she is a

7  victim of violence.

8  Q   I didn't ask if there was findings or conclusions, but

9  that Dr. Poppleton relayed information from mother that

10  describes situations of domestic violence, correct?

11  A   Yes, he did.

12  Q   And --

13  A   She did to him.

14  Q   And included in that is mother indicating that having a

15  broken family would bring shame upon her, and that threat was

16  used by father as a social leverage against her, correct?

17  A   I believe the social leverage was as she reported it, by

18  her family, that divorce in their culture is a shameful

19  event.  So she had pressure from her family to stay in a

20  marriage.

21  Q   And that father was threatening to divorce her and have

22  that social pressure leveraged against her, correct?

23  A   Yes.  That's what she reported.

24  Q   Dr. Day, how does the world work?

25          MR. MIN:  Objection.

```
 1    A    What?

 2              THE COURT:  Sustained.

 3    Q    Dr. Day, your report says that children do not understand

 4    how the world works; does it not?

 5    A    Correct.  Children --

 6    Q    Doctor, the question was, does your report indicate

 7    children do not understand how the world works.  That's my

 8    question.  Yes or no?

 9    A    Um, if you want to tell me where that is, I will answer.

10    Q    You don't recall?

11    A    I do not recall, without looking at it.

12    Q    Okay.  That's on Page 4.

13    A    Page 4.

14    Q    In about the middle of the page under the headline,

15    "Opinion on child development maturity."

16    A    Yes.  I see it.  They do not understand how the world

17    works.

18    Q    You said that?

19    A    I did.

20    Q    So how does the world work?

21    A    So the world is a complex series of relationships,

22    interactions, consequences, pros and cons that are all

23    evaluated individually to understand the life circumstances

24    of an individual.  Adults even have difficulty understanding

25    the complexity of how the world works.
```

1    For an eight-year-old, their world focuses around them.

2    They don't understand the complexities of all of those

3    interplays of the world.

4    Q   So if adults have a hard time understanding how the world

5    works, this is not any kind of reliable indication of a

6    maturity of a person?

7    A   It is for a child.  The child cannot take other

8    perspectives, has difficulty understanding the give-and-take

9    in relationships, clearly has a view of how they function and

10   how they perceive themselves in their very narrow view of the

11   world, which can be who's in my family, how does my family

12   work, or my friends, when am I going to have fun, what

13   activities am I entitled to, and what are the rules.

14   Q   So then a child who could understand that despite the fact

15   that their friends would miss them, they still want to live

16   in the U.S., that would be an indication that a child could

17   take into account another's feelings, correct?

18   A   Potentially.  It depends on the context of those questions

19   and what he has been told about friendships.

20       I don't know this child, so it's difficult to know the

21   context.  These interviews were not recorded, from my

22   understanding.  So I don't know, except what's on the written

23   paper.

24   Q   You indicate, in your report, that the child does not

25   disclose or draw a nexus between himself and domestic

1  violence, only saying his parents argued behind closed doors,

2  didn't you?

3  A   Yes, from Dr. Poppleton's report.  That's correct.

4  Q   Wouldn't it be drawing a nexus if the child were to say,

5  "I want my dad to be nice to me."  He understands the impact?

6  A   Again, I don't know the context of why that was said.

7  Dr. Poppleton said he didn't want -- the child would not talk

8  about certain aspects of either parent.  Like, his mom lied

9  to him.  He wouldn't talk about that.  He wouldn't talk about

10 why his dad wasn't around.

11     So this was not a child who was particularly open to some

12 dynamics.  I don't know if the last time he saw him, his dad

13 punished him.  I don't know those contexts.

14 Q   You said in your report, "In this case the child describes

15 the more generalized desire to remain in the U.S. because he

16 is American and has more friends in Seattle, although when

17 asked specific questions, his best friends are in Singapore."

18 You wrote that, right?

19 A   Yes.

20 Q   But that's not what Dr. Poppleton reported, right?

21 A   That is what Dr. Poppleton reported.

22 Q   Dr. Poppleton reported that the child described his best

23 friends in both Washington and Singapore.  Didn't he?

24 A   He said his best friends in Washington include two

25 children and my best friends in Singapore include two

1    children.

2    Q   So then why did you say, "When asked specific questions,

3    his best friends are in Singapore."

4    A   The way it was worded at the time that I read it meant to

5    me that longer-term friendships, because he had been in

6    Singapore longer with these friends, were representing

7    longer-term best friends than the newer relationships that

8    wouldn't be classified as long-term relationships.  That's

9    how I interpreted it.

10   Q   Just so I understand what we're talking about, your

11   interpretation of this, Dr. Poppleton reported, "He said his

12   best friends in Washington includes two, Suhan and Weisong

13   (phonetic).  There is a kid named Logan; he is fun to be

14   with.  My best friends in Singapore were Nicholas and Luka."

15          Are you saying you extrapolated from those two

16   statements somehow that the best friends in Singapore were

17   weighted more than the ones in Washington?

18   A   I guess.

19   Q   Dr. Poppleton reported that when asked if the child

20   thought his living in Washington might impact anyone, he

21   suspected that his desire to remain in Washington, "Might

22   hurt my friends in Singapore, but I want to stay."  That's a

23   description of a child who's understanding the impact of his

24   actions on others' feelings, correct?

25   A   Yes.

1   Q   But your report says that eight-year-olds do not take

2   other perspectives, seeing only their needs, right?

3   A   Yes.  In general, eight-year-olds' perspectives are not

4   prospective like that.  They can understand friendships,

5   primarily.  They can take a perspective.  But it's a very

6   self-focused perspective.

7   Q   You note that Dr. Poppleton's report has no psychological

8   testing, correct?

9   A   I do.

10  Q   Would you agree with Dr. Favaro, regarding the testing,

11  indicating that he placed little emphasis on standard tests

12  due to the age of the child and the measures standing up to a

13  methodological rigor in legal settings as opposed to clinical

14  settings?

15  A   Would I agree with that?  No.  I think, as I've said in my

16  direct testimony, psychologists have the unique ability to

17  use reliable and valid measures of things like intelligence,

18  personality strengths and weaknesses, impression management,

19  anxiety, trauma.  And we use those as collaterals; they

20  support our decisions and opinions.

21  Q   You describe that alternative hypotheses should be

22  generated in any forensic case, right?

23  A   Yes.

24  Q   What is the question to be answered in this case?

25  A   I'm not following you.  Beyond grave risk and mature age?

1   Q   No, that's what I'm -- what you've touched on, your role

2   here, is to critique Dr. Poppleton's report.  His question

3   was on grave risk and mature child, correct?

4   A   Correct.  So when you look at an opinion around that, you

5   would gather data points to support those opinions, explain

6   yourself and where you got those data points, or dispute that

7   that exists.  So you develop hypotheses within that grave

8   risk.  There's child abuse.  There's not child abuse.

9   There's domestic violence.  There's not domestic violence.

10  There's substance abuse.  There's mental illness.  You would

11  look at all of those categories in order to come to a

12  conclusion.

13  Q   And in this case the conclusion is there is a grave risk

14  or there is not, correct?

15  A   Correct.

16  Q   And so when you describe, on Page 5 of your report, things

17  that you call "hypotheses," are those actually hypotheses or

18  just observations?

19  A   They are hypotheses -- oh, I'm sorry.

20  Q   Go ahead.

21  A   No, I'll let you finish your question.  I apologize.

22  Q   Well, I was going to go through some of those that you

23  listed there.  You listed mother sharing inappropriate

24  information with the child.  That doesn't rule out a grave

25  risk or not, right?

 1   A    No.  That would go to undue influence.  So there are

 2   different hypotheses that I put out by looking, just at the

 3   data that he had, that need to be considered in order to come

 4   to an opinion.

 5   Q    And the child having an attachment to both parents does

 6   not rule out whether there's a grave risk of exposure to

 7   harm, correct?

 8   A    I don't know the answer to that because attachments are

 9   protective.  Again, domestic violence is not one size fits

10   all.  The child is not one size fits all.  So you have to

11   generate these hypotheses and explore them in order to answer

12   those questions, at least from an opinion standpoint, to

13   assist the trier of fact.

14   Q    And the mother being a restrictive gatekeeping parent does

15   not indicate whether there is a grave risk of harm to the

16   child or not, correct?

17   A    Well, it could.  If she's a restrictive gatekeeper and not

18   a protective gatekeeper, she could be influencing the child

19   to make allegations.  She could be making false allegations.

20   So it is part of answering a question.

21   Q    And cultural factors do not indicate whether there's a

22   grave risk of exposure of harm to the child or not, correct?

23   A    It's a part of understanding and interpreting mother's

24   statements and child's statements.  As we just talked about,

25   shame by her family is an important aspect, whether this is a

 1   patriarchal family.  Was it a traditional family?  How does

 2   religion -- they are Hindu.  Does being a Hindu play into

 3   these dynamics?  These are all important questions to look at

 4   grave risk.

 5   Q   And you would agree that when looking at these ideas of

 6   whether or not undue influence or gatekeeping plays in, that

 7   the first thing that we need to figure out is whether or not

 8   those are a byproduct of the domestic violence caused by

 9   father, correct?

10   A   I was thinking as you were talking.  Would you mind

11   repeating your question?

12   Q   Wouldn't you agree that when we're looking at these

13   considerations or hypotheses of undue influence or

14   gatekeeping, that we first need to look at the issue of

15   whether those are a byproduct of domestic violence by father,

16   correct?

17   A   So that's all one big pot.  Yes, you're going to do

18   analysis of intimate-partner violence.  You're going to do

19   analysis of coercive control.  And you're going to have

20   alternative hypotheses to those statements.  It's not

21   uncommon in high-conflict divorces for somebody to claim

22   they're being alienated and the other parent make an

23   allegation in retaliation.  Those are perceptions and

24   narratives that often get entrenched.  And our responsibility

25   is to look at all of those components and come to a reliable

 1  and valid opinion.

 2  Q   But we're not coming to opinion on a high-conflict divorce

 3  case here, right?

 4  A   No.  I was using that as an example.

 5  Q   Do you agree that mothers can provide nurturing and

 6  security needs for their children on a day-to-day basis?

 7  A   Yes.

 8  Q   And that it's a good policy to protect their ability to do

 9  so?

10          MR. MIN:  Objection, relevance.

11          THE COURT:  Counsel, it sounds more like a custody

12  issue as opposed to the issue before this court.

13          MS. SKINNER:  Thank you, Your Honor.  I'll move on.

14  Q   When looking at analysis of whether a parent is a

15  restrictive gatekeeper or engaging in undue influence, do we

16  need to analyze the impact of domestic violence on that

17  parent?

18  A   Yes.

19  Q   And isn't it the case that domestic violence is designed

20  to destabilize control and keep that other parent in their

21  place?

22  A   Generally speaking, yes.

23  Q   Okay.

24          You indicate in your report that mother described --

25  that mother did not describe intervening in a protective

1    manner when her son was being shaken by the father.  Do you

2    remember that?

3    A    Yes.  It's not in Dr. Poppleton's report.

4    Q    Did you not consider the fact that by conceding to

5    father's demands for sex in that moment was an intervention?

6    A    So that's not what the report says.  It says that was the

7    purpose of the father's behavior.  It doesn't play out an

8    entire story that she then gave in to sex to protect her

9    child.  That's not in his report.

10   Q    And if she had done that, would you agree that that would

11   be a protective intervention?

12   A    So that doesn't seem to be the methodology of the story.

13   She is saying the shaking happened.  So she's not saying he

14   threatened to shake the child; she's saying he shook the

15   child.

16   Q    Dr. Day, you testified on direct examination that testing

17   is helpful when crafting our opinion.  Do you remember that?

18   A    Yes.

19   Q    But Dr. Poppleton in this case did not craft an opinion,

20   right?

21   A    Correct.

22          MS. SKINNER:  I have no further questions for this

23   witness.

24          THE COURT:  Redirect?

25          MR. MIN:  No redirect, Your Honor.

 1          THE COURT:  Any objection to this witness being

 2   excused?

 3          MR. MIN:  Yes, Your Honor.  She may stay and observe

 4   some of the remaining trial, if that's okay, Your Honor.

 5          THE COURT:  All right.

 6      You are not excused at this point in time, which means

 7   that you're permitted to remain, by observing.  But we'll

 8   proceed now with calling the next witness.  Counsel.

 9          THE WITNESS:  Thank you, Your Honor.

10          MR. MIN:  Thank you, Your Honor.  Do we have Kee Lay

11   Lian in the waiting room?

12          THE CLERK:  She's in the witness room.

13          MR. MIN:  I know Your Honor had reserved ruling on

14   Dr. Day's report.  Before I forget, I wanted to renew my

15   application to have that admitted into evidence.

16          THE COURT:  Counsel.

17          MS. SKINNER:  No objection, Your Honor.

18          THE COURT:  It's admitted.  And that's exhibit

19   number --

20          MR. MIN:  107.

21          THE COURT:  No. 107 is admitted.

22               (Exhibit 107 was admitted.)

23          THE CLERK:  If you could please raise your right

24   hand.

25                    KEE LAY LIAN,

 1        having been sworn under oath, testified as follows:

 2            THE CLERK:  If you could please state your first and

 3    last names and spell your last name for the record.

 4            THE WITNESS:  My last name is Kee K-E-E.  My first

 5    name is Lay Lian.

 6                         DIRECT EXAMINATION

 7    BY MR. MIN:

 8    Q    Good evening, Ms. Kee.

 9    A    Good evening.

10    Q    Could you please describe your current occupation?

11    A    I'm a partner in a law firm called Rajah & Tann Singapore,

12    LLP.

13    Q    How long have you been a practicing attorney?

14    A    I have been called to bar 1986.  So I've practiced around

15    38 years.

16    Q    In what field of law do you practice?

17    A    I practice primarily in matrimonial family law and trust

18    matters.

19    Q    What percentage of your practice would you say is in

20    matrimonial and family law?

21    A    Probably about 80 percent of my practice, current practice

22    is on matrimonial law.

23    Q    And in your matrimonial family law practice -- and we'll

24    focus on that area of law -- - do you handle cases dealing

25    with custody?

 1   A    Yes, I do.

 2   Q    Domestic violence?

 3   A    Yes, I do.

 4   Q    And what percentage of your practice would you say deals

 5   with issues of custody?

 6   A    About 50, 60 percent.  Almost all the cases deal with

 7   custody and financial issues.  So most of the cases always

 8   have children issues, in my practice.

 9   Q    What about domestic violence issues?  What percent of your

10   practice deals with issues of domestic violence?

11   A    Probably about 50 percent, I'd say.

12   Q    And in your practice, do you represent both the alleged

13   victim and alleged perpetrator of domestic violence?

14   A    That's correct.

15   Q    Have you ever written in the area of Singaporean family

16   law?

17   A    Sorry?

18   Q    Have you ever written any articles or publications in the

19   area of Singaporean family law?

20   A    Yes, I have.

21   Q    In the areas of custody or domestic violence?

22   A    Yes, I have.

23   Q    Can you describe a little bit of your writings?

24   A    Recently wrote in Chambers on relocation of children, the

25   current trends in Singapore.  I also wrote on prenuptial

 1  agreements and the financial distribution in Singapore.  It's

 2  been published in England and in the local journals.

 3  Q   Have you ever lectured or taught any courses in the area

 4  of Singaporean family law?

 5  A   Yes.  About four years to six years I was a member of the

 6  Singapore Institute of Legal Education, which train the --

 7  practice trainings, before they are called to bar.  And I

 8  teach and facilitate the lectures in family law and in trust

 9  probate and wills.

10  Q   Do you belong to any professionals organizations?

11  A   Yes.  I'm a fellow of the IAFL, the International Academy

12  of Family Lawyers.  I am also mediator of the Singapore

13  Mediation Centre.  I do -- I'm also a notary public, a

14  commissioner for oath, and Singapore Law Academy member.

15  Q   What is the International Academy of Family Lawyers?  Can

16  you describe that?

17  A   The International Family Lawyers -- Academy of Family

18  Lawyers is an organization which is -- admits only family

19  lawyers who have been in practice for at least ten years.

20  They are also people who are invited to be members.  And they

21  must be people who are recognized as -- by their own peers as

22  leaders of that profession.

23  Q   I'm going to show you a document that's been admitted into

24  evidence as Petitioner's Exhibit 109, starting at Bates stamp

25  1589.  We'll look at the four pages, 1689 to 1692.  Is this a

1    copy of your CV?

2    A   Yes, it is.

3    Q   Scroll down four pages.

4        Have you ever been qualified to give testimony as an

5    expert witness?

6    A   Yes, I have.  I've given expert witness opinions in court

7    to testify in foreign courts, in Australia.

8    Q   How many times have you testified as an expert witness in

9    foreign courts?

10   A   About three times.

11   Q   What areas?

12   A   In areas of family law in Singapore, jurisdiction,

13   (unintelligible) and custody.

14       MR. MIN:  Your Honor, at this time we would like to

15   move to qualify Ms. Kee as an expert in the area of

16   Singaporean family law.

17       MS. SKINNER:  We would object on the basis that

18   FRCP 26(a)(2)(B) was not complied with in this regard.  The

19   witness just testified that she has written publications,

20   which were not provided within her written report.  The rule

21   requires that the witness include a list of all publications

22   authored in the previous ten years.  The report is void of

23   that requirement.

24       THE COURT:  Counsel.

25       MR. MIN:  Your Honor, just let me check on that.

1       Your Honor, we're just double-checking that.

2               THE COURT:  We'll have a stretch break while you're

3       looking for that, counsel.

4               MR. MIN:  Your Honor, can I just run to the bathroom

5       real quick?

6               THE COURT:  Yes.

7                           (Stretch break.)

8               THE COURT:  Ready, counsel?

9               MS. SKINNER:  Yes, Your Honor.

10              MR. MIN:  Yeah.

11      Your Honor, I note the witness just testified to a

12      publication that was not noted in her report.  We acknowledge

13      that.  However, we think the probative value outweighs any

14      prejudicial effect.  Counsel has an opportunity to voir dire.

15      We're happy to supplement with whatever publications she has.

16              MS. SKINNER:  The purpose of this rule is very clear,

17      that the publication should be provided.  And the purpose of

18      that is that that would give me an opportunity to read the

19      publications, and in the course of my cross examination,

20      potentially impeach this witness with her own publication, if

21      she says something different in a publication than she said

22      on the stand today.  So this will materially prejudice my

23      ability to cross examine this witness.

24              THE COURT:  Counsel, we're going to conduct the

25      examination of the witness.  I'll require that counsel

1    produce to you a copy of that report.  We'll recess and give

2    you the opportunity to review the report.  And you can

3    continue with your cross examination if you believe that's

4    necessary or appropriate.  How voluminous is this report?

5              MR. MIN:  The publication?

6              THE COURT:  Yes.

7              MR. MIN:  I would have to ask the witness.

8              MS. SKINNER:  Just to clarify.  All publications in

9    the past ten years is the requirement.  So we'd ask the

10   witness to provide those.

11             THE COURT:  I think the witness only testified to

12   having published this one.

13             MS. SKINNER:  I don't know if he asked about a

14   ten-year period or the most recent publication.

15             MR. MIN:  I'll ask the witness.

16   Q   Ms. Kee, how many publications do you have in the last ten

17   years?

18   A   About three.

19   Q   Could you please send those over when you get a chance?

20   A   Yes.

21   Q   Thank you.

22             THE COURT:  Counsel, will you ask how difficult the

23   process will be to transmit those reports?  And does she have

24   an assistant where she is right now that could start that

25   immediately?

 1          MR. MIN:  Is there someone you could contact to

 2     transfer those three publications over as soon as possible?

 3          THE WITNESS:  Your Honor, it is 1:51 at the moment in

 4     Singapore -- a.m. in Singapore -- so I can't get anybody to

 5     do it.  It's just me at this moment.  I have a hearing in

 6     court at 9:30 a.m., for the whole morning.  So the earliest I

 7     can give you will be around my time in the afternoon.

 8          THE COURT:  How voluminous are the reports?

 9          THE WITNESS:  They are articles, so probably a few

10     pages.  And it wouldn't be more -- each article wouldn't be

11     more than ten pages.

12          THE COURT:  And have any of the articles been

13     produced, counsel?

14          MR. MIN:  No, Your Honor.

15          THE COURT:  All right.  Please continue.  The court

16     has provided a remedy.

17          MS. SKINNER:  Yes, Your Honor.  Just so I understand,

18     will the witness remain available after I receive the

19     reports?

20          THE COURT:  She has to be made available.

21          MR. MIN:  Yes, Your Honor.

22          MS. SKINNER:  Thank you, Your Honor.  I had one other

23     basis.  She also failed to comply with the requirement of

24     FRCP 26 to provide a statement of compensation paid.

25          MR. MIN:  Your Honor, that in fact is not true

 1  because we provided counsel a disclosure of that on

 2  December 19, 2024.

 3            THE COURT:  Do you acknowledge receipt of that,

 4  counsel?

 5            MS. SKINNER:  I can look at that during -- it wasn't

 6  provided with the report, and that's where I looked for it,

 7  Your Honor.  So I can look for the separate disclosure.

 8            THE COURT:  Based on the representation of counsel,

 9  it was provided.  Unless you provide something contrary, the

10  objection is overruled on those grounds.

11            MS. SKINNER:  Thank you, Your Honor.

12            THE COURT:  Please continue.

13            MR. MIN:  Thank you, Your Honor.

14  Q   Ms. Kee, can you briefly describe what you were asked to

15  do in this case?

16  A   I'm sorry.

17  Q   Can you previously describe what you were asked to do in

18  this case?

19  A   I was asked to give an opinion about the Singapore law

20  from the perspective on child custody issues in Singapore,

21  access and protection in Singapore, and maintenance in

22  Singapore for the child.

23  Q   And did you reach conclusions or opinions as part of your

24  assignment?

25  A   Yes.

1    Q    I'm going to show you a document that's been admitted as

2    Exhibit 1019, Bates No. 1675 to 1687.  Is this the copy of

3    the report that you produced?

