1            UNITED STATES DISTRICT COURT

2        WESTERN DISTRICT OF WASHINGTON AT SEATTLE

3    _____

                                    )
4    PRASANNA SANKARANARAYANAN,      ) CV24-01745-RAJ
                                    )
5                   Petitioner,      ) SEATTLE, WASHINGTON
                                    )
6         v.                         )
                                    ) January 6, 2025 -
                                    ) 9:00 a.m.
7    DHIVYA SASHIDHAR,               )
                                    )
8                   Respondent.      ) EVIDENTIARY HEARING -
                                    ) Day 1
9                                     )
     _____

10   _____

11            VERBATIM REPORT OF PROCEEDINGS
         BEFORE THE HONORABLE RICHARD A. JONES
12            UNITED STATES DISTRICT JUDGE
     _____

13

14   APPEARANCES:

15   For the Petitioner:      Richard Min
                              Michael Banuchis
16                            Green Kaminer Min & Rockmore LLP
                              420 Lexington Avenue
17                            Suite 2821
                              New York, NY 10170
18

19   For the Respondent:      Katrina Anne Seipel
                              Katelyn Skinner
20                            Buckley Law PC
                              5300 Meadows Road
21                            Suite 200
                              Lake Oswego, OR 97205
22

23

24

25

         Proceedings stenographically reported and transcript produced with computer-aided technology

EXAMINATION INDEX

EXAMINATION OF:                                         PAGE

  PRASANNA              DIRECT EXAMINATION              9
  SANKARANARAYANAN      BY MR. MIN
                        CROSS-EXAMINATION             103
                        BY MS. SKINNER
                        REDIRECT EXAMINATION          172
                        BY MR. MIN

EXHIBIT INDEX

EXHIBITS ADMITTED                                       PAGE

  All exhibits admitted, except depositions and          7
  Exhibits 336-344

 1          THE COURT:  Good morning.  Please be seated.

 2          THE CLERK:  We are here in the matter of

 3    Sankaranarayanan versus Sashidhar, Cause No. 24-1745, assigned to

 4    this Court.

 5       If counsel would please rise and make your appearances for

 6    the record?

 7          MR. MIN:  Richard Min, Green Kaminer Min & Rockmore, on

 8    behalf of petitioner.  Next to me is Michael Banuchis of the same

 9    firm.  And at the end of the table is Holly McHale, legal

10    assistant at our firm, handling exhibits, Your Honor.

11          THE COURT:  All right.  Good morning to all three of

12    you.

13          MS. SEIPEL:  And good morning, Your Honor.  Katrina

14    Seipel for respondent, with my colleague Katelyn Skinner and

15    respondent, Dhivya Sashidhar here.

16          THE COURT:  Good morning to all three of you.  Please be

17    seated.

18       Well, counsel, we're going to begin the trial, and I received

19    the parties' ongoing dispute regarding the testimony of Dr.

20    Favaro and the ability of the parties -- I should rather say, the

21    inability of the parties to reconcile their differences regarding

22    what's true rebuttal testimony and what's not.

23       What I'm going to do is I'm going to give to the parties,

24    which I'm not going to take on now, one document, which is Dr.

25    Favaro's report.  It says "P" for petitioner and one that says

1    "R" for respondent.  I'm not going to take the time to go line by

2    line and figure out what is supposed to come in and what's not to

3    supposed to come in.

4        What I'm going to do is give it to the parties, and I expect,

5    during the break or recess, over the lunch hour, to go through

6    and highlight or identify what you believe is the necessary

7    testimony.  "Necessary" does not mean everything that you want to

8    come in, but what's necessary to get to the merits of the case,

9    what is true rebuttal testimony.  And if it doesn't fit in those

10   categories, I'm going to strike it.  But I'm going to give you

11   the last opportunity to address this and put this to bed.

12       So if there's nothing further, do the parties wish to make

13   opening remarks or dispense with opening remarks and begin with

14   the testimony?

15           MS. SEIPEL:  We do not wish to make an opening

16   statement, we would waive that, but just I do have one other

17   minimal matter for Your Honor, and that is that we would move to

18   preadmit all of our exhibits into evidence, except for the

19   depositions, as well as Exhibits 336 to 344, of course, reserving

20   the right to use the depositions as we need to during this trial.

21       We believe that preadmission will just make things flow a

22   little bit smoother.

23           THE COURT:  Is there any objection, counsel?

24           MR. MIN:  Well, Your Honor, we would object, just

25   because the context in which the exhibits are going to be used is

1  obviously important.  So, I mean -- that's our position.  I mean,
2  we want to know in what manner those exhibits are going to be
3  used, with which witness, to make sure that there's a proper
4  relevance and foundation laid for each exhibit.
5        THE COURT:  Well, counsel, you had the opportunity to
6  interpose objections, and the Court ruled on those objections.
7  So is your objection now just a question of pure timing of when
8  the exhibits come in?
9        MR. MIN:  Well, I mean, I think there's -- the
10  objections we see facially, when we receive the exhibits, there
11  are certain objections we're able to make, but the context in
12  which they're being proposed is certainly an important one.  I
13  mean, my experience has been of course, and it differs in each
14  court, but, you know, my experience has been that, generally, we
15  make objections at a pretrial phase for what we understand or can
16  see facially would be an objection.  But based upon its usage at
17  court, we may have additional objections that might be raised.  I
18  mean, are they being offered, necessarily a specific document,
19  for what purpose, for the truth of each statement contained
20  therein.  Especially like an affidavit that might exist, is that
21  being offered simply for the fact that it was filed in the court
22  or for the fact that the truth in those affidavits are true.  And
23  those are two different usages for that document.
24        THE COURT:  Counsel, you should have had the context of
25  how those exhibits were being offered during the course of

1    discovery.  You also had the opportunity of either interviewing

2    witnesses or being familiar with the parties in this case.  And

3    it's also a question of we have limited time.  We have got three

4    days.

5        What counsel has proposed is an efficient means of getting

6    the exhibits before the Court and before the parties.  If you

7    have a specific objection during the course of examination or

8    testimony, or even at the end of the case for some justified

9    reason, we could take it up at that point in time.

10        MR. MIN:  Makes sense, Your Honor.

11        THE COURT:  Oftentimes, counsel, what I will do is, as a

12   witness begins to testify, have that witness's exhibits that are

13   uncontested all be admitted at that time.  That speeds things up

14   considerably.  As opposed to going through each single exhibit,

15   taking an objection, and then resolving it, particularly when

16   they're unobjected to.

17        So I'm going to accept counsel's proposal.  The same can be

18   extended to you as well, counsel.  Are you asking the same for

19   your exhibits?

20        MR. MIN:  Yes, Your Honor.

21        THE COURT:  All right.  Then the rule applies to both

22   parties.

23        Counsel, at the break or recess, I will ask you to go through

24   and confirm, with the in-court deputy, to make sure that those

25   exhibits are clearly marked, clearly identified, and are those

1    that are admitted.  And before we rest, the Court will take into

2    consideration all the admitted exhibits.  You will have a chance

3    to look at them again to ensure that the only exhibits I'm

4    looking at or considering are those which have been properly

5    offered and considered by the Court.

6         Anything further, counsel?

7         MS. SEIPEL:  Just one clarification.  That the Court is

8    admitting all exhibits, except deposition transcripts and

9    Respondent's 336 through 344?

10        THE COURT:  Unless they were exhibits that I referred to

11   in the conference last week.

12        MS. SEIPEL:  Correct.  Okay.  Thank you, Your Honor.

13   (All exhibits admitted, except depositions and Exhibits 336-344.)

14        THE COURT:  All right.  Are we ready to proceed?

15        MR. MIN:  Yes, Your Honor.

16        THE COURT:  All right.  Let's proceed, counsel.  Do you

17   wish to make an opening statement?

18        MR. MIN:  Your Honor, yes.  I mean, we would like to

19   make brief opening statements, unless the Court doesn't want

20   them, because I know respondent counsel is not in favor of those,

21   but, I mean, our preference would be to make a very brief opening

22   statement.

23        THE COURT:  I'm open to it, counsel.  Just please know

24   that I have read everything that the parties have submitted.  I'm

25   very familiar with the facts in this case and the arguments to be

1  made.  If you want to use that time allocation for purposes of an

2  opening remark, have at it.

3          MR. MIN:  Your Honor, we will waive that, and we will

4  move forward.  I understand Your Honor's point and I appreciate

5  that.  And I think getting to the facts and the heart of the

6  matter is probably the most useful use of our time.  Okay.

7      Your Honor, for our --

8          THE COURT:  Just to clarify, I can see your client on

9  the phone, at least on the monitor, and if at any point in time

10 you need to confer with your client, always let me know.  I will

11 do my best to make sure that he continues to stay on.  He is some

12 distance from this courthouse, so if for some reason there's a

13 loss in transmission, we need to deal with that.  But at this

14 point in time, let's verify that your client can hear and see

15 what's taking place.

16         MR. SANKARANARAYANAN:  Yes, I can, Your Honor.

17         THE COURT:  All right.  Thank you.

18         MR. MIN:  Your Honor, for our first witness, we would

19 call petitioner, who is present on Zoom.

20         THE COURT:  All right.  You will be placed under oath,

21 sir.

22         THE CLERK:  Please raise your right hand.

23                    PRASANNA SANKARANARAYANAN,

24     having been sworn under oath, testified as follows:

25         THE CLERK:  If you could please state your first and

 1   last names and spell both for the record.

 2           THE WITNESS:  My name is Prasanna Sankaranarayanan.

 3   P-r-a-s-a-n-n-a S-a-n-k-a-r-a-n-a-r-a-y-a-n-a-n.

 4           THE COURT:  You may inquire.

 5                   DIRECT EXAMINATION

 6   BY MR. MIN:

 7   Q   Good evening to you, I believe, in Singapore.

 8       Can you state your date of birth, please?

 9   A   It's 22nd August 1987.

10   Q   And where were you born?

11   A   In Chennai, India.

12   Q   And do you know Dhivya Sashidhar?

13   A   Yes, I do.

14   Q   How do you know her?

15   A   She's my wife.

16   Q   When did you first meet her?

17   A   I met her in college in 2007 in {indecipherable} India.

18                   (Court reporter interruption.)

19   Q   How do you spell Ms. Sashidhar's name, full name, please?

20   A   Dhivya Sashidhar, D-h-i-v-y-a S-a-s-h-i-d-h-a-r.

21   Q   I'm going to ask you to go much slower.  If you heard the

22   court reporter, we just need you to speak up and talk slower, and

23   that is something you should do throughout the course of your

24   testimony, okay?

25   A   Okay.

1          MR. MIN:  Ms. Court Reporter, do you need that spelling

2    back?

3          THE COURT REPORTER:  No.  I need the name of the place

4    they met.

5    Q    Can you restate where you met Ms. Sashidhar?

6    A    I met her in Trichy, India, in my college.

7    Q    Can you spell the name of the city in which you met her?

8    A    T-r-i-c-h-y.

9    Q    And when was that?

10   A    I met her in 2007.

11   Q    And after meeting her, did you and Ms. Sashidhar develop a

12   romantic relationship?

13   A    Yes, we did.

14   Q    And when was that?

15   A    By 2009, we were in a relationship.

16   Q    Okay.  And in 2009, where were you living?

17   A    I was living in Vancouver, Canada.

18   Q    And what were you doing in Vancouver?

19   A    I was working for Microsoft.

20   Q    Okay.  And where was Ms. Sashidhar living in 2009 when your

21   relationship started, if you know?

22   A    She was in Trichy, in college.

23   Q    In India?

24   A    In India.

25   Q    Okay.  Did there come a time when you left Vancouver and

1    moved out of Vancouver?

2    A    Yes.  Sometime in 2009, I left to Palo Alto, the United

3    States.

4    Q    Why did you move to Palo Alto?

5    A    To start a company.

6    Q    Okay.  Did there come a time when you and Ms. Sashidhar were

7    married?

8    A    Yes.

9    Q    When was that?

10   A    We were engaged and officially married in September 2013, and

11   we had a wedding Hindu ritual in February 2014.

12   Q    In 2013, where were you residing?

13   A    I was in Chennai, India.

14   Q    Why were you residing in Chennai, India at that time?

15   A    Because my start-up failed and I was taking a break.

16   Q    Okay.  When did you move to Chennai, India?

17   A    Sometime in 2013.

18   Q    And can you do me a favor, can you give a spelling for

19   Chennai, please?

20   A    C-h-e-n-n-a-i.

21   Q    And in 2013, where was Ms. Sashidhar living, if you know?

22   A    I believe she was working in Den Haag, Netherlands.

23   Q    And do you know why she was working in the Netherlands?

24   A    She had a job at Royal Dutch Shell, Netherlands.

25   Q    And do you know when she moved to the Netherlands for this

 1    job?

 2    A    I think one or two years before that.

 3    Q    Did there come a time when you left India and moved somewhere

 4    else?

 5    A    Yes.  After our wedding, I moved to the Netherlands.

 6    Q    To the Netherlands?

 7    A    Yes.

 8    Q    Okay.  To live with Ms. Sashidhar?

 9    A    Yes.

10    Q    Okay.  And how long did you and Ms. Sashidhar reside together

11    in the Netherlands?

12    A    About a year.

13    Q    And where did you and Ms. Sashidhar move after that?

14    A    So after that, I moved to San Francisco, California, and

15    Dhivya spent a few months in Chennai to take care of her sick

16    father, and then she joined me in San Francisco, California.

17    Q    And why did you and Ms. Sashidhar move to San Francisco at

18    this time?

19    A    I got a job at a company, a start-up, called Zenefits.

20    Q    Can you spell Zenefits, please?

21    A    Z-e-n-e-f-i-t-s.

22         MR. MIN:  Your Honor, can I just ask the witness if he

23    has some sort of microphone he can use?  Because it sounds very

24    muffled.  Is that right?

25         THE COURT REPORTER:  Yes.

1          MR. MIN:  Your Honor, can I just take a quick break?

2          THE COURT:  Yes.

3                     (Off the record.)

4          THE WITNESS:  Is this clearer?  Is this better?  Hello,

5     hello.  Mic testing.  Mic testing.  Is this clearer or not?

6          MR. MIN:  I think it's slightly better.

7          THE COURT:  Let's give it a try.

8          MR. MIN:  Yeah.  Thank you, Your Honor, for the

9     courtesy.

10    Q    I think we left off, you said you moved to San Francisco to

11    work at Zenefits; is that correct?

12    A    That is correct.

13    Q    Okay.  And was Ms. Sashidhar working in California after she

14    joined you?

15    A    She was take caring of her dad's family business called

16    "Equus."

17    Q    How do you spell that, please?

18    A    E-q-u-u-s.

19    Q    What do you mean by when you say she was taking care of her

20    family business?

21    A    So after her dad passed away, she became the CEO of Equus and

22    she was managing the operations.

23    Q    Where is this company based?

24    A    It is based in Chennai, India.

25    Q    Was she continuing to work at Royal Dutch Shell at this time,

1  when she moved to San Francisco?

2  A   No.  She took a leave of absence and eventually left Shell.

3  Q   Did there come a time when you and Ms. Sashidhar had a child?

4  A   Yes.

5  Q   When was that?

6  A   In 2016.

7  Q   Okay.  Where was your child born?

8  A   He was born in San Francisco, California.

9  Q   Does your child hold citizenship to any other country in the

10  world besides from the United States?

11  A   He -- no.  No.  He's a citizen of the United States.  He also

12  has permanent residency of India.  It's called OCI, overseas

13  citizenship of India.

14  Q   Go slower, Prasanna.  I just want to keep reminding you --

15  A   Okay.

16  Q   -- go slower.

17      And can you just state that one more time, slow?

18  A   So he's a citizen of the United States of America.  He also

19  has an overseas citizenship of India.  It's called an OCI card.

20  Q   An OCI card?

21  A   It is a permanent residency of India, where -- which allows

22  him to stay and live indefinitely in India.

23  Q   What is your citizenship?

24  A   Indian.

25  Q   Do you hold any other citizenship?

```
 1   A    No, I do not.

 2   Q    Okay.  Do you know what Ms. Sashidhar's citizenship is?

 3   A    American.

 4   Q    Okay.  Does she hold any other citizenship status anywhere

 5   else?

 6   A    No, not that I'm aware of.

 7        She also holds the overseas citizenship of India, which, when

 8   she renounced her Indian passport, she converted it to an

 9   overseas citizenship of India.

10   Q    Did there come a time when you left, you and Ms. Sashidhar

11   left San Francisco, moved out of San Francisco?

12   A    Yes.

13   Q    When was that?

14   A    Around 2020, we left to Washington.

15   Q    And so between 2014 -- well, withdrawn.

16        When did you move to San Francisco initially?

17   A    By myself or after the wedding --

18   Q    By yourself.

19   A    -- after we were married?

20        So, initially, I moved sometime around 2009 until 2013.  And

21   then, you know, after the wedding, we moved sometime in 2014 and

22   left to Washington mid-2020.

23   Q    So between 2015 and 2020, did you continuously live in San

24   Francisco?

25   A    In the San Francisco Bay Area in general, yes.  We moved
```

1   around from San Francisco to San Bruno.

2   Q   What was the other city that you mentioned or other town that

3   you mentioned?  Go slow.

4   A   San Bruno.  S-a-n B-r-u-n-o.

5   Q   Where is San Bruno?

6   A   San Bruno is near San Francisco.  It's in the general San

7   Francisco Bay Area.  It is maybe a 15-, 20-minute drive.

8   Q   Okay.  Make sure you talk slow, okay?  Don't speed up.

9   A   Okay.

10  Q   When did you move from San Francisco to San Bruno?

11  A   I think sometime in 2016 or 2017.

12  Q   Why did you move from San Francisco to San Bruno?

13  A   We wanted bigger space.  We were going to have a child, and

14  we wanted to get {indecipherable},

15  Q   Prasanna, it's not great to hear you.  I'm going to ask that

16  perhaps you remove the headset.  It's --

17  A   Okay.  Now you cannot hear me, so I should take it out?

18  Q   Take it out.

19  A   Okay.

20  Q   Can you repeat --

21  A   Hello, hello.

22  Q   Can you repeat that answer?  Why did you move from San

23  Francisco to San Bruno?

24  A   We were going to have a child, and we wanted a bigger space,

25  so we moved to the suburbs from the city.

1   Q   And were you continuing to work at Zenefits when you moved to

2   San Bruno?

3   A   I believe, by this point, I either left Zenefits and started

4   Rippling or I was in the process of doing so.

5   Q   And was Ms. Sashidhar working when you guys moved to San

6   Bruno?

7           THE COURT REPORTER:  I'm sorry.  I didn't hear.  Can you

8   have him repeat?

9   Q   Can you please say that over?  The question was, was Ms.

10  Sashidhar working when you moved to San Bruno?

11  A   She continued to be the CEO of her family business, Equus, in

12  India.

13  Q   Was she working in the United States at all?

14  A   She was not.

15  Q   Where was Zenefits based, when you were working there?

16  A   Zenefits was based in San Francisco, California.

17  Q   And then you said, after that, you started a company called

18  Rippling?

19  A   Yes.

20  Q   And how do you spell Rippling?

21  A   R-i-p-p-l-i-n-g.

22  Q   Where is Rippling based?

23  A   San Francisco.  California.

24  Q   Okay.  At any point, did you purchase a home in California?

25  A   We did not.

1    Q    After leaving San Bruno, where did you move?

2    A    We moved to Redmond, Washington.

3    Q    And this was in 2020?

4    A    Yes.

5    Q    Okay.  And why did you and Ms. Sashidhar move to Redmond in

6    2020?

7    A    She got a new job at Microsoft, and we wanted to move closer

8    to the job.

9    Q    When did you and Ms. Sashidhar first start discussing the

10   move to Redmond?

11   A    Sometime in 2020.

12   Q    Okay.  And when did you actually move to Redmond, do you

13   recall the month?

14   A    I believe it was sometime in June, July, August, somewhere in

15   that range, 2020.

16   Q    Sometime in the summer of 2020?

17   A    Yes.

18   Q    Okay.  Was Ms. Sashidhar's job in person or remote?

19   A    It was remote.

20   Q    Okay.  So if her job was remote, why did you need to move

21   closer to her job?

22   A    We -- for a variety of reasons.  One is, you know, we wanted

23   to save on taxes.  You know, Washington had no state taxes.  We

24   wanted to get -- you know, we were figuring out the child's

25   schooling arrangements, so we wanted to sort of do those over the

 1  summer.  And then, you know, I also thought at some point the job

 2  would be in person and we wanted to move sort of closer to that.

 3  Q   What do you mean when you say that Washington doesn't have

 4  state income tax?  Is that something you and Ms. Sashidhar

 5  discussed as part of the move?

 6  A   Yes.  We discussed Washington doesn't have state taxes and it

 7  would be helpful to move, move over there.

 8  Q   What was your job status when you moved to Redmond in 2020?

 9  A   I was transitioning down from the CTO job duties of my

10  start-up company, Rippling, so I was spending more and more time

11  with family.

12  Q   You said you were transitioning down from your something job

13  at Rippling, but I'm not sure I caught that.

14  A   So I was the chief technology officer of Rippling, CTO, and I

15  was taking a break and stepping down from that role.

16  Q   Okay.  When you moved to Redmond, did you purchase any homes

17  in Washington?

18  A   No, we did not.

19  Q   Okay.  You rented a home?

20  A   Yes.

21  Q   How many homes did you live in while you were in Washington?

22  A   One.  We might have had an intermediate stay somewhere, but

23  the rented house, we lived in one rented house.

24  Q   Okay.  When you moved to Redmond, was this before or after

25  COVID-19 started?

1    A    After.

2    Q    Okay.  Can you briefly describe your child's life in 2020,

3    after the move to Redmond?

4    A    We were very captive and concerned about COVID.  We were

5    mostly at home, kept to ourselves.  We had him enrolled in a

6    homeschooling.  We looked around for a homeschooling option.  We

7    found a teacher and enrolled him in a home school.  We found

8    another friend of his to home school with, who was another

9    colleague from Microsoft.  He --

10   Q    Prasanna, you have to go slow.

11            THE COURT REPORTER:  And can he move in to the

12   microphone?

13            MR. MIN:  Yeah.

14            THE WITNESS:  Okay.

15            MR. MIN:  And can you move closer?

16            THE WITNESS:  Yeah.

17            MR. MIN:  And it's very -- it's quite difficult to hear

18   you, and it might be on our end.  But, yeah, just please go --

19            THE WITNESS:  Yeah.  Is it okay now?

20            MR. MIN:  Yeah.  Wait for me to finish talking, go slow,

21   and enunciate, okay?

22            THE WITNESS:  Okay.

23   Q    Okay.  Again, I apologize.  I'm just going to ask the

24   question again.  Can you briefly describe your child's life after

25   you moved to Redmond in 2020?

1   A    We were careful about not contracting COVID-19, so we decided

2   to home school the child.  We found a home schoolteacher.  There

3   was another student of his age that was part of it, and the

4   teacher could home to our house, or the other student's house,

5   and teach lessons in the beginning of 2020.

6   Q    When you say "the beginning of 2020," what do you mean?

7   A    Sorry.  In the end of 2020 or the beginning of 2021 was the

8   homeschooling arrangement.

9   Q    Okay.  Did there come a time when your child -- and when we

10  refer to your child, I'm going to refer to him as "A.S." for

11  privacy and confidentiality reasons, so if you could do the

12  same -- did there come a time when A.S. began going to school in

13  person in Washington?

14  A    Yes.  Early 2021, he started in-person schooling.

15  Q    Okay.  And where did he start in-person schooling?

16  A    He started in a school called Cedar Crest academy.

17  Q    Can you spell that, please?

18  A    C-e-d-a-r C-r-e-s-t, Cedar Crest Academy.

19  Q    And do you recall when he started in 2021 at Cedar Crest?

20  A    Sometime early 2021 is my recollection.

21  Q    Okay.  Did he remain at that school?

22  A    No.  Within a month or two, we switched him to a different

23  school called Montessori Children's House.

24  Q    Why did you switch him to the Montessori school?

25  A    He did not like his teacher at Cedar Crest.  He was refusing

1   to go to school, and he was scared of the teacher.

2   Q   What grade was A.S. in in this school year, the fall-2020-

3   to-spring-2021 school year?

4   A   He was in pre-K.

5   Q   Okay.  So I want to stick to that time frame, so fall 2020 to

6   spring 2021.  Was A.S. enrolled in any extracurricular

7   activities?

8   A   No.

9   Q   Where did he go to school in the fall of 2021?

10  A   Montessori Children's House, MCH.

11  Q   The same school he finished at the end of -- the spring of

12  2021?

