

```
 1                  UNITED STATES DISTRICT COURT

 2            WESTERN DISTRICT OF WASHINGTON AT SEATTLE

 3    _____
                                    )
 4    PRASANNA SANKARANARAYANAN,     ) CV24-01745-RAJ
                                     )
 5                     Petitioner,   ) SEATTLE, WASHINGTON
                                     )
 6      v.                           ) January 7, 2025 -
                                     ) 9:00 a.m.
 7    DHIVYA SASHIDHAR,              )
                                     )
 8                     Respondent.   ) EVIDENTIARY HEARING -
                                     ) Day 2
 9                                   )
      _____
10
                    VERBATIM REPORT OF PROCEEDINGS
11           BEFORE THE HONORABLE RICHARD A. JONES
                   UNITED STATES DISTRICT JUDGE
12    _____

13

14    APPEARANCES:

15    For the Petitioner:      Richard Min
                               Michael Banuchis
16                             Green Kaminer Min & Rockmore LLP
                               420 Lexington Avenue
17                             Suite 2821
                               New York, NY 10170
18

19    For the Respondent:      Katrina Anne Seipel
                               Katelyn Skinner
20                             Buckley Law PC
                               5300 Meadows Road
21                             Suite 200
                               Lake Oswego, OR 97205
22

23

24

25
```

1                          EXAMINATION INDEX

2

3        EXAMINATION OF:                                     PAGE

4        DHIVYA SASHIDHAR     DIRECT EXAMINATION               13
                              BY MS. SEIPEL
5                             CROSS-EXAMINATION                120
                              BY MR. MIN
6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          THE COURT:  Good morning.  Please be seated.

2          THE CLERK:  We're here resuming our evidentiary hearing

3   in the matter of Sankaranarayanan versus Sashidhar, Cause No.

4   C24-1745, assigned to this Court.

5          THE COURT:  Before we begin, counsel, the Court received

6   the petitioner supplemental response to motion to compel, and it

7   appears that the discovery that was requested was provided, and

8   the impetus of what's being requested is essentially a protective

9   order.

10      I haven't heard any opposition from counsel for the

11   respondent.  And since it was just filed last evening, do you

12   take a position on the request for the protective order?

13          MS. SKINNER:  Your Honor, we have no objections to a

14   protective order that the information received in this case be

15   used in this case.  The only issue that we wanted to bring up for

16   the Court is the filing of the hundreds of pages of declarations

17   from experts.  We'd ask for those to be stricken.  It's hearsay.

18   We obviously haven't had an opportunity to cross-examine or

19   provide our own report in regards to those declarations.

20          THE COURT:  Declarations as it relates to this

21   memorandum?

22          MS. SKINNER:  Yes, Your Honor.

23          THE COURT:  Okay.

24      Counsel, before we begin, I'm inclined to grant the request

25   for a protective order, which would limit the scope of anything

1   that was provided as it related to the communications with

2   counsel and the third person, or the petitioner brother.  It is

3   only limited for purposes of this proceeding.  It's not permitted

4   to be used for purposes of any custody or any other proceedings,

5   regardless of the other jurisdiction's location.

6           MR. BANUCHIS:  Your Honor, I think the issue is that

7   under both Singapore and Indian law, and we filed a supplemental

8   declaration from our client's Indian lawyer this morning, they

9   have a right to privacy, which should be extended to any

10  conversations regarding anything in those proceedings, and they

11  should not be disclosed in this proceeding as well.

12      So our position is that nothing that was discussed between

13  our client, his Indian lawyer, his Singapore lawyers, that was

14  previously redacted, should be able to be utilized in this

15  proceeding.

16          THE COURT:  All right.  Well, counsel, you have the

17  Court's ruling.  I will give you the benefit of a protective

18  order, and that's as far as the Court will go.

19          MR. BANUCHIS:  Understood, Your Honor.

20          THE COURT:  Okay.

21      Now, let's go to the next stage.  And where are we as far as

22  witnesses?

23      Petitioner, you indicated, at the beginning, you were going

24  to call your client and then, essentially, rest.  Is that still

25  your position?

```
 1            MR. MIN:  Yes, Your Honor.  We have three additional
 2   witnesses, barring no surprise rebuttal -- which we don't
 3   anticipate -- three witnesses:  Dr. Day, Dr. Favaro, and Kay Lee
 4   Lian, who is our Singapore expert.  They are all addressing the
 5   affirmative defenses, so we would be calling them after
 6   respondent puts on their case -- or tries to establish their
 7   burden on the affirmative defenses, Your Honor.
 8            THE COURT:  Okay.
 9       Counsel, do you have your witness ready?
10            MS. SEIPEL:  Yes, Your Honor.  But prior to calling any
11   witnesses, I would like to ask the Court for judgment as a matter
12   of law, and I would like to be heard on that, if the Court would
13   allow me the opportunity.
14            THE COURT:  Make your motion, counsel.
15            MS. SEIPEL:  Thank you.
16       So at this time --
17            THE COURT:  Step to the lectern, counsel.
18            MS. SEIPEL:  I'm sorry.  Say that again.
19            THE COURT:  Step to the lectern.
20            MS. SEIPEL:  Understood.
21       At this time, Your Honor, respondent moves for a judgment as
22   a matter of law.  In order for the Court to grant judgment as a
23   matter of law, the Court should look at the facts in the light
24   most favorable to petitioner.
25       That being said, petitioner still continues to have a burden
```

1    of proving his case, proving his prima facie case, by a

2    preponderance of the evidence or that it is more likely than not

3    that they have met their burden.

4         The only issue regarding their prima facie case is habitual

5    residence, whether or not the child was habitually a resident in

6    the country of Singapore.

7         Because the Court has to look at the facts most favorable to

8    petitioner, let's talk about the facts that they had that would

9    be favorable to them, arguably.  The child went to school in

10   Singapore; the child had friends in Singapore; the child attended

11   playdates and sleepovers in Singapore; the child received medical

12   care in Singapore; and he had a roof over his head and a place to

13   sleep at night.  Those are the only facts that they have

14   presented that this place, Singapore, could be the child's

15   habitual residence.  But none of these facts, to use petitioner's

16   words, to indicate Singapore for this child was anything more

17   than a, quote/unquote, short sojourn abroad.

18        The petitioner needs to prove more than this.  They provided

19   no facts regarding the residence being habitual.  To use the

20   words of *Monasky,* which was cited at length in both of the

21   parties' trial briefs, a child's presence, in order to be deemed

22   habitual, needs to be more than transitory, needs to be more than

23   temporary.

24        Petitioner testified on both cross-examination and in sworn

25   affidavits that he filed in both India and Singapore, that the

1    parties' presence in Singapore was temporary.  He swore under

2    penalty of perjury in the India affidavit that India was his

3    child's home, not Singapore, that the parties were only in

4    Singapore temporarily.  Petitioner presented no testimony

5    whatsoever about the child acclimatizing to Singaporean culture.

6        *Monasky* also dictates that one consideration for the Court to

7    look at is how acclimatized the child is to their surroundings.

8    Nothing about eating food at Singaporean restaurants.  The child

9    attended American school, not Singaporean school.

10       Again, his own sworn statements is that India is the child's

11   home, not Singapore.

12       The evidence presented by petitioner is simply insufficient

13   to support a finding that the child's presence in Singapore is

14   habitual or anything more than transitory.

15       Petitioner testified himself, on more than one occasion,

16   we're just here for a short time, it is a short sojourn, India is

17   my child's home.  And when he has asked for his child to be

18   returned to a place that all parties believed was temporary, that

19   is not a habitual residence.

20       For these reasons, I would ask the Court for judgment as a

21   matter of law at this juncture.

22           THE COURT:  Thank you, counsel.

23       Counsel, response.

24           MR. MIN:  Yes, Your Honor.  Thank you.

25       Your Honor, respondent brings up some issues with respect to

1    habitual residence and ignores much of the case law and the facts

2    of this case.  She relies on some statements by my client in a

3    legal proceeding talking about a short sojourn.  The child was

4    there for approximately two and a half years, Your Honor, longer

5    than he lived in Washington.  They had signed a lease for three

6    more years to be in Singapore.  They changed schools and moved to

7    be closer to that school.

8        There is no dispositive fact that a temporary move means that

9    habitual residence cannot be established.  Respondent seemingly

10   wants to argue that this eight-year-old child has no habitual

11   residence, something that the *Monasky* court as disfavored as a

12   result.  Courts have repeatedly said it's not about where you

13   bury your bones that matters; it's about setting up a home, a

14   habitual residence.

15       *Monasky* talks about a commonsense approach:  Where is the

16   child's home before the wrongful abduction?  Where was this

17   child's home, aside from the United States?  Where else did he

18   have a toothbrush or a bed or toys or friends?  Not in the U.S.,

19   not in India.

20       Whatever the parents say about the habitual residence is not

21   dispositive, nor is it a significant factor.  Look at the recent

22   case in the Seventh Circuit of *Baz v. Patterson*.  In that case,

23   the parties agreed in writing in the Illinois state courts that

24   the habitual residence of the child was the United States.  They

25   repeated that to the German courts.  The Seventh Circuit said it

1    doesn't matter what the parties agree the child's habitual

2    residence to be; what matters is what the child's habitual

3    residence actually is.  So forget the fact that the parties

4    agreed the U.S. was the habitual residence, when the father

5    abducted the child from Germany back to the U.S., after the child

6    lived in Germany for about a year; Germany was still the habitual

7    residence, irrespective of their agreements contradicting that.

8         So the same holds true here, Your Honor.  Your Honor is

9    tasked with finding the child's habitual residence, not the

10   father's, not the mother's.  What the mother intended, what the

11   father intended, sure, may be relevant, but what's relevant is

12   where the child's home was on October 14th, 2024, and that is

13   what respondent seemingly wants to ignore in this case.

14        The child, as admitted, his school, friends, activities,

15   sleepovers, he speaks Tamil, one of the official languages of

16   Singapore, proximity to family in India, which is where their

17   cultural heritage comes from, these are all important and crucial

18   factors in determining the child's habitual residence, Your

19   Honor.

20        Nothing further.  Thank you.

21            THE COURT:  Okay.

22            MS. SEIPEL:  Just briefly, Your Honor, I want to

23   respond.

24        Mr. Min says that respondent ignores the case law, in making

25   this argument for judgment as a matter of law, and he cites to

1    *Baz v. Patterson*.  In their trial brief, petitioner cited *Nisbet*

2    *v. Bridger*.  In that case, the children were present in Scotland

3    for two years -- they had never lived in another country

4    before -- and Scotland was determined to not be their habitual

5    residence.

6        *Smith v. Smith,* a case cited in our trial brief, out of the

7    Fifth Circuit.  The children were present in Argentina for over

8    two years.  Prior to living in Argentina, they lived in the

9    United States.  And the Court determined that Argentina was not

10   the habitual residence.

11       Mr. Min says that what this Court needs to look at, and,

12   essentially, the only thing this Court needs to look at, is where

13   was the child at home.  The child was physically present in

14   Singapore, but by petitioner's testimony, India is his child's

15   home.  In one court proceeding, he is saying India is my child's

16   home; in this court proceeding, he is now arguing that Singapore

17   is the child's home.

18       The habitual residence analysis is more than where the child

19   is physically present.  It looks at the totality of the

20   circumstances.  What evidence has petitioner presented in this

21   case to determine that the residence is habitual more than

22   transitory.

23       The fact that the child went to school there does not

24   indicate that he was in Singapore for anything more than a

25   temporary period of time.

1    Thank you.

2         THE COURT:  At this stage of the proceedings, the

3    central issue is the child's habitual residence.  I will note

4    that there were inconsistencies pointed out or particularized

5    statements identified regarding what the petitioner represented

6    as where he was residing at different periods of time, including

7    his travels.  This is a fact-intensive determination.

8         The Court doesn't find persuasive that at this juncture of

9    the proceedings, the request by the respondent should be granted.

10   The Court will deny the motion.  We will proceed forward.

11        And counsel, if your witness is ready, let's have the first

12   witness called.

13        MS. SEIPEL:  Thank you, Your Honor.

14   We would call Dhivya Sashidhar to the stand.

15        And, Your Honor, is it all right if I remain seated here when

16   I'm questioning her?

17        THE COURT:  Is there some particular reason, counsel?

18   Because, normally, in federal court, questions are asked from the

19   lectern.  I know there's a lot of documents.  I've got tons of

20   filings.

21        MS. SEIPEL:  No.  That's completely fine, Your Honor.

22   Mostly because I'm somewhat ill and using my laptop.  But I am

23   completely fine standing up there.

24        THE COURT:  Okay.  Well, I don't want you to spread your

25   illness, counsel.

```
 1            MR. MIN:  I was going to say, my personal preference
 2   would be for counsel to remain there, if that's okay, but ...
 3            THE COURT:  Then stay over there, counsel.
 4        I just saw something in the news about whooping cough, and
 5   I'm not saying what condition you have, and I apologize that you
 6   are suffering from that, but at the same time, we need to be as
 7   careful and cautious as possible with our health, as well as the
 8   health of other individuals.
 9            MS. SEIPEL:  Absolutely.
10            THE COURT:  So I'll allow you to remain at counsel
11   table.
12            MS. SEIPEL:  Understood.  Thank you, Your Honor.
13            THE COURT:  Please proceed.
14        Please step forward.
15            THE CLERK:  Please raise your right hand.
16                     DHIVYA SASHIDHAR,
17        having been sworn under oath, testified as follows:
18            THE CLERK:  Please have a seat.
19            THE WITNESS:  I can sit?
20            THE CLERK:  Yes.
21        If you could please state your first and last names and spell
22   both for the record?
23            THE WITNESS:  My name is Dhivya Sashidhar, and the
24   spelling is D-h-i-v-y-a S-a-s-h-i-d-h-a-r.
25            THE COURT:  Just to start the day off, we had a number
```

```
 1   of interruptions because of the speed of the parties speaking.

 2   Please slow down.  I know we have a limited amount of time, but

 3   that doesn't mean that you rush to the finish line by making it

 4   inconvenient for the court reporter or for an accurate record

 5   being made.

 6       You may begin your examination.

 7            MS. SEIPEL:  Thank you, Your Honor.

 8                      DIRECT EXAMINATION

 9   BY MS. SEIPEL:

10   Q   Ms. Sashidhar, where were you born?

11   A   I was born in Chennai, in India.

12   Q   How long did you live there?

13   A   Until I turned 20 years, I think, 20 or 21.

14   Q   When did you meet your now husband?

15   A   I met him in my undergraduate college years, probably 2007 or

16   2008.

17   Q   Where did you meet him?

18   A   I met him at the National Institute of Technology in Trichy,

19   in India.

20   Q   When did the two of you get married?

21   A   We had married in September 2013.

22   Q   Where did you get married?

23   A   In Chennai, in India.

24   Q   How long did the two of you live in India following your

25   marriage?
```

1   A    We really did not ever live in India following our marriage.

2   There were a few months when I was in India, though, because of

3   the passing away of my father.  But other than that, there was no

4   time when we actually lived in India after the marriage.

5   Q    Where did you live following your marriage?

6   A    I used to work in The Hague in the Netherlands.  So I used

7   to -- after my marriage, we lived in the Netherlands for about a

8   year.

9   Q    Where did you go after you left the Netherlands?

10  A    We all came to California in the United States.

11  Q    Why did you move to California?

12  A    Prasanna wanted to pursue, like, entrepreneurship

13  opportunities in Silicon Valley and California.  So I, like, came

14  back to the U.S. with him, yeah.

15       And I think the first year in the Netherlands, we were

16  basically waiting to get, like, a permanent residence or a green

17  card in the U.S. so that I could come and also work in the U.S.

18  Q    So tell me about that.  You just said that when you were in

19  the Netherlands, you were waiting for a green card for yourself

20  in the United States?

21  A    Yes.

22  Q    Did your husband have a green card in the United States?

23  A    We applied together, after registering our marriage, and at

24  that time, yes, we were both waiting to get the green card in the

25  United States together.

1    Q    Okay.  Were you working when you lived in the Netherlands?

2    A    Yes.

3    Q    Were you working when you moved to California?

4    A    After I moved to California, my intention was to find work,

5    to get -- you know, continue my career, but unfortunate incidents

6    happened, like life happened.  My dad passed away and I got

7    pregnant with a child.  For so many reasons, I couldn't really,

8    like, get back into work life.

9    Q    Why did you want a green card, prior to coming to the United

10   States?

11   A    I had a very good and established career in the Netherlands.

12   And, you know, I was also an ambitious student, like I graduated,

13   like, with the highest achievement award from the Cambridge

14   University in the UK.  And I really wanted to, like, pursue my

15   career further, like ambitiously, and I was, you know, aware that

16   if I came to the U.S. on a dependent visa, there was no way I

17   could like -- you know, I was not legally permitted to work.  So

18   I made it clear to my husband that I would move to the U.S. only

19   if I had like a visa with which I could work and I could set my

20   roots permanently in the U.S. then.  So that's why we waited for

21   the green card before we moved to the U.S.

22   Q    When did you give birth to your child?

23   A    February 2016.

24   Q    Where?

25   A    In San Francisco, California.

1    Q    How long did your family live in California?

2    A    So we moved in 2015, and we lived there till about the middle

3    of 2020.  So about four and a half, five years.

4    Q    Where did you move to following California?

5    A    We moved to Washington, Redmond.

6    Q    Why did you move to Redmond, Washington?

7    A    So in the middle of 2020 -- so my husband's start-up that he

8    had started like -- called "Rippling.com" had, like, offered some

9    shares in the company for him.  I think at that point he owned

10   about 40 percent of the company.  And there was a four-year

11   vesting period, which meant that after he worked for the four

12   years in Rippling, those 40 percent of shares would actually,

13   like, you know, be vested on him.  And during that time, he heard

14   something about, like, you know, saving on taxes.  So moving us

15   to a state where there was no state tax was, you know, something

16   that he wanted.  And I also, at that point, had gotten a job with

17   Microsoft in Washington; however, that job did not really want me

18   to come to Washington, like, for even like one and a half, two

19   years, according to my manager, because it was the year of COVID,

20   we were all working remotely.  So I wasn't really, you know, for

21   the area --

22   Q    Ms. Sashidhar, I'm going to interrupt you for one second

23   here.  I don't believe that --

24             MS. SEIPEL:  Where did petitioner go?

25             MR. MIN:  Objection, Your Honor.  Counsel is

1  interrupting her own witness.  I mean, the witness should be

2  permitted to answer the question without interruption.

3          THE COURT:  It's overruled.  Please continue.

4          MS. SEIPEL:  Your Honor, at this point, I don't believe

5  that petitioner is present.

6          THE COURT:  I saw his image before the witness started

7  testifying.

8      Do you see him, Victoria?

9          THE CLERK:  He is on.  He just turned off his camera,

10 but he's here.

11         MS. SEIPEL:  Okay.  I would request that the Court order

12 petitioner to leave his camera on as my client is testifying.

13         THE COURT:  All right.  Sir, counsel has requested that

14 you maintain your presence on the camera.  Does that cause a

15 problem for you?

16         MR. SANKARANARAYANAN:  Okay, sir.  No problem.

17         THE COURT:  Okay.  Please proceed.

18         MS. SEIPEL:  Thank you, Your Honor.

19 Q   (By Ms. Seipel:)  Okay, Ms. Sashidhar, I'm sorry to interrupt

20 you.

21     So you were talking about why you moved to Washington.  Can

22 you continue that?

23 A   Yes.

24     So like I said, the shares of Rippling.com were vesting on my

25 husband around like 2020, I think in the middle of the year, and

1    at that point, he chose to move us to a place with, like, no

2    state taxes, and that's when we started discussing about moving

3    to Washington.  And I had a job with Microsoft, so although I

4    didn't really have to go into the office even for, like, maybe

5    one and a half, two years, according to my manager, because it

6    was the years of COVID, I was working remote.  And upon the

7    insistence of my husband, we moved our family from California to

8    Washington.

9    Q    Okay.  How long did you live in Washington?

10   A    We lived in Washington for two years.

11   Q    Where did you move to following Washington?

12   A    We moved to Singapore.

13   Q    Why did you move to Singapore?

14   A    We moved to Singapore because Prasanna, again, wanted to,

15   like, root some of his assets outside the U.S. and put them into

16   an overseas trust.  He believed that doing that while he was

17   living in the U.S. would be, you know, attracting the attention

18   of tax authorities.  He wanted to avoid that.  And, also, I know

19   that at that point he had transferred all of the shares from

20   Rippling.com and the bulk of his assets into his brother's name.

21   His brother was getting married in the year 2023, and I think

22   Prasanna felt a little afraid whether the brother's wife might

23   claim, like, ownership on the assets.  So he tried to ask people,

24   like, living in Singapore or Dubai to help him, you know,

25   transfer the assets through them, but the friends and the cousins

1   who he had requested refused it.  So, then, eventually, he

2   decided that the better thing would be for him to move out of the

3   U.S. and transfer the assets through his own self.

4          MR. MIN:  Your Honor, I move to strike this answer based

5   on the lack of foundation and basis of knowledge.  She's just

6   stating facts without stating how she knows any of this

7   information or the basis of her testimony.

8          THE COURT:  The Court won't sustain the objection, but I

9   will give the counsel the opportunity to follow up with

10  foundational questions to establish the basis of this witness's

11  knowledge.

12      Proceed, please.

13  Q   (By Ms. Seipel:)  Ms. Sashidhar, what did your husband tell

14  you about moving to Singapore?

15  A   So my husband told me that his brother was getting married in

16  2023 and he had to transfer the assets out of the brother's name,

17  without attracting attention of the U.S. tax authorities.  And so

18  he wanted himself -- and by virtue of that, you know, I didn't

19  want to be separated, you know, as a family.  So he wanted us to

20  move together as a family to Singapore for a temporary period of

21  time, when he would transfer the assets, and then we could be

22  back.  That is what he told me.

23  Q   Okay.  So I want to take a step back here and talk about

24  before you and your husband got married.

25      Prior to your marriage, did you ever have second thoughts?

1    A    Yes, on multiple occasions.  Like when we started dating, we

2    were already like long distanced, and I always felt that an

3    element of care or emotional connection was very missing, and he

4    would also, like, you know, come back and tell me things, like,

5    "Even after marriage, I will just vanish.  I will go to Africa

6    for two months.  I won't have a phone on me.  And like, you know,

7    you should be okay with all of this.  And that's when our

8    marriage might work."  And that, to me, was feeling like a really

9    scary thought.  I'm like, you know, if I have a child and then he

10   just leaves us for two months and I don't know where he would be,

11   like, I'm not used to that kind of a family construct.  So I had

12   decided to call off our marriage.

13       And like, you know, I had multiple instances like that, when

14   we would fight, and then there were, like, either my friends and

15   my parents who got involved in between.

16       At all these times, also, once I pulled back, the thing that

17   might happen is -- that had happened, in fact, is that he would

18   come back crying to me saying, "I just said those things.  I

19   would never really do that, but, you know, I am an

20   individualistic person, like, you know, I should be allowed to do

21   what I want to do."  And, you know, he would fall at my feet.

22       He flew from the U.S. all the way to India to meet with my

23   parents.  He would fall at my parents' feet and he would ask them

24   to convince me not to call off the marriage.

25       So after all such incidents happened, I trusted that, okay,

1  he might actually like, you know, keep up what a marriage and a

2  family means to me, and that's when I agreed for the marriage.

3  Q   So I want to talk to you now a little bit about your life in

4  California.  What can you tell me, in a general sense, about your

5  life in California?

6  A   Yeah.  California and the U.S. was like a new country for me

7  to live in at that point when we had moved in.  So I had to take

8  some time to find my roots and then to find my community.  I had

9  a bunch of friends who had studied with me from school and also

10 from university days who were living in California, so I got the

11 opportunity to connect back with them.

12     But the situations under which I came, like, I was -- you

13 know, I had just lost my father and I was really, like, in an

14 emotionally, like, sad state.  So when I moved in to California,

15 I was really looking for my husband's support and, you know, care

16 at that point in time, to at least emotionally be with me.  But

17 as soon as I came into California, I realized that my husband had

18 prioritized his career over me or like, you know, being a part of

19 this marriage, and there were days when he would not come back

20 home in the nights.  Like, I think he was working in this company

21 called Zenefits at that point in time, the first year we were in

22 California.  He didn't have a phone with him.  It was the year

23 2025 {sic} and, you know, like he would refuse to buy a phone

24 because he would be, like, I don't want you to, you know, ask me

25 where I am or, like, keep any tabs on me.  And it was all too

1  difficult, like, you know, finding my own setting, like, in that

2  country with, like, a person who was my husband and he was absent

3  for the most part.

4      Eventually, I decided, I think, you know, to -- I spoke to

5  Prasanna.  For some reason, I thought that if I got pregnant and

6  had a baby, my mind might get distracted, like, you know, pull

7  myself into parenting and I would forget about what happened to

8  my father.  So we did end up getting pregnant together, and I

9  think the days of pregnancy, again, were very lonely.  Like

10 Prasanna wouldn't come back home, like I would -- after a point,

11 I think friends convinced him, saying that, "Hey, what if your

12 wife has an emergency during the pregnancy days?  Like, please

13 get a phone for yourself, you know."  And then he bought a phone

14 for himself, so he was more reachable.

15     So these were like the early days in California, you know.

16 And then February 2016, I gave birth to my child.

17 Q   Okay.  Let me stop you and ask.  You mentioned Rippling and

18 also I think you said Zenefits.  What can you tell me about your

19 husband's work in California?

20 A   He was primarily, you know, trying to work at startups or he

21 would, you know, start his own company, and he was most often

22 than not, like, you know, at work.  Like, he would -- I mean,

23 what I knew was that, like, there was a lot of, you know,

24 high-intensity work that had to be done in these startups, but at

25 the same time, like, he was someone that was almost always like

1    at, you know, work.  He would come back home and he would sit

2    with his laptop.  Like he's gone before we wake up or, like, he's

3    not back home, even, like, you know, after we have fallen asleep.

4    And that's how it felt.

5        Like the times even after I had my child, it would almost

6    always be like just me and the child at home by ourselves waiting

7    for him to come, but when he comes, we had a restricted, small

8    amount of time.  And the other times, he's like just with his

9    work laptop or, you know, he's at the office, and -- yeah.

10   Q    Did you ever confront him about being absent?

11   A    A lot, yeah.  I wanted him to be a present husband, I wanted

12   him to be involved with parenting, but he would say that, you

13   know -- he would tell me that, "Look, this is my opportunity at

14   making like millions of dollars, and this is more important to me

15   than anything else, like you are disrupting my work, you are

16   asking me to participate in things related to the family or

17   friends."

18       Even over the weekends, we would have fights.  Like, you

19   know, I would plan for some sort of a playdate for my child with

20   friends, where we would attend together as a family, but he would

21   never, like, show up, he would not be present.  And I had a lot

22   of fights asking him to, like, you know, set foot into the

23   marriage, kind of be present with my child, try to do at least

24   some bits as a father, but he would just -- you know, he'd always

25   just tell me, "No.  This is the time that I can earn this money,

1   and I need to be like, you know, free of all of these duties of

2   family and parenting."

