```
1                  UNITED STATES DISTRICT COURT

2            WESTERN DISTRICT OF WASHINGTON AT SEATTLE

3    _____
                                        )
4    PRASANNA SANKARANARAYANAN,         ) CV24-01745-RAJ
                                        )
5                    Petitioner,        ) SEATTLE, WASHINGTON
                                        )
6        v.                             )
                                        ) January 8, 2025 -
                                        ) 9:00 a.m.
7    DHIVYA SASHIDHAR,                  )
                                        )
8                    Respondent.        ) EVIDENTIARY HEARING -
                                        ) Day 3
9                                       )
     _____

10
                 VERBATIM REPORT OF PROCEEDINGS
11         BEFORE THE HONORABLE RICHARD A. JONES
                 UNITED STATES DISTRICT JUDGE
12   _____

13

14   APPEARANCES:

15   For the Petitioner:     Richard Min
                             Michael Banuchis
16                           Green Kaminer Min & Rockmore LLP
                             420 Lexington Avenue
17                           Suite 2821
                             New York, NY 10170
18

19   For the Respondent:     Katrina Anne Seipel
                             Katelyn Skinner
20                           Buckley Law PC
                             5300 Meadows Road
21                           Suite 200
                             Lake Oswego, OR 97205
22

23

24

25
```

```
 1                        EXAMINATION INDEX

 2    EXAMINATION OF:                                     PAGE

 3    DHIVYA SASHIDHAR     CONTINUED CROSS-EXAMINATION       3
                           BY MR. MIN
 4                         REDIRECT EXAMINATION              72
                           BY MS. SEIPEL
 5                         VOIR DIRE EXAMINATION             80
                           BY MR. MIN
 6                         CONTINUED REDIRECT EXAMINATION    81
                           BY MS. SEIPEL
 7                         RECROSS-EXAMINATION               93
                           BY MR. MIN
 8    PRASANNA             DIRECT EXAMINATION                95
      SANKARANARAYANAN     BY MS. SKINNER
 9                         CROSS-EXAMINATION                103
                           BY MR. MIN
10                         REDIRECT EXAMINATION             105
                           BY MS. SKINNER
11    LANDON POPPLETON     DIRECT EXAMINATION               114
                           BY MS. SEIPEL
12                         CROSS-EXAMINATION                142
                           BY MR. MIN
13

14

15                         EXHIBIT INDEX

16

      EXHIBITS ADMITTED                                   PAGE
17
       327, page 105                                        56
18     327, page 47                                         92

19

20

21

22

23

24

25
```

1          THE COURT:  Good morning.  Please be seated.

2          THE CLERK:  We are resuming our evidentiary hearing in

3    the matter of Sankaranarayanan versus Sashidhar, Cause No.

4    C24-1745, assigned to this Court.

5          THE COURT:  I believe we were completing the

6    cross-examination, so if you would return to the witness stand.

7       Counsel, please continue cross-examination.

8          MR. MIN:  Thank you, Your Honor.

9                        DHIVYA SASHIDHAR,

10      previously sworn, resumed and testified as follows:

11          THE COURT:  You may inquire.

12          MR. MIN:  Thank you Your Honor.

13                   CONTINUED CROSS-EXAMINATION

14   BY MR. MIN:

15   Q   Good morning.

16       Have you had a chance to look at the ASI order we left off

17   with yesterday?

18   A   Good morning.

19       Yes.

20   Q   I'm going to pull it up on the screen.  You would agree that

21   this ASI order does not prohibit custody from being determined in

22   Singapore, correct?

23   A   Yes.

24   Q   Although you testified that it did, correct?

25   A   I mean, it says in the order that India will not interfere

1   with child custody matters, I guess.  I don't know if that means

2   that Singapore can determine custody.  So I'm not sure how to

3   interpret that.

4   Q   Sure.

5       When you got the passport, the emergency passport, in

6   October 2024, did you have to give a reason for why you needed

7   that passport?

8   A   Yes.

9   Q   And was the reason because you had to travel to India?

10  A   There were multiple reasons --

11  Q   "Yes" or "No."

12  A   One of them was because I got summonsed from the Indian

13  court.  I had to talk about it to the U.S. Embassy, yes.

14  Q   Did you ever do that, travel to India for the court

15  appearances?

16  A   No.  I was told I didn't have to.

17  Q   I'm going to show you a page Bates stamped 2840.  And this is

18  from the ASI order.  Petitioner's Exhibit 122 in evidence.

19      Who is V. Manohar?

20  A   He is a lawyer that represents me in India.

21  Q   Okay.  I thought you said earlier you had no lawyer in India,

22  in your testimony?

23  A   No.  I said I contacted a lawyer after I received the

24  summons from India.

25  Q   Okay.  So you do have representation in India?

 1  A    For this particular anti-suit injunction case, yes.

 2  Q    Paragraph 24 -- if we can scroll down, Ms. McHale -- the

 3  Court asked your lawyer whether you would seek a continuance or

 4  adjournment in Washington.  Do you see that?

 5  A    I see that, yes.

 6  Q    If we go to the next page, the first paragraph, the Court

 7  then said, quote, "This reluctance on the part of the first

 8  respondent indicates that the plea that this court should not

 9  deal with the injunction is merely a tactic to delay and secure

10  an order before the American court."  Do you see that?

11  A    Yes.

12  Q    And "first respondent" is referring to you, correct?

13  A    Correct.

14  Q    And the reluctance is the fact that your Indian lawyer would

15  not agree to delay the Washington divorce, correct?

16  A    I think he just said we need to discuss and get back.  I

17  don't think he refused.

18  Q    Okay.  If I go to Bates page No. 2857, paragraph 53, the

19  court notes, quote, "At this stage, I take notice of the fact

20  that the Courts in Singapore have invoked their jurisdiction

21  vis-à-vis the child.  Hence, it would not be appropriate for the

22  Family Court in Chennai to exercise its jurisdiction over the

23  child."

24       If we go to the next page, referring to the Hague Convention

25  case going on, the fourth line up, "Noticing this difficulty,

1  Ms. Geeta Luthra submitted that the husband will not proceed with

2  respect to any orders for interim custody or otherwise before the

3  Courts in India."  Do you see that?

4  A    Yes.

5  Q    And that was your husband's lawyers in the Indian

6  proceedings, right?

7  A    Yes.

8  Q    Okay.  Representing to the court that they are not proceeding

9  with any custody claims in India and will be proceeding with

10 custody issues in Singapore, correct?

11 A    Yes.

12 Q    Okay.  If I go to Bates page number 2862, paragraph 61, the

13 court says, quote, "At this stage, I have to refer to the typed

14 set of papers filed by Mr. V. Manohar," end quote.

15      And, again, Mr. V. Manohar is your lawyer, right?

16 A    Yes.

17 Q    Going on, quote, "In an e-mail that has been addressed to the

18 American Citizens Services at the U.S. Embassy at Singapore, the

19 1st respondent pleaded that she requires a passport to be issued

20 for the child XXX born to the couple as she needs to submit

21 herself before the Courts in India," end quote.

22      Again, "1st respondent," referring to you, right?

23 A    Yeah.

24 Q    And there was an e-mail addressed to the American Citizen

25 Services stating that you needed to submit yourself to the Courts

 1   in India as a reason you needed an emergency passport, correct?

 2   A    Yeah.

 3   Q    If you go to Bates page number 2865, paragraph 66, the Court

 4   noted, quote, "As pointed out above, most of the evidences and

 5   witnesses are situated in Singapore and in India.  The cost of

 6   producing these witnesses and evidences in United States would be

 7   prohibitive.  The 1st respondent cannot create fortuitous

 8   circumstances and, thereafter, plead that the American Court has

 9   jurisdiction."

10        If you would go to Bates No. 2866 --

11             MS. SEIPEL:  Objection.  Mr. Min just read a paragraph.

12   There was no question following it.

13             THE COURT:  Is there a question, counsel, or just a

14   statement?

15             MR. MIN:  For that one, I will withdraw.  There was

16   going to be a question, but I'm going to move on to the next

17   paragraph and we will ask a question.

18             THE COURT:  Please continue.

19   Q    (By Mr. Min:)  If we go to Bates page number 2866,

20   paragraph 67, second line, the Court says, quote, "On the verge

21   of her departing from Singapore, the Singapore Court also granted

22   an order restraining her from taking the child away from

23   Singapore.  She secured the passport in order to appear in this

24   country.  However, she utilized it to travel to United States."

25        Again, this is referring to you securing the passport,

1    correct?  The "she" in this paragraph is referring to you,

2    correct?

3    A    Yes.

4    Q    And if we go to Bates page number 2876, paragraph 85(i), the

5    Court orders, quote, "The 1st respondent is restrained from

6    proceeding further with the divorce proceedings initiated by her

7    in United States of America (USA) or from initiating any

8    proceeding in Singapore with respect to the marriage between the

9    petitioner and the 1st respondent."

10       Do you see that?  That was the anti-suit that the Court

11   issued, right, from divorce proceedings going forward in the

12   United States or Singapore, correct?

13   A    Yes.

14   Q    Okay.  But, again, the Court noted that custody proceedings

15   should go forward in Singapore, and that was what your husband's

16   lawyer agreed to, that custody would be decided by the Singapore

17   courts, correct?

18            MS. SEIPEL:  Objection.  Speculation.

19            THE COURT:  That's sustained.

20   Q    You sought an anti-suit injunction in the Washington courts,

21   correct?

22   A    Correct.

23   Q    Trying to stop the divorce from proceeding in India, correct?

24   A    Yes.

25   Q    When did you do that?

1   A    I think the date of the filing might be October 29th.  I'd

2   have to look up the dates for a precise answer on that.

3   Q    Did you get an anti-suit injunction order from the Washington

4   courts?

5   A    Not yet.

6   Q    You are still seeking one, though, correct?

7   A    Yes.  There have been no hearings and we're waiting for the

8   petitioner to -- I mean, we're waiting for the respondent to

9   respond to us.

10  Q    In the fall of 2024, before you left for the United States on

11  October 14th, you represented to your husband -- or withdrawn.  I

12  will rephrase.

13       Between September 1st, 2024, and October 13th, 2024, isn't it

14  true that you represented that you would have remained in

15  Singapore if your husband returned to Singapore and provided you

16  with safe conditions?

17  A    I mean, the situation --

18  Q    "Yes" or "No."

19  A    -- in which I was, I don't even remember like -- yeah, I sent

20  him numerous e-mails asking if he was coming back.  I've asked

21  him for so many things.  But, yeah, if this is specifically what

22  I would have asked for and what I would have intended, I'm not

23  sure.

24  Q    Okay.  I'm going to show you a document from your deposition

25  transcript, Bates stamp 2606, page 20, starting on line 14:

1          Question:  "So you did not tell him before

2          October 12th that you were planning on going back to

3          the United States on October 14th, correct?"

4          Answer:  "I told him in multiple formats that I want

5          to go back to the U.S. with my child if he did not

6          respond back or if he did not show up in Singapore or

7          if he did not provide safe conditions for us to live

8          in.  But the date October 14th was communicated to him

9          after I booked the tickets and after I knew that I was

10         actually" -- go to the next page -- "leaving on

11         October 14th, yes."

12         Is that an accurate reading of the question you were

13         asked and the answer you provided?

14    A    Yes.

15    Q    So your testimony is that you told him if you don't come back

16    to Singapore and provide us safe conditions, then I want to go

17    back to the U.S.?

18    A    Or respond to me either, yeah.

19    Q    And you had felt unsafe in Singapore; is that fair?

20    A    Yes.

21    Q    And you felt like you were short on money; is that fair?

22    A    Yes.

23    Q    That you couldn't afford to pay for things; is that fair?

24    A    Yes.

25    Q    You were concerned about the rent on the house, which is

1    about 20,000 Singapore dollars?

2    A    Yes.

3    Q    By the way, the anti-suit injunction we just looked at, they

4    ordered your husband to pay you 30,000 Singapore dollars in

5    maintenance, correct?

6    A    Yes.

7    Q    Okay.  And they ordered him to pay you 30,000 Singapore

8    dollars, correct, a month?

9    A    Yes.

10   Q    Okay.  And how much is that approximately in U.S. dollars?

11   A    I don't know.  I'm sorry.  I would have to calculate.

12   Q    I mean, a range?  Is it, you know, about 20-, 25,000 U.S.

13   dollars, is it less?

14   A    I do not know, sir.  I'm sorry.

15   Q    Okay.  And your rent in your house -- and I apologize if

16   you've already answered this -- in the Singapore house, 4 Astrid

17   Hill, was about 20,000 Singapore dollars per month, correct?

18        THE COURT:  Counsel, counsel, slow down, please.  Repeat

19   the question.

20   Q    The rent on the 4 Astrid Hill home was approximately 20,000

21   Singapore dollars a month in rent?

22   A    Correct.

23   Q    And you were concerned because you couldn't afford that rent,

24   correct?

25   A    Correct.

1  Q   And you wrote to him, your husband, asking whether he was

2  going to pay for the rent?

3  A   Yes.

4  Q   So would it be fair to say that if you had funds, if you had

5  safe living conditions, that you would have been perfectly happy

6  continuing to live in Singapore?

7  A   No.

8  Q   Would it be fair to say that you would have continued living

9  in Singapore if you had access to funds and felt safe?

10 A   Depending on what's right for my child and what we agree with

11 my husband.

12 Q   You said that what you wanted was to be able to have money to

13 afford living in a place, spend on food, without wondering

14 whether the credit card will be blocked the next time you have to

15 shop for groceries; is that fair?

16 A   Yes.

17 Q   We're going to pull up a document, Exhibit -- Respondent's

18 Exhibit 308, admitted into evidence.  This is an e-mail you sent

19 to your husband upon arriving in Washington, correct?

20 A   Correct.

21 Q   You talked about waiting for your husband in Singapore,

22 correct?

23 A   Wait.  I don't know which line you are reading that from, but

24 I just want to ...

25 Q   I'm not reading, but I'm paraphrasing.  But the last sentence

 1    of the first paragraph, starting "How long can we wait for you?

 2    It's been more than 1.5 months."

 3    A    Yes, I have said that.

 4    Q    In the second sentence -- or the second line, "There was no

 5    way for us to continue living in Singapore without any funds in

 6    my bank account."  Do you see that?

 7    A    Yes.

 8    Q    That was one of your concerns?

 9    A    Yes.

10    Q    Okay.  And then you also say, "As well as the fear of when

11    you will revoke our DPs"?

12    A    Yes.

13    Q    Okay.  That was one of your concerns?

14    A    Yes.

15    Q    And then in the next paragraph, you invited him to call you

16    on your Singapore number at any time and talk to A███, correct?

17    A    Yes.

18    Q    Okay.  Was this before or after you got a protective order

19    against him in Washington preventing him from talking to your

20    son?

21    A    Before.

22    Q    That was before.  Okay.

23         So at this time, you were fine with him speaking to your son

24    whenever he wanted, but sometime thereafter, when you left to the

25    United States to feel safer, you felt it appropriate to cut off

1    contact between your son and him?

2          MS. SEIPEL:  Objection.  Argumentative.

3          THE COURT:  It's overruled.

4    A    I did not want to cut off contact between him and the child,

5    but I wanted him to have, like, a safe conversation with my child

6    without manipulating or intimidating my child or asking him to

7    get me to withdraw my cases and things like that.  My child

8    shouldn't be brought in the midst of all of this.

9    Q    In the next paragraph, you say, "A.S. and I are happy and

10   feeling a lot more secure financially and mentally here in the

11   U.S."  Do you see that?

12   A    Yes.

13   Q    So one of the things you were looking for in Singapore was

14   financial security, fair?

15   A    Correct.

16   Q    You have bank accounts in Singapore, correct?

17   A    Correct, one account.

18   Q    You're CEO of a company in India, correct?

19   A    Correct.

20   Q    And that company generates how much in revenue a year?

21          MS. SEIPEL:  Objection.  Relevance.

22          THE COURT:  Sustained.

23   Q    You earn a salary from that company, correct?

24   A    No.

25   Q    Zero?

1    A    Zero.

2    Q    Have you ever filed taxes in India?

3    A    No.

4    Q    You have U.S. bank accounts, correct?

5    A    Correct.

6    Q    Okay.  And you had over $100,000 in a U.S. bank account,

7    correct?  "Yes" or "No."

8    A    In one single account, no.

9    Q    Over several accounts?

10   A    Yes.

11   Q    In your name?

12   A    Yes.

13   Q    Okay.  At no point after August 31st, 2024, did you receive

14   notice that the rent on your home at 4 Astrid Hill was not being

15   paid, correct?

16   A    So you are asking if I was ever notified if the rent was not

17   paid?

18   Q    Yes.

19   A    That's correct.

20   Q    Okay.  You had no reason to believe -- withdrawn.

21        At any point after August 31st, before you left on

22   October 14th, did you get any notification that any bills

23   associated with that home were not being paid?

24   A    Yes.

25   Q    What?

1    A    Like the pool-maintenance person asked me why the bill was

2    not paid.  I sent it to Prasanna in e-mail.  He didn't respond to

3    my e-mail.  And, also, the rent payment was coming up on

4    October 18th, and I asked Prasanna if he's going to pay the rent.

5    He didn't respond to me.  So I was -- yeah, I was really scared

6    whether these things were going to be paid or not.

7    Q    But you don't know whether the rent was paid on October 18th?

8    A    I don't know that.

9    Q    Okay.  And you left before that happened?

10    A    Correct.

11    Q    Okay.  And the pool-maintenance cleaner, you sent that

12    invoice to your husband is your testimony?

13    A    Yes, on e-mail.

14    Q    And do you know if that invoice is paid?

15    A    I don't know.

16    Q    So you left for the United States to feel more financially

17    secure, correct?

18    A    Correct.

19    Q    When you arrived in the United States, you stayed at a

20    friend's house, correct?

21    A    Correct.

22    Q    About a week?

23    A    Yeah.  Maybe less than that.

24    Q    Okay.  And you leased a home, correct?

25    A    Correct.

1    Q    How much are you paying for that home?

2    A    $1,805 a month.

3    Q    Okay.  Now, this is money that's coming from your savings,

4    correct?

5    A    Correct.

6    Q    This is an expense that you did not have in Singapore,

7    correct, this lease on the Washington home?

8    A    Can you clarify that question?

9    Q    Well, meaning, in Singapore, you were not paying for an

10   apartment in Washington, correct?

11   A    Correct.

12   Q    Okay.  Meaning that in Washington, when you arrived, you now

13   had eight -- what was it, 1,800?

14   A    Yeah.

15   Q    Okay.

16        -- $1,800 a month in increased expenses, correct?

17   A    I mean, yeah, that's my rent in Washington.  I don't know how

18   to interpret that question.  But is it over the expense in

19   Singapore?  How do you -- I mean, I don't know how to interpret

20   that question.  Like, Prasanna is paying for everything in

21   Singapore.  So what I'm paying here is -- yeah.

22   Q    You asked your husband for money between September 1st and

23   October 13th, correct?

24   A    Yes.

25   Q    And you asked him for money after you arrived in the U.S.,

1    correct?

2    A    No.

3    Q    No?

4         You filed maintenance applications in Singapore courts,

5    correct?

6    A    Correct.

7    Q    In Washington?

8    A    I don't know if we've already filed, but I think

9    everything -- all the cases were stayed recently, so I just have

10   to look back and refer to what my lawyers filed or not filed yet.

11   Q    Okay.  Before you left for the United States, your child had

12   a driver, correct?

13   A    Not in the last few weeks.

14   Q    Okay.  But up until late September, he had a driver?

15   A    I don't know until what date, but there was a driver that

16   dropped him at school and brought him back from school, just for

17   that one thing.

18   Q    And you terminated this driver, as you testified, because of

19   what you believed were inappropriate discussions between your

20   husband and your child, right?

21   A    Terminated the driver.  Concern for the safety of my child,

22   not because of the conversations itself.

23   Q    Okay.  But before you terminated this driver, your husband

24   was paying the driver's expenses, right, or bills?

25   A    I do not know that.

1   Q   But you never received notice that he was not being paid,

2   correct?

3   A   I mean, the driver sent some things on a WhatsApp chat asking

4   to be paid, and then he didn't follow up on it.

5   Q   You had a helper in the home?

6   A   Yes.

7   Q   Okay.  Did you ever receive notice that she was not being

8   paid?

9   A   She's a new helper, so for the first month, she didn't have

10  to be paid.  But after that, she asked me to be paid, and I paid

11  her from the bank account that I had, yes.

12  Q   The bank account where?

13  A   In Singapore.

14  Q   How much did you have in that bank account?

15  A   I mean, at what date?  This is a question that -- how do I

16  answer this question?

17  Q   Sure.

18      In September 2024, how much did you have?

19  A   Probably like 3,000, 4,000 dollars in the bank account.

20  Q   October?

21  A   By October, maybe like 1,500, 2,000 dollars in the bank

22  account.

23  Q   Were you using any credit cards when you were in Singapore?

24  A   Yes.

25  Q   Whose?

1    A    I mean, there is a joint credit card from the U.S. bank

2    account, joint bank account, that me and Prasanna hold.  I was

3    using that and also -- I mean, that's the only credit card that I

4    was using.

5    Q    How much did you ask the Singapore courts for in financial

6    maintenance?

7    A    I think they asked me this question two times.  So one was

8    either like 20,000 or 30,000 dollars, factoring in that rent

9    itself was $20,000 in the Singapore house.

10   Q    At some point did you ask for 40,000?

11   A    I don't remember asking for 40,000.  Maybe they added the

12   child's expenses along.  I'm not sure of this.

13   Q    I'm going to show you a document, Petitioner's Exhibit 105,

14   page 2, paragraph 5.  Is this you asking the Singapore courts to

15   order your husband to pay 40,000 per month commencing in

16   October 2024?

17   A    No.

18        Can I see the top of the filing?  I don't know which country

19   this filing is coming from.

20   Q    Apologies.  I will withdraw, actually.  Apologies.  I will

21   withdraw the question.

22        Did you ask for $40,000 a month in the Washington courts for

23   maintenance?

24   A    Yeah.

25   Q    And you asked for 20- or 30,000 Singapore dollars in the

1    Singapore courts for maintenance?

2    A    Yeah.

3    Q    Okay.  So you asked for more money in the U.S. courts for

4    maintenance than you did in the Singapore courts; is that fair?

5    A    Yeah, because of the legal expenses that I'm having here.

6    Q    You submitted an application for a personal protective order

7    in Singapore, correct?

8    A    Correct.

9    Q    This was in late September 2024, correct?

10   A    Yeah.  It was -- I tried to file it early in September, but,

11   I mean, yeah, late September is when it got filed.

12   Q    And then you sought to withdraw these applications, correct?

13   A    Correct.

14   Q    Why did you want to withdraw these applications?

15   A    Because I had moved to the U.S., and, yeah, I couldn't really

16   show up in person for hearings in Singapore.  And it didn't

17   make -- I don't know what's -- how -- what it would mean to have

18   a protective order in Singapore while I was living in the U.S.

19   So I just withdraw the applications there.

20   Q    Okay.  When did you file for a protective order in

21   Washington?

22   A    October 21st.

23   Q    October 21st.

24        The court in Singapore granted your application to withdraw

25   your maintenance and personal protective order applications,

 1  correct?

 2  A    Yes.

 3  Q    And pending still is your custody application in Singapore,

 4  correct?

 5  A    I wanted to withdraw that as well, but, yeah, the court

 6  refused to let me withdraw it.

 7  Q    Okay.  And also pending is your husband's cross-application

 8  for custody in Singapore?

 9  A    I think so, yeah.

10  Q    Would you agree that there is nothing preventing you from

11  returning to Singapore with your child at this time?

12  A    I mean, like what do I do without any money in Singapore or

13  the ability to work and earn --

14        THE COURT REPORTER:  I'm sorry, ma'am.  You need to say

15  that again.

16  A    Sorry.

17        I said, what do I do without any ability or -- I mean, to

18  earn and, you know, support my life or my child's life in

19  Singapore, like, and not have money in Singapore?

20        So, I mean, money is one concern, but, also, I don't know, I

21  feel definitely, like, the safety aspects, there's a lot of -- I

22  mean, so, really, honestly, it also feels like just revisiting a

23  lot of trauma for me, thinking of going back to Singapore.  And

24  it feels like I live, like, a captive life or something.  I don't

25  know.  Just emotionally, I feel really -- yeah.

1  Q    Okay.  But you asked for 20- or $30,000 in maintenance for

2  you and your family and your child.  The Indian courts ordered

3  30,000 Singapore dollars to be paid to you monthly for

4  maintenance, correct?