4    A    Yes.  I confirm that's my report.

5    Q    I'm sorry, you said you confirm that this is your report?

6    A    That this is my report.  Yes, I confirm.

7    Q    Okay.  So I want to ask you, did you offer an opinion as

8    to whether Singapore has jurisdiction to issue orders of

9    custody in this case?

10   A    Yes.  I offered an opinion, and that is found in the

11   report at paragraph 8 on the section "parent arrangements,"

12   which would include custody, care and control, and access.

13   Q    What was your opinion?

14   A    I'm sorry.

15   Q    I was going to ask you what your opinion was about the

16   question posed?

17   A    My opinion is that Singapore has jurisdiction under the

18   Guardianship of Infants Act in Singapore.  It is standalone.

19   There is no requirement of the minimum stay in Singapore.  As

20   long the child is habitually at residence in Singapore, the

21   court in Singapore, under Section 5 of the Guardianship of

22   Infants Act, has jurisdiction.

23        In fact, in this case the mother herself and the father

24   make applications under this in the Singapore court.  The

25   mother's application is OSG-131 of 2024, and the father's

1    application is OSG-140 of 2024.

2    Q    And so if Singapore courts have jurisdiction to issue

3    orders of custody, what type of orders could they issue as it

4    pertains to custody?

5    A    The courts can make a decision on the child care, control

6    of the child, based on the best interests of the child.  And

7    the court will also grant access.  Under this legislation,

8    the court can also grant maintenance for the child.

9    Q    Okay.  What factors do Singaporean courts consider when

10   issuing orders of custody?

11   A    The court will consider what is in the best interests of

12   the child.  The court takes into account all the relevant

13   factors in that particular case.  And the court will look at

14   the child's welfare as a priority over the parents' wishes.

15   The wishes of parents as well as of the child is also taken

16   into account.

17   Q    What about domestic violence?  Is that taken into account

18   in custody determinations?

19   A    The court will consider that as part of the metrics of

20   what is relevant.  And at the end of the day, the court still

21   looks at what is the relevance to the best welfare of the

22   child.

23   Q    What do you mean by that?

24   A    The court basically looks at whether the domestic violence

25   is directed at the child, is directed at the other members of

1  the parties.  And the court doesn't really think every

2  domestic violence should be the reason why a custody should

3  be awarded or not awarded to a parent.  So it depends on the

4  relevance of that domestic violence.

5  Q   Okay.  What about relocation?  Is that something that the

6  Singapore courts are in a position to address?

7  A   Yes.  The Singapore courts look at the relocation and also

8  considering best interests of the child in each case.

9  Q   So in this case, is the mother able to seek relocation

10  before the Singaporean courts to relocate to the United

11  States?

12  A   Yes.

13  Q   I'm sorry, did you say "yes"?  I apologize.

14  A   Yes.  The mother is able to apply to Singaporean court for

15  relocation.  And I believe in this application the mother

16  wants to do that as well.

17  Q   So can you describe the process or processes that can be

18  employed during custody proceedings in Singapore?

19          MS. SKINNER:  Objection, relevance.

20          MR. MIN:  Your Honor, this is relevant because this

21  goes to ameliorative measures on a grave-risk case.  So when

22  the court is assessing whether there's a harm of risk to the

23  child and whether that meets the high threshold of grave risk

24  of harm to a child, one of the considerations this court

25  should undertake is what measures are possible and feasible

1  in Singapore to ameliorate or, as the experts have called it,

2  "mitigate" any risk of harm.  So what options are available

3  to the Singapore courts and to the parties through litigation

4  in Singapore is certainly relevant to these proceedings.

5          MS. SKINNER:  Your Honor, in *Golan v. Saada* the U.S.

6  Supreme Court indicated that it should decline to consider

7  such ameliorative measures if such proposed measures "Draw

8  the court into determinations properly resolved in custodial

9  proceedings."

10     So this falls outside of that consideration.

11         MR. MIN:  Counsel is misapplying the *Golan* case.  The

12 case talked about warning that this court should not embroil

13 itself in making custody determinations as part of

14 ameliorative measures.

15     We are not asking this court to make custody

16 determinations.  We're asking this court to understand and

17 assess Singapore's ability to make custody determinations and

18 whether those available measures are sufficient to ameliorate

19 any potential risk.

20         THE COURT:  Objection is overruled.  She can answer

21 the question.

22 Q   So I'll withdraw the question, Ms. Kee.  I'm going to ask

23 a more pointed question.

24         During a custody proceeding in Singapore, are forensic

25 or other psychological evaluations an available mechanism for

1    courts to determine the best interests of the child?

2    A    Yes.  The courts in Singapore have several tools to

3    consider the best interests of the child when there are

4    issues about who is the best parent.  The court can appoint

5    their own in-house counselors.  In Singapore we have court

6    counselors within the court system itself, called the

7    "Counseling and Psychological Services" of the courts.

8    Called, in short, CAPS, C-A-P-S, CAPS.

9        These are counselors and psychologists that are in the

10   court system, and the court often refers to them for custody

11   evaluation reports, or access evaluation reports, or

12   specifically [indecipherable] reports.  And the counselors

13   and psychologists will speak to the child as well as the

14   parent and come up with their own report.

15       The counselor's report in these cases are usually private

16   to the judge and confidential.  So parties and their lawyers

17   are not given access to the report.  That's why they're

18   independent.  And the court often also orders for -- orders

19   for people to -- for parents to go to this system called the

20   "Divorce Specialists Support Agency" which is an agency

21   called DSSA where they can do supervised visitation or do

22   supervised handover.  So the court can do things in

23   Singapore.

24       And after around eight sessions the DSSA counselor will be

25   able to give a regular report.  And the court sometimes

1    extends the eight sessions to another eight sessions.  And

2    the court also, in Singapore, has the ability for the judges

3    to do judicial interview of the child.

4    Q    What is a judicial interview of the child?  What does that

5    entail?

6    A    The judicial interview of the child means the court, the

7    judge himself can exercise its discretion, speaking to the

8    child himself, and find out the inclination and the voice of

9    the child by talking to them directly.

10   Q    Before when you were answering the question about forensic

11   or psychologic evaluations, you were using the term

12   "counselors."  I just wanted to clarify.  Are you referring

13   to mental health counselors, not legal counselors?

14   A    Yes.  The mental health counselors, like psychologists.

15   Q    Okay.  Are children able to have their own representation

16   during custody proceedings in Singapore, meaning can they

17   have their own lawyers?

18   A    Yes, they can appoint -- the court can appoint a

19   representative for the child.  The benefit of a child

20   representative is that they are specially trained, and

21   usually they're lawyers or psychologists.  And they can go

22   and interview the relevant parties, meaning the schools, they

23   can visit the child at their home, they can do a lot of other

24   things, like visiting the child, bringing the child out and

25   interacting with the child to see what the child really needs

1   and wants.

2   Q   When you were talking about the forensic or psychological

3   evaluation process, you mentioned that they could -- you

4   mentioned some of the things they looked at, and they can

5   also evaluate specific, I think, specific tasks or issues.

6        Are forensic or psychological evaluators or counselors

7   sometimes tasked with evaluating domestic violence in the

8   context of a custody case?

9   A   No.  I don't think psychologists -- the court's

10  psychologist is usually tasked for the reason for domestic

11  violence, but the information that is coming across during

12  the interviews with the counselors.

13  Q   What was the last part?

14  A   There is information that the parties can give the

15  counselors, and the counselors can take that and report to

16  the court.

17  Q   Okay.  They report that to the court?

18  A   Yes.

19  Q   Okay.  And you were mentioning the process with the DSSA.

20  Is that considered supervised visitation in Singapore?

21  A   Yes, it is usually access where the parties -- where the

22  father, in most of the cases, has lost contact with the child

23  or has difficulty reconnecting with the child, and the issues

24  of safety or issue of whether the child is comfortable with

25  the father.  Can the father look after the child without, you

1    know -- and the relationship between the father and the child

2    and the father's ability to take care of the child.  So they

3    often ask for access to be supervised for a period of time,

4    over around eight sessions, for the counselors to watch and

5    to report to the court.

6    Q   Is there anything akin to therapeutic visitation that a

7    Singaporean court can order?

8    A   That is one of them.  But the court can, on its own, also

9    order private psychologists, allow private psychologists to

10   accompany the visitation as well.  So there are reported

11   cases on that in Singapore, where the court allows the

12   parties to accompany the visitation.

13   Q   The court can order -- can the court order psychological

14   therapy for one or both of the parties?

15   A   Yes.  The Singapore court can order parenting -- both

16   parents to attend parenting courses, or parenting courses for

17   both parties.  In some cases the court allows and orders

18   therapeutic intervention for the entire family.

19   Q   If the parties agree to a temporary custodial arrangement,

20   for example, if the parties agreed that temporarily

21   visitation would be supervised, is that something that the

22   Singaporean courts would adopt as an agreement between the

23   parties?

24           MS. SKINNER:  Objection, relevance and speculative.

25   A   Yes.

1           THE COURT:  It's overruled.  You may answer the

2   question.

3   A   Yes.  The court will allow such report of consent order.

4   Q   You mentioned earlier child maintenance as one of the

5   areas you opined on, correct?

6   A   Yes.

7   Q   And did you come to an opinion as to whether the Singapore

8   courts have jurisdiction to issue orders for child

9   maintenance?

10  A   Yes.  The courts have jurisdiction, under the Guardianship

11  of Infants Act order, to order maintenance for the child.

12  And usually the court will look at the child's personal

13  expenses as well as the household expenses, including the

14  parents'.  And a share of the household expenses attributable

15  to the child.

16      But in cases where mothers has no ability to earn any

17  money, the court can contribute the entire household expenses

18  to child maintenance as well.

19  Q   If the parties were to agree on a temporary maintenance

20  amount, again, temporarily until the court was in a position

21  to make a final order, would that temporary agreement be

22  something that the Singapore courts would adopt?

23          MS. SKINNER:  Objection, relevance.

24          THE COURT:  It's overruled.

25  Q   You can answer.

1    A    I'm sorry, do I answer?

2    Q    Yes.

3    A    Yes.  The court will basically allow such orders to remain

4    as well.  Does that answer your question, Richard?

5    Q    Yes.

6         Did you reach any conclusions or opinions about whether

7    Singapore courts have jurisdiction to issue orders of

8    protection in Singapore, called Personal Protection Orders?

9    A    Yes, I did.

10   Q    What was your opinion as to whether the Singapore courts

11   could issue Personal Protection Orders?

12   A    The courts have the power to issue protection orders.  In

13   fact, the law on protection orders has just recently been

14   changed on the 16th of January.  And this new ruling on

15   family violence has been expanded, and it rises to physical,

16   emotional and physical abuse.  So under the new legislation,

17   the court has very extensive power.

18   Q    So what type of protection orders are available by the

19   Singapore courts?

20   A    The Singapore courts distribute a protection order, which

21   is usually -- protection order without any specified time for

22   expiry.  And a very -- in a case where there's an emergency,

23   the court can expedite the protection order even before

24   trial, just to protect the applicant before the hearing or

25   the trial of the matter.  And the court can also include a

1    domestic exclusion order to exclude a party from matrimonial

2    home or the family home.  With the extension of the order

3    under the new rule, the court can make 13 orders, in fact,

4    which include non-contact, no-contact order.  The court can

5    include supervised access.  The court can include an order

6    for removal of the person from the house.  So it is a very

7    extensive power now that the court in Singapore is going to

8    have.

9        This legislation just came into force.  So we are all

10   waiting to see how this will play out.  But it is expected

11   that under the regime, it's going to be easier to get a

12   protection order if the applicant is under abuse.

13   Q    What considerations does the Singapore court undertake

14   when deciding whether to issue protective orders?

15   A    The court looks at whether violence is committed, which

16   means, under the new legislation, whether there's hurt, the

17   fear of hurt, whether there's sexual abuse, emotional abuse,

18   coercion.  The court looks at, also, the issue of whether

19   this person has been repeatedly abused.

20   Q    Are protective orders available for children as well?

21   A    Yes.  Typically the court has issued protective orders

22   against the father or the mother for children where needed.

23   Q    I'm sorry.  What was the last thing that you said?

24   A    They have issued where needed.

25   Q    Where needed, okay.

1    A    Where needed.

2    Q    What do you mean by "where needed"?

3    A    If circumstances require, the court will issue such orders

4    for the children.

5    Q    But I would like you to explain what circumstances would

6    require something like that.

7    A    Where there's violence against the children.  Where the

8    court feels, in Singapore -- in the origin -- where the court

9    feels that there's continual harassment with intention to

10   cause anguish to the parties.  Where there's physical hurt.

11   Where there's fear of hurt, threats.  Where there is false

12   imprisonment or confinement of a person against the person's

13   will.  So these aren't all the cases.  But as I say, these

14   definitions have been retexturized under the new law which

15   allows for sexual, physical and emotional abuse.  So "abuse"

16   is now the key word for protection order.

17   Q    So if the parties in this case were to reach an agreement

18   or the father in this case were willing to agree to a

19   protective order, is that something that the Singapore courts

20   would abide by?

21   A    Yes.  The Singapore courts typically -- let me explain how

22   we do it.  The Singapore court usually lets the parties, when

23   there's a new application, for parties to have a counselor

24   before the court sees the parties.  And where the parties

25   agree to a protection order or to removal of that

 1   application, the court typically allows that, and the court

 2   then orders.

 3   Q    If the parties were to agree, and if the father were to

 4   agree not to cancel any dependent passes for the spouse, is

 5   that something that could be reduced to a court order in

 6   Singapore?

 7   A    Yes, it can be.

 8        MR. MIN:  Your Honor, I have no further questions at

 9   this time.

10        THE COURT:  Cross examination.

11        MS. SKINNER:  Thank you, Your Honor.

12                        CROSS EXAMINATION

13   BY MS. SKINNER:

14   Q    Ms. Kee, in coming up with your opinions here today, did

15   you consider any facts that were provided to you?

16   A    Yes, I did.

17   Q    Where are those facts located in your report?

18   A    The facts were the OSG documents 131 and OSG-140.  The

19   documents provided to me was the application as well as the

20   affidavit and supporting affidavit.

21   Q    I'm sorry, could we break that down?  What was the first

22   set of facts that you describe?  OSG?

23   A    OSG-131, which is the mother's application under the

24   Guardianship of Infants Act.  And the OSG-140, which is the

25   father's application under the Guardianship of Infants Act.

1    So those documents are provided to me, you know, as a

2    background to what this case is all about.

3    Q    Can you help me understand what an OSG-131 is?

4    A    OSG is the application, the summons number for the

5    mother's application for child, care of the child.  And this

6    is referred to at paragraph 10 of my report.

7    Q    So you're talking about a court pleading that was filed in

8    Singapore courts?

9    A    Yes.  That's correct.

10   Q    Okay.  And you're saying there was a filing made by mother

11   in OSG-131; is that right?

12   A    Yes.

13   Q    And that there was a filing made by father in OSG-140?

14   A    Yes.  That's correct.

15   Q    Okay.  Were there any other facts provided to you about

16   the case that you used in forming your opinions?

17   A    Was there any other facts?  These are the papers given to

18   me, mother's maintenance application, maintenance summons.

19   And the mother's protection order application, which is the

20   PPO application in Singapore.  So the mother made

21   applications for maintenance in Singapore, and the mother

22   also made application for a protection order in Singapore.

23       What I understand is that both applications has been

24   withdrawn by the mother in Singapore.

25   Q    Okay.  So I'm not asking about what the current status of

1  these documents are.  I'm just asking what you considered in

2  coming up with your opinion.  And you just testified that

3  there was two more court pleadings that you reviewed, the

4  mother's application for maintenance support in Singapore; is

5  that right?

6  A    Yes.

7  Q    And then the mother's application for a protective order

8  in Singapore?

9  A    Yes.

10  Q    And do you refer to both of those documents in your

11  report?

12  A    No, I did not.  Because they were given to me as

13  background of the facts that, you know, that they wanted me

14  to understand before I made my report.  My report is based on

15  the ability of the court to protect the child and to give the

16  jurisdiction of the court in Singapore.  That's all.

17  Q    So you were provided and reviewed, again, these two

18  additional court pleadings that you did not refer to in your

19  report.  Is that your testimony?

20  A    Yes.

21  Q    And then you indicated that you reviewed a letter of

22  instruction dated November 21, 2024.  What is that document?

23  A    That is the letter from Green Kaminer to me informing me

24  and instructing me to give a report on the situation and what

25  my opinions were to cover.

1    Q    Were there facts and data contained in that letter?

2    A    Yes, there was.

3    Q    And are those facts --

4    A    As a background.

5    Q    Are those facts and data referenced in your report?

6    A    No, they are not.

7    Q    And you also reference that you received annexures or

8    exhibits to that letter.  What did that comprise?

9    A    Annexures were HPP annexures concerning custody cases,

10   like the OSG applications, the two applications, the court

11   papers, the application for the protection order, the

12   complaint by the mother, and the complaint filed by her for

13   DSSA, which is the protection order and the complaint.

14        MS. SKINNER:  Your Honor, at this point I'd move to

15   strike this witness's testimony, again, for failure to comply

16   with FRP 26(a).  The witness just testified there were facts

17   and data that she considered that were not contained in her

18   report.

19        MR. MIN:  Your Honor, the witness testified to the

20   complete opposite.  She said it was background.  And that's

21   not what she relied on in issuing her opinions.  Her opinions

22   were about the Singapore court's ability to address certain

23   issues, not what they would do in this specific case based

24   upon the facts.  The facts of this case were not relevant or

25   what she used to support her opinions.  Her opinions are what

1    is the Singapore court empowered to do?  What she literally

2    just testified to was, this was background information just

3    so I know what is going on.  And she then testified, I did

4    not use this, and that was not the basis of my opinions.

5       What FRCP requires is facts or data considered in forming

6    the opinions.  If she did not consider these facts in forming

7    her opinions on what the Singapore courts are able to do,

8    it's not required.

9          MS. SKINNER:  Your Honor, the report itself indicates

10   that she is making the opinion that the Singapore courts have

11   jurisdiction over this case, and that she reviewed data and

12   facts in forming that opinion.

13         MR. MIN:  She referred to the two documents she

14   reviewed, which are the filings that we've been discussing ad

15   nauseam, which is her custody filing and his custody filing.

16         MS. SKINNER:  She referred to four documents, two

17   which she referenced.  One was -- the two that were

18   referenced in her report were OSG-131 and OSG-140.  She

19   referenced two additional documents that she testified she

20   considered in making her opinion, which were mother's PPO

21   application and mother's maintenance application that are not

22   -- she testified are not referenced in her report.

23         MR. MIN:  I don't believe she testified that she

24   considered that as the basis of her opinion.  I believe she

25   testified she reviewed them.  Those are two different things.

 1            THE COURT:  Counsel, the court notes your objection.

 2   But the key is what did this witness rely upon in coming to

 3   her opinion?  The direct examination so far indicates that

 4   her opinion was predicated upon law in Singapore and what

 5   relief could be provided under Singapore law, and nothing

 6   further.  You're free to explore this on cross examination,

 7   but your objection is overruled.

 8            MS. SKINNER:  I will note one more category was a

 9   letter from petitioner's office.  Again, she testified it

10   included facts and data that were not referred on the report.

11            THE COURT:  Again, counsel, the testimony I have so

12   far indicates that they may have been reviewed, but that's

13   not the basis for which she formulated her opinion.  And

14   that's the grounds for which the court overrules the

15   objection.

16            MS. SKINNER:  Thank you, Your Honor.

17            THE COURT:  We're close enough to the morning recess.

18   Let's take it at this time.

19            MS. SKINNER:  Thank you, Your Honor.

20            MR. MIN:  Your Honor, may I instruct the witness that

21   we'll take a 15-minute break, I don't think she is familiar

22   with this.

23                      (Recess.)

24   Q   Ms. Kee, were there facts or data contained in the letter

25   that Ms. Redmond provided to you that you considered in

1  forming your opinion in this case?

2  A   Yes.  Those facts were basically that mother is allegedly

3  being abused.  And then the applications for both parents

4  contesting for the child to have care and control of the

5  child, and the father to want to bring the child back.  So

6  basically these were the facts, and the mother's

7  applications, as I say, in Singapore.

8      So the questions I was asked was what was the power of the

9  court in Singapore in such cases when the court has

10  jurisdiction to grant the relief to the mother.  And also

11  what are the protective orders that Singapore courts can

12  afford to the mother in a case such as this.

13  Q   Were there facts or data that you considered in forming

14  your opinions in this case contained in mother's PPO

15  application?

16  A   Not primarily.  I just used this for the background and

17  the understanding of the case.  That's it.

18  Q   So you gathered facts and data from the PPO application as

19  background in considering -- forming your opinion?

20      MR. MIN:  Objection.

21  A   Yes, that's right.

22      THE COURT:  Grounds?

23      MR. MIN:  Objection, she was -- I'll withdraw it.

24      THE COURT:  Please continue.

25  Q   Were there facts or data contained in mother's maintenance

 1  application and summons that you considered in forming your

 2  opinion in this case?

 3  A    No.  As I said, it was just background information of what

 4  transpired in Singapore.

 5          MS. SKINNER:  Your Honor, again, at this time I'd

 6  like to renew my motion to strike this witness's testimony.

 7  I believe the proper foundation has now been laid that this

 8  witness has admitted to considering facts and data in forming

 9  her opinion in this case, contained in a letter received from

10  Ms. Redmond, to which she testified before the break she did

11  not include those facts and data in her report, as well as

12  the PPO application, which she just testified that she did

13  use in forming her opinion in this case, and which she

14  testified before the break that she did not reference those

15  facts and data in her report.

16          THE COURT:  Same ruling.  Please continue.

17          MS. SKINNER:  Thank you, Your Honor.  And, Your

18  Honor, just to clarify the ruling.  Does there need to be

19  more foundation laid?