13  A   Yes.

14  Q   And what grade was he in at that time, fall of 2021?

15  A   He was in kindergarten.

16  Q   And did he complete the year in kindergarten at the school?

17  A   Yes, he did.

18  Q   Okay.  And so starting in that school year, including the

19  summer before, so the summer of 2021, was A.S. involved in any

20  extracurricular activities?

21  A   No, not to my memory.

22  Q   Where were his -- what did he do over the summer of 2021?

23  A   He -- I think he went to some chess camp and maybe some

24  soccer camp.

25  Q   Okay.  Any other activities that you recall during his time

1   in Washington?

2   A   We used to play with neighbors and then we used to go -- and

3   I used to teach him cycling and we used to go to the nearby park.

4   Q   Did A.S. have playdates while he was living in Washington?

5   A   Yeah, with the neighbors and the schoolkids that we

6   homeschooled him with.

7   Q   And what about sleepovers?

8   A   No.

9   Q   I'm sorry.  What?

10  A   No, he did not.

11  Q   Did there come a time when you and Ms. Sashidhar moved out of

12  Washington State?

13  A   Yes.

14  Q   When was that?

15  A   In the summer of -- in the summer of 2022.

16  Q   Why?

17  A   We wanted to move to Singapore for a variety of reasons

18  including saving on U.S. taxes, moving closer to family, having

19  helper at home, better schooling opportunities for the child.  A

20  bunch of these reasons.

21  Q   When did you and Ms. Sashidhar begin discussing moving out of

22  Washington State?

23  A   We were discussing moving out of the United States even in

24  like late 2019, 2020, and then we eventually, you know, figured

25  out and planned everything and moved in the summer of 2022.

1  Q   Well, how did these discussions commence?  Who initiated the

2  discussions about moving out of the United States?

3  A   I initiated them.  And I was exploring options and I was

4  discussing with my wife, and she wanted to work a few years in

5  the United States, before we left the U.S., which was the plan.

6  Q   And when did you and Ms. Sashidhar reach a decision to move

7  out of the United States ultimately?

8  A   So it was decided sometime late 2020 that we would move out,

9  and -- and in mid-2021, I had applied for immigration status in

10  Singapore.

11  Q   So you said you applied for immigration status in Singapore

12  in mid-2021.  What steps did you take to apply for immigration

13  status in Singapore?

14  A   I applied for a pass called a Tech.Pass.  So I submitted the

15  application sometime in July 2021.

16  Q   Don't speed up.  Talk slow.

17  A   Okay.

18  Q   Because once we do that, we have to start over again, because

19  the court reporter is not getting everything you're saying, okay?

20  So I'm going to ask it again.

21      You just testified that you applied for immigration status in

22  Singapore in mid-2021.  So what steps did you take to apply for

23  immigration status at that point?

24  A   I applied for a Tech.Pass, which is a Singapore work pass,

25  and thereafter, I also applied for Dependent Passes for my son

1  and my wife.  It was got approved a few months later.

2      Our move was taking little bit longer, and we wanted to move

3  around the end of the school year, to not disturb my child's

4  education.  So I had to renew the Tech.Pass and had to apply one

5  more time and eventually got it extended until the date of the

6  move.

7          THE COURT:  Counsel, I'm not clear, is he saying "text,"

8  "tech," or what type of pass is he referring to?

9          MR. MIN:  Sure.

10 Q   Can you spell the name of the pass that you obtained?

11 A   It's called "tech," t-e-c-h p-a-s-s.

12 Q   Tech.Pass?

13 A   Tech.Pass, yeah.

14 Q   Okay.  So what is a Tech.Pass?

15 A   It is given out to exceptional entrepreneurs in the field of

16 technology to come and start a company in Singapore.

17 Q   Okay.  And how long does that allow you to stay in Singapore?

18 A   Two years.

19 Q   And you said you applied for Dependent Passes for your wife

20 and your child?

21 A   Yes, I did.

22 Q   Okay.  How long did that let them stay in Singapore for, once

23 you received it, initially?

24 A   Two years.

25 Q   Okay.  After you received your Tech.Pass or -- withdrawn.

1          When did you receive your final Tech.Pass?

2     A    I think sometime in 2022.  I'm not sure of the exact time

3     frame.  But it was late 2021 or early 2022.

4     Q    Okay.  At any point after receiving your Tech.Pass, did you

5     apply for any other immigration status for you or your family in

6     Singapore?

7     A    After we moved to Singapore, I applied for a ONE Pass.

8     Q    What is a ONE Pass?

9     A    ONE Pass is another type of immigration pass that was

10    recently introduced in Singapore to bring in exceptional people

11    in the field of technology and to create more jobs in Singapore.

12    So I switched from Tech.Pass to ONE Pass, when we were living in

13    Singapore.

14    Q    Were you exploring the ONE Pass previously?

15    A    No.  Because the ONE Pass was just introduced.

16    Q    Was the ONE Pass available when you applied for the

17    Tech.Pass?

18    A    No.

19    Q    So when did you apply for this ONE Pass?

20    A    I believe 2023 or early '24 late.  2023 or early 2024 is my

21    recollection.

22    Q    Okay.  And did you obtain the ONE Pass?

23    A    Yes, I did.

24    Q    Okay.  Did you apply for any other additional status, aside

25    from the Dependent Passes you mentioned earlier for your wife and

1    child at that time?

2    A    Yes.  We had to apply for another set of Dependent Passes and

3    get them issued to extend the Dependent Passes for my wife and

4    child.

5    Q    How long does the ONE Pass allow you to stay in Singapore?

6    A    Five years.

7    Q    Five years from the date it was issued?

8    A    Yeah, sometime around five years.  So the expiry of the pass

9    is, I believe, August 2028.

10   Q    And the Dependent Passes for your wife and child, are those

11   also five years?

12   A    Yes.

13   Q    I'm going to show you a document that's been admitted into

14   evidence as Petitioner's Exhibit 15.  Can you identify these

15   documents, please?

16   A    This is her Dependent Pass, my wife's Dependent Pass, in

17   Singapore.

18   Q    What about the other pages in this document?

19   A    This is the back of the Dependent Pass.

20       This is my ONE Pass and the back of my ONE Pass.

21       This is my son's Dependent Pass and the back of his

22   Dependent Pass.

23   Q    And we can stop there.

24       If you look at the top right, that date, August 23, 2023,

25   does that signify anything to you?

1   A    I believe it might be the date that this pass was issued.

2   Q    Did you have discussions with Ms. Sashidhar, when you were

3   applying for the Tech.Pass and the ONE Pass?

4   A    Yes, I told her about it, and I told her there was this

5   opportunity.

6   Q    Okay.  And did Ms. Sashidhar say anything about getting the

7   Tech.Pass or the ONE Pass or did she object to getting the

8   Tech.Pass or the ONE Pass?

9   A    No.  She was excited about it.  She asked if I've applied for

10  her and the son.  She asked if I can apply for immigration status

11  to her mother.

12  Q    Go slow.  Go slow, please.  Prasanna, or we have to restart.

13  You have to go slow, please.  Don't speed up.

14      I'm going to ask it again.  Can you just give your answer

15  again?

16  A    She was excited about it.

17  Q    What else were you saying?

18  A    She asked whether I applied for a Dependent Pass for herself

19  and our son.  She also asked if I could apply for a long-term

20  pass for Dhivya's mother.

21  Q    Can you repeat that last part again, just because we couldn't

22  hear.  She also asked what?

23  A    She also asked if I could apply for a long-term visitor pass

24  for Dhivya's mother.

25  Q    Okay.  Whatever you did just there is much better, leaning

1   in.

2   A   Okay.

3   Q   Stay just like that.

4       You said she asked for a long-term visitor's pass for her

5   mother.  When was that?

6   A   It was, I think, before the move to Singapore.  I think

7   she -- I believe she wrote an e-mail to ask the immigration

8   authorities whether her mother could get a long-term pass to stay

9   in Singapore.

10  Q   Okay.  I'm going to show you a document that's been marked

11  and admitted as Petitioner's Exhibit 2, and we will scroll down

12  here.  If you can identify this document, please, or just let us

13  know what this is.

14  A   This is a document that Dhivya is writing, an e-mail, to the

15  Economic Development Board of Singapore, who issues the

16  Tech.Pass, and she was asking if her mom can stay long term in

17  Singapore with us.

18      This is before --

19  Q   Go ahead.

20  A   This is before our move to Singapore.

21  Q   Okay.  So I'm going to stop on page 2, if we can go up a

22  little bit, right there.  So this is Dhivya's e-mail?

23  A   Yes.

24  Q   Okay.  And this is in 2021 when you only had the Tech.Pass,

25  right, not the ONE Pass, yet?

1  A    Yes.

2  Q    Okay.

3  A    This was after {sic} the move to Singapore.

4  Q    Okay.  And so this is the year before you moved, right?

5  A    Correct.

6  Q    Okay.  Did you and Ms. Sashidhar discuss her mother coming to

7  Singapore with you?

8  A    Yes.

9  Q    And what did Sashidhar say to you about wanting to bring her

10  mother?

11  A    She wanted her mother to be able to live with her long term

12  in Singapore.

13  Q    Did you and Ms. Sashidhar talk about how long you might stay

14  in Singapore when you moved or when you were planning your move?

15  A    Yes.  We wanted to live there long term, until the child goes

16  to college or something.

17  Q    So was it surprising to you when she asked the Economic

18  Development Board and stated that she wanted her mother in

19  Singapore long term?

20  A    No, it was not surprising to me.

21  Q    And when you say you and Ms. Sashidhar discussed staying

22  there long term, what do you mean by that?

23  A    We were looking to put our roots down somewhere, and, you

24  know, we were looking at schools which go all the way till

25  twelfth grade.

1    Q    Till what?

2    A    Till twelfth grade, till college.

3    Q    Till college.

4         Did you say "twelfth grade"?

5    A    Yes.

6    Q    Okay.

7         Why were you looking at somewhere where he could complete

8    twelfth grade?

9    A    We wanted him to have continuity in his schooling life, like

10   we had, me and Dhivya had, and so we wanted to find the best

11   schools that he would graduate from.

12   Q    Okay.  I'm going to go back to the immigration stuff quickly.

13   Other than the Tech.Pass and ONE Pass, did you and Ms. Sashidhar

14   explore any other immigration options in Singapore either before

15   the move or after you moved?

16   A    Yes.  After we moved, we also considered getting a permanent

17   residency, PR, of Singapore.

18   Q    Okay.  When did you look into getting permanent residency in

19   Singapore?

20   A    Around the same time, you know.  Prior to applying for the

21   ONE Pass.

22   Q    Did you and Ms. Sashidhar apply for permanent residency in

23   Singapore?

24   A    No.  I spoke to the Economic Development Board about it, and

25   they said -- you know, they said that the requirements to get a

1   PR is very high, and, instead, they directed me to apply for a

2   ONE Pass.

3   Q   What's your understanding about the process to apply for a

4   permanent residency in Singapore?

5   A   My understanding is that I had to create a certain number of

6   jobs in Singapore, and even a permanent residency of Singapore is

7   subject to renewal requirements, three to five years.  Every

8   three to five years, it happens.

9   Q   Slow down, slow down.

10      Okay.  You said even permanent residency is required what?

11  A   As renewal requirements.  It is not like totally permanent.

12  You need to renew it once every three to five years.

13  Q   What does that mean, "renew" it?

14  A   So you need to continue to meet some high requirements to be

15  able to hold the permanent residency.

16  Q   What -- such as what type of requirements?

17  A   You either had to create a certain numbers of jobs in

18  Singapore and employ a certain number of people in Singapore or

19  you had to keep a certain amount of money in Singapore.  Some

20  combination thereof.

21  Q   And why did you and Ms. Sashidhar decide to apply for the ONE

22  Pass instead of the permanent residency?

23  A   So the Economic Development Board invited me to apply --

24  Q   Can you repeat that, please?

25  A   Okay.  The Economic Development Board of Singapore, who I

1  spoke with about the permanent residency, invited me to apply for

2  a ONE Pass, instead of the permanent residency, which is a new

3  program that they were just introducing, and it had a five-year

4  validity.

5  Q   It's a five-year validity?

6  A   Yes.

7  Q   Okay.  So why was that more attractive to you as an option?

8  A   Well, it gave us the same or more validity with much lesser

9  and stringent requirements.

10 Q   You mentioned before that you wanted the child to complete

11 twelfth grade in Singapore, right?

12 A   Yes.

13 Q   And did you and Ms. Sashidhar discuss long-term schooling

14 options for your child in Singapore?

15 A   Yes.

16 Q   Okay.  And what did you and Ms. Sashidhar discuss together

17 about schooling options in Singapore?

18 A   We looked at five {undecipherable} schools and discussed them

19 with Dhivya.  And we were talking about what of these schools can

20 be very long term, that he can graduate --

21        THE COURT REPORTER:  I'm sorry.  Would you ask him to

22 repeat?

23        MR. MIN:  Sure.

24 Q   We're going to ask you to repeat.

25     You know, I'm going to also ask perhaps if there's like

 1    another computer you can use or some other device.  If you have

 2    someone in the house, a friend, that perhaps can run out and get

 3    a microphone for you?

 4        Your Honor, I will note, you know, we did a test run

 5    yesterday, and it was fine, so I apologize for this.

 6            THE WITNESS:  Okay.  How about I join through my phone,

 7    and -- you know, I'll do the video through my laptop and audio

 8    through my phone; is that a better idea?

 9            THE COURT:  Let's try that.

10            THE WITNESS:  Can we try that?

11            THE COURT:  Let's try that.

12            MR. MIN:  Yes, the Court said, "Let's try that."  So if

13    you can try that, please.

14            THE WITNESS:  Okay.

15            THE COURT:  And for the record, I will let you know, I

16    have given the court reporter full authority to interrupt at any

17    point in time she can't hear.  It's important that we get an

18    accurate record, a consistent record, and we can only do that if

19    she can hear what's being said.

20            MR. MIN:  Yes.  Thank you, Your Honor.  And I apologize

21    for giving direction to the witness at times.

22            THE WITNESS:  So this is actually me talking through my

23    phone, but really through the computer.  Is this a better idea?

24            (The Court and court reporter confer.)

25            THE COURT:  One second.

 1          MR. MIN:  Thank you, Your Honor, for the courtesy.

 2          THE COURT:  Let's just run a test to see if this is

 3   working.  This isn't recorded.

 4                      (Testing audio.)

 5          THE COURT:  That's better.

 6          MR. MIN:  Yes, better.  Thank you.

 7      If I could ask the court reporter to read back the last

 8   question?

 9          THE COURT:  I think the question was regarding the

10   schooling.

11   Q   So can you describe the discussions you had with

12   Ms. Sashidhar about the long-term schooling options in Singapore?

13   A   Yes.  We wanted him to grow up in a school with consistency,

14   and we were looking at school options which go up till twelfth

15   grade.  So both me and my wife went to a school and stayed there

16   long term, like ten to -- you know, like ten years, and we wanted

17   to try and give that for our child.

18   Q   Okay.  So I'm not asking for the reasons.  I'm asking for the

19   discussions you had with Ms. Sashidhar.  Can you recall the

20   discussions you had with her about the long-term schooling

21   options?

22   A   Yes.  I shortlisted two schools, which are rated very highly

23   in Southeast Asia, in Singapore, and I discussed with Dhivya

24   about enrolling in those schools.  I spoke with several of the

25   school alumni, several of the school alumni who are

 1  entrepreneurs, and, you know, I believe I sort of discussed those

 2  conversations with Dhivya, in terms of choosing which school he

 3  would go to.

 4  Q   Well, was Ms. Sashidhar involved in the process of speaking

 5  to the schools directly or evaluating the schools?

 6  A   Yes, she was.

 7  Q   How so?

 8  A   She scheduled virtual meetings with the school, attended

 9  school tours virtually from the U.S., and participated in

10  applying for these schools.

11  Q   Before moving to Singapore, had and you Ms. Sashidhar ever

12  discussed that your stay in Singapore would only last two or

13  three years?

14  A   No.

15  Q   Was there ever a time limit on your stay in Singapore that

16  was discussed with you and Ms. Sashidhar?

17  A   No.

18  Q   When you moved to San Francisco in or around 2015 or

19  thereabouts, what was your immigration status in the United

20  States?

21  A   I was a permanent resident of the United States.

22  Q   Okay.  At some point, did you -- were you no longer a

23  permanent resident of the United States?

24  A   Yes.

25  Q   When was that?

1   A    Sometime late 2020.

2   Q    And what happened to cause you to no longer be a permanent

3   resident of the United States?

4   A    I gave up my green card.

5   Q    When did you start the process of doing that?

6   A    Sometime in late 2020.

7   Q    So late 2020, you started the process of giving up your green

8   card.  And your green card -- you did give up your green card

9   also in 2020?

10  A    Yes.  I believe December 2020, I gave it up.

11  Q    Okay.  And why did you give up your U.S. green card?

12  A    At that point, we were in the process of our plans to like

13  move out of the United States, and I gave up my green card and

14  converted to a different visa in the U.S. so that I can stay in

15  the U.S. before we ultimately left.

16  Q    Okay.  And what visa did you acquire, after giving up your

17  green card?

18  A    I got an O-1 visa.

19  Q    What is an O-1 visa?

20  A    An O-1 visa is given to -- you know, it's called a visa for

21  aliens of extraordinary ability, so, you know, it's given to,

22  like, successful entrepreneurs and people who contribute to

23  certain fields.

24  Q    Okay.  And although your sound quality is much better, just

25  remember to speak slowly still, okay?

1    A    Okay.

2    Q    Did there come a time when your O-1 visa expired?

3    A    Yes.

4    Q    Okay.  When was that?

5    A    Sometime in 2023, I think.

6    Q    Okay.  You gave several reasons earlier about why you and

7    Ms. Sashidhar decided to leave the United States and move to

8    Singapore.  You talked about educational opportunities.  What did

9    you mean by that, specifically?

10   A    We thought Singapore was a great -- was a place with great

11   education options.  The schools there, they're ranked very

12   highly.  They paid a lot of attention to math and science.  And

13   these schools had very high rates of admission in top

14   universities.

15   Q    You say they had high rates of admission at top universities.

16   Is that something you and Ms. Sashidhar looked at when evaluating

17   schools?

18   A    Yes.  Yes.

19   Q    Why was that important to you?

20   A    We wanted our child to go to the best universities, after

21   graduating.

22   Q    Okay.  That would require A.S. to complete school at that

23   particular school that had the high-admission rate, right?

24   A    That is correct.

25            MS. SKINNER:  Objection.  Calls for speculation.

1              THE COURT:  I'll allow it.  Please continue.

2    Q    You also talked about financial reasons for moving, correct?

3    A    Correct.

4    Q    What did you mean by that?

5    A    We didn't want to pay U.S. taxes on the assets that I was

6    holding.

7    Q    Is that something you discussed with Ms. Sashidhar?

8    A    Yes.

9    Q    Okay.  And did she agree with that as a reason for moving?

10   A    Yes.

11   Q    Was that also one of the -- the tax and financial reasons,

12   was that also one of the reasons you moved from California to

13   Washington in the first place?

14   A    Yes.

15   Q    You also mentioned having better domestic assistance?

16   A    Yes.

17   Q    What did you mean by that?

18   A    So it is much easier to get helpers in Singapore.  So we have

19   a helper at home, who stays with us, and manages everything in

20   the house from cooking, cleaning, packing our child's bag, to a

21   lot of different things.

22   Q    Okay.  What school was A.S. enrolled in when you arrived in

23   Singapore, when you moved?

24   A    Singapore American School.

25   Q    Okay.  And did he stay at that school during the whole time

 1  he was living in Singapore?

 2  A    No.  We switched him.

 3  Q    To what school?

 4  A    So after two years, after completing two years, we switched

 5  him to UWC, United World College.

 6  Q    United World College, UWC.  Okay.  Do both of those schools

 7  go through high school, through twelfth grade?

 8  A    Yes.

 9  Q    You also testified -- withdrawn.

10       After A.S. moved from the United States to Singapore, did he

11  continue to stay in contact with his friends from school in the

12  United States?

13  A    He had a few video calls, but over time, the contacts

14  dropped.

15  Q    You also testified earlier one of the reasons for the move

16  was family; is that right?

17  A    Yes.

18  Q    What do you mean by that?

19  A    We wanted to be closer to our family.  Our family was based

20  in India.  Dhivya's mom, my parents, all of her extended cousins,

21  a lot of them were based out of India, and we wanted to move

22  closer to them.

23  Q    Did you have any family -- did you or Ms. Sashidhar have any

24  family in the United States prior you to moving to Singapore?

25  A    No.

1    Q    Do you or Ms. Sashidhar have any family in Singapore?

2    A    Yes.  I have my first cousin, who lives here in Singapore

3    with his wife and his child, and our kids play together.

4    Q    And -- go ahead.

5    A    We also have a few more relatives here in Singapore.

6    Q    Okay.  How long was the flight generally from Seattle to

7    India -- or from Washington to India?

8    A    About 20 to 24 hours, probably.

9    Q    What about from Singapore to India?

10   A    About three to four hours, I think.

11   Q    What is your primary language?

12   A    My mother tongue is Tamil.

13   Q    How many languages do you speak?

14   A    Fluently, Tamil and English.

15   Q    And what about Ms. Sashidhar, what is her mother tongue?

16   A    Tamil.

17   Q    And do you know if she speaks any other languages besides

18   Tamil and English?

19   A    We both speak a little bit of Hindi, but not very frequently.

20   Q    Okay.  Well, what language do you speak at home with A.S.?

21   A    We speak Tamil and English.

22   Q    What is or are the official languages of Singapore, if you

23   know?

24   A    It is English, Tamil, Malay, and Chinese.

25   Q    English, Tamil, Malay, and Chinese?

1    A    That's my recollection, yes.

2    Q    Okay.  Are there a lot of people who speak Tamil in

3    Singapore, in your experience?

4    A    Yes.  Yes.

5    Q    Is there a large Indian community in Singapore, in your

6    experience?

7    A    Yes.

8    Q    Are you able to speak Tamil in the community in Singapore

9    when you're out?

10   A    Yes.  Yes.

11   Q    You said your child speaks Tamil and English?

12   A    Yes.

13   Q    Okay.  Is he studying either Malay or Chinese?

14   A    He is studying Chinese in school.

15   Q    When did he start doing that?

16   A    From first grade.

17   Q    First grade.  Okay.

18        So when he first started moving to Singapore, when he first

19   moved?

20   A    Yes.

21   Q    And how many grades did he complete in Singapore?

22   A    Two completed.

23   Q    First and second grade?

24   A    Yes.

25   Q    Did he start third grade in Singapore?

1    A    Yes.

2    Q    Okay.  Was he taking Chinese language classes all two-plus

3    years?

4    A    Yes.

5    Q    How often did you visit India, you, your family, while you

6    were living in Singapore?

7    A    Once every two, three months, I think.

8    Q    And how often did your family or Ms. Sashidhar's family visit

9    from India to Singapore while you were living in Singapore?

10   A    I think two or three times a year.

11   Q    When you were living in the United States, did you have, you

12   know, furniture, cars, belongings that you owned?

13   A    Yes.

14   Q    What did you do with those belongings when you moved to

15   Singapore?

16   A    I sold my car, I resold a lot of our furniture, and then

17   shipped the rest into a shipping container to Singapore.

18   Q    Did you leave any belongings behind in the United States once

19   you moved?

20   A    No.

21   Q    Did you have a storage facility where you left any

22   belongings?

23   A    No.

24   Q    Did you ask any of your friends to hold belongings for you in

25   the United States when you moved?

 1   A    No.

 2   Q    I'm going to show you a document that's been admitted as

 3   Petitioner's Exhibit 47.  We will just pull it up on the screen.

 4   Can you just let us know what we're looking at?

 5   A    Yes.  So this is from my wife sending me an e-mail about

 6   everything that we need to sell before we moved to Singapore.

 7   Q    Was Ms. Sashidhar actively involved in the moving process to

 8   Singapore?

 9   A    Yes.

10   Q    How so?

11   A    She was actively involved in finding a new place, selling all

12   the stuff, talking to movers, talking to the schools, every step

13   along the way.

14   Q    You said finding a new place.  You mean a new place to live

15   in Singapore?

16   A    Yes.

17   Q    You said dealing with the movers and moving your belongings

18   from the U.S. to Singapore?

19   A    Yes.

20   Q    You said also talking to the school, right, the school in

21   Singapore?

22   A    Yes.

23   Q    Okay.  Are these the belongings that she asked you or

24   discussed with you that needed to be sold before moving?

25   A    Yes.

1    Q    Did she ever mention to you that perhaps you guys should keep

2    anything in the United States for when you might eventually come

3    back?