3       We even had like people, like our friends, or like, you know,

4   my mom, for example, who would come in between and try to help

5   us.  They would try to talk to him and say that your child will

6   only be so small like for a few years and you have to be like,

7   you know, present with him, but -- yeah.  And he would just say,

8   "You know, Monday through Friday, let them live somewhere else.

9   I might live like close to my office.  I will just go visit them

10  over the weekends."  These are the things he has told people and,

11  you know, to me as well.

12  Q    Did you work while living in California?

13  A    I did not work in the United States, but after my father

14  passed away, I took over a business that he was trying to start

15  in India and I ran it remotely.  I had a whole team in India that

16  was managing it for a time, but I would just spend like a couple

17  of hours a week maybe on the business.  Aside from that, I think

18  it was all like I was being a full-time caregiver to my child.

19  Q    In California, were you ever physically harmed by your

20  husband?

21  A    Yes.  There are two distinct incidents that I feel I can

22  remember right now.

23      So after I gave birth to my child and also through the, like,

24  later parts of pregnancy, it was very hard for me to have, like,

25  physical intimacy with him.  And sex was like something that he

1   was -- I mean, he really, like, wanted, like, you know, it once a

2   day, sometimes more than once a day, even -- I think he had a

3   large appetite for it, and he would keep asking me.  But when --

4   I would tell him, "I'm in pain, I don't want to do it."

5        There was one particular night that I -- you know, after the

6   delivery of my baby, I was asleep, taking some pain

7   medications -- I had refused to have sex with him.  He kicked me

8   so hard in -- you know, when I was sleeping on my back, and I

9   woke up like jarring, like feeling a lot of pain, and I asked

10  him, "What just happened?"  And he was like, "Oh, I'm sorry, I

11  kind of kicked you, you know, in my sleep."  And to me, that felt

12  like, okay, maybe he's carrying forward some kind of, like, you

13  know, a hate from not having gotten sex from me then.

14       And then another incident that I remember clearly is he took

15  my child to a playdate that was planned one day by me, but I

16  wouldn't -- I couldn't go because I was sick and I didn't want to

17  spread my germs to the kids there.  He left, you know, the child

18  in that -- in that friend's house and he just went away with a

19  friend.  And my friend, who's the kids' mom, would call me, like,

20  saying that "Hey, your husband just left.  I have two kids to

21  take care of already.  Like, you know, I don't know where he is,

22  and, you know, please tell him not to leave the child like this."

23  And I would confront him about that and also, like, you know,

24  "Could you please be around the child, take care, make sure that

25  he eats his meals and don't leave him, you know, in the other

1  parent's sort of care.  Like she has her hands full already."  So

2  at this point, he got, like, very defensive.  He shouted like "Go

3  and die, bitch," at me, like, you know -- and then he came at me,

4  like he had my throat, and he was, like, shaking me.

5      So that's an incident I really remember, like, strongly,

6  where -- I think he just never wanted to be, like, told, you

7  know, to care for someone.  He didn't really think about, like,

8  my feelings or the child's feelings at that point.

9      My child was so small that, you know, I know he was

10  comfortable in the friend's house, but, you know, I would think

11  that he would be, like, afraid if, you know, his primary

12  caregiver was not around him at that point.

13      And also with Prasanna, when I asked him, "Okay.  Did you

14  feed the child, did you make sure that he ate his meals, and

15  things like that?"  He's like, "Don't tell me what to do.  I

16  don't really care about whether he eats or not."  You know, those

17  kind of conversations around this particular fight, which is -- I

18  remember that really well.

19  Q   Okay.  I'm going to show you Exhibit 305.

20          THE WITNESS:  Can I get a Kleenex?

21  Q   Do you recognize --

22          THE CLERK:  She needs a Kleenex.

23          MS. SEIPEL:  Oh, I'm sorry.  Yeah, yeah.

24          THE WITNESS:  I just need two pieces.

25          MS. SEIPEL:  Thank you.

 1   Q    (By Ms. Seipel:)  Do you recognize this e-mail thread,

 2   Ms. Sashidhar?

 3   A    Yes.  This is the incident I was talking about, and I think

 4   this is Prasanna e-mailing me after the incident saying that, you

 5   know, he was sorry about yelling at me saying "Go and die"

 6   and -- yeah.

 7        He was really explosive at me, and, you know, I was very

 8   devastated after that.  But I think this e-mail was his way of,

 9   like, telling me what happened and -- and he still did not

10   apologize.  I was feeling sad about that.  Like, you know, I

11   said, "Look, you shouted at me.  You're writing about this

12   e-mail, but you are really not saying sorry or, you know,

13   apologizing for that action."

14   Q    Down here at the bottom, is this Prasanna saying to you, "No

15   regrets.  Don't think I did anything wrong and would do it again.

16   Here, I just think your mom and you are an echo chamber of

17   negative thoughts, and since you both agree, somehow you seem to

18   have strong opinions on things that you are not entitled to

19   have"?

20   A    Yeah.

21        My child at that point, you can see, was like one and a half

22   years old.  This is November 2017.  And -- I mean, me and my

23   mother -- I mean, I definitely feel that leaving a

24   one-and-a-half-year-old child at the friend's place with the

25   friends' -- the kids' mom and like just going is not okay, and, I

1   mean, my friend was not okay about that either.  So, yeah.

2   Q   Did your husband ever sexually mistreat you while you were

3   living in California?

4   A   Yes.  So especially after I had given birth to my child, I

5   had a lot of pain down there, because I had gone through what is

6   called an episiotomy, like, you know, they had to cut and take

7   the child out, and then I had like a couple of surgeries

8   following that as well in that year.  So I was in a lot of pain.

9   And there was always fights about, you know, having, like,

10  physical intimacy, and Prasanna would come and tell me, "Look,

11  sex is a primal need for me.  You have to do it.  It doesn't

12  matter, like, you know, how much pain you're in."  And if I

13  refused or if I, like, spoke to him and said, "Please, like, you

14  know, can we, like, not do it tonight," and he would literally,

15  like, tell me that, you know, "If you don't do it, then I want to

16  go outside and get it," you know, and I should be okay with that.

17  Like he would make me feel, like, guilty.  And I would feel very

18  threatened by the fact that, oh, if he starts going out, then

19  that would be like the end of, I don't know, the marriage and the

20  family.  And I would ask him, like, you know, "Please try to

21  think about what I'm going through.  Like, can you please be more

22  empathetic about like the fact that I just gave birth to our

23  child?"  But he would always just say that, you know, "You need

24  to actually think about my needs, and even if you are in pain,

25  you have to do it," so -- and even in those points when I had

1  pain, like, you know, he would want me to do certain things,

2  like certain experiences that he was craving for, like -- I don't

3  know if I can say this in court, but things like anal sex, which

4  is supremely painful like, and he would be, like, "If you don't

5  give it, like I'm going to want to find these experiences in life

6  outside from someone else."  And I would feel very threatened and

7  I would feel like, okay, I have to try to, you know, comply with

8  it and try to do it; otherwise, it's not going to be all right

9  for the marriage.

10      So I remember this specifically happening in California days,

11  and a lot of times it was also, like, him not being around us,

12  but then when he wants sex, he's there and he's asking, and I'm

13  telling him, like, I need some, you know, emotional connection,

14  some empathy from him, which I think I never really got.  Yeah.

15  Q   Did your husband, when you were living in California, ever

16  physically harm your child?

17  A   Yes.

18  Q   How?

19  A   So Prasanna was always this person who, you know, would tell

20  us that what he wants, we need to comply with or we need to like,

21  you know, do it.  Like, if not, he would get, like, really, you

22  know, wild at us, like he'd get, like, verbally really sort of --

23  he'll shout like the "Go and die" incident.  He'll shout, like

24  verbally, very abusive things.

25      With my child, when I don't give him sex, for example, the

1    next following hours or the next morning, like, you know, he

2    would like behave very violent and aggressive with the child.

3    Like I remember one instance where it was an innocent mistake by

4    the child, he just dropped something on the floor and it broke,

5    and Prasanna would just like lash out at the child, grab him and

6    then, like, you know, shake him, saying "Why did you do this?"

7    And it would be, like, very jarring for both me and the child.

8    The child would come running to me, asking for me to hold him.

9    Like these were younger years as well.

10       And I remember times when he has hit my child.  It's more

11   from "I told you to do this right now and you're not and it's not

12   okay," and he would just like really, like, lash out and hit my

13   child.

14       And then multiple instances of him pinching the child as

15   well.  Like, he would pinch my child, like on his arm or like on

16   the thigh sometimes.  And when asked, he'll say, "Look, my mom

17   pinched me as I grew up, and I think the kid needs to, like,

18   learn to respect whatever I say," and, like, act accordingly and

19   things like that.

20   Q   You said just now that you watched your husband hit your

21   child, and I saw your arms sort of move in a sweeping motion.

22   Can you describe in words how your husband would hit your child?

23   Would he slap your child?  Would he punch your child?  Shove your

24   child?  Can you just describe that a little bit for the Court?

25   A   Yeah.  I have never seen him slap my child on the face, but

1   I've seen him, like, spank my child on the butt or, like, you

2   know, on his shoulder like really, like, badly.  Like once there

3   was a time when his five fingers were on my kid's back, and like,

4   you know, it was, I think, like a red patch there.  It was just

5   really scary and sad.  And he gets very -- like I said, he would

6   get very violent with the child, like he would just lash out and

7   like hold him so tight and shake him.  That's something that I

8   have seen.

9       Yeah, in terms of hitting, as it is, it's just like open-hand

10  hitting, I guess.  I have never seen him punch the child.

11  Q   Did you ever address his actions with him?

12  A   Yes, multiple times.  I remember there were even times when,

13  after he would hit my child, my child thinks now that, you know,

14  it's okay to hit people.  Like he started hitting other kids

15  around him, for instance, and I had to, you know, try to address

16  that issue with my child and also with the husband, saying it's

17  not okay to do that, like.

18  Q   I'm showing you Exhibit 303 on the screen.  Is this an e-mail

19  from your husband, after you sent him articles about hitting and

20  physical aggression, where he says, "You're 100 percent right.

21  Thanks for these articles.  I really need to self-reflect and

22  learn from these"?

23  A   Yes, yes.

24      I sent him the e-mail after I noticed that, you know, the

25  child was behaving -- hitting other people, and Prasanna is,

1    like, reading the articles and accepting the idea that he should

2    stop hitting the child.

3    Q    Okay.

4         MR. MIN:  Objection, Your Honor.  I think the witness is

5    mischaracterizing the exhibit.

6         THE COURT:  It's overruled.  The testimony remains and

7    stands.

8         The next question.

9    Q    (By Ms. Seipel:)  Let's move on now to your life in

10   Washington.  Again, in a general sense, what can you tell me

11   about your family life in Washington?

12   A    I mean, the move itself was a really difficult one because it

13   was the peak of COVID, and I think I had told Prasanna multiple

14   times that we shouldn't move.  You know, I think it was July or

15   August 2020.  We were just getting out of the whole lockdown and

16   things like that.

17        Just after we moved into Washington, though, we stayed in a

18   temporary accommodation that was provided to me by Microsoft,

19   because I had just gotten my job then.  We spent about two months

20   in the temporary accommodation and then we started looking for

21   homes to purchase and settle down in Washington.

22        At that point, Prasanna had also, I think, made some liquid

23   money out of the stocks that he had, you know, at Rippling.  He

24   told me that he was getting about like $10 million from a sale,

25   and so he was looking out for, like, luxury properties around,

1    like, Lake Sammamish here in Washington.  We spent a few weeks

2    and I think we made offers on some homes even, but he, in the

3    end, you know, just pulled the plug on it, saying "I don't want

4    to, you know, confine like some of my, like, liquid cash into

5    buying a home right now."  And, also, the time for the temporary

6    accommodation was coming to an end, so we had to rush.  Instead,

7    so we decided we would rent a really nice place, like it was, I

8    think, a six-bedroom, single-family home, for like $6,000 a

9    month, with a beautiful backyard.  So we rented the place in

10   Redmond, you know, and we moved into that place from the

11   temporary accommodation.

12       My child in Washington -- yeah, after we came into

13   Washington, he really didn't physically attend a school because

14   it was the years of COVID.  We had him in a homeschooling

15   arrangement.  I found another friend whose child was of the same

16   age group as A███, as my child, and, you know, we got them

17   together, we found a tutor, who would come alternating days

18   between my house and their house, and, you know, they would

19   teach -- she would teach the two kids.

20       And, yeah, those years, I think, was the first time Prasanna

21   was taking like a step down from work, like he wasn't really

22   working -- I mean, he wasn't really putting in the hours with

23   Rippling anymore.  But even then, like, you know, I would make

24   bids for connections, saying "Hey, can you actually also like

25   start spending more time with our child?  Because I want him to,

1  you know, learn like fatherly affection from you and things like

2  that."

3      I remember there were days during COVID when, like, you know,

4  me and my child would be like -- I mean, we were awake during the

5  day, but my husband would sleep through the day and he will keep

6  awake all throughout the night, almost as a way of, like,

7  avoiding, you know, providing care for my child or being around

8  me and the child, but he would tell me that he's kind of burnt

9  out from his start-up.  So he would play games on his laptop all

10  night and then he will sleep through the day, like days where we

11  were at home all the time, my child was at home.  Like this was

12  what Prasanna used to do.

13      Slowly, though, like, you know -- but I remember also, I

14  think it was December 2020, like he had a lot of fights with me

15  about, you know, increasing the frequency of sex between us.  He

16  would want me to have sex with him like once a day, twice a day

17  sometimes.  And at that point, I was remotely working for

18  Microsoft.  It was very hard.  Like, you know, there was no way

19  that I could actually like take care of my child and like satisfy

20  everybody's needs.  I would be like, "Hey, I need some slack

21  here, like just please be understanding about me being in a job

22  finally."  You know, he was not really working, but ...  So he

23  just would be like, "You know, look, I think I need a break from

24  this marriage."  He would tell me that, you know, "I think I want

25  to, like, go away to Thailand, where my brother was" -- where his

1  brother was living at that point, and I remember that he just

2  left me and our child in Washington.  And he was gone for like

3  two, two and a half months, to Thailand, I think.  The end of

4  2020, like December, and January 2021.

5      So I mean, I remember it being a difficult period where I had

6  to solo parent my child, which was almost always the case, like,

7  you know -- and then he was at home, like he was being

8  homeschooled.  So, eventually, I decided, okay, we will

9  transition him out of the homeschooling arrangement and get him

10 to a real physical school where he could attend classes.

11     So he went to one school, which didn't really, like, suit his

12 personality type.  I think he was really unhappy there.  And then

13 I moved him into a Montessori school where he loved the

14 independence he had.  You know, he, like, performed really well

15 in school.  He had a great community around him.  Like the

16 Montessori system encouraged like forming communities, where he

17 had like a multiple-year classroom where he was taking care of

18 the younger children but the older kids were actually, like, you

19 know, helping him out with some things.  So that instilled a lot

20 of sense of community in him.  He ended up falling in love with

21 that school, like he didn't really want to move to any other

22 schools after that.

23     I remember applying for private schools in the Seattle area,

24 you know, where I intended for our child to, like, do his

25 schooling on a more sort of permanent basis.  Like I remember

1  applying to Saint Thomas School in Medina, then a couple of

2  other, you know, good schools that would go all the way to like

3  Grade 12.  He had admissions, but then the child felt very happy

4  in Montessori Children's House, that he decided that, you know,

5  he needs to stay in Montessori Children's House.  And our child

6  is generally very strong willed.  Like, you know, he knows his

7  preferences, he states them, and then if we put him in any other

8  situations other than what he really wants, I mean, the first

9  school failed miserably because of that.  He didn't want the

10  first school and then we had to change him into the Montessori

11  school.  So we just continued.

12       MR. MIN:  Your Honor, I'm not moving to strike or

13  anything, but this has been a very long answer.  I'm not sure all

14  of it was responsive to the question.  And either the questions

15  are calling for a narrative response or the answers are

16  nonresponsive.  It's just -- yeah, I'm not moving to strike or

17  anything.  I just perhaps ...

18       THE COURT:  It is a narrative, counsel.  Let's ask

19  pinpointed questions.

20       MS. SEIPEL:  Understood, Your Honor.

21  Q   (By Ms. Seipel:)  Ms. Sashidhar, I want to talk about your

22  work in Washington.  You mentioned that you worked while you were

23  in Washington; is that correct?

24  A   Yes.

25  Q   How did your husband feel about you working?

1           MR. MIN:  Objection as to form.

2           THE COURT:  That's sustained.

3    Q    Did your husband say anything to you about your employment?

4    A    He asked me, like, you know, to put in, like, lesser hours

5    than was required at work, for example, because he stepped out of

6    Rippling at that point, he was free, and he asked me to spend

7    like considerable amount of, like, time, you know, especially

8    when it came to satisfying his sort of sexual needs.

9           Like, I remember there were times when he would tell me to

10   work Monday through Thursday, take off on Friday from work, and

11   he would want me to accompany him to like a lodge called "Willows

12   Lodge" here.  And I felt that he had these very sort of

13   voyeuristic needs that he would express to me from time to time,

14   that, hey, my friend is doing this, my friend is doing that, and

15   I want you to do all of those sexual acts with me and I want to

16   take you away to another place so we feel like, you know, it's

17   all right.  Because my mother at that point, during COVID, was in

18   Seattle in the house with us, I mean, in Redmond, so I think he

19   needed the privacy.

20          So he would ask me to not work for a day, you know, in the

21   week, and he would tell me that I have to accompany him to the

22   lodge, and if I refused, it was almost always him like telling

23   me, "If you don't do this, I'm going to go out and, you know, get

24   sex from another woman, or like, you know, all of these

25   experiences from somebody else."  So it put a lot of strain on me

1  in terms of work, like where I was expected to work 40 hours and,

2  you know, remote during COVID, and I found it very hard to

3  perform in the job at that time.

4  Q   During the time you were living in Washington, do you recall

5  your husband ever physically harming your child?

6  A   Yes, multiple times.

7      So if I have to recall instances, there is one time when I

8  remember very specifically that, in the morning, my child was

9  just trying to sit and read a book, and he wouldn't really, like,

10 you know, get up fast, like, leave to school immediately, and my

11 husband got, like, very sort of, you know, angry at him.  He

12 started shouting very badly and he had pinched him so hard.  And

13 I remember confronting my husband about it saying that, you know,

14 this is not the right way to force him to comply and send him to

15 school in the morning, like I want him to go as a happy child to

16 school as opposed to being, you know, scared.  And I remember

17 that my child was shaking after that, like crying, and he went to

18 school feeling really sad.

19 Q   Do you recall any other instances, specific instances?

20 A   Anything in Washington?

21     I remember once when, I think, Prasanna was trying to be,

22 like, on his laptop inside, in the bedroom, and, like, you know,

23 our child would go and try to keep asking "Daddy, play with me,

24 Daddy, play with me," and then I remember Prasanna getting really

25 irritated and, like, hitting him and saying like "Get out," you

1  know, "I want -- I want to be here by myself."  That's one thing

2  that I remember.

3  Q   You mentioned earlier that your child attended a Montessori

4  school in Washington.  How long did he attend that school?

5  A   I think it was a year and a couple of months.  We were in

6  Washington for two years.  For a few months, he did the

7  homeschooling.  So in the first year, it was a few months, and

8  then the next full school year, he attended at the Montessori

9  school.

10 Q   Did your child have friends in that school?

11 A   Yeah, many friends in that school.

12 Q   Your husband testified yesterday that your child did not have

13 any sleepovers while you lived in Washington.  I'm going to ask

14 you, did your child have any sleepovers while you lived in

15 Washington?

16 A   Yeah.  I remember that our child had sleepovers, and -- so we

17 had -- we still have some extremely close friends here in

18 Washington, right?  So since our child was also younger, what we

19 would do is the parents would gather together in one home and we

20 would let the children, like our kids, have a sleepover together,

21 like, you know, in a bedroom.  So I remember multiple days of

22 these things happening.  Like, in fact, it was a colleague from

23 Microsoft, who was also Prasanna's very close friends from like

24 15 years back, so -- and they had two kids, both of whom were

25 very close to my child.

 1          THE COURT:  Counsel, before the next question, let's

 2   take a stretch break.  Everyone can stand and stretch.

 3                      (Stretch break.)

 4          THE COURT:  We will take a convenience break.  It's not

 5   going to be our formal break.  The witness needs to use the

 6   restroom facilities.

 7                      (Off the record.)

 8          THE COURT:  All right.  Let's proceed.

 9      Counsel, you may continue your examination of the witness.

10          MS. SEIPEL:  Thank you, Your Honor.

11   Q   (By Ms. Seipel:)  Ms. Sashidhar, did your child receive

12   medical care in Washington?

13   A   Yes.

14   Q   Did he have a regular pediatrician?

15   A   Yes.

16   Q   Did he attend the dentist?

17   A   Yes.

18   Q   Was he invited to birthday parties?

19   A   Oh, yes, a lot of them.

20   Q   How often would you attend birthday parties?

21   A   Almost every other week, I guess, there was some kid or the

22   friends from our neighborhood, someone having birthdays.

23   Q   I'm going to show you Petitioner's Exhibit 61.  In his

24   testimony, petitioner did not testify about this birthday party

25   invitation.  Is this a birthday party invitation to a birthday in

```
 1   the state of Washington?

 2   A   Yes.

 3   Q   And it appears that it was sent on June 18th, 2022?

 4   A   Right.  Yeah.  It's -- Lena is like my child's friend from

 5   Montessori Children's House.

 6   Q   Was this after you had moved to Singapore?

 7   A   No.

 8   Q   Okay.  So I now want to talk in more depth about Singapore

 9   life.

10       What was your feeling, opinion, regarding the move to

11   Singapore?

12   A   Initially, I was very unhappy, like I really didn't want to,

13   you know, move our life out of the U.S.  Like, first of all, like

14   I didn't want to move from California.  I thought that, you know,

15   California would be our home and we could set roots there.  And

16   then on Prasanna's insistence, we moved to Washington, like, you

17   know, and that was a little all right for me because I thought

18   that, okay, if I work with Microsoft, at least I could go back to

19   office.  But Singapore was completely not in the family's plan

20   ever.  And it just felt like an abruption to everybody's life,

21   including my child's.  Like he was finally in a school that he

22   really loved, you know, he found friends.  And I was in a job,

23   like this would also mean like an interruption to my career.  But

24   Prasanna told me that it is just a short sort of temporary move.

25   Like, initially, his discussions with me were more like he
```

1   thought he alone will go outside the U.S., like he thought he

2   would give up his green card and he'll move outside the U.S.; me

3   and our child could stay back in the U.S. and we would just meet

4   like occasionally.  And that just didn't feel all right to me.

5   To me, I felt that it's like a completely broken family then.

6   And then he told me, okay, if you guys come, it will be your

7   temporary move until he had -- you know, he told me he needed to

8   move the assets into an overseas trust.  So his idea was that,

9   according to what he communicated to me, was to move the assets

10  into an overseas trust and then we could come back to the U.S.

11  Q    What country are you a citizen of?

12  A    I'm a citizen of the U.S.

13  Q    Are you a citizen of any other countries?

14  A    No.

15  Q    Did you have to give up your Indian citizenship to become a

16  United States citizen?

17  A    Yes, I gave up my Indian citizenship.

18  Q    Why did you do that?

19  A    India doesn't allow dual citizenship.  And, also, to me, I

20  had made a clear choice, when I moved into California, that I

21  wanted to be a permanent resident in the U.S., like I wanted to

22  start and raise a family here, like have a career here.  So, you

23  know, for me, it was almost -- I didn't really need to have an

24  Indian citizenship for any reason.  I wanted to live in the U.S.

25  Q    Did you have discussions with your husband about this?

1    A    Yes, multiple times.  And there was a time when he also

2    forced me to give up my green card, and I refused.  I said,

3    "Look, I see our lifelong term in the U.S."  And my child -- I

4    mean, I dreamed for my child to go to like Ivy League

5    universities.  He also shared this dream with me, like we spoke

6    always that we wanted our child to attend like Stanford or

7    Harvard.  And I'm, like, so education here, continuing here, made

8    sense, you know.  And when he asked me to give up my green card,

9    I refused.  I said, "I want to get the citizenship," and I, you

10   know, moved on to getting the U.S. citizenship.

11   Q    What country is your husband a citizen of?

12   A    He's a citizen of India.

13   Q    Does he have citizenship in any other country?

14   A    Not that I'm aware of.  I don't think so.

15   Q    Prior to your move to Singapore, what was your husband's

16   status in the United States?

17   A    He had the permanent residence green card up until a certain

18   point, and then there was a time when he gave up the green card,

19   and in the U.S., he got something called an O-1 visa, with which,

20   you know, he continued living here in Washington with us.

21   Q    Did your husband tell you why he gave up his green card?

22   A    Yeah.  He told me that if he holds the green card for longer

23   than seven years, he would be subject to something called the

24   "exit taxes" on his assets by the U.S. government.  He wanted to

25   not pay those taxes.  So he decided that before he finished the

1  seven years on the green card, he wanted to give it up.

2  Q   Does your husband currently hold a United States driver's

3  license?

4  A   I think, yes.

5          MR. MIN:  Objection.  Basis of knowledge.

6          THE COURT:  Sustained.

7  Q   Have you ever seen an active United States driver's license

8  of your husband's?

9  A   Yes.

10 Q   To your knowledge, do the two of currently have marital

11 assets located within the United States?

12 A   I mean, my understanding is that the majority of our marital

13 assets came from this company called Rippling.com, which is based

14 in the United States.  And then I have like my savings from my

15 work time at Microsoft that's here in the United States.  And I

16 know we have like bank accounts in Bank of America.  There is a

17 joint account.  So those assets are here in the United States.

18 Q   When you first moved to Singapore, what was your husband's

19 visa status?

20 A   When we moved in, I remember he told me he has applied for a

21 Tech.Pass in Singapore, so sort of like an entrepreneurial visa

22 to be in Singapore.

23 Q   Does he hold the same visa status right now?

24 A   No.  He changed in between.  So the Tech.Pass was only valid

25 for either one year or two years, if I'm not wrong.  You know, he

1    told me that the validity will expire because it was only a

2    temporary stay that we were looking for.  And then he spoke about

3    shifting into something called an Overseas Networks & Expertise

4    Pass.  So that's -- he's on that visa right now in Singapore.

5    Q    Did your husband ever tell you why he never applied for a

6    permanent residency in Singapore?

7    A    Yeah, we discussed about it, and he -- I mean, first of all,

8    I wanted to come back to the U.S.  He also told me that, you

9    know, he never intended to be in Singapore for longer, and if we

10   got the permanent residency, our child would need to do what is

11   called the national service, he would need to work at the Army

12   for two years, I think, at the end of his schooling, and we are

13   both against, I mean, that.  Like my child is a citizen of the

14   U.S. too, so ...

15   Q    What was your visa status in Singapore?

16   A    I was on a Dependent Pass, and the visa was dependent on the

17   husband's -- the Tech.Pass or the ONE Pass, whatever it is right

18   now.