5  A    I did not ask for anything in the Indian court, and that

6  Indian court order has a lot of factual errors also in it,

7  including like the dates of filings and things like that.  So I'm

8  not sure I entirely agree with what the Indian court has ordered,

9  even though they're giving me money.  I mean --

10  Q    My question was, you had asked the Singapore courts for 20-

11  or 30,000 Singapore dollars per month in maintenance, correct?

12  A    When I lived in Singapore, yes.

13  Q    Yes.

14      And the Indian courts have ordered that your husband pay you

15  30,000 Singapore dollars monthly in maintenance, correct?  "Yes"

16  or "No."

17  A    Yes.

18  Q    Okay.  And you just testified that your husband deposited

19  $100,000 into your Singapore bank account?

20  A    I mean, the Indian court ordered that on December 20th.  He

21  deposited that money, I think, just before the start of this

22  trial, like he didn't -- so, yeah.  But, yes, I did check in the

23  bank account and there was a $100,000-odd deposit.

24  Q    The Indian court ordered, as you said, late December the

25  maintenance payments, correct?

1    A    Yes.

2    Q    And they ordered that 30,000 shall be paid by the 5th of

3    every calendar month, correct?

4    A    Yes.

5    Q    Okay.  And so the first calendar month for that to apply was

6    January 5th, correct?  "Yes" or "No."

7    A    No.

8    Q    I will pull up the Indian ASI.

9              THE COURT:  The exhibit number, counsel?

10             MR. MIN:  Petitioner's Exhibit 122.

11   Q    And if we go to paragraph 85(ii), right, he's to pay you

12   30,000 Singapore dollars per month.  Now, the liability for this

13   commences in September, right?

14   A    Yes.

15   Q    But if we go to the next page, the maintenance shall be paid

16   on or before the 5th of every calendar month, right?

17        So this order was issued in late December, and by, I guess

18   from what you testified, I think you said Monday, so January 6th,

19   he deposited 100,000 or so into your Singapore accounts, right?

20   A    Yeah, but he was liable to pay that since September.  So, I

21   mean, why is it construed that he has to pay only on January 5th?

22   Q    So the order issued in late December ordering him to pay by

23   the 5th of January.  Going back to September, when he started

24   owing you that money, he has paid you, essentially, how much he's

25   owed you, 30,000 Singapore dollars, from September until

 1   January --

 2          MS. SEIPEL:  Objection --

 3   Q    -- on Monday, correct?

 4          MS. SEIPEL:  -- compound, confusing question.  Calls for

 5   a legal conclusion.

 6          THE COURT:  It's overruled.

 7   A    He -- I mean, can we do a calculation like September,

 8   October, now we're in December, four months of $30,000, I think

 9   that's $120,000, but what he paid me in my account was much less

10   than that.  And so did he meet with what the Court has asked him

11   to pay?  I mean, I don't know.  And I -- yeah, honestly, like, it

12   doesn't -- yeah.  So you can answer the question -- or what do I

13   say, like he was supposed to pay me about 150 grand and he's paid

14   me 100,000 into the Singapore bank account.

15   Q    I thought we said it was 120-?

16   A    I calculated for four months.  I did not calculate January.

17   So if you take January into account, that's five months, right?

18   Q    So how much did you exactly receive on Monday?

19   A    I'd have to look up my bank account for that.  But I remember

20   that it was $100,000 plus or minus a few more thousands.

21   Q    This is your Singapore bank?

22   A    Yes, sir.

23   Q    Okay.  And he had also transferred money, previously to this

24   Monday, into your Singapore bank account, correct?

25   A    Can you restate that question?  He had also previously

1  transferred money?

2  Q   Your husband, in addition to the hundred thousand that was

3  paid to you recently, had transferred additional sums to you

4  before that into your Singapore bank account, correct?

5  A   Correct.  I think he transferred $5,000 into the Singapore

6  bank account before the $100,000.

7  Q   One payment of 5,000 is your testimony?

8  A   I think I just want to look back.  Like, I'm not using that

9  account right now, so I don't really have much access to it

10  either.

11  Q   Okay.  But you are able to view it online?

12  A   Correct.

13  Q   Are you able to access its funds?

14  A   Not really.  I'm trying to, but it's a hard route.

15  Q   What do you mean by "not really"?

16  A   I mean, the bank wants me to send some signatures or come in

17  person and sign with them to be able to withdraw money out of

18  that to another -- I don't know, to the U.S., for example.  So

19  it's ...

20  Q   But if you were in Singapore, you would be able to access

21  those funds?

22  A   I believe so.

23  Q   You agree that your husband is contesting jurisdiction of

24  Washington to proceed with the divorce, correct?

25  A   I think so, yes.

1   Q   He's contesting jurisdiction in Washington for any of the

2   legal actions, aside from this Hague Convention case; is that

3   fair?

4   A   I mean, I'm not a lawyer, sir, so I don't exactly know how to

5   answer that question.

6   Q   Have you ever told your mother that you wanted to strangle

7   your husband?  "Yes" or "No."  "Yes" or "No."

8   A   I don't remember.

9   Q   You don't remember.

10      Have you ever told him that you wanted to kill him -- told

11  your mother that you wanted to kill your husband?  "Yes" or "No."

12  A   I don't remember.

13  Q   Okay.  Is there something that might help you refresh your

14  recollection, like a recording?

15  A   Sure.

16          MR. MIN:  Your Honor, can I just approach the witness

17  and have her listen to the recording?

18          MS. SEIPEL:  I'm going to object to this.  I don't know

19  what recording we're talking about, I don't know if I have heard

20  it, and I'm also objecting on relevance grounds.

21          THE COURT:  Counsel, clarify.

22          MR. MIN:  Your Honor, I do think it's relevant because

23  the witness is bringing up incredible marital discord and

24  accusing the father of threats and specific verbal assaults or

25  abuses, and I do think that her behavior is important, and her

1  words matter as much as his words matter.

2          THE COURT:  How does this go to establishing habitual

3  residence of the child?

4          MR. MIN:  Well, no, this part does not go to habitual

5  residence.  It goes to the affirmative defenses, Your Honor.

6          THE COURT:  All right.  Has counsel for the respondent

7  had the opportunity to listen to this tape in advance of this

8  proceeding?

9          MR. MIN:  No.  This is simply to refresh recollection,

10 Your Honor.  It's not in evidence or offered in evidence.

11         THE COURT:  All right.  The objection is overruled.

12     Are you playing the tape, just for the benefit of the

13 witness --

14         MR. MIN:  Yes.

15         THE COURT:  -- or for the Court?

16         MR. MIN:  Just for the benefit of the witness, Your

17 Honor.

18         THE COURT:  All right.

19         MR. MIN:  Just to refresh her recollection.

20         THE COURT:  All right.

21     And, counsel, this will not be recorded, if it's used to

22 refresh her recollection.

23         MR. MIN:  Of course.  And we're not planning on it.

24 Just to refresh recollection.

25         THE COURT:  Okay.

 1          MR. MIN:  I mean, my plan is to just put it there and
 2   let her listen to it, and I will ask her an additional question.
 3          THE COURT:  And you say for "her to listen."  She's only
 4   a few feet from me, counsel.  So how is it that I am not supposed
 5   to hear what she's hearing?
 6          MR. MIN:  I actually don't believe it's in English, Your
 7   Honor, so -- but I'm happy for the witness to go somewhere else,
 8   whatever Your Honor wishes.
 9          THE COURT:  When you say you "don't believe it's in
10   English," do you know if it's in English or not?
11          MS. SEIPEL:  Your Honor, I would request that Mr. Min
12   send me the recording and that I be given an opportunity to let
13   my client listen to it in one of your rooms, and then we could
14   take her back up on the stand and Mr. Min can ask her the
15   questions that he wants to ask her.
16          THE COURT:  Well, to move things along, can you
17   represent, counsel, that it's in English or not in English?
18          MR. MIN:  Your Honor, I don't believe it's in English.
19   That's ...
20          THE COURT:  Well, just to be cautious, let's go ahead
21   and take a short recess and let the witness step into the
22   anteroom that's right outside this courtroom.  As soon as she's
23   had the opportunity to review it, we will come back into court.
24          MR. MIN:  Thank you.
25          THE COURT:  How long is it, counsel?

1           MR. MIN:  Fifty seconds, Your Honor.

2           THE COURT:  All right.  Let's proceed.  I will stay on

3    the bench then.  You can step down.

4       Counsel, you can accompany.

5           MS. SEIPEL:  Thank you, Your Honor.

6           THE WITNESS:  So I go with them?

7           THE COURT:  Yes, and your lawyer, with your lawyer.

8           THE WITNESS:  Okay.

9           THE COURT:  Yeah.

10                          (Off the record.)

11          MS. SEIPEL:  Your Honor, I have a lot of questions about

12   this recording.  In discovery, we requested to be provided with

13   all recordings of respondent.  Mr. Min just told Your Honor that

14   I have not had a chance to view this video, but then he just told

15   me that it was provided in discovery.

16          THE COURT REPORTER:  Counsel, can you hold on one

17   minute, please?

18       Sorry.

19          MS. SEIPEL:  I'm sorry.

20          THE COURT REPORTER:  Okay.  Go ahead.

21          MS. SEIPEL:  I will reiterate for the record that I have

22   serious concerns about this recording.

23       In our requests for production, we requested all audio and

24   video recordings of the respondent.  Mr. Min just told the Court

25   that I have not had a chance to hear this, view it, or review it.

1    When I just asked him a question about it not being in discovery,

2    he told me that it was provided in discovery.

3         And I also have concerns about it being in another language,

4    that of which, other than my client, I don't speak, haven't had

5    that chance to hire a translator, haven't had a chance to bring

6    someone into court to testify about it otherwise, there's nobody

7    here to translate it or interpret it.  And so at this point, I

8    think -- I renew all of my objections and request that we move

9    on.

10        THE COURT:  Mr. Min?

11        MR. MIN:  Your Honor, again, this is simply to refresh

12   recollection.  Any document can be used to refresh recollection,

13   Your Honor.  I mean, it's not -- it doesn't matter whether I

14   understand it or counsel understands it.  It's about the witness.

15   It could be anything.  If that refreshes her recollection as to

16   whether or not she said these things, that's the only thing that

17   matters.

18        THE COURT:  Well, counsel, at this juncture of the

19   proceeding, the Court is going to give her the opportunity to

20   listen to it.  If there's continued or ongoing concerns about

21   what's contained -- counsel has represented it's just a matter of

22   seconds.  I believe your client, in light of where we are right

23   now, can assist you in providing a proper translation.  If

24   there's ongoing concerns, you can bring it to the Court's

25   attention.

 1            MS. SEIPEL:  Okay.

 2            THE COURT:  But at this point in time, the objection is

 3    overruled.  This recording can be utilized to refresh the

 4    witness's recollection.

 5            MS. SEIPEL:  Could I ask a clarification question?

 6        If this video was requested in discovery, and we were not

 7    provided this video in discovery, they should not be permitted to

 8    use it even to refresh my client's recollection, and I would ask

 9    that it be not viewed/heard on that ground.

10            THE COURT:  Mr. Min, was this provided?

11            MR. MIN:  We're checking on that.  It may not have been

12    provided because it may not have been responsive to any of the

13    issues in this case.  I mean, she's now just testifying that she

14    doesn't recall, which is the only reason we even thought about

15    using it.

16            MS. SEIPEL:  Again, we requested all video and audio in

17    his client's possession.

18            THE COURT:  All right.  Let's go listen to it, counsel,

19    then come back.

20            MS. SEIPEL:  Thank you.

21            THE COURT:  When I say "us," meaning the three of you.

22            MS. SEIPEL:  Thank you, Your Honor.

23                        (Off the record.)

24            THE CLERK:  Please rise.

25                        (Recessed.)

 1              THE COURT:  Please be seated.

 2              MR. MIN:  Your Honor --

 3              THE COURT:  Counsel, where is your co-counsel?  She's

 4      the one that's responding --

 5              MS. SKINNER:  She's in the restroom, but we're ready to

 6      proceed, Your Honor.  I can cover.  No problem.

 7              THE COURT:  Okay.  So is there still an outside issue as

 8      raised by your co-counsel?

 9              MS. SKINNER:  The issue as far as -- this recording is

10      responsive to a request that we asked for all audio or video

11      recordings from January 1, 2022, to present, and it was not

12      produced in discovery.  So we continue our objection that this

13      not be used for any purpose during this trial, as it was not

14      provided.

15              THE COURT:  Counsel, can you demonstrate whether or not

16      that was produced?

17              MR. MIN:  It was provided.  We told them exactly what

18      folder it was in, the date it was produced, which was the initial

19      discovery response date.  There were supplementals after that,

20      but this was produced in Folder 11, Document No. 22, and we told

21      counsel that during the break.

22              MS. SKINNER:  We were told that it was provided on

23      December 19th.  We have no discovery received on December 19th.

24              MS. MCHALE:  No.  December 17th.

25              MR. MIN:  No.  The --

 1            THE COURT:  Wait a second, wait a second.

 2       So, Mr. Min, what do you have that you can show to the Court

 3   to demonstrate that that recording was actually produced?

 4       I will tell you what, I'm not going to waste any more time on

 5   this issue.  I'm not going to permit counsel to ask that

 6   question.  I will give you the opportunity over the noon hour or

 7   over the break to demonstrate to counsel that, in fact, that

 8   document or recording was produced.  If you can demonstrate to

 9   the Court's satisfaction that it was produced, then you can make

10   your examination of the witness on that point.  Otherwise, let's

11   move on.

12            MR. MIN:  Your Honor -- I mean, so I shouldn't ask her

13   about the recording yet?

14            THE COURT:  If you can demonstrate to the Court that you

15   have produced that document --

16            MR. MIN:  We can.  Within ten seconds, we can do that.

17            THE COURT:  All right.  Let's do it.

18            MR. MIN:  We sent them the link.  Again, counsel is just

19   stating the wrong date in which the discovery was produced.  It

20   was produced on the first date of discovery.  We sent them a link

21   with all the documents in there.  We can show the Court the link

22   with all the documents that were in there.

23            THE COURT:  Well, let's do it this way.  Ask the witness

24   the question.  Counsel will have the opportunity to inspect your

25   records over the break or over the noon hour.  If you find

1    something different, then you can present it to the Court, I will

2    strike the witness's -- the question and answer provided.  But

3    short of that, counsel is permitted to ask the question, based

4    upon his representation in good faith that the discovery was

5    produced.  Let's proceed.

6              MR. MIN:  December 17th.

7    Q    (By Mr. Min:)  Did that help you refresh your recollection?

8    A    No.

9    Q    No?  Okay.

10         Have you ever heard that recording before?

11   A    No.

12   Q    Your husband filed for a personal protective order in

13   Singapore, correct?

14   A    Yes.

15   Q    Okay.  In there, did he allege that you had said these

16   things?

17   A    I don't know.

18   Q    Have you ever thrown a tumbler at your husband?

19   A    No.

20   Q    In New Zealand, you never threw a tumbler at him?

21   A    No.

22   Q    On August 31st, 2024, did you try to physically remove his

23   phone from his possession?  "Yes" or "No."

24   A    No.

25   Q    You never lunged at him and tried to grab his phone when he

```
 1   was holding it?
 2             MS. SEIPEL:  Objection.  Asked and answered.
 3             THE COURT:  That's sustained.
 4   Q   Your husband wanted you to work while you were living in
 5   California, correct?
 6   A   I don't know that.
 7   Q   Didn't your husband suggest you should get a job while you
 8   were living in California?
 9   A   I know I wanted to try and get a career back.  I don't
10   remember if he told me "Get a job."
11   Q   I'm going to pull up a page from your deposition, Bates stamp
12   P2423 to 2424, starting on line 18, on Bates stamp page 2423 --
13   and the first question and answer is more for context, so if you
14   just want to take a look at it, about entering the job force --
15   and then the question:
16        Question:  "Well, I didn't -- I don't mean to say he
17        pushed you, but more that he thought you should do
18        it?"
19        Answer:  "You know, so I think he -- we were going
20        through, like, issues where -- you know, I think he
21        felt that, like, for example, the same -- the same
22        thing that keeps coming up in our relationship that,
23        you know, I need emotional support, I'm feeling very
24        lonely, you're very busy with your career, you never
25        show up, you're never around me and the baby.  And he
```

1          goes, 'You know, you should do that for yourself too,

2          like maybe get a job and get out of the house.'

3          Because although I enjoy being with my baby, just

4          doing that throughout the day and not seeing another

5          human being, except the baby, for days together was

6          getting to me quickly.  I was going through some

7          postpartum issues as well as.  So maybe he did

8          express -- I remember Prasanna saying, 'You know,

9          maybe you should get a job too, so that you can get

10         out of this rut and feel better about it.'"

11    A    Yeah.

12    Q    So he did suggest you get a job while you were living in

13    California, correct?

14    A    Yeah.

15    Q    He wanted you to get out the house and have your own life,

16    correct?

17    A    Yeah.

18    Q    Your mother came to visit you in California, correct?

19    A    Yes.

20    Q    And in Washington, correct?

21    A    Yes.

22    Q    And when she would come, she would stay for months at a time,

23    correct?

24    A    Yes.

25    Q    Living with you and your husband, correct?

 1   A    Correct.

 2   Q    And your husband never complained or expressed any issue with

 3   your mother coming to visit, correct?

 4   A    He complained.

 5   Q    He complained.  Okay.

 6        What did he complain about?

 7   A    I don't know.  I think he was -- maybe he would be, like, too

 8   many days that your mom is staying with us, maybe lack of

 9   privacy.  Like, I just remember that he wasn't -- I mean, he

10   wasn't a happy, welcoming person sometimes.

11   Q    So he complained about her staying too long; is that your

12   testimony?

13   A    Yeah.

14   Q    Okay.  But your mother did come --

15   A    Yeah.

16   Q    -- frequently?

17   A    Yeah.

18   Q    Okay.  And he never prevented your mother from coming to

19   visit, correct?

20   A    Yeah.

21   Q    And while you were living in the United States, you

22   socialized with your friends, correct?

23   A    Yes.

24   Q    You would go to their houses and they would come to your

25   houses?

1    A    In the -- yes.

2    Q    And your husband never prevented you from socializing with

3    your friends, correct?

4    A    We have had fights around that.  I make plans for the

5    weekend, and he will, you know, argue that we should not go or

6    he'll be busy with something and he will not show up.  So I

7    remember having some, like, you know, disagreements and fights

8    around that.  But, yes.

9    Q    About him not wanting to go?

10   A    Also, like not wanting for me and the child to go.

11   Q    Go where?

12   A    To meet with our friends over a weekend, for example.

13   Q    Was that just because he didn't believe the schedule or the

14   logistics of it made sense?

15              MS. SEIPEL:  Objection.  Speculation.

16              THE COURT:  Sustained.

17   Q    You made meaningful friendships, though, in California and

18   Washington?  You personally, correct?

19   A    Yes.

20   Q    And your testimony is that Prasanna objected at times to you

21   having a social life and meeting your friends?

22   A    Yes.

23   Q    I'm going to show you a line from your deposition,

24   Bates stamp page 2476, page 95, starting at line 21.  Apologies.

25   It's Bates stamp 2472.

1        One second, Your Honor.  Apologies, Your Honor.  One last

2    time, one last try.  Bates stamp page 2474:

3        Question:  "Okay.  Did Prasanna ever express to you

4            any feelings that he didn't want you meeting up with

5            your friends or didn't want you, you know, leaving

6            the home to have a social life?"

7        Answer:  "To be honest, we never really left the home

8            to have a social life.  I feel like I would invite

9            people over or I would actually visit them.  And the

10           only other time that we would leave the home was to go

11           on hikes.  Like I was not really, like, the nightlife

12           type of person.  I preferred to put my child to sleep

13           at home and just sleep with him, you know, kind of.

14           So I don't think he had objections, yeah, and for me

15           as well.  I tried to prioritize my immediate family

16           over the friends.  So I don't know that he had any

17           issues, at least I don't remember him expressing any

18           issues like that to me."

19       Is that an accurate reading of the question you were

20   asked and the answer you provided?

21   A    Yes.  I think this is purely about the COVID time, though.

22   It looks like I've said that we only went to people's homes and

23   didn't do other things.  So I'm not sure of the context, it's

24   all -- all of U.S. life or just in Washington during COVID.

25   Q    Okay.  So is it your testimony that during COVID, he had no

1   objection to you seeing your friends, but that outside of the

2   COVID period, he did?

3   A   Yes.

4   Q   When was the last time you spoke verbally with your husband?

5   A   Maybe like early September, when he tried to call to my child

6   through my phone.  I just had a quick exchange with him on the

7   phone.

8   Q   So after August 31st -- or withdrawn.  Was August 31st the

9   last time you had an extended conversation with him?

10  A   Yes.

11  Q   Your testimony was that he, your husband, had threatened you

12  with releasing pornographic materials; is that your testimony?

13  A   Yes.

14  Q   Okay.  Those threats occurred before August 31st?

15  A   Yes.

16  Q   Not in these brief exchanges you had in early September,

17  correct?

18  A   Yes.

19  Q   You filed a police report on August 31st, correct?

20  A   Correct.

21  Q   You didn't mention anything about any threats or anything,

22  correct?  "Yes" or "No."

23  A   I mean, I went in to give the devices --

24  Q   "Yes" or "No."

25  A   No.

1    Q    You filed, then, further police complaints, correct?

2    A    Yes.

3    Q    When was that?

4    A    August 31st, October 2nd, and then probably another date,

5    maybe November or late October.

6    Q    Okay.  I'm going to show you a document admitted as

7    Petitioner's Exhibit 103.  This is your sworn statement in the

8    Washington courts, correct?

9    A    Yes.

10   Q    Paragraph 15, Bates Page No. 1529, you wrote, "On

11   October 2nd, 2024, I received the Indian divorce papers and

12   notice of a hearing in India scheduled for October 8."  Do you

13   see that?

14   A    Yes.

15   Q    So on October 2nd, you were served -- or you were notified

16   that -- notified of Indian proceedings, correct?

17   A    I received the courier or the mail on October 2nd in the

18   house.  When I received it, I wasn't -- I mean, I was just

19   outside at that time.

20   Q    Okay.  And then you filed two additional police reports

21   afterwards against your husband, correct?

22   A    I was filing the police reports when I received the summons

23   at home.

24   Q    Not both, though.  One you filed afterwards?

25   A    So I left by taxi.  When I was leaving outside the gate of my

1  house, the person that was delivering the mail gave the mail to

2  me, and I was on my way to the police station at that point in

3  time already.  Because that's when I discovered that those

4  recording devices had cameras in them, and I took them straight

5  to the police.

6  Q   I thought you testified that you took the devices to the

7  police on August 31st?

8  A   I initially took them on August 31st, thinking that they were

9  just voice recorders, and the police refused to take them in.

10  They said it's okay for a husband to place voice recorders inside

11  the house and they refused to take that as a report.  I also

12  requested them to check the devices and look through my house for

13  more such devices, but the police refused to do that, and they

14  only took in the complaint for the domestic assault.

15         MR. MIN:  Your Honor, nonresponsive to the question and

16  hearsay as to what the police said.  The question was, "I thought

17  you took the devices to the police on August 31st?"

18         THE COURT:  The answer remains.

19  Q   You testified that your husband grabbed you by the throat in

20  2017; is that correct?

21  A   I don't remember the year, but there was one instance where

22  he grabbed me by the throat.

23  Q   But was it not the same instance that you talked about in

24  Exhibit 305 -- if we could pull that up? -- where your husband

25  was -- you and your husband were talking about your husband

1  saying "Go and die" and his feelings about that?

2  A    Yes.

3  Q    That was the same time period?

4  A    Yes.

5  Q    That was when your husband went downstairs with his friend

6  and left your child with his friend's wife?

7  A    Yeah.  He just left the child there and he went out

8  somewhere, yes.

9  Q    And he told you that his friend went downstairs to smoke a

10  cigarette and he joined him and left the child with his wife for

11  a few minutes, right?  That was what he told you happened?

12  A    I don't remember what he told me, but he just left the child

13  and he went.  That's what I remember happening.  And if I spoke

14  to him about it, it should have been a prolonged period,

15  otherwise, why would I ask?  Why would my friend complain to me

16  that the child was just left in my care?

17  Q    Okay.  You don't mention any physical altercation in

18  Exhibit 305, correct, in your e-mail exchange with your husband?

19  "Yes" or "No."

20  A    I mean, I'd have to read through it and remember that there

21  is ...

22  Q    Sure.  Feel free to read through it.  Do you want me to give

23  you a hard copy?

24  A    I'm fine with this.  Thank you.

25  Q    Okay.  Just let me know if you ever mention or talked about

1    him grabbing you by the throat.

2    A    I mean, on this page, I --

3    Q    Do you talk about him grabbing you by the throat?

4         THE COURT:  Counsel, the witness hadn't completed her

5    answer.