20          THE COURT:  No.  I'm indicating, counsel, that the

21  court previously ruled that the witness is permitted to

22  testify.  And that her testimony is predicated upon having

23  received that information.  That was merely background.  But

24  her opinion is predicated upon what law is in Singapore.  I

25  don't know that that letter could provide that level of

 1    detail or basis for her to formulate her opinion, in other

 2    words, what happened in this case.  She's testifying what the

 3    law is in Singapore.

 4              MS. SKINNER:  As applied to the facts that she

 5    considered that were not disclosed in the report.  I thought

 6    that there was one step further on that.

 7              THE COURT:  Anyway, counsel, the court overruled the

 8    objection.  She'll be permitted to testify.  And the court

 9    will deny your request to strike the testimony.

10              MS. SKINNER:  Thank you, Your Honor.

11              THE COURT:  Please continue.

12    Q   Ms. Kee, is it part of your understanding and

13    consideration of the analysis in this case that the father is

14    present in Singapore on a ONE Pass visa?

15    A   Yes.  That was the background I was told.

16    Q   And the ONE Pass visa is for non-Singapore citizens who

17    are working in Singapore, right?

18              MR. MIN:  Objection.  This is outside the scope.

19    She's not here to testify about what the ONE Pass is or is

20    not.

21              THE COURT:  I will allow limited latitude, counsel.

22    Please continue.

23    Q   Do you need me to repeat my question?

24    A   Yes, please.

25    Q   And so the ONE Pass is a visa for non-Singapore citizens

1    to be able to work in Singapore?

2    A    Um, I think the ONE Pass is an expertise visa given to

3    people with talents that the Singapore government wants to

4    attract.  So I'm not sure whether, you know -- how it works.

5    But this is really the visa that the Singapore government

6    gives to people who are talented and Singapore wants to

7    retain that talent.

8    Q    Right.  Singapore wants to receive the talent so that that

9    person lives and works in Singapore, right?

10   A    I believe that this person can work in Singapore, yes.

11   Q    And isn't it the case that the ONE Pass holder gains the

12   right to establish a company in Singapore, thus fostering

13   entrepreneurial endeavors in Singapore?

14            MR. MIN:  Objection, relevance.

15            THE COURT:  It's sustained, counsel.

16   Q    If a ONE Pass holder is not working to establish a company

17   in Singapore, then they don't qualify for the ONE Pass,

18   correct?

19            MR. MIN:  Objection.

20            MS. SKINNER:  Your Honor, this witness's report in

21   paragraph 10 and 11 discussed the ONE Pass and dependent

22   passes, so I'd like to explore that.

23            THE COURT:  Objection is overruled.  Please continue.

24   A    Question, again.

25   Q    If the ONE Pass holder is not working to establish a

1  company in Singapore, then they don't qualify for the ONE

2  Pass any more, correct?

3  A   I'm afraid I can't answer that because that's really an

4  immigration question.  I've been given information that he is

5  a ONE Pass holder, and he can actually work in Singapore on

6  that basis.

7  Q   Well, your report talks about the fact that you say, "The

8  father has a ONE Pass under which mother and Amar obtained

9  dependent passes."

10 A   Yes.

11 Q   So you made that statement without really understanding

12 what the ONE Pass was?  Is that your testimony?

13 A   No.  They have DP, dependent passes under the ONE Pass.

14 And this was the background I was given.

15 Q   Then you go on to say, "We understand that the wife and

16 the child are currently on dependent passes tied to the ONE

17 Pass," right?

18 A   Correct.

19 Q   And then you go on to talk about what would happen if the

20 dependent passes were canceled, right?

21 A   Yes.

22 Q   Then you go on to talk about a student pass and a

23 long-term visit pass.  So you're giving opinions and

24 providing information about immigration issues in this

25 letter, correct?

1    A    This is from the cases I do in Singapore.  And this is not

2    an unusual case.  We have a lot of expatriates that end up in

3    Singapore and end up divorcing here, too.  These issues crop

4    up very often when a dependent's pass is canceled, then what

5    do the wife or the child do?  What other kind of passes?  So

6    this is information that I gathered from my work during which

7    it comes up when there is foreign couples on dependent

8    passes.

9    Q    But you don't have any expertise in immigration?

10   A    Yes.

11   Q    You indicated, though, that a child who's enrolled in a

12   school in Singapore might be able to obtain a student pass

13   visa, right?

14   A    That is correct.

15   Q    That is for full-time college students though, right?

16   A    Not necessarily.  They can come for primary school

17   education as well.  In Singapore, you know, the student

18   passes that are applied through the school by the parent

19   themselves.

20   Q    Right.  And that requires the child to be interviewed at

21   the Singapore embassy in Beijing, right?

22   A    Singapore is not part of China.  We are a small country in

23   southeast Asia.  So there's no interview involved.  The

24   application is done by the adult and the school.  So I don't

25   believe that there's any interview involved at all.

1    Q    Did you receive information on immigration issues through

2    certain governmental websites?

3    A    Can you be more specific?

4    Q    Well, your report attaches some printouts from a website,

5    ICA.  The back of your report.

6    A    Yes.

7    Q    So you did review some information from governmental

8    websites about immigration issues?

9    A    This is the immigration website of Singapore, yes.  It's a

10   printout from the website.

11   Q    Right.  And you reviewed that, correct?

12   A    Yes.

13   Q    And you attached it to your report, correct?

14   A    Correct.

15   Q    And it's a governmental website, correct?

16   A    Yes.  But I don't believe that this is the website that --

17   that this is the document I produced.

18   Q    I'm sorry, what?

19   A    I don't believe this is the document I produced.  Can you

20   show me and refer me to that document I produced?

21   Q    Okay.  So we're going to show Exhibit 109.  Do you have

22   access to this portion of the report that you provided that

23   we're showing here on the screen, ICA printouts?

24   A    Yes, I do.

25   Q    So are you saying you did not provide these documents with

1   your report?

2   A   No.  I have this page in the exhibit that I put in my

3   report, yes.  I do have this.  This is the last exhibit.

4   Q   I'm sorry, what was that?

5   A   This was the last page of my exhibit -- of my report, is

6   the exhibit.

7   Q   So, again, you went to a Singapore government website,

8   correct?

9   A   Yes, correct.

10  Q   And you reviewed information about immigration, correct?

11  A   Yes.

12  Q   And you --

13  A   On the application of student pass.

14  Q   And you included that with your report, correct?

15  A   Correct.

16  Q   I'm going to show you another government website.  This is

17  the Ministry of Foreign Affairs of Singapore.  Do you see

18  that there?

19        MR. MIN:  Objection as to form, testifying to a fact

20  not in evidence.

21        THE COURT:  It's overruled.

22  Q   Do you see that, Ms. Kee?

23  A   Yes, I see this.  But this is Beijing application.  So

24  it's probably from China.

25        MR. MIN:  Objection.  Objection.  Objection.  Moving

 1    to strike the witness's answer.  The question was, does she

 2    see this.

 3              THE COURT:  Let's answer just the question that was

 4    asked of you as to whether or not you see this particular

 5    document, and that will give the court the opportunity --

 6              THE WITNESS:  Yes, I see a document.  Sorry, Your

 7    Honor.

 8              THE COURT:  That's fine.  Please continue.

 9    Q    So a child who is applying for a student pass would need

10    to take an interview at the Singapore embassy in Beijing,

11    correct?

12    A    This is for application for --

13              MR. MIN:  Objection.  Objection.  Objection.

14              THE COURT:  Let's clarify, counsel.  Is this a

15    document the witness has attached to the exhibit, or is this

16    an independent exhibit that you wish to examine the witness

17    on?

18              MS. SKINNER:  This is just a document to show -- for

19    impeachment purposes.  The witness had previously testified

20    that an interview in Beijing was not required.

21              THE COURT:  And you're not representing that this

22    document is a document that was attached to her exhibit?

23              MS. SKINNER:  No, Your Honor.

24              THE COURT:  Objection is overruled.

25    A    What's the question?

1    Q    So, in fact, for the child student pass visa, the child

2    would need to have an interview at the Singapore embassy in

3    Beijing, correct?

4    A    This is a website for the Ministry of Foreign Affairs, and

5    this is not an immigration issue.  I think the Ministry of

6    Foreign Affairs is advising for key RC China citizens who are

7    above 19 years old, what they have to do.  I do not see this

8    as a sponsorship of a case like this for a student pass.  And

9    this is above 19 years old.  I'm not here to answer this

10   because I do not -- it's not factually relevant to this

11   current case.

12   Q    In fact, you made it relevant when you included in your

13   report, in paragraphs 10 and 11, discussions about the

14   immigration status of the child and the parties, correct?

15   You talked about dependent passes, student passes, long-term

16   passes, didn't you?

17          MR. MIN:  Objection as to form.  Objection,

18   argumentative.

19          THE COURT:  It is argumentative.  Rephrase the

20   question.

21   Q    You did include information and opinions relating to the

22   mother and child's abilities to seek immigration status in

23   Singapore in your report, did you not?

24   A    Yes, the information to me.  And this information is

25   common situations where dependent passes -- and what else can

1   be applied for in place of the Dependent Pass.

2   Q   Right.  And that's because the father in this case can

3   cancel the Dependent Pass under his ONE Pass visa at any time

4   he desires, correct?

5   A   I am not aware.  But I assume that this can be done with

6   or without consent.  I am also not -- there is no information

7   on the website for this.

8   Q   And in order for the mother in this case to apply as a

9   parent of a child studying on a student's pass, she would

10  need to obtain a local sponsor who is a Singapore citizen or

11  permanent resident age 21 or older, correct?

12  A   I'm sorry, can you repeat the question?

13  Q   In order for mother to apply as a parent of a child

14  studying on a student's pass, she would need a local sponsor

15  who is a Singapore citizen or a permanent resident age 21 and

16  older, correct?

17  A   I'm not aware of this.

18  Q   And the processing time for such an application can be six

19  weeks or longer, correct?

20  A   I'm not aware.  I'm aware in one of the cases that I've

21  dealt with the mother, who was my client, managed to get an

22  EP, an employment pass, within a short period of time.  The

23  mother also got -- was able to get a short-term visit pass

24  upon cancellation of the dependent's pass.  That's one of the

25  cases where my client is the mother.

1    Q   But that case is not this case, and the facts are

2    different, correct?

3    A   Correct.  So I'm not aware of the immigration practice.

4    But in practice, I have a case at hand which my client is

5    able to obtain a short-term visit pass and an employment

6    pass.

7    Q   Why did you say with certainty in your report that the

8    child would still be able to obtain a student pass when you

9    actually don't know the requirements of it?

10   A   The student pass is applied for the student, the child.

11   And typically it does not need to have a sponsor.  And in

12   this case, if the child is going to be studying in Singapore,

13   I believe that the father will either be the sponsor of the

14   Dependent Pass, or the father can also be the sponsor of the

15   child student pass.

16   Q   But father is not a permanent resident, correct?

17   A   The ONE Pass is almost equivalent to permanent residency

18   in Singapore.

19   Q   But it's not, right?

20   A   I say in practice it's equivalent to that, that they can

21   work and they can stay in Singapore for a long time.

22   Q   That means you're saying on a ONE Pass visa, somebody who

23   has a ONE Pass can then be a permanent resident in Singapore?

24   A   It's equivalent.  It's not a permanent residence.  It's a

25   ONE Pass, which gives a lot of benefits to the holder of the

1    ONE Pass.

2    Q   But it doesn't give the same benefits of a permanent

3    residency?

4    A   I believe so, but it's almost -- in practice, it's almost

5    equivalent.

6    Q   It needs to be renewed every five years, correct?

7    A   Yes.

8    Q   And you have to meet certain qualifications for renewal,

9    correct?

10   A   Correct.  Residency is renewable every five years.

11   Q   So you testified -- you wrote in your report that mother

12   could obtain a protective order in Singapore, correct?

13   A   Yes.

14   Q   But isn't it true that after a party seeks an initial

15   temporary protective order, that a hearing is scheduled?

16   A   As the court mentioned, after the application.

17   Q   If the respondent does not show up to that, the protective

18   order may get dismissed, correct?

19   A   The respondent, no.  If the respondent does not show up,

20   the court has power to issue a warrant of arrest for breach

21   or contempt of court.

22   Q   And if the warrant is not executed on, the protective

23   order can get dismissed, correct?

24   A   That is not correct.

25   Q   So the protective order can remain?  Is it your testimony

1  that the protective order can remain indefinitely without any

2  service upon the respondent?

3  A    It's not an order; it's an application.  So upon the

4  served application, upon the service of the summons, the

5  respondent and the applicant are supposed to go to court, as

6  I mentioned.  So if the respondent does not show up, the

7  court will be able to issue a warrant for arrest.  So when

8  the respondent is outstationed and not in Singapore at that

9  time, any time the respondent reaches the Singapore

10  immigration, he can be arrested at the airport or the

11  embarkation point.

12      So that is how we, in Singapore, deal with it.  And it is

13  not unusual for people to be arrested at the airport and

14  brought to court for the protection order to be heard.

15  Q    Ms. Kee, I understand that you're talking about a scenario

16  in which an arrest warrant is issued and executed upon.  I'm

17  asking about a scenario where an arrest warrant is issued and

18  not executed upon.  The protective order will be dismissed,

19  correct?

20  A    No, it isn't.  Because it cannot be dismissed, because the

21  application is still there.

22  Q    Now, your report --

23  A    And -- go ahead.

24  Q    There's no question pending.  Thank you.

25      You testified that there was changes to the protective

1   order definitions or rules.  I believe your testimony was

2   that those were effective on January 15th of this year.  Was

3   that your testimony?

4   A   16th of January.

5   Q   16, one-six?

6   A   Yes.

7   Q   Okay.  But your report states that that's effective

8   January 2, 2025.  That's on paragraph 7 in your report --

9   excuse me -- 47 in your report.  So which is it, 2 or 16?

10  A   It's 16.  The gazette just came out last month.  At that

11  time there was talk that it should be in January.  So 2nd is

12  a mistake.  It was in January, but it wasn't the 2nd.  So the

13  16th.  I confirmed the 16th of January.

14  Q   So you issued your report on December 9th of 2024,

15  correct?

16  A   Correct.

17  Q   Are you saying that the date set for the effectiveness of

18  the new rules had not been set as of December 9th of 2024?

19  A   It's not been set.  And let me add why I said it was 2nd

20  of January because I'm in the working committee of the rules

21  committee of the Family Justice Rules.  So as part of rules

22  review, we were discussing to see whether it would be

23  implemented by January the 2nd.

24  Q   But that's not at all what your report says.  You didn't

25  say that this is a working date and we're trying to figure

1    out the date.  You said that it will be from January 2nd,

2    2025, forward?

3    A   Yes.  I confirmed it is not the 2nd of January and that

4    that was a date we were targeting to see whether we could

5    have made it on the 2nd.  But that was my mistake.  So that's

6    why, in the earlier part of the report, I said sometime in

7    January.  I forgot to remove the 2nd on that paragraph.

8    Q   But you came up with this January 2nd date indicating that

9    that was the date that the implementation would occur.  But,

10   in fact, that was -- as of December 9th of 2024, that was not

11   a date certain for the implementation to occur, correct?

12          THE COURT:  Counsel, your point has been made on that

13   issue.  Let's move on.

14          MS. SKINNER:  Thank you, Your Honor.

15   Q   At this time -- this is a new law, correct, having been

16   implemented as of last week, correct?

17   A   Yes, that's right.

18   Q   And so there's no case law describing how the court will

19   apply this new expanded definition, correct?

20   A   That's correct.

21   Q   Now, you indicate in your report that the protective order

22   would be granted if family violence has been found to have

23   been committed, correct?

24   A   Correct.

25   Q   Within what timeframe must the violence have been

1   committed?

2   A   I don't believe that any specific timeframe.  But, of

3   course, if there is going to be a long delay, then the

4   question is whether it was necessary or will be necessary to

5   issue such protection order.

6       So generally the report will be based on an event, and

7   sometimes the harassment continues, even if the person is not

8   in Singapore.  And in addition to that, may I add that we

9   also have another legislation --

10  Q   No, Ms. Kee.  I haven't asked about that.  Ms. Kee, I'm

11  going to stop you there.  I'm not asking about other

12  legislation.  I'm talking about the protective order.  And my

13  question was in what timeframe, must that be committed?  And

14  you answered, there is no specific timeframe, correct?

15  A   Yes.  That's right.

16  Q   Okay.  What is the petitioning party's burden of proof to

17  prove that abuse or family violence has happened?

18  A   So the burden of proof is to show that violence happened

19  as defined by charter, by the charter, meaning the women's

20  charter, which is the governing legislation in Singapore.

21  And the court will then be able to decide, first, whether

22  such violence did happen.  The second thing the court would

23  decide is whether it was necessary to issue the protection

24  order for the protection of the person.

25  Q   So my question is about a burden of proof.  What does the

1   petitioning party have to show, to what degree of certainty,

2   that family violence occurred?

3   A   It's a question of fact that such violence has occurred.

4   So typically if there is physical violence, usually medical

5   reports, sometimes even communications.  Any evidence that's

6   relevant, the court will consider.  Like documentary

7   evidence, medical reports, psychiatry reports, anything that

8   is relevant to prove that the violence has occurred.

9   Q   You testified that part of kind of the umbrella of the

10  protection order is that the court can exclude the party from

11  a home, correct?

12  A   Correct.

13  Q   But the parties have to have been living together at that

14  time in order for the court to make that order, right?

15  A   Correct.  It could be the matrimonial home, yeah.

16  Q   Yeah.  Thank you.

17        You talk about, in your report a POHA, Protection from

18  Harassment Act.  In that case the court can order the victim

19  of harassment to engage in counseling or mediation with the

20  perpetrator, correct?

21  A   I'm sorry, can you refer me to the section where I said

22  that?

23  Q   Do you not recall or do you not have testimony without

24  being able to review your report?  Is that your statement?

25  A   You said that the court can order the parties to go for

1    counseling?

2    Q    Under the Protection from Harassment Act, the court can

3    order the victim of harassment to engage in counseling or

4    mediation with the perpetrator, correct?  Do you have an

5    answer without being able to review your report, Ms. Kee?  Or

6    do you need to read it in order to answer my question?

7    A    I need to review it.  Because I believe the counseling is

8    usually done for the respondent and not so much the victim.

9    Q    Okay.  Then I'll refer you to paragraph 58, Ms. Kee.

10   A    Did you say 58?

11   Q    Yes, 58.

12   A    Yes, I see that.

13   Q    Do you need me to repeat my question?

14   A    Yes, I see that.  Yes.  Yes, the court can refer the

15   person or the victim to attend a counseling obligation.

16   Q    Okay.

17          MS. SKINNER:  I have no further questions for this

18   witness.

19          THE COURT:  Redirect.

20          MR. MIN:  No redirect.

21          THE COURT:  Any objection to this witness being

22   excused by petitioner?

23          MR. MIN:  No, Your Honor.

24          THE COURT:  Counsel?  By the respondent?

25          MS. SKINNER:  Excuse me, Your Honor.

```
 1            THE COURT:  The court previously ordered that her

 2    reports are supposed to be provided to counsel for the

 3    defendant.  And I'll ask the witness, approximately how much

 4    time do you believe it will take to transmit the reports?

 5            MR. MIN:  We have two documents transmitted by her

 6    office already.  One is on the topic of relocation.  So I

 7    think a one-page summary article, in a bigger article,

 8    country by country.  And she wrote the section on Singapore.

 9    We have that.  And then we have an article on prenuptial

10    agreements.  And I'm happy to send that on.  And we're

11    waiting for one more.

12            THE COURT:  To whom will you provide that, counsel?

13            MR. MIN:  We just received it and I think we're

14    compiling it.

15            THE COURT:  I'm trying to speed up having a copy

16    made, unless you have a copy machine back in the conference

17    room, which I doubt, counsel.  Can you transmit that document

18    to our in-court deputy?

19            MR. MIN:  Of course.

20            THE COURT:  Let's do that.  And as soon as that's

21    done, we'll provide that to counsel for the respondent.  That

22    will speed up the process for review and minimize the time

23    this witness has to be available.

24        So Ms. Kee, you're not free.  You haven't satisfied your

25    obligation to this court.  Upon receipt and review of your
```

 1 | reports by counsel for the respondent, you may be subject to

 2 | recall to continue your examination.  Do you understand?

 3 |            THE WITNESS:  Yes, I do.

 4 |            THE COURT:  Counsel for the petitioner, I trust that

 5 | you'll be able to communicate with the witness when she'll be

 6 | required to report back for continued testimony.

 7 |            MR. MIN:  Of course, Your Honor.

 8 |            THE COURT:  Okay.  All right.  Then we'll stop with

 9 | this witness.  You can terminate your call now.

10 |      Your next witness, counsel for the petitioner?

11 |            MR. MIN:  We will be calling the petitioner, on short

12 | rebuttal.

13 |            THE COURT:  Okay.  Please step forward.

14 |            MR. MIN:  He is Zoom, Your Honor.

15 |            THE COURT:  Yes.  He's not been excused, so he's

16 | still subject to being under oath.  We don't have to reissue

17 | the oath.

18 |                    PRASANNA SANKARANARAYANAN

19 |  Having previously been sworn, testified further as follows:

20 |                      DIRECT EXAMINATION

21 | BY MR. MIN:

22 | Q   Hello.  I'm going to ask you a few brief questions.

23 |      Did you ever ask your wife to have sex with other men?

24 | A   No.

25 | Q   Has she ever raised that to you as a concern, prior to

```
 1   recent events?

 2   A    No.

 3   Q    Meaning -- "recent events" meaning this litigation.

 4   A    No.

 5   Q    Have you ever had anal sex with your wife?

 6   A    No.

 7   Q    Have you ever forced your wife to have sex with you?

 8   A    No.

 9   Q    Did your wife ever raise the issue of anal sex to you,

10   prior to a hearing in this litigation?

11   A    Absolutely not.

12   Q    Did you ever put your hands on your wife's neck or

13   shoulders during an argument?

14   A    No.

15   Q    Did she ever raise that issue with you prior to this

16   litigation?  I'm sorry, did you answer?

17   A    No, she did not.

18   Q    Did you ever shake your son violently?

19   A    No.

20   Q    Did you ever shake your son because your wife refused to

21   have sex with you?

22   A    Absolutely not.

23   Q    Did you ever hit your son on the back?

24   A    Yes.

25   Q    Did you ever punch your wife in the chest?
```

1    A    No.

2    Q    Have you ever left any bruises or marks on your son, after

3    corporal punishment?