4    A    No.

5    Q    Did you guys own a car in the U.S.?

6    A    Yes.

7    Q    What did you do with that car?

8    A    I sold it.

9    Q    Okay.  How did you move your belongings to Singapore?

10   A    We rented a container in a ship.

11   Q    I'm going to show you a document that's been admitted as

12   Petitioner's Exhibit 49.  Pull that up.  If you can just let us

13   know the document that we're looking at.

14   A    Yes.  This is the estimate to rent a container, the cost.

15   Q    Okay.  And if we stop there, looking at the e-mail dated

16   Friday, April 22nd, 2022, at 2:41 p.m., is that Dhivya's e-mail

17   address?

18   A    Yes.

19   Q    Was she part of the process to facilitate the move?

20   A    Yes.

21   Q    Is this the moving company that you and Ms. Sashidhar

22   ultimately hired to move your belongings to Singapore?

23   A    Yes.

24   Q    I'm going to show you a document that's been premarked as

25   Petitioner's Exhibit 9.  Is this your agreement with Universal

1   Relocations?

2   A    Yes.

3   Q    Okay.  I'm going to show you a document that's been admitted

4   as Petitioner's Exhibit 13.  Is this the invoice for your

5   shipment to Singapore from Universal Relocations?

6   A    Yes.

7   Q    Did you pay this invoice?

8   A    Yes.

9   Q    Did your belongings get shipped to Singapore?

10  A    Yes.

11  Q    Okay.  While you were living in the United States, did

12  Ms. Sashidhar have any medical issues that required medical

13  treatment or constant medical treatment?

14  A    Yes.  She has a chronic condition called lupus.

15  Q    Okay.  And did that require her to take medication?

16  A    Yes.

17  Q    Okay.  And was she exploring medical treatment options in

18  Singapore?

19  A    Yes.

20  Q    I'm going to show you a document admitted into evidence in

21  Petitioner's Exhibit 10.  Can you describe this e-mail, please?

22  A    This is the e-mail from Dhivya to -- actually, from me -- to

23  one of the best hospitals for lupus in Singapore, asking for --

24  asking for a doctor to consult with, as far as the availability

25  of lupus medication.

1    Q    Why were you e-mailing on Ms. Sashidhar's behalf for medical

2    care?

3    A    She told me to figure out good doctors in Singapore.

4    Q    Okay.  And did -- was your wife able to get medical treatment

5    for her lupus in Singapore?

6    A    Yes.

7    Q    From this hospital or another facility?

8    A    She visited this hospital and other facilities as well.

9    Q    Was there an issue with her medication for her lupus in

10   Singapore?

11   A    She had to switch to a different medication in Singapore.

12   Q    Did your child, A.S., receive any medical care in Singapore

13   while you lived there?

14   A    Yes.  He had a pediatrician and he also frequently visited

15   Gleneagles Hospital.

16   Q    What is Gleneagles Hospital?

17   A    Gleneagles Hospital is a hospital in Singapore that A.S.

18   visited a few times, was admitted once.

19   Q    Is that different than his pediatrician?

20   A    He also had another pediatrician in KinderCare.

21   Q    Can you just spell that or repeat that?  He also had another

22   pediatrician at where?

23   A    KinderCare, K-i-n-d-e-r-C-a-r-e.

24   Q    I'm going to show you a document admitted as Petitioner's

25   Exhibit 59.  If you can just describe and tell us what this

1    document is.

2    A    So this was when A⬛⬛ had to be -- sorry, A.S., had to be

3    admitted in the hospital, and this was the bill from the

4    Gleneagles Hospital.

5    Q    Did he have any vision care -- I mean, any medical care for

6    his eyesight while in Singapore?

7    A    Yes.

8    Q    I'm going to show you a document admitted as Petitioner's

9    Exhibit 60.  Can you describe what this document is?

10   A    This is Singapore American School doing a vision test for

11   A.S.

12   Q    After this vision test result, did you get any other vision

13   care for your son?

14   A    Yes.  We purchased a spectacle.

15   Q    I'm sorry.  What did you say, you did what?

16   A    We purchased eyeglasses for my son.

17   Q    Okay.

18   A    For our son.

19   Q    Did he need glasses?

20   A    Yes.

21   Q    Did you purchase those in Singapore?

22   A    I -- we definitely bought one in India.  I don't know if we

23   also bought another in Singapore or not.

24   Q    Did A.S. receive any medical care in the United States

25   between summer 2022 and summer 2024?

 1    A    No.  After we left, no.

 2    Q    I mean, has he ever returned to the United States between

 3    summer 2022 and October 14th, 2024; A.S., has he ever gone back

 4    to the U.S.?

 5    A    No.  No.

 6    Q    Did you have bank accounts in the U.S. when you left?

 7    A    Yes.

 8    Q    Okay.  Do those remain open?

 9    A    Yes.

10    Q    Why?

11    A    I had no reason to close them.

12    Q    Did you open bank accounts in Singapore when you moved?

13    A    Yes.

14    Q    Did Ms. Sashidhar?

15    A    Yes.

16    Q    Okay.  Did you use those bank accounts?

17    A    Yes.

18    Q    For what?

19    A    The Singapore bank accounts was what we used day-to-day to

20    pay our bills.

21    Q    Did you continue paying taxes in the United States after you

22    moved?

23    A    No, not -- I did not.  So the last tax filing year for me was

24    the year of 2022.

25    Q    Did Ms. Sashidhar pay taxes, besides year 2022?

1   A    So I believe, after she moved, she was terminated from her

2   job at Microsoft, and she received some compensation as a part of

3   it, so she filed taxes as a part of that.

4   Q    In what year?

5   A    Probably in year -- it could be 2023.  I'm not sure.

6   Q    But your last tax year was 2022, which is the last year you

7   lived in the U.S.?

8   A    That is correct.

9   Q    Did you have any good-bye parties or good-bye celebrations

10  in the U.S. when you left?

11  A    Yes.  We met with a few of our friends for dinner and they

12  said good-bye.

13  Q    When specifically did you move from the United States to

14  Singapore?

15  A    Summer of 2022.

16  Q    I'm going to show you a document that's been admitted as

17  Petitioner's Exhibit 6.  If you can just identify this document,

18  please?

19  A    This is, I believe, our flight ticket to Singapore.

20  Q    Okay.  Is this an accurate, I guess, description of when you

21  flew to Singapore from Seattle on Friday, July 15th, 2022?

22  A    I think so, yes.

23  Q    Okay.  I mean, do you recall changing your flights at all?

24  A    I don't recall.

25  Q    Did you have U.S.-based cell phone numbers when you were

1    living in the United States?

2    A    Yes.

3    Q    Okay.  Did you continue to have those numbers after you moved

4    to Singapore?

5    A    No.  We -- our primary phone numbers lapsed.

6    Q    When you say "primary phone numbers," what do you mean by

7    that?

8    A    The mobile phone number that we were using ceased to exist.

9    Q    For you and Ms. Sashidhar?

10   A    Yes.

11   Q    Did you get Singapore numbers?

12   A    Yes.

13   Q    I'm going to show you a document that's been admitted into

14   evidence as Petitioner's Exhibit 31.  Can you just describe this

15   document, please?

16   A    This is my wife e-mailing the schoolteacher saying that my

17   phone number had been changed to a Singapore phone number.

18   Q    And plus 65 is a Singapore number?

19   A    Yes.

20   Q    Did Ms. Sashidhar also have a Singapore number?

21   A    Yes.

22   Q    Okay.  Did you obtain a driver's license in Singapore after

23   the move?

24   A    Yes.

25   Q    What about Ms. Sashidhar?

1    A    She also did.

2    Q    Approximately when?

3    A    Probably 2023 -- or, yeah, I think 2023.

4    Q    You guys drive in Singapore?

5    A    Yes.  We leased a car.

6    Q    When did you start looking for housing in Singapore, in

7    preparation for the move?

8    A    I believe a few months before.

9    Q    Okay.  And you said earlier that Ms. Sashidhar was involved

10   in the process of finding housing in Singapore, correct?

11   A    Correct.

12   Q    I'm going to show you a document that's been admitted as

13   Exhibit 51, Petitioner's Exhibit 51.  Can you describe this

14   document, please?

15   A    This is Dhivya looking at housing options and real estate

16   housing options in Singapore, and she is saying that this was

17   something that was recommended by a relative living in Singapore,

18   and she is asking if we should book this apartment.

19   Q    You said recommended by a relative.  Is that Usha?

20   A    Yes.

21   Q    Okay.  Whose relative is that?

22   A    Usha is my relative.

23   Q    How so?

24   A    She is related to my father.

25   Q    Okay.  And were you and Ms. Sashidhar in communication with

1    her regarding your move to Singapore?

2    A    Yes.

3    Q    Okay.  How so and why?

4    A    She was helpful in terms of planning which place to live, and

5    we had -- Dhivya was asking a lot of questions to her.

6              THE COURT:  Counsel, it's 10:30.  Is this a convenient

7    time to take the morning recess?

8              MR. MIN:  Okay.

9              THE COURT:  We will break at this time.

10   Fifteen minutes.

11             THE CLERK:  Please rise.

12        The parties are excused.

13                        (Recessed.)

14             THE COURT:  Good morning, again.  Please be seated.

15        Counsel, you may resume your examination.

16             MR. MIN:  Thank you, Your Honor.

17   Q    (By Mr. Min:)  Where did you and your family reside initially

18   upon arriving in Singapore?

19   A    We resided in Shangri-La.

20   Q    I'm going to show you a document that's been admitted as

21   Petitioner's Exhibit 50.  Can you describe this document, please?

22   A    This was my wife booking the Shangri-La apartment and

23   forwarding that booking to me.

24   Q    And how did you come to stay at this Shangri-La apartment?

25   A    We caught a flight and booked a cab and came here.

1  Q    No.  How did you find this apartment and why did you choose

2  this apartment?

3  A    I think my wife researched it and found it, considering many

4  different apartments.

5  Q    How long did you and family stay there?

6  A    I'm not sure.  Maybe a few weeks.

7  Q    Okay.  Did you move into more permanent housing afterwards?

8  A    Yes, we did.

9  Q    Where?

10  A    We moved into an apartment later.  I think we might have

11  lived in one more temporary place.  I'm not sure.  But,

12  eventually, we moved into, in a month or so, we moved into an

13  apartment in Ardmore Park.

14  Q    Okay.  I'm going to show you a document that's been admitted

15  as Petitioner's Exhibit 18.  Can you identify --

16  A    It's a letter.

17  Q    -- this document?

18  A    Yes.  This is a tenancy agreement of Ardmore Park, which is

19  the apartment that we moved into.

20  Q    Okay.  And how long did you live at the Ardmore Park address?

21  A    Two years.

22  Q    And how did you come to choose this apartment?

23  A    Our realtor showed us a bunch of different apartment

24  choices.  This apartment was recommended to Dhivya by her friend.

25  Q    And did you -- did there come a time when you moved out of

1    this home?

2    A    Yes.

3    Q    When was that?

4    A    It was August 2024.

5    Q    I'm going to show you a document, No. 19.  I'm going to show

6    you a document that's been admitted into evidence as 19,

7    Petitioner's Exhibit 19.  Can you identify this document?

8    A    This document is the lease for the apartment that we moved

9    after Ardmore Park.

10   Q    Where was that located?

11   A    4 Astrid Hill.

12   Q    And how long was that lease agreement for?

13   A    Three years.

14   Q    And when did you sign this lease agreement?

15   A    I think June 2024.

16   Q    And when did you move to Astrid Hill?

17   A    August 2024.

18   Q    Okay.  So in around August 2022, you signed a two-year lease

19   at Ardmore Park, right?

20   A    Yes.

21   Q    And then in June 2024, you signed a three-year lease at

22   Astrid Hill?

23   A    Yes.

24   Q    That commenced in August 2024; is that correct?

25   A    Correct.

1    Q    When you moved to Ardmore Park, the first two-year lease or

2    the two-year leasehold, was that home furnished?

3    A    No.

4    Q    Did you take any steps to furnish it?

5    A    Yes.  We bought a few different things, including a master

6    bed, a television, and a few other things, to furnish it.

7    Q    I'm going to show you a document that's been admitted as

8    Petitioner's Exhibit 29.  Do you see that in front of you?

9    A    Yes.

10   Q    Can you describe what this document is?

11   A    This is my wife, Dhivya, sending an e-mail to A███'s class

12   teacher saying that we have moved to a permanent home on

13   August 22 -- she's referring to the Ardmore Park house -- and

14   telling the teacher to help him get into his new bus, which takes

15   him to his permanent home.

16   Q    Can you describe your Ardmore Park home, briefly?

17   A    It was an apartment.  It was -- it had a swimming pool, which

18   we played in.  There were a lot of kids A███'s age, many of them

19   going to the Singapore American School.  There were teachers who

20   were coming in to teach swimming, which A███ participated in;

21   there were teachers who were coming in to teach basketball, which

22   A███ participated in; there was a friend named Greg in Ardmore

23   Park who A███ had sleepovers and playdates with.  It was a fun

24   place.

25   Q    Okay.  And, Prasanna, I'm just going to ask you to remember

1   to speak slowly, okay?

2   A    Okay.

3   Q    Why did you choose to move to 4 Astrid Hill then?

4   A    We changed his school from Singapore American School to UWC,

5   and one of the common issues we faced was Ardmore Park was too

6   far away.  A███ had -- sorry, A.S. had a big commute time to the

7   Singapore American School.  So after our lease ended, we wanted

8   to find something with a much shorter commute time.

9   Q    What was the process in selecting this home at 4 Astrid Hill?

10  A    So we engaged the same real estate agent, who is Dhivya's

11  relative, and he showed us a bunch of different homes.  Me and

12  Dhivya went and visited a lot of different houses.  We even

13  considered buying some houses and eventually decided against it.

14  We eventually rented -- chose to rent this 4 Astrid Hill.

15  Q    At the end of the lease period for Ardmore Park in the summer

16  of 2024, did Ms. Sashidhar ever tell you it was time to return to

17  the United States?

18  A    No.

19  Q    Was she in agreement with leasing a three-year or signing or

20  executing a three-year lease at 4 Astrid Hill?

21  A    Yes.

22  Q    When you say that you looked at homes to buy, what time

23  period are we talking about?

24  A    I'm not sure about the exact time period, but somewhere

25  before the move to Astrid Hill.

1   Q   What was the process by which you and Ms. Sashidhar were

2   looking at homes to buy?

3   A   We were in touch with the same real estate agent, who's

4   Dhivya's second cousin, to go and look at homes.

5   Q   And did you go and look at homes?

6   A   Yes.

7   Q   Okay.  Can you describe 4 Astrid Hill?  What kind of home is

8   it?

9   A   4 Astrid Hill is a bungalow.  It's a big bungalow.  It has a

10  swimming pool, it is a detached house, and it has a garden around

11  it.

12  Q   Did Ms. Sashidhar ever tell you what sort of home she wanted

13  to buy?

14  A   Yes.  She sent me property links, and we were going and

15  visiting them.

16  Q   But were there any restrictions on what type of homes you

17  could buy in Singapore?

18  A   Yes.  We found out that -- you know, after visiting the

19  houses, we found out that we couldn't buy a landed house in

20  Singapore, as a non-Singaporean.

21  Q   What's a "landed house"?

22  A   A landed house is something that's not an apartment.

23  Q   Okay.  Did Ms. Sashidhar want to purchase a landed home?

24  A   Yes.  We looked at a house.  We wanted to -- we were

25  considering the house.

1  Q   Did Ms. Sashidhar ever talk to you about steps you could take

2  to buy a landed home in Singapore?

3  A   Yes.  She asked the real estate agent whether anything could

4  be done to purchase the home.

5  Q   Did you and her discuss taking any steps to, at some point,

6  be able to buy a landed home?

7  A   We briefly discussed about potentially, you know, getting a

8  PR, but it was a brief conversation.

9  Q   Okay.  Did you and Ms. Sashidhar and A.S. attend any

10  religious classes in Singapore?

11  A   Yes.  We attended something called balmukthas.

12  Q   Can you spell that, please?

13  A   B-a-l-m-u-k-t-h-a-s.

14  Q   And what is that?

15  A   It teaches kids about Hindu scriptures.  It teaches kids and

16  parents about Hindu scriptures.

17  Q   And how often would you attend those classes?

18  A   We attended it on Saturdays, at 4:00 p.m.

19  Q   And is that something you did in the United States?

20  A   No.

21  Q   Whose idea was it to attend these classes in Singapore?

22  A   Dhivya.

23  Q   Did she tell you why she wanted to attend these classes?

24  A   Yes.  She said she wanted to -- it would teach our child

25  Hindu values.

1    Q    When you moved to Singapore, were you working?

2    A    Yes.  I started a new company.

3    Q    What's the name of that company?

4    A    0xPPL.com.

5    Q    0xPPL?

6    A    Yes.

7    Q    And how do you spell the name of the company?

8    A    The number zero, alphabet X, and PPL, "people," com.

9    Q    What kind of company is that?

10   A    It's a crypto social network.

11   Q    Okay.  And when was that company established?

12   A    I believe it was found -- it was created prior to the move to

13   Singapore.  And it was incorporated in Singapore, so I had to

14   move to Singapore.  I'm not exactly sure when.

15   Q    Okay.  Do you know how much prior to the move it was set up?

16   A    I don't know.  I think a few months.

17   Q    Was it set up in anticipation of your move to Singapore?

18   A    Yes.

19   Q    Okay.  You said it was set up in Singapore?

20   A    Yes.

21   Q    Did there come a time when you restructured the company to no

22   longer be set up in Singapore?

23   A    Yes.

24   Q    When was that?

25   A    Sometime in -- sometime in, I think, summer 2023.

1    Q    Okay.  And where is it established now?

2    A    It is in the Cayman Islands.

3    Q    And why did you restructure your company to be established in

4    the Cayman Islands instead of Singapore in 2023?

5    A    When we got -- when I got external investors in the company,

6    they suggested the Cayman Islands as a better jurisdiction.

7    Q    Okay.  What happened with the company that was established in

8    Singapore as 0xPPL?

9    A    It was eventually renamed and used for a venture called

10   Lumebox Ventures.

11   Q    Can you spell that, please?

12   A    L-u-m-e-b-o-x.  Lumebox Ventures.

13   Q    And that was around 2023?

14   A    I think it was 2024.

15   Q    Okay.  And what is Lumebox Ventures?

16   A    Lumebox Ventures is a venture capital fund that my wife was

17   running.

18   Q    And what's her -- does she have a role at Lumebox Ventures?

19   A    She's the CEO.

20   Q    Okay.  Was your wife working after the move to Singapore?

21   A    She continued working on her family business.  She was the

22   CEO of Equus, and then she was on a leave of absence from

23   Microsoft during 2023, when we moved to Singapore.

24   Q    And at some point, was she no longer employed at Microsoft?

25   A    Yes.

 1    Q    When was --

 2    A    She was -- she was terminated, I believe, sometime in 2023.

 3    Q    And was she -- you had testified earlier that she was CEO of

 4    this Equus company while you were living in California, correct?

 5    A    Correct.

 6    Q    As far as you understand, did she continue in the role as CEO

 7    of this company from California through when you moved to

 8    Singapore?

 9    A    Yes.

10    Q    And then sometime in 2024 or so, she became CEO of Lumebox

11    Ventures?

12    A    Yes.

13    Q    Okay.  You said that's a VC fund.  Did that company make any

14    investments into any companies?

15    A    Yes.

16    Q    Okay.  Who made the decision to invest in companies?

17    A    Dhivya.

18    Q    Did she talk to you about her investments in companies as CEO

19    of this venture capital fund?

20    A    Yes, she discussed some ideas, but the decision was

21    ultimately hers.

22    Q    When did you first start exploring schools in Singapore,

23    prior to the move?

24    A    I'm not sure.  Sometime in the year before.

25    Q    Did you have any contact with Singapore American School

1   before the move to Singapore?

2   A    Yes.  We attended a virtual tour and we spoke to many alumni.

3   Q    I'm going to show you a document that's been admitted into

4   evidence as Exhibit 24, Petitioner's Exhibit 24.  Please describe

5   this document for the Court.

6   A    This is Dhivya scheduling a virtual event with Singapore

7   American School, to explore it prior to our move in

8   February 2022.

9   Q    Okay.  And was this Dhivya writing to the school about the

10  virtual event?

11  A    Yes.

12  Q    And did you attend the virtual event?

13  A    I believe so.

14  Q    I'm going to show you a document admitted into evidence as

15  Petitioner's Exhibit 26.  Can you describe this document, please?

16  A    This is Dhivya writing to Singapore American School, after we

17  reached Singapore, about A.S.'s orientation and helping him get

18  started in his new school.

19  Q    Again, this is your wife corresponding with the school?

20  A    Correct.

21  Q    I'm going to show you a document admitted into evidence as

22  Petitioner's Exhibit 48.  Can you describe this document, please?

23  A    This is for the same program.  We were discussing when we

24  would reach Singapore from the U.S., and, you know, Dhivya

25  confirmed that I can go ahead and enroll into this program, and

1    she also tells us when we leave the U.S. and reach Singapore.

2    Q    I'm going to show you a document admitted into evidence as

3    Petitioner's Exhibit 27.  Can you describe this document, please?

4    A    I think this is Dhivya writing to the Singapore American

5    School teacher asking her to take care of our son, and she's

6    saying that he's a picky eater who needs some encouragement to

7    adapt to a new school.

8    Q    Did you send your medical -- the child's medical records from

9    the U.S. to Singapore for schooling?

10   A    Yes, we did.

11   Q    I'm going to show you a document admitted into evidence as

12   Petitioner's Exhibit 4.  Did you send any school records to the

13   school as well?

14   A    Yes, we did.

15   Q    Can you describe this e-mail, please?

16   A    This is from A███'s previous school, Montessori Children's

17   School, or MCH, and getting all his records from the school.

18   Q    How did S.A.S. -- I'm sorry, A.S. perform at SAS?

19   A    He did extremely well.  He was a bright student in school.

20   Q    I'm going to show you a series of documents starting with

21   No. 20, Petitioner's Exhibit 20, admitted into evidence.  Can you

22   just let us know what this document is?

23   A    This document is a report card in Singapore American School.

24   Q    And he excelled at SAS; is that correct?

25   A    Yes.

1    Q    Okay.  I'm going to show you a document admitted into

2    evidence as Petitioner's Exhibit 21.

3    A    This is his second semester report card.

4    Q    Okay.  And did he do well in this semester?

5    A    Yes, he did.

6    Q    I will show you an exhibit marked -- admitted into evidence

7    as Petitioner's Exhibit 22.

8    A    This is one of the report cards.

9    Q    And did A.S. continue to get good grades?

10   A    Yes.

11   Q    You mentioned briefly, before, some activities that A.S.

12   participated in.  Specifically, during his time at SAS, do you

13   recall what extracurricular activities A.S. engaged in?

14   A    Yes.  He went to some swimming classes for some period of

15   time.  He went to basketball classes over the weekend.  He had a

16   piano teacher coming home to teach piano.  He went to drums

17   classes for some period of time.  He went to math classes

18   briefly.  We went to this religious balmukthas theater.

19   Q    The last thing you went to?

20   A    Balmukthas, the religious class, the Hindu religious class,

21   balmukthas, over the weekend.

22   Q    You mentioned in Washington he had some chess camp in the

23   summer of 2021.  Did he continue to play chess in Singapore?

24   A    Yes.  There was a teacher who came home twice a week to teach

25   chess to A███.

1    Q    What about any science or coding camps?

2    A    He was -- he went to coding -- a coding class over the summer

3    break.  He was also enrolled -- my wife had enrolled him in a

4    science camp, which he was about to start, prior to the

5    abduction.

6    Q    I'm going to show you a document that's been admitted into

7    evidence as Petitioner's Exhibit 34.  Can you identify what this

8    document is?

9    A    This is Singapore American School swim report card for

10   A███ -- or A.S.

11   Q    I'm going to show you a document that's been admitted as 54,

12   Petitioner's Exhibit 54.

13   A    So this is a festival at A.S.'s school, which

14   Dhivya {indecipherable}, and we all attended together as a

15   family.

16             THE COURT REPORTER:  I'm sorry.

17   Q    Can you say the last part?  Again, remember to go slow.

18   A    We all attended together as a family.

19   Q    Can you -- we're going to show you a document that's been

20   admitted as Petitioner's Exhibit 55.  Can you describe what this

21   document is?

22   A    So this is -- this is, I believe, an outdoor activity for

23   A.S. that Dhivya signed up for in the school.

24   Q    Okay.  I'm going to show you a document marked as 36,

25   admitted into evidence as 36.  Can you describe what this

1    document is?

2    A    This is a tour that his school arranged for his class.  It's

3    a class trip for A.S.

4    Q    When did you and Ms. Sashidhar decide to change schools for

5    A.S.?

6    A    Sometime in early 2024.

7    Q    I'm going to show you a document admitted into evidence as

8    Petitioner's Exhibit 37.

9    A    This is the offer from the new school admitting him and

10   giving him a spot.