19   Q    What was your child's status in Singapore?

20   A    Also on a Dependent Pass.

21   Q    What can you tell me about being on a Dependent Pass?

22   A    So I think with the Dependent Pass, I had like very limited

23   scope or rights to, like, you know, be like a proper sort of

24   resident there.  I wasn't allowed to open a bank account without

25   having like legal employment in Singapore.  I wasn't allowed to,

1   you know, work, like I'm not legally permitted to work and earn a

2   living in Singapore.  And, also, in the most recent times, I

3   learned that a lot of the state benefits, I don't know, like

4   hiring pro bono lawyers or even having like facilities or access

5   to, I don't know, like a shelter and stuff, and towards the end,

6   which I explored, was not even given to Dependent Pass holders;

7   it was more only for -- driven towards like PR and citizens of

8   Singapore.

9   Q   Do you know whether you could lease your own apartment on a

10  dependent visa?

11  A   Oh, yeah, I could not sign a lease on my own in Singapore.

12          MR. MIN:  Objection.  Beyond the scope of the question.

13  The question was, "Do you know if you could sign a lease?"

14  A   I explored that because in the end, I had to --

15          THE COURT:  Just a second.  The objection is sustained.

16      Counsel, more foundation.

17  Q   (By Ms. Seipel:)  So I'm going to ask you again,

18  Ms. Sashidhar, and I just need a "Yes" or a "No."  Do you know

19  whether or not you could lease an apartment on your Dependent

20  Pass?

21  A   No, I could not, is the -- yeah.

22          MR. MIN:  Objection.  Outside the scope of the question.

23          THE COURT:  That's overruled.  The answer remains.

24  Q   (By Ms. Seipel:)  If you were ordered to return your child to

25  Singapore, do you know if you and your child's Dependent Passes

1    are still valid?

2    A    I do not know that, but I believe I should be able to check,

3    log into a system and check.

4    Q    What happens to your dependent visa upon divorce?

5    A    It gets canceled.

6              MR. MIN:  Objection.  Basis of knowledge.  Calls for

7    speculation.

8              THE COURT:  That's sustained.

9    Q    Have you had any conversations with your husband about the

10   status of your dependent visa upon divorce?

11   A    Yes, I have.  And he has told me that because I'm a dependent

12   on him and I'm not legally married to him, this Dependent Pass

13   would be canceled.  And he also had told me that, you know, he is

14   the person that decides whether or not -- even when we are

15   married, like he can unilaterally revoke the Dependent Pass when

16   he chooses to do so.

17             MR. MIN:  Objection, Your Honor.  Improper use of

18   hearsay.  They're seemingly offering this for the truth of the

19   matter, not the impact on the person receiving the statement.

20   And to the extent that they're being offered to state that, upon

21   divorce, that her Dependent Pass gets invalidated and they're

22   using a hearsay statement for my client as a basis for that,

23   that's an improper answer, Your Honor.

24             THE COURT:  Counsel, you wish to respond?

25             MS. SEIPEL:  It's not hearsay.  It's a statement of a

1    party opponent.

2            THE COURT:  Ill allow it.  Please continue.

3    Q    (By Ms. Seipel:)  Ms. Sashidhar, do you know if there are any

4    other visas you could obtain to be in the country lawfully

5    without your husband's sponsorship?

6    A    I am not aware of any other visas.

7    Q    Upon your move to Singapore, did you maintain a United States

8    driver's license?

9    A    Yes.

10   Q    Why?

11   A    I maintained all my ties to Washington under the impression

12   that we're always coming back to Washington.  I also worked in

13   the state of Washington.  You know, I had my bank accounts based

14   here.  Yeah.

15   Q    Did you and your husband continue to file taxes in the United

16   States?

17   A    Yes.

18           MR. MIN:  Objection.  Basis of knowledge, filing taxes.

19           THE COURT:  It's overruled.

20   Q    I'm going to show you Exhibit 321.  What is this?

21   A    This is my W-2 statement from Microsoft for the year -- tax

22   year 2023.

23   Q    And in 2023, where were you living?

24   A    I was living in Singapore.

25   Q    What address is listed here on your 2023 W-2?

1   A    This is a Washington mailing address that I maintained back

2   in the U.S. still because, I mean, I had my medical insurance, I

3   had, like I said, my driver's license, and a lot of connections

4   still remaining, and the mails would come to my Washington

5   address.

6   Q    Okay.  I'm also going to show you Exhibit 322 here.  Are

7   these you and your husband's 2022 tax returns?

8   A    Yes.

9        MR. MIN:  Your Honor, I'm going to be objecting to this

10  exhibit.  This is an unsigned document.  Page 4 of this document,

11  "Sign here," "Spouse's signature," there's no signatures here.

12       THE COURT:  Counsel?

13       MS. SEIPEL:  Your Honor already overruled their

14  objection on this regard.

15       THE COURT:  I couldn't hear you, counsel.

16       MS. SEIPEL:  I'm sorry, Your Honor.  They have already

17  objected to this document and Your Honor has overruled their

18  objections.

19       MR. MIN:  And, Your Honor, again, this goes to the

20  purpose.  That's why I stated before it all depends on what

21  purpose these documents are being used for.

22      If this document is being used for the proposition that my

23  client filed U.S. taxes, then his signature on a tax return, I

24  think, would be fairly important to that respect.

25       MS. SEIPEL:  Petitioner testified that he filed taxes in

DHIVYA SASHIDHAR - Direct (Seipel)          Day 2 - January 7, 2025 - 50

1   2022.

2          THE COURT:  All right.  The objection is overruled.

3   Q   (By Ms. Seipel:)  I'm not sure if you answered,

4   Ms. Sashidhar, so I'm going to ask you again.  Are these your and

5   your husband's tax returns from 2022?

6   A   Yes.

7          THE COURT:  And, counsel, just to clarify, you're free

8   to cross-examine the witness regarding if these tax forms were

9   actually submitted, but right now, they're admitted for purposes

10  of establishing that taxes were prepared or testimony that they

11  were submitted.

12         MR. MIN:  Thank you, Your Honor.

13         THE COURT:  Please continue.

14  Q   (By Ms. Seipel:)  Did you maintain your employment with

15  Microsoft upon your move to Singapore?

16  A   Yes.  I took a leave of absence.  In fact, I explored with HR

17  if I could work remotely, but they said that if I was out of the

18  U.S., they couldn't let me work remotely.  But I had an agreement

19  with the HR and my manager that I could take like a short leave

20  of absence and come back to work.

21         MR. MIN:  Objection.  Hearsay.  Move to strike the

22  hearsay portions of the answer.

23         THE COURT:  That's sustained.  As to what the employer

24  told the witness, that's struck, but the balance of the witness's

25  testimony remains.

 1    Counsel, we're almost at 10:30.  Let's take our morning

 2    recess at this time.

 3              THE CLERK:  Please rise.

 4                   (Recessed.)

 5              THE COURT:  Good morning again.  Please be seated.

 6    Counsel may continue your direct examination of your client.

 7              MS. SEIPEL:  Thank you, Your Honor.

 8    Q    (By Ms. Seipel:)  Ms. Sashidhar, we previously looked at an

 9    exhibit of filled-out tax returns.  Whether the actual document

10    you looked at was signed, did you and your husband in 2022 file

11    United States taxes?

12    A    Yes.

13    Q    Okay.  Now, when we broke there, you were talking about your

14    employment with Microsoft.  I want to ask you about your husband.

15    When you moved to Singapore, did your husband maintain United

16    States employment?

17    A    Yes.  He told me about it.  And, also, he was getting the

18    salary from Rippling.com into our Bank of America accounts with

19    which we were spending sometimes.

20    Q    Did you maintain United States bank accounts?

21    A    Yes.

22    Q    Do you still have United States bank accounts?

23    A    Yes.

24    Q    What about health insurance, did you maintain your United

25    States health insurance upon your move?

1   A    Yes.  I had a Premera Blue Cross insurance, which was live

2   even until like early 2024, yeah.

3   Q    Why did you maintain United States health insurance?

4   A    Because I wanted continuity in medical care, like, you know,

5   and our plan was always to come back to the U.S.  I just didn't

6   want to like let go of the medical care plan that I had from

7   Microsoft, so I used the COBRA to continue on the medical care

8   plan.

9   Q    Did you ever have health insurance in Singapore?

10  A    No.

11  Q    Did you ever utilize your United States health insurance for

12  medical care in Singapore?

13  A    Yes, all the time.  We couldn't pay directly, but we would

14  claim the costs of Singapore medical costs from the U.S. medical

15  insurance plan.

16  Q    Do you have any chronic medical conditions?

17  A    Yes.

18  Q    What?

19  A    I have some autoimmune conditions, of which the bigger one is

20  called "systemic lupus."

21  Q    Do you take special medication for your condition?

22  A    Yes.

23  Q    Upon your move to Singapore, was your medication available

24  there?

25  A    It was not available in Singapore, so I had to carry like a

1   large supply of it from the U.S.

2   Q   Did you and your husband discuss a plan regarding where you

3   would obtain medication upon your move?

4   A   Yes, we had multiple discussions.  And I was also definitely

5   like, you know, against moving to Singapore for this reason,

6   because I need some specialty medication to keep my condition

7   under check, and those were -- or are available only in the U.S.,

8   some cutting-edge medicines that, you know, I could get access to

9   here.

10      So the plan that we discussed was we will try with some

11  Singapore hospitals, and he helped me with those, he asked

12  around, but we discovered that Singapore did not have the

13  medication that I was using.  So we discussed that we will carry

14  like six months' worth of medication from the U.S., initially

15  upon entering Singapore, and that I will come back once every six

16  months to pick up the same medication and take it to Singapore.

17  And this felt sustainable because, I mean, my understanding was

18  it's a short trip, like, you know, we would be there for a year

19  max and, you know, I could do that.

20  Q   Over the course of your two years in Singapore, was your

21  husband working?

22  A   He started a company in the blockchain or cryptocurrency

23  space, and he was doing like part-time work on that company, his

24  own sort of venture.

25  Q   What company was he doing work for?

1    A    His company's name is OxPPL.

2    Q    Where is OxPPL based out of?

3    A    He has an office based out of Bangalore in India, and all his

4    employees are based in Bangalore.  So he would work remotely out

5    of our house in Singapore and then visit the Bangalore office

6    like maybe one week every month.

7    Q    What was your opinion on life in Singapore?

8    A    It was a new country again, new culture.  We had a hard time

9    sort of settling in.  And I think my child, especially, had a

10   hard time with the hot and humid weather.  And, also, for me, for

11   like my medical condition, like higher levels of UV exposure is

12   like really counterproductive.  So Singapore was not good in

13   those aspects for us.

14       But we, you know, tried to find a community that maybe we

15   could live in, where we were like -- so we ended up like living

16   in a condominium where, predominantly, American expats were

17   living, and our child went to the American Singapore school.

18       The times -- I mean, some things I remember are like our

19   child could never get used to the long commute times.  He would

20   like take one hour, one way, to get to school and come back in

21   the evenings.  So that took away like two hours every day from

22   his -- you know, his life, and he would be very tired.

23       There were instances where he's -- you know, the nurse called

24   in from the Singapore American School stating that he was dizzy.

25   And once, where he fainted, we would to go and bring him back

1   home from school.  I think it was because of the heat and the

2   weather in Singapore.

3        Aside from that, I tried to --

4            MR. MIN:  Your Honor, again, I don't how long this

5   answer is going to go.  I was trying to wait for the answer to be

6   done.  It seems like it's calling for a narrative response.  I

7   was going to object on some of her testimony as it relates to

8   what the child felt or believed, or, you know, what's not her

9   observations of the child.

10       And, again, I apologize for interrupting.  I just -- you

11  know, to some extent, I think this is just going to be another

12  narrative response.

13           THE COURT:  Sustained on both grounds, narrative and

14  calls for opinions that's not based upon personal knowledge,

15  unless you can establish that foundation.

16  Q    (By Ms. Seipel:)  Ms. Sashidhar, when you were living in

17  Singapore, did your husband ever physically abuse you?

18  A    Yes.  I remember two instances.

19       One was in the end of August, when we had decided that we

20  will -- we, you know, will be getting a divorce, and he was

21  trying to force a financial settlement on me.  And I confronted

22  him about some recording devices which I thought, initially, were

23  voice recorders that were put all over my house.  And when I

24  asked him to show his phone, he punched me violently in my chest,

25  and, you know, he started trying to like get away from me.  And

1  then I started filming that he was punching me, so he wanted to

2  grab my phone from me.  So I sustained a couple of like bruises

3  on my hand, from his nails like poking on me.

4      And the other instance that I remember clearly is we had

5  altercations on the topics of money and sex again.  He was not

6  working full time when he was in Singapore.  He was at home all

7  the time.  So sometimes he would like force me to have sex with

8  him like two times, three times in a day, and I really felt like

9  I couldn't -- I couldn't really like do it, and he would tell me

10  that, you know, if I don't do it for him, again, like he would

11  threaten me, saying he would go out and get it.

12      And then the other thing about money were we've had fights in

13  the past where he'll tell me "All the money is my money."  Like

14  he'll tell me, "It's all my money and, like, you know, you need

15  to have no say on -- you can have no say on how and where or whom

16  I spend it on."  And there were times where I felt like I had no

17  freedom to spend.  And I was not in a job in Singapore, like, you

18  know, I really didn't have my own money, so when I asked him that

19  he, like, deposit some cash into my --

20  Q   Okay.  Ms. Sashidhar, I am going to ask you to stop because I

21  want you to just answer the questions that I ask you, okay?

22          MR. MIN:  Your Honor, I'm going to then move to strike

23  as nonresponsive to the question.  I mean, counsel was predicting

24  my objection, noted that it's not responding to her question.  I

25  would move to strike.  She can ask it again.

1           THE COURT:  The answer remains.  The request to strike

2      is denied.

3         Please continue, counsel.  But I am going to sustain the

4      objection.  It's a narrative from this point on.

5           MS. SEIPEL:  Thank you.

6      Q   (By Ms. Seipel:)  Ms. Sashidhar, I am going to show you

7      Exhibit 327.

8         Could you read this portion for me?

9           MR. MIN:  Objection, Your Honor.  This document is not

10     in evidence, as far as my understanding goes.  So I think this is

11     just an improper way to ask the question.

12          THE COURT:  For the record, the Court is sustaining the

13     objection, and I believe I amplified my ruling on the objection

14     in pretrial proceedings by advising the parties that there was no

15     global admission of this document because the document had --

16          MR. MIN:  It's a different document, Your Honor.  This

17     is the chat between the parties.  This is not the WhatsApp chat

18     with the lawyers.

19          THE COURT:  I understand that.

20          MR. MIN:  Oh, okay.

21          THE COURT:  If I can finish my ruling, counsel --

22          MR. MIN:  Sorry.

23          THE COURT:  -- what my intention is is to indicate that

24     there's a lot of irrelevant information that's reflected in this

25     document.  So if you can, with pinpoint accuracy, identify a

1  portion, establish a foundation as to the spokesperson, and then

2  the Court will consider admission.  But you still have to ask for

3  admission of that portion of Exhibit 327 as opposed to the global

4  admission.  Is that clear?

5          MS. SEIPEL:  Yes, very much, Your Honor.

6          THE COURT:  Okay.

7          MS. SEIPEL:  Thank you.

8  Q    (By Ms. Seipel:)  Ms. Sashidhar, over the course of your

9  marriage, did you have written message communication with your

10 husband?

11 A    Yes.

12 Q    On what platform?

13 A    On WhatsApp and e-mails.

14 Q    Did you have written message communication on WhatsApp around

15 the time of March of 2024?

16 A    Yes.

17 Q    I'm showing you Exhibit 327.  What is this document -- let me

18 rephrase.  I'm showing you Respondent's Exhibit 327, page 43.

19 What is this?

20 A    It looks like a chat between me and my husband.

21 Q    What does your husband say on March 24th, 2023 {sic}?

22         MR. MIN:  Objection, Your Honor.  The witness is reading

23 from a document not in evidence.

24         THE COURT:  That's sustained, counsel.

25 Q    Okay.  Do you recall your husband saying anything to you in

1   March of 2024?

2            MR. MIN:  Objection.  Vague.  Form.

3            THE COURT:  It's overruled on those grounds.

4   A   Can you ask the question again to me, please?

5   Q   Do you recall your husband saying anything to you in March of

6   2024 about your sexual life?

7   A   Yes, we have had like multiple conversations about sex life.

8   And, you know, he constantly wants sex from me, and, you know,

9   he's always expressing that he's unhappy and he wants me to do it

10  whenever when he asks me.  And we've had like multiple

11  altercations, and he would just say that if I don't give him sex

12  anytime that he wants, he'll just break the marriage, like just

13  leave the marriage, or he'll go to other women to get sex.

14  Q   Do you recall his specific words?

15           MR. MIN:  Objection as to form.  The witness testified

16  about having multiple conversations.  So is she asking about his

17  specific words in all of these conversations in March of 2024 or

18  all of the statements he made in March 2024?

19           THE COURT:  I will sustain the objection.

20       Counsel, if you can narrow this down.

21  Q   (By Ms. Seipel:)  Do you recall something specific that your

22  husband said to you on March 23rd of 2024?

23  A   Yes.  He just came and told me that he feels like he's

24  begging for sex all the time and that should never be the case.

25  He has to get it whenever he wants it from me, and if not, he's

 1   like "I don't think I can sign up for that," which -- yeah.

 2          MR. MIN:  Your Honor, maybe this is just sitting on

 3   technicalities, but, again, the question is, "Do you recall

 4   anything specific he said," and the witness is just looking at

 5   the screen and reading from the message.  So, again, it's just an

 6   improper question.  The witness is reading.  If she does not

 7   recall, then maybe she can have something to refresh her

 8   recollection.  But that wasn't her testimony.  And the witness

 9   reading, again, from a document that's not in evidence, that's

10   improper.

11          THE COURT:  That's sustained, counsel.  Counsel has

12   given you the cue that the witness can use this to refresh her

13   recollection.  So if you want to pursue that avenue of offering

14   the testimony, you can pursue that.  Otherwise, the objection is

15   sustained.

16          MS. SEIPEL:  Okay.

17   Q   (By Ms. Seipel:)  Ms. Sashidhar, you just testified that you

18   recalled something specific your husband saying to you, and you

19   were looking at a screen.  Did you use what is on the screen in

20   front of you to refresh your recollection?

21          MR. MIN:  Objection as to form.

22          THE COURT:  It's overruled.

23   A   Yes.

24   Q   And after looking at the screen, what did you recall about

25   what your husband said to you?

1          MR. MIN:  Objection.  Witness reading.  Witness should

2     not be reading when recollecting, refreshing her recollection.

3          THE COURT:  That's correct, counsel.

4     The proper procedure is, if the witness looks at the

5     document, she is supposed to stop looking at the document, and

6     then you ask the witness, "Does this refresh your recollection?"

7     She either answers the question "Yes" or "No."  If it refreshes

8     her recollection, she testifies as to her refreshed recollection,

9     not by reading the document.

10         MS. SEIPEL:  Okay.

11         THE COURT:  Let's proceed.

12    Q   (Ms. Seipel:)  So, Ms. Sashidhar, did you look at the screen

13    in front of you?

14    A   Yes.

15    Q   And did what's on the screen in front of you refresh your

16    recollection as to what your husband said to you?

17    A   Yes.

18    Q   Okay.  What do you recall now that your husband said to you?

19    A   I recall that it was a Friday evening, and, you know, I had

20    like changed into my pajamas, and my husband came to me and he

21    started yelling at me saying that, you know, "I cannot be begging

22    you for sex."  And it was -- I felt that, you know, he -- he told

23    me that I need to ask for his permission before I change clothes

24    and that, you know, I need to have sex with him before I changed

25    into some comfortable clothes.  And if I refused, he told me that

1   he will never -- he does not, you know, want to sign up for that,

2   indicating to me that he will go outside of the marriage or break

3   our marriage.

4          MR. MIN:  Your Honor, I'm going to move to strike

5   because I'm -- perhaps it's my confusion.  But is the witness

6   testifying about a text message conversation that he wrote to her

7   or about a verbal communication that he stated to her?

8   Because --

9          THE COURT:  Counsel, you can clarify that on

10  cross-examination.  Let's move on.

11         MR. MIN:  Okay.

12         MS. SEIPEL:  At this point, Your Honor, I would move to

13  admit Exhibit 327, page 43.

14         THE COURT:  Counsel, the exhibit doesn't come in.  The

15  document was used to refresh the witness's recollection.  It

16  stops there.  The document itself used to refresh the

17  recollection does not itself become evidence.  So that's not

18  going to come in.  That's refused.

19         MS. SEIPEL:  Okay.

20  Q   (Ms. Seipel:)  Ms. Sashidhar, did your husband ever admit to

21  sexually mistreating you?

22  A   Yes.

23  Q   What did he say?

24  A   There is one instance that I recall him coming and telling me

25  that even though you were in pain, you had sex with me and he

1   appreciated that I did comply to his wishes on that day.  And he

2   has told me sometimes that, you know, okay, that I compromised on

3   my work schedule like to go with him to a lodge, for example,

4   during a working day, on a workweek, and he talked about that.

5   And there were times when he would also like, you know, tell me

6   that even though I found some things, like, not to my liking or I

7   found some things disgusting, that I would still do it for his

8   sake, and he would tell me that he appreciated that.

9   Q    When you were living in Singapore, did your husband threaten

10  you in any way?

11  A    Yes.

12  Q    What specifically would he say to you?

13  A    Some things -- sometimes he would tell me "This marriage is

14  not working.  I'm going to walk out." He would tell me that

15  he'll not sign up for a marriage where like, you know, if I did

16  not provide any of his sexual needs, then he will walk out.  He

17  will threaten me by saying to me that if I didn't perform certain

18  acts with him, he will go outside to other women and, you know,

19  get what he wants from them.

20       And closer towards the end of when we separated, there were

21  instances where we would fight.  I would, you know, refuse some

22  things that he would ask of me, and he will threaten me by saying

23  that he will release like intimate videos or naked pictures of

24  mine.  He was forcing me for an open marriage at some point.  He

25  will come in and sort of, you know, tell me that his friend rated

1   me a 10 on 10, and he will tell me that if you don't do this with

2   him, then I am going to like release more of your pictures to

3   so-and-so.

4        And a few other things that I remember are he tells me

5   constantly that, you know, he is above any rule or law.  He will

6   tell me that he has so much money and power that he will destroy

7   me.  That's something that he has told me, and I'm very scared of

8   that.  And then he also has told me that he will leave me and my

9   child on the streets without giving us any money.

10  Q   Was your child ever present when he was making threats about

11  leaving you and the child out on the streets?

12  A   I do not think directly, but there are times when we might

13  have had like loud conversations and my child has been probably

14  like in the next room, yeah.

15  Q   Now, both you and your husband have testified some about your

16  son attending school in Singapore.  What was the name of the

17  original school that your son was enrolled in?

18  A   The first school he was enrolled in is called Singapore

19  American School.

20  Q   Why the Singapore American School rather than a Singaporean

21  school?

22  A   Our child is used to the American curriculum, and we wanted

23  to always come back and continue on the American curriculum.  So

24  our first natural choice was to enroll him like in the American

25  School in Singapore, yeah.  We didn't even, like, look at local

 1   Singapore schools.

 2   Q    How did your child adjust to his Singapore school?

 3   A    He --

 4        MR. MIN:  Objection.  I think it's an improper question,

 5   in terms of how did the child adjust.

 6        THE COURT:  It's overruled.

 7   A    So our child had a hard time like in terms of the weather in

 8   Singapore.  It was too hot for him.  There were times when we

 9   were called into the school by the nurse because he was fainting

10   or he was dizzy.

11        And then the commute from our house to the school took him

12   like one hour each way, and he would come back home and he was

13   very, you know, drained out; he would not really like get up and

14   play with us; he would refuse to like eat something.  He would

15   just come back home and crash on the bed.

16        And he was also trying to make friends in Singapore, but at

17   some level, I think there were -- you know, it was a different

18   set of things that friends would talk about in that school

19   because it was mostly like rich kids, and our child would come

20   and tell us that, you know, "Mommy, he has a Nintendo Switch" --

21   Q    Okay.  So I don't --

22        MR. MIN:  Your Honor, I would like to make an objection.

23   First, she's talking about what friends are talking about at

24   school, she's talking about the nurse said that the child

25   fainted.  She's not testifying whether she has any basis of

 1  knowledge.  She's offering that as a truth of the statement.

 2  She's saying that the child was not adapting to the heat and the

 3  humidity.  Again, none of these have basis of knowledge.  She's

 4  relying on hearsay and it's nonresponsive to the question, Your

 5  Honor.

 6          MS. SEIPEL:  The question was, "How did your child

 7  adjust?"  She is giving her observations as to how the child

 8  adjusted.  Any hearsay, I'm not admitting for the truth of the

 9  matter.  It's for her -- effect on listener, her observations of

10  how the child adjusted to school in Singapore.

11          THE COURT:  The objection is overruled.  Please

12  continue.

13  Q   (By Ms. Seipel:)  Why did you take your child out of the

14  Singapore American School?

15  A   There were a lot of bullying issues in the school.  In my

16  child's class, there were two of his friends who bullied another

17  child, and my kid was also involved in that incident.  The school

18  reported that to us, and both me and Prasanna spoke about it and

19  we exchanged that, you know, there are certain, like, value

20  systems that we expected out of the school, but the school had,

21  like, more of entitled behavior from the kids and they felt that,

22  you know, hurting somebody else, whether physically or verbally

23  was all right, and we talked that we definitely had to, like,

24  move out of that school.

25          The other part was also that the commute to school from any

1   part of Singapore that we would live in was just too harrowing on

2   the child.

3   Q   How did your husband treat your child while living in

4   Singapore?

5   A   My husband was, you know, not working full time, so he was at

6   home.  He would sometimes, like, try to do, like, you know,

7   playtime with the child that was mostly, like, rough playing.

8   That's what my child calls it and he calls it that.  And a lot of

9   times, I also remember that my husband was, like, traveling when

10  in Singapore.  So he would go for his office job back in

11  Bangalore.  So almost every month, like a couple of weeks, he's

12  gone to India or some other countries that he's traveling with

13  his friends.

14       And the hitting and pinching also continued, and there were

15  instances where, you know -- I know that this happened in front

16  of me -- my child, like, refused to do something, and my husband

17  just kind of chased him down and, like, hit him real bad.  My

18  child started, like, really shivering from that.  My mother and I

19  were around.  We tried to stop Prasanna, saying "Please don't do

20  this.  Like just reconcile with him.  He's, you know, doing

21  things out of fear, and that's not the right motivation to do

22  it."  So --

23  Q   How would your child react to your husband doing these sorts

24  of things physically?

25  A   There were instances where I have noticed him shivering.  He

1  will come running to me, in younger years, like, you know, asking

2  that I should lift him up and, like, protect him.  And once he

3  got more of a voice, he started telling "Daddy, this is not okay.

4  I am feeling very hurt."  He would start crying a lot, and he

5  would, you know, go into a shell.  He would just say, "I want to

6  be in my room.  Please leave me alone for some time," and he will

7  cry for hours together sometimes, until we had to console him and

8  get him out.

9      Yeah, those are some things I remember.

10 Q   Let's transition a little bit here.  What are the national

11 languages of Singapore?