6         You may complete your answer.

7         THE WITNESS:  Yes, sir.

8    A    I mean, on this page that I'm shown, I'm talking about the

9    abusive behavior, but I'm not specifically stating "grabbing the

10   throat," I guess.  I mean, that's what I'm reading here.

11   Q    Do you want to go down to the next few pages?  We will go

12   down to page 2, whenever you are ready.

13        THE COURT:  Counsel, I believe we're ready.

14        MR. MIN:  Okay.

15   Q    The next page.

16        THE COURT:  It's 10:30.  We will take our morning

17   recess.

18        THE CLERK:  All rise.

19        THE COURT:  During the break, I will allow the witness

20   to continue reading the balance of the document so we're ready to

21   go when we come back.

22                   (Recessed.)

23        THE COURT:  Good morning, again.  Please be seated.

24        Please continue, counsel.

25        MR. MIN:  Thank you.

1    Q    (By Mr. Min:)  Have you had a chance to review this document

2    during the break?

3    A    Yes.

4    Q    Okay.  And there's no mention of grabbing the throat in this

5    document, correct?  "Yes" or "No."

6    A    If you go down like one page from what's being shown right

7    now?

8    Q    Sure.

9    A    Some more, please.

10        Further down.

11        So I had mentioned abusive behavior.  Like, you know, I've

12   not really specified that he caught my throat and shook me, but I

13   think that's what I have, like, written back.

14   Q    You had several exchanges -- or withdrawn.

15        This is an e-mail exchange between you and your husband, yes?

16   A    Did you say e-mail exchange?

17   Q    Yes.

18   A    Yes.

19   Q    Yep, yep.  Okay.

20        And you both are lodging complaints about the other in this

21   exchange, correct?

22   A    Yes.

23   Q    Okay.  If we go to page 2 -- and just to clarify, the ones

24   with the lines on the left are your husband's e-mail and then

25   your response is the one without the lines next to it.  All

 1  right?

 2  A   Yes.

 3  Q   Okay.  And you see in the second part that has a line next to

 4  it, where it starts "The diff," right?

 5  A   (No audible response.)

 6  Q   Yes?

 7  A   Right.

 8  Q   Do you see where -- can we highlight that whole section?

 9      Do you see the highlighted part?

10  A   Yes.

11  Q   That's your husband e-mailing you, right?

12  A   Yes.

13  Q   And he's complaining to you -- saying to you in the e-mail

14  that you're putting him down and that he feels like he has to

15  report to you, correct?

16  A   Yeah.  When I say "feed the kid and don't abandon the kid,"

17  he's feeling like I'm acting superior to him.  That's what he's

18  saying.

19  Q   Well, does he say that in here?  When you say that's what he

20  is saying, does he say --

21  A   Yeah.

22  Q   -- when you -- well, let me finish the question.

23      Is he saying that in this e-mail, "When you tell me to feed

24  my child, you're acting superior to me"?

25  A   Yeah, that is the context, right?  So he said the difference

1  in the two formats, and the format we have been discussing, the

2  context, is that he left the child and he didn't feed the child.

3  Q   Okay.  And if we go down below, to the next section with the

4  line next to it, you guys are talking about the things you said

5  to each other during this argument, correct?

6  A   (No audible response.)

7  Q   "Yes"?  Number 4.

8  A   Did you mean the highlighted part?

9      Yeah.

10 Q   Yeah.

11     And then you said -- you used the word "nakkittu" -- and I

12 will spell that, n-a-k-k-i-t-t-u -- what does that word mean?

13 A   It just means -- and this is a hard one to -- Tamil is a

14 very, like, colloquial language.  So it's in Tamil.  It means if

15 you want to please your -- please, like, you know, sort of -- how

16 do you call it? -- if you want to serve the friend or please that

17 friend.

18 Q   Okay.  What is "sappify," s-a-p-p-i-f-y?

19 A   That's a word that Prasanna has used.  I don't know what he

20 meant by that.  But, literally, in Tamil, it means to -- it's

21 like to lick a popsicle or something like that, to ...

22 Q   And above that, your husband accused you of yelling at him

23 during this argument, correct?

24 A   Yeah.

25 Q   Did you yell at him?

1    A    I mean, I said, "Is my child an orphan?  Why did you leave
2    him and go?"  Like, you know, I think that's his version of
3    saying I yelled at him.
4    Q    All right.  But your husband didn't think he did anything
5    wrong, that would be fair to say, right?
6              MS. SEIPEL:  Objection.  Speculation.
7              THE COURT:  Sustained.
8              MR. MIN:  Okay.
9    Q    Your husband told you in this e-mail that he did not have any
10   regrets about going downstairs with his friend and leaving the
11   child with his friend's wife, right?
12   A    Yes.
13   Q    If we go to the fourth page of this, where you write, in
14   response to this -- well, actually, apologies, where it says
15   "Anyway," the fourth paragraph down, you talked to him -- no, no.
16        Where it starts "Anyway," going down to that whole section,
17   you mention events from your marriage that have scarred you very
18   deeply, right?
19   A    Yes.
20   Q    Yeah.
21        And so you start listing things that have scarred you very
22   deeply from your marriage.  And this is written in 2017, correct?
23   A    Yes.
24   Q    And your child was born in 2016?
25   A    Yes.

1    Q    And so the first thing you talk about is the fact that you

2    say your husband, early in the marriage, would prioritize going

3    out with his friends, right?

4    A    Yes.

5    Q    And then you also talk about how you -- in the Netherlands,

6    while you guys were living there, you would come home wanting to

7    have intimacy with your husband, but then no longer want to

8    because of things that you found objectionable, correct?

9    A    Yeah.  He would have satisfied himself watching porn and,

10   yeah, nothing will happen between us.

11   Q    Okay.  And that was --

12   A    That's what I was talking about.

13   Q    Apologies.

14       And that was one of the scarring events in your relationship,

15   correct?

16   A    Yes.

17   Q    And the third thing you referenced was what you perceive to

18   be your husband's hygiene, correct?

19   A    Yeah.

20   Q    And then you talk about what you're looking for in him,

21   correct?

22   A    Yeah.

23   Q    You don't mention any discussion here about sexual assault or

24   rape or anal sex, correct?

25   A    Yeah.

1   Q   Now, would you consider that your husband grabbing you by the

2   throat is a form of physical assault?

3   A   Yeah.

4   Q   Yet, when you filed your police report in Singapore, you told

5   the Singapore police that the incident on August 31st was the

6   first time your husband had ever assaulted you, correct?  "Yes"

7   or "No."

8   A   Yes.

9   Q   Okay.  You testified you went to the hospital that evening,

10  correct?

11  A   Yes.

12  Q   Okay.  Did you produce hospital records for this Court to

13  review?

14  A   It's with the Singapore police.  They refused to give it to

15  me.  I asked them, but they did not really, like, you know,

16  produce it to me.  They said they got it from the hospital and

17  it's with them.  Maybe we should -- I don't know how to get it

18  from them.  I requested them for it.

19  Q   And did you ever try to request it from the hospital?

20  A   I did, and they refused.  They said that I would have to get

21  it from the police.  So I contacted the police, and the police

22  refused to give it to me.

23  Q   Okay.  Did you mention your husband grabbing you by the

24  throat in either your Singapore application for a protective

25  order or your Washington application for a protective order?

1   "Yes" or "No."

2   A   I mean, the Singapore application, I think I mentioned only

3   the domestic violence complaint on August 31st.  I don't remember

4   what I mentioned in the Washington protection order.  I think it

5   was more of the recent events that I mentioned in the Washington

6   protection order.

7   Q   Did you take a video or a recording of the incident on

8   August 31st?

9   A   I tried to, which is when Prasanna tried to, like, lunge and

10  grab the phone from me.  And I couldn't really like capture the

11  video.  My phone was facing the other side.

12  Q   But you did record something?

13  A   I think so, yeah.

14  Q   Okay.  Did you --

15  A   I would have to check.

16  Q   Did you turn that over to your lawyers for discovery?

17  A   I'd have to check.  I don't remember.

18  Q   But you didn't present it as evidence in this case?

19  A   I don't -- I don't know.  I don't think so.

20  Q   Did you ever ask your husband to discipline your child?

21  A   I have asked him to step in with parenting, but I don't know

22  if I've asked him to discipline the child.

23  Q   Have you ever expressed frustration with things that your

24  child did?

25  A   Yes.

```
 1   Q    Okay.  Have you ever called your child names?

 2   A    I don't think so.

 3   Q    Have you ever referred to your child as -- with a negative

 4   name?

 5   A    No.

 6   Q    You have never called your child a "sick asshole"?

 7   A    No.

 8   Q    Have you ever said that your son is "being a sick asshole"?

 9              MS. SEIPEL:  Objection.  Relevance.

10              THE COURT:  Sustained, counsel.

11              MR. MIN:  Well, I think it's relevant because the

12   witness has spent ample time trying to present herself as a

13   doting mother who should be the parent of this child and,

14   essentially, arguing that the child being with her is what

15   provides a secure environment.

16              THE COURT:  I will sustain the objection.  Move on,

17   counsel.

18   Q    (By Mr. Min:)  Have you ever -- you have asked your husband

19   to help out with A███ in situations when you've found it

20   difficult to deal with him?

21   A    Yes.

22   Q    Some of those issues would be your son eating; is that

23   correct?

24   A    Yes.

25   Q    And your son going to sleep as well?
```

1    A    Yes.

2    Q    You produced several years' worth of WhatsApp messages

3    between you and your husband, correct?

4    A    Yeah, I may have.  I don't remember if I did.

5    Q    Do you know if the word "rape" appears anywhere in those chat

6    messages?

7    A    I don't know.

8    Q    Would it surprise you if the word "rape" did not appear in a

9    single message between you and your husband in the messages you

10   produced?

11        MS. SEIPEL:  Objection.  Her surprise is not relevant.

12        THE COURT:  That's sustained.

13   Q    Are you aware of if the word "force" appears in any of those

14   text messages?

15   A    I think.

16   Q    You think?

17   A    Yes.

18   Q    Can you show where perhaps?

19   A    Should I use my phone to show it or -- I don't know how I

20   should do that.

21   Q    Perhaps at the next break.  I won't take the time.

22        What about "coerce"?

23   A    I don't know.

24   Q    Isn't it true that you and your husband did not have sexual

25   relations for a significant period of time after your child was

1   born?

2   A   I was away in India when I had three surgeries back-to-back,

3   so, yes.  He was in the U.S.  So we were physically apart from

4   each other after my child was born for some time.

5   Q   And there were other periods of time in your life, in your

6   relationship and marriage, after your child was born, in which

7   you and your husband did not have sexual relations, correct?

8   A   When we were physically apart from each other, yes.

9   Q   I'm going to show you a message, Respondent's Exhibit 327,

10  page 105.  These are messages between you and your husband?

11  A   Yes.

12  Q   Okay.  Accurate messages between you and your husband from

13  August 25th, 2023?

14        MS. SEIPEL:  Objection.  This exhibit has not been

15  admitted into evidence.

16        THE COURT:  That's correct.

17        MR. MIN:  Your Honor, I'm laying a foundation, Your

18  Honor.

19        THE COURT:  I understand, but I'm not sustaining the

20  objection either.  So please continue.

21        MR. MIN:  Thank you.

22  Q   These are accurate messages between you and your husband on

23  August 25th, 2023?

24  A   Yes.

25  Q   Okay.  This is you and your husband discussing your sex life,

 1    fair?

 2    A    Yes.

 3              MR. MIN:  Your Honor, we'd move to admit this page,

 4    page 105 of 239 from Respondent's Exhibit 327.

 5              THE COURT:  Just page 105, correct?

 6              MR. MIN:  Yes, Your Honor.

 7              THE COURT:  Any objection, counsel?

 8              MS. SEIPEL:  Hearsay.

 9              THE COURT:  The objection is overruled.  It's admitted.

10              MR. MIN:  Okay.  Thank you.

11              THE CLERK:  Which page is this, Your Honor?

12              THE COURT:  105.

13              (Exhibit No. 327, page 105, admitted.)

14    Q    Your husband, on August 25th, is bringing up your sex life

15    with you, correct?

16    A    Yes.

17    Q    He says, "Hi, sweetheart.  You are such a treasure.  You are

18    very pretty and beautiful in your heart.  Generally wish the best

19    for others while also going through a lot personally in terms of

20    pain and pulling off lots of responsibilities.  I love you lots

21    and I know you do many things for me.  I feel very selfish and

22    greedy talking about sex to you.  Mind stops me from doing it.

23    The heart stills feel this narrative of I haven't had sex for

24    many months and I waited patiently and it's still being

25    considered the lowest priority."

1        So he's talking about not having sexual relations with you

2   for months, correct?

3   A    Yeah, he's saying that, but -- yes.

4   Q    Okay.  And then he's talking about what he's looking for in a

5   partner in terms of a sexual relationship, correct?

6   A    Yes.

7   Q    At the end, or towards the end, at 15:53:09, your husband

8   writes to you that "I crave for your love and kisses every day,"

9   right?

10  A    Yes.

11  Q    Then he's also saying that he is looking for sexual relations

12  once every two days.  That is what he wants, right?

13  A    Yes.

14  Q    And then you respond, if we can scroll down, "Okay.  I

15  understand, babes.  I will definitely try to prioritize your

16  needs henceforth.  A lot conflicted in values too.  That's

17  something that I can discuss separately with you and try to sort

18  out.  Because in my mind I'm trying my hardest to be a really

19  good family person and a really immersed mother.  I feel that

20  having a mom with such qualities becomes very important for boys

21  as they grow."

22        So at this time, in the summer of 2023, was Prasanna --

23  withdrawn, Your Honor.

24        Was the first complaint you made about rape the police report

25  that you filed in Singapore --

 1   A     Yes.

 2   Q     -- in October of 2024?

 3   A     Yes.

 4   Q     You went on a retreat in December of 2023, correct?

 5   A     Yes.

 6   Q     For how long?

 7   A     I think it was 20 days.

 8         It was the naturopathic treatment.  I don't know if I'd call

 9   it a retreat.

10   Q     You were writing with your mother and your husband about you

11   being away for that time period, correct?

12   A     I was writing?  Can you clarify that?

13   Q     Yeah, messaging on WhatsApp with your mother and your

14   husband.

15   A     Yes.

16   Q     And your husband was saying that he had no problem taking

17   care of A█████, correct?

18   A     Well, he -- I mean, he said -- there were two maternal

19   caregivers that I left with my child when I went for the

20   naturopathic retreat.  One was my mother and the other was the

21   domestic helper, and Prasanna was okay with that arrangement.  He

22   wouldn't be okay with me leaving A███ alone with him.

23   Q     Did you ever write to your husband and say, "Well, super

24   daddy, you are doing an amazing job spending time with A███ and

25   taking care of him"?

1    A    Yeah, for sure, I would have appreciated him.

2    Q    Would you describe your husband as very physically violent,

3    explosively angry, and an unsafe parent towards your child ever

4    since infancy?

5    A    I think physically violent, yes.  Explosively angry, also,

6    yes.  An unsafe parent, yes.

7    Q    Ever since the child's infancy?

8    A    Yes.

9    Q    And you're describing he is physically violent towards your

10   child?

11   A    Yes.

12   Q    And explosively angry towards your child?

13   A    Yes.

14   Q    Unsafe parent toward your child?

15   A    Yes.

16   Q    Did you describe him that way to Dr. Poppleton?

17   A    I don't remember.

18   Q    You filled out a questionnaire for Dr. Poppleton, though,

19   correct?

20   A    Yes.

21   Q    Okay.  And do you recall being asked "Describe your concerns

22   with your child's residential placement"?

23   A    Can you ask that question again?

24   Q    Sure.

25        Do you recall being asked on the questionnaire "Describe your

1   concerns with your child's residential placement"?

2   A   I don't specifically recall that question, but maybe it was

3   on the questionnaire.

4   Q   Sure.

5       We will pull up Exhibit 110, Bates stamp page 2147.

6       Do you see where it says "Describe your concerns with your

7   child's residential placement, if applicable"?

8   A   Yes.

9   Q   Okay.  You wrote, "I'm worried if he might get exposed to

10  vices very early on in life through the father's voyeuristic

11  behaviors, porn addiction and sex addiction, as well as worried

12  whether he can get any infections or diseases due to the father's

13  continuous frivolous sexual behaviors with many

14  partners/prostitutes."  Do you see that?

15  A   Yes.

16  Q   That was your concern with your child's residential

17  placement, that your child might learn bad habits from his

18  father; is that --

19  A   I think that was one of my concerns for sure, for the

20  long-term sort of values of my child.

21  Q   Interesting.  Because following that, when asked "Has your

22  child or do you expect your child has been physically abused?"

23  You say, "No."  "Sexually abused?"  You say, "No."  "Emotionally

24  abused?"  You say, "No."  Do you see that?

25          MS. SEIPEL:  Objection.  Compound question,

1   argumentative.

2          THE COURT:  It's overruled.

3   A   I see that.

4   Q   Okay.  But when asked if he was neglected, you say, "Yes,"

5   and you describe that "the father in recent times" -- or you

6   describe that he was neglected in recent times by the father.

7   You go on to say, quote, "Father was also very neglectful until

8   the child turned 5+ years old.  Father used to be selfishly

9   focused on his career and his enjoyment outside of the family.

10  Only after he took a step back from his career, and after much

11  insisting from me to form a bond with our child, he started

12  participating in the child's life.  In recent times, however, the

13  father abandoned our child since August 31."

14      So your concern to Dr. Poppleton was that until your child

15  turned approximately 5 or 5-plus years old, your husband was very

16  neglectful of your child; is that fair?  That's what you wrote to

17  him, right?

18  A   Yes.

19  Q   But after you insisted that your husband form a closer bond

20  with your son, you expressed no concerns until you allege that

21  your husband abandoned your son on August 31.  Is that what you

22  wrote to Dr. Poppleton?

23  A   I wrote that, but there were e-mails that I have expressed

24  concerns, you know, that he's hitting my child and all that.  I

25  don't know why I said "No" to the physically abused question.

1  But, of course, my child is, hopefully, definitely not sexually

2  abused or emotionally abused.

3  Q   If we go to page 2149, you were asked to mark off all that

4  the child has been exposed to.  You do write "domestic violence,"

5  you don't click "pornography," you do not check off "spanked,"

6  you check off "abandonment" and "timeout."  Yet, you testified

7  yesterday that your husband did spank your son.  Do you recall

8  that?

9  A   I think "spanked" is more like hitting on the butt, right?  I

10 testified that he pinched and hit him on the back.

11 Q   I thought you used the term "spanked."  Did you not in your

12 testimony?

13 A   I don't -- I don't remember.  But, I mean, the incidents I

14 remember in my head are, like, pinching and the hitting on the

15 back.

16 Q   One of the concerns you raised was that your child might

17 develop vices, including a porn addiction, right?

18 A   Correct.

19 Q   But you did not check off that your child has been exposed to

20 pornography, correct?

21 A   I hope to God that he has not been exposed to pornography,

22 but there are instances where Prasanna's laptop would, you know,

23 have pornography advertisements or images, and I'm afraid that my

24 child might just peep and look and like, yeah, be exposed to it.

25 Q   You asked the Singapore courts for supervised visitation,

 1  correct?

 2  A    Yeah.  In my filing?  Maybe, yes.

 3  Q    Okay.

 4  A    I asked that he be allowed to visit the child.  I don't know

 5  if it's supervised.

 6  Q    We'll pull up your affidavit in the Singapore courts,

 7  Exhibit 68.

 8       This is the affidavit you filed in the Singapore courts?

 9  A    Yes.

10  Q    We will go to Bates stamp page 524, the last paragraph, "To

11  make sure that our child" -- well, withdrawn.

12       You wrote to the Singapore courts, quote, "To make sure that

13  our child does not feel completely abandoned by the father

14  Prasanna, I will cooperate for supervised visitation of the child

15  by the father on one or two days every month in a mutually agreed

16  upon public space or play area provided he proves medically that

17  he's free from STDs and other communicable infections, as well as

18  will not be accompanied by any other women/friends of his who can

19  threaten our child's safety."

20       This was your concern, correct?

21  A    Yes.

22  Q    That's why you asked for supervised visitation, correct?

23  A    Yes.

24  Q    And so if given supervised visitation with these conditions,

25  you would have been fine with your husband visiting with your

 1   child, correct?

 2   A    Yes.

 3   Q    In Singapore?

 4   A    Yes.  But I think the situation is slightly different now.

 5   I'm seeing how a lot of this is about him.

 6          MR. MIN:  Your Honor, move to strike.  There's no

 7   question pending.

 8          THE COURT:  Sustained.

 9   Q    You testified that you observed your husband hitting your

10   child in Singapore, correct?

11   A    Yes.

12   Q    Okay.  I'm going to pull up a deposition transcript, Bates

13   stamp page 2667, page 81, line 1:

14          Question:  "When was the last time you observed

15          Prasanna physically and aggressively contact your

16          child either through hitting, slapping, pinching, or

17          anything like that?"

18          Answer:  "I remember a day in the older Singapore

19          home, just right before we moved to the new home, I

20          think he had hit A███, and my mom was with us even.

21          And, yeah, I remember something like that.  I'm not

22          sure exactly if I remember the dates.  I can't

23          remember specifics."

24          Is that a question asked to you and answer you

25   provided?

1    A    Yes.

2    Q    I'm going to start at line 13:

3         "Can you describe what happened, what you observed?"

4         Answer:  "I remember I heard a lot of noise, and

5         Prasanna had hit A█████ and A█████ was crying.  They were

6         sitting inside Prasanna's bedroom.  And, yeah, my mom

7         was asking Prasanna not to hit him so hard.  And

8         that's just all I remember.  I don't know what led to

9         that.  I wasn't around.  But I just went in when --

10        after I heard A████ crying."

11        Is that the question you were asked and answer you

12   provided?

13   A    Yes.

14   Q    So you didn't observe your husband hitting your child,

15   correct?  "Yes" or "No."

16   A    That day, I did not observe him hitting --

17   Q    You're saying there were other --

18        THE COURT REPORTER:  Excuse me.  Can you repeat your

19   answer, please?

20   A    Yes.

21        On that day, I did not observe Prasanna hitting A████

22   directly.

23   Q    So there were other incidents when you did observe that; is

24   that your testimony?

25   A    Yes.

1  Q    So do you recall receiving an e-mail on Monday, January 6th,

2  from your husband's Indian counsel?

3             MS. SEIPEL:  Objection.  Hearsay.  Calls for hearsay.

4             THE COURT:  It calls for a "Yes" or "No" answer.

5  A    I'd have to look up the date.  I don't recall.

6  Q    Do you recall receiving a detailed accounting of the monies

7  that your husband was transferring to you, in compliance with the

8  Indian order for support?

9  A    I don't recall.  I haven't seen my e-mails because of the

10 trial that's ongoing.  Like, it's been many days since I have

11 paid attention.

12 Q    So you don't recall.

13      If I show you an e-mail, would it help you refresh your

14 recollection?

15 A    If I have seen it, yes.

16 Q    So we will pull up something on the screen.

17            MR. MIN:  Scroll down.  Keep scrolling.  Oh, scroll up,

18 so you can see the date.  Then we will scroll down.

19            MS. SEIPEL:  I'm going to object to the relevance of

20 this.

21 Q    Do you recall -- does this help you refresh your recollection

22 as to whether you received an e-mail from --

23            THE COURT:  Let's respond to the objection first,

24 counsel.

25            MR. MIN:  Sorry.  Your Honor, it's relevant because it

 1  goes to impeaching the witness's testimony about how much money

 2  should have been transferred to her, with respect to complying

 3  with the Singapore -- the Indian order of maintenance.

 4          THE COURT:  I will sustain the objection.  Counsel, move

 5  on.

 6  Q   Do you recall receiving an e-mail on December 31st regarding

 7  payment of the maintenance amounts to you?

 8          MS. SEIPEL:  Objection.  Relevance.

 9          THE COURT:  I'll allow that.

10      You may answer that question.

11  A   I don't recall.

12  Q   I'm going to -- if I showed you an e-mail, would it possibly

13  help you refresh your recollection?

14  A   Sure.

15          MS. SEIPEL:  I will renew my objection to relevance.

16          THE COURT:  You can answer the question.  Does this

17  refresh your recollection?

18          MR. MIN:  Your Honor, we haven't gotten there yet.

19      Your Honor, I will move on for now.

20  Q   (By Mr. Min:)  If this Court were to direct your child to

21  return to Singapore, what financial considerations or other

22  considerations would make you feel safe and secure to reside

23  there with your child?

24          MS. SEIPEL:  Objection.  Her feeling safe and secure is

25  not relevant.