4    A    No.

5    Q    Did you ever kick your wife while she was sleeping because

6    she refused to have sex with you?

7    A    No.

8    Q    Did you file taxes in the United States in 2023?

9    A    No.

10   Q    How about 2024?

11   A    No.

12   Q    Did you ever threaten your wife by saying that you would

13   destroy her?

14   A    No.

15   Q    Did you ever threaten your wife by telling her you would

16   leave the family on the streets?

17   A    No.

18   Q    Did you ever threaten to revoke your wife's Dependent

19   Pass?

20   A    No.

21   Q    Did you ever threaten to distribute pornographic videos or

22   materials of her?

23   A    Absolutely not.

24        MR. MIN:  No further questions, Your Honor.

25        THE COURT:  Cross examination.

 1            MS. SKINNER:  Thank you, Your Honor.

 2                          CROSS EXAMINATION

 3    BY MS. SKINNER:

 4    Q   You testified just now that you never shook your child

 5    violently.  Have you ever shook him?

 6    A   Have I shaken -- I have shaken my child to put him to

 7    sleep.

 8            THE COURT:  Can you repeat your answer, sir?

 9    A   I have shaken my child to put him to sleep.  I put him to

10    sleep every day as a baby.  I fed him.  And I sung to him.

11    Yes, I shook him.

12    Q   You testified that you never left bruises or marks on your

13    son, right?

14    A   Yes.

15    Q   So after each occasion that you pinched your son, did you

16    inspect his body for the -- to discover whether there was a

17    mark on him?

18    A   No, because it was never that strong.  I knew it; I didn't

19    need to check it.

20    Q   But my question is not what you knew or whether -- how

21    strong it was.  My question is whether you checked his body

22    after the times that you pinched him.

23    A   I already answered your question.

24    Q   Is the answer "no"?

25    A   Yes.  No, I did not.  And I told you why.

1  Q   I didn't ask why; I just asked whether you did or not.

2         So now you testified that you did not threaten to

3  distribute pornographic images of your wife, right?

4  A   Correct.

5  Q   But you did distribute video and audio recordings of your

6  wife to your brother, correct?

7         MR. MIN:  Objection, outside the scope of direct.

8         THE COURT:  It's overruled.

9  A   Yes.

10  Q   It's a yes or no.

11  A   I did not distribute it.  Like, distribute means I give

12  it.  No, I did not distribute it.

13  Q   So you're taking issue with the word "distribute."  Okay.

14  Did you give, transfer or provide to your brother audio and

15  video contained from hidden camera devices that contained

16  your wife?

17         MR. MIN:  Objection.  This was asked and answered on

18  cross examination.

19         THE COURT:  I understand.  The door was opened,

20  counsel, on direct examination of your client.

21         MR. MIN:  I meant to say cross examination when he

22  was initially called.

23         THE COURT:  It's still opened sufficiently for

24  counsel to probe at this time.

25         Please continue.  Reask the question.

 1   A   I don't believe that there were any images of my wife

 2   given to him.

 3   Q   So your testimony is that you did not provide any video

 4   images of your wife to your brother from the hidden cameras?

 5   A   Yes.

 6   Q   And what about video of your son?

 7   A   I do not believe I did that.  No.

 8   Q   You testified that you did not force sex on your wife; is

 9   that right?

10   A   Absolutely.

11   Q   Okay.  So didn't you tell her, though, that "Babes, any

12   issue you have in life, you always seem to attack or refuse

13   sex"?

14   A   I don't know the context of what you're stating.  Out of

15   context, I don't know whether I said that to her or not.

16   Q   You don't know whether you said that to her?

17   A   Yeah.  I don't know if I said that to her.

18   Q   And do you know whether you said, "That's really not cool

19   with me"?

20   A   I don't know.  If you just want to --

21           THE COURT:  Could you repeat your answer, sir?

22   A   I do not know that I said what she's saying.

23   Q   Didn't you say to her, "It's a need that I have, and I

24   think I have a right to have that need met"?

25   A   Same answer.

1   Q   You don't recall saying that, or you're saying I'm taking

2   it out of context?

3   A   It could be either.

4   Q   But do you recall saying that?

5   A   I do not recall saying that, and I do not recall the

6   context in which you are quoting these things.

7   Q   So did you say to her that refusing the act also shakes

8   the foundation of the relationship?

9   A   If you want to show it to me.

10  Q   Okay.  I'm showing you now Exhibit 327, Page 25, a

11  communication made by Pras on December -- February 23, 2023.

12  A   Yes, I see the highlighted portion.

13  Q   Okay.  So didn't you say to your wife, "Babes, any issue

14  you have in life, you seem to always attack or refuse sex."

15  Didn't you say that to her?

16  A   Yes.

17  Q   Then you said to her, "That's really not cool with me."

18  You said that, right?

19  A   Yes.

20  Q   And you said, "It's a need that I have, and I think I have

21  a right to have that need met."  You said that to her, right?

22  A   Yes.

23  Q   "And refusing that also shakes the foundation of the

24  relationship."  You said that to her, right?

25  A   Yes.

1    Q   By refusing "that," you're talking about her refusal to

2    have your need met of sex, right?

3    A   Yes.

4    Q   Didn't you ask your wife, "What are your real thoughts on

5    an open marriage and multiple sexual partners?"

6    A   Do you want to quote it to me?  Do you want to show it to

7    me?

8    Q   No, I'm not going to show it to you.  I'm asking you this.

9    Didn't you ask your wife, "What are your real thoughts on

10   open marriage and multiple sexual partners?"

11   A   I don't recall.

12        MS. SKINNER:  Your Honor, may we have a moment?

13   We're attempting to pull up some videos that would

14   contradict.

15        THE COURT:  We'll have a stretch break.  My in-court

16   deputy advised the court that one of the documents that was

17   transmitted was approximately 300 pages.  Is that the same

18   document?  Because the witness testified the report was a

19   matter of pages, and you represented ten or less.  So is that

20   the correct document that was sent?

21        MR. MIN:  Is this the child relocation one?  I think

22   that's what I had referenced that she had done one page on

23   Singapore.  That's in a broader article where they go country

24   by country about relocation laws in their country.  So my

25   representation was she had done the one page on Singapore.

1  So the article is all of the countries, not just her part of

2  it.  It's the entire publication in which she does the one

3  page.

4          THE COURT:  Can you have her resend just the pages

5  that are relevant to what she is the author of?  We're not

6  going to produce 300 pages.

7          MR. MIN:  Oh, sure.  I did it just for the

8  completeness so the court could see the whole publication

9  instead of just the excerpt that she did.

10     It's actually more like five pages.  But we'll extract

11  those five pages, or so.

12          THE COURT:  And resend that.

13          MR. MIN:  Yeah.

14          MS. SEIPEL:  Your Honor, would it be okay if I step

15  out to try to make this video play?  And I'm hoping to make a

16  one-minute call.

17          THE COURT:  Can your co-counsel continue with her

18  examination of the witness?

19          MS. SKINNER:  Your Honor, I believe that that really

20  concludes my questioning.  I would just appreciate the

21  ability to be able to locate this one piece of evidence and

22  present it to the witness.

23          THE COURT:  All right.  I'm going to stay on the

24  bench, counsel.  You're free to step outside.  And I'll stay

25  here with the expectation that you're going to come right

 1   back.

 2           MS. SKINNER:  Thank you, Your Honor.

 3                       (Recess.)

 4           THE COURT:  Ready now, counsel?

 5           MS. SKINNER:  We have evidence we want to show the

 6   witness on this computer.  We're just trying to work to be

 7   able to upload it to the one that's visible to everybody.  So

 8   I think we just need maybe another minute or two to work that

 9   out.

10           THE COURT:  Do we have the next witness ready?

11           MR. MIN:  There's no more witnesses for the

12   petitioner.

13           THE COURT:  Is there a witness from respondent?

14           MS. SEIPEL:  Yes, we would be calling Dr. Poppleton.

15           MR. MIN:  We'd be objecting to that.  Does the court

16   want to hear argument on that?

17           THE COURT:  Let's do one thing at a time.  Counsel,

18   how much more time do you need?  It's about quarter to 12.

19           MS. SEIPEL:  Maybe five or ten minutes.

20           THE COURT:  What's your argument on Dr. Poppleton?

21           MS. SEIPEL:  It is our burden of proof to prove grave

22   risk of harm and mature child exceptions to return.  When it

23   is our burden of proof, we get to put on a rebuttal case.

24   And so I am entitled to call Dr. Poppleton to rebut any of

25   the things on my burden of proof as to what Mr. Min's experts

1   testified to.

2           THE COURT:  Counsel, your objection?

3           MR. MIN:  Yes, Your Honor.  I mean, first -- on two

4   grounds.  Number one, rebuttal is for the purpose of

5   rebutting unforeseen testimony or circumstances.

6   Dr. Poppleton has had rebuttal reports by Dr. Favaro and Dr.

7   Day for quite some time now.  He's testified his opinion to

8   some of those reports in his direct testimony.  That was his

9   opportunity to rebut or to testify about their reports.

10          Second, FRCP 26, which counsel has repeatedly cited to,

11  requires advance disclosure of any opinions.  So if he's

12  trying to offer some sort of opinion or information now that

13  he has not given, or knowledge of, then that would be in

14  violation of FRCP 26.  He's not designated as a rebuttal

15  expert.  He had the opportunity to testify after reviewing

16  their rebuttal reports and disclosures.  And to the extent he

17  did so, he has testified to that.

18          If there's something unforeseen that counsel could point

19  to or some sort of testimony that they believe is true

20  rebuttal, then I'd like to hear an offer of proof on that.

21  But simply calling him because they want him to respond to

22  Dr. Favaro and Dr. Day's testimony, which was in line with

23  their report, we believe is insufficient.

24          THE COURT:  Counsel, can you give with pinpoint

25  accuracy exactly what Dr. Poppleton is going to testify

1   about, to your knowledge?

2           MS. SEIPEL:  He will be commenting on specific areas

3   that Dr. Day and Dr. Favaro testified to.

4           THE COURT:  And those specific areas, counsel?

5           MS. SEIPEL:  Dr. Favaro and Dr. Day critiqued

6   Dr. Poppleton, the scope of his evaluation, and also

7   commented on the scope of their own assessment in this case.

8   So he will be testifying regarding scope.  I have questions

9   for him regarding testing.  There was testimony about

10  Dr. Favaro administering a test on the child called the Child

11  Behavioral Checklist, but he did not score that checklist.

12  Dr. Poppleton has now scored that checklist, which says that

13  the child is depressed and anxious.  That is proper rebuttal

14  testimony on a matter that is, again, our burden of proof.

15          THE COURT:  Counsel, have you provided notice of this

16  brand-new opinion to counsel for the petitioner?

17          MS. SEIPEL:  Dr. Poppleton -- I did not provide any

18  notice, Your Honor, to answer that question.  But

19  Dr. Poppleton is not going to be offering an opinion.

20          THE COURT:  I thought you just said he was going to

21  testify to the results of another test that he administered.

22  Isn't that an opinion?

23          MS. SEIPEL:  Dr. Poppleton did not administer any

24  test.  He took the test that Dr. Favaro administered, and

25  it's a matter of calculation.  Dr. Favaro testified that he

 1  didn't calculate it.  Dr. Poppleton did the calculation of

 2  the test that Dr. Favaro did.

 3          THE COURT:  Isn't that rendering a new opinion?

 4          MS. SEIPEL:  No, Your Honor.  I don't believe

 5  Dr. Poppleton saying, "This is what the test is," that's

 6  testifying about results of something.  That's not

 7  Dr. Poppleton saying, "It's my opinion the kid is depressed."

 8  That's Dr. Poppleton saying, "This test, administered by

 9  father's expert in the case, shows that the child is

10  depressed."

11          THE COURT:  All right.  Anything further, counsel?

12          MR. MIN:  I mean, Your Honor, I think that's clearly

13  an opinion.  And, again, this is clearly everything he could

14  have testified in his direct.  The circumstances of rebuttal

15  testimony are clear.  My client has testified on his case.

16  He also testified on the grave risk that we could have

17  reasonably anticipated.  Dr. Poppleton was in that same

18  situation.  If he did not take that opportunity to --

19          THE COURT:  Counsel, slow down.

20          MR. MIN:  If he did not take that opportunity beyond

21  his direct, then that's whatever decision they made on that.

22  And, again, what Your Honor, I think, has alluded to, clearly

23  they're trying to offer him to render a new opinion that we

24  have been provided no notice of.  And our experts would have

25  an opportunity to, what, then rebut that, and we would keep

 1  going on in circles forever.

 2        THE COURT:  The court is going to allow limited

 3  latitude and permit a degree of testimony, counsel.  If I

 4  think it's going far afield, I'll entertain an objection

 5  regarding the scope of your examination.  I don't believe the

 6  fact that a witness has testified, that they have to exhaust

 7  all of their testimony and preclude it thereafter from

 8  providing additional testimony just because they've already

 9  alluded to it in the prior testimony.

10     So with that, are you ready now, counsel?

11        MS. SKINNER:  Yes, Your Honor.  The evidence is on my

12  client's computer.  She has asked the court staff for

13  permission to enter into the Zoom.  So once the court has

14  admitted her, she'll be able to share that on her screen.

15  And I'd like to continue my cross examination.

16     Your Honor, I'm ready to resume.  Thank you for your

17  patience.

18        THE COURT:  Please proceed.

19  Q  Who is in this video screen?

20  A  I think it's my wife.

21  Q  And what recording is this?

22  A  This is from the camera in the house.

23  Q  The hidden camera that you placed in the house?

24  A  Yes.

25  Q  What location in the house is this?

1    A    It is in the computer charging plug.

2    Q    In what room?

3    A    The bedroom.

4         THE COURT:  Which exhibit number, counsel?

5         MS. SKINNER:  Your Honor, this is not an exhibit.

6    This is for impeachment purposes at this point.  Thank you,

7    Your Honor.

8         THE COURT:  All right.

9    Q    And so you did capture and save video recordings of your

10   wife, correct?

11   A    Yes.

12   Q    And you provided those video recordings to your brother,

13   correct?

14   A    No.

15   Q    You testified earlier that you provided recordings in

16   order to transcribe them to use as evidence against her, did

17   you not?

18   A    Yes.

19         MS. SKINNER:  I have no further questions for this

20   witness.

21         MR. MIN:  I do have probably like five- to

22   eight-minutes of rebuttal.  Should I start now?

23         THE COURT:  Let's do it now, counsel.

24

25

```
 1                        REDIRECT EXAMINATION
 2    BY MR. MIN:
 3    Q    You testified on cross that you would shake your child
 4    while you were putting him to sleep, and you made some
 5    physical gestures; is that correct?
 6    A    Yes.
 7    Q    Were you shaking him to punish him or in an aggressive
 8    manner, or what was the reason for shaking him while you were
 9    putting him to sleep?
10    A    Well, after I feed him milk, he needs to be burped and
11    then soothed to put him to sleep.
12    Q    Burped and then what was the word you used?
13    A    Soothed.  He needs to be calmed down.  Soothed.
14    Q    So when you used the word "shaking" in this context,
15    you're using the word shaking in a manner to soothe your
16    child?
17    A    Yes.
18    Q    Okay.  Would you describe the shaking to be violent or
19    aggressive?
20    A    No.
21              MS. SKINNER:  Objection, asked and answered.
22              THE COURT:  That's overruled.
23    Q    So other than this description of shaking your child while
24    putting him to sleep, did you otherwise shake your child?
25    A    No.
```

1    Q   I'm going to direct you to an exhibit counsel asked you

2    about, Exhibit 327, Page 25.  Was your and your wife's sexual

3    relationship a source of conversation during the course of

4    your marriage?

5    A   Yes.

6           MS. SKINNER:  Objection, asked and answered.

7           THE COURT:  It's overruled.

8    Q   What was your answer?

9    A   Yes.

10   Q   Did you express -- did you ever express to your wife that

11   you were unhappy with the nature of your sexual relationship?

12   A   Yes.

13   Q   Did you ever tell your wife that you wished you and your

14   wife had more sex?

15   A   Yes.

16   Q   Was having sex with your wife something that you believed

17   was important to your relationship?

18          MS. SKINNER:  Objection, relevance.

19          THE COURT:  Sustained, counsel.

20          MR. MIN:  Well, Your Honor, I think it goes to the

21   context and purpose of this message, which was asked on

22   cross.

23          THE COURT:  I'll allow limited latitude.  You were

24   objecting to the same thing of Dr. Poppleton coming back in

25   rebuttal testimony.  It seems like it is the same category;

1  he could have testified and has testified about the exact

2  same thing previously.

3          MR. MIN:  Well, I would agree with that except for

4  the fact that the door was opened on cross, and I'm simply

5  trying to address these pointed questions that were asked on

6  cross examination.

7          THE COURT:  I'll allow limited latitude.  Repeat your

8  last question.

9          MR. MIN:  If I could just ask the court reporter to

10  read back the last question that I asked.

11      (The last question was read by the court reporter.)

12  Q   Was having sex with your wife something that you believed

13  was important to your relationship?

14  A   Yes.

15  Q   Did you -- again, looking at this message, what did you

16  mean that "Refusing that also shakes the foundations of our

17  relationship"?

18  A   Because there were problems with the marriage, and we were

19  trying to fix it.  We were trying to work on it, fix it.  And

20  I was in this case saying that the relationship is -- you

21  know, you're not working on fixing this.

22  Q   Did you ever decide, beyond complaining to your wife or

23  addressing the lack of sexual intimacy in your relationship

24  to your wife, ever force her to have sex against her will?

25  A   No.

 1          MR. MIN:  No further questions, Your Honor.

 2          THE COURT:  Further cross?

 3          MS. SKINNER:  No, Your Honor.

 4          THE COURT:  All right.  When we return back at 1:30,

 5     Dr. Poppleton will be testifying.  And he's the last witness

 6     to testify from the respondent's perspective, correct?

 7          MS. SEIPEL:  Yes.

 8          THE COURT:  I take it there are no additional

 9     witnesses or testimony on behalf of the petitioner, correct?

10          MR. MIN:  I can't commit to that because I don't know

11     what Dr. Poppleton is going to say.  I've heard some offer of

12     proof to the extent he's going to score a test that was done

13     by Dr. Favaro.  I may want to recall Dr. Favaro or Dr. Day.

14          THE COURT:  Then the only other witness I expect is

15     the Dr. Kee regarding the reports.  Have all the reports that

16     she cross-referenced or has authored in the time period

17     requested been produced now to counsel for the respondent?

18          MR. MIN:  No, Your Honor.  We're waiting on one more.

19          THE COURT:  Counsel, you agree that you have two?

20          MS. SKINNER:  We'll rely on the representation.  I

21     haven't had an opportunity to check.

22          THE COURT:  Has co-counsel checked?

23          MS. SEIPEL:  I haven't checked.  I'm pulling up my

24     e-mail right now.

25          THE COURT:  Let's make sure it happens.  I'm not

1    going to sit here and wait because I have another meeting to

2    go to.  All right.  Thank you.

3        We'll be in recess until 1:30.

4                        (Recess.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    AFTERNOON SESSION

2          THE COURT:  Good afternoon.  Please be seated.

3      First of all, I just want to inquire, has counsel for the

4  respondent had the opportunity to review the reports that

5  were prepared by Dr. Kee?

6          MS. SKINNER:  We had a brief opportunity to review

7  three publications that were forwarded to us over the lunch

8  break.  I didn't have so much of an opportunity to be able to

9  compare my notes and the testimony of the witness to any

10 portions of the publications where they might have

11 contradicted one another, which is what I had hoped to do.

12     But at this point we just will renew our motion to have

13 the witness stricken, because of failure to comply at the

14 outset with the rule regarding disclosure.

15         THE COURT:  Well, in the brief opportunity you did

16 have to review, did you see any glaring inconsistencies or

17 basis for impeachment that would justify having the witness

18 return to the witness stand for purposes of cross

19 examination?

20         MS. SKINNER:  None glaring that I can bring to the

21 court's attention.

22         THE COURT:  Taking away the glaring description, did

23 you see anything that would justify a basis for an

24 impeachment cross examination?

25         MS. SKINNER:  If my memory serves, I believe the

1  witness testified about the ability for parties to seek an

2  order in Singapore to relocate in a custody case, and that

3  was touched on in one of the articles that I could go into

4  some questioning on.

5           THE COURT:  All right.  Then we'll have the witness

6  return back to the witness stand and conclude that

7  examination.

8           MS. SKINNER:  Thank you, Your Honor.

9           THE COURT:  All right.

10     All right.  Counsel, you completed your examination of

11  your client and cross examination as well.

12           MR. MIN:  Yes, Your Honor.

13           THE COURT:  The question is, is Dr. Poppleton going

14  to get back on the witness stand?

15           MR. MIN:  We reserved our right to recall either

16  Dr. Favaro or Dr. Day, but until we hear Dr. Poppleton, we

17  won't know.

18           MS. SEIPEL:  I will call Dr. Poppleton to the stand.

19           THE COURT:  You're still under oath, sir.

20                      LANDON POPPLETON

21   Having previously been sworn, testified further as follows:

22                      DIRECT EXAMINATION

23  BY MS. SEIPEL:

24  Q   Dr. Poppleton, there were -- there was a lot of testimony

25  over the last couple of days about the scope of your work in

1  this case and whether or not you conducted a best interests

2  evaluation.  What is your understanding was the scope of your

3  work?

4          MR. MIN:  Objection, improper rebuttal.

5          THE COURT:  That's sustained, counsel.  It's

6  sustained because I heard that testimony.