11   Q    Okay.  What was the curriculum at SAS?

12   A    It was American curriculum.

13   Q    Okay.  And what was the curriculum at UWC?

14   A    It was IB, international bachelorette.

15   Q    International baccalaureate program?

16   A    Yes.

17   Q    You had mentioned earlier that A.S. was in Chinese classes,

18   correct?

19   A    Right.

20   Q    At his time at SAS as well?

21   A    Yes.

22   Q    Okay.  I'm going to show you a document admitted into

23   evidence as Petitioner's Exhibit 40.

24   A    This is Dhivya enrolling A.S. into the Chinese class in UWC.

25   Q    As far as you understand, is A.S. still enrolled in UWC?

1    A    Yes, he is.

2    Q    Okay.  Is his tuition paid?

3    A    Yes, it has been.

4    Q    I'm going to show you a document admitted into evidence as

5    Petitioner's Exhibit 44.

6    A    This is the payment of his school fees.

7    Q    Why did you and Ms. Sashidhar make the decision to change

8    A.S.'s school?

9    A    This school was ranked much better.  This was ranked No. 1 in

10   Southeast Asia by a lot of reports.  It had much more of an

11   independent upbringing, it had outdoor camps, which promoted a

12   lot for independence and humility and it had stronger values, and

13   we decide to switch him.  It is also much harder to get into.

14   Q    Did A.S. continue to socialize with his friends at SAS after

15   the switch of schools?

16   A    Yes.

17   Q    Can you name some of the friends that he stayed in contact

18   with?

19   A    He was in contact with Arian, he was in contact with Jake.

20   Q    Did he make new friends at UWC?

21   A    Yes, he did.

22   Q    Such as who?

23   A    Sorry.  What did you say?

24   Q    Such as who?  Who were his new friends?

25   A    Such as Nicholas was one new friend.  Otto, Leito, Alec.  A

```
 1   couple of different friends from UWC.
 2   Q   Did he have friends in the neighborhood as well?
 3   A   Not in the new neighborhood.
 4   Q   Okay.  Did A.S. ever have sleepovers in Singapore?
 5   A   Yes.
 6   Q   How often?
 7   A   He had sleepovers -- he had sleepovers with his friend Greg a
 8   few times a month.
 9   Q   Is that something that he did while living in Washington,
10   have sleepovers with friends?
11   A   No.
12   Q   And why did he start sleepovers in Singapore?
13   A   He was an older child and became closer friends with Greg.
14   Q   I'm going to show you a document that's been admitted into
15   evidence as Petitioner's Exhibit 62.  Can you just describe this
16   document?
17   A   This is a friend of -- this is the father of A██'s friend
18   reaching out to me for a playdate, and he's saying that his child
19   and another friend, Shiv, will join in his house.
20   Q   Okay.  And Lucas is A.S.'s friend in Singapore?
21   A   Yes.
22   Q   From where?
23   A   Yes, from SAS.
24   Q   I'm going to show you a document admitted into evidence as
25   61.
```

1    A    This is A.S.'s latest birthday party invitation, from

2    February 2024.

3    Q    This is a birthday invitation your son received?

4    A    No.  This is the birthday invitation to my son's birthday.

5    Q    All right.  If we can go to page 2?  Okay.  Can you identify

6    this document?

7    A    This is my son's friend inviting him to his birthday.

8    Q    If we can go to page 3.

9    A    This is another of my son's friends inviting him to his

10   party.

11   Q    Page 4.

12   A    Another son's friend inviting him to his birthday.

13   Q    This is in Singapore?

14   A    Yes.

15   Q    Okay.  Were the prior ones in Singapore too?

16   A    Yes.

17   Q    If we can go to page 5.

18   A    This is another birthday party invitation.

19   Q    Page 6.

20   A    This is us visiting a temple as a family for his birthday.

21   Q    Page 8.

22   A    It's another birthday invitation of Leah.

23   Q    Page 10.

24   A    It's another party invitation of Linda.

25   Q    Page 11.

1  A   This is a birthday party -- another birthday party invitation

2  of Jake.

3  Q   I mean, are these all the birthday parties that A.S. was

4  invited to during his time in Singapore?

5  A   No.  A lot more.

6  Q   Did he attend these birthday parties?

7  A   Yes.

8  Q   How often did he, A.S., have social engagements, you know,

9  playdates, sleepovers, birthday parties, outside of school?

10  A   Almost every weekend.

11  Q   What other sorts of activities did -- besides the

12  extracurricular activities, besides the playdates, sleepovers,

13  birthday parties, what sorts of activities would A.S. engage in,

14  you know, perhaps as a family, around Singapore?

15  A   We would swim in our apartment pool, me and A.S.  There would

16  be other friends from the apartment pool joining.  We would play

17  downstairs in the play area.  We would go out to different parts

18  of Singapore, like Universal Studios or Singapore zoo or night

19  safari and things like that.

20  Q   Did you ever take vacations outside of Singapore?

21  A   Yes.

22  Q   Such as to where?

23  A   We most recently went to New Zealand and spent summer break,

24  and he was in a camp, a winter camp, in New Zealand.  Prior to

25  that, we also went to Bali with a friend of A.S.  So my cousin

 1   brother in Singapore, and his family, has a child.  We all went

 2   together, like our kids play together.  So we all went together

 3   to Bali on a vacation.

 4   Q   You said your cousin brother who lives in Singapore?

 5   A   Yes.

 6   Q   Okay.  And what is a cousin brother?

 7   A   His name is Manikantan Krishnamurthy.  He lives with --

 8            THE COURT REPORTER:  Can you spell that, please?

 9   Q   If you can spell that, first.

10   A   M-a-n-i-k-a-n-t-a-n, Manikantan.

11   Q   When you say "cousin brother," I want to just understand what

12   relation that is to you.

13   A   He is my father's brother's child.

14   Q   Okay.  And you said he has children?

15   A   Yes, he has one child.

16   Q   How old?

17   A   I think he's two, three years younger than my son.  So

18   probably like five years old.

19   Q   How old -- how often do you get together with your

20   cousin-brother?

21   A   Once a month.

22   Q   Okay.  And you said you went on vacation together to Bali?

23   A   Yes.

24   Q   Okay.  Is that the only vacation you took with your

25   cousin-brother?

1    A    We took other vacations.  I don't really recall.  I mean, I

2    remember visiting him -- me and Dhivya visiting him much earlier,

3    a few years ago, before we moved to Singapore.

4    Q    Okay.  Can you describe briefly your relationship with A.S.

5    while you were living in Singapore?

6    A    It was a very close relationship.  My work duties were

7    confined to the time that he went to school, so I spent a lot of

8    time with him.

9         You know, especially the week before I had to leave the

10   house, I was fully involved in his duties.  Like, you know, I

11   woke up in the morning, woke him up, gave him a bath, fed him

12   food, had him eat the breakfast, brought him to the car that took

13   him to school, got his bags.  Once he came back, I played with

14   him, badminton or other things, you know.  We swam in our

15   swimming pool at the house.  I was -- I took him to the

16   playground.  It is -- it is a very close relationship.

17   Q    Have you ever physically punished your child?

18   A    Yes, I have, occasionally.

19   Q    How so?

20   A    I have pinched him, to discipline him.

21   Q    You said you pinched him?

22   A    Yes.

23   Q    Can you describe what you mean by that?

24   A    So I put my hand on his shoulder to warn him, and, you know,

25   if he didn't obey, I will pinch him.

1   Q    Why would you pinch him?

2   A    Pinching is typically like a last resort.  I try to warn him

3   and try to discipline him.  If he doesn't stop, then I have

4   pinched him before.

5        The last incident that I remember was in our trip to New

6   Zealand.  Us, as a family, cooked some -- cooked the dinner

7   together.  A███ is a picky eater, and his mother wanted him to

8   start exploring new food options.  And we all cooked together as

9   a family in New Zealand, and he had a deal with his mother that

10  he would eat the new food, and he refused.  And his mother was

11  fighting with him, and, you know, they were having an argument,

12  and he wasn't keeping up his end of the deal.  And I stepped in

13  to tell him to stop and, you know, follow the deal that he made

14  with his mother, and when he didn't, I pinched him.

15  Q    How often would you pinch him, as a form of discipline?

16  A    It is very rare.  I have threatened him, to pinch, but like

17  the actual pinching is like a few times a year, three or four

18  times a year.

19  Q    Was it more often when he was younger or was older or -- you

20  know, he's eight years old now.  So would you say three, four

21  times a year, you know, consistently through those eight years?

22  A    No.  I think it has reduced a lot.  After he grew older, we

23  would have conversations and resolve our differences.

24  Q    You mentioned one incident, I guess the last incident, over

25  trying the new foods.  What usually would prompt you to either

1  threaten or to pinch your son as a form of discipline?

2  A    It is usually when his mother and him are, like, having a

3  quarrel or an argument and people are frustrated, the issue is

4  not getting resolved, and, you know, I would step in to draw a

5  boundary.

6  Q    Did you ever express remorse for pinching him?

7  A    Yes.

8  Q    How so?

9  A    I'm not proud of it, and I've apologized to my son.

10  Specifically on the New Zealand incident, you know, I cried, we

11  hugged each other.

12  Q    Why pinching, though?  Like what -- like why did you choose

13  pinching as a form of punishment?

14  A    That's what my mother did to me.

15  Q    When you were growing up?

16  A    Yes.

17  Q    Did Ms. Sashidhar ever get upset at you for pinching your

18  son?

19  A    Usually she's thankful that the issue is resolved.  She --

20            THE COURT REPORTER:  I'm sorry.

21  Q    I'm sorry, Prasanna.

22            THE COURT:  I believe "she was thankful."  Was that his

23  answer, "Usually she was thankful"?  I believe the witness

24  testified "Usually she was thankful"; is that correct?

25            MR. MIN:  Yeah, I believe so.

1    Q    Prasanna, "Usually she was thankful"; is that what you said?

2    A    Yes.

3    Q    Okay.

4    A    Usually, she was thankful, that, you know, the issue was

5    getting resolved and he was getting disciplined.  She looked to

6    me to enforce discipline in the house, but sometimes she did

7    disagree with me, and, you know, she said disciplining was not

8    working.

9    Q    Did Ms. Sashidhar ever -- or withdrawn.

10        Did you ever spend extended periods of time alone with your

11    son, without Ms. Sashidhar?

12    A    Extended periods of time, yes.  Two incidents that I recall.

13        One is sometime in December 2023, she was out on an ayurvedic

14    retreat for three weeks, and I was the primary caregiver for

15    A█████

16        Prior to that, we wanted to have another child, and she was

17    out to the U.S. extracting her eggs, and during that time, I was

18    the primary caregiver for A████ as well.

19    Q    For how long?

20    A    For three weeks.  Two, three weeks, I believe.

21    Q    When was that?

22    A    That, I believe, was summer of 2023.

23    Q    Okay.  And then you mentioned December of 2023, she went on a

24    retreat.  What kind of retreat was that?

25    A    It was an ayurvedic retreat in Kerala, India.

1    Q   Can you spell both now the name of the retreat and the place

2    where it took place?

3    A   So it is a type of treatment.  So the spelling is

4    a-y-u-r-v-e-d-i-c treatment.  It's an ayurvedic retreat in

5    Kerala -- K-e-r-a-l-a, Kerala -- India.

6    Q   Okay.  So she went on this retreat for approximately three

7    weeks to India.  What was the purpose of this retreat?

8    A   So she was having a lupus chronic disease and she wanted to

9    see if this retreat would treat it.

10   Q   When you say you were the primary caretaker at this time,

11   what do you mean by that?

12   A   I dropped him to the school bus, picked him up from the

13   school bus in the evenings.  I sent him to school.  I played with

14   him.  Once he came back, I took him out.  You know, everything to

15   do with A███.

16   Q   Did Ms. Sashidhar ever express to you concern about leaving

17   A.S. with you alone?

18   A   Not that I recall.

19   Q   I mean, did she ever say that it would be dangerous for A.S.

20   to be with you?

21   A   Absolutely not.

22   Q   Can you describe briefly your relationship to Ms. Sashidhar

23   during your time in Singapore?

24   A   It was mostly a cordial and a peaceful relationship.  You

25   know, we had some quarrels from time to time, but nothing was

1   ever -- you know, there was no shouting, you know.  Or if it did

2   occur, it was like extremely rare and infrequent.  It was, for

3   the most, a cordial relationship.

4   Q   But sometimes you would get into arguments?

5   A   Yes, we would get into arguments sometimes, from time to

6   time, and we would go to bed unhappy, but there was no -- you

7   know, typically, like, it was extremely rare for us to, like,

8   shout at each other or like, you know, do anything.  There was

9   nothing violent that ever occurred.

10  Q   And you say "rare" to shout at each other, but it would

11  happen from time to time?

12  A   I think the shouting stuff might have occurred like once a

13  year or something.

14  Q   Have you ever said anything to your wife that you regretted?

15  A   Of course.

16  Q   Has your wife ever said anything to you that she regretted?

17  A   Yes.

18          MS. SKINNER:  Objection.  Calls for speculation.

19          THE COURT:  That's sustained.

20  Q   Did A.S., as far as you know, ever witness you and

21  Ms. Sashidhar shouting at each other?

22  A   No.  We tried our best to keep him out of things, so we would

23  not fight in front of our child.  Like even when we are having

24  quarrels, we try to keep him out of it.  We try to keep him in a

25  different room or a different place, and, you know, we try to

1   take it private.

2   Q   Is it possible that A.S. may have heard you, even if he was

3   in a different room?

4   A   It's possible.

5   Q   Have you ever physically assaulted your wife?

6   A   No.

7   Q   Have you ever sexually assaulted her?

8   A   Absolutely not.

9   Q   Did there come a time when you did get into some sort of

10  physical altercation with your wife?

11  A   Yes.

12  Q   When was that?

13  A   So it was August 31st of 2024, when we were discussing a

14  separation, and there was a physical altercation at that point.

15  Q   What happened?

16  A   She was trying to snatch my phone to see if I was recording

17  the conversation that we were having, and I was trying to get

18  away from that situation.  She held onto my shirt, and I pushed

19  her hand away to walk out, and she came back and grabbed my

20  shirt.  And, you know, I walked out of that place, and then she

21  came out and threatened that, you know, she's going to file a

22  police complaint against me that I assaulted her, and she was

23  sort of having a video camera pointed at me saying, you know, she

24  was going to go to the police station.

25  Q   Okay.  Did you leave the home on that day?

1   A    Yes, I -- that was the last time -- yeah, I left the house.

2   Q    Why?

3   A    Because I was worried that she was going to file more and

4   more false complaints against me if I stayed there.

5   Q    Did there come a time when you became aware that she had

6   filed a police report against you?

7   A    Much, much later.  In one of the legal proceedings, I

8   believe, she disclosed it.

9   Q    Where did you go when you left the house, meaning not like

10  immediately, but, you know, did you stay in Singapore?

11  A    No.  I was set to go on a trip the next day, so I just

12  preponed my trip and I left to Bangalore.  I flew to India.

13  Q    Where were you supposed to go the following day?

14  A    To Bangalore, India.

15  Q    So you were supposed to go to India the day after this

16  incident occurred?

17  A    Correct.

18  Q    Instead, you went immediately?

19  A    Yes.

20  Q    And what was the purpose of your trip to India, your

21  preplanned trip to India?

22  A    The reason for the travel was supposed to be a brief visit to

23  my office in Bangalore and then go on a vacation with my friends.

24  Q    And when you say visit your office in Bangalore, what do you

25  mean by that?

 1   A    So the 0xPPL office is based out of Bangalore.  There are a

 2   lot of employees working there.  I visit there often.  And that's

 3   what I mean.

 4   Q    Okay.  You say you have employees based there; is that right?

 5   A    Correct.

 6   Q    Okay.  But the company is structured in the Cayman Islands at

 7   this point?

 8   A    Yes.

 9   Q    So you had a planned trip to go to Bangalore to visit your

10   0xPPL office; is that right?

11   A    Yes, correct.

12   Q    And you were going to go on a trip with your friends?

13   A    After that, yeah.

14   Q    Okay.  And how long was your trip scheduled to last for

15   total, between Bangalore and your vacation?

16   A    About two and a half, three weeks.

17   Q    All right.  And did you return after two and a half, three

18   weeks?

19   A    No.  I returned after six weeks.

20   Q    Okay.  And why did you extend your trip for that long?

21   A    So a few different things happened.  As soon as I landed, I

22   learned that my dad was hospitalized with a stroke, so I

23   immediately left to see my father.  I also filed for a divorce,

24   and I went to my trip much later.

25        And then after that, I was trying to figure out how to come

1    back to Singapore.  I rented a place, a new place in Singapore,

2    that I could come and stay, so that I could share custody with my

3    child without entering that house again.  I believed that I could

4    not go back to that house because there was significant threat

5    that either my wife would assault me or file more false

6    complaints against me.

7    Q    So let me break that down a little bit.  So your father had a

8    stroke, which -- apologies.  Where does he reside?

9    A    He resides in Chennai, India.

10   Q    Okay.  And how far is that from Bangalore?

11   A    It is eight hours or something by car.

12   Q    Did you drive to Chennai?

13   A    I took an Uber, yes.

14   Q    So you went from Bangalore to Chennai?

15   A    Yes.

16   Q    Okay.  And then you said you went on your vacation later than

17   planned?

18   A    Correct.

19   Q    Okay.  And then you said you rented a place.  Where did you

20   rent the place, when you were talking about how to go back to

21   Singapore?  When you said you rented a place, where is that?

22   A    It's an apartment called "Interlace."

23   Q    Apartment where, like in Singapore or somewhere else?

24   A    In Singapore.

25   Q    Okay.  When did you rent a place in Singapore?

 1    A    I think sometime in September.

 2    Q    Okay.  What was the purpose of renting?  You already had the

 3    three-year lease at 4 Astrid Hill, right?

 4    A    Correct.

 5    Q    What was the purpose of renting a separate apartment in

 6    Singapore?

 7    A    Because I believed I couldn't go back to that house anymore

 8    because, at that point, my wife was filing a lot of police

 9    complaints against me and then she was also starting a bunch of

10    legal proceedings against me.  So I thought I could not go back

11    to that house anymore.  And I believed if I could rent another

12    place near my son's school, I could try and share custody with

13    her.

14    Q    Okay.  While you were gone, did you continue to stay in

15    contact with your son?

16    A    Yes, I tried.  In the beginning, I called through my

17    mother-in-law's phone.  She had reached out to me saying my son

18    wanted to speak with me, and, you know, I spoke the first few

19    days through my mother-in-law's phone.  And then my mother-in-law

20    kept asking me for returning the child's passport.  You know,

21    after that, I started calling my wife's phone to speak with my

22    son, and sometimes I was able to speak with my child, but many

23    times I was not.  I was getting different kinds of reasons and

24    excuses why my child was not available to speak with me.

25    Finally, I approached my driver, who I had employed, and I was

1   talking to my child through my driver, when he went to school in

2   the morning and evening.  When my wife found out, she fired the

3   driver and cut off all communications with me.

4   Q   When was that, when your communications with your son were

5   cut off?

6   A   End of September.

7   Q   Were you ever contacted by the police after that incident on

8   August 31st, 2024?

9   A   I was contacted.  So I came back to Singapore on

10  October 15th, once they felt there was a significant threat my

11  wife was going to abduct my child.  So I flew into Singapore, and

12  the police contacted me at the border and told me to appear for

13  investigations.

14  Q   Okay.  And so you did appear with the Singapore police as

15  part of the investigations?

16  A   Yes.  Yes.

17  Q   And can you describe that process in terms of your

18  communications with the police?

19  A   So the police told me to appear the next day, at 10 a.m.  So

20  I showed up.  There were three different complaints filed against

21  me, which I had no idea.  I think, by that point, I had learned

22  that through some legal proceedings.  But there were three

23  different proceedings, three different complaints, that my wife

24  had filed at that point, and there were investigative officers

25  assigned to these complaints who investigated me, and I was

1  briefly arrested.  While my house was searched, my electronic

2  devices were seized, my passport was seized, and then I came --

3  and then, in a few hours, I was let go on a bail.

4  Q   You said your wife filed three complaints against you.  Do

5  you know what the allegations were in those three complaints,

6  generally?

7  A   Yeah.  The first one was that I assaulted her on August 31st,

8  and then, much later, I think a month later, she filed an

9  allegation that I raped her.  You know, by this point, I

10  was outside the house for more than a month, and she went and

11  filed that I raped her.

12      She also filed a complaint saying I threatened her with

13  like -- that I had some pornographic images of her with me.  And

14  by that point, I hadn't spoken to her for like over a month, but

15  she filed these complaints anyway.

16  Q   Did you threaten her with pornographic materials?

17  A   Absolutely not.

18  Q   Were you ever charged with any crimes by the Singapore police

19  or authorities?

20  A   No.

21  Q   I'm going to show you a couple of documents, one admitted as

22  Petitioner's Exhibit 93.  Can you describe this document?

23  A   This is the police, after investigation, clearing me of any

24  charges.  The -- yeah.

25  Q   As it relates to the rape charge?

1    A    Yes.

2    Q    And I'm going to show you a document admitted into evidence

3    as Petitioner's Exhibit 94.  Can you describe this document?

4    A    This is the police giving me a warning for placing cameras in

5    my house and clearing me of -- and deciding not to charge me.

6    Q    Did you have a conditional warning for the offense of

7    voyeurism?

8    A    Yes.

9    Q    What was your understanding as to what the allegations were

10   of that?

11   A    The allegations were that I placed cameras in the house to

12   record compromising videos of my wife and I threatened her with

13   distributing pornographic videos of her.

14   Q    Did you have cameras in your home?

15   A    Yes, I had set up cameras in my house after -- after I

16   learned that my wife was having an affair.

17   Q    Why did you do that?

18   A    So I learned that my wife -- so, in July, my wife admitted to

19   me that she was having an affair, during our vacation.  I

20   uncovered the affair, and we were trying to reconcile for the

21   period of August, for the month of August, and she was trying --

22   you know, we were trying to make the marriage work, and she was

23   telling me sincerely that, you know, she wanted to make it work,

24   but I felt that -- I wanted to know if she was telling me the

25   truth.

1    Q    Why did you ultimately return to Singapore on October 15th?

2    A    I learned that my child -- she was able to obtain an

3    emergency passport for my child, and I learned that there was a

4    significant risk that she was going to abduct my child --

5    Q    Why did you think that?

6    A    -- so I returned to --

7    Q    Oh, go ahead.  Go ahead.  I'll be still.

8    A    Sorry?

9    Q    Go ahead.  I apologize.

10   A    Is the question why did I think that?

11   Q    No, no.  I interrupted you.  I'm withdrawing the question.

12   Please continue.  I apologize.

13   A    So I believed there was a significant risk that she would be

14   abducting my child, and I flew back in to try and stop that.  I

15   also filed a stop order, a request for a stop order with the

16   Singapore courts, which was eventually issued, and the Singapore

17   courts prohibited her from abducting A███ outside of Singapore.

18   Q    So you filed an application with the Singapore courts for a

19   stop order.  Can you explain what a stop order is?

20   A    A stop order prevents Dhivya from removing A███ from his

21   habitual residence of Singapore.

22   Q    I'm going to show you a document admitted into evidence as

23   Petitioner's Exhibit 78.  Can you explain what this document is?

24   A    This is the emergency application for a stop order that I

25   filed in Singapore.

```
 1   Q   I'm just going to direct your attention to paragraph 1, where

 2       it says "Orders Made:"

 3   A   Yes.

 4   Q   And this is an order from the Singapore courts?

 5   A   Correct.

 6   Q   And it says "Pending the case conference on 17 October 2024,

 7       and including 17 October 2024, the Defendant shall not remove

 8       child of the marriage."  Okay.  I'm going to stop there.

 9       So "Defendant" is your wife, Ms. Sashidhar?

10   A   Correct.

11   Q   Okay.  And the name that comes after that is the name of your

12       son?

13   A   Yes.

14   Q   Okay.  Why is it -- just explain why the name is reversed.

15   A   I don't know.  Like I actually don't know.

16   Q   "S███" is the last name, right?

17   A   Yes.

18   Q   Okay.  I'm going to show you a document admitted into

19       evidence as 79.  Now, the Singapore courts issued this stop order

20       on October 15th before, right, through October 17th?

21   A   Yes.

22   Q   Did they issue a continuing --

23   A   Yes.

24   Q   Did they issue a continuing order on October 17th?

25   A   They did.
```

1   Q    Okay.  I'm going to -- is this the continuing order?

2   A    Yes.

3   Q    Okay.  I'm just going to read "Orders Made," paragraph 1,

4   "Pending the conclusion of the next case conference on 24 October

5   2024 at 2 p.m., neither party shall remove the child out of

6   Singapore without leave of court."  Do you see that?

7   A    Yes.

8   Q    Did the Court issue any further orders?

9   A    Yes.

10  Q    I'm going to show you a document admitted into evidence as

11  81, Petitioner's 81.  The date of this order, if we scroll up, is

12  October 24, 2024.  Did they issue another stop order?

13  A    Correct.  Yes.

14  Q    Okay.  Through November 26, 2024?

15  A    Yes.

16  Q    Thereafter, was the stop order no longer in effect?

17  A    Correct.

18  Q    At that point, was your son, A.S., already out of Singapore?

19  A    Yes.

20  Q    I want to show you again the document marked 78.  Actually,

21  no, apologies, 79.  Seventy-nine.  I want to direct your

22  attention to the orders made in paragraph 2.  Do you see that?