12 A   I think Malay, Tamil, and Mandarin.  And I don't know if

13 English is also one of the national languages.

14 Q   Does your child speak any of those languages?

15 A   He speaks English for sure, and he just has, like, a few

16 words in Tamil that he is learning now.

17 Q   So he doesn't speak Tamil fluently?

18 A   No, he doesn't speak Tamil fluently.

19 Q   Yesterday, your husband told the Court about you choosing the

20 apartment that your family moved into in Singapore.  Why did you

21 choose to live in the Ardmore Park apartment?

22 A   So like when I did some research on, you know, where might be

23 all right for us to live, like in terms of the location and also

24 in terms of the people that are living there, like Ardmore Park

25 has one of the largest like American expat communities, so, you

1    know -- and, also, there are like three buses full of kids that

2    go to the Singapore American School from there.  So I wanted to

3    live in a place where my child could have like continued

4    friendships as well maybe.  And, you know, I thought that keeping

5    a connection with the American community was easier.

6         Like after going to Singapore, I also realized that it was

7    very hard to connect to the local people.  Sort of like the value

8    systems were very different as opposed to having -- after having

9    lived in the U.S.

10   Q    Okay.  I'm going to show you Exhibit 29, and your husband

11   testified a little bit about this exhibit yesterday.

12        Can you tell me what you mean by the statement "We are moving

13   to our permanent home from today"?

14   A    Yes.

15        So when we moved into Singapore, we were living in -- you

16   know, we were staying in a couple of, like, transitory

17   apartments, like -- what do you call them? -- temporary

18   accommodations sort of, like a couple of weeks.  So my child used

19   to take the school bus from these, like, temporary

20   accommodations, and then once we rented a place and moved into

21   that place, I signaled to the teacher and the bus facility that

22   we have now moved into a place that we expect our child would

23   go -- you know, bus from.

24   Q    Your husband testified yesterday about your child having at

25   least five to ten sleepovers with another child named "Greg" in

1  Singapore and also that you were the person to coordinate the

2  sleepovers.

3      Having been the person to coordinate the sleepovers, how many

4  sleepovers were there with the child Greg?

5  A   There were definitely like --

6          MR. MIN:  Objection.  Assumes a fact not in evidence.

7          THE COURT:  It's overruled on those grounds.

8  A   There were definitely, like, less than that, like two or

9  three sleepovers at best, because Greg and my child were friends

10 only for, like, the last six months when we lived in Ardmore

11 Park.  And I know that, you know, once Greg was at my place, and

12 the next time, A███ was at Greg's place, and that's all that I

13 remember.  Two to three times, maximum.

14 Q   While living in Singapore, did your family regularly eat at

15 Singaporean restaurants?

16 A   No, never.

17 Q   Why not?

18 A   Prasanna hates like any Asian -- sort of East Asian cuisines.

19 He only sticks to like Indian, Mexican, and Italian at best.  And

20 even my child, he's a picky eater, like, you know, so we didn't

21 really like -- really eat any local cuisine there.

22 Q   Did you cook Singaporean food at your home?

23 A   No.

24 Q   The Court also received evidence yesterday of a lease that

25 your husband signed in August 2024.  Why did you not sign that

1  lease?

2  A   I did not want to move into that house.  I did not actually

3  want to remain in Singapore anymore.  I had conversations with

4  Prasanna about that.  I told him -- I clearly stated that I do

5  not want to move into that house or return back to Singapore.

6  This happened during the vacation that we had in India.

7  Q   What can you tell me about your involvement with Lumebox, the

8  company that your husband testified about yesterday?

9  A   Once my job at Microsoft got severed and we were, you know,

10 staying in Singapore, I felt that I really needed to do something

11 about my career, and Prasanna was investing into companies, like

12 start-up companies by himself.  So we spoke about it and we came

13 to an agreement that we'll invest a little bit of funds through

14 me, like I will be like a -- become or learn to become an angle

15 investor in startups.

16     So there was already a company that he had, I think, out of

17 which 0xPPL was operating, or something like that, so we just

18 changed the name of that to Lumebox Ventures, and I, you know,

19 sort of took that forward as an angle investing/venture studio

20 kind of business.

21     I would -- I mean, the business is basically analyzing

22 startups that are worthy of investing into, and it was primarily

23 like -- I mean, it was all U.S.-based startups that came out of

24 an incubator program called Y Combinator.  I remember that I made

25 a decision to invest into three companies, and I ran that company

 1  maybe just for a couple of months.  So within that, we invested

 2  in three companies, all based in the U.S.

 3  Q   Okay.  I want to ask you now about the six months prior to

 4  you and your child coming to the United States and sort about

 5  your family's whereabouts and travels.

 6      Did your family take a trip in March of 2024?

 7  A   Yes.

 8  Q   To where?

 9  A   We did a family trip together to Dubai.

10  Q   Was it for a specific purpose or just for a vacation or

11  something else?

12  A   There were two reasons.  I mean, it was spring break for my

13  child, and, also, my husband wanted to, you know, look at Dubai

14  in order to move our family out of Singapore and move into Dubai

15  because Singapore was really not like -- you know, we were --

16  nobody was getting used to Singapore.  We left Singapore at every

17  given opportunity.  And it was super expensive.  So Prasanna's

18  thoughts were that -- what he told me was homes and cars are

19  cheaper and better in Dubai, and we should see if we can move our

20  family to Singa -- from Singapore to Dubai.

21  Q   Did your family or your husband travel anywhere else in

22  March?

23  A   Yeah.  He traveled to Bangalore.  Prasanna traveled to

24  Bangalore.  But as a family, I only remember the Dubai trip in

25  March.

1  Q   Do you recall how many days your husband was in Bangalore

2  for?

3  A   So it's always been the case that when he goes, he's going

4  from like Sunday to Saturday, so like for a full week.  Every

5  month, he has to be in his office in Bangalore.  So I assume five

6  to six days in Bangalore in March.

7  Q   Do you recall any travels for you, your husband, or your

8  child in the month of April?

9  A   April?  I know Prasanna went to Bangalore in April, again,

10 for a week.  I know he had booked a trip to Dubai for some

11 cryptocurrency conference in April, and I'm trying to think.  I

12 think he did not really take that trip because there was a flash

13 flood in Dubai at that point.

14     That's all I remember from April.

15 Q   How about May?  Did you, your husband, or your child travel

16 anywhere in May?

17 A   In May?

18     There was a time when Prasanna went to Chennai to meet his

19 mother, who had an illness and a surgery.  So I don't know if

20 that happened in April or May.  But I'm certain that Prasanna

21 also took a trip to Bangalore in May.

22 Q   When he went to visit his mother in Chennai, do you recall

23 how long that visit was for?

24 A   Probably three or four days, I think.

25 Q   And when he went to Bangalore in May, do you recall how long

1    that visit was for?

2    A    A week.

3    Q    Did you, your husband, or your child travel anywhere in June

4    of 2024?

5    A    Yes.  We all came back to India together.  Our child's summer

6    break had started, so we traveled to India, and we were traveling

7    around in the South of India, I think.  And I remember that me

8    and my child, we were in my mother's place in Chennai, but

9    Prasanna had traveled to Bangalore to attend his office.

10   Q    How long were you present in India in the month of June?

11   A    All the 30 days, I think.  30 or 31, June, yeah.

12   Q    Did you, your husband, or your child travel anywhere the

13   month of July?

14   A    Yes.  Prasanna actually took a trip to Kazakhstan alone, and

15   then once he came back, our entire -- I mean, the three of us --

16   Prasanna, me, and our child -- we traveled to New Zealand.

17   Q    How long was your husband in Kazakhstan?

18   A    I think five to six days.

19   Q    How long was your family in New Zealand?

20   A    Like 20 to 24 days or something like that.

21   Q    Did you, your husband, or your child travel anywhere in

22   August?

23   A    Prasanna was in Bangalore until, I think, the first two weeks

24   of August, while me and my child were back in Chennai, in India,

25   and then we traveled into Singapore in the middle of August.

1    Q    You testified earlier about a physical altercation between

2    you and your husband on August 31, 2024.  What were the two of

3    you arguing about?

4    A    We had decided that we will go through with the divorce, and

5    Prasanna was trying to convince me, and through my mother, to

6    agree to a financial settlement that he was proposing, and I

7    confronted him and asked him like, you know, if he had placed

8    like any recording devices inside the house, because I found some

9    very questionable devices, and that's what led to the whole --

10   the altercation going, like, to the next level.

11   Q    Following that altercation, what did you do?

12   A    I mean, I asked my mother to take care of A███ at home, and I

13   told her that I'm going to take these devices to the police.  So

14   I went to the police station in Singapore.

15   Q    Following that altercation, what did your husband do?

16             MR. MIN:  Objection.  Basis of knowledge.  Foundation.

17             THE COURT:  The question is what did her husband do.

18             MR. MIN:  After the altercation.

19             THE COURT:  That's overruled.

20        You may answer the question.

21   A    So husband, like, first ran out of the house with his phone,

22   because he didn't want to show me what he was recording on the

23   phone, and then before I left, I saw him coming back into the

24   house and he went into a bathroom and he was on a call for a

25   while.  I had left after that.  But my mother and my child told

1  me that --

2          MR. MIN:  Objection.  It's going to go into hearsay.

3  She left the house.  She left the house, he left the house, and

4  she's about to say what her mother and child told her happened.

5          THE COURT:  Let's clarify, counsel.  That's sustained.

6          MR. MIN:  And, Your Honor, I'm going to object to an

7  earlier portion of her answer, where she said her husband left

8  the house because he did not want whatever.  I don't know what

9  exactly she said.  But she's talking about why he left the house.

10 Again, it calls for speculation.  There is no foundation made

11 for --

12         THE COURT:  That's sustained.

13     Ask another question.

14 Q   (By Ms. Seipel:)  When you returned home from the police

15 station, was your husband there?

16 A   No.

17 Q   From August 31, 2024, until the date that you and your child

18 returned to the United States, did your husband ever come back to

19 your home?

20 A   No.

21 Q   Did your husband tell you where he was?

22 A   In some e-mails, I remember he replied, in the early part of

23 September, that he was in India and then he was going on a trip

24 with his friends to Kazakhstan.

25 Q   Between this August incident and the time you and your child

1  came to the United States, what was your life like, what were you

2  doing at that point in time?

3  A  So between August 31st and the time we came?

4  Q  Correct.

5  A  Okay.

6        MR. MIN:  Your Honor, that's going to call for a

7  narrative response, what was her life like in the last -- over a

8  month and a half period.

9        THE COURT:  That's sustained.

10  Q  What were you doing during the time period of August 31,

11  2024, until --

12        MR. MIN:  Same objection.

13        THE COURT:  Counsel, just so you understand, I need to

14  hear the question before you object.

15     State the question, counsel.

16  Q  What were you and your child doing between August 31, 2024,

17  until October 14th, 2024?

18        MR. MIN:  Objection, Your Honor.  Again, calling for a

19  narrative response.

20        THE COURT:  Counsel, you've got to narrow it down a

21  little further than that.

22        MS. SEIPEL:  Okay.

23  Q  (By Ms. Seipel:)  When your husband left Singapore and went

24  to India, did he take your child's passport with him?

25  A  Yes.

1   Q   You testified that he didn't return home between August 31st,

2   2014, and October 14th, 2024.  Why didn't you leave the country

3   at that point?

4   A   My child's passport was not with me.  My husband had the

5   passport.  And I was practically stranded in Singapore.  And, you

6   know, I was trying to figure out how to continue life in --

7   always, like financially, safely, stably.  I just couldn't leave

8   the country without my child's passport.  And the child was under

9   my sort of de facto custody because the husband just left the

10  child with me and he didn't show up to care for the child.

11  Q   If your husband had your child's passport, how did you get

12  out of the country?

13  A   I had gone to the U.S. Embassy in Singapore seeking for some

14  help in many respects.  One was that I did not have the money to

15  sustain life in Singapore in my own bank account there.  And the

16  next one was that, you know, the child's passport was gone, and I

17  really wanted the U.S. Embassy to help me, you know, get another

18  passport for the child so I could bring him to a place that felt

19  safer for both of us and always.  Yeah.

20       And the U.S. Embassy asked me for, like, a whole bunch of

21  details on what was going on in our life and the divorce, and I

22  submitted all the papers.  And I also received like legal

23  proceedings papers from the Indian court, which Prasanna had

24  filed asking expressly and stating that, like, you know, he's

25  living in India and that he wants my child to be relocated, and

1   given his --

2   Q   So I'm going to stop you for a minute.

3          MR. MIN:  Your Honor, I'm also going to move to strike

4   the portions of what the U.S. Embassy asked her.

5          THE COURT:  It's not offered for the truth.

6          MR. MIN:  Okay.

7   Q   (By Ms. Seipel:)  How did you get out of the country with

8   your child?

9   A   The U.S. Embassy issued my child with an emergency passport.

10  Q   And I believe you testified -- I will rephrase.  When did you

11  and your child return to Washington?

12  A   On October 14th.

13  Q   2024?

14  A   2024.

15  Q   What area do you live in?

16  A   We live in Redmond, in Washington.

17  Q   The same area or a different area as before?

18  A   It's the same area as before.

19  Q   Does your child have the same pediatrician now --

20  A   Yes.

21  Q   Does your child have a pediatrician right now?

22  A   Yes.

23         MR. MIN:  Objection.  Relevance.  Again, habitual

24  residence is determined on October 14th.  Whatever happened since

25  October 14th is not relevant to any decision this Court needs to

 1  make.

 2          THE COURT:  It's overruled on those grounds.

 3  Q   Does your child have a pediatrician right now?

 4  A   Yes.

 5  Q   Is it the same pediatrician or a different pediatrician than

 6  he had prior to your move to Singapore?

 7  A   It's the same pediatrician.

 8  Q   Does your child have a dentist right now?

 9  A   Yes.

10  Q   Is it the same dentist or a different dentist that your child

11  had prior to the move to Singapore?

12  A   The same dentist.

13  Q   Did you tell your husband that you returned to Washington?

14  A   Yes.

15  Q   I'm going to show you Exhibit 308.  Is this how you notified

16  your husband that you had returned to Washington?

17  A   Yes, this, and also texts via WhatsApp.  Yeah.

18  Q   And you sent this e-mail on October 14th at 11:20 p.m.?

19  A   Yes.

20  Q   How soon after you returned did you send this e-mail?

21  A   I remember -- as soon as we landed and, you know, I was safe

22  in a friend's place with my child, I remember sending out the

23  e-mail.

24  Q   How did your son adjust to being back in the United States?

25          MR. MIN:  Objection.

1          THE COURT:  It's too broad, counsel.

2    Q    What were your observations of your son upon your return to

3    the United States?

4          MR. MIN:  Objection.  Your Honor, I'm also going to

5    renew my relevance objection.  I'm not entirely sure what this

6    goes to.

7          THE COURT:  I'll allow limited latitude.  Overruled.

8    A    So my child just felt like -- I mean, he started going to

9    school the immediate week after we came here.  And, you know, he

10   had a normal routine.  He would come back from school happy.  We

11   had a set routine that he would follow.  And he started taking

12   some of the classes that he likes a lot, like, you know -- and

13   he's continuing those right now.

14        And for the most part, I see that he's thriving.  I mean,

15   he's observing sometimes that I am, you know, disturbed or, you

16   know, he's seeing that there's so many things happening around us

17   and he wonders like, you know, what's going to happen.  Other

18   than that, like, he's going about his life and school routines as

19   normal as can be.

20          MR. MIN:  Your Honor, I'm going to move to strike the

21   three responses that says that the child is happy, what he likes,

22   and what he wonders about.

23          THE COURT:  So noted.  It's overruled.

24        Please continue.

25          MS. SEIPEL:  Thank you, Your Honor.

1   Q    (By Ms. Seipel:)  In the course of your case, was your child

2   seen by a psychologist named Dr. Favaro, who had been hired by

3   your husband?

4   A    Yes.

5   Q    Did you record some of your son's meetings with Dr. Favaro?

6   A    Yes.

7   Q    Why?

8   A    So after the first meeting with Dr. Favaro, my child came

9   back to me and he started asking me whether, like, you know, can

10  he trust Dr. Favaro.  He wondered -- he told me, like, you know,

11  I have a feeling I cannot really like -- I don't know whether

12  he's telling me the truth about some things.  And I asked him

13  what he thought that involved.  He said a few things.  And then,

14  you know, we spoke about how do we make sure that, you know, he

15  can be trustworthy, and my child and I had a conversation there,

16  and, you know, I told -- I told him that maybe we can request to

17  record the conversations so that Dr. Favaro is, like, you know,

18  telling you the truth and you can also be sure of that.  And my

19  child agreed to it.  And the next day, I had requested Dr. Favaro

20  to, you know, record the meetings going forward.

21  Q    I now want to move on to all of the different legal

22  proceedings in all of the countries between you and your husband.

23       So I first want to start with Singapore.  What actions,

24  petitions, et cetera, did you file in the country of Singapore

25  against your husband?

1   A   I filed for a protection order, I filed for maintenance --

2   Q   So let's just take them one by one.  When did you file for a

3   protection order?

4   A   The date of filing, I think maybe like September 26th.

5   Q   All right.  And why did you file for a protective order?

6   A   I want to add that I actually filed that in -- on the 1st or

7   2nd of September, as soon as the physical assault happened, but

8   the Court refused to take it in because they wouldn't be able to,

9   you know, find my husband, like we didn't know where to serve

10  him.  And then, eventually, they accepted the September 26th

11  order.

12          MR. MIN:  Object.  Move to strike why the Court didn't

13  accept her initial filing.

14          THE COURT:  That's sustained.

15          MS. SEIPEL:  Okay.

16  Q   Why did you file a protective order on September 26th?

17  A   I was feeling very unsafe, and there were conversations where

18  Prasanna had threatened me, saying that with his power and

19  influence, he would destroy me or, you know, that he's going to

20  like, basically, leave me and my child without any money, and

21  then he had hurt me.

22      I also recognized or realized that my house was bugged with

23  all kinds of sort of like illicit surveillance, and I wanted the

24  Singapore police or the court's help to kind of, you know, feel

25  safe, like just see if they could, like, help us search the house

1   and get all the devices out and -- reasons like that.

2   Q   Did you end up withdrawing your protection order in

3   Singapore?

4   A   Yes.

5   Q   Because I had moved to the U.S., and at some point, I think

6   the Singapore counsel of Prasanna's was forcing me to attend the

7   hearings in person.  And it also didn't make sense anyway.  I had

8   moved to the U.S. and I had requested for a protection order

9   here.  So I withdrew my complaints.

10         MR. MIN:  Your Honor, I move to strike as to what she

11   thinks the child's attorney in Singapore was forcing her to do.

12         THE COURT:  That's sustained.

13   Q   Was it your understanding that you were supposed to appear in

14   Singapore in person?

15   A   No.  The Court and Prasanna's attorneys were continuously

16   sending me e-mails, and I requested to appear via Zoom, but

17   Prasanna's attorneys refused, and the Court forced me to come in

18   person for the hearings.

19   Q   Okay.  What else did you file in Singapore?

20   A   I filed for maintenance/support in Singapore.

21   Q   And when did you file that?

22   A   On September 9th.

23   Q   Why did you file that?

24   A   Prasanna had left me with just $5,000 in my bank account, and

25   he paid that to me on August 21st, and his -- I mean, he stated

1   to me that he will not pay me any more money because he didn't

2   want me to hire an attorney before I signed, like, the financial

3   settlement he was giving me.  So he refused to pay me any more

4   money.  And, you know, to sustain life, I needed some more

5   guarantee of funds in my own bank account.

6   Q    Did you also end up withdrawing that filing?

7   A    Yes.

8   Q    Why?

9   A    Because we had moved to the U.S. and, like, I was forced to

10  otherwise appear in person to continue with that hearing.

11  Q    What else did you file in Singapore?

12  A    I filed for interim child custody in Singapore on

13  September 17th.

14  Q    Why did you file for custody in Singapore?

15  A    Because I was trying to get a passport for my child and the

16  Embassy told me that unless I had full custody of my child, I

17  would need the husband's consent to be able to get a new

18  passport.

19         MR. MIN:  Objection.  Move to strike the hearsay

20  portions.

21         THE COURT:  That's sustained.

22  Q    You mentioned, earlier in your testimony, filing police

23  reports on your husband; is that right?

24  A    Yes.

25  Q    How many police reports did you file?

1    A    I filed three.

2    Q    What were those reports regarding?

3    A    So just a correction.  I think there were four filings.  The

4    third filing had like an addendum to it.

5         So the first filing was regarding domestic violence or

6    physical assault after the August 31st incident; and then the

7    next one was about marital rape; and the third one is placing

8    hidden cameras inside the house and threatening to, you know,

9    release like intimate pictures and videos.

10   Q    When did you file the report regarding the physical abuse?

11   A    On August 31st.

12   Q    When did you file the report regarding marital rape?

13   A    I think it's October 1st or 2nd.  October 2nd.

14   Q    Why did you not file a police report regarding marital rape

15   until October 2nd?

16   A    Well, first of all, I was very afraid of filing any police

17   reports against Prasanna.  Like, he has threatened me, always

18   saying that he's very rich and powerful and that he will destroy

19   me, and I was, like, very scared of how he would retaliate or,

20   you know, just get back at me for this.

21        And also, on October 2nd, I went into the police station to

22   turn in the hidden cameras, and the case officer, who heard my

23   case, had informed me of the fact that rape, even though it's in

24   a marriage, is, you know, not acceptable in Singapore, so she

25   asked that, you know, I should file that along.  And that's when,

1  you know -- so on October 2nd, when I went to turn in the hidden

2  cameras, I also filed for the martial rape.

3          MR. MIN:  Your Honor, I move to strike the hearsay

4  portions of the response.

5          THE COURT:  Sustained.

6          MS. SEIPEL:  It's not for truth of the matter, Your

7  Honor.  I asked her why she waited so long.  So it's for effect

8  on listener.

9          THE COURT:  That's still sustained, counsel.  Please

10 continue.

11 Q   What can you tell me about your husband's participation in

12 the Singapore filings and proceedings?

13 A   There were multiple hearings that I showed up for in relation

14 to all the three proceedings, but he did not really show up for,

15 I think, five or six hearings, and the Singapore court issued a

16 warrant to arrest because he was evading the hearings.  And then

17 I received a communication from the court stating that the

18 warrant was executed and that he would start appearing for

19 proceedings.

20 Q   Had you notified your husband about your Singapore filings?

21 A   Yes.

22 Q   I am going to show you Exhibit 311.  Is this you notifying

23 your husband of the Singapore proceedings?

24 A   Yes.

25 Q   Why didn't you file for divorce in Singapore?

 1   A    Singapore did not allow me to file for a divorce until I

 2   completed three years of residency or living in Singapore.

 3   Q    Did your husband obtain a protective order against you in

 4   Singapore?

 5   A    I know he has applied for one and there are, like, pending

 6   hearings on it.

 7   Q    Do you recall when he applied for it?

 8   A    He applied for it maybe end of October or even like

 9   mid-November, actually, if I'm right, yeah.  After I withdrew my

10   sort of -- my applications/proceedings in Singapore, I remember

11   that he applied for the protective order in Singapore for

12   himself.

13        MS. SEIPEL:  Your Honor, if I may, I'm next going to ask

14   my client about the filings in India.  Does the Court intend to

15   break at noon?  And if so, this may be a good stopping point.  I

16   believe I only have about 30 minutes left of direct examination.

17        THE COURT:  Counsel, you have only got a limited amount

18   of time.  Let's use the next five minutes.

19        MS. SEIPEL:  Okay.

20   Q    (By Ms. Seipel:)  So, Ms. Sashidhar, I want to ask you now

21   about the legal proceedings in India.  What did your husband

22   file?  Did your husband file anything in India?

23   A    Yes.  He filed for divorce, child custody, and for an

24   anti-suit injunction in India.

25   Q    When did he file for divorce and custody?

1  A   He filed for divorce on September 4th, and the custody and

2  the other filings were done on September 24th or 25th, one of

3  these two dates.

4  Q   Has your child ever lived in India?

5  A   No.  Except for vacations and holidays, we have never lived

6  in India.

7  Q   Did you file anything in India?

8  A   No.

9  Q   Do you have a lawyer in India?

10 A   I have a lawyer in India, yes, but -- they tried to help me

11 with the anti-suit injunction.  There was a proceeding on that.

12 But, yeah.

13 Q   Are the proceedings in India open and ongoing?

14 A   Yes.

15 Q   What legal action have you taken in the state of Washington?

16 A   I applied for my divorce in Washington.

17 Q   When did you file for divorce in Washington?

18 A   On September 6th.

19 Q   Were you still living in Singapore at that time?

20 A   Yes.

21 Q   Why did you file for divorce here?

22 A   Because Singapore did not allow me to file for divorce in

23 Singapore, and, you know, I had been a resident of Washington

24 before, so -- I also intended to always come back, like, so I

25 filed in Washington.

1   Q    What else did you file for in the state of Washington?

2   A    I filed for a protection order in Washington.

3   Q    When did you file for a protection order in Washington?

4   A    I think October 21st.

5   Q    I'm going to show you Exhibit 325.  Is this your protection

6   order in the state of Washington?

7   A    Yes.

8   Q    Does this order prohibit contact between your husband and

9   your child?

10  A    Yes.

11  Q    Has your husband contested the restraining order?

12  A    No.

13  Q    Has your husband attended any hearings on your filings here

14  in the United States?

15  A    Yes.

16  Q    What filings?

17  A    He attended the last hearing on the protection order with his

18  counsel, and then there was a hearing on my divorce motion, one

19  of the motions that we applied for in Washington, and he appeared

20  on that hearing with his counsel as well.

21  Q    When did your husband last have contact with your son?

22  A    His last call to my child was on September 23rd.

23          THE COURT:  Counsel, we're close enough to noon now.  We

24  will take our afternoon break.

25          MR. MIN:  Your Honor, can I just address the Court for

1    one minute about scheduling logistics?

2           THE COURT:  Certainly.

3    You may step down.

4    Counsel.

5           MR. MIN:  Thank you, Your Honor.

6    Taking counsel at their word, they have about half an hour

7    left, give or take, which is somewhat similar to how we did it

8    yesterday, and then we were able to get through my client

9    yesterday.  So I assume, generally, we will get through

10   respondent's testimony today.  That leaves us tomorrow.

11          I'm not sure if Your Honor is like keeping track of time, if

12   we're getting equal time, or if it's just three days and we're

13   done.  I mean, I have my three experts.  They should each be

14   fairly short.  I know respondent has Dr. Poppleton.  I know they

15   have listed probably a dozen additional fact witnesses.  I

16   believe at least one of them will be by Zoom.

17          I just wanted to understand, and I'm happy to confer with

18   counsel during the break, just the Court's scheduling, we are

19   done Wednesday at 4:30, that's the last day, we're not getting

20   any additional days.  That was my understanding.  I just wanted

21   to clarify so that we can work on dividing the rest of the time

22   equitably.

23          THE COURT:  Well, counsel, I didn't divide time.  I

24   don't think that's appropriate in these types of cases.  We do

25   that in civil litigation, traditional civil litigation, but

1    because of the nature of these types of proceedings, we need to

2    move in an expedited fashion, and the Court has done its best to

3    try and accommodate the parties' request to move in that fashion.