1          MR. MIN:  Your Honor --

2          THE COURT:  That's overruled.

3      You may answer that question.

4  A    I mean, that's a really difficult question to answer.  Like,

5  just the thought of going into Singapore makes me feel really

6  unsafe, like if I have to be there on a Dependent Pass and

7  knowing that my husband is constantly trying to move us out of

8  the country.  I'm looking for safety and stability for my child.

9  I don't want him to, you know, be moved out of Singapore, like,

10 you know, and -- I don't know.  Like, I just feel like I want

11 some permanence.  And, yeah, there's a lot in question about

12 financial security, physical safety and security.  I don't have a

13 formed answer to this question.

14 Q    But when you were living in Singapore, you had sought, again,

15 20- to $30,000 in financial support, correct?  That was your

16 request?

17 A    Based off of the expenses at that point in time, based on the

18 fact that the rent alone costed {sic} me $20,000, yes.

19 Q    Okay.  And you had requested supervised visitation for your

20 child, correct?

21          MS. SEIPEL:  Objection.  Asked and answered.

22          THE COURT:  That's sustained, counsel.

23          MR. MIN:  Okay.

24 Q    Would it be fair to say that receiving 30,000 Singapore

25 dollars per month would fit -- make you feel safe and secure in

1    returning to Singapore?

2    A    No.

3    Q    What about your husband having an order of supervised

4    visitation temporarily?

5    A    No.

6         I just think that he can go to any extent now to take the

7    money, and, you know, I feel really, like, unsafe for my child to

8    be in that situation.

9    Q    What situation?

10   A    I don't know.  My husband is going to try to coerce him or

11   threaten using him to make sure that I back off.  That's what he

12   has done so far.

13   Q    But you're the one who abducted the child to Washington,

14   correct?

15            MS. SEIPEL:  Objection.

16            THE COURT:  Sustained.

17   Q    Have you used your child to coerce your husband?

18   A    No.

19   Q    Do you believe that abducting your child or taking your child

20   from Singapore to Washington was a means to control your husband?

21            MS. SEIPEL:  Objection.

22   A    No.

23            THE COURT:  Sustained.  Strike the answer.

24   Q    We're going to pull up the document that I referenced

25   earlier, the e-mail, to help you see -- or see if it will help

1   you refresh your recollection.  We will pull that up on the

2   screen.

3            MS. SEIPEL:  Objection.  I'm just not sure that the

4   witness knows what she's refreshing her recollection on.

5            THE COURT:  Counsel, let's clarify.

6   Q    Does this help you refresh your recollection as to whether

7   you received an e-mail on December 31st, 2024?

8            THE COURT:  Counsel, let's identify and clarify the

9   specifics of what this is.

10           MR. MIN:  Yeah.  It's an e-mail from petitioner's Indian

11  counsel to respondent regarding the payment of sums, as directed

12  by the Indian ASI.

13           THE COURT:  All right.  The only question is, what

14  portion, counsel?

15           MR. MIN:  Well, it's the whole thing, but paragraph 6 is

16  the relevant portion.

17           THE COURT:  All right.  The only question before you is,

18  does paragraph 6 refresh your recollection?

19           THE WITNESS:  It doesn't.  I don't remember seeing this

20  e-mail from my mailbox.

21           MR. MIN:  Okay.  Your Honor, if I can just have one

22  moment?

23           THE COURT:  You may.

24  Q    (By Mr. Min:)  Have you asked the Singapore courts for

25  permission to relocate to the United States with your child?

 1    A    I do not know if my Singapore counsel asked in the Singapore

 2    child custody hearing, but I know we've asked in the Washington

 3    court for permission to relocate here.

 4    Q    So you asked the Washington court for permission to relocate

 5    from Singapore to Washington?

 6    A    Yes.

 7    Q    But you are not sure if you asked the Singapore courts for

 8    permission to relocate from Singapore to Washington?

 9    A    Yes.

10         MS. SEIPEL:  Objection.  Asked and answered.

11         THE COURT:  It's overruled.  The answer remains.

12    Q    If your child was directed to be returned to Singapore, would

13    you be planning to ask for relocation, if you had not done so

14    already, to the United States with your child?

15         MS. SEIPEL:  Objection.  Relevance.

16         THE COURT:  That's overruled.

17    You may answer the question.

18    A    Can you clarify the question to me?

19    Q    Of course.

20    If the Court does direct your child to be returned to

21    Singapore, would you ask the Singapore courts for permission to

22    relocate from Singapore to the United States, to the extent you

23    have not done so already?

24    A    I do not know.  It depends on how safe and good and I feel

25    for my child.

 1    Q    Right.

 2         So you may decide to stay in Singapore or ask for relocation,

 3    depending on your level of feeling safe or secure in Singapore?

 4              MS. SEIPEL:  Objection.  Speculation, calls for

 5    privileged attorney-client communications.

 6              THE COURT:  Well, you are not required to answer the

 7    question regarding these statements or conversations you had with

 8    your lawyer, but you may answer the question otherwise.

 9         Do you understand the question?

10              THE WITNESS:  Can I ask a clarifying question?

11              THE COURT:  Yes, you may.

12    A    Please clarify the question, sir.

13    Q    Sure.

14         Based upon your prior answer, is it then your testimony that,

15    depending on how safe and secure you feel in Singapore, you may

16    decide to stay in Singapore or ask for relocation?

17    A    My mind is not firm on that.  I don't know what is going to

18    happen after this.  I feel very -- unsettling and a lot of

19    unknowns at this point.  So, yeah --

20              MR. MIN:  No further --

21    A    -- I do not know the answer to that.

22              MR. MIN:  Apologies.  No further questions, Your Honor.

23              THE COURT:  Redirect.

24              MS. SEIPEL:  Yes, Your Honor.

25                        REDIRECT EXAMINATION

1  BY MS. SEIPEL:

2  Q   Ms. Sashidhar, do you have a real property interest anywhere

3  in the world?

4  A   Did you say "real property"?

5  Q   Do you have a real property interest anywhere in the world?

6  A   No.

7  Q   You testified on your cross that during the period of COVID,

8  when you lived in Washington, you didn't socialize much.

9      Did your family socialize much in Washington when COVID

10  restrictions were lifted?

11  A   Yes.

12  Q   What sorts of things would you do?

13  A   We went to birthday parties.  We, you know, interacted a lot

14  with our neighbors.  The kids would play together in the

15  neighborhood a lot.  And then we went to birthday parties and

16  social events, even indoors as well as outdoors.  I think my

17  child started going to a lot of extracurricular activities and

18  classes.  And then we started going out to restaurants.  We

19  would, you know, visit the fall fair and, you know, the pumpkin

20  patches and apple farms and things like that.  And, I mean, we

21  were -- yeah, we were around a lot of friends.  We would get

22  together for dinners with friends.  And I remember taking trips

23  along with friends, together, friends and family together.

24  Q   You testified on cross-examination about discussions you had

25  with your husband regarding the Ardmore Park lease, and you said

1  that your husband told you about a diplomatic clause in the

2  lease.  What did your husband tell you about that diplomatic

3  clause?

4  A   He told me if that we had to leave the country and once we

5  give up the employment pass, like this diplomatic clause could

6  be, you know, pulled up and we didn't have to continue paying for

7  the lease; we could break the lease at a point where we decided

8  to leave the country altogether.

9  Q   When you came to the United States for a visit in the summer

10  of 2023, where was your child?

11  A   I left him under the care of my mother in India, in her

12  house.

13  Q   Where was your husband at this point in time?

14  A   I believe he spent one week with my child in India, and then

15  he also came to the U.S. to be with me for, like, the last many

16  weeks of my trip.

17  Q   Does your son have a close relationship with your husband's

18  mother?

19  A   No.

20  Q   Does your son have a close relationship with your husband's

21  father?

22  A   No.

23  Q   Does your son have a close relationship with your husband's

24  brother?

25  A   No.

1    Q    Does your son have a close relationship with your mother?

2    A    Yes.

3    Q    You testified on cross-examination that your mother, when she

4    comes to visit you in the United States, is able to stay here for

5    up to six months; is that accurate?

6    A    Yes.

7    Q    You also testified that when your mother -- your mother, when

8    she comes to visit you in Singapore, can stay for up to one

9    month; is that accurate?

10   A    Yes.

11   Q    Did you ever buy a house in Singapore?

12   A    No.

13   Q    Mr. Min asked you some questions about Exhibit 68, which is a

14   declaration that you filed in Singapore, where you wrote, "I

15   would like to make sure my child is not abducted, coerced, his

16   health and safety put at major risk by any irresponsible actions

17   of parent Prasanna."

18        What did you mean when you said you were worried about your

19   child being abducted?

20   A    Prasanna had A███'s passport at that time, and, also, like,

21   there were unsafe situations surrounding the driver who was

22   driving my child, and, you know, I was afraid that without my

23   knowledge or even without my own child's consent, he could be,

24   like, taken away from us.

25   Q    You said there were unsafe situations with your child's

1   driver.  What unsafe situations are you referring to?

2   A    When the driver became privy to the fact that me and my

3   husband were going through a divorce and there was a rough patch,

4   like, you know, he could have used that information to sort of

5   just take our child away.  And around that time, there were also

6   incidents of wealthy men in cryptocurrency and the blockchain

7   space being kidnapped and stuff like that.  So it was concerning

8   for me that, you know, he could just say, hey, I told the other

9   parent I took your child, but I didn't let you know, and the

10  information wouldn't pass between me and my husband because we

11  were not talking at that point.  So many different ways like

12  that.  Because the driver knew that, you know, me and my husband

13  were just not really, like, talking to each other.  And I know

14  that the driver was also aware of the fact that we were a very

15  wealthy family, like, you know, because we lived in this big

16  bungalow in Singapore, and Prasanna is, you know, a very famous

17  personality in the blockchain-cryptocurrency space.  So, yeah.

18  Q    Has your husband ever threatened to abduct your son from you?

19              MR. MIN:  Objection.  Leading.

20              THE COURT:  It is leading, counsel.  Sustained.

21  Q    Has your husband -- I'll rephrase.

22       When you made this statement in your Singapore declaration,

23  why were you worried about your child being coerced?

24  A    Around the time, during Prasanna's calls with A███, or our

25  child, Prasanna -- I mean, our child would come and tell me that,

1  you know, "Mommy, are you trying to loot a lot of money from

2  Daddy" or "Mommy, are you trying to" -- you know, "Will anybody

3  go to jail for applying for a divorce?"  And he would tell me

4  things like, "Please withdraw all the cases you have filed,"

5  "What's going on?"  And then there was a point when he came and

6  told me that, "Mommy, you chose to have a baby and leave your

7  career, so, you know, you chose not to make money.  Now, why is

8  it that, you know, you want money for life?" and things like

9  that.  And, you know, I just felt that it unnecessarily exposed

10 my child to certain details which were hurting him, and he became

11 very sort of anxious and nervous, you know, intimidated about it.

12 Like when he goes to sleep, he will, like, express fear that one

13 or the other parent is going to be, you know, like, going through

14 some harm because of all of this.

15     And he was brought into a lot of other information, which I

16 think -- I mean, I had to eventually, like, call to talk to him

17 about these things because Prasanna started up the conversation.

18 One of the things he would do is also, like, he would tell A█████,

19 our child, that "I think Mommy is recording my call, and your" --

20         MR. MIN:  Objection.  Your Honor, I was going to wait

21 until the end, but now she's going into what the father would

22 tell the child.  I mean, it's hearsay, unless she's saying she

23 personally observed that.

24 A   I'm there.

25         THE COURT:  Just one second.

1          MR. MIN:  If I may, it's turning into a narrative

2     answer, Your Honor.  She talked about statements that the child

3     made, which is hearsay.  She talked about how the child was

4     feeling afraid, anxious, nervous, which is an improper response.

5     So I would move to strike those portions of the response.

6          MS. SEIPEL:  The statements from the child are not

7     offered for the truth.  My question was, "Why were you worried

8     about your child being coerced?"  It goes to her state of mind,

9     the effect on listener.

10          THE COURT:  And, counsel, was she present, to your

11     knowledge, during the course of these conversations?

12          MS. SEIPEL:  Yes.

13          THE COURT:  I will allow the questions.

14          MS. SEIPEL:  Thank you.

15          THE WITNESS:  Yes.

16     Can I continue, Your Honor?

17          THE COURT:  Yes, you may answer.

18  A    One other thing that happened was when Prasanna called my

19     child through my phone, he told my child that I'm recording the

20     call between the child and Prasanna on my phone.  My child came

21     to me and asked me, "Mommy, are you recording my call with

22     Daddy?"  I mean, that's another thing that my child even relays,

23     somebody is recording somebody else.  And, you know, I actually

24     wasn't recording the call.  I showed my child all the apps that

25     were open, and then, you know, I offered to my child that he's

1    welcome to take my phone and go into a bed and talk to Daddy in

2    privacy.

3         But these are things that, for an eight-year-old child, I

4    just felt -- I mean, he got exposed to all of this at that point,

5    and it felt very inappropriate and wrong, yeah.

6         And I also now strongly think that, you know, the way

7    Prasanna has used my child to say "Withdraw the cases against

8    Daddy, don't take, you know, any money," I mean, the child

9    doesn't understand that we need some money to live, right?  And I

10   have to talk to him about all of that as well.

11        So I think Prasanna might coerce my child into, you know,

12   making sure that this divorce goes favorable to my husband, to

13   one side, and I don't want to put my child in between all of

14   this.

15             MR. MIN:  Your Honor, can I ask for a quick voir dire on

16   this response?

17             THE COURT:  You will have the opportunity on recross,

18   counsel.

19             MR. MIN:  Well, I might make a motion to strike as

20   outside the scope of the question, but it depends on the basis of

21   the question -- the answer.

22             THE COURT:  I will allow limited latitude, counsel.

23             MR. MIN:  Okay.

24   ///

25   ///

```
 1                    VOIR DIRE EXAMINATION
 2    BY MR. MIN:
 3    Q   When did this conversation occur between your husband and
 4    your child that you -- did you personally -- withdrawn.
 5        Did you personally hear your husband asking or telling your
 6    child that you were recording?
 7    A   Yes.
 8    Q   And then your child came to you and said "Don't record"?
 9    A   Yes.
10    Q   When did that conversation occur?
11    A   Sometime in early September when Prasanna had called through
12    my phone.  My child was sitting in the living room and talking,
13    and Prasanna asked this.  Like, you know, it was on the
14    loudspeaker, I think, and I was coming from upstairs, and I heard
15    this happening.  Then A███ came to me, to the staircase, and
16    asked the question.
17    Q   Before or after September 8th?
18    A   Before or after September 8th?
19    Q   Yeah.
20    A   This is very hard.  I do not really remember the date,
21    but ...
22    Q   So you don't know whether it happened before or after
23    September 8th?
24            MS. SEIPEL:  Objection.  Asked and answered.
25            THE COURT:  Overruled.
```

1    A    I don't remember.

2                MR. MIN:  Your Honor, I would move to strike.  Because,

3    again, the question is about why she said something in a

4    Singapore affidavit about her concern about coercion, and if

5    she's testifying to an incident that she does not know whether

6    that occurred before her filing, then it cannot be a basis for

7    why she made that filing.

8                THE COURT:  It goes to weight, not admissibility,

9    counsel.

10               MR. MIN:  Thank you, Your Honor.

11               THE COURT:  The next question.

12                    CONTINUED REDIRECT EXAMINATION

13   BY MS. SEIPEL:

14   Q    Mr. Min asked you questions on cross-examination surrounding

15   the timing of you deciding to come back to the United States.  So

16   I just want to ask you a few things about that.

17        What was the date of the incident that your husband punched

18   you in the chest?

19   A    August 31st.

20   Q    In the weeks leading up to that incident, did your husband

21   make any threats to you?

22   A    On that day, yes, but not in the weeks leading up.  It was

23   more indirect.

24   Q    What did he say?

25   A    It came through friends and family and through my son.  Like,

1   you know --

2   Q   I'm going to stop you.

3       What did he say to you on that date?

4   A   On that date?

5   Q   On August 31st.

6   A   On that date, he basically told me, you know, "I am so rich

7   and powerful, I'm going to destroy you, you will watch this

8   happening."  And, you know, he just kind of went away.  That's

9   something that he told me directly.

10  Q   What date did you discover your child's passport was gone?

11  A   The subsequent day.  I think the 1st of September.

12  Q   What date did you discover your husband had your child's

13  passport?

14  A   On the first e-mail that I sent to him.  Or even on the call.

15  I think my mother and I, we were sitting on a call with him, and

16  he was asked, and he said, "Yes, I have it."

17  Q   Do you recall what date that happened?

18  A   Probably September 1st or 2nd.

19  Q   When did you file for an emergency passport for your son?

20  A   Probably in that same date range, maybe like September 3rd

21  or 4th.

22  Q   What date did you file for divorce in Washington?

23  A   September 6th.

24  Q   When did you start getting worried about finances?

25  A   I already -- on the last payment that Prasanna had made, he

1  paid me like $5,000 on August 21st, I, you know -- and during the

2  course of the events in that week, you know, I realized that he

3  had decided he wanted -- you know, he's going to divorce, but he

4  was just making use of me at that time, and I asked him if he can

5  pay me like a year's worth of living expenses, or at least two

6  months' worth of living expenses, and he said, "I will not pay

7  you that because I don't want you to contact any attorneys before

8  you sign the financial settlement," that, you know, he was

9  proposing to me.

10 Q   When did you start getting worried about your status in the

11 country?

12 A   As soon as Prasanna left and I also figured that he had my

13 child's passport, one of the biggest worries was that if he, you

14 know, left us or if he canceled his pass, or if he chose to

15 cancel just my Dependent Pass, that would mean I have to leave

16 Singapore in seven days or so, and my child is left alone with

17 me.  And, you know, I was just going through a lot of stress

18 thinking about that.

19     So, yeah, September 1st, in that date range, I was already

20 scared of what's going to happen.

21 Q   When did you buy your plane tickets back to Washington?

22 A   On October 12th.

23 Q   When did you go back to Washington?

24 A   On October 14th.

25 Q   Did the e-mail from East Asia Law that Mr. Min showed you

1   yesterday play any role in your decision to file for divorce in

2   Washington and return to the United States?

3   A   No.

4           MR. MIN:  Objection as to form, Your Honor.

5           THE COURT:  Rephrase.

6   Q   Was your decision to file for divorce in Washington based off

7   of the e-mail you saw yesterday from East Asia Law?

8           MR. MIN:  Objection, Your Honor.  The e-mail and the

9   date of the filing are two different dates.  One does not precede

10  the other.  So the question just doesn't make any sense.

11          THE COURT:  Let's clarify, counsel.

12  Q   Okay.  Ms. Sashidhar, I am going to show you Plaintiff's

13  Exhibit -- Petitioner's Exhibit 75.  What is the date on this

14  e-mail?

15  A   October 11th.

16  Q   What date did you file for divorce in the United States?

17  A   September 6th.

18  Q   Mr. Min went over in depth with you the anti-suit Indian

19  injunction order.  Prior to that order being issued, did you and

20  your husband participate in an evidentiary trial like this?

21  A   No.

22  Q   What is the date of that order, do you recall?

23  A   December 19 or 20.  I think it's 20.

24  Q   When did your husband withdraw his custody petition in India?

25  A   I don't know.  I think he said -- I mean, he said it's

1  probably like January, early January.

2  Q   To your knowledge, had he withdrawn his custody petition

3  prior to the anti-suit injunction order on December 19th?

4  A   No.

5  Q   You have testified that prior to coming to the United States,

6  you were worried about rent and bills being paid.  Why were you

7  worried about those things?

8  A   I mean, I didn't have money in my own bank account to pay for

9  them, and I tried to contact Prasanna through WhatsApp, as well

10  as on e-mails sending him bills, and he just cut contact with us.

11  Like he didn't really respond to whether he was going to pay or

12  not, and I was very afraid whether he -- would he actually pay.

13  Like there was no way for me to know about it.

14      I think his last communication with me was like

15  September 23rd or 24th, and then he just did not respond to any

16  of my e-mails, WhatsApp.  He didn't even talk to my child after

17  that.

18  Q   At some point after your husband left Singapore, did your

19  husband block your credit card?

20  A   Yes.

21  Q   What charge was blocked?

22  A   I paid lawyers' fees, and that was disputed, and the credit

23  card was blocked after that.

24          MR. MIN:  Objection.  Basis of knowledge then.

25          THE COURT:  The first part of the witness's testimony

 1  may remain, but the latter part the Court will strike.

 2  Q   Did you review a WhatsApp message conversation between your

 3  husband and his lawyers prior to this trial?

 4  A   Yes.

 5  Q   Are these the messages that you reviewed between your husband

 6  and his lawyers?

 7          MR. MIN:  Objection, Your Honor --

 8  A   Yes.

 9          MR. MIN:  -- how is this witness going to testify to

10  messages that don't pertain to her?

11          THE COURT:  Let's clarify, counsel.

12          MS. SEIPEL:  For the basis of her knowledge, the

13  objection prior was whether she had personal knowledge as to

14  whether the credit card was blocked, and this is how she has

15  knowledge that the credit card was blocked.

16          MR. MIN:  She's relying on a hearsay statement for her

17  basis of knowledge.  That's what I'm hearing.  That's not proper

18  usage, Your Honor.

19          THE COURT:  It's sustained, counsel.

20      We're almost at the noon hour.  We will take a break at this

21  time, but before we do so, counsel, how much more redirect do you

22  contemplate?

23          MS. SEIPEL:  Your Honor, admittedly, I'm a terrible

24  estimator.  An hour.

25          THE COURT:  All right.  Well, it's abundantly clear to

 1  this Court that the parties are not going to complete this trial

 2  by the balance of today.  So I'm going to give you dates that the

 3  Court will renew or continue this case, upon the finish of

 4  proceedings this afternoon at 4:30, and those dates are

 5  January 21st and January 22nd.  But I expect the case to be

 6  completed no later than the 22nd.  This Court has other

 7  obligations and the Court can't accommodate anything taking place

 8  next week.

 9      So I'm not going to ask you to make a determination now, but

10  I strongly suggest that you bring your calendars with you this

11  afternoon.  Whatever conflicts that you have, you should remove

12  them and rearrange your schedules so that you can be present.

13      So with that, we will be in recess.

14          THE CLERK:  All rise.

15                  (Recessed.)

16                  AFTERNOON SESSION

17          THE COURT:  Good afternoon, again.  Please be seated.

18      Counsel, you may continue your redirect examination of your

19  client.

20          MS. SEIPEL:  Thank you, Your Honor.

21          THE CLERK:  We need petitioner on the camera.

22      He's on, but ...

23          MR. MIN:  Can I just address him through the --

24          THE CLERK:  Yeah.

25      Oh, there he is.  Okay.

1           THE COURT:  We're ready.

2           MS. SEIPEL:  Thank you.

3    Q   (By Ms. Seipel:)  Ms. Sashidhar, you testified on cross-

4    examination that you were concerned about your husband revoking

5    your Dependent Pass in Singapore.  Why were you concerned about

6    that?

7    A   He threatened me saying that he can revoke the DP at any

8    time.

9    Q   Mr. Min asked you questions on your cross-examination about

10   you seeking between $20,000 and $40,000 per month in maintenance.

11   Is that a lot of money to you?

12   A   Yes.

13   Q   How much money does your husband have?

14          MR. MIN:  Objection.  Relevance, Your Honor.

15          THE COURT:  That's overruled.

16       You may answer the question.

17   Q   How much money does your husband have?

18   A   Around $2 billion.

19          MR. MIN:  Objection.  Basis of knowledge.

20          THE COURT:  That's sustained.

21   Q   How do you know?  Has your husband ever told you how much

22   money he has?

23   A   He has told me that he has about $2 billion.

24   Q   We have heard testimony in this trial about your husband

25   recording you.  Prior to you finding cameras in your home, did

1    your husband ever tell you that he was recording you?

2    A    No.

3    Q    Did your husband ever ask to record you?

4    A    No.

5    Q    Did your husband ever ask to record your child?

6    A    No.

7    Q    Did you ever agree to be recorded?

8    A    No.

9    Q    Did you ever agree for your child to be recorded?

10        MR. MIN:  Objection --

11   A    No.

12        MR. MIN:  -- outside the scope of cross, Your Honor.

13        THE COURT:  I believe there was some examination,

14   counsel, about cameras, so that opened the door to an opportunity

15   for reexamination over topics that's been covered.

16   Q    Did you ever ask if -- I'm sorry.  Did you ever agree for

17   your child to be recorded?