7  Q   Father's expert yesterday mentioned an instrument called

8  an "HCR."  What is that?

9  A   It's a tool that guides you through an evaluation process

10  where you can look at empirically based risk factors for

11  violence risks.

12  Q   It looks for violence risks?  Would that be part of a

13  domestic violence risk assessment on father?

14  A   It could be.

15  Q   Did you hear Mr. Day's testimony yesterday that she

16  believed you should have done this?

17  A   I believe that's what I heard her saying.

18  Q   Was that an option for you?

19  A   No.  I couldn't do the evaluation that they're claiming,

20  and it wasn't an option for me to do that.  I would have to

21  get consent through counsel to do something like that.

22  Q   Dr. Day yesterday went through four components of what she

23  called a risk assessment of a child.  Do you recall hearing

24  that?

25  A   I do.

1  Q   Do you recall what she says that included?

2  A   I believe it included things like -- I should probably get

3  closer to the microphone for you -- attachment, cognitive

4  level.  I think it had things related to resiliency and a

5  child's emotional regulation, if I remember right.  That's

6  what those were.  I might be off on one of those.

7  Q   Do you agree with that?

8  A   No, I don't agree with that at all.

9  Q   Why not?

10  A   Um, I think the follow-up questions about where something

11  else would fit into that was very appropriate.  And that is

12  that the issue is related to grave risk as it pertains to

13  domestic violence.  And so domestic violence, those might

14  relate to maybe the sensitivity of a child, but without the

15  actual capacity question of a parent related to the issue

16  before the court, it's incomplete.  And that would be an

17  essential piece of that in a case like this.

18  Q   Dr. Day referenced, in her testimony, what she refers to

19  as a "standard of care."

20  A   Sure.

21  Q   And she referenced the APA forensic guidelines.  Do you

22  recall that testimony?

23  A   I do, yeah.

24  Q   Do you also recall her talking about AFCC parenting plan

25  evaluation guidelines?

 1    A    Yeah, I do recall that.

 2    Q    Are you familiar with both of these guidelines?

 3    A    Yeah.  I'm reasonably familiar with both.

 4    Q    Are these guidelines applicable to your work in this

 5    matter?

 6    A    So the AFCC guidelines are not applicable to the work in

 7    this matter.  I think there was an attempt to try to pull

 8    pieces from that to make it so.  But it's very clear in their

 9    kind of opening statements that they're not intended for

10    other purposes outside of that.  Those are for the

11    development of parenting plans.  There's things in Dr. Day's

12    report around parent/child observations and procedures

13    related to evaluations that I think could have a place in a

14    case like this.  But I testified very clearly before that,

15    that if I was to -- if I was examining the mom and the child,

16    I'd be soliciting information as to what they had to offer

17    and then providing information to the court.  And I've been

18    very clearly -- through this whole thing, I have not done an

19    evaluation that would result in findings or an opinion,

20    despite the attempt of Dr. Day to try to paint that as if

21    that is what I was doing.

22    Q    Does Dr. Day opining that you violated inapplicable

23    guidelines put her in violation of these guidelines?

24    A    It would, under those guidelines.

25    Q    How so?

1   A   Well, she needs to take care to be careful to -- and I'll

2   use her terms -- to look at the four corners of my evaluation

3   for what I actually was doing and not paint a picture of

4   something different than that to prop that up for criticism.

5   And I think if that was what I was doing, I was doing a full

6   evaluation that would lend itself to findings and opinions,

7   and that might be appropriate.

8       But this critique that she provided would be more

9   appropriate for maybe a critique of the work that Dr. Favaro

10  did or offered up as to what he did, not what I did.

11      I was very clear in my opening paragraph and very

12  consistent through this that I was providing information to

13  the court only on things that might be helpful, and it was

14  not an evaluation.

15  Q   Did you hear Dr. Favaro's testimony yesterday regarding

16  the Child Behavior Checklist?

17  A   I did.

18  Q   And is it your understanding that Dr. Favaro had father

19  answer and complete that checklist?

20  A   That is my understanding from reading his description of

21  that and listening to his testimony.

22  Q   Do you recall Dr. Favaro's testimony that he did not score

23  the Child Behavior Checklist?

24  A   I did.  And I recall testimony about how -- that somehow

25  his testing made it more appropriate work product.  But it

1   actually has probably more problems as a result of him not

2   scoring it as a result of that.

3   Q   Have you had an opportunity to review the checklist that

4   was contained in Dr. Favaro's file?

5   A   I have, yes.

6   Q   Did you have an opportunity to score it?

7   A   Yeah, I scored it.

8   Q   What does that process involve?

9   A   There's software that's produced by the company that

10  produces this test that we use to score that.  And it's

11  basically taking and plugging in the information on the

12  checklist into that to see how those things line up with the

13  norms that are owned by the testing company.

14  Q   What did you discover in scoring this?

15          MR. MIN:  Objection, outside the scope of rebuttal.

16  Your Honor.  I'd also ask for a quick voir dire.

17          THE COURT:  You may.

18          MR. MIN:  Thank you.

19                    VOIR DIRE EXAMINATION

20  BY MR. MIN:

21  Q   Dr. Poppleton, when did you first review the Child

22  Behavior Checklist?

23  A   I believe it came in part of -- through discovery.  And I

24  couldn't tell you an exact date on when I first reviewed it.

25  But it probably would have been around the first of this

1    calendar year.

2    Q    So before you testified in this case?

3    A    Certainly before I testified, yes.

4    Q    So you would agree that you had an opportunity to score

5    the test before your testimony on January 8th, yes or no?

6    A    Yeah, absolutely.  Yeah.

7    Q    Did you score it before January 8th?

8    A    I scored it, I believe -- well, I can answer your question

9    a lot easier than the way I'm thinking about it.  But, yeah,

10   I had this scored before I testified on January 8th, if

11   that's what the point of your question is.

12   Q    In general, the Child Behavior Checklist is supposed to be

13   filled out by both parents, correct?

14   A    Well, it depends on how you're using it and what question

15   you're attempting to answer.  But if we're going back to talk

16   about maybe a full family evaluation under a best-interest

17   framework, maybe something that would be akin to those AFCC

18   guidelines that have been talked about for parenting plan

19   evaluations, yes, it would be scored by both parents.

20        But this test is not designed specifically to be scored by

21   both parents.  It's used in a lot of different capacities.

22   Q    Well, you use both parents to cross-check the information

23   that's being provided to you, correct?  Is that one of the

24   reasons?

25   A    That's one way it could be used.  That's within the realm

1  of possibility, certainly.

2  Q   And there's also a teacher checklist that goes along with

3  this Child Behavior Checklist?

4  A   There is a teacher checklist.  There is also, I believe, a

5  self-report checklist at a certain age.

6  Q   For children?

7  A   I'd have to go look at the cutoffs, but I think, off my

8  memory, don't hold me to this, I believe it starts at 11.

9  Q   So at age 11 the child would do a self-report checklist,

10 the teacher does a checklist, and two parents do checklists?

11 A   It depends on the circumstances.  So that's a question

12 that I can only say, it depends.  I think in -- usually in

13 family studies, if you're doing a full best interests one,

14 which this is not typically, you would at least have both

15 parents do it.

16       MS. SEIPEL:  Your Honor, at this point I'm going to

17 object.  He can ask these questions on cross examination.

18       THE COURT:  I would agree, counsel.  We've gone

19 beyond the voir dire purpose.

20       MR. MIN:  Well, I think the issue is whether or not

21 this witness is qualified to answer the question that was

22 posed before him about the Child Behavior Checklist, and if

23 it's inappropriate or insufficient for him to answer that

24 question based upon what process he employed to get to that

25 result, then I believe that's proper voir dire.

1     I mean, Your Honor, I think, also, I would renew my

2     argument from before.  This witness just testified that he

3     was able, and he did score this test before his testimony on

4     direct on January 8th.  He was aware of it.  It was mentioned

5     in Dr. Favaro's report.  This is not proper rebuttal, then.

6     This was foreseen.  This was foreknown.  This was not

7     something that came out on Dr. Favaro's testimony yesterday,

8     and that's what he's rebutting to.

9          So Dr. Poppleton had ample opportunity to provide this

10    information on direct.  This is not proper rebuttal, Your

11    Honor.

12         MS. SEIPEL:  It is proper rebuttal because at the

13    time of Dr. Poppleton's testimony yesterday, we had asked

14    this court countless times to exclude Dr. Favaro.  That

15    decision had not been made as to whether or not he was going

16    to testify.  His report had not been admitted into evidence

17    at that time.  So it was not proper for us, when

18    Dr. Poppleton got on the stand yesterday, to go and ask him

19    about a checklist that was not in evidence.  The witness who

20    administered that checklist had not testified.  And a report

21    from an expert referencing that checklist had not been

22    admitted into evidence.  It is absolutely within the realm of

23    proper rebuttal.

24         MR. MIN:  Your Honor, the checklist is still not in

25    evidence, so I'm not sure what counsel's argument is with

 1  respect to the checklist being in evidence or not being in

 2  evidence.  Your Honor, that checklist is not part of the

 3  evidentiary record.

 4         THE COURT:  Well, there's testimony about it,

 5  counsel, in detail.  And it's before the court.  So the

 6  objection is overruled.

 7      Please continue.

 8         MS. SEIPEL:  Thank you, Your Honor.

 9              DIRECT EXAMINATION (Cont.)

10  BY MS. SEIPEL:

11  Q   Dr. Poppleton, what did you discover?

12  A   I discovered something different than what Dr. Favaro

13  talked about in his report.  And that is that this kid --

14  according to the responses that are reported to be by father,

15  puts this child at a significant level for anxious/depressed

16  and withdrawn/depressed.  And that would be considered in the

17  clinical range.

18      Now, before I get this on rebuttal of this rebuttal, that

19  is one data point that needs to be considered.  And in the

20  context of a -- usually a larger evaluation that is done,

21  like an evaluation that Dr. Favaro was maybe attempting to do

22  in this particular case.

23      So with that said, it really just results in a finding of

24  improper use of this test.

25  Q   Did you hear Dr. Favaro testify yesterday that a child who

1   is depressed would be more vulnerable to a risk of harm?

2   A   I did hear him say that.

3   Q   Do you agree?

4   A   I think I testified to that on my first -- what word do I

5   want to use?  The first time I was examined here, I'll leave

6   it at that.  I think I said the same thing, generally

7   speaking.  Specifically, I can't say.  But generally

8   speaking.

9   Q   Did you hear Dr. Favaro's testimony yesterday regarding

10   protective gatekeeping?

11   A   I did, yeah.

12   Q   And what is your position on this?

13   A   So the gatekeeping construct has many facets to it.  It's

14   not a simple, like, yes-or-no question in all cases.  And

15   there's usually a formulation that goes behind it.  I differ,

16   I believe, from him, if I understood his testimony

17   correctly -- but there were times I had trouble following it

18   -- and that is that if you have a mother who's engaged in

19   some level of that -- and I don't know that I even have seen

20   things in his report or anywhere else that would suggest that

21   it's extreme, as extreme as he says it is.  But if you have

22   any of that going on, the first thing you need to start

23   looking at -- and I think this is true in any case -- is

24   whether or not there is a history of domestic violence.

25   Because typically the attitude that's behind that is one of

1    protection against some form of harm.  And it can result in a

2    parent who looks controlling, might be restricting access in

3    some ways, might be having communications that sometimes we

4    consider inappropriate with the child.  And that can be the

5    manifestation of the impacts of domestic violence.

6         And so I don't believe, from my view of his testimony,

7    that he took that seriously enough as a potential working

8    hypothesis in his evaluation, is what he calls it, to be able

9    to rule that out in favor of maybe this being a gatekeeping

10   issue that results in some form of influence on the child.

11        Because you could take that one step further and say,

12   well, if you want to get to the question of influence and who

13   is exerting undue influence, if it's the result of domestic

14   violence, then you have the original causal component being

15   the domestic violence, which is having its influence through

16   the impact that it has on the alleged gatekeeping parent.

17        And so it's a different hypothesis that would need to be

18   entertained and examined very carefully so that it can be

19   appropriately evaluated.

20        And so it also has a lot to do with the distribution of

21   responsibility for the undue influence that's being claimed

22   that is existing in this case.

23   Q   Did you hear Dr. Favaro's testimony yesterday regarding

24   Dr. Favaro telling the child that his dad loves him very

25   much?

1    A    I heard that.  I listened to that questioning and the

2    answers.

3    Q    How might this communication strike the child?

4              MR. MIN:  Objection.  Calls for speculation.

5              THE COURT:  Sustained.

6    Q    Could this communication influence how later interview

7    questions were answered by the child?

8              MR. MIN:  Objection.

9              THE COURT:  Sustained.  Same.

10   Q    What are the implications of that communication?

11             MR. MIN:  Objection.

12             THE COURT:  Same ruling, counsel.

13   Q    Did you hear Dr. Favaro testify yesterday that the child

14   is a typical eight-year-old in a concrete operational stage

15   of development?

16   A    I did hear that, yeah.

17   Q    Did you hear the same or similar testimony from Dr. Day?

18   A    Yeah, I heard some -- her talk around that issue as well.

19   It sounded like that, yeah.

20   Q    Has there been any research done about what percentage of

21   people move beyond the stage of concrete operational in terms

22   of their cognitive development?

23             MR. MIN:  Objection.  Outside the scope of rebuttal,

24   Your Honor.  Again, if he was called to testify about mature

25   age, he had the opportunity to do so.

 1              THE COURT:  Overruled.  You may answer the question.
 2    A    Yeah.  I think this is fairly well known, but 50 percent.
 3    So what you should consider is that when you get a concrete
 4    operational stage child, that's somebody who can engage in
 5    genuine problem solving, they can take perspectives of
 6    others, they can understand that other people have different
 7    perspectives than they do and might see things from a
 8    different perspective than they do as well.
 9         When you move beyond that, you start getting into this
10    what they call formal operational stage, which has a lot to
11    do with abstract thinking, you know, the development of
12    abstract thinking, hypothetical thinking.  Often people at
13    that stage can engage in kind of jury-like deliberations.
14    And so that's usually from about age 11 on, what we're
15    talking about.  But, yeah, it's about 50 percent of people
16    will move from that concrete operational stage up into a
17    formal operational stage in their life.  And that was
18    referenced by Garber in his development -- I think it was
19    development -- it was a developmental psychology book for the
20    family law professionals.  But he originally took that from
21    Arland's [phonetic] publication in developmental psychology
22    where that reference is fairly well understood and
23    established.
24    Q    Can a child be considered mature despite not being in a
25    stage of development beyond concrete operational?

1          MR. MIN:  Objection, Your Honor.  Outside the scope

2    of rebuttal.  The witness is now being asked to give opinions

3    about issues that there was no notice provided.

4          THE COURT:  Counsel, he's going into more of an

5    opinion form of testimony than anything else, so I'll sustain

6    the objection.

7          MS. SEIPEL:  Understood.  I'll move on.  Thank you,

8    Your Honor.

9    Q   So I just have a couple more questions for you, Dr.

10   Poppleton.

11         In addition to Drs. Favaro and Day, did you also have

12   the opportunity to listen to Ms. Kee's testimony today?

13   A   Yeah, I did.

14   Q   So she testified about a number of protective measures

15   that Singapore courts might afford the mother and child in

16   this case.

17         How does domestic violence come into play in the

18   analysis of what, if any, protective measures might help

19   mitigate risk?

20         MR. MIN:  Objection.  Outside the scope.

21         THE COURT:  That's sustained, counsel.

22         MS. SEIPEL:  Your Honor, if I may be heard.

23     My question to Dr. Poppleton is regarding protective

24   measures and mitigation of risk.  And none of this -- that

25   topic was not brought into this trial until Ms. Kee

 1   testified.  And so it is within the scope.  It is proper

 2   rebuttal to rebut her testimony that these protections are

 3   available, when Dr. Poppleton is likely to testify that while

 4   they are available, when domestic violence is involved, they

 5   are not adequate.

 6        MR. MIN:  Your Honor, that statement completely

 7   ignores the record.  Because Dr. Poppleton, on my cross

 8   examination I asked him many questions about mitigating risk,

 9   supervised visitation, therapeutic visitation, orders of

10   protection.  We went through all of that.  They could have

11   asked that on redirect, Your Honor.  Those questions were

12   asked and answered by many witnesses, including

13   Dr. Poppleton.

14        THE COURT:  Limited latitude, counsel.

15        MS. SEIPEL:  Thank you.

16   Q   So Dr. Poppleton, I'm going to restate the question.

17   A   Please, because I don't even remember the question.

18   Q   Ms. Kee testified about a number of protective measures

19   that Singapore courts might afford mother and the child in

20   this case.  How does domestic violence come into play in the

21   analysis of what, if any, protective measures might help

22   mitigate risk?

23   A   Again, you know, you need to get the findings of domestic

24   violence, which I can't provide.  But most of the protective

25   measures that the courts can employ are predicated upon the

1    compliance of the parties themselves.

2        So one thing that's a feature of coercive control,

3    domestic violence, is that sometimes you don't get the

4    compliance that you want.  It can be a hallmark of

5    perpetrators, if that's what they have been found to be.  It

6    can also be a hallmark of victims as part of a profile of a

7    victim.  Sometimes victims are going outside of these orders

8    and structure that have been established in order to manage a

9    situation, or believing they can manage it, or appealing to

10   maybe the better spirit of their co-parent, and foolishly

11   doing that, you know.  And that happens quite a bit for a lot

12   of us who are working in this area.

13       That's been delineated in some of the professional

14   publications as well.  And that's not an unknown thing.  So

15   you do worry about -- you can put all the orders and

16   structure you want, but it depends on the compliance.

17       We also know domestic violence is notoriously unreported,

18   as just another -- something that we know about it.  And so

19   that can also happen as well.

20   Q   Thank you.

21           MS. SEIPEL:  I have nothing further.

22           THE COURT:  Cross.

23           MR. MIN:  Thank you, Your Honor.

24

25

1                        CROSS EXAMINATION

2     BY MR. MIN:

3     Q   You're not diagnosing this child with anxiety or

4     depression, are you?

5     A   Oh, certainly not, counselor.

6     Q   I just want to be clear.

7     A   Yeah, absolutely.  You know my testimony.

8     Q   You're aware -- you listened to testimony of Dr. Favaro

9     where the mother declined to complete a Child Behavior

10    Checklist, correct?

11    A   I do believe I recall that, yes.

12    Q   You didn't ask the mother to complete one, did you?

13    A   No, I did not.

14    Q   And you talked about the fact that with an HRC, I believe

15    -- is that the proper acronym?

16    A   Yes, that's correct.  HCR, I'm sorry.  It's easy to mix

17    up.

18    Q   My fault.

19    A   No.  I share with you.

20    Q   It would have needed the consent of the father, correct?

21    A   Yeah.  I think if you're going to subject anybody to an

22    examination or an evaluation where you're going to have

23    findings and conclusions about them and an opinion, you would

24    need to have consent.  And that certainly applied to your

25    client.

1    Q    You did not attempt to get his consent, did you?

2    A    No.  I don't believe that's my role to do that.

3    Q    Was it your understanding, after reading Dr. Favaro's

4    report or listening to his testimony, that he utilized the

5    Child Behavior Checklist in order to reach some sort of

6    diagnosis of the child?

7    A    I don't know that he was doing a diagnostic evaluation,

8    from what I can tell.  I think he was trying to answer or get

9    to answers that might allow him to provide an opinion on

10   issues of the court.

11   Q    It would be possible to use a Child Behavior Checklist

12   simply to get some background information from one parent,

13   correct?

14   A    We might be -- I might be hung up on the background

15   information thing.  But I'm just going to say "yes," yeah.

16   Q    But once the mother declined to produce or respond to the

17   Child Behavior Checklist, Dr. Favaro would not have been in a

18   position to do a full evaluation with respect to the child

19   because he wouldn't have had two parents checklists, he

20   wouldn't have had the teacher's checklist, and obviously

21   might -- the child might be too young, but wouldn't have any

22   self-report checklist from the child?

23   A    Yeah, I agree with you there, counsel.

24   Q    You're aware the Child Behavior Checklist is from the

25   early 2000s, approximately 2001?

 1   A   I looked at the reference at the bottom.  And I can look

 2   at it very quickly, but I believe that is correct.

 3   Q   And it has not been updated since, correct?

 4   A   I can't recall.  I'd have to go look.

 5   Q   You said you scored it with a computer.  You didn't hand

 6   score it?

 7   A   No.  I used the software from the company.

 8   Q   Software which was updated when?

 9   A   I don't know.

10   Q   So you don't know if the software was updated from 2001 or

11   updated in 2024?

12   A   It's the one they currently offer.  But I can't tell you.

13   I don't write that software.  I don't know exactly when that

14   was last updated by the publishing company.

15   Q   When is -- when did you obtain this software, initially?

16   A   We've had this for a while now in the office.  We have, I

17   think -- I'd have to go back and look how it is, but I

18   believe it works off of buying credits.  I'd have to check

19   with my office.  And so we've had this for a while.

20   Q   Is it your testimony, then, that that software

21   automatically updates?

22   A   I have no idea.  You'd have to get the software developer

23   up here.

24   Q   You don't know when the last time it was updated?

25           MS. SEIPEL:  Objection, asked and answered.

1           THE COURT:  It has been, counsel.

2    Q    You have no idea when the norms were established for the

3    scoring of that test?

4    A    No, I have no idea.

5    Q    So norms could have been, according to your testimony, the

6    norms could have been established in 2001, not in 2024?

7    A    Or earlier.

8    Q    Or earlier?

9    A    Of earlier, yeah.  You're asking me something I don't

10   know.

11   Q    Right.  Norms are important when you score a test or score

12   an instrument, correct?

13   A    Yeah.  They're going to aid in some hypothesis

14   development, interpretation about a child, certainly.

15   Q    Meaning that if the norms that your software used were

16   2001 or earlier, the results could be different than if the

17   norms were from 2024, 2025, correct?