23  A    Yes.

24  Q    "The Defendant's counsel shall write to the Plaintiff's

25  counsel by 18 October 2024, 4 p.m., stating the whereabouts of

1   the child, i.e. the address that the child is residing at."  Do

2   you see that?

3   A    Yes.

4   Q    Ms. Sashidhar had a lawyer in Singapore?

5   A    Yes, she does.

6   Q    Okay.  Prior -- when did you file your request for this stop

7   order?

8   A    The 14th of October.

9   Q    The 14th of October.  Okay.

10       At that point, had Ms. Sashidhar already filed legal

11  proceedings in Singapore?

12  A    Yes.

13  Q    Okay.  What had she already filed in Singapore before

14  October 14th, 2024?

15  A    She had three legal proceedings going in Singapore.  One was

16  for the custody of A.S., one was for maintenance and child

17  support, and one was for her protection.

18  Q    For a protective order?

19  A    Protective order for her and the child.

20  Q    Okay.  So she already had legal representation in Singapore,

21  correct?

22  A    Correct.

23  Q    Okay.  And so did your wife comply with this order, No. 2,

24  that her lawyers write to your lawyers by October 18th stating

25  the whereabouts of the child?

 1  A    No.

 2  Q    At some point, though, after October 18th, did they comply

 3  and provide you an address?

 4  A    After several weeks, then we had to find her address and

 5  serve her the Hague return papers.  After we found her address,

 6  she tried to comply and provide the address, although it was

 7  incomplete because the apartment address -- without the apartment

 8  number, the unit number.

 9  Q    So I'm going to show you a document admitted into evidence as

10  Exhibit 90, Petitioner's 90.  Is this the correspondence sent

11  from her lawyers to your lawyers stating the address?

12  A    Yes.

13  Q    Okay.  And paragraph 1, they write, "We refer to the above

14  matter and the Order made by the Court on 17 October 2024."  Do

15  you see that?

16  A    Yes.

17  Q    And that's the order that required that they turn over the

18  address by October 18th, correct?

19  A    Something like that, yes.

20  Q    Okay.  And the date of this letter is November 9th?

21  A    Yes.

22            THE COURT:  Counsel, we're at the noon hour.  Is this a

23  convenient time to break?

24            MR. MIN:  Yes, Your Honor.

25            THE COURT:  We will take our afternoon recess at this

 1  time and return at 1:30.

 2      Counsel, how far are you in your client's --

 3          MR. MIN:  I should have half an hour, at most, left.

 4          THE COURT:  All right.  We'll see you at 1:30.

 5          MR. MIN:  All right.  Thank you.

 6                  (Recessed.)

 7                  AFTERNOON SESSION

 8          THE COURT:  Good afternoon.  Please be seated.

 9      Counsel, you may resume your direct examination.

10          MR. MIN:  Thank you, Your Honor.

11  Q   (By Mr. Min:)  I believe, when we left off, you were

12  mentioning that your wife had filed three proceedings in

13  Singapore, correct?

14  A   Yes.

15  Q   I think you said she filed for a protective order, she filed

16  for maintenance, financial maintenance, and she filed for

17  custody; is that correct?

18  A   Yes.

19  Q   Okay.  Are those proceedings still active in Singapore?

20  A   I believe she withdrew two of them.  I think one of them is

21  still stayed.

22  Q   One of them is still what?

23  A   Stayed.

24  Q   Okay.  Which two did she withdraw?

25  A   I think the child custody stuff is dead.  I'm not sure.  I

1    think the other two are withdrawn.  I'm not totally sure, to be

2    honest.

3    Q    Did you file for custody in Singapore?

4    A    Yes.  I cross-filed for custody.

5    Q    Did your wife ever attempt to withdraw your child from UWC?

6    A    Yes, she did.

7    Q    I'm going to show you a document that's been admitted into

8    evidence as Petitioner's Exhibit 45.  Just let us know what we're

9    looking at.

10   A    Yes.

11   Q    What is this?

12   A    So she's writing to UWC saying she wants to withdraw him from

13   the school.

14   Q    And did you consent to your child being withdrawn from

15   school?

16   A    No.

17   Q    Okay.  Did you consent to your child being taken out of

18   Singapore to the United States?

19   A    No.

20   Q    Did your wife ever ask you if she could relocate back to the

21   United States with A.S.?

22   A    No.

23   Q    Did she ever talk to you about withdrawing your child from

24   UWC?

25   A    No.

1   Q   As far as you understand, is your child still enrolled at

2   UWC?

3   A   Yes.

4   Q   Okay.  Is tuition paid at UWC?

5   A   Yes.

6   Q   Did you receive any communications from your wife after she

7   left Singapore for the U.S.?

8   A   Yes, I did.

9   Q   I'm going to show you a document that's been admitted into

10  evidence as Petitioner's Exhibit 58.  Can you explain what this

11  document is?

12  A   Yeah.  So she sent me a long e-mail, after she landed in

13  Washington, that she has left and taken the child to Washington,

14  and she sent -- this was after we got a stop order.  And the stop

15  order was -- we were -- my lawyers delivered the stop order to

16  the house that she was living in, and her mother got the stop

17  order and mentioned that she's already left.  And then, in a few

18  hours, I got this e-mail and text messages from her saying she's

19  in Washington.

20  Q   So what is this document we're looking at?

21  A   So this is an e-mail that she's written to me saying that

22  she's left to Washington.

23  Q   I want to direct your attention to -- let's stop right

24  there -- that first paragraph that she wrote to you that starts

25  with "A.S. and I just landed some time ago in Washington."

1        Okay.  The third sentence, the second line, she writes to

2   you, "There was no way for us to continue to living in Singapore

3   without any funds in my bank account as well as the fear of when

4   you will revoke our DPs."  Do you see that?

5   A    Yes.

6   Q    What did you understand her to mean when she wrote that to

7   you?

8   A    She is claiming that she has no money in her bank account.

9   Q    She then goes on to say, the last two sentences, or the last

10  sentence of that paragraph, "How long can we wait for you, it's

11  been more than 1.5 months with no sign of you ever returning."

12        THE COURT REPORTER:  I'm sorry.  Counsel, can you speak

13  up and slow down, please?

14        MR. MIN:  Sure.  My apologies.  The last -- I'll

15  withdraw the question.

16  Q    The next paragraph, she invites you to -- stating that "You

17  can contact me on my Singapore WhatsApp number any time and you

18  can talk to A.S. any time that you want to."  Do you see that?

19  A    Yes.

20  Q    Were you able to contact and talk to your son?

21  A    No.

22  Q    When you were living in Singapore, prior to August 31st,

23  2024, did Ms. Sashidhar ever complain to you about not having

24  financial resources?

25  A    No.

1  Q    After you separated on August 31st, 2024, did Ms. Sashidhar

2  ever make a request either to you or through the courts for

3  financial support?

4  A    Yes.

5  Q    Okay.  And did she make a request directly to you?

6  A    Yes.

7  Q    For how much?

8  A    $5,000.

9  Q    $5,000?

10  A    Uh-huh.

11  Q    Okay.  Did she make a request to the Court for financial

12  support?

13  A    Yes.

14  Q    Was this a Singapore court?

15  A    Yes.

16  Q    Okay.  How much did she ask for from the Singapore courts?

17  A    $30,000 a month.

18  Q    You said 30-?

19  A    30,000 Singapore dollars a month.

20  Q    Okay.  Was that ever -- was an order for financial support

21  ever issued by the Singapore courts?

22  A    No.  The Singapore courts asked her to provide a

23  breakup {sic} of her expenses, and she said she would provide it,

24  and then by the time the hearing came, she withdrew her

25  application.

1    Q    So she withdrew her petition for financial support?

2    A    Yes.

3    Q    Generally, do you have an understanding of how much in U.S.

4    dollars 30,000 Singapore dollars is?

5    A    I think it's like 22- to 25- probably.

6    Q    22- to 25- U.S. -- thousand U.S. dollars?

7    A    Yes.

8    Q    When Ms. Sashidhar left on or around October 15th, 2024, are

9    you aware if she had access to funds?

10   A    Yes.

11   Q    What knowledge do you have about her access to funds at that

12   time?

13   A    At that time, I knew that she was still using my bank

14   account.  She had a debit card for which she was paying expenses

15   every day.  She was also using the credit card.  You know, both

16   of which had limits of like $20,000-plus.  And I also knew that

17   she had bank accounts with hundreds of thousands of dollars in

18   it, with access to it.

19   Q    What was the last thing you said?  You knew she had bank

20   accounts with hundreds of thousands of dollars in it and what?

21   A    So she had her own personal savings with hundreds of

22   thousands of dollars.

23   Q    You said she was also using credit cards, your credit cards?

24   A    Yes.

25   Q    Were you paying the bills for those credit cards?

1    A    Yes.

2    Q    How was the rent on the home at 4 Astrid Hill being paid?

3    A    I paid every month.

4    Q    Okay.  When she left on October 15th, was the rent paid up to

5    date at that point?

6    A    Yes.

7    Q    Okay.  What about the child's tuition at school, was that

8    being paid?

9    A    They were paid.

10   Q    Were there utilities or other expenses related to the home?

11   A    Yes.  They were all paid.

12   Q    Did Ms. Sashidhar ever tell you that there was a specific

13   expense or a bill that was not being paid?

14   A    Whatever she brought up got paid.

15   Q    What do you mean by "whatever she brought up"?

16   A    She sometimes sent me bills by e-mail or WhatsApp and I took

17   care of them.

18   Q    Can you give an example?

19   A    She sent me grocery bills, she sent me pool maintenance

20   bills, she sent me landscaping bills.  I paid them anyway, but

21   sometimes it gets posted to the house, and when she sent it to

22   me, I made sure that it was taken care of.

23   Q    I'm going to show you a document that's been admitted into

24   evidence as Petitioner's Exhibit 82.  Can you describe what this

25   document is?

1    A    This is an e-mail written by my attorney to her, and her

2    attorney stating that she was withdrawing her maintenance

3    proceedings from Singapore.

4    Q    I'm going to direct your attention to paragraph 3 and the

5    last sentence that states, quote, "In any case, we note, as do

6    you, that we would have clarity as to the figure sought by you

7    with the ETS to be filed 6 November 2024 as directed."  Do you

8    see that?

9    A    Yes.

10    Q    And this is Drew & Napier, your lawyers in Singapore?

11    A    Yes.

12    Q    Okay.  What were they requesting on your behalf that

13    Ms. Sashidhar provide?

14    A    So she appeared, after she had left to Washington, in a

15    maintenance hearing that was happening in Singapore, and she was

16    requesting for -- she first requested for 20,000, then she

17    requested for 30,000, and the judge ordered her to provide a

18    breakup of her expenses to justify her request, and this was my

19    lawyers, you know, stating that she needs to file that by 6

20    November 2024.

21    Q    So when you say a "breakup" of those expenses, what do you

22    mean by that?

23    A    So sometimes for maintenance, you have to provide what are

24    your costs and what are your expenses, and that is what the judge

25    requested from her.  She said she would provide it by that date.

1   Q    Like a detailed accounting of what money she needed and for

2   what?

3   A    Yes.  Correct.

4   Q    And did she ever provide that to the Court or to you or to

5   your lawyers?

6   A    No.  No.

7   Q    Have you provided any sums of money to her since August 31st,

8   2024?

9   A    Yes.

10  Q    How much?

11  A    I -- over time, at different points in time.  So 10,000

12  Singapore dollars was provided to her bank account, she withdrew

13  some from the U.S. bank account, and she was also given, in

14  aggregate, $150,000, in aggregate till today, Singapore dollars

15  in her bank account.

16  Q    Were there any expenses for A.S. that were not being paid, as

17  far as you understand?

18  A    No.

19  Q    I would direct your attention back to Exhibit 58.  So the

20  first paragraph, she writes, the last line, "Plus there is

21  nothing in Singapore for me and A███, no family, no friends."  Do

22  you see that?

23  A    Yes.

24  Q    Okay.  Did -- and I apologize for using his name.

25       Did A.S. have friends in Singapore?

 1   A    Yes.

 2   Q    Did you guys have family in Singapore?

 3            MS. SEIPEL:  Objection.  Asked and answered.

 4   A    Yes.

 5            THE COURT:  That's overruled on that question.

 6   Q    Have you ever threatened to revoke or cancel your child's or

 7   Ms. Sashidhar's Dependent Passes?

 8   A    No.

 9   Q    Would you cancel either of their Dependent Passes?

10   A    No.

11   Q    You are seeking custody in Singapore, correct?

12   A    Yes.

13   Q    If you canceled or tried to cancel your child's Dependent

14   Pass, would he be able to live in Singapore?

15   A    No.

16   Q    If the Court were to order your child to be returned to

17   Singapore, would you agree that you would not cancel anyone's

18   Dependent Pass?

19   A    Yes.

20   Q    Would you agree to that being reduced to court order?

21   A    Yes.

22   Q    Would you agree that that order be enforceable against you in

23   the United States and in Singapore?

24            MS. SKINNER:  Objection.  Relevance.

25            THE COURT:  That's sustained, counsel.  Let's move on.

1        MR. MIN:  Your Honor, if I can make an offer of proof?

2        THE COURT:  Please do.

3        MR. MIN:  Your Honor, one affirmative defense counsel is

4   raising is grave risk of harm, and pursuant to the *Golan v. Saada*

5   case before the U.S. Supreme Court, one of the considerations for

6   the Court is whether there's any ameliorative measures to prevent

7   the grave risk of harm, and one of the issues respondent is

8   raising is this possible cancellation of Dependent Pass.  So what

9   we are proposing is an ameliorative measure that could alleviate

10  any risk of harm that counsel or respondent may raise during the

11  course of these proceedings.

12       THE COURT:  Counsel, you wish to respond?

13       MS. SKINNER:  *Golan v. Saada* says that the ameliorative

14  measures are not mandatory but up to the Court's discretion.  So

15  we would continue to argue that the question is irrelevant.

16       THE COURT:  If the objection is on relevance, the Court

17  will permit some latitude, counsel.

18       MS. SKINNER:  Thank you, Your Honor.

19       THE COURT:  Some latitude.

20       MR. MIN:  Thank you, Your Honor.

21  Q   (By Mr. Min:)  Would you be -- if the Court ordered the child

22  to be returned, would you agree to provide Ms. Sashidhar sums of

23  money for financial support until the Singapore courts ruled on

24  the question of maintenance?

25  A   Yes.

 1  Q   What about any protective orders or agreements that you not

 2  go near Ms. Sashidhar, would you agree to those conditions so

 3  that she felt safe and secure back to Singapore?

 4  A   Yes.

 5          MR. MIN:  Your Honor, no further questions at this time.

 6          THE COURT:  Cross-examination.

 7          MS. SKINNER:  Thank you, Your Honor.

 8      Permission to remain seated at counsel table, or is the

 9  Court's preference to stand at the lectern?

10          THE COURT:  As long as you speak clearly and loudly into

11  the microphone, counsel.

12          MS. SKINNER:  Thank you, Your Honor.

13                          CROSS-EXAMINATION

14  BY MS. SKINNER:

15  Q   You just testified that you would agree to provide support.

16  Why haven't you voluntarily agreed to provide support up until

17  now?

18  A   I have.  I have returned -- my lawyers have returned

19  countless letters to her asking for her bank account, and we have

20  deposited funds directly.  We have sent three different letters

21  to her asking for bank account details to provide funds, and she

22  has not done that.  And we have deposited funds into her

23  Singapore bank account.  I have deposited funds into her

24  Singapore bank account.

25  Q   So if the reason why you are saying you haven't provided

1   funds is because you need a bank account number from her, then

2   why is it that you are also testifying at the same time that you

3   have been able to provide funds through a bank account?

4   A    Sorry.  I don't understand the question.

5   Q    You're testifying that for one of reasons why you have not

6   voluntarily provided her support up until now is because you've

7   made multiple requests for her bank account information, correct?

8   A    That is correct.

9   Q    But, yet, you also testified that you have her bank account

10  information and you have provided support.  So which is it?

11  A    It is both.  She said provide me in the U.S. and don't

12  provide me in Singapore.  I asked multiple times, that, in the

13  U.S., to provide, give me your bank account details.  She has

14  refused to answer that.  And then we provided it in Singapore.

15  Q    Is your Bank of America account a joint account with

16  Ms. Sashidhar?

17  A    It is.

18  Q    Why haven't you deposited funds there?

19  A    It got closed down.  The account got shut down, after there

20  were fraudulent withdrawals.

21  Q    You mean the withdrawals that Ms. Sashidhar made and then you

22  froze the account?

23  A    The withdrawal was made.  I didn't know who made it.  It was

24  a personal account.  It was not withdrawn from a joint account.

25  The withdrawal was made from my personal account that Sashidhar

 1  was not a part of.  So some fraud happened there.  I don't know

 2  what.  I complained to the bank, and the bank closed the account.

 3  Q   But she was the one who withdrew the funds from the account,

 4  correct?

 5  A   She did not tell me that.  I do not know that.

 6  Q   You don't know that.

 7      You didn't at some point allege that she fraudulently

 8  withdrew funds from that account?

 9  A   I think she could have.  I don't know that for a fact.  I

10  called the bank and asked who did it.  I asked whether my wife

11  did it or not.

12  Q   My question was whether or not you had alleged that.

13  A   I suspected that, yes.

14  Q   Did you allege that, meaning you indicated to somebody that

15  that's what you believe happened?

16  A   Yes.

17  Q   Okay.  So you believed that she took funds from that account,

18  you complained to the bank, and the account was frozen, correct?

19  A   Correct.

20  Q   And so when you're testifying that you deposited 10,000

21  Singapore dollars to her bank account over time, that was this

22  morning, correct?

23  A   No.  $10,000 was deposited in November or December.

24  Q   What date?

25  A   I don't know the date off the top of my head, but it was in

 1    November or December is my belief.

 2    Q    Was deposited to her Singapore account?

 3    A    Correct.

 4    Q    You testified about the monthly expenses that Ms. Sashidhar

 5    was asked for in regards to her claim for support in Singapore.

 6    What were your monthly expenses in Singapore, in total,

 7    approximately?

 8    A    I think the total expenses probably stood somewhere around

 9    30,000 Singapore dollars for the entire family, I think.

10    Q    So with the rent being 20,000 in and of itself, your

11    testimony is that your driver, pool, food, helper, utilities,

12    entertainment, all of that, was just 10,000?

13    A    I believe somewhere in that range.  The house was the biggest

14    expense.

15    Q    You testified about an e-mail that Ms. Sashidhar sent to the

16    child's school indicating that this child should be withdrawn.

17    Did you respond to the school and tell them not to withdraw your

18    son?

19    A    I did.

20    Q    And how did you communicate that to them?

21    A    Through my attorneys.

22    Q    So when Ms. Sashidhar sent the e-mail to the school asking

23    that your son be withdrawn, she copied you on that communication,

24    correct?

25    A    Correct.

PRASANNA SANKARANARAYANAN - Cross (Skinner)       Day 1 - January 6, 2025 - 107

1   Q   And did you copy her on the communication that you sent

2   through your attorneys to the school indicating that you did not

3   want him to be withdrawn?

4   A   I don't remember if my attorneys copied her or not.

5   Q   You testified that you cross-filed for custody in Singapore

6   courts.  And that was after you had filed for custody in India,

7   correct?

8   A   Correct.

9   Q   And in addition, in India, you filed an injunction with the

10  Indian court asking for a court order that Ms. Sashidhar not be

11  allowed to file any legal proceedings in Singapore, correct?

12  A   Correct.

13  Q   And in the U.S., correct?

14  A   Correct.

15  Q   Because you claimed that she was forum shopping, correct?

16  A   Correct.

17  Q   And then you filed or cross-filed proceedings in Singapore,

18  correct?

19  A   Correct.

20  Q   And then you filed these proceedings in the U.S., correct?

21  A   Correct.

22  Q   You testified that Ms. Sashidhar cut off your child's access

23  to the driver who was facilitating phone calls between your child

24  and you during his drive to school in Singapore, correct?

25  A   Can you repeat that question?

1  Q    You testified about Ms. Sashidhar terminating a driver in

2  Singapore who was facilitating phone calls between you and your

3  child, correct?

4  A    Yes.

5  Q    And that was because she told you that she was concerned

6  about the types of things you were saying to your son during

7  those drives, correct?

8  A    No.

9  Q    Okay.  I would like to show the witness what's been marked as

10  Exhibit 306.  In this e-mail, Ms. Sashidhar wrote to you about

11  the concerning statements that she understood you were making to

12  your child during those drives.  Do you see that there?

13  A    Yes.

14  Q    And so my question one question ago was, did Ms. Sashidhar

15  tell you about the concerns she had about the communications you

16  had with your child during the drives?

17  A    Yes.

18  Q    So she did, in fact, tell you that she fired this driver

19  because you were saying things to your child about the divorce

20  proceedings, about mom asking for money, about mom filing

21  criminal cases against you, right?

22  A    Yes.

23  Q    You testified that there were some periods of time, during

24  two distinct periods, where you had the child in your care

25  without mom over some period of time.  Do you remember that

1    testimony?

2    A    Yes.

3    Q    In summer of 2023, you testified that Ms. Sashidhar had a

4    trip to the U.S. for a medical procedure and that your child was

5    in your care, correct?

6    A    Correct.

7    Q    But, in fact, your child and you were at her mom's house in

8    India during that time, right?

9    A    Correct.

10   Q    And then in December of 2023, when Mrs. Sashidhar went to a

11   retreat, you and your son, again, were spending time with her

12   mother in Singapore, correct?

13   A    Her mother was staying in our house, yes.

14   Q    Okay.  And you would agree that her mother provides care to

15   your son, correct?

16   A    Yes.

17   Q    You testified that you have pinched your son and that you

18   have additionally pretended to pinch him.  What does that mean,

19   "pretending" to pinch him?

20   A    It is to warn him that if he doesn't -- you know, that he

21   might get pinched.

22   Q    And so what physical action do you take when you are

23   pretending to pinch him?

24   A    I put my hands on him and pretend to pinch him.

25   Q    So you put your hand on him as if you were going to squeeze?

PRASANNA SANKARANARAYANAN - Cross (Skinner)         Day 1 - January 6, 2025 - 110

 1    A    Yes.

 2    Q    And his reaction, is that in fear?

 3    A    Yes.

 4    Q    You presented an exhibit that shows a birthday invitation,

 5    that your son was invited to a birthday party in Singapore at the

 6    American Club.  What's the American Club?

 7    A    It is a club nearby, near our house.

 8    Q    Why is it called the American Club?

 9    A    No particular reason.

10    Q    It's not geared towards Americans?

11    A    Yes.  Americans get a discount if they buy a membership in

12    the club.

13    Q    Okay.  And so the members are mostly American expats,

14    correct?

15    A    I think it's 50/50.  I'm not sure, though.

16    Q    And there's different types of these clubs in Singapore,

17    right?  There's a British Club, for example, right?

18    A    Yes.

19    Q    But you specifically were members of the American Club?

20    A    We were never members of the American Club.

21    Q    You went to events at the American Club?

22    A    There was a birthday party hosted by my son's classmate at

23    the American Club that we attended.  We were never members of the

24    American Club.

25    Q    You testified that your son had a few sleepovers per month

 1    with his friend Greg in Singapore.  Do you remember that

 2    testimony?

 3    A    Yes.

 4    Q    Were those on weekends or weeknights, typically?

 5    A    Weekends.

 6    Q    So what's a "few"?

 7    A    A few times a month, like once or twice a month or something.

 8    Q    So once or twice out of every month your son was sleeping

 9    over at Greg's house?

10            MR. MIN:  Objection.  Mischaracterizing the evidence.

11            THE COURT:  It's overruled.

12    You may answer the question.

13    A    Yeah, I do remember, you know, once or twice either him

14    sleeping at Greg's house or Greg sleeping in our house.

15    Q    Per month, as you testified to, or are you saying in total

16    now?