4         If you don't finish tomorrow, then you better bring your

5    calendars to figure out the next date that could be accommodated.

6    That's not a license to say you go on and on ad infinitum,

7    because the Court is not going to permit that, but as you know,

8    Thursday is a day of mourning for President Jimmy Carter, who

9    passed away, and this court will not be open on Thursday.  So

10   that propels us into a different time for continuation of this

11   case, if you can't finish tomorrow.  But I would encourage, with

12   all deliberate speed, that you complete the case by tomorrow.  I

13   know, I believe, both parties are anxious about getting

14   resolution for these matters.  So revisit the length and depth of

15   questioning of your witnesses, the length of time that's

16   necessary to accomplish your goals and objectives, and to get

17   your evidence before this Court.  I can't comment on how long

18   your witnesses are going to testify.  I'm not going to limit

19   their testimony.  But I would encourage you to use your

20   reasonable skills and capabilities to move the case in a timely

21   fashion.

22        MR. MIN:  The Court is also engaged on Friday, right?  I

23   just wanted to clarify.

24        THE COURT:  That's correct.

25        MR. MIN:  Thank you, Your Honor.  I appreciate it.

 1            THE COURT:  Anything further?

 2            MS. SEIPEL:  Nothing else, Your Honor.  Thank you.

 3            THE COURT:  Okay.  We will be in recess.  Have a good

 4    lunch.

 5            MR. MIN:  You too.

 6                      (Recessed.)

 7                    AFTERNOON SESSION

 8            THE COURT:  Good afternoon, again.  Please be seated.

 9        Counsel, you may continue your examination.

10            MS. SEIPEL:  Thank you, Your Honor.

11    Q    Ms. Sashidhar, since being in the United States, has your

12    husband given you any financial support?

13    A    No.  He claims to have deposited some money in my Singapore

14    bank account, but I haven't been able to access that here.

15    Q    Have you been able to view what is in your Singapore bank

16    account?

17    A    Yes, I can view it.

18    Q    Did your husband send you money yesterday morning, right

19    before beginning trial?

20    A    Yes.  I got notified of it, yes.

21    Q    How much money did your husband send you yesterday morning?

22    A    I think it was $100,000, plus or minus a few thousands.

23    Q    You testified earlier about a joint Bank of America account

24    in the United States.  Is that account still active?

25    A    It is.  I can view it, but I'm not able to transact in it

1    anymore.

2    Q   Why are you not able to use it anymore?

3    A   It just gives me an error message saying you're not able to

4    do that with the account anymore, and I heard from the bank

5    teller that it's frozen now.

6         MR. MIN:  Your Honor, objection.  Move to strike what

7    she heard from the bank teller.

8         THE COURT:  That's overruled.

9    Q   Between the time that your husband left Singapore and today,

10   did you ever try to use any credit cards that were declined?

11   A   Yes.  I tried to use our Bank of America credit card, which

12   was in my name as well.  There was a transaction that I made, I

13   paid to my lawyer, and that transaction was disputed by Prasanna,

14   and then the card was -- I mean, the access to the card was

15   revoked from me.

16        And there were also, like, credit cards from Amazon and Uber

17   that we use in the U.S. or been doing online shopping.  Those

18   credit cards seemed to have been blocked as well.

19        MR. MIN:  Objection as to what my client disputed.

20   Basis of knowledge.

21        THE COURT:  I will sustain as to the precise dispute by

22   petitioner.  Otherwise, the remainder of the answer stays.

23        MS. SEIPEL:  Your Honor, if I may be heard?

24        Petitioner yesterday testified that he alerted the account to

25   it being fraud.  So that is the basis of her knowledge.

 1              THE COURT:  The objection stays the same.

 2   Q    How many lawyers did you reach out to in an attempt to find

 3   someone to represent you on this Hague Convention matter?

 4   A    At least six or seven lawyers in the Seattle area.

 5   Q    Who?

 6   A    I reached out to Stacy Heard, Amir John Showrai.  I reached

 7   out to David Starks.  I reached out to Maggie Smith.  I reached

 8   out to -- who else? -- Lucia Levias.  And I also reached out to

 9   Mr. Robertson.  I forget his last {sic} name.  Yeah.

10   Q    How old is your child?

11   A    How old is my child?  He is eight years old.

12   Q    What grade is he in?

13   A    He's in grade three.

14   Q    How would you describe his behavior?

15   A    I think he's like an active, very energetic -- generally

16   like, you know, a high-energy child.  He asks to play all the

17   time.  He's drawn to screens a lot.

18        In the recent times or few years now, he does have some

19   behaviors like hitting people.  Like he would hit me or my mother

20   sometimes if, you know, we say something to him and he wants us

21   to follow what he's proposing in that instance.  And -- yeah.

22   Other than that, I think he makes friends, you know, and he's a

23   happy child, I think.

24   Q    How is he at expressing his emotions to you?

25   A    He talks to me about them.  Like I put him to bed every night

1  and that's, like, our moments of connection.  So he will tell me

2  about his day.  He expresses to me about what has happened

3  through the day or how he's feeling, and, you know, we talk about

4  it.  Yeah.

5  Q   Is your child able to express his preferences to you?

6  A   Yeah, very strongly.

7  Q   If your child is ordered to go back to Singapore, what ties

8  does your child actually have to the country?

9  A   I heard yesterday that his school -- I mean, the father paid

10  for the school fees, so he still has a seat in the school.  Other

11  than that, like, I don't think this -- I mean, there's one friend

12  from the new school that he made.  Other than that, I don't think

13  there's any ties that he looks forward to in Singapore.

14         MR. MIN:  Objection.  Outside the scope.  The question

15  wasn't what he looks forward to.  The question is what ties.  I

16  would move to strike the portion of what the child looks forward

17  to.

18         THE COURT:  That's sustained.

19  Q   (By Ms. Seipel:)  How long was your child in his new school

20  prior to you coming to the United States with him?

21  A   About a month, a month and a half.

22  Q   Was your child partaking in any activities or extra-

23  curriculars within that month, month and a half, prior to you

24  coming to the United States?

25  A   After the summer break, he didn't really do any of these

1  activities/hobbies that he was doing.  I think the only class
2  that I took him to was the spiritual teachings class, and that's,
3  I think, just one weekend we went for it, and that's about it.
4  Q   Was there a specific religion that you and your son were
5  learning about in this spiritual teachings class?
6  A   Yes.  We were learning from the scriptures in the Hindu
7  religion.
8  Q   Is your husband religious?
9  A   No.
10  Q   Is your husband anti-religious?
11  A   I have heard him say to me multiple times, and also to my
12  child, that, you know, he believes he is God himself.  He says
13  anything else is just an eyewash.  And he said that to my child
14  as well.  The child had, you know, started kind of saying, "Oh, I
15  don't want to go to these classes."
16  Q   Have you heard from any of your child's friends' parents in
17  Singapore since leaving?
18  A   Two people reached out to me recently because I believe
19  Prasanna had contacted them to come on as a witness in the case.
20       MR. MIN:  Objection.  Move to strike about why she
21  believes they contacted her.
22       THE COURT:  That's sustained.
23  Q   Did your son have a regular pediatrician in Singapore?
24  A   No.
25  Q   Between January 2024 and the time that you and your child

1    came to the United States, did you have any health insurance

2    whatsoever?

3    A    No.

4    Q    Does your child have a dentist in Singapore?

5    A    No.

6    Q    If you are ordered to return your child to Singapore, where

7    will you and your child live upon being returned?

8    A    I have no idea.

9    Q    Why have you put up with your husband's behavior and hung on

10   to your marriage for this long?

11   A    So a lot of times, when incidents happen, I would go back to

12   him and talk to him about it.  I would ask him to, you know,

13   change or hope that he would change.  He would express some

14   things on the line of, "Okay, you know, I will try to change,"

15   but then it always ended up being like what I said is, like, high

16   expectations and I had to reduce my expectations.  And then he

17   would just say that "Let's live like roommates" and things like

18   that to me.

19        And there's -- also, the culture that I come from, like, for

20   instance, like my papers, my side of the family, like they have

21   never seen, like, divorces, and I'm always, like, told that, you

22   know, women have to kind of like go through with things, be

23   tolerant, be patient, and wait, hoping for the husband to change.

24   And it's almost like when you lose your marriage, it's like, as a

25   woman, you have lost your entire life.  I have told -- you know,

1   I'm -- you know, I have feared that at all times.

2       And, also, we have a child together.  I really always worry

3   about, like, the mental state of the child.  And, you know, he

4   needs to have, like, two healthy parents around him, he needs to

5   have a happy household around him.  That's something that I have

6   tried for throughout, until a point where I realized I just

7   cannot sustain it anymore and it's taken, like, an immense toll

8   on me.

9   Q   You testified earlier about your husband kicking you in the

10  back.  What did that do to you emotionally?

11  A   One, I felt scared.  I felt like I have been hurt.  And, you

12  know, what is this person, how come, like, you know, he can hurt

13  me like this.  I was also like really -- I mean, distraught.

14  That I just gave birth to a child and I was on painkiller drugs

15  and I'm sleeping, and then the person kicks me.  And, you know, I

16  just felt like:  Can you have some compassion on me, please?  Can

17  you take care of me?  So those are feelings that I went through.

18  I just felt sad a lot.

19  Q   What did your husband kicking you in the back do to you

20  physically?

21  A   I remember having sustained pain on the lower part of my

22  back, and I went to a doctor to get the back x-rayed.  And I

23  already have, like, an underlying autoimmune condition as well,

24  so I had sustained, like, some sort of an injury, and it took a

25  while for that to kind of go away, you know.  The pain just

1    continued.

2    Q   Did your husband kicking you in the back do anything -- let

3    me rephrase.  Did your husband kicking you in the back affect

4    your parenting capacity at all?

5    A   Yeah.  I mean, I'm in pain.  You know, a part of my brain is

6    just really like anxious and in pain and I'm not feeling happy.

7    So I have always felt, like, if you are sad, that, okay, I want

8    to be a happy parent around my child, and when I feel like I'm in

9    pain, that's not something that I'm able to do.

10       And I remember also like going through periods as far as

11   feeling depressed or sad or feeling stuck kind of.  Like, you

12   know, I want this marriage to be a nicer one, but -- a happier

13   one, but I can't get out of it and I'm hoping for change.

14       So, yeah, postpartum, a lot of this period, I went through

15   like a lot of depression around that time.

16   Q   You testified earlier about an incident with your husband

17   where he either shook you or held you around your shoulder/neck

18   area.  What did this incident do to you emotionally?

19   A   I was really scared.  I felt very intimidated, like I had to

20   back off.  I just felt the need to kind of submit and just say,

21   okay, let's just, you know, cool off, I will do what you want me

22   to do.  That's kind of what I went into.  And, I mean, over a

23   period of time, when, let's say, like these incidents happen or

24   he's like shouting at me and things like that, then I also, you

25   know, had, again, the same feelings of being stuck in the

1  relationship, like neither can I get out.  I want to preserve it

2  for the sake of my child and, like, honor and family and society

3  and things like that, and a lot of feelings of how do I make this

4  better, you know.  So, yeah.

5  Q    What did this incident do to you physically?

6  A    Physically, I don't think there was, like, an immediate

7  repercussion of that, you know, shaking itself.  But my

8  autoimmune condition also tends to, like, flare up immensely when

9  I go through these bouts of stressful periods in the

10 relationship, like then I would have to go on a higher dose of

11 medication, you know, and my pain and things related to my

12 muscles just like gets worse.  So, physically, I would feel

13 effects in terms of how the autoimmune condition had flared up.

14 Q    What are the physical effects of your autoimmune condition?

15 A    I have something called fibromyalgia, you know, in relation

16 to lupus, like so I would have, like, a lot of pain in my

17 muscles.  And then, physically, I would feel extremely tired,

18 like deteriorated, loss of energy.  Like I would wake up feeling

19 extremely drained and tired.

20      And then I have a lot of -- I mean, I get rashes that break

21 out on my skin, like rashes on my scalp and hair.  For example, I

22 lose, like, patches of hair and it gets bald there and things

23 like that.  And when such things happen, it also affects how I

24 feel about myself, and then I start feeling, like, bad about,

25 you know, how I look or something like that.  And I tried really

1  hard to not let that get to me.

2  Q   We viewed an e-mail earlier from your husband admitting to

3  telling you "Go and die."  When your husband told you to go and

4  die, how did that affect you emotionally?

5  A   I remember that being an extremely hard period, like trying

6  to take care of my child, like, early, you know, after

7  childbirth.  And I was already going through like a depressed

8  phase in life.  And I also lost my dad.  I just felt like life

9  has become so dark.  And I myself had, like, suicidal thoughts at

10 that point in time, like I just felt that how do I put an end to

11 this kind of suffering.  Like, you know, it's almost like how do

12 we -- does it get better, how do I hope, do I wait.  And so, you

13 know, I just went through all of those motions, and, emotionally,

14 at that point, I was really, like, broken.  How can somebody that

15 you loved so much come and tell you that go and die, right?  Like

16 what do you mean by that?  Do you want me to get out of your

17 life?  You know, how about the child, right?  Like it made me

18 question a lot of things about my relationship with Prasanna.

19 Q   Prior to your husband telling you to go and die, had you

20 shared with him that you had had suicidal thoughts?

21 A   I don't remember, but he knew that, you know, I was feeling

22 low, kind of.  So I don't really remember if I had told him about

23 this.

24 Q   Had you shared with him that you were feeling low?

25 A   Yes.

1   Q   How did your husband telling you to go and die affect you

2   physically, if it did?

3   A   I mean, so, again, there was no immediate physical harm.  I

4   think it was more of my body reacting to all of this, like just

5   being in a stress mode, and then my autoimmune condition just got

6   like worse off with every passing year, like I just -- you know,

7   I was on a low dose of some smaller medication, and then I had to

8   go to, like, some really high dose of specialty medications and

9   things like that.  So the autoimmune condition just got

10  progressively worse over time, like on the longer term.

11  Q   What about the impact on your parenting?  Did that comment

12  have an impact on your parenting, do you think?

13  A    In that scenario, I remember that my child was, you know, a

14  small, young toddler, like, you know, I was trying really hard to

15  be around him the whole day and like take care of him.  But I

16  would feel a lot of pain, for instance, and I would just -- I

17  just feel like -- I don't remember being like a very happy, sort

18  of healthy parent.  Like I would try to get along with the day

19  and the routines.  Like I would take him to a park, for example,

20  but I'm in extreme levels of pain and, you know, just going

21  through a lot of sadness in your head, and I couldn't really,

22  like, be present as well.  That's my sort of feeling of that

23  period of time with my child.

24  Q   We also viewed an e-mail earlier of your husband telling you

25  that you and your mother have opinions that you are not entitled

1   to have.  What did that comment do to you emotionally?

2   A   Can you repeat that, please?  Entitled to what?

3   Q   We viewed an e-mail earlier of your husband telling you that

4   you and your mother are not entitled to have certain opinions.

5   What did that comment do to you emotionally?

6   A   Well, that -- so I think that e-mail was specifically about

7   me, like, asking Prasanna or requesting, like, you know, why did

8   you leave my child alone and go?  Like, you know, could you have

9   please given him to me?  Like do not expect the other parent to

10  take over.

11      So I definitely felt like Prasanna's care for my child was

12  extremely low.  Like, you know, I have always also -- like,

13  throughout the marriage, this has been something I have asked him

14  for, that, you know, please provide more care for me and the

15  child.

16      And so, emotionally, I think, for me, that was, again, like,

17  you know, in this marriage, as a father or as a husband, is

18  Prasanna able to be there for us?  Is he able to think for us?

19  Like, why does he talk only about himself?  Like, you know, he

20  wants to go out, and that's all about himself, but he doesn't

21  really address what has happened to the child in that moment.

22      So it started making me question, like, you know, how the

23  future or how parenting from his side is going to look like.

24  And, yeah, I just also -- I mean, so what did it feel like when

25  he wrote back that e-mail to me?  I also always felt that, you

1   know, he needs to have the item, I'd say, or control over

2   anything that happens.  Like I cannot really, like, push back

3   even on matters where I was given like the primary

4   responsibility, like I'm the primary parent -- I think he talks

5   about it in that e-mail, like, you know -- but when I tell him

6   something, he just wouldn't -- he still wouldn't agree, ever.

7   He's just like it's my way or the highway, and that's all he

8   tells me all the time.

9   Q    You testified earlier about your husband forcing sex on you.

10  What did that do to you emotionally?

11  A    I felt very violated, you know.  I would feel that -- I would

12  really always like wish for, like, some care and protection and

13  feelings of possessiveness that you express -- or expect from,

14  like, the masculine person that you're married to, kind of, you

15  know, but I felt like I missed out on all that and -- I mean,

16  emotionally, of course, it was not happy.  I did not enjoy it.  I

17  just wanted to, like, walk out.  I remember bursting out in tears

18  multiple times.  Like there were multiple instances when he's

19  forcing sex on me, I would cry, and he would like, you know, end

20  up telling me, did that pain -- he will not address it, but he

21  would be like, "Oh, even through your pain, like you did this for

22  me, and thank you for that."  And, you know, I would just think

23  to myself that there should be some way to make this better, like

24  we -- I took him to a therapist, for instance, like we did

25  counseling sessions and so many things like that.  And it's just

1    I'm stuck, that's another feeling, like I have to do it.  If not,

2    I know this marriage is just going to break.  You know, he will

3    go out to other women.  So I was also scared of that.

4    Q   What did your husband forcing sex on you do to you

5    physically?

6    A   Physically, I mean, pain, I will end up crying, it feels very

7    violating, like, you know, and I think part of that is all these

8    feelings manifest on my autoimmune condition in the end, like the

9    flare-ups just get worse off.

10       And I also have this deep fear of contracting, like, sexually

11   transmitted diseases from him.  Like I have confronted him and

12   he's also, like, accepted too now, like, you know, seeing women

13   outside of marriage, like regularly visiting prostitutes, that

14   that was where like, you know, our marriage broke.  And for me,

15   the deepest fear is like physically contracting a disease from

16   him, either me or even my child.  Like I know it's not sexual,

17   but if they exchange like food or saliva, he kisses the child on

18   the mouth, I'm really scared.

19   Q   What did your husband forcing sex on you do to your parenting

20   capacity?

21   A   Over a period of time, for the most part, just feeling

22   violated.  And also like carrying forward with doing similar

23   things, I feel like it has destroyed my sense of self.  Like, you

24   know, I question like, you know, okay, what am I doing, like, you

25   know, do I continue living with self-respect?  Like am I

1    actually, like, giving into a person just to preserve the

2    marriage?  But that also means like I'm violating myself.  And I

3    felt like much lower in terms of how, you know, I could have

4    operated.

5        Like I definitely feel a marked difference in how I used to

6    be, like, you know, as -- I don't know.  As I graduated out of

7    university, I was working in the Netherlands, I had a career of

8    my own, you know.  I just felt that I was a different woman, like

9    I was happening, I was feeling good, like -- and then from there

10   to now, this more just negative feelings that are inside of me.

11       So when I parent my child, like, you know, I feel that is

12   taking a toll on me, like I could do a lot more as a happier

13   parent.

14   Q   What do you think about yourself?

15   A   I think of myself as a -- I don't know.  I used to think of

16   myself as an ambitious, passionate girl, but now I think of

17   myself mostly as a mom, a patient, kind of tolerant person, and

18   now, yeah, I kind of feel like myself, my identity, is lost

19   somewhere.  Like, you know, I tried to find a job.  I don't have

20   a job now.  So I'm, like, so where do I belong?  Like do I have a

21   career?  What am I supposed to be?  Like, for the most part, I

22   just feel that the strongest identity I have around me right now

23   is being a mom to my child.

24   Q   You testified earlier about your husband forcing anal sex on

25   you.  What did that do to you emotionally?

1  A    I just remember crying, crying a lot about it, like -- and he

2  would tell me that, you know, "I went to Thailand and, you know,

3  I can get this all the time.  Like you're just, like, acting like

4  it's hard for you."  But it pains like -- yeah.  I've cried like

5  many nights thinking about, like, I wish my husband was more

6  caring about me than this.

7  Q    Would your husband praise you for going along with it?

8  A    Yeah.  He would say, "Oh, even if you had pain, you did this

9  for me, like, you know, thank you."  That's something that he has

10  like said in the past, yeah, even after these incidents.

11  Q    What did your husband forcing anal sex on you do to you

12  physically?

13  A    I was in pain like, you know, a day or two, and then ...

14  Q    You testified about an incident on August 31st, 2024, where

15  your husband made some threats to you and also punched you in the

16  chest.  What did that do to you emotionally?

17  A    Emotionally, I think it was already a very sort of turbulent,

18  very low period, because we had decided that, you know, we're

19  going to break up, and he was trying to force this financial

20  settlement deal on me, like stating that, you know -- he said

21  that he'll pay me like a million dollars in an escrow and he

22  decides where I should live; I need to grow up the child and he

23  will come and visit and be with the child whenever he wants

24  inside the house.  He's, like, you shouldn't ask an attorney

25  about this, I want you to sign it, and, you know, I just said,

1    no, I'm not going to sign it, and then I -- I mean, I could

2    see -- foresee like, you know, where this is all going to lead,

3    like, you know, he just wanted to -- I don't know -- still keep

4    me under his sort of box and control and like just use that.  He

5    had the finances, I didn't have it, and he was going to use it

6    against me.  So I felt financially very insecure at that point.

7        I also felt that I was stuck, like I needed a way to kind of,

8    like, help myself through this situation, like come out of this

9    divorce and be all right, you know.

10   Q    How did that incident affect you physically?

11   A    Physically, I had like a few, like, bloody bruises on my left

12   hand, and I think I had a little bit of a redness, like a

13   contusion, on my chest where he had punched me.

14   Q    Did you go to the hospital and have an exam after that

15   incident?

16   A    Yes.

17   Q    When your husband left you and your child in Singapore from

18   August 31st until you came to the United States in October, how

19   did that make you feel emotionally?

20   A    Can you repeat the question, please?

21   Q    When your husband left you and your child in Singapore from

22   August 31st until you came to the United States in October, how

23   did you feel about that emotionally?

24   A    I think that period was one of the toughest times to ever go

25   through.  Like, I mean, imagine living in a house where you don't

1    know, when the next time you change your clothes, if somebody is

2    watching you on a cam.  Like, you know, I was insanely stressed

3    out and just figuring out -- and I felt very like, again, stuck,

4    confined.  The child's passport was gone.  Like I couldn't even

5    leave the country, if I wanted to.  And I didn't have money to --

6    you know, in my bank account to look at, okay, what am I going to

7    do in the next, like, couple of months with it.  And we were in a

8    house where the rent was $20,000 a month.  Like even if I used my

9    savings, there was no way I could like, you know, sustain paying

10   that kind of rent.  And I tried finding a job.  I was told that,

11   you know, I'm not eligible to legally work in Singapore.  It's

12   not easy to find a job there either.

13        And I went through a lot during that period.  I just did not

14   know how to cope with it.  But, you know -- and my feelings were

15   also that my child, he was also with us, and, you know, getting

16   affected by it.  There were nights that he would cry himself to

17   sleep, asking like, you know, "Where is Daddy," when he's coming,

18   and things like that.  And, you know, I just had to kind of like

19   find a way to make us feel, like, safe and stable, and that's --

20   I just -- those two months were just insanely harrowing, like to

21   think how to move life forward.

22   Q   When your child would ask you things like "Where is Daddy,"

23   would you talk to him about what was going on?

24   A   Yes.  After Prasanna left, like, he also did, you know, call

25   the child, and he was telling the child that he's going to come

1    back after his trip.  So I would say the same things to him.  And
2    my child obviously -- I mean, I think he's perceptive enough to
3    understand that we were like, you know, going through sort of a
4    negative period.  So, you know, he worriedly asked me, "Mommy,
5    what's happening?"  Then I would tell him that, you know, "We are
6    going through a divorce.  This means like, you know, Mommy and
7    Daddy probably will not stay" -- I mean, "will not live in the
8    same house, but I'm still your mom, he's still your dad.  Come
9    with me, like, you know, we'll take care of you, don't worry
10   about it."  This is kind of how I used to talk to him when we
11   were in Singapore.
12   Q   When you discovered all of the video cameras around your
13   home, what did that do to you emotionally?
14   A   I was shocked, insanely shocked, that, you know -- and I felt
15   betrayed in every sense of the word.  Like you live with someone
16   for ten years, you think that, you know, there will be some
17   decency or decorum of how you part ways.  But why put cameras in
18   my bathroom?  I felt, like, extremely like violated, and I was
19   scared.
20        Like the other side to this is my mother was with me too,
21   and, you know -- and, again, in my sort of family or the society
22   that I come from, like having naked pictures of yourself online
23   or being released outside, it's like -- it's a shame to you.  I
24   mean, even though it's being committed to you, like people look
25   down upon you rather than, you know, talk about it.  So I just

1   was very scared of, like, who has access to these cameras and,

2   like, what are they doing with all these pictures and why is it

3   in the house in the first place or -- yeah.

4        I went to the police the night that I discovered that these

5   were cameras, and they helped, like, remove the remaining cameras

6   from the house.

7        The other problem was that, also, I'm stuck in that house.

8   Like, you know, how do I clean up the house?  How do I live

9   peacefully, you know, in the house?  And I contacted the police

10  and they said they're not able to search the house, like I would

11  have to get, like, a personal detective who could come in and

12  like do the search for me.  I contacted a personal detective.

13  He's, like, to search your house, it's going to cost like 2,000,

14  $3,000, and I couldn't afford it.  Like I literally could do

15  nothing about it.  Even if I took out a few devices that were

16  front of my sight, like I don't know what else was there.

17  Q    Did your husband putting video cameras in your house affect

18  you physically?

19  A    I mean, again, that, I think, is just manifestation of the

20  emotional stress.  Like, you know, my autoimmune condition is

21  probably like at an all-time high right now.  Like, you know, I'm

22  having to take a lot of medication just trying to go through all

23  of this stuff.  And navigating like, you know, the cameras was

24  hard on me.

25  Q    Did it have any impact on your parenting?

1  A   Well, for one, like what do you tell a child who is seeing

2  police come into the house and remove stuff from your bathroom?

3  Like my bathroom has a wall hole that had, like, live wires.

4  Like, you know, I had to ask him, "Don't touch the wires.  We

5  have to cover it up."  So, you know, he's like "What happened,

6  Mommy?"  And I had to talk to him about this, that, "You know, I

7  think there was a camera here.  We got rid of it."  You know, I

8  had to tell him "You're safe."  And the whole -- I mean, the

9  series of incidents, as it is, I think the level of time and

10  energy that I have for parenting has definitely -- you know, like

11  it has been impacted.  Like I try really hard to put my child as

12  the first priority like, but I still need to attend to a lot of

13  these things and cope with this emotionally.

14      The hardest thing has been to, like, hide all of this in

15  front of my child and just, you know, go through with like

16  day-to-day life.  Like I can't break down in front of him.

17  Q   You testified earlier about your husband threatening to leave

18  you and your child on the street.  What did that threat do to you

19  emotionally?