18   A    No.

19   Q    Were the recording devices found in your home hidden?

20   A    Yes.

21   Q    How so?

22   A    Some of them were like extension plug cords that he had

23   brought in and he had put in.  And then, like, there were, like,

24   little pinholes, you know, like, with which, I think, the camera

25   was pointing at.  And then one of them was in the bathroom.

1    There's a wall plug socket, which seems to have been replaced by

2    this hidden camera unit, which had like a little hole in it.  And

3    yeah, that's how we figured these had cameras in them.

4    Q    How many cameras did you find?

5    A    I remember turning in like five different such cameras to the

6    police.

7    Q    Where were those five cameras located?

8    A    Two of them were in our second master bedroom, two of them

9    were in the master bedroom, and one was in the bathroom.

10   Q    When you decided to come back to the United States, did you

11   believe your husband would be coming back to Singapore?

12   A    No.  I thought he had gone.

13   Q    Why did you think that?

14   A    I mean, he left us on August 31st, and then I saw, like,

15   videos that his friend had posted about him traveling with the

16   friends in Kazakhstan.  And then a few weeks or days later, I

17   received like a summons from the Indian court stating that he is

18   now living in India and he asked for my child to be relocated to

19   India.  So I believed that he was completely gone from Singapore

20   and he's not going to come back.

21   Q    Mr. Min asked you some questions about WhatsApp messages

22   between you and your husband, where your husband says he wants to

23   have sex with you one time every two days.  At other times, how

24   often did your husband want sex from you?

25            MR. MIN:  Objection.  Leading.

1           THE COURT:  That's overruled.  You may answer the

2    question.

3    A    I mean, before, at least once in a day, and towards the end,

4    like weeks leading up to August 31st, he would ask for sex even

5    three times, four times in a day.

6    Q    Are you in possession of several years of WhatsApp messages

7    between you and your husband?

8    A    Yes.

9    Q    I am going to show you Exhibit 327, page 47.  Are these those

10   messages?

11   A    Yes.

12   Q    Where your husband says to you, "I also definitely" --

13           MR. MIN:  Objection.  Improper form.

14           THE COURT:  Counsel?

15           MS. SEIPEL:  I'll rephrase.

16   Q    What does your husband say to you in this message?

17           MR. MIN:  Objection as to form.

18           THE COURT:  Sustained.

19   Q    Did your husband say to you, "I also definitely don't want to

20   torture you when you are in periods" --

21           MR. MIN:  Objection as to form.

22           THE COURT:  Counsel, what specific portion of this

23   document are you referring to?  Because I can see your highlight

24   keeps bouncing around, so I'm not exactly sure myself.

25           MS. SEIPEL:  Sorry.  I will try to ...

1    Q    (By Ms. Seipel:)  Ms. Sashidhar, do you recall the

2    highlighted message from your husband?

3    A    Yes.

4            MS. SEIPEL:  I would move to admit page 47 of 327.

5            THE COURT:  Objection, counsel?

6            MR. MIN:  Your Honor, just to save time, I'm not going

7    to object, Your Honor.

8            THE COURT:  All right.  Please, proceed.  It's admitted,

9    unless -- counsel, you are offering the entirety of this page?

10           MS. SEIPEL:  Yes.

11           THE COURT:  All right.  There being no objection,

12   page 47 of Exhibit 327 is admitted.

13               (Exhibit No. 327, page 47, admitted.)

14   Q    At times throughout your marriage, was your husband a good

15   father?

16   A    There were times when he would, like, play with my child,

17   yes, do some things with my child.

18   Q    Was he a good father when he pinched your child?

19   A    No.

20   Q    Was he a good father when he hit your child?

21   A    No.

22           MR. MIN:  Objection.

23           THE COURT:  Sustained.

24           MS. SEIPEL:  I have nothing further.

25           THE COURT:  Does that complete your redirect

1    examination?

2              MS. SEIPEL:  Yes, Your Honor.

3              THE COURT:  Counsel, any further cross-examination?

4              MR. MIN:  Very brief, Your Honor.

5                          RECROSS-EXAMINATION

6    BY MR. MIN:

7    Q    You had testified on redirect that on August 31st, 2024, your

8    husband had made threats to you, correct?

9    A    Yes.

10   Q    What threats were those?

11   A    One of them I remember very clearly was him saying, "I have a

12   lot of money and power and I'm going to destroy you."  That's

13   something he said.  And, yeah.  I mean, I remember him saying

14   that he can revoke our Dependent Passes at any time, but I'm not

15   able to clearly remember if that's on that date it happened.

16   Q    Any other threats from that day, do you recall?

17   A    Not anything else from that day.

18   Q    And when asked by your lawyer leading up to August 31st,

19   whether he made threats to you, you responded, "On that date,

20   yes, but not weeks leading up to that."  Do you recall that

21   testimony?

22   A    I don't recall it.

23   Q    So in the weeks leading up to August 31st, did he make

24   threats to you?

25   A    He did.

1   Q   You've also said -- when asked "What did he say," you said it

2   came through family and friends.  Do you recall that testimony?

3   A   I think I said after August 31st, he came through family and

4   friends, if I remember correctly.  Because the weeks leading up

5   to the 31st, he was with me and he was talking directly to me.

6           MR. MIN:  One second, Your Honor.

7       Your Honor, no further questions.

8           THE COURT:  Okay.  Anything further, counsel?

9           MS. SEIPEL:  Nothing further, Your Honor.

10          THE COURT:  All right.  You may step down.

11      Counsel, your next witness.

12          MS. SKINNER:  Call the petitioner to the stand.

13          THE COURT:  The witness has not been excused.  I don't

14  believe there's a necessity for him to be resworn.

15      Counsel, do you believe your client needs to be resworn

16  testifying on behalf of the respondent?

17          MR. MIN:  I don't believe so, Your Honor.

18          THE COURT:  Counsel for the petitioner {sic}, do you

19  believe he needs to be resworn?

20          MS. SKINNER:  No, Your Honor.

21          THE COURT:  All right.  Let's proceed.

22          MS. SKINNER:  Thank you, Your Honor.

23                  PRASANNA SANKARANARAYANAN,

24      previously sworn, resumed and testified as follows:

25  ///

1                        DIRECT EXAMINATION

2    BY MS. SKINNER:

3    Q    Have you heard the audio recording that was played for the

4    respondent earlier today?

5    A    Yes.

6    Q    Who captured that audio?

7    A    A recording device that I placed in the house.

8    Q    When?

9    A    I believe mid to late August.

10   Q    Is that audio part of the allegations of the crime to which

11   you are alleged to have committed in Singapore?

12   A    I believe the crime is voyeurism.  It is related to.

13   Q    So what's your understanding of what the alleged crime was

14   that you were charged -- or that you were alleged to have

15   committed?

16   A    The allegation was I had compromising pictures and videos of

17   her, which I threatened her with.

18   Q    And you received a conditional warning for that allegation?

19   A    Yes.

20   Q    Did you tell your wife you were recording her?

21   A    No.

22   Q    And did you hide the recording devices in the home?

23   A    Yes.

24   Q    Did you pay someone to install those?

25   A    Yes.

1    Q    Who?

2    A    The landlord's contractor.

3    Q    What's their name?

4    A    I don't remember.

5    Q    How did you pay them?

6    A    I think through my real estate agent.

7    Q    When did you hire that person to install the cameras?

8    A    A few days before we moved in.  Sometime mid-August, mid to

9    late August.

10    Q    How long were they in the home?

11    A    I believe we moved in sometime around August 22nd, and I left

12    the home on September -- on August 31st.  So probably like a

13    week.

14    Q    The recording devices were in the home for one week; is that

15    your testimony?

16    A    The recording devices were in the home till whatever time my

17    wife took them out.  But the recording I could access was within

18    a week.

19    Q    So were you able to access recordings for the week period of

20    when you moved in the home until you left the home on

21    August 31st?

22    A    Yes.

23    Q    How were those stored?

24    A    They were stored on the local device, the recording device.

25    Q    Did you extract the data at any point from the local device?

1    A    Only certain clips.

2    Q    Can you please repeat your answer?

3    A    Only certain clips.

4    Q    How were you able to review what clips you extracted?

5    A    There is an app you go into to access the camera.

6    Q    So is the data stored within the local device but you can

7    access the data as well from a remote device?

8    A    You can access -- you can connect the remote device through

9    the Wi-Fi.

10   Q    Did you store any of the data outside of the local device at

11   any time?

12   A    Yes.  I downloaded certain clips to my phone.

13   Q    How did you decide which clips to download?

14   A    I went to points that my wife and her mother were having

15   conversations.

16   Q    How many clips did you save and download?

17   A    I don't remember the exact number.  But one of the clips I

18   saved and downloaded, I have provided it to you in discovery.

19   Q    Did you destroy any clips after downloading them?

20   A    When the police seized my phone, after the investigation,

21   they did get destroyed, but -- and they destroyed my phone.  But

22   I had given these to my lawyers earlier, so I was able to provide

23   that copy.

24   Q    When did the police destroy your phone?

25   A    I'm not sure of the exact date, but sometime in November, I

1    think.

2    Q    So between the time that you downloaded the certain clips and

3    the police destroying your phone, other than your lawyer, who

4    else did you give the clips to?

5    A    I think possibly my brother and -- and his personal

6    assistant.

7    Q    Why?

8    A    They helped -- the personal assistant helped transcribe some

9    clips for my lawyers.

10    Q    Did you instruct your brother to destroy the clips at any

11    time?

12    A    Yes.  I told him not to hold copies of those, that is, like,

13    legal material.  After -- you know, after transcription, it just

14    goes to my lawyers.

15    Q    Then did you tell the personal assistant to destroy the clips

16    after they had transcribed them?

17    A    I don't know if I directly interacted with him or not.  Maybe

18    not.

19    Q    Did you file India legal proceedings at the beginning of

20    September?

21    A    Yes.

22    Q    And on September 24th, did you file a declaration with the

23    Indian court?

24    A    Possibly.

25    Q    On September 24th, was your child with Ms. Sashidhar in

1    Singapore?

2    A    Yes.

3    Q    What concerns about your child's well-being in

4    Ms. Sashidhar's care did you mention in your filing?

5    A    I don't remember.

6    Q    I would like to show you Exhibit 335, page 5.  Please read

7    paragraphs 10 and 11 and let me know if that refreshes your

8    recollection about what concerns you mentioned about your child's

9    well-being while in the care of his mother.

10   A    Yes.

11   Q    Okay.  What concerns did you describe in the Indian court

12   filings in September 2024 about the well-being of your child

13   while in the care of his mother?

14   A    I described that the mother is not mentally stable, and I was

15   concerned about the child's well-being.

16   Q    Okay.  Did you say that Ms. Sashidhar had repeatedly

17   neglected the basic needs of your son?

18   A    Yes.

19   Q    And neglected proper nutrition for your son?

20   A    Yes.

21   Q    And neglected your son's healthcare?

22   A    Yes.

23   Q    And neglected your son's education?

24   A    Yes.

25   Q    And did you indicate that you have serious concerns regarding

 1    the physical health of your son if he's left under your wife's

 2    care?

 3    A    I said --

 4              THE COURT REPORTER:  I'm sorry.  Can he repeat that?

 5    Q    Can you please repeat your answer?

 6    A    I said physical and mental health.

 7    Q    I was going to ask it one at a time.  So you had serious

 8    concerns regarding the physical and mental health of your son if

 9    left under your wife's care, that's what you stated in this

10    declaration?

11    A    Yes.

12    Q    And I would like to show you page 13 -- or, excuse me, the

13    following -- yes, page 13, paragraph 43.

14         Did you indicate to the Indian court that you believed there

15    was a high risk that your son would be subject to harmful

16    experiences if continued to be left in Ms. Sashidhar's care?

17              MR. MIN:  Objection, Your Honor.  This seems like

18    custody issues to me.  I mean, this Court is not determining

19    which parent is in the best position to be the primary caretaker

20    for this child.  So I'm not entirely sure of the relevance of

21    this line of questioning.

22              THE COURT:  It's overruled, counsel.

23    A    Would you able to read the entire sentence instead of picking

24    only the parts that you like?

25    Q    Excuse me?

1   A   Can you please -- I mean, I feel like you are picking certain

2   parts and, like, cherry-picking.

3       Can you read the entire sentence, please?  If you want to ask

4   me on a statement, can you read the entire statement?

5   Q   You can answer my question.  Did you indicate to the Indian

6   court that there would be a high risk that your child would be

7   subject to harmful experiences if left under the care of your

8   wife?

9   A   Yes, due to her unstable mental and emotional state.  Yes.

10  Q   And due to her neglect of your child, as you alleged, right?

11  A   Yes.

12  Q   In September, did you return to Singapore at any time that

13  month?

14  A   No.

15  Q   Why didn't you go to Singapore to file for emergency relief

16  to remove your son from his mother's care?

17  A   I was occupied with, like, many things in September, which I

18  explained to you.  If you want me to repeat and go through all of

19  them, I'm happy to.

20  Q   No, that's fine.  You were occupied.

21      So during the month of September, for a period of time, you

22  were in Kazakhstan, weren't you?

23  A   Yes.

24  Q   You were there with a friends' trip?

25  A   Yes.

1    Q    Were you having fun?

2              MR. MIN:  Objection.

3    A    Yes.

4              THE COURT:  Sustained.

5    Q    Did you go to a dance club?

6              MR. MIN:  Objection.

7              THE COURT:  Sustained.

8    Q    Was the activities that you were doing in Kazakhstan one of

9    the activities you indicate why you were occupied during the

10   month of September and did not return to Singapore to file court

11   emergency relief for your son?

12             MR. MIN:  Objection.

13             THE COURT:  That's overruled.

14        You may answer that question.

15   A    So I was talking to my lawyers about custody stuff.  I was

16   starting to engage counsel and I was talking --

17             MR. MIN:  Objection.

18   A    -- you know, I was trying to figure out a plan.

19             MR. MIN:  I would instruct the witness not to talk about

20   anything privileged.

21             THE COURT:  That's sustained.

22   Q    So then I will repeat my question.  I'm not asking for

23   anything you discussed with your lawyers or strategy between your

24   lawyers.

25        My question was, was your trip to Kazakhstan one of the

1   things you were occupied with that you indicate precluded you

2   from going to Singapore to seek relief for your son?

3   A   I was trying to seek relief for my son.  I didn't need to go

4   to Singapore.  Like I challenge the surmise of your question,

5   that I had to go to Singapore to seek relief for my son.  I was

6   seeking relief for my son.

7   Q   Okay.

8        MS. SKINNER:  I don't have any further questions of this

9   witness.

10       THE COURT:  Cross-examination.

11       MR. MIN:  Thank you, Your Honor.

12                        CROSS-EXAMINATION

13  BY MR. MIN:

14  Q   The recording that counsel just asked you about, do you

15  recall what your wife said on that recording that she listened to

16  earlier?

17  A   Yes.

18  Q   What did she say?

19  A   She said to her mom that she would like to strangle me and

20  kill me, and she continued, if she gets a chance, she would

21  definitely do it.

22  Q   Definitely do what?

23  A   Strangle me and kill me.

24  Q   Did she say any other threatening things to her mother that

25  you were made aware of?

1    A    I don't recall right now.

2    Q    Okay.  What concerns did you have about the child being left

3    in the care of your wife when you filed in the fall of 2024 for

4    custody?

5              MS. SKINNER:  Objection.  Asked and answered.

6              THE COURT:  It was covered on cross -- it was covered on

7    your examination, counsel.

8              MS. SKINNER:  And the same question is now being asked.

9              THE COURT:  I understand that.

10             MS. SKINNER:  Thank you.

11             THE COURT:  You may answer the question, sir.

12   A    So my wife was in a state of severe lupus, and she was

13   climbing up and she was unstable.  In the last week, before I

14   left, I was the caregiver for my child.  I told my wife to sleep

15   in, to relax.  I woke up and I took care of my child.

16        And after I left, other family members told some of my family

17   members that she's on the highest dose of medication for lupus.

18   And my driver told me that my son, who's usually very cheerful --

19             MS. SKINNER:  Objection if he's testifying as to what

20   the driver said.

21             THE COURT:  Sustained.

22   Q    Let's talk about your concerns that you had at this time.

23   A    My concerns -- my concern was my child was not getting the

24   care that I was providing him, and I was providing him the care

25   most of the last few week -- the last two weeks before I left

 1   because my wife was unwell.  And my concern was my wife was very

 2   volatile, and I felt that my son was not getting parental

 3   attention and time.

 4             MR. MIN:  One second, Your Honor.

 5   A    I --

 6             THE COURT:  Sir, there's no question before you.

 7             THE WITNESS:  Okay.

 8             MR. MIN:  Nothing further, Your Honor.

 9             THE COURT:  Anything further, counsel?  Anything

10   further?

11             MS. SKINNER:  Yes, Your Honor.

12                         REDIRECT EXAMINATION

13   BY MS. SKINNER:

14   Q    You were so concerned that your son wasn't getting the care

15   that he needed, yet you continued to party in Kazakhstan, right?

16             MR. MIN:  Objection.  Argumentative.

17             THE COURT:  Sustained.

18             MS. SKINNER:  I don't have any questions, Your Honor.

19   Thank you.

20             THE COURT:  All right.  Your next witness.

21             MS. SEIPEL:  Your Honor, our next witness will be

22   Dr. Landon Poppleton.

23        I really apologize for this.  I have lost a contact, and I

24   cannot see.  So our hotel is right across the street.  I have to

25   ask for permission to go get a contact because I cannot see.

 1              THE COURT:  Do you have any glasses, counsel?

 2              MS. SEIPEL:  At my hotel.

 3              THE COURT:  Are your glasses for close-up viewing?

 4              MS. SEIPEL:  I'm sorry.  Say that again.

 5              THE COURT:  Is your vision close vision or distance

 6    vision?  In other words, I'm asking -- you have co-counsel there,

 7    she's wearing glasses -- can you borrow her glasses?

 8              MS. SEIPEL:  Oh.  Maybe.

 9         No.  I'm sorry.  I -- yeah, I can't see.

10              THE COURT:  All right.  Let's take a short recess.

11              MS. SKINNER:  Thank you, Your Honor.

12                        (Recessed.)

13              THE COURT:  Please be seated.

14         Counsel, you are back and ready to go?

15              MS. SEIPEL:  Thank you, Your Honor.  I apologize again.

16              THE COURT:  Okay.

17              MR. MIN:  Your Honor, before respondent calls their next

18    witness, can we just address an evidentiary issue quickly?

19              THE COURT:  Certainly.

20              MR. MIN:  Thank you.

21         Your Honor, at the pretrial phase, Your Honor made some

22    evidentiary rulings on the objections.  Both sides had objected

23    to the other side's expert reports.  Your Honor had ruled that

24    Dr. Poppleton's report would come in but not Dr. Favaro's or

25    Dr. Day's.

1    We had conferred after additional filings over the weekend

2   with opposing counsel, and, yesterday, in addition to the

3   redactions made over the weekend, they had requested one

4   additional sentence be redacted from his report to signify what

5   the scope of his testimony would be at trial.  We have agreed,

6   and that issue should be put to bed.

7        But in light of that, I'm not sure why Dr. Poppleton's report

8   would be admitted into evidence and not Dr. Favaro's albeit

9   redacted version, which would be his anticipated testimony, and

10  Dr. Day's report, Your Honor.  And I -- oh, yes.

11           THE COURT:  When those rulings were made, counsel, there

12  was a question of whether or not your expert was going to testify

13  as part of your case-in-chief.  I believe you have changed your

14  strategy so that your expert was going to testify as part of your

15  rebuttal case.

16           MR. MIN:  Yes.

17           THE COURT:  Is that correct?

18           MR. MIN:  It wasn't a change of strategy.  It was always

19  for rebuttal purposes.  I mean, at the end of the day, the expert

20  report is only on the affirmative defenses.  So the content of

21  the report has nothing to do with habitual residence or anything

22  that's our burden to carry.  It's in response to the affirmative

23  defenses the respondent has a burden to carry.

24       So, I mean, the anticipation was always to call Dr. Favaro

25  as rebuttal to Dr. Poppleton.  I will note, and this is my

 1   understanding of psychological ethical guidelines, is that the

 2   reason we have both Dr. Day and Dr. Favaro is Dr. Day, as we've

 3   put in our opp to the motion in limine, is focused on

 4   methodology.  She did not evaluate the child or meet with the

 5   child.  Dr. Favaro is focused on the observations and evaluation

 6   of the child insofar -- as much as to rebut Dr. Poppleton's

 7   evaluation and observations of the child.  So they serve two

 8   purposes.

 9       Again, our anticipation is that, and expectation, is that

10   they will both testify after Dr. Poppleton's testimony, not

11   implying directly after, but once he's finished his testimony, to

12   rebut his reported testimony.

13       And, again, I would ask that their reports, to the extent

14   that Dr. Poppleton's is being admitted, would also be admitted as

15   well into evidence.

16           THE COURT:  Counsel, any concern?

17           MS. SEIPEL:  Yes, Your Honor.

18       I guess, first and foremost, I'm not entirely sure why we are

19   addressing this at this juncture, being that we are not about to

20   call their expert witnesses.

21       That being said, since we are, we had previously, prior to

22   this trial, filed a supplemental motion in limine to exclude

23   Dr. Favaro, petitioner filed a response to that, and Your Honor

24   instructed the parties to go confer regarding the scope of his

25   testimony.

1    I do not believe that the Court made a ruling on our

2    supplemental motion in limine, and I would ask for a ruling on

3    our supplemental and reiterate that Dr. Favaro says here, in his

4    own report, "My conclusion is that, for these reasons, I did not

5    rely on Dr. Poppleton's report to any large extent in my own

6    opinion formulation."  That is the definition of initial expert

7    independent opinions.  And it's improper rebuttal.

8    So I would renew our supplemental motion in limine asking

9    that he be excluded in his entirety and ask for a ruling on that.

10   THE COURT:  Counsel, have the parties engaged in efforts

11   to address the Court's determination earlier in this proceeding

12   regarding what would be true rebuttal testimony?  I think that

13   was a charge to the parties.  Have you met and conferred for that

14   to be resolved?

15   MR. MIN:  Yes, Your Honor.  Again, and this is what I

16   stated, I'm a bit confused because we met and conferred

17   yesterday, and the request from respondent's counsel was to

18   redact one further sentence.  We got an e-mail clarifying

19   yesterday evening, saying we've agreed -- quote, "but we've

20   agreed to the content of Dr. Favaro's testimony to include the

21   unhighlighted portions of the report you provided us with over

22   the weekend and filed with the Court on Sunday, with the

23   exception of the one sentence in Section 3 reading 'My suspicion

24   is that she did not get the audio quality she was looking for in

25   the prior session.'"  And this was what was discussed at the

1    meet-and-confer.

2        So counsel has represented, both orally and in writing in

3    their e-mail, that we agree with what we filed -- or what was

4    filed over the weekend that was redacted by us as potentially

5    improper rebuttal, and they added one sentence that they wanted

6    to add to that for redaction, and they stated that "We have

7    agreed to the content of Dr. Favaro's testimony to include the

8    unhighlighted portions."

9        So I'm not entirely sure -- they're saying they're renewing a

10   motion in limine when they're agreeing to his testimony except

11   for the stricken portions of his report.

12       MS. SEIPEL:  I am agreeing to his testimony except for

13   the stricken -- the redacted portions of his report, following

14   Your Honor's instruction for the parties to confer.  That was

15   done.  Should the Court allow Dr. Favaro to testify, that is what

16   we agree to.

17       But prior to that, I would respectfully request a ruling on

18   our motion in limine.  It is improper rebuttal testimony.

19       THE COURT:  Well, counsel, the Court's expectation is

20   that you were going to provide the Court with the results of your

21   meet-and-confer.

22       MR. MIN:  We actually asked for that, and the respondent

23   responded saying that we did not agree for that to be filed with

24   the Court.  Filing, perhaps, was a little bit too far.  So we

25   agreed, fine, we're agreeing to not filing it with the Court.  We

1    did redact it with black redactions.

2            THE COURT:  Counsel, slow down.

3            MR. MIN:  We did redact it with black redactions and we

4    e-mailed it to counsel last night with, instead of highlighted

5    redactions, actual black bars.  So that has been e-mailed to

6    respondent's counsel last night.

7        And including the one additional sentence they wanted, we're

8    fine e-mailing that to the Court, or however the Court wants to

9    proceed in providing hard copies.

10       But that was our agreement as to the limitations of his

11   report.  And my understanding was Your Honor ruled on the motion

12   in limine, saying to further meet and confer and to come to an

13   agreement, and we have.

14           THE COURT:  Well, counsel, I'm not going to get into

15   what you engaged in by way of discussions.  You are making

16   certain representations of what took place.  Counsel is making a

17   different representation.