18   A    Yeah.  So yeah, depending on when the norms are collected

19   and how they're sampled and the demographics of those, they

20   could certainly change over time.  But again, you'd have to

21   go to the software company to see.  I mean, we're not using

22   an old version, so...

23   Q    But you didn't check on that?

24   A    On the norms.  No, I don't know when those norms were last

25   updated.  I have no idea.

1  Q   There's criticism of the Child Behavior Checklist and its

2  use in the legal setting, correct?

3  A   I think there's criticism that could be brought about

4  every test.  And I don't think that the Child Behavior

5  Checklist is immune from that.

6  Q   Because it's not normed for legal settings; isn't that

7  right?

8          MS. SEIPEL:  Objection, speculation.

9          THE COURT:  Overruled.  You may answer the question.

10  A   Yeah, I don't know that they're -- my understanding of

11  that test -- that they're pulling samples of children that

12  are in a forensic context and using them in that situation to

13  norm the test.  That's not been my understanding of that

14  test.

15  Q   It's not normed for the Indian population, correct?

16  A   I don't believe so.  But I'd have to go back and look.

17  Q   Normed for the Singaporean population?

18  A   I don't know.

19  Q   The MMPI has scales, correct?

20          MS. SEIPEL:  Objection, outside the scope.

21          THE COURT:  It is outside the scope.

22          MR. MIN:  It will tie into the Child Behavior

23  Checklist, comparing scales and validity.  But I'll get to

24  the point.

25  Q   The Child Behavior Checklist does not have scales,

1   correct?

2   A   The Child Behavior Checklist has -- no, it has different

3   scales for different -- they call them "syndrome scales."

4   And there are other scales you can look at.  I can pull up

5   the protocol and tell you exactly what they are.  But they're

6   certainly scales for different things that it measures,

7   claims to measure, purports to measure.  Let's word it like

8   that, that it purports to measure.

9   Q   But the MMPI has scales that give information about

10  whether the parent or person completing the test is being

11  honest or faking good responses?

12  A   I see.

13           MS. SEIPEL:  Objection, outside the scope.

14           THE COURT:  Overruled.

15  A   Yes.

16  Q   The Child Behavior Checklist does not have those types of

17  scales?

18  A   It does not.

19  Q   No, they don't?

20  A   That's my answer.  No, they do not.

21  Q   You agree that the Child Behavior Checklist lacks

22  scientific validity or reliability?

23  A   That it lacks -- I think you need to look at the

24  psychometrics behind that, because if it purports -- if it

25  measures what it purports to measure, then that would be a

 1  measure of validity.  If it has reasonable internal

 2  consistency, it could produce a similar result across time,

 3  then that's how we define that as reliable.

 4  Q   So is it your testimony that it is scientifically

 5  reliable?

 6  A   Well, it's normed, it's published, it's commonly used

 7  among psychologists.  It's commonly used in pediatricians'

 8  offices.  It is commonly used in family evaluations.  I have

 9  never understood that it's lacking in those things.  But I

10  get your point, it's a messy -- it could be a very messy test

11  to use, which is part of my point with my issue with

12  Dr. Favaro.

13  Q   Did you go through the DSM-5-TR criteria?

14  A   For what purpose?

15  Q   For anxiety and depression?

16  A   I'm not diagnosing anybody with anxiety and depression.

17  Q   But you testified that the test or scoring results showed

18  significant levels of that?

19  A   Based on the test itself, that would indicate that that

20  would be something relevant that would need to be looked at.

21  Q   Okay.  But did you compare the test results or the scoring

22  results with the DSM-5-TR?

23  A   I'm not doing a diagnostic evaluation on this, counselor.

24  There is no way I would do that.

25  Q   Then how do you state that their levels -- I'll withdraw

1    the question.

2    A    Thank you.

3    Q    The Child Behavior Checklist is scored from a scale of

4    zero to what?

5    A    Well, we can -- I can open it back up and take a look at

6    it.

7    Q    Do you recall?  You don't have to do that.  Do you recall?

8    A    No.  It's put on T-scores.  So it's going to be

9    standardized scores where you'll have, it looks --

10   Q    I'm not asking you to look at anything, so I'd rather you

11   not look at anything.

12   A    Yeah, so you have standardized scores.

13   Q    Dr. Poppleton, I'm not asking to you look at anything.

14   I'm asking you to answer a question.  If you could please

15   focus on me, okay?

16         Without looking at any documents, are you aware of how

17   the scores or what the range is of results -- again, without

18   looking at the document, Dr. Poppleton, please -- are you

19   aware of what the scores are or the options that a parent can

20   complete on the Child Behavior Checklist?

21   A    So what I have in front of me is the scoring profile.  But

22   you -- I guess to your question, if we want to put it into

23   the box you're trying to put this in, you could have a zero

24   score on some of these scales.  But that's not how it works.

25   They're transferred, or there's a tabulation they use to put

 1  them in a standardized score.  So they're put into what they

 2  call T-scores.  So that would be a different form of scoring.

 3  Q   Okay.  Do you have the profile, the scoring profile?

 4  A   I have both of them here, yes.

 5          MR. MIN:  Your Honor, we'd ask for that to be

 6  produced since this is a late opinion or information that was

 7  not -- we were not given notice of beforehand.

 8          THE COURT:  Do you have that document in front of

 9  you, sir?

10          THE WITNESS:  I do.

11          THE COURT:  All right.  Do you wish to retrieve it,

12  counsel, for the examination?

13          MR. MIN:  Sure.  Your Honor, we ask it be produced at

14  some break.  Because as I stated earlier, we might want to

15  call Dr. Favaro or Dr. Day as rebuttal, but we would need to

16  see the scoring profile before we make that decision.  No

17  further questions.

18          THE COURT:  Counsel, anything further?

19          MS. SEIPEL:  I have nothing further, Your Honor.

20          THE COURT:  Is there a need to call Dr. Kee back?

21          MS. SEIPEL:  No, Your Honor.

22          THE COURT:  Counsel, let's look at the scoring

23  counsel has and make a determination if you wish to call

24  anybody else.

25          MR. MIN:  Sure.

 1       Could I ask counsel if they have that electronically, so I

 2   can e-mail that, since they are not here in person?

 3           MS. SEIPEL:  I don't have that.

 4           THE WITNESS:  I have it in paper form and I will give

 5   you my copy.

 6           MR. MIN:  I appreciate that.  Your Honor, may I

 7   approach?

 8           THE COURT:  Yes.

 9           THE WITNESS:  There you go, counselor.  You can keep

10   it.

11           MR. MIN:  Can we take a short recess so I can take

12   photos of this and send it to Dr. Day and Dr. Favaro?

13           THE COURT:  I just want to give the parties an

14   understanding.  We're going to finish this case today.  The

15   court is going to give you limited opportunity for closing

16   remarks today.  The court would like to give you its oral

17   opinion today before you leave.  And so the more time you

18   take offering testimony this court has already heard or

19   repetitive testimony, that's not really of value or helpful

20   to the court.

21       The court has heard from all these doctors already once

22   around.  Now we're going the second time around.  Some of it

23   is true rebuttal; some of it is not.  But nonetheless, I want

24   to give the parties a clear understanding what the

25   expectations of this court will be.

1          MR. MIN:  Thank you, Your Honor.  We're not going to

2     recall Dr. Day or Favaro.  We would prefer to go to oral

3     summation?

4          THE COURT:  Do you still need to take a break or

5     recess?

6          MR. MIN:  Can I ask you -- yes, Your Honor, the

7     answer is yes.  How much time will we have for oral

8     summation.

9          THE COURT:  I would say no more than 30 minutes.

10         MR. MIN:  Perfect.  We would ask a short time for

11    rebuttal.

12         THE COURT:  Rebuttal or a break?

13         MR. MIN:  No, no, no, with our opening statement, if

14    Your Honor permits, we would like to take 25 minutes on our

15    closing statements and save five minutes for rebuttal.

16         THE COURT:  That's fine with the court.

17         MR. MIN:  I would like a short break.

18         THE COURT:  We'll take a short break.

19       Counsel, with that, just so we're clear, petitioner has

20    rested, respondent has rested, correct?

21         MS. SEIPEL:  Yes, Your Honor.

22         MR. MIN:  Yes, Your Honor.

23         THE COURT:  All right.  Five minutes, counsel.

24                     (Recess.)

25         THE COURT:  I know there's a time limit.  Please be

1   mindful we have a court reporter here.

2        MR. MIN:  Thank you, Your Honor.

3      May it please the court.  We've heard five days of

4   testimony.  The story here has been made clear.  On

5   October 14, 2024, this child, A.S., was taken from his only

6   home by his mother in a transparent attempt to gain a

7   financial advantage and forum shop in the state of

8   Washington.

9      The parties moved to Singapore in 2022, after years of

10  planning, for financial reasons, and to be closer to family

11  in India.  Even assuming respondent's arguments here that

12  they planned to move to India for a temporary period of time,

13  as she testified, a year, maybe two, which the record does

14  not support, that plan clearly changed by the fall of 2024.

15  And any purported temporary stay that respondent alleges, at

16  minimum, turned into an indefinite relocation.

17     The parents here took all normal steps to establish a new

18  home in a new country, sufficient to change this child's

19  habitual residence from the United States to Singapore.  This

20  child's habitual residence.

21     In the summer of 2024, the parties experienced marital

22  difficulties after respondent admittedly had an emotional

23  affair with one of her friends.  They began weighing their

24  options in the summer, while they were in India on vacation.

25  They agreed jointly, after the summer of 2024, to return and

1    live in Singapore.  That was their agreement, as testified to

2    by respondent in these proceedings.  They had already

3    re-signed or signed a new three-year lease to be closer to

4    the child's new school in Singapore, a school that no longer

5    followed the American curriculum.

6        In the fall of 2024, after learning that the financial

7    circumstances would be better for respondent in the United

8    States, she decided to leave and seek relief in the state of

9    Washington.  Respondent here disputes that Singapore is the

10   child's habitual residence on the grounds that, one, they

11   always intended to move there temporarily, and they never

12   wanted to live and raise their child in Singapore

13   indefinitely.

14       However, they looked at schools that would go through high

15   school.  They talked about their concerns about the child

16   having to do service after graduating high school, all

17   indicating that their discussions were about staying in

18   Singapore long term.

19       However, even if the parties did not intend to permanently

20   live in Singapore or stay in Singapore long term, it does not

21   mean that the child's habitual residence was not Singapore.

22   Key here is the case of *Koch v. Koch,* 450 F3d 703, out of the

23   Seventh Circuit.  "Although residing habitually in a place

24   means that a person has, some in sense, settled there, it

25   need not mean that's where you plan to leave your bones."

1      In the *Koch* case, the Seventh Circuit was quoting *Moses*, a

2  Ninth Circuit case.  The family, as stated in the case of

3  *Silverman*, must merely have a, quote, "Sufficient degree of

4  continuity to be properly described as settled."  End quote.

5      The Hague Convention was adopted in 1980 for situations

6  like this.  It was adopted to address the problem of

7  international child abductions during domestic disputes,

8  cited by *Golan v. Saada*, 596 U.S. 666, U.S. Supreme Court in

9  2022.  The problem of international child abductions during

10 domestic disputes.  That is exactly what was going on in the

11 fall of 2024.  The parties were engaged in a domestic

12 dispute.  And the mother unilaterally took the child from

13 Singapore, from his home, to Washington.

14     The Ninth Circuit has stated in *Cuellar v. Joyce*, 596 F3d

15 505, that "The Hague Convention seeks to deter parents from

16 abducting their children across national borders by limiting

17 the main incentive for international abduction, the forum

18 shopping of custody disputes."

19     The mother here did exactly that.  She is seeking relief

20 in the state of Washington because of her abduction of the

21 child from Singapore.

22     The Seventh Circuit found in *Garcia v. Pinelo*, 808 F3d

23 1158, "One of the Convention's two central objectives is

24 deterring the abductor from depriving his actions of any

25 practical or juridical consequences."  Here respondent is

1    seeking to maintain these actions in Washington as a result

2    of her abduction.

3        The defense's -- three are raised by the respondent --

4    grave risk of harm, mature age exception, and the Article 20

5    human rights exception, should be construed narrowly.

6        The case from the Seventh Circuit of *Martinez v. Cahue*,

7    826 F3d 983, states, "Applying a defense would undermine the

8    deterrent effect of the Convention's system.  A court should

9    hesitate to take that step."

10        The Convention's core premise is that the interests of

11    children, matters relating to their custody, are best served

12    when custody decisions are made in the child's country of

13    habitual residence.  Custody should be determined by

14    Singapore.  They are in the position to address requests for

15    relocation, address best interests analysis, to undergo the

16    full type of evaluation that Dr. Poppleton, Dr. Favaro, Dr.

17    Day spoke about, that would address what is in this child's

18    best interests.  That is not something this court is equipped

19    to do.  And it's not something, as Dr. Poppleton admitted, he

20    was equipped to do, given the time constraints and

21    limitations of that process.

22        The Singaporean courts are ready, willing and able to

23    address the custody disputes at hand.  And that is where this

24    case should be resolved.  The mother has the opportunity and

25    had the opportunity to seek the resolution that she wanted,

1    to live in the United States, before the Singaporean courts.

2    She filed several proceedings before the Singaporean courts

3    before voluntarily withdrawing those related to orders of

4    protection and maintenance.

5        However, the custody application by the mother and the

6    cross-application for custody by the father are still pending

7    in Singapore.

8        This court is well aware this is not a custody case.  Even

9    though one of respondent's defenses is the grave risk of

10   harm, courts have routinely said, "It's not intended to be

11   used by defendants as a vehicle to litigate or relitigate the

12   child's best interests."  This court cannot try to determine,

13   quote, "Whether the child is happy where it currently is, but

14   whether one parent is seeking unilaterally to alter the

15   status quo with regard to the primary locus of the child's

16   life."  End quote.  This is from *Maxwell*, Fourth Circuit.

17   Also quoting *Moses* from the Ninth Circuit.

18       Did this mother unilaterally try to alter the child's

19   status quo?  She most certainly did.  She did not seek the

20   father's consent, did not inform the father until, as she

21   alleges, hours before she traveled to the United States; a

22   fact which is contested.

23       And the locus of the child's life.  Where was that on

24   October 14, 2024?  It certainly wasn't Seattle where they

25   moved all of their personal belongings, or sold them, or gave

1    them away, where they had no home, where the mother returned

2    to sleep in a friend's room for a week before securing her

3    own apartment.  That is not where the child's life was, which

4    is this court's focus.

5        Perhaps the parties had some leftover bank accounts.

6    Perhaps the parents had some friends.  But the question is

7    where was this child's life?  And that was unequivocally in

8    Singapore.

9        While living in the United States, prior to summer of

10   2022, the child went to kindergarten for a year and went to

11   pre-K for a couple of months after schools reopened, after

12   the COVID pandemic.  The first nine or so months the child

13   was living in Seattle, the child was restricted socially and

14   academically because of the COVID restrictions.  The child

15   did not develop the type of friendships that he returned to

16   in 2024.  He did not have sleepovers with his friends that he

17   did in Singapore.  He did not engage in the type of

18   activities or the level of activities that he did in

19   Singapore while he was living in Washington.

20       Respondent may try to argue that this child has no

21   habitual residence, something that courts have routinely

22   disfavored as an outcome because, as the Supreme Court has

23   noted, it leaves some children unprotected by the parameters

24   of the statute.  That is certainly not an outcome that should

25   be considered by this court.

 1          The primary issue in this case is habitual residence.  The

 2     case of *Monasky v. Taglieri*, from the Supreme Court in 2020,

 3     addressed the issue of habitual residence.  "A child's

 4     habitual residence depends on the totality of the

 5     circumstances specific to the case," says the *Monasky* court.

 6     They articulated several principles for determining habitual

 7     residence.  "A place where the child is at home at the time

 8     of removal or retention ranks as the child's habitual

 9     residence."  A child, quote, "Resides where she lives."  End

10     quote.

11          Ultimately, the question the Supreme Court posed is,

12     quote, "Was the child at home in the particular country at

13     issue?"  End quote.  In this case, was Singapore the child's

14     home on October 14, 2022?  Respondent cannot reasonably argue

15     that this child's home was anywhere but Singapore.  His

16     school was in Singapore.  His belongings were in Singapore.

17     His friends were in Singapore.  He was close to family in

18     Singapore.  He spoke two of the four official languages in

19     Singapore.  His social life was in Singapore.  Religious

20     activities, studying the Hindu religion in Singapore.

21          The question before this court is, did this child's life

22     have a sufficient degree of continuity on October 14th?  Yes,

23     it did.  He was going to school.  In fact, mere days before

24     the child's abduction, the mother was signing the child up

25     for extracurricular activities in Singapore.

 1      The Supreme Court has stated a few factors the court

 2  should look at in addressing habitual residence.  A change in

 3  geography.  Check.  They moved to Singapore.  Passage of an

 4  appreciable period of time.  Check.  They lived there for

 5  over two years.  Age of the child.  Check.  Eight-year-old

 6  child, went to first, second and parts of third grade in

 7  Singapore.  Experts testified, very important developmental

 8  stage for a child, where you start branching out of your

 9  immediate family and you make social connections.

10      Immigration status of the parent and child.  They have

11  long-term visas in Singapore.  They have five-year visas that

12  expire in 2028.  Academic activities.  Check.  The child was

13  engaged in numerous academic and social activities.  Social

14  engagements.  He went to birthday parties.  He had his

15  birthday parties in Singapore.  He had friends.  He had

16  sleepovers.

17      Participation in sports programs and excursions.  They

18  traveled around.  And they always returned to Singapore

19  because that's where their home was.  Language proficiency.

20  Child was fluent in English.  Testimony of petitioner, spoke

21  Tamil and was also learning Chinese, the third of the four

22  major languages, or official languages of Singapore.  And the

23  last one, location of personal belongings.  That's where all

24  of his personal belongings were, in Singapore.

25      We can cite to some of the exhibits.  I'm not going to

 1    waste the court's time citing to the exhibits about the

 2    personal property, but we put in several exhibits that talked

 3    about the shipment and the transfer of personal property,

 4    including respondent's participation.  This is key here.

 5    Respondent participated in every meaningful step of the way

 6    in moving to Singapore.  Looking at housing.  Talking about

 7    getting rid of their personal belongings.  Enrollment in

 8    activities.  Enrollment at school.  Going to the virtual

 9    meetings for the school.  Discussing moving to a new place to

10    be closer to the school.

11        The respondent was not -- just willingly acceded.  In

12    fact, the testimony was clear from both sides.  They looked

13    at three countries.  Switzerland, Dubai or the UAE, and

14    Singapore.  And the mother's preference was Singapore.  That

15    is where they moved.

16        Respondent testifies that the move was temporary.  We'll

17    address that.  She says it was a year.  That was the

18    intention.  When they moved there they, got a Tech.Pass that

19    was good for approximately two years.  That, in 2023, was

20    moved to a ONE Pass.  So about a year after they were there,

21    they applied for a longer-term immigration status.  When they

22    moved there, they didn't sign a one-year lease, they didn't

23    sign a six-month lease they signed a two-year lease for an

24    apartment.

25        Then the mother says, "Well, maybe we were going to be

1   there for two years."  Well, after two years, they signed

2   another lease.  They switched schools.  They continued to be

3   on the ONE Pass.  Respondent's testimony about the temporary

4   nature of this move lacks credibility and is not supported by

5   the record in this case.

6       Some of the activities the child participated in on a

7   weekly basis included chess lessons, swimming lessons, piano

8   lessons, drum lessons, basketball, math, coding, religious

9   education, including, as I mentioned before, Chinese-language

10  classes.

11      *Monasky* talked about a lot of the factors.  One of the big

12  factors is intent.  The parties' shared intent.  And

13  specifically their last shared intent.  This was developed

14  under the *Moses* line of cases.  It was not abrogated by the

15  Supreme Court in *Monasky*.  It was simply one factor among

16  many that the court should look at.

17      But when looking at the intentions of the parties in this

18  case, it's not just what they said; it's what they did.  And

19  the case law is clear about that.  *Moses* says that "A settled

20  intention to abandon a prior habitual residence need not be

21  expressly declared if it is manifest from one's actions.

22  Indeed, one's actions may belie any declaration that no

23  abandonment was intended."

24      We went through a lot of the actions of these parties.

25  The move.  The school.  We don't need to repeat that.  And I

1    go back to the intentions.  Summer of 2024, respondent's

2    testimony here is key and crucial.  They were in India.  They

3    were having domestic disputes.  She felt pressure from --

4    including her family, to move to India.  She says she wanted

5    to move to the United States.

6        Her and petitioner could not agree what they were going to

7    do after the separation, until they agreed to go back to

8    Singapore.  And she specifically testified to that.  "We

9    agreed to go back to Singapore until we could figure out what

10   to do next."  The question was then asked, "You never agreed

11   what to do next.  You never came to a different agreement

12   after that."  And she agreed with that statement.  The last

13   agreement they made was to live in Singapore, was to continue

14   their life in Singapore.

15       This was not a quick decision.  Petitioner relinquished

16   his U.S. green card, several months, a year before they

17   moved.  They transferred assets.  They talked about various

18   opportunities and options that were before them.  They looked

19   at schools for several months.  They engaged in the entire

20   process of deciding between various countries.  They had

21   already moved once at this point, partly for financial

22   reasons, from California to Washington.  And they moved from

23   the United States to another country because of financial

24   reasons, among others.

25       Even if, for argument sake, they had left the door open to

1    returning to the United States sometime in the future, the

2    family's home was clearly Singapore.  Again, the *Moses* case

3    is important.  "Even if the petitioning parent had earlier

4    consented to let the child stay abroad for some period of

5    ambiguous duration, sometimes the circumstances surrounding

6    the child's stay are such that, despite the lack of perfect

7    consensus, the court finds the parents to have a shared

8    mutual intent to let the stay last indefinitely."