17    A    No.  He has slept over more than two times, definitely more

18    than two times, I think.  And Greg lived in the apartment.  He

19    lived upstairs.  So they spent a lot of time together.

20    Q    That's not my question.

21        You testified that your son had a few sleepovers per month

22    with Greg in Singapore, right?

23    A    That is correct.

24    Q    And then you qualified that a "few" meant one to two per

25    month, correct?

1   A   Correct.

2   Q   When did he start having sleepovers with Greg?

3   A   I think 2024 is when they got very close.

4   Q   When in 2024?

5   A   I don't remember.

6   Q   So how many, in total, sleepovers have they had?

7   A   Maybe five to ten.

8   Q   What are Greg's parents' names?

9   A   Alyssa, and the dad's name, I forget.  Alyssa is the mom.

10  The dad's name, it's suddenly not striking.  But if I'm not

11  wrong, I have given it on the witness list.

12  Q   Who coordinated the sleepovers?

13  A   Dhivya.

14  Q   So she probably would have a more accurate total of how many

15  your son actually had, correct?

16          MR. MIN:  Objection.

17          THE COURT:  Sustained.

18  A   Yes.

19  Q   You testified that you changed schools from Singapore

20  American School to UWC because it was a better ranked school.  Do

21  you remember that testimony today?

22  A   Yes.

23  Q   And you gave testimony in a deposition where I asked you

24  questions under oath previously, correct?

25  A   Yes.

1   Q    What were the additional reasons that you testified to in

2   your deposition that you did not testify to today as a reason

3   behind changing schools?

4   A    Um, there was one incident of bullying in school, which A

5   was involved in, which is something that -- we wanted to find a

6   school with, like, better values.

7   Q    What did the school's values have to do with a bullying

8   situation?

9   A    The school's values around promoting independence, promoting

10  humility, promoting service, I think, has a lot to do with it.

11  Q    But you extensively researched that school before placing

12  your son in it to begin with, didn't you?

13  A    Yes.

14  Q    What does it mean to be "better ranked"?

15  A    There are several ranking lists, and, you know, they rank

16  schools based on accomplishment, campus, and many other factors,

17  and results.  That is very important in that as well.  And in

18  these ranking lists, it was ranked.

19  Q    But who determines what score to give a school within that

20  list?

21          MR. MIN:  Objection.

22          THE COURT:  That's sustained.  Ask another question --

23  A    You mean --

24          THE COURT:  Sir, when the Court sustains an objection,

25  that means you are not required to answer.  So any time you hear

 1  either party object, wait until I rule before you answer, because

 2  you might not have to answer the question.

 3                THE WITNESS:  Okay.  Thank you.

 4                THE COURT:  Ask the question, counsel.

 5                MS. SKINNER:  Thank you.

 6  Q   You testified about a Singapore venture capital business.  I

 7  think it was called Lumebox.  Do you recall that testimony?

 8  A   Yes.

 9  Q   And that was a business that your wife was working on,

10  correct?

11  A   Correct.

12  Q   She discussed with you where to invest things, but the

13  decision was ultimately hers, correct?

14  A   Correct.

15  Q   And the only investments that were made from Lumebox were

16  into U.S. companies, correct?

17  A   I think there was a U.S. company.  I believe there was an

18  Indian company.  I don't remember if there was a Singapore

19  company or not.  I don't believe everything was U.S., but I don't

20  know.

21  Q   But Ms. Sashidhar was --

22  A   I think there was an Indian company.

23  Q   But Ms. Sashidhar was the one in charge of those final

24  decisions, correct?

25  A   Correct.

1    Q    You testified that "we" attended religious classes in

2    Singapore.  You never went to any, right?

3    A    I absolutely did.

4    Q    You're not religious, though, correct?

5    A    I'm not very religious, that is correct, but I did go to

6    religious events with my family.

7    Q    Well, are you making a distinction between religious events

8    and the religious classes that you testified to earlier?

9    A    No.

10    Q    So those are the same things?

11    A    Yes.

12    Q    And you testified you went to those on Saturdays?

13    A    Yes.

14    Q    How many of those did you go to?

15    A    I think maybe 10 to 20.

16    Q    When did you start going?

17    A    I'm not sure.  Maybe 2023 or 2024.  I'm not really sure.

18    Q    Who's the guru there?

19    A    That was a couple whose house the event was running in.  I

20    forget the name.  But I believe they were working in -- the

21    husband was working in an FMCE company.  I forgot the name.

22    Q    Okay.  So I didn't ask where anybody was working.  I said

23    who, what are their names.  And so your testimony is you don't

24    know?

25    A    Yes.  I forgot.

PRASANNA SANKARANARAYANAN - Cross (Skinner)      Day 1 - January 6, 2025 - 116

1   Q   When was the last time you went?

2   A   Probably six months ago or maybe more than that.

3   Q   You testified about the lease of the house that you're

4   currently renting, the Astrid Hill home.  And on that lease,

5   Ms. Sashidhar did not sign that lease, correct?

6   A   Correct.

7   Q   You asked her to sign it, but she refused, right?

8   A   I believe she signed as a witness, if I'm not wrong.

9   Q   Oh, I misunderstood then your testimony.  I thought I asked

10  you, "She did not sign it?" and I thought you said "Correct."

11  A   I misunderstood you as well.

12  Q   Okay.  So your testimony is that she signed the lease?

13  A   I believe so.  We can pull up the lease.  I don't know.  I

14  don't remember.  But I definitely don't think she ever refused

15  signing.

16  Q   Okay.  Well, let's pull up Exhibit 19, which is a copy of the

17  Astrid Hill lease.  The last page has signatures on it.

18      Does her signature appear on that lease?

19  A   No.

20  Q   You testified that your U.S.-based cell phone number, that

21  you either gave that up or it lapsed; wasn't that your testimony?

22  A   Yes.

23  Q   But you still have a Palo Alto area code phone, don't you?

24  A   I do not.

25  Q   You do not have -- own the phone number 650-468-0136?

```
 1   A    I do.  I don't own the phone.  It is a VoIP number.

 2   Q    So that's a U.S.-based phone number, a Palo Alto area code,

 3   correct?

 4   A    Maybe.

 5   Q    Where else -- if it's maybe, what do you think 650 is?

 6   A    I don't know.

 7   Q    So do you recognize that phone number?

 8   A    Yes.

 9   Q    And when did you get that phone number?

10   A    I believe sometime in -- when I was in California, if I

11   recall correctly, if I remember correctly.

12   Q    Okay.  So you got the 650-area-code phone number when you

13   lived in California and you still have that phone number.  If I

14   called or texted you to that number today, it would reach you,

15   correct?

16   A    Correct.

17        Just to be clear, it is a Google --

18   Q    There's no question pending.  Thank you.

19        So you testified that you bought glasses for your son in

20   India.  Why did you buy them there?

21   A    I think that we were there on a summer break and we bought

22   it.

23   Q    Does he wear glasses?

24   A    He -- we were -- the school told us that he might need

25   glasses to see farther away, so we prepared for it by buying.
```

PRASANNA SANKARANARAYANAN - Cross (Skinner)         Day 1 - January 6, 2025 - 118

1    Q    Does he wear glasses?

2    A    No.

3    Q    Did you receive a prescription in India for glasses --

4    A    Yes.

5    Q    -- for him?

6    A    Yes.

7    Q    So he's received vision care in India.  Has he also received

8    medical care in India in the last two years?

9    A    Medical care?  I don't recall if he ever went to a doctor in

10   India or not.

11   Q    You testified, "I thought there was no way to close our U.S.

12   bank accounts."  Do you remember that testimony?

13            MR. MIN:  Objection.  Mischaracterization of the

14   testimony.

15            THE COURT:  You can rephrase it, counsel.

16   Q    Did you testify or do you believe that there's no way to

17   close your U.S. bank accounts?

18   A    No.

19   Q    So if you wanted to close a bank account, you would know how

20   to do it?

21   A    Yes.

22   Q    You testified that in 2001 {sic} to 2022, in Washington, your

23   son did not participate in extracurricular activities, correct?

24   A    Yes, not that I recall.  Yeah.

25   Q    So you don't recall him being in painting class at Crossroad

1    Art School?

2    A    I remember now.  I took him to those classes.

3    Q    Oh, so you do remember that now that I said it?

4    A    Yes.

5    Q    And you're not aware that he attended music lessons at

6    School of Rock?

7    A    So both of these are four classes or something, four or five

8    classes, and they were not regular extracurricular activities.  I

9    think they occurred, but they were not continuous.

10   Q    So my question was, were you aware that he attended music

11   lessons at School of Rock?

12   A    Yes, I recollect now.

13   Q    Okay.  And what about -- do you recall that he attended

14   soccer lessons?

15   A    He went to -- I mentioned that earlier in my testimony.  He

16   went to a summer camp for soccer.

17   Q    But you don't classify that as an extracurricular activity?

18   A    It was not an after-school activity.  It was a small,

19   sequenced summer camp.

20   Q    You testified that you decided in 2020 to move out of the

21   U.S.; is that correct?

22   A    Yes.  Around 2020, yes.

23   Q    But, in fact, in 2020, you applied for the 01 visa status in

24   the United States, correct?

25   A    Correct.

PRASANNA SANKARANARAYANAN - Cross (Skinner)        Day 1 - January 6, 2025 - 120

1   Q    And that visa is an indefinite visa?

2   A    No.

3   Q    There's a time period for it?

4   A    Yes.

5   Q    How long is that?

6   A    Two to three years.

7   Q    What would be the difference between having it for two versus

8   three years?

9   A    I just don't remember if it's two or three.

10  Q    And when you moved from the green card to the O-1 visa, that

11  was to avoid paying exit tax upon leaving the U.S., correct?

12  A    Yes.

13  Q    Exit tax on what?

14  A    On unrealized capital gains.

15  Q    Unrealized capital gains of what asset?

16       MR. MIN:  Objection.  Relevance.

17       THE COURT:  Counsel?

18       MS. SKINNER:  Your Honor, this is relevant to, again,

19  the habitual residence analysis about the assets that the party

20  owns, where they're located, and the reasons behind a temporary

21  move to a foreign country versus more of a permanent move.

22       THE COURT:  All right.  The question is permitted.

23  A    Can you -- sorry.  Can you repeat the question?

24  Q    Exit taxes related to unrealized capital gains on what asset?

25  A    The biggest one was shares of Rippling, the company I

 1    founded.

 2            THE COURT:  Counsel, you are going to have to have the

 3    witness spell that.

 4            MS. SKINNER:  Thank you, Your Honor.

 5    A    Rippling.

 6    Q    Can you please spell the name of the company that you

 7    referenced there?

 8    A    R-i-p-p-l-i-n-g.

 9    Q    And so when you were looking to move from the United States

10    to another country, leading up to your 2022 move to Singapore,

11    what countries did you consider?

12    A    We considered Singapore, Dubai, Switzerland.  But, mostly, we

13    focused on Singapore.

14    Q    And the tax implications of the country that you would move

15    to were a factor that you considered, correct?

16    A    Correct.

17    Q    Because you had received significant wealth, correct?

18            MR. MIN:  Objection.  Relevance.

19            THE COURT:  It's overruled.

20            MR. MIN:  Your Honor, if I may be --

21    Q    Because you had received significant wealth, correct?

22            THE COURT:  Counsel?  I'm sorry.

23            MR. MIN:  Your Honor, if I just may be heard quickly on

24    this?

25            THE COURT:  You may.

1          MR. MIN:  Your Honor, counsel stated that it was

2    relevant for the location of assets.  The location of assets may

3    be relevant.  The wealth is not relevant to these proceedings.

4    It's not a divorce proceeding, Your Honor.

5          THE COURT:  Counsel?

6          MS. SKINNER:  Your Honor, the substantial nature of the

7    wealth, it is crucial to this case, because if we're talking

8    about a few hundred thousand dollars, then the parties are going

9    to be having different discussions and intentions for moving.  In

10   this case, because of the substantial nature of the wealth, the

11   motivations and the intentions of the parties are crucial -- are

12   critically linked to that, and so I would ask for just a little

13   bit of leeway on this questioning.

14         THE COURT:  I will allow limited latitude.  Your

15   objection is noted, counsel.

16   Q    (By Ms. Skinner:)  So my question is that you were

17   considering the tax implications of the country that you would

18   move to because you had received significant wealth, correct?

19   A    Yes.

20   Q    And because you have represented yourself to be a

21   billionaire, correct?

22         MR. MIN:  Objection, Your Honor.

23         THE COURT:  That's sustained, counsel.

24         MR. MIN:  You don't have to answer the question.

25   Q    (By Ms. Skinner:)  And you thought that it would be wasteful

 1   for the family to have assets that would be taxed by the U.S.,

 2   and so you wanted to move to a country that would not tax them,

 3   correct?

 4   A   I wanted to save on U.S. taxes, yes.

 5   Q   Because you said that it would be wasteful if you had to pay

 6   taxes on them, right?

 7   A   I don't remember if I used that word or not.

 8   Q   Okay.  I would like to show your deposition transcript.  You

 9   recall taking a deposition on two occasions where I asked you

10   questions under oath, correct?  Exhibit 350 --

11   A   Yes.

12   Q   -- page 194, or 44 of 79.

13           MS. SKINNER:  Page 194, or 44 of 79.

14           MR. MIN:  Your Honor, this document is not in evidence.

15   It wasn't offered into evidence at this point.  So we're just --

16           THE COURT:  Counsel, she's free to use the deposition

17   for purposes of impeachment.  The objection is overruled.

18   Q   So I asked you ...

19           MR. MIN:  Your Honor, while counsel considers the

20   question, I just want to be clear on the record, these

21   transcripts have not been signed by either party.  So I'm not

22   contesting that, but I want to make sure that, you know, there's

23   not going be a future argument about the fact that depositions of

24   their witnesses have been unsigned at this juncture.

25           THE COURT:  I don't know the status of the deposition as

 1   being signed or not being signed.  What's your situation,

 2   counsel?

 3          MS. SKINNER:  I'm not sure about whether they're signed

 4   or not, but certainly all parties asked for very expedited copies

 5   of these transcripts, so we have had them for a while to

 6   determine whether there's any clerical errors that need to be

 7   corrected.  But I can certainly ask the question about whether

 8   there's a clerical error that needs to be corrected on this.

 9          THE COURT:  You can ask the witness if the deposition

10   was taken and did he can make these statements, and then you can

11   proceed from there.

12          MS. SKINNER:  Thank you, Your Honor.

13   Q   (By Ms. Skinner:)  And so you recall that you were deposed

14   and you answered questions that I asked you, correct?

15   A   Correct.

16   Q   And your deposition was transcribed by the court reporter,

17   correct?

18   A   Yes.

19   Q   And you've had a copy of those transcripts available to you

20   to review, correct?

21   A   Yes.

22   Q   And so you testified in your deposition here that it might be

23   wasteful for the family to have assets that are taxable by the

24   U.S., correct?

25          MR. MIN:  Objection.  Improper use of deposition, Your

1  Honor.  Deposition transcripts are to be read with a question and

2  answer, and that's the limitation of the use of deposition.  I

3  think counsel needs to state what the question was and what the

4  answer was from the deposition transcript.

5          THE COURT:  That procedure, as stated, is correct.

6  However, do we know whether or not this witness has a deposition

7  transcript in front of him?

8          MR. MIN:  It's on the screen, Your Honor.  So I don't

9  know if the witness has it physically, but, of course, I'll

10  acknowledge that --

11          THE WITNESS:  Yeah, I'm seeing it.

12          THE COURT:  The reason I'm asking, counsel, is to

13  clarify.  Oftentimes witnesses like to look in the deposition

14  themselves to see context for the question being asked.  That's

15  proper and that's permitted.  So that's the reason I asked the

16  question "Does he have a copy of the transcript?"

17      Setting that aside, if a copy of that single page is

18  available to the witness, ask those questions.

19          MS. SKINNER:  Thank you, Your Honor.

20          THE COURT:  Ask the question as proposed by counsel for

21  the petitioner.

22          MS. SKINNER:  Thank you, Your Honor.

23  Q   (By Ms. Skinner:)  And so I asked the -- in the deposition,

24  we were talking about the flow of the shares of Rippling that you

25  received, and you testified that the bulk of that asset went to

PRASANNA SANKARANARAYANAN - Cross (Skinner)        Day 1 - January 6, 2025 - 126

 1    your brother.  Do you see that there on page 18?

 2              MR. MIN:  Objection, Your Honor.

 3    A    Yes.

 4              MR. MIN:  Misuse of deposition transcript testimony.

 5    Again, the proper form of deposition questions is to recite the

 6    question and the answer, and that is the limitation of deposition

 7    transcript use.  To ask him what he testified in general is not

 8    proper deposition use.

 9              THE COURT:  That's correct, counsel.

10              MS. SKINNER:  Sorry, Your Honor.  I was trying to give

11    context for the question by reading a few questions back.

12              THE COURT:  Read the question and the answer provided by

13    the witness.  Whether he needs context or not, that may be the

14    responsibility of his own lawyer --

15              MS. SKINNER:  Okay.

16              THE COURT:  -- not necessarily a requirement of

17    yourself.

18              MS. SKINNER:  Okay.

19    Q    (By Ms. Skinner:)  So you testified that the bulk went to

20    your brother, and the question was why.

21              MR. MIN:  I object, Your Honor.

22              MS. SKINNER:  I don't know how I could ask -- I guess I

23    could just say the question is why and then have the witness

24    testify about the answer, but --

25              THE COURT:  Which line are you starting on, counsel?

 1            MS. SKINNER:  So it would be 18.

 2            THE COURT:  Let's do it this way, counsel.  Again, I

 3   don't know if he has the deposition.  Instruct the witness to go

 4   back to a certain line in the deposition.  He could get his own

 5   context for the purpose of the question.  It will move things

 6   along quicker and have a better understanding by the witness of

 7   exactly the precise questions you're asking.

 8            MS. SKINNER:  Understood, Your Honor.  Thank you.

 9   Q   If the witness could read the page that's in front of him,

10   lines 16 to 25.

11   A   Okay.

12            MR. MIN:  Your Honor, could I ask that we zoom out so

13   that the witness can just read the entire page?

14            THE COURT:  That's fine.

15            MR. MIN:  Your Honor, while we do that, I know it's not

16   time for the break, can I just take a one-minute bathroom break

17   while the witness is reading this page?

18            THE COURT:  Why don't we take an afternoon recess, a

19   convenience break, for all parties.

20            MR. MIN:  Thank you.

21            THE CLERK:  Please rise.

22            THE COURT:  We will be in recess.

23            THE CLERK:  Fifteen minutes.

24                          (Recessed.)

25            THE COURT:  Good afternoon, again.  Please be seated.

 1          Counsel, you may resume your cross-examination.

 2              MS. SKINNER:  Thank you, Your Honor.

 3     Q    (By Ms. Skinner:)  In the deposition, I asked you "Why,"

 4     correct?

 5     A    Yes, I see a "Why" in front of me.

 6     Q    And you answered, in part, "It might be wasteful for the

 7     family to have assets that are taxable by the United States."  Is

 8     that accurate?

 9              MR. MIN:  Objection, Your Honor.  Again, improper

10     deposition -- use of deposition transcript.  Question and full

11     answer.  I mean, she's cherry-picking parts of an answer and

12     asking if that's correct, Your Honor.  That's not the proper

13     format/form of a question.

14              THE COURT:  Okay.  Counsel, I understand the objection,

15     but to move things on, let's answer the question.

16          Please, proceed.

17              MR. MIN:  Your Honor, I will also note I had an

18     objection in that deposition question, on the issue of relevance.

19              THE COURT:  On the relevance, that's overruled.

20              MR. MIN:  Okay.

21              THE COURT:  The witness may answer the question.

22     A    So these are two different contexts.  You asked me a question

23     that's very different from what's in this deposition.  Do you

24     want me to explain?

25     Q    No.  That's fine.  Thank you.

 1        So you have assets located in the Cayman Islands, correct?

 2             MR. MIN:  Objection.

 3             THE COURT:  It's overruled.  I believe the issue of the

 4   "Cayman" reference came out during the course of direct

 5   examination, counsel.  So it's fair game.  You opened the door.

 6   A    So I have a company that is incorporated in the Cayman

 7   Islands, correct, a start-up.

 8   Q    And that's 0xPPL; is that right?

 9   A    Yes.

10   Q    All of the employees, other than you, are in India, correct?

11   A    Yes.

12   Q    Are you an employee or an owner or both?

13   A    Part owner and employee.

14   Q    What are you paid as an employee?

15             MR. MIN:  Objection.  Relevance.

16             THE COURT:  It's overruled.  The answer remains.

17             THE WITNESS:  So I should answer, right?

18             THE COURT:  You have already answered, sir.

19             THE WITNESS:  Okay.

20             THE COURT REPORTER:  I'm sorry, Your Honor.  I don't

21   have the answer.

22             THE COURT:  All right.  Ask the question again.

23   Q    What are you paid as an employee?

24   A    Zero.

25   Q    Are any of your other employees paid zero?

```
 1              MR. MIN:  Objection --

 2    A    No.

 3              MR. MIN:  -- as to the other employees, the relevance of

 4    that, Your Honor.

 5              THE COURT:  You may answer the question "Yes" or "No,"

 6    but if there's another question about what are they paid, the

 7    Court will sustain that objection.

 8         The next question.

 9    Q    And you use a neobank called "Roma Global"?

10    A    Yes.

11    Q    And 0xPPL is not affiliated with Singapore anymore, correct?

12    A    Yes.

13    Q    You switched that from being Singapore based to Cayman Island

14    based, correct?

15    A    Correct.

16    Q    And you think you did that a year or two ago, correct?

17    A    Yes.

18    Q    And you have assets located in American Samoa?

19    A    Those are not my assets, so, no, I do not have assets that I

20    own that are located in America Samoa, no.

21    Q    A trust, which the source of the funding for the trust is

22    your Rippling stock, is run out of an LLC in American Samoa,

23    correct?

24    A    The source of funding for the trust is my brother's Rippling

25    shares.  Now, some of it, he invested in Rippling and obtained.
```

 1    Some of it he obtained through gifts from other members in the

 2    family.

 3    Q    The bulk of the Rippling shares in the American Samoan LLC

 4    owned by the trust are from you, correct?

 5              MR. MIN:  Objection.  Relevance.

 6              THE COURT:  Overruled.  And answer the question "Yes" or

 7    "No."

 8    A    Not directly.

 9    Q    What does that mean?

10    A    I did not put any shares in American Samoa entities.  So it

11    did not come from me.

12    Q    The initial source?

13    A    There were many transactions, and a lot of the stock was

14    originated when I founded the company.

15    Q    I'm sorry.  A lot of the stock was what when you cofounded

16    the company?

17    A    A lot of those stocks were granted to me when I cofounded the

18    company.

19    Q    So the majority of the shares were sourced from you, correct?

20              MR. MIN:  Objection.  Vague.

21              THE COURT:  That's overruled.

22    A    If by "sourced," you mean you can infinitely look back over

23    many years, over many transactions, then, yes.

24    Q    Okay.  That was what I meant, so thank you.

25         And you are the manager of those LLCs, correct?

1    A    Yes.

2    Q    The ones organized in American Samoa, correct?

3    A    Correct.

4    Q    And the trust that owns the American Samoa LLCs has a

5    professional trustee located in South Dakota, correct?

6    A    Correct.

7    Q    And that is Bridgeford; is that correct?

8    A    Yes.

9    Q    And you communicate with them regularly because you manage

10   significant assets within that LLC, correct?

11   A    Yes.

12   Q    And you have a Bank of America account located in the U.S.,

13   correct?

14   A    The bank is based out of the U.S., correct.

15   Q    And you created a trust in September of 2024 called "Rabbit

16   Box Trust," correct?

17   A    Yes.

18   Q    And that is run out of the country of Nevis; is that correct?

19   A    Yes.

20   Q    And the trustee is Blue Box; is that correct?

21   A    Yes, I believe so.

22   Q    And your son is the sole and irrevocable beneficiary of that

23   trust, correct?

24             MR. MIN:  Objection.  Relevance.

25             THE COURT:  It's overruled.

PRASANNA SANKARANARAYANAN - Cross (Skinner)          Day 1 - January 6, 2025 - 133

| | | |
|---|---|---|
| 1 | A | Yes. |
| 2 | Q | Do you own a car in India? |
| 3 | A | My wife does. |
| 4 | Q | Did you purchase -- |
| 5 | A | I do not. |
| 6 | Q | Did you purchase a car for her? |
| 7 | A | Yes. |
| 8 | Q | When? |
| 9 | A | Probably June of this year. |
| 10 | Q | Last year? |
| 11 | A | 2024. |
| 12 | Q | You lease an apartment in India? |
| 13 | A | Yes. |
| 14 | Q | You have an interest in a home owned by your mother in India? |
| 15 | A | I co-lease an apartment with my mother-in-law, in which my |
| 16 | | mother-in-law lives, yes.  Is that the question? |
| 17 | Q | I'm talking about the home that your own mother has in India. |
| 18 | A | Do I have any interest in it? |
| 19 | Q | Yes. |
| 20 | A | Is that the question? |
| 21 | Q | Yes. |
| 22 | A | No. |
| 23 | Q | And do you have an interest in a home owned by your dad in |
| 24 | | India? |
| 25 | A | No. |

PRASANNA SANKARANARAYANAN - Cross (Skinner)      Day 1 - January 6, 2025 - 134

1   Q    You have a --

2   A    Just a clarification.  Did you ask me if I have any equity

3   interest in my mother or my dad's houses?