20  A   Extremely -- feelings of, you know, insecurity, like what do

21  you do with life, like do I have a job.  Like, you know, I

22  started like -- I would always keep thinking in my mind like, you

23  know, if there was a -- if there was a situation where like the

24  husband took all the money to himself, he's not paying anything

25  to me and my child, and I would have to think through, like, how

1   to support us.  For example, like, I mean, these days, I am going

2   through that, and I don't sleep in the night.  You know, when I

3   try to fall asleep, I'm thinking about what do I do for, you

4   know, the next set of months, like how do I make sure that we're

5   financially like well covered, that we are safe, and that, you

6   know, my child can have a safe and stable life.  I don't want to

7   keep also disrupting like, you know, his life through all of

8   this.

9           THE COURT:  Let's take a stretch break.

10                      (Stretch break.)

11          THE COURT:  Counsel, we're 45 minutes into the afternoon

12   session.  You indicated previously it was going to be about

13   30 minutes.  Where are you now?

14          MS. SEIPEL:  I have about four more incidents I want to

15   go through with my client and then two or three questions to wrap

16   it up.

17          THE COURT:  Two or three questions left or two or three

18   more incidents?

19          MS. SEIPEL:  Both.  Two or three more incidents and two

20   or three questions following that.

21          MR. MIN:  Your Honor, can I just run to the restroom

22   very quickly?

23          THE COURT:  Yes.

24                      (Off the record.)

25          THE COURT:  Please be seated.

1      You may continue.

2           MS. SEIPEL:  Thank you, Your Honor.

3   Q   (Ms. Seipel:)  Ms. Sashidhar, you testified earlier about

4   your husband saying to you that your money was his money.  How

5   did that affect you emotionally?

6   A   So when I started off in the marriage, my understanding was

7   that whatever we earned belonged to the both of us, whether I

8   earned it or he earned it.  And then when he said this, I kind of

9   felt that -- it just broke my view of what I endured this

10  marriage in with.  And it kind of also felt suddenly that, you

11  know, I have to think twice about, like, you know, how I would

12  live my life like financially independent.  After that, like I

13  felt very insecure.  And, you know, just, like, what did he mean

14  by, like, all of the money is his?  Like, you know, how is life

15  going to look like, without questioning the whole construct of

16  the relationship?  And, yeah, it was scary.  Because, at that

17  point, I also had our child, like, you know, and I was a

18  stay-at-home mom then, like I really wasn't making any money.  I

19  really didn't have savings for myself in California when this

20  incident had happened.  So then I started -- I just think that

21  some sort of survival instinct kicked in and I was like maybe --

22  I need to get back at a job, like I need to make my own money.

23  So that's what I went through.

24  Q   You testified earlier this morning that your husband forced

25  you to have sex with his friends.  How did that affect you

1   emotionally?

2          MR. MIN:  Objection.  Mischaracterization of the

3   testimony.

4          THE COURT:  Sustained.

5   Q   You testified earlier about having sex with your husband's

6   friends.  What did that do to you emotionally?

7          MR. MIN:  Objection.  Mischaracterization of the

8   testimony.

9          THE COURT:  The same ruling.

10  Q   You testified earlier about your husband wanting you to have

11  sex with his friends.  What did that request do to you

12  emotionally?

13  A   I felt really destroyed.  I was, like, how can my husband

14  have such thoughts?  You know, I just felt very vulnerable.  I

15  felt really scared, like I didn't want to do it.  Like I

16  definitely felt, like, I hoped that, you know, he's not going to

17  force me into it.  And I felt very -- yeah, I just -- I just

18  didn't feel right about it.  I just felt that, you know, it's not

19  something that's like -- it's not a -- it didn't come across even

20  as a good intention.  I felt that he cared very little about me

21  at that point.  Very little compassion to what I might go

22  through, you know, when he says something like that.

23  Q   After the incidents we went through, those sorts of things

24  happened, what was the aftermath like?

25  A   So they asked for open marriages, is that what you're asking

1    about?  Like what happened after that?

2              MR. MIN:  Objection as to form.

3              THE COURT:  The witness asked for a clarification, so

4    I'm not certain what the question is, nor is the witness.

5        Rephrase the question, counsel.

6    Q    (By Ms. Seipel:)  The incidents that we have just gone

7    through, after incidents with your husband like this happened,

8    what was the aftermath like?

9              MR. MIN:  Objection.  Vague and calls for a narrative.

10             THE COURT:  It's overruled.

11   A    I mean, it's a deep sense of -- I mean, when I think about

12   how it feels in my mind, it's like a deep sense of darkness.

13   It's like I just feel, like, you know, life is lost, kind of.

14   Like, you know what, what is happening, sort of like a lot of

15   sadness and feeling depressed about it.

16       And, in general, all of the incidents that have happened is

17   also like, you know -- it's like what you dream for yourself,

18   somebody else just kind of, like, took that away from you and

19   they just walked all over you.  That's kind of the feeling that I

20   have, yeah.  And it's left me, like, scrambling for life, trying

21   to figure out how am I going to support myself, how am I going to

22   support my child.  I want to make sure that, you know, we are,

23   like, in a good place, like my child is, like, having a happy

24   life going forward.  So it's just kicked in a lot of, like,

25   instincts in me to protect ourselves, for example, like to make

1   sure that we don't get violated by, like, more things that people

2   can do to us.  That's a strong instinct that comes out for me.

3        And the other part of this is also, like, you know, I feel

4   more strongly about how my child needs to be raised.  Like, you

5   know, he needs to know the right from wrong and he needs to

6   actually kind of, like, learn compassion, certain values that I

7   feel, you know, he needs to see from the parents.

8        So those kinds of thoughts are what are running in my head.

9   So, yeah.  I mean, is that the question?  Does it answer the

10  question?

11  Q   How many people have you talked to about the things you've

12  talked to us about today?

13  A   Oh, it's been an insanely hard time.  I can count, like,

14  members of the family and then some friends, and then to the

15  police and then to lawyers and then to therapists.  So, yeah,

16  it's been a lot of people.  And it's just been so hard going

17  through the whole thing again and again.

18  Q   How do you hold yourself together?

19  A   Well, I think I have my moments.  Like, I don't know, maybe

20  like cry in the bathroom.  And then in my sleep, like, you know,

21  I -- I think I go through all of these insecurities, and I try --

22  I have, like, some friends that I talk to, for instance, who try

23  to hold me up through like bad times, and -- yeah, that's stuff

24  that I can think of.

25  Q   After you testified this morning, what happened over the

1    lunch break?

2          MR. MIN:  Objection.  I'm not -- objection as to

3    relevance.

4          THE COURT:  It's sustained.

5          MS. SEIPEL:  Your Honor, it goes directly to her state

6    of mind, her emotional state.  Domestic violence, domestic abuse,

7    how it affects her, how it could affect the child, and how that

8    relates to grave risk is directly in play in this case.

9          THE COURT:  Counsel, you are referring to something that

10   happened over the lunch period.  The Court has grave questions

11   about the relevance of what incident.  Perhaps if you want to

12   make a proffer to the Court to make a record of what you believe

13   took place over the lunch hour, but based upon the questions you

14   have asked and your summary of the response to the objection, I'm

15   going to sustain the objection, unless you can add something

16   else.

17         MS. SEIPEL:  Okay.

18   Q    (By Ms. Seipel:)  You just testified about crying in the

19   bathroom.  When was that, the last time you did that?

20   A    I did that during the lunch break, in the bathroom now,

21   after -- you know, during the court lunch break now.

22         MS. SKINNER:  I have nothing further.

23         THE COURT:  Cross-examination.

24         MR. MIN:  Thank you, Your Honor.  If I can just have a

25   moment to set up.

1                           CROSS-EXAMINATION

2     BY MR. MIN:

3     Q    Good afternoon.

4          While living in the United States, did you ever purchase a

5     home?

6     A    No.

7     Q    When you left for Singapore in 2022, did you or your husband

8     have any real property interest in the United States?

9     A    No.

10    Q    Did you maintain U.S. life insurance from the summer of 2022

11    consistently through the summer of 2024?

12    A    I know for a part of it there was a life insurance through my

13    employer, but I don't know until what date it's maintained.

14    Q    I'm talking about health insurance, and I apologize for not

15    being clear about that.  Did you maintain U.S. health

16    insurance --

17    A    We did.

18    Q    Well, let me finish the question.

19         -- from the summer of 2022 continuously through the summer of

20    2024?

21    A    I think the health insurance, like, was maintained until

22    January or February 2024.  Not till the summer.

23    Q    And then you restarted it at some point?

24    A    No.

25    Q    So you don't have health insurance in the U.S. right now?

1    A    Right now, there's no health insurance.

2    Q    There no health --

3    A    I mean, to be correct, right now, I do have a health

4    insurance covering myself and my child in Washington.  Yes, I do

5    have, right now.

6    Q    That's what I'm asking.  When did that start?

7    A    That started from, like, the 14th of October, when I came

8    here.

9    Q    Okay.  Did you provide any U.S. health insurance proof in the

10   discovery in this case?

11   A    I don't remember.  I can check back.

12   Q    But you didn't provide it on your exhibits, right, for trial?

13   A    I do not know that.  Like, I think ...

14   Q    Isn't it true that your husband stopped getting paid by

15   Rippling in December of 2022?

16   A    I believe so.

17   Q    And earlier you testified that you were unable to open a

18   Singapore bank account because of your Dependent Pass status,

19   correct?

20   A    Correct.

21   Q    But you have a Singapore bank account, correct?

22   A    Correct.  They did not allow me to open it.  I had to show my

23   Microsoft employment status, based on which they ended up

24   allowing me to open the account.

25   Q    Okay.  So you are able to open a bank account in Singapore,

1    to be clear?

2    A    If I go back now on a Dependent Pass, I am not allowed to

3    open a bank account.  I tried --

4    Q    What's the basis of you stating that?  How do you know that?

5    A    I tried that during the interim period, because people were

6    trying to help me by, like, loaning me money in Singapore.  They

7    didn't want to put it into the account, you know, that I already

8    had.  But the bank refused to let me open a new account.

9    Q    Do you have a bank account right now --

10   A    Right now --

11   Q    -- in Singapore?

12   A    -- I do have a bank account.

13   Q    You testified earlier that you brought medication with you

14   from the U.S. to Singapore when you moved, right?

15   A    Yes.

16   Q    For your autoimmune disease?

17   A    Yes.

18   Q    Okay.  And then you said you would have to go back to the

19   U.S. every six months to get more, right?

20   A    Yes.

21   Q    You never did that, though, right?

22   A    No, we never came back to get more.

23   Q    In fact, you were given new medication in Singapore to treat

24   your autoimmune disease, right?  Correct?

25   A    I was given an older medication, which was available in

1    Singapore, and I had to kind of make do with it.

2    Q    So you received medication in Singapore to treat your

3    autoimmune disease, correct?

4    A    I actually received medication from India and not directly in

5    Singapore.  So I actually, like, ended up buying my medicines in

6    India through my rheumatologist in India.

7    Q    You never received medication from Singapore?

8    A    I did receive some medication in Singapore too.  But is it

9    related to my autoimmune condition, I mean, yeah, I did like

10   Panadol in Singapore, for example.

11   Q    And did you receive medical care in Singapore?

12   A    I received medical care in Singapore.

13   Q    Isn't it true that your husband's father speaks to your son

14   in Tamil?

15   A    No.

16   Q    No?

17        He speaks to him in English; that's your testimony?

18   A    I mean, people speak to my child, but does he -- yeah, I

19   mean, he might have spoken to my child in Tamil.  Okay.

20   Q    Okay.  So your son --

21   A    I have not observed, so I am not able to comment on this.

22   Q    You've never observed your father-in-law and your son

23   communicate?

24   A    No.

25   Q    What about your mother, does your mother communicate with

 1  your child in Tamil ever?

 2  A    She -- she speaks, for the most part, in English.  My son

 3  responds in English.  We do try to, like, teach him some words in

 4  Tamil.

 5  Q    So sometimes she speaks to him in Tamil?

 6  A    As a language, when we're talking to each other, it's always

 7  in English at home.

 8  Q    Did you have, at some point in the child's life, a

 9  housekeeper who only spoke Tamil?

10  A    Yes.

11  Q    Did your son communicate to that person?

12  A    There always had to be like a mediator.  So it would be me

13  explaining things of what she's saying.  And she started learning

14  English from my child.

15  Q    A.S. started preschool in Washington State in or around March

16  or April 2021, correct?

17  A    Yeah, he did preschool in California already.  But, yes, in

18  Washington, he started around, like, I think February or March

19  2021, yes.

20  Q    Okay.  I'm going to -- you recall you were deposed in this

21  case?

22  A    Yes.

23  Q    Okay.  And you swore to tell -- answer questions under oath?

24  A    Yes.

25  Q    Truthfully?

 1  A    Uh-huh.

 2  Q    So I'm going to show you a page from your deposition, and

 3  page 63, Bates stamp page 2442, lines 12 to 16:

 4       Q.  "At what point did A▮▮▮ start attending any

 5       school, be it virtual or physical in Washington?"

 6       A.  "I think it was like the early months of maybe

 7       like March/April 2021."

 8       Was that the question that you were asked and the answer you

 9  provided?

10  A    Yes.

11  Q    You also applied to private schools in Washington, correct?

12  A    Yes.

13  Q    And you were planning on moving him out of the Montessori

14  school and putting him into private school, correct?

15  A    Correct.

16  Q    And the Montessori school was the second school that he

17  attended in Washington, not the first, correct?

18  A    Correct.

19  Q    And so the Montessori school wasn't a long-term schooling

20  option for your child, correct?

21  A    When we enrolled him initially, that's the thought, you know,

22  because they were the only ones that had an open spot and I

23  wanted to try out a Montessori system for our child.  So that's

24  why we applied for private schools and would put him in the

25  Montessori school for the interim period.  He ended up liking it

1    very much, and he chose to continue it, so we had to forego the

2    admits from the private schools in Washington.

3    Q    But he started kindergarten, correct?  The fall of 2021 was

4    kindergarten, correct?

5    A    Fall of 2021 was kindergarten, that's correct.

6    Q    And after that, was he going to stay in Montessori?

7    A    Yeah.

8    Q    But when you moved to Singapore, you gave up the spot at the

9    Montessori school, correct?

10   A    Correct.

11   Q    Would it be fair to say in the first six or nine -- six to

12   nine months after arriving in Washington that A.S. did not engage

13   in any extracurricular activities?

14   A    Well, the first six months of moving to Washington was the

15   peak of COVID and, yeah, I would think it would put my child at

16   risk if we had done anything, you know, in a group setting.  But

17   did he do something at home?  I would have to think back.  Like a

18   virtual coding lesson or something, I don't remember.

19   Q    Okay.  But social, out-of-the-home, structured activities in

20   the first six to nine months after arriving in Washington, he did

21   not engage in any of those types of activities, right?

22   A    He had one buddy, the friend, with whom he did the learning

23   board.  So all of our social activities were confined to like

24   that family and a few others that we met.  We didn't really do

25   anything beyond that.

1    Q    Would it be fair to say that due to the COVID-19 pandemic,

2    you spent most of your time at home while you lived in

3    Washington?

4    A    I mean, we loved spending time outdoors as well.  Like the

5    first few months maybe after coming in, I don't know, I remember

6    like going to the parks nearby, yeah.  As a family, we would do

7    like short hikes and stuff.  But a large part of it indoors,

8    yeah.  We really didn't socialize much.

9    Q    Would it be fair to say that A.S. had more friends in

10   Singapore than he did during his time in Washington, prior to

11   2022?

12   A    I don't -- I mean, so he was in a Montessori classroom with

13   like 25 kids, and he was, like, close to more kids in that class

14   than I have ever seen him be, like, in any school in Singapore.

15   Like it was a hand-picked few kids in the Singapore schools as

16   opposed to, like, you know, the Montessori classroom.  I think

17   that classroom just promoted a whole lot of, like, you know, good

18   relationships between the kids.

19   Q    But isn't it true that he only socialized with a couple of

20   children outside of the school environment between 2021 and 2022?

21   A    Outside of the school environment, in 2020, yeah, we

22   socialized with our neighbors, like my friends' kids, Prasanna's

23   friends' kids.

24        Can I ask you to ask the question again, please?

25   Q    Sure.

1      Isn't it true that he only socialized with about two to four
2    children outside of the school environment between the years 2021
3    and 2022?
4    A    That's not true.
5    Q    That's not true.
6      I'm going to show you a page from your deposition, page Bates
7    stamped P2479, page 100 of the transcript, lines 14 to 21.
8        "Okay.  How many friends would he socialize with
9        outside of the school environment during -- between
10       2021 and 2022?"
11       Answer:  "That's a difficult question to answer
12       actually, how many friends.  Maybe I won't have, like,
13       perfect numbers for you, but like I said, like there
14       were two kids -- Utkarsh's two sons and then the
15       cousin's two daughters."
16       Is that the question you were asked and the answer you
17       provided?
18   A    Yes.
19   Q    Is it fair to say that the only family members of your family
20   and your husband's family that visited you in Washington during
21   the time you lived there between 2020 and 2022 was your mother?
22   A    Yes.  And there's also like Prasanna's cousin that lives
23   here in Washington.  They would visit us from time to time.
24   Q    So you're saying other family members visited you while you
25   lived here between 2020 and 2022?

 1   A    My mom was the closest one, but the other extended family

 2   members was this Prasanna's cousin that we just read about, like

 3   who has two kids, they would come over for playdates or, you

 4   know, spend some time with us.

 5   Q    In terms of your family, though, specifically it was just

 6   your mother?

 7   A    In Washington, yeah, it was just my mother.

 8   Q    Is it accurate to say that A.S. had more frequent visits with

 9   his family, meaning your family and your husband's family, while

10   he was living in Singapore between 2022 and 2024?

11   A    No.

12   Q    You had family visit Singapore on multiple occasions,

13   correct, while you were living in Singapore?

14   A    Yeah.

15   Q    Aside from your mother, you had other family members come

16   visit, including cousins and aunts and uncles, correct?

17            THE COURT:  Counsel, you need to slow down in your

18   questioning.

19   Q    In addition to your mother, you had other family members come

20   to visit you in Singapore, including your cousins and your aunts

21   and uncles, correct?

22   A    I had one cousin that visited me.  She also visited me in the

23   U.S.  And the aunt and uncle -- I mean, the uncle visited me in

24   the U.S. as well.  So I don't see why -- I mean, I don't know how

25   to answer that question.  Like, they have all visited me in the

1    U.S.  They also visited me in Singapore.

2    Q    In Washington?

3    A    Not in Washington.  They visited me in California.

4    Q    But that wasn't the question I asked.

5         I asked you if A.S. had more frequent visits with his family

6    while you were living in Singapore than when you were living in

7    Washington.

8    A    Okay.  So how to answer -- how do I answer?  What is

9    "frequent," right?

10        Like if my mom came to visit in Washington, she could stay

11   with me for six months, whereas if she came to visit us in

12   Singapore, she could only stay with me for one month.  So, I

13   mean, she had to visit us like a second time, you know, like

14   within, like, six months to be around us.  So, yeah.  Then -- and

15   by that, if you were just counting the number of times they took

16   a flight and came home, then, yes.

17   Q    And then you had other family members, aside from your

18   mother, visit you while you were living in Singapore, correct?

19   A    Yeah.

20   Q    And your husband also had more family members come visit you

21   while you were living in Singapore, correct?

22   A    His brother visited us in the U.S., he visited us in

23   Singapore, yeah.

24        His father visited us -- the husband's father visited us once

25   in Singapore.  He has never visited us in the U.S.

1    Q    Would it be fair to say that you took more trips to India

2    while you -- during the two years you were living in Singapore

3    compared to the two years you were living in Washington?

4    A    So the year we were living in Washington was a COVID year.  I

5    could not have, like, taken a trip to India even if I wanted to.

6    And my mother was here with me, so I do not know if, you know --

7    I mean, the second year, I went two times to India.  But even in

8    Singapore, I probably go like two to three times, maybe two

9    times, to India.  So I couldn't, like, say the exact numbers

10   there.

11   Q    Okay.  In the summer of 2023, did you have discussions with

12   your husband about having another child?  "Yes" or "No"?

13   A    Summer of 2023, yes.  We had the discussions even before the

14   summer, yes.

15   Q    Okay.  I'm going to just ask you, if I ask you a "Yes" or

16   "No" question, just to answer "Yes" or "No," if you are able,

17   okay?

18        And was your hope that the surrogate -- or withdrawn.  Were

19   you discussing having a child through surrogacy?

20   A    Yes.

21             MS. SEIPEL:  Objection.  Outside the scope.

22             THE COURT:  That's overruled.

23        You may answer the question.

24   A    I said, "Yes."

25   Q    And was it your hope that the surrogate would have the child

1    by the summer of 2024?

2    A    Yes.

3    Q    Did that happen?

4    A    No.

5    Q    When you moved to Singapore --

6            THE COURT:  Counsel, we're right at the 2:45 mark.

7    Before you ask the question, is this a good time to break?

8            MR. MIN:  Sure.  Any time is fine.

9            THE COURT:  All right.  We will take the afternoon

10   recess.

11           THE CLERK:  Please rise.

12           THE COURT:  You may step down.

13                    (Recessed.)

14           THE COURT:  Good afternoon.  Please be seated.

15       Counsel, you may continue your cross-examination.

16           MR. MIN:  Thank you.

17   Q    (By Mr. Min:)  You testified earlier that you expected to be

18   in Singapore for one year at most, correct?

19   A    Yeah.

20   Q    What was that based on?

21   A    Based on my conversations with Prasanna.

22   Q    Did you guys have an agreement that you would come back after

23   a year?

24   A    Yeah.  He told me that once the trust is settled, we could,

25   like, come back.

1    Q    My question was, did he tell you that you guys would come

2    back in a year?

3    A    No.

4    Q    So, again, where did this one year come from?

5    A    I mean, I think that it was my, sort of, understanding.  And,

6    also, it was a temporary period.  And like the visa stamping in

7    the beginning, I think, was either one or two years maximum.  So

8    I feel like my understanding at that point was one year.

9    Q    So did you have any conversations with your husband about how

10   long you would be in Singapore for?  "Yes" or "No."

11   A    Yes.

12   Q    Yes.  Okay.

13        And so can you describe when you first started having

14   conversations with your husband about how long you would be in

15   Singapore for?

16   A    So like this conversation started when he decided that he

17   would move the assets to himself and we'd be out of the country.

18   Like, you know, so his estimate was before his brother gets

19   married.  So he was like maybe a year, like, you know, that we

20   would be able to move the funds into an asset, so like an

21   overseas trust.  This is kind of the conversation that we had.

22   Q    So he told you that it would be like a year?

23   A    I don't remember specifically, but, you know, I think I

24   remember asking like, you know, what time frame his brother was

25   getting married, and like if we moved, then, like, you know, by

1    when we will be able to do it, to do the trust thing, you know.

2    Q    And when did that conversation take place when you asked him?

3    A    When -- I don't remember the time frame.  Maybe 2021, like

4    when we started talking about this.

5    Q    Okay.  And so let's go to the first half of 2022.  Before the

6    move to Singapore, did you have continued conversations with him

7    about how long you might remain in Singapore for?

8    A    I don't think we had conversations after that about how long

9    we'd --

10   Q    I apologize.  You did not have conversations?

11   A    I don't remember, like after 2022, in the beginning, I don't

12   know if we had the same conversation again.

13   Q    Okay.  So after you moved to Singapore in the first -- the

14   last six months of 2022, did you have continued conversations

15   about how long you would be in Singapore for?

16   A    No.

17   Q    So when you were looking for homes in Singapore, you were

18   aware that you were signing a lease for Admore Park, correct?

19   A    Yes.

20   Q    And were you aware that the lease was for two years?

21   A    Yes.

22   Q    And did you ever tell your husband, "Why are we signing a

23   lease for two years if we're only going to be here for one year?"

24   A    Yes.

25   Q    You did.

 1        What did he say?

 2    A   So the real estate agent spoke and they said that nothing

 3    less than two years could be signed, and I remember being told

 4    that if within one year, we had to end the lease, there's

 5    something called a "diplomatic clause" that was on the lease, so

 6    if we gave up our passes and left Singapore, we could cancel the

 7    lease.

 8            MR. MIN:  Your Honor, I would move to strike as

 9    nonresponsive.  The question is what you and your husband talked

10    about with respect to the two-year lease and your understanding

11    that you would be there for a year.

12            THE COURT:  The motion to strike is granted.

13        Answer the question.

14    A   Can you please repeat the question to me?

15    Q   Sure.

16        Can you describe the conversations you had with your husband

17    when you realized that the lease for Admore Park would be for two

18    years?

19    A   Yes.  I asked him, "Could we sign the lease for a year?"  And

20    he said that there is not a possibility to sign for a year.  The

21    least they would offer is two years.  But I remember asking him,

22    "So if we have to move, then what happens?"  And there was a

23    diplomatic clause that he told me about that was in the contract.

24    I also read the contract along with him, and I signed it.

25    Q   Okay.  When you arrived in Singapore, you were a dependent on

1    a Tech.Pass, right?

2    A    Yes.

3    Q    And your understanding is that that lasted one to two years?

4    A    Yes.

5    Q    And at some point after the move, your husband applied for a

6    ONE Pass, correct?

7    A    Yes.

8    Q    And your understanding is that lasts for five years, correct?

9    A    Yes.

10   Q    And you're a dependent on that ONE Pass, correct?

11   A    Yes.

12   Q    As is your son?

13   A    Yes.

14   Q    Okay.  And you were aware he was applying for that ONE Pass,

15   correct?

16   A    Yes.

17   Q    Did you ever tell him you did not want him to apply for a ONE

18   Pass?

19   A    No.

20   Q    Did you ever tell him, "Why are we staying in Singapore

21   longer?  You had said we would be here for one year"?

22   A    I mean, I asked him if we are done with what we came for.

23   And, you know, he told me that he would like to, like, prolong

24   the stay a little bit because he didn't want to attract the

25   attention of U.S. tax authorities.

1    Q    When did you realize you would be staying for longer than one

2    year in Singapore?

3    A    When we continued paying our child's school fees.  Like I

4    think it was like maybe January or February of the first year

5    when we lived there, like the school would ask to reenroll.  I

6    don't remember the timelines.  But the reenrollment sort of.

7    Q    Sometime in early 2023, does that make sense?

8    A    Yeah.

9    Q    Okay.  So by the summer of 2023, you realized that you would

10   be in Singapore for another school year at least; is that fair?

11   A    Yes.

12   Q    Okay.  Was it your hope that you would be back in the States

13   living in the U.S. by the summer of 2024?

14   A    Yes.

15   Q    Did you have that discussion with your husband about

16   returning to the United States to live in the -- by the summer of

17   2024?

18   A    Yes.

19   Q    Did you come to an agreement to return to the United States

20   by the summer of 2024 with your husband?

21   A    No.

22   Q    When did you first start talking to your husband about

23   returning to live in the United States by the summer of 2024?

24   A    Maybe like when we started discussing plans for surrogacy and

25   then, also, like December or January of 2024, when he had to make

1  a choice about the next school year.  Yeah.