18       I'm going to direct you after today's proceedings to meet and

19   confer and give me a copy, a hard copy, so that I can see exactly

20   what the redactions are.

21       And, counsel, if you've made representations to counsel as

22   the proceeding has been going forward of an agreement to the

23   admissibility, you can't come in, lay in the weeds, and then

24   change your strategy when your witness is about to be called.  So

25   if you make a concession and make an agreement, I expect you to

 1    abide by and comply with the terms of that commitment.

 2           MS. SEIPEL:  Absolutely, Your Honor.

 3           THE COURT:  Okay.  Then let's call your witness.

 4           MR. MIN:  Your Honor, just on the issue of the

 5    admissibility, again, we don't take issue with the reports in

 6    general, to the extent that they're within the confines of

 7    rebuttal, to come in, because I do think it would speed up direct

 8    testimony.  Because if Your Honor has copies of the report that

 9    are in evidence, then we don't need to necessarily ask cumulative

10    questions on direct.  And that's the reason that I think all the

11    reports should come in, to the extent that the redactions are

12    proper with Dr. Favaro's report, Your Honor.

13           THE COURT:  Counsel?

14           MS. SEIPEL:  I think Mr. Min can make a motion for

15    admission of his expert's report, should this Court allow the

16    expert to testify, and I will address it at that time.

17       I don't -- my position at this time is that Dr. Favaro should

18    be excluded, and I will read the e-mail that I sent to counsel

19    last night.

20       Michael and I discussed and agreed to the content of

21    Dr. Favaro's testimony, not his report and not you filing the

22    report with the Court.

23       So again, I will reiterate, that I conferred with counsel,

24    following this Court's instruction, but I specifically also

25    represented to them that I am reserving our right to ask for a

1    ruling on this motion.

2         THE COURT:  Did you make any affirmative representations

3    to counsel that would indicate that you were in agreement to

4    allow a report to come in as redacted?  Was that a commitment

5    that you made to counsel?

6         MS. SEIPEL:  No.  I specifically said we do not agree to

7    his report, and Mr. Banuchis responded, "You're right, Katrina."

8         MR. MIN:  For the filing, specifically.

9         And I would appreciate it if counsel finished the sentence in

10   the e-mail.  It was about filing the report with the Court, and

11   Mr. Banuchis's wrote "You're right, Katrina," as to filing.

12        Again, the verbatim word is "We've agreed to the content of

13   Dr. Favaro's testimony to include the unhighlighted portions of

14   the report you provided us with over the weekend and filed with

15   the Court on Sunday, with the exception of the one sentence,"

16   which I then quoted before.  They are agreeing to his testimony.

17        If they're agreeing to his testimony, what I'm confused about

18   is, why wouldn't his report, which we met and conferred on and

19   redacted that additional sentence, also come in?  That's the

20   added step that I feel like there's some confusion about.  If

21   he's testifying, then why wouldn't his report come in, just as

22   Dr. Poppleton is testifying and his report is coming in?

23        THE COURT:  Is there anything more in his testimony that

24   you plan on extracting beyond what's contained in the report?

25        MR. MIN:  Your Honor, the simple answer to that is it

1    depends on what Dr. Poppleton testifies to.  Because his -- the

2    reports are, of course, advance notice of your anticipated

3    testimony, but, of course, Dr. Poppleton, if he says something

4    that's not in his report, then we would want to be free to

5    explore that with any rebuttal testimony.  So I want to say, I

6    don't anticipate that, but it depends on what Dr. Poppleton's

7    testimony is.

8            THE COURT:  All right.  Let's hear Dr. Poppleton's

9    testimony, counsel.

10           MS. SEIPEL:  Thank you, Your Honor.  I will call

11   Dr. Poppleton to the stand.

12           THE COURT:  Please step forward, sir.

13           THE CLERK:  Please raise your right hand.

14                       LANDON POPPLETON,

15       having been sworn under oath, testified as follows:

16           THE CLERK:  Okay.  Please have a seat.

17           THE WITNESS:  Thank you.  Is there some water up here?

18           THE CLERK:  There is water up here.

19           THE WITNESS:  Okay.  Thanks.

20           THE CLERK:  If you could please state your first and

21   last names and spell your last name for the record.

22           THE WITNESS:  Yes.  Landon Poppleton, P-o-p-p-l-e-t-o-n.

23           THE COURT:  You may inquire.

24           MS. SEIPEL:  Thank you, Your Honor.

25                       DIRECT EXAMINATION

1    BY MS. SEIPEL:

2    Q    Dr. Poppleton, how are you employed?

3    A    As a psychologist.

4    Q    What was your education and training?

5    A    My -- I will just go with graduate training -- or education,

6    but I have a Ph.D. in clinical psychology.  I completed that in,

7    I believe, 2008.  I ended up going back and getting a J.D. later.

8    But, as well, I was in private practice already.  I completed a

9    J.D., I think it was 2016.

10        And then most of my experience and then my early training,

11   while I was a graduate student, was in cases that was kind of the

12   interplay between families and child, you know, development and

13   needs and family law.

14   Q    How long have you been employed in this capacity?

15   A    Well, I started in private practice in 2009, if my memory

16   serves me right.

17   Q    What does your current practice involve?

18   A    Most of it is in that interplay between psychology and family

19   or domestic relations cases.  So it includes just doing family

20   studies.  I do a lot of consultation.  I will do some court

21   education on things.  I will do some case management.  They call

22   it like "parenting coordination."  I do some of that.  I have

23   done some family therapy in that.  It's really just a variety of

24   things within that context.

25   Q    How many family evaluations have you done?

 1    A    Oh, heavens, sometimes they're narrowly focused, sometimes

 2    they're fairly broad with ultimate issue opinions and

 3    recommendations.  But it's probably 400, around there.

 4    Q    Have you completed risk assessments in the course of your

 5    career?

 6    A    Yeah.  Yeah, they come up.  Sometimes they're just individual

 7    evaluations of a person for some -- most often, it's going to be

 8    risk of child abuse or domestic violence.

 9    Q    Have you published any works?

10    A    Not since graduate school.  You know, other than -- and as

11    far as peer-reviewed work, there was, I think, probably two when

12    I was a graduate student.  It's on my CV.  But it's been a long

13    time.

14    Q    I am going to show you Exhibit 301.

15    A    Okay.  I see it.  Thank you.

16    Q    Is this a copy of your CV?

17    A    Yeah.  I mean, I think it could probably be updated a little

18    bit, but it should be pretty accurate as of the date at the

19    bottom on the first page.  I think we identified one thing I

20    should change in it during my deposition.

21         MS. SEIPEL:  At this time, I would ask to qualify

22    Dr. Poppleton as an expert in the intersections between child

23    development, families, and the law.

24         THE COURT:  I trust there's no objection to that

25    determination?

1              MR. MIN:  Can I get the offer again, child

2    development --

3              MS. SEIPEL:  -- families, and the law.

4              MR. MIN:  Well, I would dispute qualifications as an

5    expert in anything dealing with the law.  I don't think that this

6    witness has been qualified as some sort of legal expert.

7        I have no issue with qualifications of child development and

8    families, although I'm not entirely sure that that's relevant to

9    these proceedings.  But I have no objection to that.

10             THE COURT:  All right.  I will qualify him as an expert

11   but not regarding law.  You haven't established that proficiency.

12             MS. SEIPEL:  Okay.

13   Q   Dr. Poppleton, is your title a "forensic psychologist" or a

14   "psychologist"?

15   A   It's technically a psychologist, but what happens is when you

16   do work in the court, you fall within that umbrella, so you end

17   up kind of operating within a forensic role when you are here to

18   serve a trier of fact or a judge.

19   Q   Have you testified in court before?

20   A   I have, yeah.

21   Q   How many times?

22   A   Many times over the years.  Quite a few.

23             THE COURT:  Counsel, I'm qualifying him as an expert,

24   but the limitation is just in the component of the area of law.

25   So I'm not sure if you are trying to establish a foundation for

 1  his qualifications for the other areas, because if you are,

 2  that's already been addressed and determined by the Court.

 3            MS. SEIPEL:  Okay.  I will move on.  Thank you, Your

 4  Honor.

 5  Q   Dr. Poppleton, what role have you had in this case?

 6  A   You brought me on as a consultant, you know, in aid of you,

 7  and so my -- it was, really, you asked me to meet with your

 8  client and the child and provide some information that might

 9  serve to be helpful to the Court around some of the particular

10  issues that are playing out.

11  Q   What issues were you analyzing?

12  A   The two things you asked me to meet with them about had to do

13  with the grave risk of harm under Hague, and the other one had to

14  do with the kind of maturity and objection of a child.

15  Q   What actions have you taken in order to complete your role in

16  this case?

17  A   Fairly limited.  I met with, I think, Mom in the case -- is

18  it okay?  I kind of refer to them as "Mom" and "Dad" to

19  facilitate communication -- but Mom in the case twice.  I think I

20  met with the child as well, off my memory, twice as well.  And

21  some documentation was provided to me that that I looked through.

22  I don't know how helpful that was.  And then I just wrote up a

23  letter, you know, just outlining some of the history that was

24  provided to me and then what that might mean in terms of the

25  questions that are before the Court, if the reliability of the

1    information that was provided to me is established to be true.

2    Q    I am going to show you Exhibit 302.  Is this letter report

3    dated December 8th, 2024, the report that you just mentioned?

4    A    Yeah.  I mean, I wrote it up in a letter.  I think it's

5    probably most appropriate that it is in that format.  But, yeah,

6    that is the summary of what I wrote up.

7    Q    You mentioned "reliability."  Can you talk a little bit about

8    the limitations on your role in this matter?

9    A    Yeah.  I think they're fairly obvious, when you look at the

10   letter I wrote.  But when you meet with one person, you have some

11   issues right off the bat, and that has to do with can you

12   establish the reliability of the claims and assertions that are

13   being made.  And so in any evaluation, you'll have, typically,

14   methods that you employ, and then those methods are going to lend

15   themselves to the reliability of any particular finding.

16        So, for example, in this particular case, you might have a

17   claim in the case that this is a domestic violence case.  Well,

18   when you meet with one side and it's fairly unbalanced, you can

19   have some difficulties in determining how reliable that

20   information is, and it can be difficult, at that, to entertain

21   alternative hypotheses.  So I think you could wax philosophically

22   about them all day, but it's difficult to know what would be an

23   alternative, relevant, rival hypotheses, with the emphasis on

24   "relevant," without getting a bigger picture of the case.

25        So, typically, in a typical matter, where there's a larger

 1    family study that's done and you have access to -- under,

 2    usually, a court order, where both were going to participate and

 3    you have time to do this, you can address the issue through

 4    multiple and varied methods of assessment, come to reliable

 5    findings, and then have, from that, a proffered opinion about the

 6    ultimate issue -- psychologists do that all the time -- so you

 7    can provide actually an opinion on the matter.

 8        Without that, you have issues around the potential findings,

 9    and so that you are just -- you just, maybe at the end, are

10    trying to identify what might be relevant and then what might be

11    helpful to the Court to understand about the issue, but not

12    really be able to provide any opinion about the matter because

13    you don't know -- you don't know how reliable -- you don't have

14    reliable findings.

15    Q   Now, transitioning a little bit, I first want to talk about

16    your assessment of grave risk of harm.

17    A   Sure.

18    Q   What is your understanding of what is meant by grave risk of

19    exposure to harm or intolerable situation under the Hague

20    Convention?

21        MR. MIN:  Objection.  His understanding of a legal term

22    of art is irrelevant, Your Honor.

23        THE COURT:  That's overruled.

24        You may answer the question.

25    A   It's a good question.  It's where you run into some

1    difficulties.  But, typically, it's going to be fact driven by

2    what the family is bringing to the table.  So you have to take a

3    family where they're at.  The number of permutations that can

4    develop out of a family system is really quite large.

5        So in this particular case, my understanding of it and what

6    was brought to me by your client, was assertions and claims of a

7    pattern of domestic violence that's of the coercive-control type.

8    And so that would be maybe a label to place on it.

9        And maybe I will stop answering the question there because I

10   could certainly go out on a limb.

11   Q   Okay.  So you mentioned domestic violence, so let's just

12   start there.  How is domestic violence defined?

13   A   It's typically -- it's hard to know where to start with this

14   one too.  There's typically behavior of one oriented towards the

15   other that has some sort of physical, psychologic, or sexual

16   harm.

17       There's different typologies of domestic violence too,

18   however.  One typology of domestic violence has to do with power

19   and control.  Typically, under that one, the underlying agenda is

20   related to domination or control of another person.  And then

21   there's often, when you are looking at the construct and trying

22   to cover that construct in full, there's a host of tactics that

23   are often employed to be able to really control another

24   individual.  And those tactics can fall in domains related to --

25   probably, more frequently, they're related to emotional abuse,

 1   belittlement, dehumanizing, threatening, use of children,

 2   economic abuse.  Often it's male to female, so you will get this

 3   air of male superiority or king-of-the-castle phenomena geared

 4   towards controlling another individual.

 5        And then beyond that, in more extreme cases, you will get

 6   physical and you will get sexual violence that is often to help

 7   aid in that control of another individual.

 8        And that's just -- that was what your client, at least,

 9   asserts and presents.

10   Q   You mentioned just now coercive control.  Is there a specific

11   definition for coercion and control in your line of practice?

12   A   Well, I thought I gave a decent one right there.  It was

13   maybe a little verbose and I apologize about it.

14   Q   Let me rephrase.

15   A   Yeah.

16   Q   What are specific examples of coercive control?

17   A   Yeah.  And, again, they come down into the tactics that are

18   used.  So that's what I was trying to do my best to explain.

19   But, again, they could be things like physical assault or sexual

20   assaults.  There could be withholding access to finances or using

21   finances to unsettle or to control another individual.  You can

22   get the use of children in there too.  It could be threats to a

23   child.  It could also be an attempt to try to gain the

24   affiliation of a child to you against the other parent.  That's

25   another one that can come up in cases.  Threats are often there.

1   There's an air of contempt that can exist in those cases as well.

2   But there's usually just kind of a host of strategies that are

3   looked at.  Isolation is another one.  Just off the top of my

4   head, I kind of just listed, in testimony, and thinking about

5   that one.  That one, I didn't think about that much before.  But

6   isolating from family, friends, community, can be something as

7   well.  So there's just a host of tactics.  That's often how it

8   looks.

9        There's usually an impact that that can have, too, on a

10  parent as well who's subject to that, if it's indeed what's going

11  on.

12  Q   Did you learn about any course of controlling behaviors in

13  the course of your work on this case?

14  A   Well, you know, all I know is what Mother reports, right, and

15  those are uncorroborated.  And, typically, just to reiterate

16  this, they typically should be reviewed with both sides, and if

17  you can't do it as a psychologist, then it usually happens

18  through the examination process in some way.  So I wouldn't know

19  how reliable they are.  But Mother did report multiple things

20  related to that issue.

21  Q   What effects does coercive control have on victims?

22  A   Well, so when you are dealing with it in a family -- you

23  know, a family law matter, for example, or even outside of family

24  law, it could be -- I don't know why there would be any

25  distinction -- but it can have a big impact on the family system.

1    And so family systems typically are commissioned, I think, just

2    by their inherent nature, to support children where they exist in

3    their healthy development.  And so it can have an impact on the

4    family system's ability to function in that role, to support

5    children towards healthy growth and development.  It can have an

6    impact related to that in various ways.  It can impact parenting,

7    in a parent's ability to do the job.  It can actually contribute

8    sometimes to -- and these are just things that would be on the

9    scope of investigation -- maybe harsh parenting.  It can

10   contribute -- in victims, they can come across looking harsh in

11   their parenting.  Sometimes it can impact their capacity due to

12   the depression and anxiety it can create.  Depression is a good

13   example of a reasonable causal factor to a parent not having the

14   capacity to really be mindful enough for a child to support them

15   and meet their developmental needs often in their day-to-day

16   lives.  It can create an atmosphere of fear.  Certainly, that's

17   like from a parent's perspective, a parent who is the subject to

18   the violence.  It could certainly result in mood disorder,

19   anxiety disorder.  There's trauma and stressor-related disorders

20   that can contribute to as well, like post-traumatic stress, if

21   it's severe enough and impactful enough.  It can cause a parent

22   to question their own perception of reality.  And that's another

23   impact that that can have on a parent.

24        And that's just the parent.  That doesn't even get to the

25   child yet or a child who might be raised in that kind of

1  environment.

2  Q    So let's talk about the children.  What effects could

3  domestic violence and coercion and control have on a child raised

4  in that sort of environment?

5  A    You could look at kind of immediate and long term, you know,

6  but I don't know that they -- they kind of interrelate in a lot

7  of ways.  But the fear, being unsettled, feeling like they're

8  responsible or have to take responsibility, the parentification

9  of children.  That can be something that's very real.

10      Your Honor, there's this developmental concept or idea, what

11  they call multifinality.  It's, basically, you can take two kids

12  that are very closely -- maybe related even genetically and

13  subject them to the same stressor and they can have different

14  outcomes.  And that seems to be true for children raised in this.

15  So you can get some kids who have what they call like

16  "externalizing" problems.  That can be things like oppositional

17  defiance or conduct problems, behavioral problems.  Some are

18  going to be more internalizing problems that are going to relate

19  to kind of more mood struggles, could be depression, their own

20  anxiety.

21      If they're victims directly of it, in physical ways that

22  could do harm or result in serious injury, they could also

23  experience some trauma and stress-related conditions.  It can

24  impact their social development.  It can impact their education.

25  It can be quite taxing on their young and growing psyche.  So a

1  lot of resources that, you know, might be devoted towards meeting

2  developmental tasks related to maybe social skill development or

3  soccer skills, or whatever they might be involved in, it can take

4  away from that.  And so it can contribute to reasonable delays in

5  some areas.

6      It can be really quite a bag full, depending on the severity

7  and the nature and how chronic it is.  There's a lot of things

8  that can go into it.

9  Q   So I guess, just for example, you just said it can take away

10  from the child's development of soccer skills.  How exactly does

11  it take away from the child's development of soccer skills?

12  A   You have to kind of ask yourself, again, where are the

13  psychological resources going.  You know, are they going

14  internally to manage and cope with the distress, you know, or

15  maybe take responsibility for a parent.  And, you know, there's a

16  finite amount of resources or psychological resources somebody

17  might have to devote to different things.

18      And you see this too, also, with older individuals.

19  Sometimes you will see people that might have to drop out of law

20  school or can't work very well because they're so wrapped up and

21  sucked into, you know, that world.  That that's drawing so much

22  of their time and energy and emotional resources that they can't

23  devote it to even functioning in other areas of life.  And that's

24  why you can -- at least, you know, one way you might put it, that

25  you might have some -- it could result in capacity problems in

1   other areas.

2   Q   In your report, you note that patterns of coercion/control

3   can extend to what is available to control another person.  What

4   do you mean by that?

5   A   What I mean by that is what might lend itself to leverage of

6   an individual who is oriented or carries an attitude of such.  So

7   one, maybe, example to illustrate that is that there is a risk if

8   there is -- if it is a coercive control case and that's the

9   flavor of domestic violence that exists in a matter, then what

10  can be used to leverage, and in divorce and separation, it often

11  has to do with children and money because it's what tethers

12  people together ongoing.  I would say, at the same time, there is

13  a co-parenting relationship there, so they do have to continue to

14  negotiate as well, and that can be often something that keeps

15  people in a type of relationship, even if it's not a romantic

16  relationship.  And so those are often things that just become

17  available to use to unsettle or to try to manipulate or to

18  control another person.  And there's just a myriad of ways that

19  those can play out.

20  Q   You mentioned just now use of a child.  What does that mean?

21  A   So I'll just maybe pull an example from Mother.  Again, this

22  is subject to examination to determine if this is something

23  that's really happening, because I don't know, which is why I

24  can't draw conclusions about this issue in this case.

25        But one of the things that was raised by your client, when I

1    met with her, related to that if she didn't succumb to the sexual

2    desires of her husband, the father, then there was shaking of the

3    child or some sort of physical harm that would befall the child

4    as a way to do that, and then the child would be presumed to be a

5    leverage point or something important to your client under that

6    scenario.  But that's one of the ways that she had represented

7    that.

8    Q    You also note in your report that a pattern of coercion/

9    control can extend into divorce and separation, with a common

10   tactic being use of the child when there are no other options

11   available.  What do you mean "when there are no other options

12   available"?

13   A    That might be just -- I might have worded that a little bit

14   better, and I could certainly think of different ways that I

15   could have worded that.  But my point in that sentence would be

16   this, and that would be that if this is a case of that flavor,

17   there is a risk -- and that's a probabilistic statement -- that

18   it's possible that the child could continue to -- could be

19   subject to the use in the tactics that are employed if it

20   continues post-separation, if it's that kind of case.

21        And, again, there's just different ways that that can happen.

22   Sometimes it can happen through trying to gain the support of a

23   child against a parent, it can happen through withholding, or it

24   can happen through -- and sometimes it's not just withholding a

25   child, but there's this idea, we call it "hostage taking" in

1  divorce and separation, where maybe you're deliberately

2  withholding things that the child might need for you to be able

3  to enact the role of parenting to meet a child's needs.  So it

4  might be sometimes, in very subtle ways, by deliberately not

5  returning needed items -- maybe it's a retainer for their braces,

6  you know, or it could be certain things that are required for

7  their extracurricular activities -- for the purposes of just

8  being unsettling to the other person and making things difficult

9  or even punishing, or whatever, you know, the motive is from

10  there, because I can only speak hypothetically from experience in

11  working with families.  But that's a risk.  And, again, the

12  creativity is probably the ruling factor here because it's just

13  what opens itself up for availability.  You don't ever know.  But

14  if there is a course of controlling manner and if it does

15  continue post-separation, then it often will just glom on to

16  what's available in kind of an opportunistic way.

17  Q   In your report, you state that abuse and the extension of

18  abuse to children is a violation of a fundamental human right

19  with real impact.

20          MR. MIN:  Your Honor, can we just get page cites or some

21  sort of Bates number cites for where counsel is reading from in

22  the report so we can follow along?

23          THE COURT:  Please do so, counsel.

24          MS. SEIPEL:  That's fine.  Thank you.

25          THE WITNESS:  I have a copy of my report, but I don't

1    have the one with the page numbers on it.  Would that be helpful?

2              THE COURT:  She will probably just put the screen up

3    with the copy that you need.

4              THE WITNESS:  Okay.  Thank you, Your Honor.

5    Q    Okay.  So I am looking at page 5 of 8 here.

6    A    5 of 8.

7              THE COURT:  This is Exhibit 302, counsel?

8              MS. SEIPEL:  Yes, Your Honor.  Apologies.  Thank you.

9    Q    You state here that abuse and the extension of abuse to

10   children is a violation of a fundamental human right with real

11   impact.

12        Can you tell me what you mean by that statement?  Why is it a

13   violation of a fundamental human right?

14             MR. MIN:  Objection to the extent that that calls for

15   some sort of legal conclusion or a legal statement, Your Honor.

16             THE COURT:  All right.  That objection is overruled.

17   A    Typically, those fundamental rights are going to relate to

18   things like liberty, health, freedom, security.  Those are often

19   what you'll find.  They can also extend to things like freedom

20   from being subject to torture, inhumane, or dehumanizing

21   treatment.  And that's what domestic violence is looked at as, as

22   depriving somebody of, or subjecting somebody to, in the latter

23   case.

24   Q    How does one draw the line between corporal punishment and

25   child abuse?

1    A   Oh, not well, to be really honest with you.  You just have to

2    make, you know, enough reports of child abuse to the state to

3    realize how messy that can be.  Like one of the demarcations, for

4    example, of the state, when you call, they always want to know,

5    "Well, did you see a mark?" or "Was there a mark?"  You know, if

6    there's not, they're "Thanks.  We will note it down," and kind of

7    that's the end of it.

8        But corporal punishment has to do with, typically, physical

9    forms of development.  And then you might have that not leaving a

10   mark, right?  And then you might have it existing in a much

11   broader pattern that has -- it's found itself in a fairly toxic

12   family system related to things that are emotionally abusive in

13   nature.  You know, things where there's maybe manipulation and

14   use of guilt, threats in parenting, and it's sufficiently chronic

15   and severe that it's -- it might even potentially, in some cases,

16   have, you know, greater impact compared to the situation where

17   had maybe a spanking left a mark, you know.  They're really

18   tricky situations.  And so that's why I say I don't think it's

19   done very well.  I think you have to take every case at its facts

20   and look very closely at those things.

21       And going back to this methodological question, which I know

22   came up in my deposition, but it's, I think, fairly clear that

23   there is a question about trying to establish reliability around

24   findings related to that too.