9        What was their agreement to return to the United States?

10   We've heard no testimony about this.  When were they supposed

11   to come back?  Did they have round trip tickets?  Did they

12   have any tickets?  Did they discuss where they would come

13   back to?  Did they look at housing options in the U.S. for

14   when they came back?  Schooling options.  There's no

15   testimony about any concrete plan or discussion about

16   returning back to the United States because of one simple

17   fact, there was no discussion or consensus or agreement about

18   returning to the United States at any point in time.

19       Petitioner gave up his green card.  After he did that, he

20   obtained an O-1 visa, which then expired in 2023.  His

21   immigration status lapsed.  In Singapore, he started a

22   business.  That business eventually was reconstituted in the

23   Cayman Islands.  But that business then turned into

24   respondent's business, a venture capital business that she is

25   the CEO of and she uses to invest in other companies.  That

1    business is situated in Singapore.

2        She's also CEO of another company situated in India.  Her

3    family business.  She's not employed in the United States.

4    She has no ties to employment in the United States at all.

5    In fact, she testified that she is still unemployed here in

6    the United States.

7        The filings in the fall of 2024 are critical here, so I'm

8    going to go through the timeline a little bit, starting in

9    August 2024.

10        THE COURT:  Just so you know, counsel, you're at

11    22 minutes almost now.

12        MR. MIN:  I've used 22 minutes?

13        THE COURT:  Yes.

14        MR. MIN:  Thank you, Your Honor.

15        They returned to Singapore.  And August 31st they had a

16    domestic dispute that resulted in police reports being filed.

17    Shortly thereafter, my client, petitioner, left Singapore to

18    go to India on a preplanned business trip that he pushed up

19    one day.  When there, he discovered his father was in the

20    hospital, and he spent time with his father and his family.

21    He then filed for divorce in India.  Respondent then filed

22    for divorce in Washington a couple days later.  She then

23    filed various actions in Washington and Singapore addressing

24    maintenance, protective orders, and custody.

25        Now, the respondent will certainly argue that petitioner

1    filed for divorce in India and filed request for custody and

2    made certain representations.  We've talked about the *Baz v.*

3    *Patterson* case before.  I'm going to repeat that case here.

4    In that case the parties had agreed in writing, and to a

5    court, that the habitual residence was the United States.

6    The court, the federal court, disagreed.  It doesn't matter

7    what parents represent a habitual residence to be.  That is a

8    legal conclusion.  That is a factual determination made by

9    the court about the child's habitual residence.  Parents can

10   say whatever they want to say for whatever purpose they want

11   to say it.  It does not make it true.  And the *Baz v.*

12   *Patterson* case was clear about that.

13        Now, respondent also cites to a couple cases in their

14   pretrial brief about habitual residence.  The *White v. White*

15   case is distinguishable on these grounds.  In that case the

16   parties moved to Argentina for two years.  That's what the

17   court found.  They maintained ties in the United States,

18   employment, a leave of absence, family, property.

19        Here there was no such agreement.  There is no time

20   demarcation here in this case.  They moved there

21   indefinitely, not temporarily, indicating some sort of

22   limited time duration.  Respondent could never testify and

23   did not testify about when the return was supposed to happen.

24   This case is more like the *Schram v. Zarak* case out of the

25   New York Southern District.  There, during COVID, the parties

1   moved to Iceland for an indefinite period of time.  The

2   mother, the respondent there, testified, after taking the

3   children back to New York, "We were only there temporarily,

4   and we were always going to come back to the United States."

5   And the court found that may be the case.  But you did not

6   have a timeframe for when you were going to come back.  And

7   when you moved there, even if you hoped or expected one day

8   to return, that does not mean that habitual residence does

9   not shift.

10       Similarly, in this case, irrespective of respondent's

11   hopes and dreams and expectations, the agreement of the

12   parties was to continue living in Singapore with no ending.

13       I'm going to turn quickly to the affirmative defenses.

14           THE COURT:  You're at 25 minutes now, counsel.

15           MR. MIN:  I'll reserve my time and use the

16   affirmative defenses on rebuttal.

17           THE COURT:  All right.  Thank you.

18           MS. SEIPEL:  Forum shopping.  The Hague Convention on

19   international child abduction was designed to prevent parents

20   in the middle of domestic disputes from taking their children

21   across country borders to gain a more favorable custody

22   forum.  That's why we're here.  We're not here to determine

23   where mother believes or was advised she would be entitled to

24   retain more of the marital assets.  But that's what father

25   has made this case about and why he filed this case, to

 1  protect what he cares about, in his own words, "his" billions

 2  of dollars.

 3      Now, there are three main determinations that the court

 4  has though make in this matter today.  First, whether the

 5  child was habitually resident in Singapore.  Second, whether

 6  the child would be subject to a grave risk of exposure to

 7  physical or psychological harm if returned to Singapore.  And

 8  third, whether the child is mature and whether he objects to

 9  being returned to Singapore.  And I want to talk about each

10  of those in that order.

11      So first, whether the child was habitually resident in

12  Singapore.  *Monasky v. Tagliari* states that, "A child's

13  residence is habitual only when the residence is more than

14  transitory."  When analyzing a child's habitual residence or

15  lack thereof, courts must be sensitive to unique

16  circumstances of the case and informed by common sense.

17      Among other factors to consider, some relevant ones

18  include the place the child considers home, the length of

19  time the child has resided in the location claimed to be the

20  habitual residence, and the intentions of the child's

21  caregivers surrounding the family's residence.  Those factors

22  come from *Rodriguez v. Molina*, 608 F. Supp 3d 791.

23      *Monasky* also clarified that the child's immigration status

24  and language proficiency in the claimed habitual residence

25  are also relevant factors to consider.

1      Now, notably, the Convention does not require a district

2   court to determine where a child habitually resides.

3   Instead, the Convention requires that the district court

4   determine whether the child habitually resides in the

5   location that petitioner claims he does.

6      So in this case, father must convince the court that it is

7   more likely than not that the child's presence in Singapore

8   was more than temporary.

9      So let's consider the facts that father believes proves

10   his case.  The child had a home there.  His home in Singapore

11   was in an American community.  The child went to school in

12   Singapore.  He went to an American school.  And both parties

13   testified that the child experienced bullying in school, such

14   that he struggled to acclimatize and had just switched

15   schools prior to coming to the United States.

16      The child had friends and playdates there.  He had the

17   same in Washington.  This fact doesn't count one way or the

18   other.  The child received medical care in Singapore.  But he

19   did not have a regular pediatrician, and he did not have

20   health insurance there.  And the parties sold their

21   belongings.  They are billionaires.  They can do whatever

22   they want with their belongings.  Again, this doesn't cut one

23   way or the other.

24      Now, the facts that indicate that Singapore was a

25   temporary place for the family to live and a place the child

1  was not fully acclimatized to, mother credibly testified that

2  she wanted and believed the move to Singapore to be temporary

3  and that father assured her that it would be temporary.

4      To that end, mother did not quit her job upon leaving.

5  She took a sabbatical.  She maintained connections with

6  friends and colleagues.  She maintained an address in

7  Washington, as evidenced in her 2023 tax returns.  And the

8  parties continued to file United States taxes.  The parties

9  maintained United States bank accounts.  To this day father

10  holds assets in trusts in the United States.  Mother and the

11  child are United States citizens.  Father continues to have

12  lawful permanent status in the United States.  Both parties

13  maintain United States driver's licenses.  Mother continues

14  to vote in the United States.  The parties maintained health

15  insurance in the United States.  The parties were working

16  with a United States surrogacy agency to have a baby in the

17  United States.

18      The court should consider the parties and the child's lack

19  of ties to Singapore in this analysis as well.  The child

20  speaks English.  And he may have had some Tamil words to his

21  father's father.  But nothing more than that and he is

22  certainly not fluent.

23      There was no testimony in this trial about the child

24  attending Singaporean cultural events.  The family didn't

25  frequent restaurants or ever eat Singaporean food.  Mother

1    and the child are in Singapore on dependent status that could

2    be unilaterally revoked by father at any time.  Mother won't

3    have a dependent status upon divorce.  And father, despite

4    being eligible, never applied for permanent residency in

5    Singapore.

6        Mother does not work in Singapore.  She runs an investment

7    company that has no employees and invests only in United

8    States companies.  Father does not work in Singapore.  He

9    intentionally moved his business out of Singapore to India

10   and the Cayman Islands, quote, "A year or two ago."  Father's

11   address on his newly issued Indian passport is his Indian

12   address.  Father leases an apartment in India.  He recently

13   bought mother a car in India.  He holds a personal bank

14   account in India.

15       And the parties' travels throughout their time in

16   Singapore.  Just within the past six months, the parties

17   spent an entire three months away from Singapore, in India

18   and New Zealand.

19       And perhaps most importantly the court must consider

20   father's own sworn statements in his Indian custody filing.

21   In Exhibit 335, paragraph 10, father is quote, "Seeking

22   custody of minor son and relocation of the minor son back to

23   his home country, i.e., India."  Then in paragraph 14 father

24   writes, "I state that the respondent and I, despite our short

25   sojourn in the United States of America and Singapore, have

1  always intended to return and settle permanently in India.

2  At no point did we contemplate making a permanent life

3  outside of India.  This shared intent to return to India

4  forms a significant part of our family's identity."

5       Where father himself, prior to filing this Hague

6  Convention matter, claims that the country of India is where

7  his child's identity lies, he does not now get to change his

8  stance solely because it suits him better.

9       Exhibit 351 in this regard is telling.  Father consulted

10  with countless lawyers.  He included his brother in those

11  communications.  And he worked with his lawyers to figure out

12  a way to lie to mother and the courts about his true

13  residence and intentions.  Father, with his lawyers, plotted

14  for Singapore to be his quote, "home," despite it not being

15  so.

16       Using common sense, as *Monasky* dictates, the court must

17  determine where the child is at home.  To that end, the child

18  told Dr. Poppleton that he's American.  The United States is

19  his home.  Because it is his home.  To use petitioner's words

20  directly, "Singapore was a short sojourn for the family" and

21  nothing more than that.

22       In analyzing habitual residence in this matter, rather

23  than ask whether a settled purpose is present, the court

24  should instead ask whether a merely transitory, contingent or

25  other temporary purpose is apparent.

1        The parties in this matter clearly disagree about a whole

2    lot.  But the evidence shows that they do agree on one thing,

3    and that is that Singapore was for a temporary and limited

4    purpose.  And that is not habitual residence.

5        The second thing that the court must make a determination

6    on today is whether the child would be subject to a grave

7    risk of exposure to physical or psychological harm if he is

8    returned to Singapore.

9        Under Article 13(b) of the Hague Convention, "A court may

10   refuse to return a child to his habitual residence if it

11   determines that there is a grave risk that the child's return

12   would expose him to physical or psychological harm."

13       *Baran v. Beaty* clarifies that the Article 13(b) exception,

14   in holding that courts are not required to find that the

15   child had been previously physically or psychologically

16   harmed, it's required to find only that the child would be

17   exposed to such harm.

18       At the heart of this case is domestic violence.  And the

19   court today must make a determination whether or not there

20   was domestic violence in the home.  And if so, to what extent

21   domestic violence plays a role in the grave-risk analysis.

22       The record is ample with the specifics of domestic

23   violence that mother and the child have lived through over

24   the years.  But to comment on a few.  I want to start with

25   physical abuse.  Father violently kicking mother in the back

1   when she wouldn't have sex with him, such that she needed to

2   have an x-ray.  Father holding mother up by her neck, also

3   known as strangulation.  Father punching mother in the chest,

4   culminating in him fleeing to India to avoid police and

5   criminal repercussions, to only later come back and file his

6   own criminal complaint against mother.  Father hitting the

7   child.  Father shaking the child in rage.  Father pinching

8   the child or pretending to pinch the child or threatening to

9   pinch the child.

10       Father and Dr. Favaro played this off as permissible

11  discipline.  But is enticing pain in your child to gain

12  compliance with what you want, forcing your child to cower,

13  sob, run away from you in fear, discipline or abuse?

14       And father raping mother.  The term "rape" was not

15  directly used in testimony, but that is exactly what

16  happened.  Marital rape.  Exhibit 327, Page 47.  Father

17  admits, quote, "Pain forcing mother to have sex with him."

18  That's rape.

19       Financial control.  Father, throughout their marriage,

20  claims that the marital assets are his.  His money.  Father's

21  threats to leave mother and the child on the streets.  Father

22  threatening to cut mother and the child off from funds to

23  live.  Father not responding to mother's requests for payment

24  of bills upon fleeing to India after the August 31st

25  argument.  Father flagging mother's credit card transactions

 1    as fraud.  Father blocking mother from one of their joint

 2    credit cards.  Father paying lawyers, as evidenced and

 3    admitted to in father's WhatsApp chat with his lawyers, for

 4    the sole purpose of conflicting them out so mother would not

 5    have adequate representation in this case.

 6        Father paying mother $100,000 on the very morning of this

 7    trial, into her Singapore account, rather than a trust of his

 8    lawyer's, so the mother could have it in an account of her

 9    choosing.

10        Verbal abuse.  Father saying to mother, "Go and die,

11    bitch."  An e-mail that is an exhibit in evidence.  Father

12    saying, "You and your mother have opinions you're not

13    entitled to have."

14        And other evidence of father's control and abuse.  His

15    threats to gain compliance with his demands.  Mother

16    testified about father threatening to cancel her and the

17    child's visas, to end the marriage, shaming her and her

18    Indian culture.  To go get sex elsewhere if she would not

19    give it to him.

20        Controlling litigation.  The very first litigation filed

21    here was father's Indian filing.  And after that he refused

22    to show up in Singapore, until he was arrested for not

23    showing up.  Then he files this case and asks to appear

24    remotely for the sole purpose of evading service of the

25    Washington dissolution case.  The hidden cameras in the home.

1    Installed just two days after the family moved.  Father

2    admits that he paid someone to install illegal surveillance

3    of his wife to illegally observe her and monitor her.  And he

4    sent footage of this to his brother and his brother's

5    assistant.

6        Now, father claims the video footage in these cameras

7    didn't work, for some reason.  But does that make this

8    behavior any less threatening, any less concerning to the

9    person who is being illegally observed?

10       And last, father declaring to mother and the child that he

11   is God.  He is king.  He is a billionaire, and he can do

12   whatever he wants.  And he's done just that.  Used his

13   wealth, filed this case, and continued to perpetuate his

14   abuse throughout this litigation.

15       Now, with this overwhelming evidence, the courts must

16   evaluate whether returning the child to this type of

17   environment would expose the child to physical or

18   psychological harm.  Unless the court discredits mother's

19   entire testimony, believing she's making everything up,

20   there's simply no way of getting around the risk.

21       Over the course of almost the past two days, the court has

22   heard extensive expert testimony regarding domestic violence

23   and risk.  And the court has reports in hand on this issue.

24   But what is telling about every expert that testified in this

25   trial is one thing.  In reading from Page 15 of father's own

1  expert's report, "All of the professionals in this case agree

2  that domestic violence in the home constitutes grave risk."

3  Mother testified throughout this trial as to the impact that

4  the domestic violence has had on her, her emotional capacity,

5  her mental capacity, her physical health and her parenting

6  abilities.

7      Dr. Poppleton testified today about a potential that the

8  domestic violence has had on the child.  The Child Behavior

9  Checklist was administered by Dr. Favaro, father's own

10  expert, in the course of his work.  Now notably, the Child

11  Behavior Checklist was filled out or given information by

12  father, who has not seen the child since August 31st of 2024.

13  So that checklist was based on information about the child

14  prior to the child coming to the United States.

15     Dr. Favaro testified that he doesn't often rely on the CBC

16  because parents are often self-serving, not being fully

17  honest in their answers, to obtain better results for them.

18  Yet, even assuming father filled out this questionnaire in a

19  self-serving way, the child still came out on that

20  questionnaire to be depressed and anxious.

21     There is one reasonable conclusion here and one only, and

22  that is that the child is already being impacted by the

23  domestic violence his father has perpetuated in the family's

24  home.

25     Briefly, I want to touch on the topic of ameliorative

1 measures.  Ameliorative measures simply should not be

2 considered in this case.  The case of *Golan v. Saada*, notably

3 argued and lost by Mr. Min himself at the Supreme Court,

4 specifically states that courts have discretion to decline to

5 consider imposing ameliorative measures where it is clear

6 that they would not work.  The Supreme Court writes, quote,

7 "Physical or psychological abuse, serious negligent and

8 domestic violence in the home may also constitute an obvious

9 grave risk to the child's safety that could not readily be

10 ameliorated.  A court may decline to consider imposing

11 ameliorative measures where it reasonably expects that they

12 will not be followed."  End quote.  Reasonably expects that

13 they will not be followed.

14      So if this court is inclined to impose ameliorative

15 measures, can we reasonably expect that they will be

16 followed?  Will father follow ameliorative measures when he

17 has already proved that he'll do what he wants no matter who

18 is telling him to do something?

19      Father knew about the Singapore proceedings, but he didn't

20 show up.  He was arrested because he did not show up.  Again,

21 he asked to appear remotely in this trial to evade service of

22 the Washington State dissolution case.  And mother testified

23 credibly that father said to her, on countless occasions,

24 "I'm a billionaire.  I can do whatever I want."

25      In *Golan v. Saada* the Supreme Court also stated, "The

1    Convention does not pursue return exclusively or at all

2    costs.  Rather, the Convention is designed to protect the

3    interests of children and their parents.  And children's

4    interests may point against return in some circumstances.

5    Courts must remain conscious of this purpose."

6        To that end, all experts in this trial testified that

7    domestic abuse violates a fundamental human right.  All

8    persons have a human right and interest to be free from

9    violence and abuse.  Ameliorative measures are simply not

10   proper in this case, and I ask the court to decline to

11   consider them altogether.

12       The last main topic that this court must make a ruling on

13   today is whether or not this child is mature enough for his

14   views to be taken into consideration and whether he objects

15   to being returned to Singapore.  Now, this exception to

16   return is rooted in the autonomy of the child.  This comes

17   from *Rodriguez v. Yanez* out of the Fifth Circuit.  The court

18   writes, "Children are not inanimate objects.  They are people

19   with agency of their own.  This exception thus allows a

20   sufficiently mature child to interpret his own interests.

21   The drafters of the Convention simply deemed it inappropriate

22   to return a mature child against its will.  Whatever the

23   reason for the child's objection, in such cases the child's

24   autonomy trumps the Convention's interests in preventing

25   wrongful removals."

1        Now, father argues in this case that the child's either

2    not mature enough for the court to consider his views or that

3    the child does not have a particularized objection to being

4    returned.

5        As to that first point, whether or not the child is mature

6    enough for the court to consider his views, the court heard

7    testimony from both experts -- I should say Dr. Favaro and

8    Dr. Poppleton -- in this case, that the parties' child is a

9    bright, expressive, delightful, albeit bored, eight-year-old

10    kid.

11        Dr. Day admitted that based on her review, and Dr. Favaro

12    and Dr. Poppleton also testified, that this child is able to

13    take other people's opinions and feelings into consideration.

14        In Exhibit 320, on Page 4 of 7, the child's report card

15    from Singapore, his teacher writes that the child used plain

16    evidence and reasoning as he thought about what he observed,

17    and what he thought was true about those observations, and

18    the evidence to prove or disprove what he thought was true.

19        Then the teacher writes on Page 5 of 7, "The child showed

20    maturity when researching the Peranakan culture and the

21    contemporary artist Louise Hill."  And further writes, "The

22    child responds to questions and discussions in class through

23    mature reflection."  And what is more, when father was

24    questioned about these things, he agreed that he sees some of

25    these traits in his child.

1    The law is very clear that a child need not be mature

2  beyond his years for his views to be considered.  Where all

3  experts in this case agree that this child is in the concrete

4  operational stage of cognitive development, and Dr. Poppleton

5  told the court today that only 50 percent of the human

6  population ever makes it past this stage, there's simply no

7  reason to discredit the child's maturity in this matter such

8  that the court should not consider his views.

9    The child clearly and particularly objects to being

10  returned to Singapore.  The child told Dr. Poppleton, as

11  Dr. Poppleton lays out in his report:  The child was born in

12  America.  He's an American citizen.  Washington is home.  He

13  likes it more in Washington.  The school in Washington was

14  more welcoming to him.  The kids in America are more inviting

15  and nice.  He made more friends easily here.  The weather

16  here is much better.  The child objects to being returned to

17  Singapore for these reasons.

18    As I just stated, the content of the reasoning is not what

19  matters; it is simply that there is particularized reasoning.

20  And those are particularized objections.

21    Now, last I want to comment on the testimony and claims by

22  father surrounding influence and gatekeeping.  Now, I'm not

23  going to stand up here before this court and deny that mother

24  has had an influence on her child's views.  But her influence

25  is not vindictive or undue or unjustified restrictive

1    gatekeeping.  Dr. Poppleton explained in depth to the court

2    that when the evidence supports or corroborates allegations

3    of abuse or harm, the court may be looking at a situation of

4    justified restrictive gatekeeping, rather than unjustified

5    restrictive gatekeeping.  And Dr. Favaro agreed with that.

6    Mother is not influencing her child because she's mad at the

7    father.  She's being protective after her and her child

8    endured years of domestic violence at father's hands.  She's

9    answering her child's questions, and, in her mind, protecting

10   him from further harm caused by his father.

11       So to conclude, I ask that the court find in mother's

12   favor in this trial.  Father has not proved his prima facie

13   case.  And mother has more than proved her affirmative

14   defenses.  She and her sweet eight-year-old son are the

15   victims of abuse.  Father has violated their fundamental

16   human rights to be free from abuse, to be free from violence.

17   And this child, under no circumstances, should be returned to

18   Singapore.

19       Thank you.

20            THE COURT:  Thank you, counsel.

21            MR. MIN:  Thank you, Your Honor.  Just a few quick

22   corrections.  Counsel misstated the record a couple of times

23   talking about the child being in an American community and in

24   an American school.  Yeah, perhaps before the summer of 2024.

25   But they moved.  And they moved to a new school that was not

1  an American school and that was not an American community.