4   Q    An interest.

5   A    What interest are you talking about?  Do I own a portion of

6   it?  Is that the question?

7   Q    My question is, do you have an interest in a home owned by

8   your mother in India?

9   A    I do not have any equity interest in either of those homes.

10  Am I interested in the well-being of my parents?  Yes.

11  Q    And you have a bank account in India?

12  A    I have a newly opened zero-balance, zero-transaction bank

13  account in India, yes.

14  Q    And by "newly opened," you actually mean within the last

15  year?

16  A    Yes.

17  Q    You testified that you travel for work purposes to 0xPPL in

18  India for one week every two months.  Didn't you testify to that?

19  A    Yes, somewhere in that range.  It's not a strict thing, but

20  roughly that range.

21  Q    So just approximately six times a year?

22  A    Yes.

23  Q    And 0xPPL is located in what part of India?

24  A    Bengaluru.

25  Q    So in the six months leading up to Ms. Sashidhar and the

 1    child moving from Singapore to Washington State, were you then in

 2    Bengaluru just about three times during that period?

 3    A    Something like that.

 4    Q    In that same time period, you also visited your hometown area

 5    in India.  And where is that?

 6    A    Chennai.

 7    Q    And you visited there, correct, in the six months leading

 8    up --

 9    A    Not all the time.

10         Have I visited Chennai?  Yes, I have.

11    Q    And, again, the same time period, in the six months leading

12    up to the time in which your child and wife left from Singapore

13    to Washington State, you also traveled to Delhi?

14    A    To Delhi?

15    Q    Yes.

16    A    I don't believe so.  Maybe to transit between flights, but I

17    don't think I traveled to Delhi.  I don't recall being in Delhi.

18    Q    And to Dubai?

19    A    We went on a family vacation to Dubai, yes, with my family.

20    Q    And to Kazakhstan?

21    A    Sorry.  Did I go to Kazakhstan?

22    Q    Yes.

23    A    Yes.

24    Q    And you also traveled to New Zealand?

25    A    Yes.

PRASANNA SANKARANARAYANAN - Cross (Skinner)        Day 1 - January 6, 2025 - 136

 1    Q    And to Thailand?

 2    A    Yes.

 3    Q    What dates were you traveling away from Singapore in 2024?

 4    A    Like you want me to list all the dates that I was out of

 5    Singapore?

 6    Q    Yes.

 7    A    I don't remember.

 8    Q    Okay.  I will show you some documents to help you refresh

 9    your recollection.

10         On April 7th to April 13th, did you travel from Singapore to

11    Bengaluru?  And I'm going to show you a document that I'm going

12    to ask you to take a look at to see if it refreshes your

13    recollection regarding that.

14              THE COURT:  Is this an exhibit, counsel?

15              MS. SKINNER:  This is just to refresh the witness's

16    recollection for testimony.

17              THE COURT:  But is it an exhibit?

18              MS. SKINNER:  Excuse me?

19              THE COURT:  Is it an exhibit?

20              MS. SKINNER:  It is not an exhibit, Your Honor, no.

21              MR. MIN:  Your Honor, this is improper use of refreshing

22    recollection.  This is not how refreshing recollection works, is

23    just to show documents.

24              THE COURT:  If you are calling it "refreshing

25    recollection" in the context as does this help him remember,

 1  that's a different system, and I will allow it under those

 2  circumstances.  But refreshing recollection is usually something

 3  that the individual has created and they're using that to refresh

 4  their recollection.  So I'm treating a distinction between the

 5  two, but I will allow you to ask the witness, does it help in his

 6  memory by looking at this document.

 7              MS. SKINNER:  Thank you, Your Honor.

 8              THE COURT:  Otherwise, counsel, this should be an

 9  exhibit as opposed to something to just show the witness.  It's

10  not something that you created or that he created.

11              MS. SKINNER:  Thank you, Your Honor.  I was under the

12  impression that anything could be used to assist the witness in

13  refreshing his recollection.  And I appreciate the direction from

14  the Court.

15              THE COURT:  That's true, counsel, but it's still

16  supposed to be an exhibit.

17              MS. SKINNER:  Thank you, Your Honor.

18              THE COURT:  Please continue.

19  Q    Does this document help you to remember whether you travelled

20  from Singapore to Bengaluru April 7th?

21  A    It is possible, if I did take this flight, then, yes, I would

22  have been in Bengaluru on that date.

23  Q    Did you travel from Chennai to Bengaluru April 23rd to

24  April 26th?

25  A    I honestly don't know which of these flights I took.  I mean,

PRASANNA SANKARANARAYANAN - Cross (Skinner)   Day 1 - January 6, 2025 - 138

1   there are flights that I regularly miss.  If you show me a bunch

2   of flight tickets, I would not remember which ones I took and I

3   did not take.

4   Q   Why do you regularly miss flights?

5   A   Plans change.

6   Q   Would you have received a notification that you did not show

7   up to a scheduled flight?

8   A   If I -- I might have.  I definitely think if I looked at my

9   passport stamps, I would be able to tell, but I would have to do

10  a bunch of work to, like, pull this together.

11  Q   Is your passport there with you?

12  A   My passport is somewhere in the house.  I would need to look

13  for it.

14        MS. SKINNER:  I'd ask the witness to refer to his

15  passport to refresh his recollection about his travel from

16  Chennai to Bengaluru on April 23rd.

17        THE COURT:  Counsel, if the witness says that the

18  passport is somewhere in his house -- we've been going since nine

19  o'clock this morning; it's after 3:00 -- we're not going to waste

20  time for him looking for a passport to facilitate your

21  examination.  So next question.

22        MS. SKINNER:  Very good, Your Honor.  Thank you.

23  Q   You applied for a renewed Indian passport recently, correct?

24  A   Correct.

25  Q   That was on April 30th of 2024?

 1   A    I don't remember the date.

 2   Q    What address did you list as your residence on the passport?

 3   A    I think the address that I co-lease -- I think it is the

 4   address that I co-lease with my mother-in-law.

 5   Q    Is that your testimony or are you unsure?

 6   A    I am unsure.  I said, "I think."

 7   Q    I would like to show the witness Exhibit 319, page 3.  What

 8   is the address that's listed there?

 9   A    So I was right.  This is the address that I co-lease with my

10   mother-in-law.

11   Q    And if we scroll up to page 1, is this the passport that you

12   renewed?

13   A    Are you asking me if this is a new or old passport?

14   Q    Correct.

15   A    I don't know if it's the new one or the old one.

16   Q    Okay.  Do you see --

17   A    That's my passport.

18   Q    Do you see there, kind of to the right of your signature, it

19   indicates the 30th of April 2024 is when this was issued?

20   A    Yes.

21   Q    And so is that when it was issued to you?

22   A    Yes.

23   Q    Why did you include the address for the residence that you

24   co-lease with your mother-in-law as your address for your

25   passport?

PRASANNA SANKARANARAYANAN - Cross (Skinner)      Day 1 - January 6, 2025 - 140

1   A   Because they wanted an Indian address, and I gave that

2   address.

3   Q   When were you added as a cotenant on Ms. Sashidhar's mother's

4   home?

5   A   A few months before this.

6   Q   I'd like to show you --

7   A   Or sometime -- sometime around this.

8   Q   I would like to show you Exhibit 317.  What is this document?

9   A   This is the co-lease document.

10  Q   When was it entered into?

11  A   22nd April 2024.

12  Q   So just a few days before you renewed your passport; is that

13  right?

14  A   Yes.

15  Q   Has your Indian passport always listed an Indian address or

16  has it ever listed a foreign address?

17  A   I'm not sure.

18  Q   You testified that you bought a car for your wife in India.

19  And is that vehicle registered?

20  A   Yes.

21  Q   I would like to show you Exhibit 326.  What is this?

22  A   This is the vehicle registration.

23  Q   What address is listed for your wife there?

24  A   It's another place that her mom owns.

25  Q   A place that her mom owns?

1    A    Yes.

2    Q    Have you spent time at that home?

3    A    Yes.

4    Q    When was the last time you spent time at that home?

5    A    I think it's when her mom was living there, I think.  Maybe

6    more than two years ago is my memory.

7    Q    You have an Indian driver's license?

8    A    I had an Indian license.  I don't know if it's expired or

9    not.  I think I do.

10   Q    When you lived in Washington, you had a Washington driver's

11   license?

12   A    Yes.

13   Q    When did you first file any actions in India against

14   Ms. Sashidhar?

15   A    I filed for a divorce on September 4th, I think.

16   Q    What residential address did you list for yourself for the

17   divorce proceedings in India?

18   A    I believe my childhood home.

19   Q    Where is your childhood home?

20   A    It is in Mogappair West.

21             THE COURT:  Spelling.

22   Q    Can you please spell that?

23   A    M-o-g-g-a-p-p-a-i-r {sic} W-e-s-t, West.

24   Q    When you filed the petition, did you include a sworn

25   statement that all of the information in the petition for divorce

1  in India was true and correct?

2  A   I think so.

3  Q   And part of the information that you provided to the court in

4  India was that your address was at the Mogappair West residence,

5  correct?

6  A   Yes, I listed that as my address.  Correct.

7  Q   And in that filing, you also represented that you were

8  presently in Chennai, correct?

9  A   Yes.

10  Q   When you filed your divorce petition with the court in India,

11  you described your son's connections to India.  Do you remember

12  including that information?

13  A   I believe so.

14  Q   That he has a deep connection to the Indian culture, right?

15  A   Yes.

16  Q   And a connection to the Indian values and ethos, correct?

17  A   Yes.

18  Q   And in that sworn petition, you told the Indian court that

19  Indian culture forms an integral part of his identity and

20  upbringing, correct?

21  A   Yes.

22  Q   And you asked for interim custody of your son in the India

23  proceeding in your affidavit, correct?

24  A   Yes.

25  Q   You told the court that you are a fit person to hold custody

1    of the child and that custody should be granted to you during the

2    pendency of the India divorce case, correct?

3    A    Yes.

4    Q    And you described to the court that you were temporarily

5    staying at 4 Astrid Hill in Singapore, correct?

6    A    Yes.

7    Q    And you asked the court to order that your son be returned to

8    his home country in India, correct?

9    A    I don't know if I asked the court to order that.

10   Q    Okay.  I'd like to show you Exhibit 335.  Look at page 5,

11   paragraph 10.  Do you see that, there, in paragraph 10, the last

12   sentence, "Therefore, the Petitioner is constrained to file the

13   present application seeking custody of minor son and relocation

14   of the minor son back to his home country, i.e., India, which is

15   the best interest of the minor child."  Do you see that there?

16   A    Yes, I see that.

17   Q    And that's a sworn statement from you?

18   A    Yes.

19   Q    And it's true and correct that India is your son's home

20   country?

21   A    We have strong ties to India, yes.

22   Q    Is it true and correct that India is your son's home country?

23   A    In this context, yes.

24   Q    You described to the Indian court that your time in Singapore

25   was a short sojourn, didn't you?

1    A    Yes.

2    Q    That it was a sojourn abroad, that's what you said to the

3    Indian court, correct?

4    A    I said my time in Singapore and in the United States was a

5    short sojourn.  So please don't skip over.

6    Q    Okay.  Let's turn to page 6, paragraph 14.

7         Thank you for that clarification.

8         There, in 14, you indicated, "I state that the Respondent and

9    I, despite our short sojourn in the United States of America and

10   Singapore, have always intended to return and settle permanently

11   in India."

12        So you're indicating that both your time in the United States

13   and Singapore were short sojourns, correct?

14   A    Yes.

15   Q    And that you and Ms. Sashidhar had no intention to renounce

16   your Indian domicile, correct?

17   A    Correct.

18   Q    And so that's your true and correct testimony to this Court

19   today, that you and Ms. Sashidhar had no intention to renounce

20   your Indian domicile?

21   A    We always had strong ties to India.

22   Q    Is it true and correct in your testimony today that you and

23   Ms. Sashidhar had no intention to renounce your Indian domicile?

24   A    Yes.

25   Q    And that "At no point did we contemplate making a permanent

 1  life outside of India."  That's true and correct today, right?

 2  A   I mean, we wanted to remain close to India and, you know, we

 3  were thinking long term about whether we wanted to return to

 4  India, but there was no particular plan.

 5  Q   You testified -- you stated to the Indian court that you

 6  swore it was true and correct, as of September 24th, 2024, that

 7  "At no point did we contemplate making a permanent life outside

 8  of India"; isn't that right?

 9  A   Yes, it is a statement made by me.  Yes.

10  Q   And it's a true statement, correct?

11  A   Yes, with limits.

12  Q   There's no limits to that statement described in your

13  declaration, correct?

14  A   You have to complete the statement.  You have to, like, read

15  the full sentence.  That isn't the way it's stated.

16  Q   So paragraph 14, "I state that the Respondent and I, despite

17  our short sojourn in the United States of America, have always

18  intended to return and settle permanently in India."  That's

19  correct, right?

20  A   Yes.

21  Q   "And throughout our sojourn abroad, the parties have

22  consistently maintained strong ties to India, without any

23  intention of renouncing our Indian domicile," correct?

24  A   Correct.

25  Q   And that's a true statement?

1   A    Yes.

2   Q    "And the Respondent and I have regularly visited India,

3   actively participating in Indian cultural and religious events,

4   and ensured that our minor son remained connected to the Indian

5   values and tradition," correct?  That's a true statement?

6   A    Correct, yes.

7   Q    Thank you.

8        "At no point did we contemplate making a permanent life

9   outside of India, and we have always expressed a desire to return

10  and establish a long-term residence in India where our families

11  reside."  That's a true statement, isn't it?

12  A    Yes.

13  Q    And you also stated in your sworn declaration, "The shared

14  intent to return to India forms a significant part of our

15  family's identity, and I seek to uphold the intention in the best

16  interests of our minor son's upbringing and cultural heritage."

17  That's a true statement, correct?

18  A    Correct.

19  Q    And all of that was made to support your request for your son

20  to be returned to his home country, India, correct?

21  A    No.  This was a custody application in India, that if he was

22  returned, how custody would look like.  To actually return, you

23  would have to apply in Singapore.

24  Q    You don't mention anything about asking a Singapore court to

25  order a return of your son; you're asking an Indian court to

 1    return your son in this statement, correct?

 2    A    I'm not asking an Indian court to return the son.  I'm

 3    fighting for custody of my child.

 4    Q    Okay.  Let's turn to page 5, paragraph 10.  The last

 5    sentence, which we read through previously, you said the

 6    "Petitioner" -- which is you, correct?

 7    A    Yes.

 8    Q    -- "is constrained to file the present application," which is

 9    the request you are making to the Indian court, correct?

10    A    Yes.

11    Q    And that in that application, you are seeking custody of the

12    minor son; is that correct?

13    A    Yes.

14    Q    And you're asking for relocation of the minor son back to

15    his home country, i.e., India, correct?

16    A    Yeah.

17    Q    And you recall, again, the deposition that you attended where

18    I asked you questions under oath, right?

19    A    Yes.

20    Q    And you swore that you would tell the truth in that

21    deposition, right?

22    A    Yes.

23    Q    And I asked you, "Was your move to Singapore permanent or

24    temporary?"  Do you remember that question?

25              MR. MIN:  Objection.  Improper form.

1           THE COURT:  Sustained.

2           MS. SKINNER:  Your Honor, if I may be heard?  This is

3    direct contradictory testimony about testifying at a deposition

4    that Singapore was permanent and then testifying in India that

5    there was no intention of being there permanently.

6           THE COURT:  Counsel, it's not a question of you being

7    able to ask that question.  I believe counsel is asking --

8    posing an objection as to the form in which you're asking the

9    question.  There's a proper procedure to use a deposition, and

10   you are not using that proper procedure.  Counsel stated it once

11   before.  I have stated it.  You have to follow that procedure,

12   counsel.  There's rules that we must abide by.

13          MS. SKINNER:  Thank you, Your Honor.

14   Q    (By Ms. Skinner:)  I'd like to show Exhibit 329.  Do you

15   recognize the portion of your deposition here, on lines 17

16   through 19?

17   A    Yes.

18   Q    And did I ask you, "Was your move to Singapore permanent or

19   temporary"?

20   A    Yes.

21   Q    And did you answer "Permanent"?

22   A    Yes.

23   Q    And you answered my question in your deposition after you had

24   talked with Hague lawyers, correct?

25   A    Yes.

 1  Q    Because after you wrote your Indian statement to the court,

 2  you changed your strategy about representing India as your

 3  domicile, correct?

 4  A    Sorry.  What's the question?

 5  Q    After you wrote your Indian application, you changed your

 6  strategy about representing India as your domicile, correct?

 7  A    What strategy?

 8  Q    The strategy that you would -- that you were representing

 9  your -- representing India as your domicile.

10  A    Can you ask this question for me?

11  Q    So in your Indian affidavit, you indicated that you had no

12  intention to renounce your Indian domicile, correct?

13  A    Yes.

14  Q    So you were stating that you have an Indian domicile,

15  correct?

16  A    Yes.

17  Q    And then, in your deposition, you testified that Singapore

18  was where you lived and that that was a permanent place for you

19  to live, correct?

20  A    Yes.

21  Q    So after you wrote your Indian affidavit, you changed your

22  strategy about how you would represent where your domicile was,

23  correct?

24        MR. MIN:  Objection.  The statement of permanent or

25  temporary in the statement of domicile are maybe related, but

 1   they're not the same statements.

 2           THE COURT:  Overruled.  Please continue.

 3   Q   So you changed your strategy about representing where your

 4   domicile was, correct?

 5   A   I don't think so.

 6   Q   I'd like to show you what's been marked as Exhibit 351.  On

 7   November 13th, 2024, at 12:07 p.m., you asked a group of your

 8   lawyers, "In the Singapore courts today, Dhivya again made it of

 9   note that she does not have an address to send me a summons."

10   Then you wrote "@" -- "@" a phone number.  "If our strategy is

11   going to be to take the position that I was always living in 4

12   Astrid, then how and when do I tell this to her?"

13           That's what you said to your attorney group, correct?

14   A   Yes, but it is not related to that.  These are completely

15   independent things you're pulling out of context.

16   Q   I'm just asking whether or not you said that to your

17   attorneys.

18   A   Yes.

19   Q   Okay.  And then your attorneys gave an answer, and you

20   responded, on November 14th, 2024, at 9:21, "Okay.  So I should

21   move back to the house.  I should or should not accept any

22   registered posts that come there trying to serve me?  So far, I

23   have not stayed there trying to accept anything."  You wrote

24   that, correct?

25   A   Correct.

1    Q    You wrote an affidavit for the proceedings in Singapore,
2    correct?
3    A    Which affidavit?
4    Q    Did you write an affidavit for the proceedings in Singapore?
5    A    Yes, I wrote many affidavits.
6    Q    Okay.  Did you tell the Singapore court that you did not hold
7    the intention to apply to become a Singapore permanent resident
8    because you did not want your child to be subject to national
9    service obligations?
10   A    I might have.  Can you refresh my memory?  I might have.
11   Q    I would like to show the witness Exhibit 331, page 167.  Do
12   you see there paragraph 8?
13   A    Yes.
14   Q    You stated in your Singapore affidavit that "We did not and
15   never have had the intention to apply to become Singapore
16   residents because we did not want our child to be subject to
17   national service obligations."  Do you see that there?
18   A    Yes.
19   Q    Was that one of the reasons or the only reason you did not
20   apply for permanent residency in Singapore?
21   A    One of the reasons.
22   Q    And when you wrote to the Singapore court, you asked the
23   Singapore court to deal with child custody issues -- excuse me,
24   you asked the Indian court to deal with child custody issues,
25   correct?

 1   A    I believe I also asked the Singapore courts, but Indian

 2   courts also I asked, yes.

 3   Q    So you asked both the Singapore and the Indian courts to deal

 4   with child custody issues?  Excuse me.  You're saying you asked

 5   both courts?

 6   A    Yes.  We withdrew from India and we asked the Singapore

 7   courts.

 8   Q    Okay.  I would like to direct you to page 186, paragraph 61.

 9   You write in your declaration, "To this end, I believe that India

10   has jurisdiction to deal with child issues and may be the more

11   appropriate forum to deal with the divorce as well as the

12   ancillary matters, including the child arrangements."  Is that

13   what you asked the Singapore court to do?

14   A    Yes, we asked for the courts to deal with the custody, and

15   India was only dealing with custody after relocation.

16   Q    Where does it say that here?

17   A    It says that it is on the basis that I filed the Indian

18   divorce proceedings.  "As stated above, the Washington court

19   appears to have taken the view that in the meantime" --

20          THE COURT:  Sir, sir, I'm going to strike all the answer

21   you just provided.  Please start your answer again and speak

22   slowly.

23   A    So I'm reading from this because you asked me what it states.

24   "As stated above, the Washington courts appear to have taken the

25   view in the meantime that the Singapore court should deal with

 1   matters of A███ until relocation is permitted.  Given that the

 2   mother is located in Singapore with A███ now, I would need to

 3   prevent her from leaving the country" --

 4           THE COURT:  Sir, you still need to slow down.  I know

 5   you are reading, but please take your time, if you want an

 6   accurate record of your testimony.

 7       I believe the last words that you spoke that were recorded

 8   were "I would need to prevent her from leaving the country."

 9   Pick up from there.

10   A   "I am compelled to make this application at this time so that

11   the Singapore court may deal with these matters on account of the

12   extremely exceptional circumstances that I find myself in."

13   Q   Your custody case in India is still pending, correct?

14   A   We have submitted a withdrawal.

15   Q   Are there custody hearings pending?

16   A   I don't believe so.

17   Q   When did you withdraw your request for India to deal with

18   child custody issues?

19   A   I believe sometime in December or sometime in the last few

20   weeks.

21   Q   You don't live in Bangkok, correct?

22   A   Correct.

23   Q   Have you ever lived there?

24   A   I visited.

25   Q   Have you ever lived there?

PRASANNA SANKARANARAYANAN - Cross (Skinner)    Day 1 - January 6, 2025 - 154

1    A    Never more than a few weeks at a time.

2    Q    Visiting your brother; is that right?

3    A    Sorry?

4    Q    Visiting your brother; is that correct?

5    A    My brother lives in Bangkok, yes.  I see him when I go there.

6    Q    So the times that you have traveled to Bangkok, have those

7    been to visit your brother?

8    A    Yes.

9    Q    And you represented to JPMorgan Chase that you lived in

10   Bangkok, correct?

11   A    I gave that as my residential address, yes.

12   Q    And that was for the purpose of opening an account there?

13   A    Yes.

14   Q    Because JPMorgan Chase had limits on how many Singapore

15   clients they could take?

16   A    Yes.

17   Q    And you were living in Singapore at the time you opened that

18   account?

19   A    Yes.

20   Q    And so your JPMorgan Chase accounts list you as living in

21   Bangkok, correct?

22   A    Yes.

23   Q    You've pinched your son hard enough to make him cry, correct?

24   A    Yes.

25   Q    And that made him scared, correct?

1              MR. MIN:  Objection.

2    A    Yes.

3              THE COURT:  Sustained.

4    Q    What other reaction, other than crying, did he have to your

5    pinching physically?

6    A    I don't think any other reaction.

7    Q    Trembling?

8    A    I don't think so.

9    Q    Cowering?

10   A    Sorry?

11   Q    Cowering, trying to shrink away from you?

12   A    Trying to get away from me, yes.

13   Q    And you have hit your son?

14   A    Have I ever hit my son?

15   Q    Yes.

16   A    Yes.

17   Q    You placed hidden cameras in the home in Singapore, correct?

18   A    Yes.

19   Q    And you said that was because you were trying to collect

20   audio, correct?

21   A    Yes.

22   Q    But you didn't put in merely listening devices, you put in

23   devices that captured video, correct?

24   A    Yes.

25   Q    And one of those video cameras was in your bathroom, correct?

1    A    Yes.

2    Q    Where Ms. Sashidhar would undress for the purpose of taking a

3    shower, correct?

4    A    Yes.

5    Q    And use the restroom, correct?

6    A    Yes.

7    Q    And your son would undress for the purpose of taking a shower

8    or a bath, correct?