2  Q    And then you and your husband decided to enroll your child at

3  UWC; is that correct?

4  A    Yes.

5  Q    It would be fair to say that you and your husband never had

6  an agreement as to when you may return to the United States?

7  A    Yes.

8  Q    After you moved to Singapore in the summer of 2022, you

9  returned to the United States once between summer 2022 and

10  October 14th, 2024, correct?

11  A    Correct.

12  Q    And that was in the summer of 2023, correct?

13  A    Correct.

14  Q    And that was for the surrogacy procedure?

15  A    Correct.

16  Q    Okay.  And how long were you in the States for?

17  A    For sure, a month and a little bit more maybe.

18  Q    And at that time, your son and your husband were not in the

19  States with you, correct?

20  A    Prasanna joined me in the States for about two or three weeks

21  in that stay.

22  Q    Okay.  You and your husband discussed various surrogacy

23  options; is that fair?

24  A    Yes.

25  Q    You discussed getting the services of a surrogate in

1  Malaysia, correct?

2  A   I remember discussing creating the embryos in Malaysia, but I

3  don't know if we -- maybe, yeah.  We were exploring with a clinic

4  in Malaysia.

5  Q   Was it your understanding that surrogacy is illegal in

6  Singapore?

7  A   Yes.

8  Q   So it wasn't an option there?

9  A   Well, the Singapore clinic was the one that forwarded us to

10  Malaysia.  I mean, most Singaporean parents seem to do it in

11  Malaysia.  That's how we ended up talking to the Malaysian

12  clinic.

13          MR. MIN:  Your Honor, I move to strike just the part

14  about what most parents do.

15          THE COURT:  It's overruled.  It's part of her answer.

16  Q   When did you first start discussing with your husband the

17  possibility of moving out of the United States?

18  A   Moving out of the United States?

19  Q   Yeah.

20  A   My vague memory is when he was trying to give up his green

21  card and at the same time saying that maybe he can go live

22  outside the country or we could go together.  I remember him

23  broaching that subject to me.

24  Q   And that was a couple of years, approximately two,

25  three years before you moved?

1    A    Two years before we moved, yeah.

2    Q    And do you recall when you first started talking to your

3    husband about the possibility of moving to Singapore

4    specifically?

5    A    I don't remember.

6    Q    It would be fair to say, though, it was at least months

7    before you actually moved?

8    A    Yeah, for sure.

9    Q    So approximately two years, give or take, your husband

10   mentioned to you that he wanted to give up his green card,

11   correct?

12   A    Can you state that question again, please?

13   Q    Of course.

14        Approximately two years before you moved to Singapore, your

15   husband mentioned to you that he wanted to give up his green

16   card; is that correct?

17            MS. SEIPEL:  Objection.  Hearsay.

18            THE COURT:  By the husband?

19            MS. SEIPEL:  It's not a party opponent.  It's his

20   client.

21            THE COURT:  That's overruled.

22        You may answer the question.

23   A    Yeah.

24   Q    And your husband told you that he wanted to give up his green

25   card because of the tax implications, correct?

 1              MS. SEIPEL:  Objection.  Hearsay.

 2              THE COURT:  It's overruled.

 3    A    Yes.

 4    Q    At some point while living in the United States, did you file

 5    a gift tax return?

 6    A    I'm not aware.

 7    Q    You are not aware.

 8         At some point while living in the United States, did you gift

 9    any assets to any family members?

10    A    Yes.

11    Q    Okay.  Did you gift assets to your husband's father?

12    A    I remember like -- yeah, I think to his father.  Yes.

13    Q    You personally, right?

14    A    I remember talking about it with my husband, yes.

15    Q    Eventually your husband did give up his U.S. green card,

16    correct?

17    A    Yes.

18    Q    And he obtained an O-1 visa?

19    A    Yes.

20    Q    And the O-1 visa also was -- allowed him to not have certain

21    tax implications, correct?

22    A    I do not know about that.

23    Q    Okay.  At least -- is that what he told you though, at least?

24    A    I don't think we had a conversation about it, yeah, so ...

25    Q    Okay.  I'm going to show you a page from your deposition,

1   page -- Bates stamp page P2484.  It's page 105 from your

2   deposition transcript, lines 4 through 10:

3        Q.  "And what was your understanding of why Prasanna

4        wanted to go from a green card permanent resident

5        status to an O-1 visa?"

6        Answer:  "It was to avoid the exit taxes.  If you held

7        a permanent residence for longer than seven years,

8        then you were subject to" --

9            THE COURT:  Counsel, counsel, start over again.

10  Q   Yep.  I'm sorry.  Sorry.

11       Question:  "And what was your understanding of why

12       Prasanna wanted to go a from a green card permanent

13       residence status to an O-1 visa?"

14       Answer:  "It was to avoid the exit taxes.  If you held

15       a permanent residence for longer than seven years,

16       then you were subject to U.S. taxes anytime after

17       that."

18       Is that an accurate reading of the question you were

19       asked and the answer you provided?

20  A   Yes.

21  Q   So by the time you moved to Washington, you were already

22  aware that your husband wanted to exit the United States,

23  correct?

24  A   Yeah.

25  Q   Okay.  And you took steps, including gifting assets from you

1    and your husband to family members, as part of that, correct?

2    A    We gifted the assets even before that.  I remember doing it

3    like maybe two years before we moved, you know, to Singapore, and

4    we were talking about this with Prasanna.

5    Q    Is it your testimony that despite your husband's efforts to

6    avoid certain tax implications in the United States, that his

7    plan was to return eventually to live in the United States in the

8    future?

9    A    Yes.

10    Q    And you agreed to move to Singapore in the summer of 2022

11    without any agreement with your husband as to when you would

12    return, correct?

13    A    Yes.

14              MR. MIN:  Your Honor, I apologize.  One second.

15    Q    You and your husband discussed moving to several different

16    countries aside from Singapore, correct?

17    A    Yes.

18    Q    Okay.  Including the U.K., Switzerland, Dubai?

19    A    Yes.

20    Q    It was your preference to move to Singapore, though, compared

21    to the other options, correct?

22    A    Yes.

23    Q    When you discussed the various options with your husband, did

24    you tell him that Singapore was the best option for you and your

25    family of the options you were discussing?

 1   A    Yeah.

 2   Q    One of the reasons was because of the Indian community in

 3   Singapore, correct?

 4   A    Yeah.

 5   Q    There's a place called Little India in Singapore; is that

 6   right?

 7   A    Yeah.

 8   Q    When you were leaving and moving out of the United States,

 9   you sold and moved all of your belongings, correct?

10   A    We sold a few things, but we moved like most of our

11   belongings from the U.S. to Singapore.

12   Q    And you gave away things as well, right?

13   A    Yes.

14   Q    Okay.  I'm going to show you a document that's been admitted

15   into evidence as Petitioner's Exhibit 12.  What is MCH?

16   A    It's Montessori Children's House.

17   Q    That's where your son went to school?

18   A    Correct.

19   Q    Okay.  And you were suggesting that you would donate some of

20   your son's belongings to the school because you were moving?

21   A    Yes.

22   Q    Did you, in fact, donate those belongings?

23   A    I mean, I think the school refused to take the balls from us.

24   So I don't remember if we donated anything else to them.  We

25   might have.

1   Q    Is that a photo of the ball pit that you guys owned?

2   A    Yeah.

3   Q    Is it fair to say that most of your family and most of your

4   husband's family lives in India?

5   A    Yes.

6   Q    Would it be fair to say that moving closer to your family in

7   India was one of the considerations for moving to Singapore?

8   A    Yes.

9   Q    One of those considerations was the flight time, correct?

10  A    Yes.

11  Q    Of the various options, Singapore and Dubai had the shortest

12  flight times to India, correct?

13  A    Yeah.  They both had, yeah, equal -- almost equal flight

14  times to India, yes.

15  Q    Okay.  And that's something you discussed with your husband

16  when contemplating the move to Singapore, correct?

17  A    Yes.

18  Q    So earlier we talked about your family members coming to

19  visit you in Singapore.  Your aunt, uncle, and cousin came to

20  visit you once in Singapore, correct?

21  A    Yes.

22  Q    Okay.  And your cousin came alone twice to visit you in

23  Singapore, correct?

24  A    My cousin came a second time alone, yes.

25  Q    Did she come with her family, your cousin?

 1  A    No.  She came by herself.  With her mom and dad the first

 2  time, and then the second time was by herself.

 3  Q    And you mentioned your husband's brother also visited

 4  Singapore, correct?

 5  A    Yeah.

 6  Q    Do you recall how many times?

 7  A    I don't recall.

 8  Q    Did his cousin also visit you in Singapore?

 9  A    Prasanna's cousin?

10  Q    Yeah.

11  A    Yeah.

12  Q    Did your family stay with you when they visited Singapore?

13  A    Yeah.

14  Q    What about his family?

15  A    Yeah.

16  Q    And was your son present when your families would visit

17  Singapore?

18  A    Yes.

19  Q    And I'm not sure if you mentioned this earlier.  Do you

20  recall how many times you went to visit India while you were

21  living in Singapore?

22  A    I don't recall, but I can look up my flights and itinerary

23  and see.

24  Q    Was it at least four times?

25  A    At least two times in a year, for sure.  I don't know if I

 1  can say at least four times.  I would have to look it up.

 2  Q   Is there something that would help you refresh your

 3  recollection?

 4  A   Yeah.

 5  Q   Such as?

 6  A   Flight tickets on my, you know, bookings.

 7  Q   Okay.  Do you want to look it up?  I can also show you your

 8  deposition transcript, so ...

 9          MS. SEIPEL:  Objection.  Is there a question?

10          THE COURT:  I'm not sure.  There's an offer.

11          MR. MIN:  I asked her if she would like to look up her

12  flight tickets.

13          THE COURT:  Well, let's do it this way.  What's the

14  fastest way for you to retrieve that information, have it read

15  back from your deposition or look on your cell phone?

16          THE WITNESS:  Read back from my deposition is fine, sir.

17          THE COURT:  Okay.  Then let's proceed.

18          MR. MIN:  That's fine.

19  Q   I will show you the deposition, page Bates stamped P2524,

20  page 145, lines 9 through 12:

21      Question:  "How many how times did you go to back to

22      India to visit family while you were living in

23      Singapore?"

24      Answer:  "At least four times, I would think."

25      Is that an accurate reading of the question and answer

1  you were -- the question you were asked and the answer you gave

2  in the deposition?

3  A    Yes.

4  Q    Earlier, you testified that you and your husband dreamed --

5  and I may be using the wrong word, so I apologize -- but dreamed

6  of your son going to Harvard or Stanford or the like, right?

7  A    Yes.

8  Q    Yes.  Okay.

9      You also testified that there were concerns or your husband

10  was at least expressing concerns about your son doing, I believe,

11  national service in Singapore?

12  A    Yes.

13  Q    What is that?

14  A    I think it's, you know, any -- I think children, kind of once

15  they graduate school, they would have to, like, serve the

16  Singapore National Army for two years.  That's my understanding

17  of it.  And you're kind of forced to do it if you have a PR or a

18  citizenship in Singapore.

19  Q    When you and your husband were discussing schools in

20  Singapore, were you looking at admission rates to colleges?

21  A    I was not, but I think --

22  Q    Was he discussing with you admission rates to colleges, such

23  as Harvard and Stanford?

24  A    Yes.

25  Q    Okay.  Was he talking about notable alumni from these

1   schools?

2   A   Yes.

3   Q   I mean, it was your understanding, because of his concern

4   that your child would enter national service after graduating

5   high school, concerns about or interest in the admission rate to

6   Harvard and Stanford, that he expressed to you he expected the

7   child would complete high school in Singapore, correct?

8   A   Could you, please, repeat the question?

9   Q   Sure.

10  A   So are you asking if he -- yeah, if you can repeat the

11  question to me, please.

12  Q   Of course.

13      Based upon your husband's expression to you that he was

14  concerned that your son may have to engage in national service in

15  Singapore upon the completion of his high school degree and he

16  was also interested in the admission rates to Harvard and

17  Stanford and other top-tier schools, wasn't it your

18  understanding, and wasn't it expressed to you by your husband,

19  that he expected your son to complete high school in Singapore?

20          MS. SEIPEL:  Objection.  Confusing and compound

21  question.

22          THE COURT:  It is a compound question, counsel.  You can

23  break it up in pieces.  Sustained.

24          MR. MIN:  Sure.

25  Q   Based upon your husband's concern that your son may have to

1  enter national service upon the completion of high school, wasn't

2  it expressed to you that your husband wanted your son to complete

3  high school in Singapore?

4          MS. SEIPEL:  Objection.  Compound question.

5          THE COURT:  Do you understand the question?

6          THE WITNESS:  Not really, Your Honor.

7          THE COURT:  All right, counsel.  You will have to break

8  it up.

9          MR. MIN:  Yeah.

10         THE COURT:  You can ask a discrete, pinpoint question

11  whether or not she agrees with components of the question and

12  then come back to the...

13  Q   Your husband expressed to you concern about your son possibly

14  having to engage in national service in Singapore, yes?

15  A   Yes.

16  Q   Okay.  And your understanding was that national service would

17  be done upon completion of high school, correct?

18  A   Yes.

19  Q   Okay.  And your husband expressed to you that he expected

20  your son to complete high school in Singapore, correct?

21  A   No.

22  Q   No.

23      So your testimony is that your husband was concerned --

24  withdrawn.

25      Did your husband ever talk to you about your son completing

1   high school in Singapore?

2   A    No.

3   Q    Did you ever ask your husband, "Why are you concerned about

4   national service in Singapore if our kid is not going to even

5   finish high school here?"

6   A    I mean, if we get a PR -- whether he finishes high school in

7   Singapore or not, as a PR, he's supposed to return back to

8   Singapore for national service.  That's my understanding.  That's

9   what my -- like the aunt's kid that lived there did, for example.

10  Q    So your husband talked to you about the schools' admission

11  rates to top-tier Ivy League schools, correct?

12         MS. SEIPEL:  Objection.  Asked and answered.

13         THE COURT:  That's sustained, counsel.

14  Q    Did you ever ask your husband why he cared about your child's

15  admission rate to Ivy League schools if you didn't expect your

16  child to graduate from those schools?

17         MS. SEIPEL:  Objection.  Compound question.

18         THE COURT:  That's overruled.

19      Do you understand that question?

20         THE WITNESS:  Yes, Your Honor.

21         THE COURT:  You may answer.

22  A    I think the peer group that -- I mean, I did ask him about

23  it, and we always want our child to learn in an environment where

24  like, you know, the peer group aspired for similar things like

25  us.  Whether it's in first grade or it's in sixth grade, we want

1   to direct him towards that.  So this was our, sort of,

2   discussion.  We did the same in California and also in

3   Washington.  So, yeah.

4   Q   In California, was it your expectation that you would be

5   living there permanently?

6   A   Yes.

7   Q   In Washington, was it your expectation you would be living

8   there permanently?

9   A   Yes.

10  Q   So when you were thinking about schools in California and

11  looking at admission rates and looking at acceptance rates to Ivy

12  League schools because you were thinking about living there

13  permanently and, in Washington, when you were thinking about

14  living there permanently, you looked at the acceptance rates into

15  Ivy League schools, you did the same thing in Singapore, correct?

16          MS. SEIPEL:  Objection.  Confusing and compound

17  question.

18          THE COURT:  Counsel, you are going to have to break the

19  questions up.  And, also, slow down, counsel.

20          MR. MIN:  Apologies, Your Honor.  I think I will move

21  on.

22  Q   (By Mr. Min:)  Both schools that your son went to in

23  Singapore go through the twelfth grade, correct?

24  A   Yes.

25  Q   Was that something that your husband expressed to you was

1    important to him?

2    A    No.

3    Q    In the summer of 2024, your husband wanted to sign a

4    three-year lease for the 4 Astrid Hill home, correct?

5    A    Yes.

6    Q    Leading up to that, in the spring of 2024, you were having

7    discussions with individuals, other than your husband, about

8    housing options, correct?

9    A    Could you -- so what time frame are you asking about?

10   Q    Spring 2024.

11   A    Probably.  I don't recall.

12   Q    Someone named "Sharan"?

13   A    Yeah.

14   Q    Who's that?

15   A    He's the real estate agent that worked with my husband in

16   Singapore.

17   Q    And were you actively involved in looking at housing options?

18   A    Yes.

19   Q    Were you sending -- were you looking at houses to buy and to

20   rent?

21   A    Yes.

22          MR. MIN:  Your Honor, one second.

23   Q    Did you put offers in to various homes?

24   A    I don't recall.  But, yeah, we tried looking at a few homes

25   to rent and we were trying to decide.

1    Q    Did you look at the Leighwoods Apartments?

2    A    I don't remember that name.  Maybe.  Yes.

3    Q    Is there something that might help you refresh your

4    recollection, such as your chats with Sharan?

5    A    Sure.

6    Q    Pull that up.

7         Okay.  See the message on April 23 at 17:48:23 from you?  You

8    can read that and let me know if that refreshes your

9    recollection.

10   A    Okay.

11        So how many of those lines do you want me to go over?

12   Q    No, no.  Just that one message.

13        I'm asking if you had looked at the Leighwoods Apartments.

14   You said you don't recall.  I'm asking you if this refreshes your

15   recollection.

16   A    Yes.

17   Q    You don't have to look at any more.

18        Does that help you refresh your recollection as to whether

19   you were looking at the Leighwoods Apartment?

20   A    Yes.

21   Q    Did you look at other housing with Sharan, with the help of

22   Sharan?

23   A    Yeah.

24   Q    Were you actively involved in looking at housing options in

25   Singapore?

1   A    Yes.

2   Q    Were you actively involved in looking at the 4 Astrid Hill

3   home?

4   A    Yes.

5   Q    Were you commenting on the pros and cons of the homes you

6   were looking at?

7   A    Yes.

8   Q    What sort of home were you looking at, at this time?

9         MS. SEIPEL:  Objection.  Foundation.

10        THE COURT:  It's overruled.

11  A    Something safe, something like, you know, that's easy in

12  terms of commute for my child, and -- yeah.  Maybe -- these are

13  the two things that I can think of.

14  Q    Around this time, your child had been accepted to UWC,

15  correct?

16  A    Yes.

17  Q    And so in the spring of 2024, you knew you would be enrolling

18  your child at CW in the fall, correct?

19  A    I don't know at what point we enrolled him, but we knew that

20  we were trying to get an admission in UWC.

21  Q    Okay.  And so you were coordinating the enrollment or

22  impending enrollment at UWC and a home that would be somewhat

23  proximate to that school, correct?

24  A    Yeah.  The lease was coming to an end, and then we were

25  trying to see if we were going to move.

1   Q   When you settled on the 4 Astrid Hill home, you asked the

2   landlord for modifications, correct?

3   A   I might have, yes.

4   Q   Okay.  You asked to change the refrigerator, for example,

5   correct?

6   A   Possibly.

7   Q   Do you want me to -- I can make the same suggestion in terms

8   of if you don't recall, then I'm happy to show you something

9   else, unless you want me to show you your deposition transcript,

10  just to --

11  A   Yeah, we can see it, please.  Yeah.

12  Q   I will pull up your deposition transcript, page 132, line 17,

13  starting at line 17 -- starting at line 19, apologies:

14      Question:  "Did you specifically ask for modifications

15      to the home?"

16      Answer:  "What did I ask for?  Yeah.  Once we decided

17      we were going to move, I think the one thing I asked

18      for was, I don't know, like change to the

19      refrigerator, I remember, because it was a really bad

20      one.  And, yeah, I can't remember the other things

21      that I asked for.  But, yes."

22      Is that an accurate reading of the question you were

23  asked and the answer you provided?

24  A   Yes.

25  Q   And that was referring to the home at 4 Astrid Hill, correct?

1    A    Yes, maybe.  I don't know which house we were talking about

2    in the deposition.  Yeah, before we moved in, I asked for the

3    refrigerator to be changed, yeah.

4    Q    Did you also ask for the auto gate in the front of the home

5    to be installed -- or for a remote control for the auto gate?

6    A    Yes.

7              During your son's time at SAS, the first school he

8    attended in Singapore, he made friends, right?

9    A    Yes.

10   Q    Okay.  And he celebrated his birthday at SAS, correct?

11   A    He celebrated his birthday -- oh, yes.  I don't remember

12   whether we celebrated it in SAS, the school itself, or outside.

13   But, yeah, he celebrated his birthday that year.

14   Q    I'm going to show you a document that's been admitted into

15   evidence as Petitioner's Exhibit 33.  This is an e-mail between

16   you and the school?

17   A    Yes.

18   Q    Okay.  About celebrating his birthday at the school?

19   A    Yes.

20   Q    Do you recall if that happened or not?

21   A    Yes.  I mean, it's happened, yes.

22   Q    Okay.  He also had birthday parties outside the school in

23   2023 and 2024, correct?

24   A    Yes.

25   Q    How many kids attended his birthday parties?

1  A    I don't remember.  Probably like, you know, five to ten kids.

2  Q    Okay.  I am going to show you your deposition transcript,

3  Bates stamped P2520, lines 9 to 14 -- sorry, 11 to 14.

4       "Okay.  And do you recall how often children attended each of

5  those birthday parties?"

6       Answer:  "Probably like 10 to 15 kids, you know, each

7       time."

8       Is that an accurate reading of the question you were

9  asked and the answer you provided?

10 A    Yes.

11 Q    Not the five to ten you just stated, right?

12 A    Yes.  I mean, I'm really not able to recall.  But it's a

13 ballpark guess, 15 kids.

14 Q    And that's referring to the birthday parties he had in

15 Singapore outside of the school in 2023 and 2024, correct?

16 A    Correct.

17 Q    And your son had sleepovers in Singapore, correct?

18 A    Yes.

19 Q    And, in fact, he started having sleepovers when he was about

20 seven and a half years old; is that right?

21 A    Around that time, yes.

22 Q    When was he seven and a half?  When did he turn seven and a

23 half, roughly?

24 A    2016, so 2017, '18, '19, '20, '21, '22.

25      2023, late 2023.

1    Q    Okay.  So for about the last year -- for about a year before

2    you went to Washington in October 2024, he was having sleepovers?

3    I'm not asking how frequently.  But he was having sleepovers?

4    A    Right, yes.

5    Q    Okay.  And aside from these family sleepovers you testified

6    to earlier, where the parents were there and the children were

7    all together under one roof, he had never had children-centered

8    sleepovers before moving to Singapore, correct?

9    A    Correct.

10   Q    Just to go back quickly to your 4 Astrid Hill home, did you

11   renovate the floor tiles in that home?

12   A    Yes.

13   Q    And did you choose those floor tiles for the renovations?

14   A    It was mostly Prasanna.  Like I didn't want it.  Like I said,

15   it's a rented home, why would he want to change the flooring.

16   But he said he wanted to do it, so ...

17   Q    The Singapore American School was an American-curriculum

18   school, correct?

19   A    Correct.

20   Q    The UWC was an international baccalaureate system?

21   A    It's not an Ivy curriculum, but I think it's derived from the

22   Ivy curriculum, if my understanding is correct.

23   Q    Have you described it as a mix between the American and

24   British systems?

25   A    I don't know that.  I mean, I -- yeah.

1   Q   Did you describe it as a transition, the move to UWC?

2   A   Transition to what?

3   Q   I will withdraw the question.

4           MR. MIN:  One second.

5   Q   I'm going to show you a transcript of your deposition, Bates

6   stamp page 2496, page 118 of your deposition, starting at line 19

7   going through line 24:

8           Question:  "What kind of curriculum was at UWC?"

9           Answer:  "I think they -- they don't really have a

10          name for it, but I think it's thought of like the IB

11          curriculum, like the British curriculum.  Like they

12          have parts -- most parts, like, are similar to the IB

13          curriculum."

14          Is that a fair reading of the question and answer -- the

15   question you were asked and the answer you provided in your

16   deposition?

17          MS. SEIPEL:  Objection.  I believe Mr. Min's last

18   question was something about a transition and then he withdrew

19   and now we are looking at a deposition transcript.  So I do not

20   believe that there was a prior question.

21          THE COURT:  That's correct, counsel.  But I will let the

22   question remain, despite that, to avoid repetition of the

23   question.

24          MR. MIN:  Thank you.

25          THE COURT:  Would you like the question repeated?

1          THE WITNESS:  No, sir.

2   A   I think this is correct, yes.

3          THE COURT:  All right.  Next question.

4   Q   (By Mr. Min:)  Did you say that it was a transition away for

5   your son, a transition for your son away from the American

6   curriculum to a different curriculum?

7   A   A transition to what is the question.  But, I mean, yes, he

8   moved into a different curriculum from the American system.

9   Q   And UWC was one of the top private schools in Singapore,

10  correct?

11  A   Yes.

12  Q   Did you have any interviews with the school, you personally,

13  before he started there?

14  A   With UWC?

15  Q   Yeah.

16  A   Yes.

17  Q   Okay.  How many?

18  A   I don't recall.  But I definitely remember like meeting one

19  person.  I mean, probably like two interviews, two -- meeting two

20  people two distinct times.

21  Q   And did they ever talk to you about how long your son would

22  be enrolled at UWC?

23          MS. SEIPEL:  Objection.  Hearsay.

24          THE COURT:  That's correct, counsel.

25          MR. MIN:  Your Honor, the question was, "Did they ever

 1    talk" -- "did they ever talk to you about how long," not what was

 2    said.

 3                THE COURT:  It calls for a "Yes" or "No."

 4    A    Did they ever talk to me?  Did the people I meet talk to me

 5    about whether -- how long my child will be enrolled in the

 6    school?  Is that the question?

 7    Q    Yeah.  I'm not asking you how long.  I'm asking you if they

 8    talked to you about that subject area, about how long he might be

 9    enrolled at UWC?

10    A    I don't understand the question.  How can they make a choice

11    about how long the child will be enrolled in the school?

12    Q    So is the answer, yes, you had those conversations or you are

13    saying, no, that those conversations never happened?

14                MS. SEIPEL:  Objection.  She answered that she doesn't

15    understand.

16    A    I don't recall that.

17                THE COURT:  Just one second.  It's overruled.  The

18    answer remains.  She doesn't recall.

19                MR. MIN:  Okay.

20    Q    Your son never received medical care in the United States

21    after moving to Singapore prior to October 14th, 2024, correct?

22    A    Correct.  But we came back to the Washington pediatrician for

23    like immunization records for my child.

24    Q    But he didn't receive medical care?

25    A    He didn't receive care, yes.

1    Q    I'll direct your attention to the summer of 2024.  In the

2    summer of 2024, you testified you and your family traveled to

3    India, correct?

4    A    Yes.

5    Q    Take your time.  Do you want a second?

6    A    Yeah.

7    Q    Yeah.

8    A    I'm ready.

9    Q    I believe you said "Yes," right?

10   A    Yes.

11   Q    Okay.  During the summer of 2024, would it be fair to say

12   that you and your husband were experiencing marital

13   difficulties?

14   A    Yes.

15   Q    At some point in the summer of 2024, were you considering

16   moving to India?

17   A    He -- my husband was talking to me about --

18        MR. MIN:  Objection.  Move to strike as nonresponsive.

19   Q    The question is whether you were considering moving to India

20   in the summer of 2024.