25       Now, every discipline seems to have their way of doing that.

1    Psychology certainly has theirs as well.  But, you know, state

2    child protection agencies have their approach and family court

3    has one, criminal court has a different one, you know.  So

4    it's -- just a lot of that can be context dependent as well.  And

5    it can also relate to what question you are trying to answer

6    also.

7    Q    Does child abuse affect children in any different ways than

8    domestic violence in the home affects children?

9    A    Well, in some ways, it's all family violence.  I do think

10   that maybe the generally accepted principle around that is what I

11   had defined earlier, and that has to do with this developmental

12   concept of multifinality.

13       A lot of it can depend on the child, it can depend on the

14   child's vulnerability, and what their -- some children come in,

15   they're fairly resilient, you know, and they can sometimes take

16   things that you wouldn't want them to have to take, and other

17   children can experience things that are similar and not handle

18   them well, they can regress quite significantly, depending on the

19   vulnerabilities that they come into the situation with.

20   Q    Does the concepts of domestic violence and coercion and

21   control implicate grave risk of harm under the Hague Convention?

22            MR. MIN:  Objection as it calls for a legal conclusion.

23            THE COURT:  So noted, but it's overruled.

24   A    From my understanding, you know, I think it's a valid

25   objection that I -- you know, I'm not putting myself out as a

 1   legal expert, but I certainly have to testify to matters and

 2   evaluate matters related to impact and harm on a child, and so

 3   I'm going to be coming at it from my own discipline, and that's

 4   the discipline of psychology.  And so domestic violence is often

 5   equated with a form of child abuse.

 6   Q    So to be clear, the impact that you have testified about

 7   today, that is qualified as harm to a child?

 8   A    Yeah, it would be.

 9               MR. MIN:  Objection.  Leading.

10               THE COURT:  It is leading, counsel.  Sustained.

11        Counsel, it's 3:15.  We took a short break.  We will take

12   our afternoon recess at this time.

13               THE WITNESS:  Thank you, Your Honor.

14               THE CLERK:  Please rise.

15                         (Recessed.)

16               THE COURT:  Good afternoon, again.  Please be seated.

17               THE WITNESS:  Thank you, Your Honor.

18               THE COURT:  You may resume your examination.

19               MS. SEIPEL:  Thank you, Your Honor.

20   Q    (By Ms. Seipel:)  Dr. Poppleton, have you formed an opinion

21   regarding grave risk of harm regarding this family?

22   A    No, I have not.  And I didn't put one in my letter either.

23   Q    Why not?

24   A    Yeah, maybe I didn't explain that well earlier on.  But I do

25   think when you are trying to establish that, the psychology --

1  and I mentioned that different disciplines have different ways of

2  addressing their investigations of matters, and I don't think you

3  can do that from a one-sided approach, nor do I think you can do

4  it through a child.  And so I had access to the child and I had

5  access to Mother, and that's going to fall short of an ability to

6  be able to come to a reliable finding on that matter.  And you

7  would have to have a finding under the rules of your discipline

8  in order to base an opinion on, and I just don't have one.

9  Q    If you had access to Father, would you have been able to make

10  an opinion?

11          MR. MIN:  Objection.  Calls for speculation.

12          THE COURT:  Sustained.

13  Q    In your opinion, is there any sort of undertaking or other

14  action this Court might take to minimize any risk to a child upon

15  return to Singapore?

16  A    So I have to assume some things to answer that question.  So,

17  I guess, what context are you asking me that in?

18  Q    Let me rephrase.  If the Court orders the child to be

19  returned to Singapore, is there anything the Court might do to

20  minimize any impact to the child?

21  A    So let me try to tackle that because it requires me to have

22  to assume various things.

23          So are you saying, as a premise of that, that there would

24  also be a finding of coercive control, domestic violence?

25  Q    No.

1    A    Okay.  Well, without that, there's less of an issue, right,

2    because that's what I understand is specifically the claim of the

3    grave risk of harm.

4         Children, generally speaking, would need to adjust to a new

5    school, they might need to adjust to a new home.  That can depend

6    on a couple of things.

7         So I do look at this child, and I think that there are some

8    potential resiliency concerns that would need to be addressed,

9    but if you have two parents, under this hypothetical, who are

10   capable and able to support and facilitate the adjustment of the

11   child back to -- or to anywhere, frankly, to Singapore, and under

12   your question, a lot of that will relate to the parents and their

13   ability to do that.  And that would be reconnecting, right?

14   Reconnecting with different services, whether it be medical -- it

15   seems like those services were also connected in Washington, from

16   the testimony I listened to.  But would be connecting with

17   services there related to education, related to the neighborhood

18   and friends that they might have.  It could relate to their

19   dental and mental care.  But that would be a large factor that

20   would contribute to that, under ordinary circumstances.

21        MR. MIN:  Objection.  Move to strike as nonresponsive.

22   The question was what this Court could order that would lessen

23   any impact on the child, and the answer is talking about the

24   connections the child needs to make or remake or reconnect to in

25   Singapore.

1           THE COURT:  I'll allow the answer.

2           MR. MIN:  Okay.

3           THE COURT:  Please continue with the next question.

4    Q   (Ms. Seipel:)  Dr. Poppleton, I want to now turn to your

5    interviews with the child in this matter and your analysis under

6    the mature child exception.  What is your understanding of the

7    mature child exception under the Hague Convention?

8           MR. MIN:  Objection as it calls for a legal conclusion.

9           THE COURT:  Overruled.  It's a question of what his

10   understanding is.

11          MR. MIN:  Well, Your Honor, just on that note, his

12   understanding is irrelevant to the extent that he's not here to

13   make that determination, as he's not the finder of fact.  So I

14   don't believe his understanding is relevant, but I understand

15   Your Honor's ruling.

16          THE COURT:  Overruled.  The next question -- you

17   understand the question, sir, or would you like it repeated?

18   A   I actually -- I believe I do, but if I could, could you

19   repeat the question, just to make sure there's some continuity

20   there?

21   Q   Of course.

22       What is your understanding of the mature child exception

23   under the Hague Convention?

24   A   I think I wrote my understanding of that in the letter, but

25   my understanding is that the child actually objects to a return,

1  and that there is an age and degree of maturity that the child

2  has attained that would suggest that those views should be taken

3  into consideration.

4  Q   How much time did you spend with the child in this case

5  during the course of performing your role?

6  A   Not much.  I think maybe a total of an hour.

7  Q   Why only an hour?

8  A   I don't think I needed more than an hour.  But I think

9  there's reasons for that.

10  Q   What are those reasons?

11  A   I could do this -- answer that in contrast, but I won't.  I

12  will answer this straight, and that is, is that when a parent is

13  bringing their child in to see you in some way, typically, you

14  need to have enough rapport with the child to be able to, I

15  guess, talk to them and have them open up and answer, and

16  questions to you, and I think that I was able to borrow the

17  rapport maybe that I had with Mother and that Mother's trust in

18  me was something that really helped facilitate that.

19      So, you know, I didn't spend a whole lot of time in any

20  rapport-building phase.  I spent kind of mostly maybe some

21  administrative stuff.  And I had a child who was really wanting

22  to talk to me about things and different aspects of his life, and

23  so I was able to, I think, move into that fairly fluidly, and we

24  had a good conversation about things that I was interested in

25  knowing.  And so I just don't think it required a whole lot of

 1   time.

 2       I mean, certainly, I think I could complain about my own work

 3   and maybe I could have spent a lot more time, but I didn't.

 4   Q   Did A███ express to you whether or not he wants to be

 5   returned to Singapore?

 6   A   I wrote that down.  I asked him what his desires were -- I

 7   asked him fairly directly -- and he said that his desire was to

 8   stay in the state of Washington.

 9   Q   Did he say why?

10   A   Yeah.  I think he said why from his experience and I think he

11   said why from a perspective that I would expect, given his age

12   and what I could observe about and potentially draw inferences

13   about his stage of development.  But, yeah, he did.

14   Q   Did he consider how his opinion might affect his father?

15   A   I asked him about that, because I was curious about how it

16   might affect other people, and I think he first started

17   discussing -- again, this is without looking at my letter; I put

18   it in there -- but I discussed about how it might impact maybe

19   some friends he had there.  But I asked him specifically about

20   his dad because, you know, I found him to be a significant figure

21   in his life, and he didn't think it would have much impact on his

22   father.

23   Q   In your time with the child, were you able to assess his

24   level of maturity?

25   A   I think when you look at that -- I looked at him.  He's a

1   delightful kid.  He's a fun person to talk to.  He could engage

2   in some perspective taking.  He could engage in some, from what I

3   could tell, some potential strategies and problem solving.  The

4   way that he talked about things demonstrated a degree of kind of

5   genuine logic, but it wasn't a high level of logic.  I think I

6   would put this kid at really a concrete, operational stage of

7   development, which is not full development, typically, but as

8   typically for children that fall between, I think it's like ages

9   7 and maybe 11, off the top of my head, if I remember that right.

10  But he's not an abstract thinker.  He's not going to think about

11  things deductively, for example.  He's probably not going to be

12  an active, you know, problem solver in jury-like deliberations.

13  He's too young.

14      But, certainly, he thinks, he has his opinion, he reasons

15  from things that seem to be immediately available to him in his

16  vicinity and his life.  And so I think that's probably just based

17  on -- just in that -- I'm giving you my observational points.

18  But based on my observations, I think I would put him at that

19  concrete stage.

20  Q   So you said the stage of concrete -- the concrete operational

21  stage of development.  What is that?

22  A   Well, I think I weaved in that with a lot of what I just

23  said, but it's where you get more the introduction of what you

24  might consider, you know, genuine logic, you know, logical

25  problem-solving skills.  They can take and understand that others

1   might have a different perspective about life.  You know, they --

2   there is a degree of empathy and socioemotional maturity that can

3   come out of that as well.  And that might be a succinct way to

4   define that.

5   Q    Did the child exhibit to you logical problem-solving?

6   A    I think you could probably have done some tests related to

7   that.  I do know that there was some medical -- or not medical

8   records.  I think there were school records that I received.  I

9   don't remember when I got them.  But they kind of demonstrated

10  that he had engaged in some engineering tasks in class, and there

11  was some reports of them looking at -- I think it had to do with

12  garbage dumps across the world -- this is just off my memory and

13  without looking at it -- but looking at some of the problems that

14  were related to that and how those things might solve.  So he

15  certainly appears to have been engaging in some of that through

16  school.

17        When I asked him things, he would understand -- like there

18  was some situation -- at least one situation that he got in that

19  he talked to me about where it seemed like he was kind of caught

20  between parents around some of the issues that they were dealing

21  with, and he seemed to understand that his behavior might be

22  having some impact on one of them in particular, and he was able

23  to articulate that dynamic in a way that I felt captured it

24  fairly well also.  But that's a different question than the

25  problem-solving one, you know.

 1      So I didn't see strong indication that would put him outside

 2   of that stage of development.  But, you know, this is just based

 3   on an interview and some record review, so it has its

 4   limitations.

 5   Q    Did you consider whether Mother might be exerting undue

 6   influence over the child?

 7   A    I thought about that.  There was fairly obvious indicators

 8   from his report to me that his mother was having conversations

 9   with him about some of the -- the interparental matters that were

10   happening.

11      I was curious in his personal reasons why he wanted to stay

12   in Washington, if they might have had something to do with those

13   things.  I can't rule out completely that they might set a

14   backdrop to maybe where he is situated, and there could be kind

15   of a predisposing or stage-setting, you know, contribution that

16   those things had.

17      But as far as his report to me as to his reasons why, it

18   really just boiled down to the fact that he felt like he had a

19   great prospect for friends and he liked the weather better.  It

20   was just things non-related to that.  So it wasn't in his

21   articulations.

22      But, again, you know, there's -- for every case, every

23   observation, there's always a formulation that goes with it, and

24   that's probably important to know as well.  And that

25   formulation has -- part of that formulation has to do with maybe

1   what might set the stage for why someone is situated the way they

2   are and could that be an influential factor.  You know, I

3   certainly think that's a possibility.  But I didn't -- to bring

4   it down very concretely, Your Honor, it just didn't work into his

5   articulated reasons.

6            MS. SEIPEL:  I have nothing further.

7            THE COURT:  Cross-examination.

8            MR. MIN:  Thank you, Your Honor.

9                         CROSS-EXAMINATION

10  BY MR. MIN:

11  Q    Good afternoon, Dr. Poppleton.

12  A    Good afternoon, counselor.

13       It's good to see you again.

14  Q    It's nice to see you.

15  A    Yeah, yeah.  We said the same thing.  Jinx.

16  Q    Have you ever testified in a Hague Convention case before?

17  A    I have, yeah.

18  Q    Okay.  How many times?

19  A    Oh, we went through this, I think, in the deposition.  I

20  don't know that I did a good job then either.

21       I believe I can think of twice, but don't hold me to that.

22  But I believe two.

23  Q    What were the issues in those cases?

24  A    One of them had to do with the maturity of a particular

25  child, from what I recall, and I don't think it had a grave risk

1   component.  This is off the top of my head.  But the other one

2   was largely related to a grave risk issue.

3   Q    Okay.  You didn't list those cases in which you testified in

4   your report, correct?

5   A    Not in my report.  I think I provided those to you,

6   ultimately, in an e-mail after -- I think after the first day of

7   my deposition.

8   Q    You said one of them dealt with mature age exception; is that

9   correct?

10          MS. SEIPEL:  Objection.  Relevance.

11          THE COURT:  That's overruled.

12  A    I believe so, yes.

13  Q    And the other case, do you recall the issue in the other

14  case?

15  A    Yeah.  I believe I said that a minute ago.  But from my

16  recollection, I believe it was -- and I would be very shocked if

17  I'm wrong about this -- it had to do with the grave risk issue.

18  Q    And you recently had a Hague case, correct, in which you

19  didn't testify?

20  A    Yeah.  I believe your law firm -- well, both these law firms

21  I, frankly, believe were involved.

22  Q    Right.

23          And the issue in that case was grave risk of harm, correct?

24  A    It was grave risk of harm in that one too.

25  Q    Ultimately, you did not testify in that case; is that

1   correct?

2   A   I did not, no.

3   Q   How many Hague cases, in which you've been retained, have you

4   been retained by respondent's counsel?

5   A   I think I was able to tabulate that for you in that e-mail,

6   but I believe out of the five that I have been involved in, four

7   of them were, from my recollection.

8   Q   Including the one you just mentioned where it was both law

9   firms involved, correct?

10  A   Well, I think I'm including -- maybe I'm -- I could be -- my

11  memory could be wrong.  I believe I'm including this one, but I

12  could be wrong.

13  Q   Fine.

14      The recent case was heard at evidentiary hearing in December

15  2024; is that correct?

16          MS. SEIPEL:  Objection.  Relevance.

17          THE COURT:  It's overruled.

18  A   I'm not sure.  It wasn't terribly long ago.  So it might have

19  been in the last 30 days or 45 days.  I actually don't remember.

20  But it's not too long ago.

21  Q   And that was in Oregon, correct?

22  A   Yeah.  It was in -- it might have been Eugene, if I remember

23  right.

24  Q   In that case, the issue was whether or not there was a grave

25  risk of harm to a young child, correct, in returning to France;

 1    is that correct?

 2              MS. SEIPEL:  Objection.  Relevance.

 3              THE COURT:  It's overruled, counsel.  It goes to the

 4    witness's qualifications and his ability to render opinions in

 5    this particular case.

 6    A    I believe it might have been two children, but maybe you're

 7    correcting my memory on that, that it was one.

 8    Q    It was --

 9    A    So I can't recall.  But your question around one makes me

10    wonder if my memory is right.

11    Q    It was two children.  I apologize.

12    A    Okay.  Then my memory is correct on that.

13    Q    But the issue was grave risk of harm if returned to France,

14    correct?

15    A    That is correct.

16    Q    Okay.  And you assessed one or both of the children?

17    A    I don't recall exactly.  I think I interviewed both those

18    children.  But, again, you're going back to a case that was a

19    month ago, and I don't -- I don't -- like it's one case to the

20    next.  But I believe I interviewed both of them.

21    Q    You are what's called a "mandatory reporter," correct?

22    A    Uh-huh.

23    Q    And what does that mean?  Please explain.

24    A    Typically, it means if there is some sort of suspicion of

25    risk of harm, that you make a report.

1    Q    In that case, in Oregon, you reported suspicion of harm to

2    the Department of Human Services, correct?

3    A    I did, yeah.

4         My recollection of that is, is that --

5    Q    "Yes"?  It's a "Yes" or "No" question.

6    A    Yeah.

7    Q    You did, right?

8    A    Yeah.

9    Q    Did you do that in this case?

10   A    I did.

11   Q    You did.

12        Where?

13   A    In Washington.

14   Q    You didn't note that in your report, did you?

15   A    No, I didn't note that in my report.

16   Q    You did note it in the report in the other case, though,

17   correct?

18   A    I don't recall.  I might -- I believe so.  I don't know.  You

19   would have to -- I would have to look at the report.

20   Q    You don't believe that was valuable information to include in

21   your report here?

22   A    No.  I think I reported that after.  I had the deadline to

23   get the report out, so I -- yeah, I don't know what to tell you.

24   Q    What was the risk of harm that you reported to social

25   services in Washington?

1    A    It was just domestic violence.  But I don't believe they

2    accepted that, and I didn't think they would, but -- there wasn't

3    a mark.

4    Q    Okay.  So the social services in Washington didn't accept the

5    complaint?

6    A    No.  They told me they wouldn't accept it.  They said they'd

7    just note it down.

8    Q    Do you recall the specific allegations or context in which

9    you made this complaint?

10   A    Not off the top of my head.  I think it was more of a general

11   complaint.

12   Q    So you just generally described domestic violence or did you

13   make a specific allegation or complaint regarding an incident or

14   a series of incidents?

15   A    No.  So, yeah, this is my -- you are getting into my own

16   gripe.  My history with the Department is, is that they're not

17   going to accept reports related to domestic violence.  They're

18   going to accept those when there's actually some sort of harm or

19   mark on a child.  I testified to that earlier.  So all I could

20   testify to is that there's at least some report of domestic

21   violence in the home, and that's it.

22   Q    Okay.  Did you tell respondent that you made such a

23   complaint?

24   A    I don't believe so.  It just wasn't -- the other one, my

25   understanding was, it was going to be investigated.

1    Q    What do you mean by "the other one"?

2    A    The one that you referred to in Eugene.

3    Q    What was the outcome of that case?

4    A    I have no -- oh, in terms of the Department's investigation

5    or the case itself?

6    Q    The Hague case itself.

7    A    My understanding of that was -- is that they had -- and I

8    don't know exactly what the settlement was, but they ended up

9    settling the case.  I don't know if it was the first day or

10   second day.

11   Q    Did the children go back to France?

12              MS. SEIPEL:  Objection.  Relevance.

13              THE COURT:  Sustained.

14   Q    What is the basis in which you report child abuse to social

15   services?  What is your standard for when you issue a report?

16   A    Well, it depends on the states.  Typically, there's some sort

17   of reasonable suspicion, but I'm trying to remember how it's

18   worded in Oregon.  But the Oregon one is a little bit different.

19   Where it has to do with harm to the child that I think -- and my

20   wording might be wrong on this -- but it would be related to a

21   report of the child themself or someone related to the child or

22   the perpetrator, the alleged perpetrator.  So they can just be a

23   little bit different, depending on where you are at.

24   Q    You talked about your experience evaluating families,

25   correct?

1    A    Sure.

2    Q    Okay.  And that's outside the context of Hague cases,

3    typically?

4    A    Typically, yeah, by a large margin.

5    Q    In your Hague experience, have you done a full-family

6    evaluation as part of your role as a forensic expert in a Hague

7    case?

8    A    There was a case, one of the five, I guess, there are -- and

9    I'm trying to remember the facts of how that played out, and that

10   was, I think, one of them, in the deposition, I couldn't remember

11   a whole lot of facts about it -- but I believe the attorneys had

12   worked out an agreement that I would meet with both sides of the

13   case.

14   Q    Okay.  So in one of the approximate five cases you've had,

15   you were able to meet with both sides?

16   A    Yeah.  That's one fact that I remember about that case, is

17   that I was able to, by the agreement of the attorneys.

18   Q    Did you talk to respondent's counsel about meeting with the

19   father in this case?

20       MS. SEIPEL:  Objection.  Calls for work product.

21       THE COURT:  The question is "Yes" or "No."

22   A    No.  I don't -- I don't even believe that was brought up as

23   an option to me.

24   Q    Okay.  Do you believe that it would have been valuable to

25   speak to the father in this case?

1   A    I think that's a decision for you and your opposing counsel

2   to work out.  But my opinion is, is that more is often better.

3   So if you can agree to use somebody to answer those questions,

4   it might be, but I don't know that my experience has been one

5   where there's a joint agreement around one provider to do that.

6   Q    Well, let me ask you a question.  In your experience, not

7   limiting yourself to Hague cases --

8   A    Sure.

9   Q    -- are you typically appointed by the Court to do a family

10  evaluation or are you typically hired by one party or the other?

11          MS. SEIPEL:  Objection.  Relevance.

12          THE COURT:  It's overruled.

13  A    So there's -- it's a very different context, Your Honor.  So,

14  typically, there's an argument about who will be appointed, and

15  then you're appointed as an arm or extension of the Court in

16  those matters.  And so that's typically how that will work.  And

17  whether they come to a stipulated agreement on that, the parties'

18  counsel, or it just becomes an argument, with an order from the

19  Court, that's often how those will go.  But it's always going to

20  be top-down.

21  Q    Okay.  I'm not entirely sure I understood your answer.

22          So are you saying that you are typically appointed by the

23  Court, whether it's through an adversarial process or not?

24  A    No.  Well, it depends on how you are defining that.  So

25  there's going to be some order that's filed with the Court and it

1    has a signature on it, but there's a lot of times that those are

2    stipulated agreements with certain language in the order about

3    scope and, you know, what -- who's paying for it, you know,

4    there's things in there related to questions that need to be

5    answered.  And those are always done through negotiation or

6    top-down or they're handed to the parties by the Court with an

7    appointment order.  So it can be stipulated and filed or it can

8    be ordered by the Court.

9    Q    Okay.  And perhaps either I'm not understanding or there's a

10   little disconnect.  But what I'm asking you is whether or not, in

11   your experience, you are hired by one party directly or, if in

12   your experience, you act, I guess, as a mutual evaluator

13   appointed by the Court or agreed by both parties to be the

14   forensic evaluator for the family?

15            MS. SEIPEL:  Objection.  Compound question.

16            THE COURT:  Counsel, where are you going with this, just

17   to move things forward?

18            MR. MIN:  No, Your Honor.  I mean, I think I'm relating

19   it back to what he's testified to, was that's something that

20   should be worked out with opposing counsel.  So I'm trying to get

21   a little context for how typically he operates in forensic

22   evaluations and in what situations he may seek to interview both

23   sides or what context he's being directed by counsel, as to what

24   activities to take in a particular case.

25            THE COURT:  What theory of your case is advanced by you

 1   asking that particular question?  Which answers the question of

 2   what relevance the answer would provide.

 3            MR. MIN:  Oh, I think it's quite relevant, Your Honor,

 4   in terms of highlighting the limitations of his report and the

 5   deficiencies of his report.  In the event that it was a failure

 6   on his part to even seek or consider evidence that might be

 7   contrary to someone who may have paid his bills' position in this

 8   case, then it certainly goes to credibility and to weight.

 9            THE COURT:  Then let's go down that lane, counsel, as

10   opposed to your maneuver to go around through a different basis

11   to get to the question.

12            MR. MIN:  I thought, Your Honor, it would be helpful to

13   establish that that's not how he typically operates, but I will

14   move past it and try to get directly to the point.

15   A    Thank you.  Thank you.

16   Q    In this case, did you believe that it was respondent

17   counsel's role to determine how you evaluate respondent and the

18   child?

19   A    So you are switching the context out, right?  And so we can't

20   conflate those two things.  And that's super important to

21   understand here.

22        But I was retained as a consultant on this case, under a

23   consultant contract, and that was largely to be a Court educator.

24   Not to provide any opinion on the matter, but to provide

25   education to the Court on something that might have some

1    relevance to the issue that's before it.

2    Q    Are you familiar with the Federal Rules of Evidence on the

3    *Daubert* standard for expert testimony?

4    A    Reasonably enough.

5    Q    Okay.  And is it your understanding that the purpose of

6    expert testimony is simply to educate the Court?

7    A    That's certainly a role that exists within the domestic

8    relations sphere quite commonly.

9    Q    In federal court, it's your experience that that is the

10   common standard for expert testimony?

11            MS. SEIPEL:  Objection.  Argumentative.

12            THE COURT:  It is argumentative, counsel.

13   Q    Were you able to come to any conclusions that have scientific

14   reliability in this case?  "Yes" or "No."