2  And the record does not support counsel's representations.

3      Furthermore, counsel miscited the statement, adding the

4  word "bitch" to petitioner's comment.  That is, again, not

5  supported by the record.  So I wanted to correct those

6  statements or misstatements by counsel.

7      She also talks about not going to Singaporean restaurants.

8  The case law is clear:  This is a question about

9  acclimatization, not acculturation.  You don't need to do

10  everything Singaporean.  The question is whether the child

11  was at home there and acclimatized to Singapore, not whether

12  the child was acculturized to Singapore.

13      And talking about the mother protecting the child from

14  further harm, this is the mother who invited the father to

15  speak with the child whenever he wanted.  That is what she

16  wrote to him, offered and said, "You can speak to the child."

17  And then she went right out and got an order of protection,

18  restricting exactly that.  So she's trying to have it both

19  ways.  She's offering the connection between the father and

20  the child, and then she's taking it away.  There's no

21  consistency there.  This goes to the issue of grave risk of

22  harm.

23      The Ninth Circuit has stated in *Moses* it's about serious

24  abuse, more than minimal.  And they've also stated it's a

25  short-term remedy.  Grave risk is about short-term issues.

 1     In order to permit the custody --

 2             THE COURT:  Excuse me, counsel.

 3        Counsel, I apologize.  Could you step to the back of the

 4     courtroom?  It's very difficult for me to hear; I'm not sure

 5     about the court reporter.

 6             MS. SEIPEL:  I apologize, Your Honor.  I'm really

 7     sorry.

 8             THE COURT:  Okay.

 9             MR. MIN:  The question is whether the child is in

10     danger in the short term so that the custody court can

11     adequately address the best interests of the child.  And that

12     is what *Moses* said.  "Hague Convention provides only a

13     professional and short-term remedy in order to permit

14     long-term custody proceedings to take place."

15        So it's not about, as the court says, "Even a living

16     situation capable of causing grave psychological harm over

17     the full course of a child's development is not necessarily

18     likely to do so in the period necessary to obtain a custody

19     determination."

20        Is there a grave risk to this child in the time period

21     that -- even allowing him to go back to Singapore for custody

22     proceedings -- would cause this long-term developmental harm?

23     That's not the question, long-term developmental harm.  That

24     is what respondent is focusing on about the impact of

25     coercive control.  That is not for this court to determine.

1          It's also -- respondent also spends a lot of time talking

2     about spousal abuse.  The case law is clear:  There has to be

3     a nexus to this child.  Coercive control.  Is there a nexus

4     between that and impact on this child?

5          The case of *Grano v. Martin* out of the Southern District

6     of New York, affirmed by the Second Circuit, 443 F. Supp 3d,

7     is illustrative here.  The court found that petitioner was

8     coercively controlling, described him as a terrible husband.

9     However, it did not pose a grave risk of harm to the child.

10         That is the question here.  When asked by Dr. Poppleton,

11    the mother responded "no" to all questions about whether the

12    child had been physically, emotionally or sexually abused.

13    The concern of the mother was that the child would be exposed

14    to petitioner's sexual contact outside the marriage or view

15    pornography, not about physical abuse or other dangers to the

16    child.

17         Sporadic corporal punishment also has routinely been found

18    by courts not to be sufficient to raise to the level of grave

19    risk of harm.  The testimony here was clear:  There was

20    sporadic corporal punishment.  Pinching was the primary

21    source of corporal punishment.  There's no testimony that

22    this happened weekly, daily.  There was testimony this

23    happened a handful of times.  Respondent testified to one

24    incident where petitioner allegedly hit the child, even

25    though she later corrected herself and said she wasn't there

1   to witness it.  If this court orders the return of the child

2   to Singapore, they're not going to be living in the same

3   household; there's not going to be this ongoing dynamic the

4   child is going to be witnessing.  The courts in Singapore

5   will be able to fashion any sort of measure possible to

6   protect against any risk, be it small or grave, to this

7   child.

8       The *Golan* case is very important for this court to

9   consider.  In that case there was severe spousal abuse,

10  physical, emotional abuse on the mother.  The court there,

11  however, still considered the ameliorative measures.  Orders

12  of protection.  Payment of money to secure housing in Italy.

13  And ordered the return of the child on multiple occasions,

14  while the mother in that case was still alive.

15          THE COURT:  Counsel, your time has expired.

16          MR. MIN:  If I may have one extra minute because of

17  the interruptions, and to address mature age.

18          THE COURT:  All right, counsel.

19          MR. MIN:  Thank you.

20      In this case there are not particularized objections.  The

21  case law is clear:  Particularized objections are different

22  than preferences.  Whether possibility of friends is not a

23  particularized objection, that is a preference.  The child

24  has never stated he objects or won't go back to Singapore.

25  He's only told Dr. Poppleton he likes America and would

1   prefer to stay here.  That is a preference, Your Honor.

2       And the Article 20 defense has never been granted by any

3   court in the United States.  There's one court in Texas that

4   was overturned by the Fifth Circuit.  But that has never been

5   a sustainable defense on human rights, Your Honor.

6       THE COURT:  Thank you.  Counsel, I'll direct the

7   parties to return back to this court at 4:00 p.m., and I will

8   render my opinion at that point in time.

9       We'll be in recess.

10                      (Recess.)

11      THE COURT:  Good afternoon, again.  Please be seated.

12  Having heard from the parties, the opportunity for each party

13  to give its closing remarks in this court, the court makes

14  the following determinations and findings.

15      The Hague Convention on the civil aspects of international

16  child abduction was adopted in 1980.  The Convention's goal

17  is to secure the prompt return of children wrongfully removed

18  to or retained in any contracting state and to ensure that

19  rights of custody and of access under the law of one

20  contracting state are effectively respected in the other

21  contracting state.  The United States and Singapore are

22  signatories to the Convention.

23      In drafting the Convention's provisions, the Conference

24  attempted to address a particular type of kidnapping

25  scenario, one in which a person, usually a parent, removed

1   the child to or retained the child in a country that is not

2   the child's habitual residence in order to obtain a right of

3   custody from the authorities of the country to which the

4   child has been taken.

5        In Hague cases, the court must answer four questions.

6   One, when the removal or retention at issue took place.  Two,

7   which state the child was habitually a resident of

8   immediately prior to the removal of retention.  Three,

9   whether the removal or retention breached the rights of

10  custody attributed to the petitioner under the law of

11  habitual residence.  And whether the petitioner was

12  exercising such custody rights at the time of the removal or

13  retention.

14       Many of these issues have not been in dispute, but the

15  court must address those that are.

16       First, a Hague overview.  Article 13 provides exceptions

17  to the mandate that the child be returned to his or her

18  habitual residence.  Article 13(a) provides that a court may

19  refuse to return a child to its habitual residence if it has

20  been shown, by a preponderance of the evidence, that, one,

21  the child objects to being returned; and two, has attained an

22  age and degree of maturity at which it is appropriate to take

23  account of the child's views.  This exception is rooted in

24  the autonomy of the child.

25       Additionally, Article 13(b) contains an exception to

1   mandatory return when a respondent can show by clear and

2   convincing evidence that there is a grave risk that the

3   child's return would expose the child to physical or

4   psychological harm or otherwise place the child in an

5   intolerable situation.

6       This is in accordance with 22 United States Code,

7   Section 9003 subsection (e)(2).  If grave risk is found, the

8   court may consider ameliorative measures, conditions that

9   parents or state authorities shall follow, to help mitigate

10  the risk the child would face upon his or her return.

11      Unless and until there's a determination that the child

12  cannot be returned, the judicial or administrative

13  authorities of the contracting state to which the child has

14  been removed, or in which it has been retained, shall not

15  decide on the merits of rights of custody.

16      Here the parties do not dispute that the child was

17  wrongfully removed.  So the court need only determine

18  habitual residence and the applicability of any exceptions or

19  defenses.

20      So with this, the court will look at the evidence at trial

21  and the background of the removal.  This case, in essence,

22  can best be described as a scenario where we have two

23  conflicting parents and three experts, experts which have not

24  had the opportunity to interview all involved parties.  The

25  fact witnesses essentially are the petitioner and respondent.

1   The expert witnesses are Dr. Poppleton, a child psychology
2   expert; and the respondent's expert, Dr. Favaro; the child
3   psychology rebuttal expert, Dr. Day, the methodology rebuttal
4   expert; and Ms. Kee Lay Lian, the Singapore legal expert.
5   The court notes that it would have been helpful and
6   beneficial for the court to have some of the other witnesses
7   who were listed to provide additional fact testimony.  That
8   was the parties' discretion in terms of electing those
9   witnesses they wished to testify.  That would have been
10  helpful for the court to make independent observations from
11  those individuals who were in eye sight, ear sight, and an
12  opportunity to observe the relationship and conduct of both
13  the petitioner and respondent.
14      That didn't take place, so the court must make its
15  decisions based upon the evidence before it.
16      Let's look at the removal.  The parties 11-year marriage
17  broke down in the summer months of 2024.  Tensions came to a
18  head in late August 2024 when the respondent discovered
19  cameras in the couples' home in Singapore.  And a
20  confrontation ensued.  The confrontation ended with
21  respondent reporting this incident to law enforcement in
22  Singapore and petitioner returning to India on a trip.
23  Petitioner remained in India for several weeks before
24  respondent applied for an emergency passport with the United
25  States embassy.

1        On October 14, 2024, respondent left Singapore with the

2   child and left for Washington State.  Petitioner has had

3   little or no contact with the child since the removal.  The

4   date of removal and the breach of petitioner's custody rights

5   at the time of removal is not disputed.  The first and

6   central issue the court must decide is that of habitual

7   residence.

8        The term "habitual residence" was intentionally left

9   undefined the Convention.  This was done to avoid formalistic

10   determinations.  The Conference found that the question of

11   whether a person is or is not habitually a resident in a

12   specific country is a question of fact to be decided by

13   reference to all the circumstances on a particular case.

14        Determination of the child's habitual residence is a

15   central, often outcome determinative, concept on which the

16   entire system is founded.  The place where a child is at home

17   at the time of removal or retention ranks as this child's

18   habitual residence.

19        A child's residence in a country may be deemed habitual

20   when it's more than transitory.  The court must consider the

21   family and social environment in which the child's life has

22   developed because the child's residence becomes habitual when

23   there is some degree of integration by the child in a social

24   and family environment.

25        For children old enough to acclimatize to their

1    surroundings, facts surrounding acclimatization will be

2    highly relevant.  As a part of this fact-driven inquiry, the

3    court must be sensitive to the unique circumstances of the

4    case and informed by common sense.

5        Such facts may include the child's age, the immigration

6    status of the child and parents, the child's academic

7    activities, social engagements, participation in sports,

8    meaningful connections with people and places in the child's

9    new country, language proficiency, and the location of the

10   child's personal belongings.

11       Notably, the Convention does not require that a child's

12   habitual residence depend upon an actual agreement between

13   the child's parents.

14       When looking at the facts that have been presented to this

15   court, among others, the court looks at the facts in support

16   of Singapore as the child's habitual residence.  The facts

17   before this court demonstrate and indicate the child was in

18   Singapore for two years prior to the removal date on

19   October 14, 2024.  That was from essentially ages six to age

20   eight.  Also, the fact that the child attended school in

21   Singapore and had friends in Singapore, attended birthday

22   parties and sleepovers.  The court also noted that the child

23   participated in extracurricular activities in Singapore:

24   Basketball, swimming, dance, chess.  He was also closer to

25   family in India.  Visits from India and visits from family

1    members to Singapore.

2        There is also evidence that the child had language

3    opportunities, with some degree of understanding of different

4    languages.  And the child's activities associated with his

5    living in Singapore for that period of time and before his

6    removal, the child had been signed up for activities for an

7    additional period of time.

8        The facts against Singapore being the child's habitual

9    residence include the fact that the child is an American

10   citizen and the mother is an American citizen.  And the dad

11   is a citizen of India.  The court also notes that the

12   evidence indicates that the father gave up his green card in

13   the United States.  The child lived in the United States from

14   birth to age six.  The child mostly communicates in English.

15   Temporary visas in Singapore and the parents' intent of

16   staying in Singapore, India court documents demonstrate that

17   Singapore was a short sojourn, and the parties' testimony

18   about the child involving -- strike that -- avoiding

19   conscripted military service.

20       Looking to the habitual residence right before the time of

21   removal is critical in this court's conclusions.  The child's

22   family and social life was integrated in Singapore.  The

23   parents' intent to stay or leave Singapore is ultimately

24   inconclusive, and it cannot override that A.S.'s family and

25   social life was in Singapore at the time of removal.

1          The court confirms that intent manifested by activities

2     and just the words of the parties, particularly words of the

3     parties during a period of significant marital discord, is

4     not determinative.  So for these reasons, the court finds

5     that the habitual residence was in Singapore.

6          Next, the court looks to mature child objections and

7     considerations.  The district court may properly refuse to

8     order the return of a child if it finds that the child

9     objects to being returned and has attained an age and degree

10    of maturity at which it is appropriate to take account of his

11    or her views.  Respondent has the burden of proving this

12    affirmative defense by a preponderance of the evidence.

13         There is no minimum age attributed to this provision, and

14    if the court determines that the child's views are the

15    product of undue influence, they should not be taken into

16    account.  Further, courts distinguish between the child's

17    objection to return, as referenced in the Hague Convention,

18    and a child's wishes, as expressed in a custody case.  The

19    notion of objections is far stronger and more restrictive

20    than that of wishes in a custody case.  Expressions of a

21    preference to remain in the respondent's country is not

22    enough to disregard the narrowness and the age and maturity

23    exception to the Convention's rule of mandatory return.

24         So the court looks at the mature child factual

25    considerations.  The facts to support the mature child

1  defense.  We have expert testimony from the petitioner and

2  respondent that the child is bright and engaged.  Expert

3  testimony that the child thinks logically.  Expert testimony

4  that the child considers others' feelings, when discussing

5  which country he would live in, report cards that demonstrate

6  the child's academic ability, and expert testimony that

7  supports that A.S. is content living in Washington State.

8      The facts refuting the mature child defense is

9  demonstrated by the expert testimony that the child is

10  developmentally similar to other children his age, eight

11  years old, and expert testimony that supports that A.S. would

12  be content living in Singapore if his parents lived in

13  separate households.

14      When considering undue influence, the best testimony that

15  was presented to this court was the iPad recording sessions

16  with petitioner's expert, the child's knowledge of his

17  parents' legal disputes, the petitioner's attempt to show

18  that the child's views were the product of undue influence.

19  But the court does not find these facts establish there was

20  any undue influence.

21      The court therefore finds that even if the court found

22  that the child was mature, it is unclear that he objects to

23  returning to Singapore.  The child did not testify at trial.

24  And the testimony of the parties and experts are conflicting

25  concerning the child's views.  Therefore, the court finds

1   respondent did not meet the evidentiary burden required to

2   establish the mature child exception.  At best, we have

3   expressions of preferences by the child, but nothing further.

4       Next the court considers the grave risk of harm and

5   ameliorative measures.  Starting first with the grave risk of

6   harm legal considerations.  To succeed on this defense,

7   respondent must establish by clear and convincing evidence

8   that there is a grave risk that the child's return would

9   expose him, and I emphasize "him," to physical or

10  psychological harm or otherwise place the child in an

11  intolerable situation.

12      A respondent parent can establish a grave risk of harm

13  from abuse where the petitioning parent had actually abused,

14  threatened to abuse, or inspired fear in the child in

15  question.  The grave-risk exception has been applied in

16  instances where a child is at risk of serious abuse or

17  neglect if repatriation occurs or, alternatively, where the

18  place of habitual residence has been deemed unsafe.  For

19  instance, in times of war or famine.

20      Courts are often reluctant to apply the grave harm

21  exception in cases where the alleged harm was sporadic

22  corporal punishment.

23      Domestic violence may also establish a grave risk of harm

24  to a child, particularly when it occurs in the presence of

25  the child.

1    In determining whether domestic violence between parents

2  creates a grave risk of harm, the proper inquiry focuses on

3  the risk faced by the child, not the parent.

4    Next, the court looks at the grave risk of harm factual

5  considerations.  The facts in support of the grave risk

6  defense.  There's testimony and some corroborating evidence

7  about petitioner's sexual abuse of respondent.  The parties

8  provide extensive testimony that lasted almost two full days.

9  There's expert testimony regarding intimate partner violence

10  impacting on the children, generally.  There's testimony and

11  corroborating evidence about the petitioner's control over

12  the respondent.  For example, limiting access to bank

13  accounts after the incident in August 2024.  Only recent

14  depositing of a large sum of money to benefit the respondent.

15  Conflicting out attorneys to prevent the respondent from

16  obtaining legal representation.  Taking the child's passport

17  when he left for India in late August 2024.  And testimony

18  about the petitioner's pinching or shaking of the child.

19    The facts refuting a grave risk defense.  The testimony

20  does not demonstrate that the child was present for any of

21  the domestic violence.  There is no demonstrated pattern of

22  corporal punishment to the child.  There is even an occasion

23  where the mother, according to the testimony, was not

24  present, although there's an allegation of the father's

25  conduct in terms of striking the child.  There's also limited

1    psychological evaluations of the child.  And the only fact

2    witnesses are petitioner and the respondent.  And there's no

3    documentary evidence of any physical harm to the child, or

4    that he was present or observed physical violence against the

5    mother, or any sexual abuse against the mother, or that the

6    child observed any porn allegedly observed or watched by the

7    father.

8         Although there has been credible testimony in supporting

9    evidence that respondent has experienced intimate partner

10   violence at the hands of petitioner, there has not been

11   sufficient testimony that the child witnessed or was impacted

12   by the turmoil in the parents' relationship.

13        Therefore, respondent has not shown by clear and

14   convincing evidence the child would be exposed to physical or

15   psychological harm if returned to Singapore.

16        Next, the court looks at ameliorative measures and the

17   legal considerations.  The United States Supreme Court has

18   stated when a district court -- strike that.  "While a

19   district court has no obligation under the Convention to

20   consider ameliorative measures that have not been raised by

21   the parties, it ordinarily should address ameliorative

22   measures raised by the parties or obviously suggested by the

23   circumstances of the case."  That's a direct reference and

24   quotation from the *Golan* case, 142 Supreme Court at 1893.

25        The question whether there is a grave risk is separate

1    from the question of whether there are ameliorative measures

2    that could mitigate that risk.  These inquires will often

3    overlap considerably.

4        Now, the facts in support of ameliorative measures

5    mitigating risk.  There's expert testimony that has been

6    presented to this court that Singapore would have

7    jurisdiction to decide custody.  The courts have the power to

8    make orders for child care arrangements so long as the child

9    is habitually a resident in Singapore.

10       Singapore courts would allow the child's opinion to be

11   considered or heard.  The courts can appoint a counselor and

12   psychological services.  These counselor reports are private

13   to a judge.  The courts permit judicial interviews of a

14   child.  The child can have its own attorney, a child

15   representative.

16       Singapore courts have adequate legal procedures to protect

17   the child after custody proceedings.  This includes child

18   maintenance.  Singapore courts can issue orders based on the

19   child's personal expenses and housing expenses.

20       If the mother has no ability to earn income, the court can

21   attribute the entire household expenses to the child.  As of

22   January 16th, Singapore courts can issue Personal Protection

23   Orders for physical, emotional and psychological abuse.

24       Singapore courts can issue protective orders without

25   limitations on expiration or as ordered by the court, and the

1  court can order exclusion of a party from the home.

2      Although there was expert testimony that supports

3  Singapore courts would Honor an agreement where the father

4  agrees not to revoke the Dependent Pass visas, there was some

5  conflicting testimony about the stability of the visa

6  situation.

7      The court also notes that there's been no direct evidence

8  that the father would not Honor an order of a court from

9  Singapore.  There's an issue raised about the father not

10  returning on isolated occasions.  But there's no other

11  documented evidence other than fear or suspicion of what the

12  father's activities would be.

13      Therefore, even if this court found there was clear and

14  convincing evidence of grave risk of harm to the mother, this

15  court finds that there are sufficient measures and safeguards

16  available in the Singapore legal system that would be

17  ameliorative and mitigate the risk of harm.  These are the

18  findings and conclusions of the court.

19      Now, since both parties are here, this court is not

20  responsible for deciding custody issues.  But from my review

21  of the evidence and docket and briefing supplied by the

22  parties, an enormous amount of money, an enormous amount of

23  time and energy has been dedicated to the turmoil and strife

24  between the petitioner and respondent.

25      That same type of energy should be geared towards

1  resolution and reaching a manner of which -- looking at

2  what's in the best interests of the child.  By making these

3  comments, I'm not suggesting that I'm making a determination

4  of what's in the best interests of the child.  But what I can

5  tell you is, from my experience on the bench of many years,

6  when parents focus on trying to resolve their differences,

7  and not resolve those differences using the child as a

8  vehicle to resolve those differences, that is a manner in

9  which you can best accomplish your goals and objectives.

10      Please note that everything that you've done up to this

11  point is a matter of public record.  Everything that you've

12  done up to this point, by way of testimony, pleadings and

13  submissions to this court, is something down the road, when

14  your child is a young man, that he can look up and review.

15  Your child may have a perspective of you right now at

16  eight years of age.  But I can assure you when your child

17  reaches his 20s or 30s and goes back to look and see, "What

18  happened to my parents?  Why did my parents separate?  Why

19  did I transfer, and why was I removed to the United States?

20  What were the fears and concerns?  What were the

21  allegations?"  Those are all matters of your public record.

22      Please know that whatever record that you're making now

23  and will continue to make going forward will be part of your

24  son's memory of who you are and what you're all about.

25      Those are the findings of the court.

1        We'll be in recess.

2                        (Adjourned.)

3

4                C E R T I F I C A T E

5

6

7        I certify that the foregoing is a correct transcript from

8   the record of proceedings in the above-entitled matter.

9

10

11

12   /s/ Debbie Zurn

13   DEBBIE ZURN
     COURT REPORTER
14

15

16

17

18

19

20

21

22

23

24

25