9    A    Yes.

10   Q    And your son would use the bathroom, correct?

11   A    Yes.

12        The camera never worked.  It was never activated.

13   Q    That wasn't my question.

14        Ms. Sashidhar expressed to you that she had a feeling of

15   being forced by you to have sex, correct?

16   A    When?

17   Q    Ever.

18   A    I don't recall.

19   Q    You paid a retainer to a Washington State Hague attorney,

20   Amir John, correct?

21   A    I don't know if I paid or not.

22   Q    I would like to show you exhibit --

23   A    I don't think I paid him, actually.

24   Q    Okay.  You had a -- Exhibit 351, page 4.  You had a WhatsApp

25   group chat with some lawyers of yours and your brother for a

 1    period of time, correct?

 2    A    Yes.

 3    Q    And on November 17th, 2024, at 12:49 p.m., in that group

 4    chat, you said, "Maybe I can even pay something for that initial

 5    consult and definitely conflict him out."  You wrote that, right?

 6    A    Yes.

 7    Q    And you're talking about Washington Hague Attorney Amir John,

 8    right?

 9    A    Yes.

10    Q    And then you said, "Anyways, we can't have him represent

11    her."  Do you see you said that there at 1:23 p.m.?

12    A    Yes.

13    Q    And then, at 3:24 p.m., you said, "Paid $5,000."  Do you see

14    that?

15    A    Where is that?

16         Oh, that is the payment.  I paid $5,000 --

17    Q    I didn't ask a question, other than you said that you paid

18    $5,000, correct?

19    A    Yes, I said that.

20    Q    Okay.  Did you or anyone on your behalf reach out to any

21    other lawyers to conflict them out for Ms. Sashidhar?

22    A    I mean, this is -- isn't this misrepresentation?  This 5,000

23    was paid to Dhivya.  That doesn't mean that that's the --

24    Q    Did you --

25    A    -- citation to the lawyer.

PRASANNA SANKARANARAYANAN - Cross (Skinner)    Day 1 - January 6, 2025 - 158

1    Q    Did you or anyone on your behalf reach out to any other

2    lawyers to conflict them out for Ms. Sashidhar?

3    A    I don't remember.

4    Q    Stacy Heard?

5    A    Stacy Heard?  No, that was not to conflict her out.  I

6    engaged her a little bit -- no.

7             MR. MIN:  Objection.

8        No.

9        Objection on any question that might call for privileged

10   communications with the lawyers.

11            THE COURT:  That's sustained.

12       Clarify or narrow your question, counsel.

13            MS. SKINNER:  Thank you, Your Honor.

14   Q    (By Ms. Skinner:)  Did you or anyone on your behalf reach out

15   to Attorney Stacy Heard for the purpose of conflicting her out?

16   A    No.

17            THE COURT:  Counsel, why don't we take a stretch break?

18   Not go anywhere, but just have a chance to stretch this

19   afternoon.

20                      (Stretch break.)

21            THE COURT:  Please be seated.

22       You may continue.

23            MS. SKINNER:  Thank you, Your Honor.

24   Q    (By Ms. Skinner:)  Did you ever retain Ms. Heard?

25   A    Yes.

1   Q   Has she appeared in any matters on your behalf?

2           MR. MIN:  Objection.

3           THE COURT:  Calls for a "Yes" or "No."  You may answer

4   the question, sir, "Yes" or "No," no further detail other than --

5           THE WITNESS:  {Indecipherable.}

6           THE COURT:  I didn't hear the answer, nor did the court

7   reporter.

8       The question calls for a "Yes" or "No" as to whether or not

9   you had retained Ms. Heard.

10          MR. MIN:  Your Honor, that question was answered.  The

11  question was, has she appeared on your behalf in any -- I think

12  any proceedings or anything like that.

13          THE COURT:  You may answer that question.

14  A   No.

15  Q   Did you or anyone on your behalf reach out to David Starks?

16  A   I don't think so.

17  Q   Did you or anyone on your behalf reach out to Maggie Smith?

18  A   I don't think so.

19  Q   Did you or anyone on your behalf reach out to Lucia Levias?

20  A   What?

21  Q   Did you or anyone on your behalf reach out to Lucia Levias?

22  A   I don't think so.

23  Q   In the course of meeting with your expert, Dr. Favaro, you

24  filled out a questionnaire, correct?

25  A   That is a questionnaire that was filled out by a medical

PRASANNA SANKARANARAYANAN - Cross (Skinner)      Day 1 - January 6, 2025 - 160

1   professional who I was sitting with.  So I was assisting with

2   filling it out, I think.

3   Q   Where you were asked questions about your son, right?

4   A   Yes.

5   Q   And you described him as above average in reading, correct?

6   A   Yes.

7   Q   And above average in English and language arts, correct?

8   A   Yes.

9   Q   And above average in history or social studies, correct?

10  A   Yeah.  I don't recall exactly what the form looked like and,

11  you know, what the options are, but I could have.

12  Q   And you described him as above average in math, correct?

13  A   I could have.

14  Q   And science?

15  A   Maybe, yeah.

16  Q   And coding?

17  A   Uh-huh.  Yeah.  Maybe.

18  Q   And he shows those above-average skills in school, correct?

19  A   Yes.

20  Q   His teachers have commented on his maturity?

21  A   I don't think they commented on his maturity, no.

22  Q   Okay.  I would like to show you Exhibit 320, page 5.  Do you

23  see the second paragraph of the report card where it says "Your

24  son showed maturity when researching the Peranakan culture and

25  the contemporary artist Louise Hill"?

1    A    Yes.

2    Q    Have you read his report cards?

3    A    Yes.

4    Q    And then did you see where his teacher indicated that your

5    son "always displays confidence when presenting his art on

6    SeeSaw, is able to respectfully critique artist's work, and

7    responds to questions and discussions in class through mature

8    reflection."  Do you see that there?

9    A    Yes.

10   Q    Do you agree that your son at times shows mature reflection

11   in the work he's doing?

12   A    Maybe.

13   Q    And on page 4, your son's science teacher was describing the

14   tasks that he was doing in science lab, indicating that your son

15   "used clean evidence and reasoning as he thought about what he

16   observed and what he thought was true about those observations

17   and the evidence to prove or disprove what he thought was true."

18   Do you see that there?

19   A    Yes.

20   Q    And so do you see some of the traits that your son's teachers

21   see when you've reviewed these report cards describing these

22   skills your son has?

23   A    What is the question?

24   Q    Do you see some of the same skills that your son's teachers

25   have described about him within these report cards?

1    A    I have not observed him using clean evidence and reasoning,

2    no.

3    Q    You testified that you had reviewed the report cards, right?

4    A    I would have read it at some point, yes.

5    Q    And so, in general, some of these skills that the teachers

6    have described praising your son, do you see some of those in

7    your own observations and interactions with your son?

8    A    Have I seen some of -- any of the skills that the teacher has

9    praised my son for?  If that's the most general question, yes.

10   Q    Are there any parts of the report cards describing your son's

11   skills and traits that you disagree with?

12   A    There could be.

13   Q    What are those?

14   A    I do not recall all of his report card traits and skills

15   right now.  I do not recall whether I agree with them or disagree

16   and why and, like, the reasoning for that right now.

17   Q    You started a group chat with some of your lawyers on

18   October 15th, 2024, through WhatsApp, correct?

19   A    Possibly.

20   Q    Didn't you state that in your declaration to this Court a few

21   days ago?

22   A    Possibly.

23   Q    And when you started the group chat, you put the setting on

24   "Delete after seven days," correct?

25   A    Possibly.  I mean, if you want to show an exhibit, I can

1    confirm.  Otherwise, I have to say "maybe" because I don't

2    recall.

3    Q   You don't recall whether or not you set the group chat at

4    "Delete after seven days" when you created it?

5    A   It does a default, I think, in my phone that anything that

6    starts will delete after seven days.  So it's possible.

7    Q   It's possible or it's possible that you changed the default

8    setting when you created the group to something different?

9    A   That is possible too.

10   Q   You added your brother shortly after you created that chat

11   with your lawyers, correct?

12   A   See, these are questions of memory.  If you want to show me

13   an exhibit to refresh the memory, I can answer definitively.

14   Q   Okay.  I will pull up your January 2nd, 2025 declaration.

15       So is that your signature there on page 3, January 2nd, 2025?

16   A   Yes.

17   Q   That's just a few days ago, right, that you wrote this

18   statement?

19   A   Yes.

20   Q   Okay.  And so if we go up, you said, in paragraph 6, "I

21   started a group chat on October 15th with a few of my lawyers,

22   including my Hague Convention lawyers," correct?

23   A   Correct.

24   Q   And you said, "I enabled the disappearing message function

25   for the Hague group, not realizing or considering that I may have

 1   to disclose any of these messages."  You said that, right?

 2   A   Yes.

 3   Q   So was that the auto setting or was that something you

 4   affirmatively enabled?

 5   A   I believe it's the auto.

 6   Q   Okay.  And then you said, "I added my brother to the chat the

 7   following day."  Does that refresh your recollection from your

 8   declaration you wrote a few days ago?

 9   A   Yes.

10   Q   So you added your brother on October 16th from a group chat

11   that had your lawyers in it, and then you, at some point, changed

12   the messages to delete after 90 days, not seven days, correct?

13   A   I don't believe so.

14   Q   Okay.  I'd like to show the witness 351.  At the very top of

15   this --

16         MR. MIN:  Your Honor, I'm going to object because, Your

17   Honor, this was addressed by e-mail communications yesterday.

18   Counsel is conflating two different chats.  In the dispute that

19   occurred, we turned over two different WhatsApp chats.  The

20   declaration dealt with the other chat, which is what I explained

21   to them yesterday by e-mail.  And I think this is a purposeful

22   either misleading or misunderstanding.  But the chat they're

23   showing on the screen now is not the chat that's referenced in

24   the declaration, as I explained to counsel yesterday.  It

25   references the other chat that we turned over in discovery.

 1                   THE COURT:  Counsel?

 2                   MS. SKINNER:  Your Honor, this Court ordered the

 3     petitioner to turn over whatever chat messages that were in

 4     existence that were between -- that included the brother and

 5     counsel.

 6          This group chat included counsel and the brother, and we were

 7     provided with redacted statements and statements that -- and

 8     transcripts or excerpts that include previous dates.  There's

 9     weeks that are missing from it.

10          So I would appreciate a little bit of leeway to clarify this

11     issue with the witness.

12                   THE COURT:  I will allow some leeway.

13                   MS. SKINNER:  Thank you, Your Honor.

14     Q    (By Ms. Skinner:)  So in this chat on November 7th, 2024, it

15     indicates that the messages will disappear after 90 days; is that

16     right?

17     A    Yes.

18     Q    And so the messages that were seven days prior to when you

19     changed that function are still in existence, correct?

20                   MR. MIN:  Objection.  Assumes a fact not in evidence.

21                   THE COURT:  It's overruled.

22          You may answer the question.

23     A    Are in existence right now or on that day?

24     Q    On the date that you changed the timing for the disappearance

25     of messages, the messages from seven days prior were in

1   existence, correct?

2   A   In that date, yes, possibly.  Yeah.

3   Q   And those were then saved for the next 90 days, correct?

4   A   I don't think that's how it works.

5   Q   What's redacted on this?

6       MR. MIN:  Objection, Your Honor.  It's redacted for a

7   reason.  They're now asking him for what's redacted.

8       MS. SKINNER:  We never received a privilege log.

9       THE COURT:  Let me ask you, counsel.  Can you represent

10  that what's redacted on this specific page would fall within the

11  bounds of attorney-client communication?

12      MR. MIN:  Your Honor, what was requested and what was

13  turned over -- and when it says here, at 11:16, "Pras added you,"

14  that means me and my -- us, right, as his Hague lawyers.

15      What was requested and what was turned over is communications

16  between us, the client, and his brother.  So that's when this

17  started, when we were part of the communication.  When his

18  brother left the chat, which is towards the bottom, we redacted

19  everything after that because then it became privileged again.

20      So what we provided was every message that included his Hague

21  lawyers and his brother and him.  We didn't remove anything that

22  his other lawyer said, which is what we asked clarification for.

23  But when we were added, until his brother was removed, I can

24  represent we have provided every single message.  And that's what

25  is here.  So anything that comes before we were added, I think is

1    not within the confines of this case.  Whether he had

2    conversations with his Indian counsel, Singapore counsel, and his

3    brother is not relevant to this case.  That's not what they asked

4    for.  They asked for "your lawyers."  That's what we provided,

5    Your Honor.

6         MS. SKINNER:  Your Honor, the Court specifically

7    ordered, after we moved to compel, that --

8         THE COURT:  Which documents are you looking at, counsel?

9         MS. SKINNER:  Thank you, Your Honor.

10   I'm looking at Document 45, the order.  It goes back to

11   Document 40, which indicates that petitioner's  -- "The Court is

12   not persuaded that the doctrines can be stretched to allow

13   attorney-client privilege to protect these communications."  And

14   the Court upheld the previous order where -- Category 23, "any

15   and all communications or correspondence to/from Petitioner's

16   lawyer."  It doesn't say "Hague lawyers."  And so now petitioner

17   is saying, well, I had all of these other lawyers in this

18   communication with my brother, so it's not privileged, but

19   because I didn't have the Hague lawyers, I'm not going to give

20   that to you.  That's not what the Court ordered.

21        THE COURT:  The concern I have, though, counsel, is if

22   it pertains to communications that took place once the brother

23   was out of the chain of communication --

24        MS. SKINNER:  Your Honor, the brother was added on

25   October 16th, and the portions that are redacted, again, are from

1    when non-Hague lawyers and the brother and petitioner were in a

2    chat together, talking about things that are applicable and

3    relevant to our requests for production, which are matters

4    relating to this case.

5              THE COURT:  Counsel --

6              MS. SKINNER:  The lead-up to this case, Your Honor.

7              MR. MIN:  Your Honor, first of all, again, counsel is --

8    I don't understand the confusion because we explained it by

9    e-mail, conflating the declaration and this chat.

10        But putting that aside, Your Honor, is counsel's position

11   that every lawyer that he's ever had, if there's a chat that's

12   with his brother, that should be turned over and that they're

13   entitled to that?

14        Your Honor, this demand and request was made in the context

15   of a Hague case.  So, again, I provided all messages that we were

16   a part of, as his Hague lawyers, that his brother was a part of.

17   I'm not sure why they would be entitled to messages going back to

18   whatever time period -- and I'm not even going to start going

19   into that -- but whatever time period before we were added to the

20   chat as his Hague lawyers.  I don't understand, to what context,

21   they would be entitled to those messages.

22        Now, if this was another proceeding, perhaps they would be

23   entitled to those messages, with his divorce lawyers or his

24   Singapore lawyers.  I have no idea.  I don't take that position.

25   But, again, when they're making the request for "your lawyers" in

 1   a Hague case, then "your lawyers" to me means your Hague lawyers.

 2   It doesn't mean to me that I should be guessing that his trust

 3   lawyers or his other lawyers or any other lawyers he may have

 4   ever with his brother should be open to disclosure to them.  I

 5   don't think that's a fair reading.

 6           MS. SKINNER:  Your Honor, this matter was already

 7   litigated.  Your Honor already ruled.  You indicated that our

 8   request -- all communications or correspondence to or from your

 9   lawyer that was forwarded to any other person other than your

10   lawyer from your October 21 {sic}, 2024, so we're very limited in

11   scope -- shall be provided.  So there's -- we have already had a

12   ruling from the Court on this.

13           THE COURT:  The Court's order is clear.  The objection

14   is overruled.

15       Please continue.

16           MS. SKINNER:  And I'd ask, then, that the documents be

17   produced then at the end of the day.  And I will continue

18   questioning the witness.

19           THE COURT:  When you say "documents," what are you

20   referring to, counsel?

21           MS. SKINNER:  The messages that have been redacted and

22   that which counsel has indicated exist, to which -- that haven't

23   been provided.

24           THE COURT:  That will be directed.

25           MS. SKINNER:  Thank you, Your Honor.

 1                    THE COURT:  Please continue.

 2                    MR. MIN:  Your Honor, just to clarify, that's this

 3    message chat, the prior messages when we were not involved in the

 4    chat?

 5                    THE COURT:  That's correct.

 6                    MR. MIN:  Regardless of who's on the chat?

 7                    THE COURT:  If the brother is on the chat, the privilege

 8    is not maintained.

 9                    MR. MIN:  Regardless of what proceedings it may be

10    relevant to?

11                    THE COURT:  Well, I put a time limitation, counsel.

12                    MR. MIN:  Okay.  Thank you.

13                    THE COURT:  The next question.

14                    MS. SKINNER:  Your Honor, with that ruling, I'll

15    complete my questioning on this witness, reserving the ability to

16    recall once the documents are provided.

17                    THE COURT:  Well, counsel, I believe he's listed as a

18    witness in your case, correct?

19                    MS. SKINNER:  Yes, Your Honor.

20                    THE COURT:  Then you have the chance to examine him at

21    that point in time.

22                    MS. SKINNER:  Thank you, Your Honor.

23                    THE COURT:  All right.

24              Redirect examination.

25                    MR. MIN:  Thank you.

1      / / /

1                        REDIRECT EXAMINATION

2      BY MR. MIN:

3      Q    Why did you file for divorce in India in September?

4      A    Because my marriage was falling apart, and, you know, I

5      couldn't file for a divorce in Singapore until I meet the

6      residency requirement of three years.  And we were married in

7      India, and I thought India was the place where I should be filing

8      for a divorce.

9      Q    At that time, were you aware that your wife had filed

10     proceedings in any court in the world?

11     A    No.

12     Q    Were you aware that there was going to be a dispute as to

13     divorce or custody or maintenance?

14              MS. SKINNER:  Objection.  Calls for speculation.

15              THE COURT:  That's overruled.  Actually, I will sustain

16     that objection.

17          Next question.

18              MR. MIN:  Your Honor, I just asked him if he was aware.

19     It doesn't call for speculation.  The question is whether he's

20     aware of something.  It's not speculative.

21              THE COURT:  All right.  On those grounds, the Court will

22     overrule the objection.

23          You may answer the question.

24     A    No.

25     Q    At some point thereafter your filing, did you become aware

 1  that she had filed court proceedings in other countries?

 2  A   Yes.

 3  Q   Do you recall counsel asking you questions about

 4  conversations with your lawyers on November 14th, 2021?

 5  A   Yes.

 6  Q   Okay.  Where were you living when those conversations took

 7  place on November 14th?

 8  A   I believe Singapore.

 9  Q   You testified earlier you returned to Singapore sometime in

10  mid-October; is that correct?

11  A   Yes.

12  Q   Okay.  When was the next time that you left Singapore after

13  that, if you recall?

14  A   I don't recall.  I went on a trip to my office, but I don't

15  recall when.

16  Q   Do you recall the month?

17  A   No.

18  Q   Do you recall testifying that you cosigned a lease with your

19  mother-in-law for a home in India?

20  A   Yes.

21  Q   All right.  Who lives there?

22  A   My mother-in-law.

23  Q   Have you ever lived there?

24  A   Only visited.

25  Q   "Only visited" meaning when you made trips to India?

1    A    Yes.

2    Q    Where in India is that home located?

3    A    Chennai.

4    Q    So when you go to visit your offices in Bangalore, are you

5    staying in that home in Chennai?

6    A    No.

7    Q    You testified earlier that you provided 10,000 in Singapore

8    dollars to your wife in support sometime in the past?

9    A    Yes.

10   Q    Okay.  And you said you didn't recall when that was made,

11   correct?

12   A    Correct.

13   Q    Okay.  Is there something that would help you refresh your

14   recollection for when you made that transfer?

15   A    My bank account or the letters that I had written to her.

16        MR. MIN:  Your Honor, I'd ask for the witness to review

17   either his bank account or the letters written to Ms. Sashidhar

18   to help him refresh his recollection.

19        THE COURT:  He may do so.

20   Q    You can look at either one of those documents to help refresh

21   your recollection and then just let us know when you are done.

22   A    Okay.

23        So I see one $5,000 transfer on the 29th November.

24   Q    Pras, Prasanna, just the way it works, once you have reviewed

25   the document, you have to stop looking at the document, and then

 1  I am going to ask you the question, okay?

 2  A    Okay.

 3  Q    So you can't read from a document.

 4  A    Okay.  Got it.

 5  Q    Okay.  Are you done?

 6  A    Uh, no.  No, no, no, not yet.

 7          MS. SKINNER:  Your Honor, we would ask to see what the

 8  witness is reading.

 9          THE WITNESS:  I'm reading my bank account statement.

10          MS. SKINNER:  For what bank and date?

11          THE COURT:  Let's clarify, counsel.

12          MR. MIN:  Yeah.

13  Q    Can you clarify what you're looking at?

14  A    OCBC -- I'm looking at OCBC Bank account statements.

15  Q    Can you say that slower?

16  A    OCBC Bank statements.

17  Q    Are you finished?

18  A    Yes.

19  Q    Okay.  So do you recall when you made a prior 10,000

20  Singapore-dollar transfer to your wife?

21  A    Yes.

22  Q    When?

23  A    So 5,000 on the 18th November and --

24  Q    Go slower, please.

25  A    Sorry.

 1          $5,000 on 18th November and $5,000 on 29th November.

 2    Q    November?

 3    A    Yes.

 4    Q    After you moved to Singapore, what did you use any of your

 5    U.S. bank accounts for?

 6    A    Not a lot.  I paid my credit card bill.  I had a U.S. credit

 7    card, so I paid the bill from the U.S. bank account.  That was

 8    primarily it.

 9    Q    Before, when I asked you about your conversations with your

10    lawyers November 14th, I believe I said "2021," but I just want

11    to clarify, I was referring to November 14th, 2024, your

12    conversations with your lawyers.

13          And to ask you again, do you recall where you were living

14    when you were having those conversations with your lawyers

15    November 14th, 2024?

16    A    I believe in Singapore.

17    Q    When you were back in Singapore, after you return in

18    mid-October, were you staying at the 4 -- well, I will withdraw

19    the question.

20          Were you already renting that additional apartment?

21    A    Yes.

22    Q    What was the address of that apartment?

23    A    It was an apartment named "Interlace."

24    Q    You testified about a VoIP phone number earlier.

25    A    Yes.

1    Q    Do you recall that?

2    A    Yes.

3    Q    What does that mean, a VoIP phone number?

4    A    VoIP phone number means it's an internet phone number.

5    There's no physical set.  It does not work over the phone.  It

6    works only on a computer.  And you can make long-distance calls

7    from the internet for very low amounts of money.

8    Q    Okay.  What service is it through?

9    A    It is a service called Google Voice, which I have been using

10   to place international calls.

11   Q    Okay.  Did you also have, I think you said, a T-Mobile phone

12   number?

13   A    While I was living in the U.S., yes.

14   Q    Okay.  And that's the phone number that is no longer active

15   after the move to Singapore?

16   A    Correct.

17        MR. MIN:  Your Honor, just one second, if I may?

18        THE COURT:  Yes.

19        MR. MIN:  Your Honor, no further questions.

20        I do want to reserve my right to recall possibly as rebuttal

21   to respondent's affirmative defenses, but, you know, when we were

22   talking about logistics of this trial, I told respondent's

23   counsel that we would ask as many questions as we could

24   anticipate as to their affirmative defenses, but that we reserve

25   our right, in case something unanticipated comes up, to call him

```
 1   as a rebuttal witness.

 2            THE COURT:  You are entitled to bring him back, counsel,

 3   for rebuttal purposes.

 4            MR. MIN:  I'm sorry?

 5            THE COURT:  You are entitled to bring him back for

 6   rebuttal purposes.

 7            MR. MIN:  Okay.  Thank you, Your Honor.

 8            THE COURT:  Okay.

 9       Any further cross-examination based upon the redirect

10   examination?

11            MS. SKINNER:  No, Your Honor.  Thank you.

12            THE COURT:  Counsel, we're close enough to the end of

13   the day.  As opposed to starting another witness, let's recess

14   and pick up tomorrow morning at 9 a.m.

15            MS. SKINNER:  Thank you, Your Honor.

16            MR. MIN:  Thank you, Your Honor.

17            MS. SEIPEL:  Thank you, Your Honor.

18            THE COURT:  Please rise.

19                          (Adjourned.)

20

21

22

23

24

25
```

1              C E R T I F I C A T E

2

3        I, Nickoline M. Drury, RMR, CRR, Court Reporter for the

4    United States District Court in the Western District of

5    Washington at Seattle, do certify that the foregoing is a correct

6    transcript, to the best of my ability, from the record of

7    proceedings in the above-entitled matter.

8

9

10                      /s/ Nickoline Drury

11                      Nickoline Drury

12

13

14

15

16

17

18

19

20

21

22

23

24

25