21   A    Yes.

22   Q    In fact, your mother, in the summer of 2024, was trying to

23   convince you to move to India, correct?

24        MS. SEIPEL:  Objection.  Calls for hearsay.

25        THE COURT:  That's sustained, counsel.

1    Q    (By Mr. Min:)  Did you feel pressure from your family in the

2    summer of 2024 to move to India?

3              MS. SEIPEL:  Objection.  Calls for hearsay.

4              THE COURT:  It calls for a "Yes" or "No" answer.

5    A    Yes.

6    Q    You did not want to move to India, correct, ultimately?

7    A    Correct.

8    Q    Ultimately, you and your husband agreed to continue life in

9    Singapore, correct?  "Yes" or "No."

10   A    No.

11   Q    I'm going to show you your deposition transcript, Bates stamp

12   page 2531, page 152:

13             Question:  "Okay.  But two years later, you guys

14             signed a three-year lease, right?"

15             Answer:  "Yeah.  We were going through a lot of

16             trouble in our relationship and we were not on board,

17             you know.  Even Prasanna himself was confused.  He

18             signed the lease in India and he was trying to retain

19             myself and my child in India on summer break.  He

20             looked at schools in India.  We had a lot of fights.

21             He had a lot of things going on then.  And I refused

22             to stay on in India, although -- although there was an

23             angle of family support if we lived in India, it was

24             worse off for my child.  I don't think he can fare

25             well in India at all.  He hates being there, like

1          playing with the kids there.  I don't know if he'll

2          cope with the education system there.  I wanted to

3          come back to the U.S., but he said, 'Okay.  At least

4          we should, you know, take up the UWC admission and go

5          back to Singapore and let our child be there.'  It was

6          a half-minded thing, where I was like, okay, for the

7          sake of my child, I will go back, at least until me

8          and Prasanna figured out life between the two of us."

9          Is that an accurate reading of the question you were

10   asked and answer provided?

11          MS. SEIPEL:  Objection.  Mr. Min's prior question was,

12   "You and your husband agreed to continue life in Singapore?"

13   Ms. Sashidhar answered "No."

14          Use of this deposition -- nowhere in here does it refer to

15   Ms. Sashidhar and her husband agreeing as to whether or not to

16   continue life in Sashidhar {sic}.  It's an appropriate use of the

17   deposition.

18          THE COURT:  The objection is overruled.  The answer

19   remains.

20   Q    (By Mr. Min:)  In the summer of -- this is referring to

21   conversations between you and your husband in the summer of 2024,

22   correct?

23   A    Yes.

24   Q    Okay.  In the summer of 2024, your testimony is that your

25   husband wanted to stay in India, correct?  Is that right?

 1    A    Yes.

 2    Q    Okay.  Your testimony is that you wanted to go back to the

 3    U.S.; is that correct?

 4    A    Yes.

 5    Q    Okay.  And, ultimately, you and your husband decided to go

 6    back to Singapore until you and your husband could figure out

 7    what to do with your lives; is that fair?

 8    A    Yes.

 9    Q    Would it be fair to say that since the summer of 2024, you

10    and your husband have had no further agreements about where your

11    child should live, other than returning to Singapore in the fall

12    of 2024?

13    A    Yes.  Even Singapore was not, like, agreeable to me.  It

14    was -- yeah.  I had no other choice.  So, yeah.

15    Q    On August 31st, 2024, you and your husband got into an

16    altercation, correct?

17    A    Yes.

18    Q    And afterwards, your husband left the marital home, correct?

19    A    Yes.

20    Q    At 4 Astrid Hill in Singapore, correct?

21    A    Yes.

22    Q    Your husband accused you of having an affair around this

23    time, correct?

24    A    Yes.

25              MS. SEIPEL:  Objection.  Hearsay.

1        THE COURT:  It's overruled.

2   Q   Your answer was "Yes"?

3   A   Yes.

4   Q   Sorry.

5        You were having an emotional relationship with one of your

6   male friends; is that correct?

7        MS. SEIPEL:  Objection.  Relevance.

8        THE COURT:  It's overruled.

9   A   I mean, I have an emotional relationship with all my friends.

10  Yes, there are male friends also.

11  Q   Did you find emotional refuge in one of your male friends?

12       MS. SEIPEL:  Objection.  Relevance.

13       THE COURT:  It's overruled.

14  A   In many friends, yes.

15  Q   Did you admit to the Singapore courts that "While I found

16  emotional refuge in another male friend of mine, I could not push

17  myself to have a sexual relationship with him"?

18  A   Yes.

19  Q   Yes.

20       So you are not talking about any male friend of yours; you

21  are talking about a specific male friend of yours that you found

22  emotional refuge with, correct?

23  A   Yes.

24  Q   And is this the individual that your husband believed you

25  were having an affair with?

 1           MS. SEIPEL:  Objection.  Calls for speculation.

 2           THE COURT:  Sustained.

 3    Q    Did your husband tell you -- withdrawn.

 4           Did your husband accuse you of having an affair with a

 5    specific male friend of yours?

 6    A    I think there were three people he asked me about.

 7    Q    And was one of those three people the person you were

 8    referring to when you wrote this to the Singapore courts?

 9    A    Yes.

10    Q    It's true that you were engaging in written communications

11    with this male friend of yours of a sexual nature, correct?

12           MS. SEIPEL:  Objection.  Relevance.

13    A    No.

14           MS. SEIPEL:  Ask to strike.

15           THE COURT:  Counsel, could you narrow down the specific

16    relevance?  What point you are trying to accomplish by the

17    examination?  I have given you some latitude.

18           MR. MIN:  Sure.  Yep.  Understood.

19        Your Honor, there's a lot of context given by the witness to

20    describe what precipitated arguments and disagreements and the

21    marital discord in the summer of 2024.  She has explained it,

22    from her perspective, and we believe that this provides context

23    for why there was marital discord.  My client testified about why

24    he did certain things in Singapore after these disagreements

25    occurred.  And so I do believe that context is relevant here.

1              THE COURT:  All right.  The objection is overruled.

2      You may answer the question.

3    Q   It's true you had written communications with this male

4    friend that you found emotional refuge in of a sexual nature,

5    correct?

6    A   No.

7    Q   No?

8        Did you ever ask him to purchase a condom?

9    A   No.

10   Q   Did you ever have hotel reservations with this individual?

11   A   Did I have a hotel?  I reserved a hotel for him because his

12   credit card was not working.  I did not, like, do it for myself

13   alone.

14   Q   You reserved a hotel for him, but not for you and him to

15   meet?

16            MS. SEIPEL:  Objection.  Asked and answered.

17            THE COURT:  That's overruled.

18   A   Ask the question again, please.

19   Q   Sure.

20       You reserved a hotel for this male friend of yours, but your

21   testimony is that it wasn't for the purpose of you and him

22   meeting?

23   A   Yes.

24   Q   Did you and your friend ever discuss having an intimate

25   relationship together?

1    A    No.

2    Q    Was the alleged affair that your husband accused you of a

3    source of disagreement between the two of you in the summer of

4    2024?

5    A    Yes.

6    Q    Did you and your husband start talking about divorce and

7    separation in the summer of 2024?

8    A    Yes.  Many times in the relationship, we have spoken about

9    it.

10   Q    Including in the summer of 2024?

11   A    Yes.

12   Q    You made the decision to travel to Washington or return to

13   Washington, perhaps, on October 12th when you purchased plane

14   tickets, correct?

15   A    Yes.

16   Q    Okay.  You had not made the decision to return to Washington

17   State before that, correct?

18   A    I mean, I wanted to come back to Washington, but was it a

19   decided thing?  So how do I understand your question?  Can you --

20   Q    Sure.

21        Not your desire, but your decision.  Your ultimate decision

22   to actually go to Washington was not made until October 12th,

23   correct?

24   A    Yeah.

25   Q    Before October 12th -- after August 31st and before

1    October 12th, you were writing to your husband because you wanted

2    him to return your child's passport, correct?

3    A    Yes.

4    Q    And you accused your husband of taking the child's passport

5    to India with him, correct?

6    A    I mean, he told me he has taken the passport.  I asked him if

7    he knows where the passport is.

8    Q    You obtained, eventually, an emergency passport for your

9    child, correct?

10   A    Yes.

11   Q    When did you do that?

12   A    I think it was either October 9th or 10th, when the U.S.

13   Embassy contacted me asking to get the passport from them.

14   Q    You did not receive your husband's consent to get a U.S.

15   passport, correct, just to be clear?

16   A    I -- yes.

17   Q    Yes, correct, you did not get his consent?

18   A    Yes.

19   Q    Were you concerned between August 31st and October 12th that

20   your husband would attempt to abduct your child?

21   A    Yes.

22   Q    That was one of the reasons you filed for custody in the

23   Singapore courts, correct?

24   A    The reason to file custody was to get a U.S. passport for my

25   child.  I don't know how the custody filing helped from the child

 1   being abducted.

 2   Q   But you told the Singapore courts in your filings that,

 3   quote, "I would like to make sure that my child is not abducted,"

 4   correct?

 5   A   I don't recall.  I may have, yes, in the filings.

 6   Q   Would it help you refresh your recollection to see the

 7   filings?

 8   A   Sure.

 9   Q   Okay.  We will pull up Petitioner's Exhibit 68, Bates stamp

10   page P524, page 5 of the exhibit.

11       Is this the affidavit you filed with the Singapore courts?

12   A   Yes.

13   Q   The third paragraph --

14           THE COURT:  Why don't we take a stretch break?

15           MR. MIN:  Oh, sure.

16           MS. SEIPEL:  Your Honor, could I run to the restroom

17   very quickly?

18           THE COURT:  Certainly.

19           MS. SEIPEL:  Thank you.

20                       (Stretch break.)

21           THE COURT:  All right.  Let's continue.

22       Please be seated.  Please continue with your

23   cross-examination.

24           MR. MIN:  Thank you.  I think we were at Exhibit 68?

25           THE COURT:  Correct.

1   Q   (By Mr. Min:)  Bates stamp page 524, the third paragraph is

2   highlighted there, "I would like to make sure that my child is

3   not abducted, coerced, his health and safety put at major risk by

4   any irresponsible actions of parent Prasanna."  Do you see that?

5   A   Yes.

6   Q   So you're expressing concern about your child being abducted

7   to the Singapore courts, correct?

8   A   Yes.

9   Q   You didn't want your son taken out of Singapore without your

10  consent, correct?

11  A   Yes.

12  Q   You used the word here "abducted."  What does that mean to

13  you?

14  A   Taken without, like, my consent or his own consent.

15  Q   Okay.  Did you get your husband's consent when you took your

16  children out of -- your child out of Singapore?

17  A   I tried through multiple routes.

18  Q   Tried, but you didn't, right?

19  A   Yeah.  He didn't respond to any of it.

20  Q   You were talking about earlier, testifying earlier, that when

21  he started UWC, he really wasn't doing many activities, right?

22  A   Yes.

23  Q   And you may have mentioned one, but it was of limited nature,

24  correct?

25  A   Yes.

1   Q    I mean, he continued to have private piano lessons at the

2   home; isn't that true?

3   A    Yeah, maybe.  Yeah.  The private teacher came in.  A few

4   lessons.  I mean, I remember discontinuing them because I

5   couldn't continue paying the teacher.

6   Q    You also signed your son up for extracurricular activities in

7   the fall of 2024, correct?

8   A    I tried to sign him up for, like, camps at school, yes.

9   Q    I'm going to show you a document admitted as Petitioner's

10  Exhibit 42.

11       On October 9th, 2024, five days before you took your child to

12  Washington, you paid for badminton, science, and coding classes

13  for your son, correct?

14  A    Yes.

15  Q    All in Singapore, correct?

16  A    Yes.  That was fall-break camp.

17  Q    There's no question pending.

18  A    Yeah.

19  Q    Your mother was living with you or staying with you in

20  Singapore in the fall of 2024, correct?

21  A    Yes.

22  Q    When you left Singapore on October 14th, 2024, your mother

23  was still at your home in Singapore, correct?

24  A    Yes.

25  Q    She did not travel with you?

1   A    No.

2   Q    She stayed behind?

3   A    Yes.

4   Q    Isn't it true that when you left on October 14th, you had no

5   idea how long you would stay in Washington for?

6   A    My idea was to live here, like, and have some stable

7   arrangement for my child.  That's what it was.

8   Q    You told your mother that you would be back in a couple of

9   weeks to Singapore, correct?  "Yes" or "No."

10  A    No.

11  Q    Did you tell your mother that you would return to Singapore?

12  A    No.

13  Q    If your mother had told individuals that you were planning on

14  coming back to Singapore after a couple of weeks, would she be

15  lying?

16          MS. SEIPEL:  Objection.  Calls for speculation.  It asks

17  the witness to testify as to the truth or credibility of a

18  non-witness in this hearing.

19          THE COURT:  Sustained.

20          MR. MIN:  You're saying "non-witness."  She's on the

21  witness list, Your Honor.

22          THE COURT:  That may be true, but the objection is still

23  sustained.

24          MR. MIN:  Thank you.

25  Q    (By Mr. Min:)  Why didn't you go to California on

1    October 14th, 2024?

2    A    I don't know.  I felt that -- I mean, I have -- my bank

3    accounts are here in Washington, and, you know, I have, like, a

4    reasonable level of, like, you know, thought and idea about where

5    we can live and what school my child can go to and things like

6    that, because we lived here just before moving out of here,

7    so ...

8    Q    You say your bank accounts were in Washington.  What do you

9    mean by that?

10   A    I mean, I have, like, a bank address that's based off of

11   here.  I had to go into the bank to get some things, like a

12   checkbook and, you know, my -- I don't know, debit card and

13   things like that.

14   Q    What bank is this?

15   A    This is HSBC.

16   Q    HSBC.

17        You don't think you could have gotten a checkbook at HSBC in

18   any other city in the U.S.?

19              MS. SEIPEL:  Objection.  Argumentative.

20              THE COURT:  Sustained.

21   Q    You had not wanted to move from California to Washington,

22   correct?

23   A    Yeah.

24   Q    In fact, you wanted to stay in California, correct?

25   A    Yes.

1   Q   And, in fact, you had hoped to return to California after

2   moving to Washington, correct?

3   A   No.

4   Q   Why didn't you go to India on October 14th, 2024?

5   A   I mean, so I wanted to bring my child to a place where I

6   could stably support him, like financially and in every other

7   way, where my child was also happy to go to school.  I mean, I

8   asked my -- I mean, I know that my child doesn't want to live in

9   India, for example, so I don't want to force him to go to India.

10  But I knew that he was all right and happy to come to the U.S.

11  and, you know, be here with me.

12  Q   Did you ever consult with any lawyers in India about getting

13  divorced there?

14  A   No.

15  Q   Never?

16  A   I mean, after I received some papers from my husband, I'm

17  having a lawyer that I'm consulting with, but, yeah.

18  Q   Yes, at some --

19  A   Yes, yes.  The answer is yes.

20  Q   When did you first consult a lawyer about getting divorced in

21  India?

22          MS. SEIPEL:  Objection.

23  Q   I'm not asking what you talked about.  I'm asking when that

24  happened.

25          MS. SEIPEL:  Relevance.

1          THE COURT:  It's overruled.

2     A    Probably like the first or second week of September.

3     Q    When did you first consult a lawyer about getting divorced in

4     Washington?

5     A    First week of September.

6     Q    Did you ever consult a lawyer about getting divorced in any

7     other state in the United States?

8     A    No.

9     Q    When did you first consult a lawyer about getting divorced in

10    Singapore?

11         MS. SEIPEL:  Objection.  The witness has not testified

12    about consulting a lawyer to get divorced in Singapore.

13         THE COURT:  Sustained.

14         MR. MIN:  Your Honor, the witness testified earlier

15    about having to wait three years to get divorced in Washington.

16    She's brought up the issue of getting -- in Singapore.  I

17    apologize.  She's brought up the issue of being divorced in

18    Singapore and her understanding of that.

19         THE COURT:  Just ask her the foundational question

20    before you can ask the follow-up questions.

21         MR. MIN:  Understood, Your Honor.  Thank you.

22    Q    Did you ever consult with a lawyer in Singapore about getting

23    divorced in Singapore?

24    A    Yes.

25    Q    When did you first consult with a lawyer about getting

1   divorced in Singapore?

2   A    Probably the first week of September.

3   Q    So in the first week, first or two -- in the first two weeks

4   of September, you consulted, for the first time, lawyers in

5   Washington, Singapore, and India about getting divorced in those

6   three jurisdictions, correct?  "Yes" or "No."

7   A    Yes, I consulted lawyers about divorces in Washington and

8   Singapore for sure.  And in India, I think it was much later.  I

9   spoke after I kind of like, you know, realized that Prasanna's

10  filings are, like, being done in India.

11  Q    Did you believe that you would have a financial advantage if

12  you were divorced in Washington over India or Singapore?

13            MS. SEIPEL:  Objection.  Relevance.

14            THE COURT:  It's overruled.

15  A    No.

16  Q    No?

17       You have stated that your husband wanted the divorce in

18  India, correct?

19  A    Yes.

20  Q    What was your understanding of why your husband wanted the

21  divorce in India?

22  A    He told me that he's going to file in India before I can

23  finish three years in Singapore, after which I can file in

24  Singapore, and I mean -- so that's something that he threatened

25  me about, before he left from Singapore.

 1    Q    Why did you care where you got divorced?

 2    A    I didn't care.

 3    Q    You didn't care, but you filed for divorce in Washington on

 4    September 6th?

 5              MS. SEIPEL:  Objection --

 6    A    Yeah.

 7              MS. SEIPEL:  -- argumentative.

 8              THE COURT:  That's sustained, counsel.  Rephrase.

 9              MR. MIN:  Sure.

10    Q    You did not -- okay.  Your testimony is you did not care

11    where you and your husband were divorced, but you filed for

12    divorce in Washington on September 6th, 2024, correct?

13              MS. SEIPEL:  Objection.  Argumentative.

14              THE COURT:  It's overruled.

15    A    Yes.

16    Q    Where were you living on September 6th, 2024?

17    A    In Singapore.

18    Q    And when was the last time you had been in the state of

19    Washington before that?

20    A    Two -- two years and a couple of months back.

21    Q    If you did not care about where you and your husband got

22    divorced, why did you file for divorce in Washington on

23    September 6th, 2024?

24    A    Because I was not even aware that the husband had already

25    filed.  I filed --

1    Q   Go ahead.

2    A   I filed and -- I mean, I'm a U.S. citizen, I pay taxes in

3    Washington State, and, you know, all of that, and the lawyer here

4    told me that I can file here.  So I filed my divorce.

5    Q   You were married in India, correct?

6    A   Yes.

7    Q   Under the Hindu Marriage Act?

8    A   No.

9    Q   Were you of the understanding that you could file for divorce

10   in India?

11   A   I -- no.  I think I was -- how could I file for divorce in

12   India?  I've never lived in India.  And I've, you know -- also,

13   I'm a U.S. citizen.  Like on what basis do I go back to India and

14   file a divorce there?

15   Q   You've never lived during in India?

16   A   Until about 20 years.  But not during my marriage.  We have

17   never conducted marriage in India.

18   Q   You told Dr. Poppleton -- withdrawn.

19       Who is Dr. Poppleton?

20   A   He is our psychology expert that's helping in this Hague

21   case.

22   Q   You hired him to help you with this Hague case, correct?

23   A   My lawyers appointed him to us.

24   Q   And you had interviews with him, correct?

25   A   Yes.

1    Q    Did you tell him that your husband does not want the divorce

2    case filed in the United States because he will depart with a lot

3    of money?

4    A    Yes.

5    Q    Meaning your husband would lose a lot of money if the divorce

6    went through in Washington?

7    A    Yes.

8    Q    Meaning that you believed there was a financial advantage to

9    filing for divorce in Washington, correct?

10    A    No.  I believed that a lot of what is a marital asset was

11    taken away just by my husband.

12    Q    Okay.  And you wanted to get it back?

13    A    Yes.

14    Q    Okay.  And so you believed the best way to do that was to get

15    divorced in Washington, correct?

16    A    No.

17    Q    I'm going to show you a document admitted into evidence as

18    Petitioner's Exhibit 68, your affidavit in a Singapore court

19    proceeding.  It's going to be Bates stamp page P521.

20         The third paragraph, second sentence, you wrote, "I have

21    reason to believe that the Defendant may have also filed for a

22    divorce in India, as he had indicated to me recently.  India does

23    not enforce equitable distribution" -- "equitable division of

24    marital assets" -- apologies, Your Honor -- "matrimonial assets,

25    and I believe that he has chosen this jurisdiction for this

 1   reason."

 2       Is this what you stated under oath to the Singapore courts?

 3   A   Yes.

 4   Q   And it was your understanding that, in India, you would

 5   receive less money in a divorce, correct, the money you believe

 6   you're entitled to?

 7           MS. SEIPEL:  Objection.  Calls for privileged

 8   information and hearsay.

 9           THE COURT:  That's overruled on those grounds, counsel.

10   A   Yes.

11   Q   When did you file this affidavit?

12   A   I think September 17th.

13   Q   It's about a week or two weeks after you were consulting with

14   divorce lawyers, correct?

15   A   Yes.

16   Q   I'm going to show you a document marked -- well, withdrawn.

17       Who is Melissa Green?

18   A   She is the paralegal at my family law attorney's office in

19   Washington.

20   Q   And I'm going to show you a document admitted into evidence

21   as Petitioner's Exhibit 75.  Who is East Asia Law?

22   A   It's a corporation in Singapore that's helping me.

23   Q   Okay.  Was it your understanding that if you got divorced in

24   the United States that you may receive 50 percent of marital

25   assets compared to 30 to 35 percent in Singapore?

1    A    Yes.

2    Q    Okay.  And so you believed that there was a financial

3    advantage in getting divorced in the United States versus

4    elsewhere, correct?

5         MS. SEIPEL:  Objection.  Your Honor, at this point, I am

6    going to be objecting to this line of questioning on relevance

7    grounds.  We are here disputing habitual residence, grave risk of

8    harm to the child, and a mature child exception to the Hague

9    Convention.  Where my client sought assets, in what country in

10   their divorce, is not relevant to this proceeding.

11        THE COURT:  Counsel?

12        MR. MIN:  Yes, Your Honor.  It's quite relevant because

13   the intentions and motivations of the parties with respect to

14   where they're going and -- where they're either not going or

15   where they're staying or not staying are completely relevant to

16   these proceedings, Your Honor.  Why she decided not to stay in

17   Singapore and come to the United States at this moment in time is

18   completely relevant to these proceedings, Your Honor.

19        THE COURT:  The objection is overruled.

20   A    Could you restate the question, please?

21   Q    Sure.

22        You believed -- based upon the information you received, that

23   you may receive 50 percent of the marital assets compared to 30

24   to 35 percent in Singapore, you believed that there was a

25   financial advantage to getting divorced in Washington, correct?

1    "Yes" or "No."

2    A   I could not file a divorce in Singapore at all in the first

3    place.  But, yes.  Financially, yeah, there was.

4    Q   My apologies.

5        You could have filed for a divorce in Singapore if you had

6    stayed a few more months to reach the three-year point, right?

7    At some point in the future, you could have filed for divorce?

8    "Yes" or "No."

9    A   I don't know that.

10   Q   That was your understanding, though, that you would be able

11   to file for divorce after three years of living in Singapore,

12   correct?

13   A   Yes.

14   Q   And as we noted before, when you stated to the Singapore

15   courts that India does not enforce equitable division of

16   matrimonial assets, you also believed that Washington would

17   provide you with a better financial outcome in the divorce than

18   India would, correct?

19   A   Yes.

20   Q   And you received communication from East Asia Law

21   October 11th, 2024, about your prospects of a financial division

22   of marital assets three days before you traveled to the U.S. on

23   October 14th, correct?

24   A   I do not know if I received this, but, yes.  I mean, I don't

25   know who East Asia sent it to.  Did she send to it my lawyer's

 1  office or is it also me in there?

 2  Q    Melissa Green, correct?

 3  A    Melissa Green is a paralegal at my lawyer's office.

 4  Q    Your divorce lawyer?

 5  A    No.  She's the paralegal at the lawyer's office.

 6  Q    Right.  Meaning -- "the lawyer's office" meaning --

 7  A    The divorce lawyer, yes.

 8          THE COURT:  Counsel, counsel, let the witness complete

 9  her answer before you ask another question.

10          MR. MIN:  Apologies, Your Honor.

11          THE COURT:  Complete your answer.

12  A    Yes, she's a paralegal at my divorce lawyer's office.

13  Q    So you sought and filed for an anti-suit injunction in

14  Washington State courts, correct?

15  A    Yes.

16  Q    Okay.  You testified earlier that your husband received an

17  anti-suit injunction from the Indian courts, correct?

18  A    I testified he applied for an anti-suit injunction in the

19  Indian court.

20  Q    Okay.  He received one, correct?

21  A    I do not know the exact legal -- I mean, answer to that

22  question.

23  Q    Okay.  You filed for an anti-suit injunction to prevent your

24  husband from filing legal proceedings anywhere else in the world,

25  correct?

1   A    In India, yes.

2   Q    In India.

3        And he filed in India to prevent divorce filings from

4   proceeding anywhere else in the world, correct?

5   A    Yes.  I think divorce filings or any other proceedings in

6   Singapore, as well as in the U.S., if I remember right.

7   Q    Well, I'm going to show you a document that's been admitted

8   into evidence as Petitioner's Exhibit 122, the anti-suit order

9   from the Indian courts.  And I'm going to ask you, where in here

10  prevents any proceedings, aside from divorce, from going forward

11  in the world?

12       So I'm happy for you to look through it, and I will ask you

13  if this order only prevents the divorce proceedings from

14  proceeding elsewhere in the world, not custody or anything else.

15  So feel free to look this over and let me know if I'm incorrect.

16       MS. SEIPEL:  And, Your Honor, this is a 54-page

17  document.  If Mr. Min could provide my client with a physical

18  copy of it so she can sit there and read the 54 pages that he has

19  asked her to do.

20       MR. MIN:  Of course.

21       THE COURT:  That's requested and required.

22       MR. MIN:  Yes, Your Honor, we're happy to do that.

23       THE COURT:  And, counsel, it's 4:28, 4:29.  If this

24  document is, in fact, 54 pages, and the witness is entitled to

25  have an opportunity to review it, in light of the requests that

1    you have proposed, do you have any objection to recessing at this

2    point in time?

3              MR. MIN:  Not at all, Your Honor.

4              THE COURT:  All right.  We will take our recess.  We

5    will pick up tomorrow morning at 9 a.m.

6              MS. SEIPEL:  Thank you, Your Honor.

7              THE CLERK:  All rise.

8              THE COURT:  We're at recess.  The parties are excused.

9                         (Adjourned.)

10

11

12                   C E R T I F I C A T E

13

14        I, Nickoline M. Drury, RMR, CRR, Court Reporter for the

15    United States District Court in the Western District of

16    Washington at Seattle, do certify that the foregoing is a correct

17    transcript, to the best of my ability, from the record of

18    proceedings in the above-entitled matter.

19

20

21                    /s/ Nickoline Drury

22                    Nickoline Drury

23

24

25