15   A    Okay.  So I need to make sure I understand your question

16   first, and I think this is probably more to aid in defining that.

17   Because I think that matters.

18        But are you talking about coming to an ultimate finding or an

19   opinion, when you ask that question?

20   Q    An opinion.

21   A    Okay.  I don't have an opinion in my letter.

22   Q    Okay.

23   A    And I haven't provided an opinion, and there's a good reason

24   I haven't done that from day one.

25   Q    So it's fair to say you have not provided this Court, or in

1    your evaluation, any opinion that has any scientific reliability?

2    "Yes" or "No."

3            MS. SEIPEL:  Objection.  Argumentative, asked and

4    answered.

5            THE COURT:  The witness testified, counsel, he didn't

6    have an opinion.

7    Q   So I want to go back to the question about interviewing the

8    father.

9    A   Okay.

10   Q   Did you consider whether you thought it would be valuable to

11   interview the father when you were retained on this case?  "Yes"

12   or "No."

13           MS. SEIPEL:  Objection.  Asked and answered.

14           THE COURT:  That's overruled.

15   A   I --

16   Q   "Yes" or "No."

17   A   Did I -- well, I need to understand your question first, and

18   if I don't define that question, I'm not going to be able to

19   answer it.

20       So what you are asking is, did I consider that it might be

21   helpful in doing something like that?

22   Q   Yes.

23   A   Well, of course, I considered that.  That's different than

24   whether or not it was available.

25   Q   Okay.  But did you ask respondent's counsel if that would be

1  available?  "Yes" or "No."

2  A   No.  It wasn't my understanding that I had that option.

3  Q   Okay.  So you did not know whether it was available or not

4  because you did not ask whether it was available?  "Yes" or "No."

5       MS. SEIPEL:  Objection.  Compound question, asked and

6  answered.

7       THE COURT:  It has been answered, counsel.

8       MR. MIN:  I'm sorry?

9       THE COURT:  It has been answered.

10 Q   Typically, for family evaluations, how long does the process

11 last from the first document or information you receive to when

12 you issue a report?

13      MS. SEIPEL:  Objection.  Relevance.

14      THE COURT:  It's overruled.

15 A   So this wasn't a family evaluation, and so we're talking

16 about something that's different, and I'm happy to go down that

17 path.

18      But, typically, I would request, if someone were to come and

19 ask for what's commonly called a "best-interest evaluation,"

20 which I don't believe applies in this context, I would ask for a

21 minimum of six months, minimum, to be able to go through

22 something like that.

23 Q   Why?

24 A   Well, the procedures are quite extensive.  So you need to be

25 able to keep things quite parallel.  There's lots of collateral

 1  calls that are made.  There's many and multiple interviews with

 2  the parties.  There's typically parent-child observations.

 3      It's a completely different question outside of this realm

 4  and a different set of proceedings that go with it, and they just

 5  take time.

 6  Q   What questions were you asked to answer or provide

 7  information on in this case?

 8  A   Well, I think it's within the letter that I wrote.  The

 9  question was to -- will you meet with our client and meet with

10  the client's child and provide any information to the Court that

11  you feel might be helpful related to the issues that are

12  presented to you as they pertain to this child objection and

13  grave risk of harm.  And those are going to have limitations, and

14  I will -- I will stand by this, but I believe I accounted for

15  those in that.

16  Q   What typically goes into your evaluation process when

17  assessing families or what you call "best interests" for the

18  child?

19  A   Well, this isn't a best-interests case.

20  Q   Again, I'm not asking you that --

21  A   Yeah.

22  Q   -- and the added commentary is not part of the question or

23  the answer that I'm asking you.

24      I'm asking you what goes into a best-interest evaluation, not

25  whether this case is a best-interest case.

1    A    Yeah.  I mean, I think that you're talking about interviewing

2    everybody in the family; you are talking about often

3    psychological testing, not always; you are talking about

4    parent-child observations; you're usually talking about going

5    down a list of individuals who have been involved in the family

6    from different times and perspectives, as a way to -- all in the

7    spirit of testing hypotheses about functioning and family

8    dynamics, and what might be in the best interest of a child to do

9    so.

10        So that's the most succinct way I could put that.  But I

11   could certainly go into it in more depth, if you would like,

12   counsel.

13   Q    No.  That's fair.

14        What questions are subsumed within a best-interest

15   assessment?

16             MS. SEIPEL:  Objection.  Relevance.

17             THE COURT:  Counsel?

18             MR. MIN:  Well, there is relevance depending on the

19   answer.  Because if there are overlapping questions, then the

20   processes might have some parallel relationship, Your Honor.

21             THE COURT:  Well, this isn't a best-interest evaluation

22   that was conducted.  What's the purpose and benefit of going down

23   that road?

24             MR. MIN:  Again, if there are questions subsumed by a

25   best-interests analysis that are related to this, and I

1   understand this is not a best-interest case, but best interest is

2   an overarching theme, and within that, there are certain

3   elements, such as risk from either parent to a child as part of a

4   best-interest analysis, child functioning as part of a

5   best-interest analysis, as the witness just testified.  Those

6   certainly are relevant to the questions at hand here, and so the

7   process in which -- that the doctor employed in this case, to

8   some extent, has some direct relationship.  Now, I'm not saying

9   that the processes are equal, but some aspects of the process

10  would mirror that of a fuller family evaluation.  That is my

11  point.  And I'd like the witness to talk about the aspects of a

12  best-interests analysis to see and educate the Court as to

13  whether there is some comparison to be made.

14       THE COURT:  I'll allow limited latitude, counsel,

15  because the witness has already testified what this case

16  involves, what his directives were by way of his consultation,

17  and your questions are starting to go far afield and meandering

18  as opposed to the issues in this particular case.  So I'm going

19  to give you some latitude, counsel.

20       MR. MIN:  Your Honor, if I can be heard on that point

21  quickly?

22       THE COURT:  Quickly, counsel.

23       MR. MIN:  Yeah.  I mean, Your Honor, I understand what

24  the witness says are the issues in this case.  We disagree with

25  his representation of what the issues are in this case.  And we

1   also find that, because of those limitations placed on him, it's

2   a limitation on his ability to aid this Court in what this Court

3   ultimately has to determine.  And that is the point of this line

4   of questioning, but I will make it very brief, Your Honor.

5          THE COURT:  All right.  Please proceed.

6          MR. MIN:  Yeah.

7          THE WITNESS:  Thank you.

8          MR. MIN:  Your Honor, if I could ask the court reporter

9   to read back my last question?

10         THE COURT:  I think your question was regarding what

11  questions were subsumed in the family evaluation.

12         MR. MIN:  In a best-interests analysis, yes, Your Honor.

13  Thank you.

14  A   I will try to jell a little bit to make it a little bit on

15  point.

16      But let's say in a best-interest evaluation, one of the

17  issues that gets raised, which is a family-systems issue, is one

18  of domestic violence, just to throw that out there, that would

19  unequivocally call for -- and I think this speaks to the

20  limitations of me that he's trying to get to, and so I will help

21  there too -- call for an evaluation directly of the alleged

22  perpetrator, of their level of risk and whether or not they have

23  a propensity towards violence, or domestic violence as a broader

24  scope.  And so that would be certainly, in trying to bring this

25  together, something that would be included in a best-interest

1    evaluation that might overlap with a Hague matter where grave

2    risk of harm is an issue.

3        And you're right, I was not able to do something like that.

4    Q    There are other aspects of a best-interest analysis that

5    could have been useful in this case, such as what you'd testified

6    to earlier, child functioning, correct?

7    A    So, typically, it's going to relate a little bit differently.

8    And that might relate to maybe the actual level of competency and

9    resiliency of a child, and then what might be needed throughout

10   the entire family system that continue to support a healthy

11   course across those two factors.

12   Q    Right.

13       I mean, you understand that the question of grave risk of

14   harm to a child is a fact-specific inquiry about a specific child

15   in a specific family within a specific context, correct?

16   A    Yeah, I can -- I would never dispute that.

17   Q    So the resiliency and competency of this child is certainly

18   an important component of what risk of harm he may be faced with

19   if returned to Singapore, if at all, correct?

20   A    Yeah, yeah.

21       I will take that one step further and amplify what you are

22   saying, and that is, is that if you have a child that, let's say,

23   devoid of -- like resiliency is a bounceback question.  It has a

24   lot to do with their emotional and, you know, maybe clinical

25   levels of depression or anxiety, and if they're devoid of any of

1  that, then, yeah, it would -- it could be a very relevant factor

2  in terms of calibrating the level of risk to that child.

3  Q    Right.

4       And so if a child is highly resilient, and I apologize if I'm

5  no using the psychological term, but --

6            THE COURT:  Counsel, counsel --

7            MR. MIN:  Slow down.

8            THE COURT:  -- repeat the question.

9  Q    If a child is highly resilient compared to -- has low

10 resilience, that could impact on a conclusion as to what sort of

11 risk of harm a child may face?

12 A    Yeah.  So like a child who has depression versus one who

13 doesn't, the child with depression might be more vulnerable than

14 the one who doesn't.  That's what your question is, right?

15 Q    Right.

16 A    Yeah, I would agree with -- I would agree with that from a

17 general principle perspective.  I still think you need more

18 factors.  But from just a way of thinking about it, I would -- I

19 wouldn't disagree with that.

20 Q    But one of the limitations you had in this process is you

21 were not able to evaluate this particular's child resiliency or

22 competency, correct?  "Yes" or "No."

23 A    I got a survey that I don't think is quite -- it's less

24 helpful than I would want it to be.  But I do think that that is

25 something that could be -- add information beyond what I'm able

1   to provide to the Court, yes.

2   Q    Okay.  Did this child come across to you as resilient or not?

3   A    It's hard to always know what's going on internally with a

4   child.  The child came across to me as complaining of being

5   bored.  I chuckle a little bit because I remember it in my

6   interview with him.  But a little bit of being bored, wanting

7   some stimulus in his life, and, you know, not feeling like he was

8   getting it from grandma at the moment.  And he came across as a

9   reasonably delightful child.  That's a different question than

10  going down a diagnostic approach.

11       He did -- I did ask him some questions about that, and I have

12  my notes here, and he did report that he's -- some emotional --

13  things related to some emotional struggles.  But I would have to

14  probably look at my notes to recall exactly what he said.

15  Q    Right.

16       You talked about being bored here in Washington, correct?

17  A    I think that was related to his grandma at the moment and not

18  providing a lot.  But, yes, it happened in Washington, right?

19  Q    Right.

20  A    We could probably say that.

21  Q    Right.

22       You understood that this child had not lived in the state of

23  Washington since the summer of 2022, correct?

24  A    Yeah, it was several years.

25  Q    Okay.  And would you agree that if the child was doing well

1    in Washington, that would be evidence to support that he may be a

2    resilient child?

3    A    If he's doing well in Washington, it may support that?  Yeah,

4    from a general perspective, I think I would agree with that.

5    Q    Right.

6         Which would also then lend evidence to support that if

7    returned to Singapore, he would also be resilient in adapting

8    back to Singapore, a country in which he's only not lived in for

9    two months, correct?

10   A    Yeah.  It assumes --

11             MS. SEIPEL:  Objection.  Compound, argumentative.

12             THE COURT:  It's overruled.  You may answer the

13   question.

14   A    Yeah, I can handle that, I think.

15        So if he's going -- you're saying if he is resilient, meaning

16   he's not experiencing depression, anxiety, stuff like that, then

17   he could handle a transition better than one that would, one that

18   is, and if he handled one move under those circumstances, could

19   he potentially handle another?

20        It would lend support for that.  Let's just leave it at that

21   as a fair answer.

22   Q    One data point, if you will?

23   A    One data point, I think, would lend support for that, if

24   those things are true.

25   Q    So another thing that is valuable in a best-interest

1   evaluation, that may have been valuable here -- and I will get

2   sort of directly to the point, to speed things along --

3   A    Thank you.

4   Q    -- is evaluating a parent-child dynamic; is that correct?

5   A    Yeah.  Those typically come in interviews and observations.

6   Q    Okay.  And you did not really observe the mother and the

7   child together; is that fair?

8   A    Only in transition and maybe for a minute.

9   Q    Okay.  So it would be fair to say that one of the limitations

10  of your report was the inability to evaluate the mother-child

11  dynamic in this case directly?

12  A    Yeah.  So, counsel, there's lots of limitation why you are

13  not getting an opinion out of me, right?  But certainly if you

14  want to expand this out to something greater than what I'm able

15  to provide, yeah, that would be a limitation.

16  Q    And it goes without saying that, of course, you never

17  observed the father-child dynamic?

18  A    No, of course not.  I mean, that's a risk assessment for you

19  to make and to determine, not for me.

20  Q    You are a member of the AFCC; is that fair?

21  A    I am, yeah.

22  Q    And that's the -- well, why don't you tell me what that is?

23  A    Everyone gets it wrong.  Association of Family and

24  Conciliation Courts.

25  Q    What is that organization?

1    A    There's just like a flagship organization.  I think they have

2    a journal, a think tank, put on conferences, put out, you know,

3    practice guidelines to aid and support the field.  But they're

4    really just a club or an organization that's there to, I think,

5    support people who work in family law matters.

6    Q    Mental health professionals and lawyers?

7    A    Judges, mediators, special masters, guardians ad litem.

8    Q    Are there guidelines for what information should be reported

9    in a forensic evaluation report, as part of the AFCC?

10    A    So they have guidelines for the other, you know, report you

11    are talking about, which is related to those best-interests

12    evaluations.  They have some guidelines related to handling

13    forensic evaluations.  But it's -- I don't think they have any

14    guidelines on providing, largely, Court education.

15    Q    So did you believe that the guidelines did not apply to you

16    in this case?

17    A    Well, you would really have to put those into quite the

18    Procrustean bed to be able to force those in.  But they're

19    certainly principles that could be relied on there to a degree.

20    But they're geared towards a different question.

21    Q    Well, one of the principles in those guidelines is to report

22    whether or not your meetings were in person or by Zoom, correct,

23    or by some other virtual means?

24    A    Yeah.  I believe there's probably, off my memory, something

25    in there about that.

1   Q   And in your report, you did not report the fact that you only

2   met the mother and the child by Zoom, correct?

3   A   No.  I don't believe it's in my letter at all.

4   Q   Okay.  And that is a fact, right?  You only met the mother

5   and the child, in terms of your evaluation, over video, correct?

6   A   Yeah.  I did not meet with them in person.

7   Q   Okay.  And how many times did you meet with them?

8   A   I believe I testified to that.  I believe it was twice, each,

9   off the top of my head.

10  Q   And I think you said you met with the child, total,

11  approximately one hour?

12  A   Total of an hour, from my recollection, that's correct.

13  Q   And how long did you meet with the mother for?

14  A   I believe it was a total of four hours.

15  Q   Okay.

16  A   But between two meetings.  But that's just off the top of my

17  head.  It will be close.

18  Q   Are you aware of the APA, the American Psychological

19  Association, guidelines for reporting in forensic settings?

20  A   Yeah.  And I think they have some for -- some guidelines for

21  custody evaluations.

22  Q   Do you comply with those or follow those guidelines,

23  typically?

24  A   When I'm doing custody evaluations, I try to do those the

25  best I can.

1   Q   In general, do you believe it's important to obtain material

2   facts and information when performing a forensic evaluation?

3   A   Yeah.  I think I testified to that.  If you are able to do

4   that.  If not, then you're -- it's going to limit your ability to

5   provide an opinion that's based on anything reliable.

6   Q   And we talked before, we used a phrase "data point," right?

7   A   You did, yeah.

8   Q   Okay.

9   A   I like how you used it, so I'm going to go with it.

10  Q   Okay.  Do you believe it's important, when conducting a

11  forensic evaluation, to utilize multiple methods of data

12  collection as part of your process?

13  A   Yeah.  I mean, your -- I think you're reshaping what I'm

14  doing here.  But I would agree that, under different

15  circumstances, that would be something that would come into play.

16  Q   You don't agree that in any forensic evaluation, it's

17  important to try and obtain multiple methods of data collection?

18  A   I think that it's important, as an aspirational thing, to do

19  that, but if you can't do that, then you don't have a reliable

20  basis to make recommendations.  And that's just going to be an

21  inherent reality of that situation.  But, yeah, I don't disagree

22  with the principle at all.

23  Q   In general, when evaluating children and parents, can we go

24  through some methods of data collection that you have employed

25  historically?  And I'll start off, one is, of course,

 1   interviewing and meeting with the parent and/or child, correct?

 2   A    Well, I will make it easy.  There's really only five.  So you

 3   have got interviews; you've got usually observations; you are

 4   going to have collateral contacts; collateral source of

 5   information; and psychological testing.

 6            THE COURT:  Slow down.

 7            THE WITNESS:  Oh, I'm sorry, Your Honor.  Are we okay

 8   with that?

 9        Okay.

10   A    So those are generally what you are going to have available.

11   Q    Okay.  So I just want to make sure I understand.  One is

12   interviews?

13   A    Observations.

14   Q    Observation?

15   A    Collateral contacts.

16   Q    That means people?

17   A    People.

18   Q    Okay.

19   A    Collateral source information.  And if you want to,

20   psychological testing.

21   Q    Okay.  And collateral sources of information, aside from

22   contacts, generally means documents, recordings?

23   A    WhatsApp, text messages.  Like stuff you were presenting in

24   court, right.

25   Q    Right.

1        And then testing?

2    A    Yes, in some cases.

3    Q    Okay.  Why were you not able to do any testing in this case?

4    I withdraw the question.

5        You did not do any testing in this case, correct?

6    A    No, I did not do any testing in this case.

7    Q    Why did you not do any testing in this case?

8    A    I think I had an extremely limited amount of time.  I had

9    very hefty deadlines to meet in this thing, and it just wasn't

10   practical to be able to do that.

11       It's possible that I could have gave maybe what was given by

12   the other expert, which is a CVCL, but I just didn't do it.  I

13   was trying to get an interview done and out, based on

14   observations in the interview alone, and that's just what I did.

15   Q    When were you retained in this case?

16   A    Oh, we went through this in deposition.

17       I think it was the Friday or so before Thanksgiving week,

18   off the top of my head.

19   Q    So latish November?

20   A    Latish November.

21   Q    And the date of your report is December 8th, correct?

22   A    With a week vacation in there.

23   Q    Okay.

24   A    So you've got to put that in there.  I was gone for a week.

25   Q    You are familiar with the MMPI test?

1    A    I'm familiar with it, yeah.

2    Q    What is the MMPI test?

3    A    It's a personality test.

4    Q    It's a personality test?

5    A    Yes.

6    Q    An inventory?

7    A    Well, it's in the name, but it's a large personality test.  I

8    believe it covers something like 85 different, you know -- well,

9    there's multiple versions of it, but it covers usually the

10   psychopathology realm of personality.

11   Q    Have you ever employed this test?

12   A    I have.

13   Q    Okay.  For what purpose?

14   A    Usually for developing hypotheses about a particular case.

15   Q    Okay.  Any specific type of case?

16   A    I use them in child custody cases where I am doing a best-

17   interest analysis.

18   Q    What type of hypotheses are you looking to investigate in a

19   child custody case that would lead you to use the MMPI test?

20   A    They usually have to do with parenting functioning and

21   relational functioning, often.

22   Q    Parental functioning and relational functioning, are those

23   used or assessed as part of a risk assessment to a child in a

24   custody case?

25   A    So you switched on me.  Because I think you can only -- the

1  MMPI is going to have some limited ability to do that.  You might

2  be able to understand some things about personality and

3  orientation, but when you are talking about risk assessments,

4  those are typically going to look at identifying what the actual

5  alleged risk is and then trying to understand an individual from

6  a formulation of risk of future, I guess, events, whether it's

7  child abuse or domestic violence.

8  Q    Okay.  So as part of a risk assessment, is an MMPI test

9  valuable to ascertain whether or not someone's potential

10  personality disorder may impact on a risk to a child?

11  A    It could.  It depends on the facts.  But it certainly could.

12  Q    How long does it take to go through the MMPI test?

13  A    They tell you, with a college degree, it should take you an

14  hour, but my experience is more.

15  Q    What's your experience?

16  A    My experience is more like an hour and a half for people to

17  get through the MMPI-2.

18  Q    So with the two, two and a half weeks, between the date you

19  were retained, the date you wrote your report, with a week

20  vacation in between, you couldn't spare an hour and a half to do

21  an MMPI test?

22  A    Who would I do that to/with?

23  Q    No value to do that to the mother?

24  A    Well, my preference would be to do that with the individual

25  who's identified or alleged to be the risk.  And so that was at

1    least my understanding going into it.  Now, there might be

2    information later on that changes the framing of that, that might

3    lend itself to the answer I think you are seeking from me.  But I

4    think it would be, from my understanding at that point in time

5    even till now, that it would be more appropriate -- and, again, I

6    don't even know if it would be appropriate with this family

7    because you have to look at the norm -- but to look at that as it

8    relates to the individual who is alleged to be the risk, the one

9    who you should be doing the risk assessment on.

10              THE COURT:  Last question, counsel.

11              MR. MIN:  Okay.

12   Q   Wouldn't the MMPI test have value for the mother to assess

13   hypotheses as to the mother's, I guess, reaction to a history of

14   domestic violence?

15   A   There can be value in that, absolutely.  I would agree with

16   that.

17              THE COURT:  All right.  We will stop here.

18        And, sir, you're aware that this case is stopped for the day

19   and that it will be continued to January 21 and 22.

20        Is there any reason you would not be available to return on

21   the 21st or 22nd?

22              THE WITNESS:  No.  I'm here for you, Your Honor, and I

23   will make sure that that works.

24              THE COURT:  Okay.  Thank you.  You may step down.

25        Counsel, before we break, counsel has inquired as to the

1    status of Dr. -- or Mr. Favaro's ability to testify.

2        The Court is going to permit him to testify as to true

3    rebuttal testimony.  True rebuttal in the sense of what your

4    expert is testifying about and nothing beyond.

5        I still want copies of the reports that have been provided,

6    and the agreements of counsel, in terms of what has been redacted

7    and what's not been redacted, so that I have clarity as you are

8    going through your examination.

9        Counsel, you are still free to interpose an objection if you

10   believe the examination is going beyond the scope of true

11   rebuttal testimony.  But beyond that, that will be the

12   limitation.

13       If there's nothing else to take up, we will be in recess.

14       MR. MIN:  Yes, Your Honor.  Just one.  I understand we

15   are coming back January 21st.  Is Your Honor going to admit the

16   reports of Dr. Day and Dr. Favaro with that caveat and

17   understanding?

18       THE COURT:  Well, as long as you understand, counsel,

19   that even though you give me or I admit the report, it's only the

20   portion of the report that fits within the confines of rebuttal

21   testimony.

22       MR. MIN:  Understood.

23       THE COURT:  Okay?

24       MR. MIN:  Yes, Your Honor, I understand.

25       You also excluded the report of Dr. Day, and I'm not entirely

 1   sure if that needs to be addressed.  Again, she's testifying

 2   about methodology, not about her personal observations or

 3   evaluations of the child.

 4       I will note she had to leave because she has some great

 5   family news coming soon, so she had to leave early today, and she

 6   informed me that she would only be available by Zoom on the 21st

 7   and 22nd.  I believe by the Court's latest order about Zoom

 8   testimony, that shouldn't be an issue, but I just wanted to let

 9   the Court be aware of that.

10            THE COURT:  Okay.  That's fine.

11       All right.  We will be in recess.  I will see you all on the

12   21st.

13            THE CLERK:  Please rise.

14            THE COURT:  And one last thing.  Counsel, in the

15   interest of minimizing the volume of motions that have been

16   recently filed, if you believe that there's a justification or

17   basis for another motion, I'm going to direct that you not file

18   another motion, that you contact the Court's deputy, and that you

19   provide this Court a very brief, written, joint statement of what

20   the issue is, and I will take the matter up by way of a telephone

21   conversation.  That will expedite resolution and minimizes the

22   imposition on staff and this Court.  Is that understood?

23            MS. SEIPEL:  Yes, Your Honor.

24            MS. SKINNER:  Yes, Your Honor.

25            MR. MIN:  Understood, Your Honor.

1      THE COURT:  We will be in recess.

2                      (Adjourned.)

3

4

5                  C E R T I F I C A T E

6

7      I, Nickoline M. Drury, RMR, CRR, Court Reporter for the

8  United States District Court in the Western District of

9  Washington at Seattle, do certify that the foregoing is a correct

10  transcript, to the best of my ability, from the record of

11  proceedings in the above-entitled matter.

12

13

14                      /s/ Nickoline Drury

15                      Nickoline Drury

16

17

18

19

20

21

22

23

24

25